# EXHIBIT
# A

{FG-W0483218.}

2021 WL 4482987
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

In re 3M COMPANY SECURITIES LITIGATION

Case No. 20-CV-2488 (NEB/KMM)
|
Filed 09/30/2021

ORDER ON DEFENDANTS' MOTION TO DISMISS

Nancy E. Brasel United States District Judge

**\*1** Plaintiffs allege that 3M Company and certain of its chief executives violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 by materially understating 3M's potential legal and financial exposure related to its historical manufacture, distribution, and disposal of PFAS.[1] Defendants now move to dismiss the operative Complaint, asserting that Plaintiffs fail to meet the heightened pleading burden under the Private Securities Litigation Reform Act ("PSLRA"). For the reasons below, the Court grants the motion.

## BACKGROUND

### I. The Complaint Allegations
Reduced to its essence, the Complaint alleges as follows: (1) 3M has been sued repeatedly for damages relating to its manufacture and disposal of PFAS, which are toxic chemicals; (2) 3M disclosed the PFAS-related lawsuits to investors in various securities filings; and (3) those disclosures—and attendant statements by 3M executives— were inadequate to apprise investors of the potential extent of 3M's PFAS-related liability.

### A. PFAS
The history of the manufacture of PFAS dates back to the 1940s. Beginning approximately then, 3M developed "per- and polyfluoroalkyl substances," or "PFAS," a class of synthetic chemical compounds. (ECF No. 44 ("Compl.") ¶ 4.) These compounds were used to manufacture a range of commercial and industrial products, including high-temperature fire-fighting foam. (*Id.*) 3M manufactured PFAS at industrial facilities in Cottage Grove, Minnesota, as well

as chemical plants in Alabama and Illinois, and at sites in Belgium and Germany. (*Id.* ¶ 81.) 3M allegedly disposed of PFAS and its waste byproducts into public waterways and unlined dumps, leading to environmental contamination near 3M facilities and hundreds of other sites. (*Id.* ¶ 40.) 3M claimed that PFAS were safe and that they "created no risk of material environmental or other liability" for 3M. (*Id.* ¶ 6.)

3M allegedly knew, but did not disclose, that it was selling "toxic poisons" to the public for decades. (*Id.* ¶ 3.) Internal 3M documents suggest that 3M had completed studies in the 1950s indicating the toxicity of PFAS to animals and humans. (*Id.* ¶ 47.) In the 1960s, 3M allegedly knew that PFAS would pollute American drinking water sources, and an internal 3M manual and study found PFAS to be toxic. (*Id.* ¶¶ 41, 48.) In the 1970s, 3M knew that PFAS were toxic to fish and could impact human food sources, investigated its employees' exposure to PFAS, and recommended reducing their exposure to it. (*Id.* ¶¶ 43, 50.)

3M released a "trove" of scientific data to the United States Environmental Protection Agency ("EPA") in 1998. (*Id.* ¶ 58.) The next year, a 3M scientist concluded that PFAS was "more damaging than PCB[2]," and another described PFAS as "one of the strongest cancer promoters" the scientist had ever seen. (*Id.* ¶ 46; Pls' Ex.[3] 2 at 15.) In September 2019, a 3M senior vice president acknowledged to Congress that 3M had "studied the potential impacts of PFAS ... for decades." (Compl. ¶ 63.) Defendants allegedly knew that PFAS created massive environmental and human health consequences, and covered up 3M's knowledge of the harmful effects for PFAS. (Compl. ¶¶ 57, 63.)

**\*2** In 2000, 3M announced that it would begin to phase out its PFAS production. 3M ended its production of PFAS in 2008. (*Id.* ¶¶ 59–61; Defs' Ex.[4] 3 at 116.)

### B. Governmental Oversight and PFAS-related Litigation
In May 2016, the EPA raised standards relating to PFAS and drinking water safety, "significantly expand[ing] the scope of the contamination problem for 3M." (Compl. ¶¶ 68–69.) In 2017, the states of New Jersey and Minnesota set more stringent standards for acceptable PFAS levels in their states' drinking water. (*Id.* ¶ 74 (New Jersey); Pls' Ex. 2 at 1, 21 (Minnesota).)

At the same time, 3M and others faced multiple personal injury/toxic tort lawsuits over PFAS. In February 2017, E.I. du

Pont de Nemours & Company ("DuPont")—a PFAS customer of 3M—and related companies agreed to pay $671 million to settle thousands of personal injury lawsuits relating to PFAS exposure. (*Id.* ¶¶ 38, 95.)

### C. Minnesota AG Litigation against 3M

In 2010, the Minnesota Attorney General sued 3M over its manufacture and disposal of PFAS ("AG Litigation"). The Attorney General accused 3M of deliberate disregard of "the substantial risk of injury to the people and environment of Minnesota from its continued manufacture of [perfluorochemicals] and its improper disposal." (Compl. ¶ 87); *Minnesota v. 3M Co.*, No. 27-CV-10-28862 (Minn. Dist. Ct.).

### D. 3M's Financial Disclosures in 2017

The lawsuit before this Court is not a toxic tort or personal injury lawsuit against 3M. Instead, it alleges securities fraud based on the way 3M disclosed the underlying PFAS litigation. 3M's 2016 Form 10-K and quarterly filings for 2017 disclosed particulars about the PFAS litigation, including information about the AG litigation and several lawsuits filed in Alabama and other states. (Defs' Ex. 3 at 117–19; Defs' Ex. 5 at 34–38; Defs' Ex. 6 at 39–43; Defs' Ex. 7 at 40–45.) As the AG Litigation progressed, 3M updated the information given to the public. Its quarterly filings disclosed that the case was set for trial in February 2018. (Defs' Ex. 6 at 43; Defs' Ex. 7 at 44.) The 2016 Form 10-K and quarterly filings for 2017 also state that for the environmental litigation matters for which 3M did not record a liability, 3M "believes any such liability is not probable and estimable and [3M] is not able to estimate a possible loss or range of loss at this time." (Defs' Ex. 3 at 119; Defs' Ex. 5 at 38; Defs' Ex. 6 at 43–44; Defs' Ex. 7 at 45.)

### E. 3M's 2017 Form 10-K

3M filed its 2017 Form 10-K on February 8, 2018—just a few weeks before the AG Litigation trial was set to begin. In describing the AG Litigation, 3M disclosed that "[i]n September 2017, *the State's damages expert submitted a report that contends the State incurred $5 billion in damages,*" and 3M had "*filed a motion for summary judgment contending … that the State's claims are barred by the applicable statute of limitations.*" (Defs' Ex. 8 at 124 (emphasis added); *see* Compl. ¶ 111.) The 2017 Form 10-K noted that 3M's motion for summary judgment was pending, and that the court had urged the parties to resolve the litigation

before trial and had appointed a mediator. (Defs' Ex. 8 at 124.) 3M explained that "[i]f the parties are not able to resolve the matter, the trial is scheduled to begin in February 2018." (*Id.*) 3M also warned that an adverse ruling, judgment, or settlement "could result in future charges that could have a material adverse effect on [3M's] … consolidated financial position." (*Id.*) Finally, 3M stated that it had recorded no liability on its financial statements because it believed any such liability was "not probable and estimable." (*Id.*)

### F. Settlement of the AG Litigation and 3M's Disclosure of It

**\*3** Next came a classic "courthouse steps" settlement in the AG Litigation. On February 20, 2018—just a few weeks after 3M filed its 2017 Form 10-K, and on the day the trial was scheduled to begin—3M announced an $850 million settlement of the suit. (Compl. ¶¶ 106, 109.) Under the settlement terms, 3M was to pay the State $850 million in the form of a grant for certain environmental projects, up to $40 million more for temporary water treatment solutions, and the State's litigation expenses. (*Id.* ¶¶ 106–07; Defs' Ex. 9.) Along with the settlement announcement, 3M filed a Form 8-K disclosing that it had recorded a pre-tax charge of $897 million. (Compl. ¶ 112; Defs' Ex. 12 at 4.)

*Analysts' Reaction*. The next day, an analyst remarked that "the $850 million settlement far exceeds the ~$50 million of recorded environmental liabilities on the company's balance sheet...." (Compl. ¶ 113.) Another analyst noted that pending litigation in other states was "likely to cue off of this case to varying degrees." (*Id.*¶ 114.) And although 3M management "maintain[ed] there is little risk in other suits," analysts noted that "they still bear watching, as the sheer magnitude [of the AG Litigation settlement] is something of an outlier." (*Id.*)

*April 24, 2018 Investor Call.* During an investor call on April 24, an analyst asked Defendant Michal F. Roman—who was then 3M's Chief Executive Officer—if the settlement of the AG Litigation set a precedent for other states. (Compl. ¶ 119; Defs' Ex. 10 at 5.) Roman responded, "This is a unique situation. This is our home state and something that we've been working on with them for a number of years. This is a unique situation in both the nature of the case as well as the process that we're working through with them." (Defs' Ex. 10 at 5 (ECF pagination); *see* Compl. ¶ 120.)

*SEC's Inquiry*. Shortly after Roman's call with investors and a few months after the AG Litigation settlement, the United States Securities and Exchange Commission asked 3M to

explain why it had recorded no liability related to the AG Litigation in its 2017 Form 10-K, but disclosed an $850 million settlement soon after. (Compl. ¶ 116; Defs. Ex. 11.) The SEC asked 3M to address its use of certain accounting methods. (Defs. Ex. 11.)

The SEC's inquiry centered around general accepted accounting principles ("GAAP"), and in particular, the Financial Accounting Standards Board Accounting Standards Codification 450, Contingencies ("ASC 450"). *See* 17 C.F.R. § 210.4-01(a)(1) (financial statements not prepared in accordance with GAAP are presumed misleading or inaccurate). To understand this background (and the parties' arguments), a brief primer on ASC 450 is necessary.

*ASC 450: When Accrual Is Required.* Under ASC 450, a reporting entity must accrue for a loss contingency only where an unfavorable outcome is both (1) probable and (2) reasonably estimable. ASC 450-20-25-2. "Probable" is defined as "likely to occur." ASC 450-20-20, Glossary. Under ASC 450, the term probable "is intended to refer to at least a 70% chance of occurrence." (Defs' Ann. [5] D at 3.) The filing of a suit or formal assertion of a claim does not automatically mean that accrual of a loss is appropriate. ASC 450-20-55-13. Rather, the entity must assess whether an "unfavorable outcome" is probable. *Id.*

The "reasonably estimable" requirement of ASC 450 "is intended to prevent accrual in the financial statements of amounts so uncertain as to impair the integrity of those statements." ASC 450-20-25-4. "If some amount within a range of loss appears at the time to be a better estimate of loss than any other amount within the range," the entity is to accrue that amount. ASC 450-20-30-1. But if no amount within a range of loss is a better estimate than any other amount within that range, the entity must accrue the minimum amount within that range. *Id.*

**\*4** *ASC 450: When Disclosure Is Required.* If a loss is only "reasonably possible"—that is, the chance of the loss occurring is "more than remote but less than likely"—then the entity does not accrue for the contingent loss, and instead must disclose (1) "[t]he nature of the contingency," and (2) "[a]n estimate of the possible loss or range of loss *or* a statement that such estimate cannot be made." ASC 450-20-50-4 (emphasis added); ASC 450-20-20, Glossary (defining "reasonably possible"). ASC 450 prefers disclosure to accrual "when a reasonable estimate of loss cannot be made." ASC 450-20-25-2; ASC 450-20-50-5 (same); *see*

ASC 450-20-55-13 (requiring disclosure, rather than accrual, if an unfavorable outcome is reasonably possible but not probable, or if the amount of loss is not reasonably estimable).

*3M's Response to the SEC.* In a written letter, 3M explained to the SEC that the AG Litigation liability was neither probable nor reasonably estimable under ASC 450-20-25-2, and so it was not recorded in the 2017 Form 10-K. (Defs' Ex. 12 at 4 (ECF pagination).) The liability was not *probable* because at the time 3M filed the Form 10-K, 3M had pending dispositive motions asserting "a substantial statute of limitations defense that, if successful, would have completely barred the State from recovery," as well as other substantial legal and factual defenses supported by expert reports and scientific studies. (*Id.*) The liability was not *estimable* because there was no reasonable basis to identify any particular amount with a range of loss that was more likely to occur than any other. (*Id.*) And "because any liability arising from this litigation was neither probable nor estimable, or if estimable had a low end of the range of $0, [3M] concluded that no accrual for this matter was required" for its 2017 Form 10-K. (Compl. ¶ 117; Defs' Ex. 12 at 4–5.) 3M further explained to the SEC that "[b]etween December 31, 2017 and February 8, 2018"—the date the 2017 Form 10-K was filed—3M was proceeding along "two parallel paths": on the one hand, "actively preparing to try the case"; and on the other hand, participating in mediation discussions in which the parties remained "far apart." (Defs' Ex. 12 at 5.) During that time, 3M asserted, "no event or development occurred in the litigation that changed [3M's] view of the case as of the balance sheet date or as of the date [3M] filed its Form 10-K." (Compl. ¶ 117; Defs' Ex. 12 at 5.) In February before the settlement, 3M continued on these two parallel paths, simultaneously preparing for trial and discussing settlement. The result was settlement, but the "[k]ey critical terms and amounts lending themselves toward resolution did not come together until shortly before trial," with the parties agreeing on an amount and other material terms on February 20, the day the trial was scheduled to start. (Defs' Ex. 12 at 5.)

Upon receiving 3M's response, the SEC took no further action.

*Disclosure of 3M Documents.* After announcing the AG Litigation settlement, the Minnesota Attorney General posted internal 3M memoranda and other correspondence on a website. This information "made clear that 3M was aware as far back as the 1970s ... that PFAS pose a serious risk to public health." (Compl. ¶ 115.) And this information appeared

to fuel further lawsuits: later litigation brought against 3M and others alleging PFAS contamination cite information disclosed by the Minnesota Attorney General, as well as the EPA's heightened regulations for PFAS levels in drinking water. (Pls' Ex. 3 ¶¶ 1, 13, 106, 118 (Oct. 2018 class action on behalf of Michigan residents whose drinking water had been contaminated by PFAS from Wurthsmith Air Force Base); Pls' Ex. 4 ¶¶ 12, 39, 60 (Feb. 2019 lawsuit alleging PFAS contamination in New Jersey).)

### G. 3M's Other Disclosures Made in 2018

**\*5** After the settlement with the Minnesota Attorney General, each of 3M's 2018 quarterly findings continued to disclose information about other PFAS-related litigation. In these statements, 3M accrued amounts ranging from $54 million to $69 million for PFAS-related liabilities (identified as "other environmental liabilities"), and explained that for matters for which it did not record a liability, 3M "believes any such liability is not probable and estimable and ... is not able to estimate a possible range of loss at this time." (Defs' Ex. 13 at 36–39 (1Q18 Form 10-Q); Defs' Ex. 14 at 41–44 (2Q18 Form 10-Q); Defs' Ex. 15 at 42–46 (3Q18 Form 10-Q).)

### H. 3M Disclosures Made in 2019

3M filed its 2018 Form 10-K in February 2019. (Defs' Ex. 16; Compl. ¶ 23.) Like 3M's prior disclosures, this Form 10-K disclosed litigation over historical PFAS manufacturing operations in Alabama and Minnesota, state attorneys general litigation relating to PFAS, as well as aqueous film forming foam ("AFF Foam") environmental litigation, and other PFAS-related litigation. (Defs' Ex. 16 at 115–19.)

*April 25 Report of 1Q19 Results.* On April 25, 2019, 3M reported results for the first quarter of 2019, which included, among other things, that its sales decreased by five percent and its adjusted earnings per share ("EPS") decreased 10.8% year-on-year. (Compl. ¶ 122; Defs' Ex. 18 at 2 (ECF pagination).) 3M also announced two significant litigation issues that impacted its first-quarter results: (1) a litigation reserve of $235 million "to resolve certain environmental matters and litigation ... related to its historical manufacture and disposal of PFAS-containing waste" in Alabama, Illinois, Minnesota, Belgium, and Germany; and (2) a litigation reserve of $313 million for "coal mine dust lawsuits." (Defs' Ex. 18 at 3; *see* Compl. ¶¶ 122–23, 131, 190.)

During an earnings call that day, Roman explained that the new PFAS reserve of $235 million covered "certain environmental matters and litigation related to the manufacture and disposal of PFAS at five 3M facilities including three in the United States and two in Europe." (Defs' Ex. 19 at 3.) When asked why 3M's reserve for manufacturing and disposal matters "might not just be 850 [million] times 4," representing the amount of the AG Litigation settlement multiplied by the four other sites where 3M manufactured and disposed of PFAS, Roman explained,

> our manufacture footprint is different in every one of those sites. And so, that's part of it. But really, I guess what you can take from this is it's not ... simple math of multiplying times 5. We now define probable and estimable for the litigation that we face in those five sites as with this reserve. So that is ... the way we have determined what is estimable across that.

(*Id.* at 19.)

One analyst commented 3M's $235 million reserve "look[ed] low vs. $800m+ paid to Minnesota." (Compl. ¶ 127.) 3M stock fell around 13% that day. (*Id.* ¶ 130.)

*1Q19 Form 10-Q.* The next day, 3M filed its 1Q19 Form 10-Q, in which it explained that 3M increased its reserve based on a recently completed "comprehensive review with the assistance of environmental consultants and other experts regarding environmental matters and litigation" relating to the PFAS past manufacturing operations in Minnesota, Alabama, and Germany, and four former landfills in Alabama. (Compl. ¶ 131.[6])

*May 15 Earnings Call.* During an analyst conference on May 15, 2019, Defendant Nicholas Gangestad—who was then 3M's Chief Financial Officer—stated:

> **\*6** We also established a PFAS reserve of $235 million to cover certain environmental matters and litigation related to our manufacture and disposal of PFAS at 5 3M facilities, including 3 in the United States and 2 in Europe. This reserve does not cover any product claims related to PFAS.

...

> On PFAS, the ring-fence I would call it is ring-fenced around liability around our 5 manufacturing sites and disposal of PFAS. Because that's a view where we looked at all the discussions going on in all of the sites, all the litigation and putting our best estimate together of what we think all of those costs will be. So that portion, I would call ring-fenced.

(Defs' Ex. 21 at 5, 8 (ECF pagination); Compl. ¶ 137.)

In June, a Barclays analyst issued a report estimating that 3M's potential liabilities could total $5 billion for PFAS-related liabilities. (Compl. ¶ 139.)

*July 8 Disclosure.* On July 8, 2019, 3M announced that it had begun to investigate possible PFAS contamination in three municipal landfills that had accepted waste from 3M's Alabama plant. (Compl. ¶ 140.) 3M explained that "for the past several months, 3M has been conducting a thorough search for former landfills ... to test for any waste that may include PFAS." (*Id.* ¶141.) The price of 3M common stock fell 1.6% that day. (*Id.* ¶ 143.)

That same day, an analyst estimated that 3M's liability could be anywhere from $6 billion (based on cases filed to date) to $22 billion (based on the contaminated sites identified to date). (Pls' Ex. 9 at 1.) The analyst also noted these estimates could prove to be conservative, but that "favorable trial verdicts [for 3M] could push the manufacturer liability in the opposite direction." (*Id.*)

### I. Consistent Statements in 3M's Financial Disclosures

3M's annual financial disclosures for 2016, 2017, and 2018 all state that 3M "complies with the requirements of ASC 450, Contingencies, and related guidance," and the specific accrual and disclosure requirements of ASC 450. (Defs' Ex. 3 at 112 (2016 Form 10-K); Defs' Ex. 8 at 117 (2017 Form 10-K); Defs' Ex. 16 at 110 (2018 Form 10-K).) As for accruals, 3M stated that it "records liabilities for legal proceedings in those instances where it can reasonably estimate the amount of the loss and the loss is probable." [7] (Defs' Ex. 3 at 112 (2016 Form 10-K); Defs' Ex. 8 at 117 (2017 Form 10-K); Defs' Ex. 16 at 110 (2018 Form 10-K).) And 3M "discloses significant legal proceedings even where liability is not probable or the amount of the liability is not estimable, or both, if [3M] believes there is at least a reasonable possibility that a loss

may be incurred." (Defs' Ex. 3 at 112 (2016 Form 10-K); Defs' Ex. 8 at 117 (2017 Form 10-K); Defs' Ex. 16 at 110 (2018 Form 10-K).)

3M also included cautionary language about litigation risk, warning of the "difficult[y in] reliably predict[ing]" and "inherent uncertainties" of litigation, that "unfavorable rulings or developments could occur" that could lead 3M to "change current estimates of liabilities" or "make such estimates for matters previously not susceptible of reasonable estimates," that "there can be no certainty that [3M] may not ultimately incur charges in excess of presently recorded liabilities," and that developments "could result in future charges that could have a material adverse effect on [3M's] results of operations or cash flows in the period in which they are recorded." (*E.g.*, Defs' Ex. 3 (2016 Form 10-K) at 12, 112.) "Although [3M] cannot estimate its exposure to all legal proceedings, it currently believes that such future charges, if any, would not have a material adverse effect" on 3M's financial position. (*Id.* at 112.) 3M explained that it "reexamines its estimates of probable liabilities ... each period, and whether it is able to estimate a liability previously determined to be not estimable and/or not probable," and makes "additions to or adjustments of its estimated liabilities." (*Id.*) It also noted that "current estimates of the potential impact on [3M's] consolidated financial position ... for the legal proceedings ... could change." (*Id.*)

**\*7** Between December 31, 2016, and December 31, 2018, 3M recorded between $25 million and $69 million for "other [PFAS-related] environmental liabilities." (Compl. ¶ 125; *see id.* ¶¶ 153, 159, 162, 165, 169, 176, 179, 182, 186.) 3M repeatedly disclosed that its accruals for these "other environmental liabilities" stemmed from "an evaluation of currently available facts ...." (*Id.* ¶¶ 153, 159, 162, 165, 169, 176, 179, 182, 186.) During that time, 3M's financial disclosures stated:

> For sites included in both "environmental remediation liabilities" and "other environmental liabilities," [8] at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, [3M] believes the exposure to loss in excess

of the amount accrued would not be material to [3M's] consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, [3M] cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

(Compl. ¶¶ 153 (2016 Form 10-K); 159 (1Q17 Form 10-Q); 162 (2Q17 Form 10-Q); 165 (3Q17 Form 3-Q); 169 (2017 Form 10-K); 176 (1Q18 Form 10-Q); 179 (2Q18 Form 10-Q); 182 (3Q18 Form 10-Q); 186 (2018 Form 10-K).) 3M's auditor PwC reviewed 3M's accruals on a quarterly and annual basis. After each review, PwC affirmed that the statements conformed with GAAP. (*E.g.,* Defs' Exs. 3 at 54; Defs' Ex. 5 at 47.)

### J. Post-Class Period Events
After July 8, 2019, 3M took additional charges for PFAS-related liabilities. (ECF No. 100 ("Pls' Br.") at 12–13.) In January 2020, 3M announced a litigation-related pre-tax charge of $214 million in part because, during the fourth quarter of 2019, 3M "updated its assessment of environmental matters and litigation related to its historical PFAS manufacturing operations and expanded its evaluation of the other 3M sites that may have used certain PFAS-containing material and locations at which they were disposed." (Pls' Ex. 13 at 6 (Jan. 28, 2020 Form 8-K).) According to 3M's 2019 Form 10-K, 3M recorded liabilities of $445 million for its "other [PFAS-related] environmental liabilities." (Pls' Ex. 5 at 121.) 3M continued to increase its accruals for PFAS-related environmental liabilities during the first three quarters of 2020. (Pls' Exs. 6–8.)

### K. This Litigation
Plaintiffs represent a putative class of purchasers of 3M common stock between February 9, 2017, and July 8, 2019 ("Class Period"). (Compl. ¶ 1.) They allege that 3M and the Individual Defendants (Roman, Gangestad, and former 3M CEO Inge Thulin), knew, or were reckless in not knowing, by February 9, 2017 (the day after 3M filed its 2016 Form 10-K and eleven days before the AG Litigation settlement), that 3M faced significant liabilities related to its manufacture, distribution, and disposal of PFAS. (*Id.* ¶¶ 144, 147.) Count I alleges violations of Section 10(b) of the Exchange Act and

SEC Rule 10b-5 against all Defendants, and Count II alleges violations of Section 20(a) of the Exchange Act against the Individual Defendants. (*Id.* ¶¶ 261–69.)

## ANALYSIS

### I. Section 10(b) Claim under the PSLRA
**\*8** To survive a motion to dismiss in a private securities-fraud action, Plaintiffs must plausibly plead a claim to relief under Section 10(b) and Rule 10b–5 when accepting all alleged facts as true. *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1070 (D. Minn. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, (2007)). "The PSLRA goes beyond the ordinary pleading requirements described in Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure." *In re 2007 Novastar Fin. Inc., Sec. Litig.,* 579 F.3d 878, 882 (8th Cir. 2009).

Under the PSLRA's heightened pleading requirements, a complaint must: (1) "specify each false statement or misleading omission and explain why the omission was misleading," and (2) "state 'with particularity' facts giving rise to a 'strong inference' that the defendant acted with the scienter required for the cause of action." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741–42 (8th Cir. 2002) (quoting *Fl. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir. 2001)). These two heightened pleading requirements are intended to end the practice of pleading "fraud by hindsight." *Id.* at 742 (citation omitted). As the Eighth Circuit has explained, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonabl[y] available to them." *Id.* at 743 (citation omitted). The Court considers the Complaint as a whole, as well as documents incorporated into the Complaint by reference, and matters of which a court may take judicial notice. *Tellabs*, 551 U.S. at 323.

Defendants assert that the Court should dismiss the Section 10(b) claim because it fails to plead an actionable misstatement and fails to plead a strong inference of scienter. The Court addresses each issue in turn.

### A. Actionable Misstatement

Under the PSLRA standard, Plaintiffs must "plead the existence of any facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." *Navarre*, 299 F.3d at 742. The "circumstances of the fraud must be stated with particularity, including such matters as the time, place and contents of false representations, ... [t]his means the who, what, when, where, and how." *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 980 (8th Cir. 2012) (citing *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002)).

Defendants argue that the Complaint fails to comply with the PSLRA because it amounts to "puzzle" or "kitchen sink" pleading. [9] Under this principle, courts are to disregard "catch-all" or "blanket" assertions not meeting the particularity requirements. *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 853 (8th Cir. 2005). "[I]f no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law." *K-tel*, 300 F.3d at 897 (citation omitted).

**\*9** In their Complaint, Plaintiffs include something at least akin to the kitchen sink, by alleging that entire swaths of 3M's SEC filings are false. Plaintiffs contend that they have identified the misstatements at issue by using the word-processing functions of highlighting and bold font. (Pls' Br. at 40.) Though this approach does not avoid the "kitchen sink" issue entirely, the Court focuses on and analyzes those statements below. Plaintiffs direct the Court to certain paragraphs setting forth allegedly false and misleading statements and omissions made during the Class Period and facts supporting why each is false or misleading. (*Id.* at 40 n.23 (citing Compl. ¶¶ 144—51, 172).) [10]

The parties do not dispute that throughout the Class Period, 3M (1) disclosed the nature of its PFAS-related contingent liabilities, (2) accrued for some PFAS-related liabilities, and (3) stated that it could not estimate the possible loss or range of loss for other PFAS-related liabilities. The parties quarrel over whether the Complaint adequately pleads that 3M's accruals and beliefs about the effect of future PFAS-related charges were both (1) probable and (2) reasonably estimable under ASC 450. And Plaintiffs maintain that Defendants failed in their duty to disclose an estimate of the possible "range of loss" for the PFAS-related liabilities. (Pls' Br. at

16); ASC 450-20-50-4. For the reasons below, the Court finds that Plaintiffs have not adequately alleged a material misrepresentation based on 3M's failure to accrue or estimate a range of loss for PFAS-related liabilities.

*1. GAAP Allegations*

A critical question to the resolution of this motion is whether the Complaint sufficiently alleges that 3M's disclosures failed to satisfy the requirement of ASC 450, and specifically: (a) whether 3M appropriately accrued for PFAS-related liabilities; and (b) whether 3M had a duty to disclose an estimate of a range of loss for such liabilities. But the Complaint does not mention GAAP, ASC 450, or any other accounting rule. And although Plaintiffs assert in their brief that "[t]he Complaint alleges that [3M's] PFAS-related liabilities were both 'probable' and could be 'reasonably estimated' during the Class Period," (Pls' Br. at 16), nowhere does the Complaint allege that the losses relating to PFAS were in fact "probable" or could be "reasonably estimated." *Cf.* *Luna v. Marvell Tech. Grp. Ltd*, No. 15-CV-05447-RMW, 2016 WL 5930655, at *7 (N.D. Cal. Oct. 12, 2016) ("The decisions to accrue a loss reserve requires more detailed analysis than matching expenses; therefore, more detailed allegations are required to explain how defendants violated GAAP in this case.").

a. PFAS-Related Accruals

Despite the lack of allegations about ASC 450 or GAAP in the Complaint itself, Plaintiffs' briefs argue that 3M's allegedly unrealistic PFAS-related accruals violated GAAP and therefore constituted securities fraud. (Pls' Br. at 17–24.)

3M accrued between $25 million and $69 million for "other environmental liabilities" related to PFAS through December 31, 2018. (Compl. ¶ 125.) 3M also described various litigation matters, including the AG Litigation. For environmental litigation matters described in the financial statements for which 3M did not record liability, 3M stated its belief that "any such liability is not probable and reasonably estimable and [3M] is not able to estimate a possible loss or range of loss at this time." (*E.g.*, Defs' Ex. 3 at 119; Defs' Ex. 5 at 38; Defs' Ex. 6 at 43–44; Defs' Ex. 7 at 45.) In April 2019, 3M increased its accrual for "other environmental liabilities" by $235 million, "representing [3M's] best estimate of the *probable* loss" to cover (among other things) environmental matters and litigation related to the manufacture and disposal

of PFAS at five 3M facilities. 3M also explained that it was "not able to estimate a *possible* loss or range of loss in excess of the established accruals at this time." (Compl. ¶ 131 (quoting 1Q19 Form 10-Q, emphasis added).)

**\*10** Plaintiffs maintain that the amounts 3M accrued were "materially less than [3M's] true (but undisclosed) multi-billion dollar exposure." (Pls' Br. at 17.) They point to 3M's later increases in accruals for PFAS-related liabilities, and analysts' later estimates of 3M's liabilities, to demonstrate that the earlier statements were inaccurate. These arguments alone are impermissible fraud-by-hindsight. The PSLRA "cannot be satisfied with allegations that defendants made statements and then showing in hindsight that the statement is false." *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008) (citations omitted, cleaned up).

Under ASC 450, 3M needed to accrue for losses that were probable *and* reasonably estimable at the time it issued the financial statements. Plaintiffs insist that when 3M issued its financial statements, 3M's undisclosed liabilities were probable because 3M had distributed PFAS for decades, and 3M knew of: (1) DuPont's $671 million settlement, (Compl. ¶ 96); (2) 3M's nearly $900 million settlement of the AG Litigation, (*id.* ¶ 106); (3) the Minnesota Attorney General's expert report that the State had suffered $5 billion in damages as a result of 3M's PFAS, (*id.* ¶ 111); (4) the EPA's raising standards relating to PFAS and drinking water safety, (*id.* ¶¶ 68–69); and (5) the internal 3M documents that the Minnesota Attorney General disclosed after settling the AG Litigation, (*id.* ¶ 115). (Pls' Br. at 18–19.)

Taken as true, Plaintiffs' factual allegations do not suggest that the PFAS-related liability for which 3M did not accrue was "probable,"—that is, had at least a seventy percent change of occurring—when 3M made the statements. (Defs' Ann. D at 3.) Before settling the AG Litigation, 3M moved for summary judgment on a statute of limitations defense that, if successful, would have resulted in zero liability. Nor does the Complaint allege how the DuPont settlement (to which 3M was not a party), or the EPA's heightened standards (which are "non-enforceable and non-regulatory," (Defs' Ex. 55 at 1)), made additional PFAS-related liability probable.

*See* *Luna*, 2016 WL 5930655, at *6 (dismissing securities claim based on the company's alleged failure to accrue for the domestic royalties where plaintiffs did not allege "any contemporaneous facts demonstrating that defendants must have known that Marvell would lose" in patent litigation).

And even if these alleged facts made additional PFAS-related liability *probable*, none of them offers any indication that any amount beyond 3M's accrual was *reasonably estimable*.

*See* *K-tel*, 300 F.3d at 891 ("[T]he complaint must allege facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made.") (internal quotation marks and citations omitted). Indeed, the alleged facts do the opposite: they highlight the difficulty in reasonably estimating the appropriate accrual. For example, in September 2017, the Minnesota Attorney General produced an expert opinion that 3M's PFAS had caused $5 billion in damages to the state (3M disclosed the opinion in its 2017 Form 10-K). Five months later, the parties settled the AG Litigation for a fraction of that amount ($897 million). So the expert opinion, even in hindsight, was not a reasonable estimate of liability. And the Complaint points to no other document available at the time that would garner a reasonably estimable PFAS-related exposure.

Construing all inferences in Plaintiffs' favor, the Complaint does not provide any indication that Defendants knew of a reasonably estimable amount that 3M should have accrued during the Class Period above the amounts it did accrue. Instead, the Complaint itself demonstrates that the liability was not estimable: it uses descriptions, rather than numbers, to call the potential liability "massive," "significant," and "enormous." (*E.g.*, Compl. ¶¶ 3, 104–05, 144, 146–47, 149.) [11] Plaintiffs point to analyst assessments of 3M's PFAS-related liabilities as ranging from $5 to $6 billion to more than $22 billion. (Compl. ¶¶ 139, 206; Pls' Ex. 9 at 1.) But these reports do not indicate that 3M's liability was "probable." (*E.g.*, Defs' Ex. 23 at 5 (ECF pagination) (Barclays June 2019 analyst report noting that many of the PFAS claims had a "low probability of proving causation"); *see also* Compl. ¶ 126 (alleging that a Deutsche Bank analyst wrote that 3M's "PFAS litigation remains an unquantifiable concern" in April 2019).) No reasonable investor could have been aware of 3M's public disclosures and yet unaware of the potential PFAS-related liabilities. The relevant details "were encompassed by what was communicated to the market," that is, that 3M was facing substantial liabilities relating to its historical manufacture and disposal of PFAS. *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) (finding that defendants were not liable for failing to reiterate information to which reasonable investors had ready access), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). [12]

**\*11** Plaintiffs argue that, at a minimum, the reasonable estimate of loss was "a range of amounts," and thus 3M had to accrue an amount for the loss. ASC 450-20-25-2. They contend that Defendants "did not accrue a single dollar for any liabilities related to" the AG Litigation before settlement. (Pls' Br. at 21.) But the amounts at issue in that litigation ranged from nothing—if the court accepted 3M's statute of limitations defense—to $5 billion—if the factfinder believed the Minnesota Attorney General's expert. 3M disclosed this information in its 2017 Form 10-K, along with the court's admonition that the parties attempt to settle the litigation prior to the trial set for February 2018. (Defs' Ex. 8 at 124); *see* *Luna*, 2016 WL 5930655, at \*7 (finding that plaintiff failed to allege any misstatement with respect to the company's litigation reserve where defendants disclosed the total amount of the potential loss, the status of the company's appeal, and its decision not to accrue a reserve for any part of the award); *Bank of Am.*, 980 F. Supp. 2d at 584 (finding that the company's disclosure that "[f]or some matters for which a loss is probable or reasonably possible, such an estimate is not possible" captured a potential lawsuit because the company's exposure to the suit, which ranged from zero to $10 billion, was inestimable).

Plaintiffs also rely on *In re Bayer AG Securities Litigation*, in which the court upheld allegations that sufficiently pled a material misstatement related to the drug Baycol. No. 03 Civ. 1546 WHP, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004). The *Bayer* plaintiffs alleged that during an internal meeting, safety experts told Bayer executives that the dangers associated with Baycol were "putting the brand at risk." *Id.* at \*4. Bayer later withdrew Baycol from the market, but described product liability litigation over Baycol as "unfounded" and "concluded that there was no need to establish reserves for potential losses." *Id.* at \*5–6. The defendants contended that the complaint failed to allege facts showing that "it was more likely than not that a liability had been incurred during that time, or that the amount of the potential loss could reasonably be estimated." *Id.* at \*12. The court disagreed, finding that once "defendants were aware of problems with Baycol" at the internal meeting, that "information ma[de] it more likely than not that a loss contingency would arise." *Id.* The court found that the plaintiffs "sufficiently pled a material misstatement in light of the conclusion reached at the [internal] meeting,"

but did not specially address whether the amount of loss was also reasonably estimable. [13] *Id.* at \*14.

Finally, Plaintiffs rely on *CitiGroup, Inc. Bond Litigation*, in which the plaintiffs alleged that CitiGroup materially misrepresented its "loan loss" reserves [14] because although the company "was required to hold in reserve an amount necessary to protect it against all 'likely' losses," it calculated reserves based only on assets that had already defaulted, rather than also including assets that were reasonably likely to default in the future. 723 F. Supp. 2d at 575, 592. The loss reserves allegedly violated GAAP rules "which required defendants to set aside reserves whenever it was 'probable that an asset had been impaired' and 'the amount of the loss [could] be reasonably estimated.' " *Id.* at 580 (citing complaint); *see* Statement of Fin. Acct. Standards (SFAS) No. 5. The *CitiGroup* court did not specifically address whether the amount was reasonably estimable, but noted that the complaint identified "specific factual allegations" supporting a finding that CitiGroup failed to satisfy the GAAP requirement. 723 F. Supp. 2d at 592. The court held that the complaint plausibly alleged that the loan loss reserves failed to accurately account for losses likely to incur and thus were materially misleading. [15] *Id.*

**\*12** 3M is distinguishable from the cases cited by Plaintiffs. Unlike *CitiGroup*, this Complaint does not contain specific factual allegations supporting a finding that 3M failed to satisfy ASC 450. [16] And unlike *Bayer*, the Complaint does not allege facts showing that 3M had internal information that conflicted with what it disclosed to the public. For example, 3M disclosed in its 2017 Form 10-K that the Minnesota Attorney General's expert had opined $5 billion in damages. (Defs' Ex. 8 at 124.) Although 3M did not record liability for the AG Litigation because it believed such liability was "not probable and estimable," 3M cautioned that an adverse ruling "could result in future charges that could have a material adverse effect on [3M's results of operations or cash flows ... and on the consolidated financial position of [3M]." (*Id.*); *see* *Bank of Am.*, 980 F. Supp. 2d at 582 (finding that defendants had no duty to supplement their truthful disclosures about litigation risk or its effect on profitability where the particulars of a potential lawsuit "were known to the market and thus allowed investors to evaluate the defendant's statements").

#### b. Duty to Estimate a Range of Loss

In a different argument, Plaintiffs contend that under ASC 450, 3M had a duty to estimate a range of loss for 3M's PFAS-related liabilities. (Pls' Br. at 24–27.) Under the ASC 450 standard, 3M's PFAS-related liabilities were "reasonably possible" (though not, as addressed above, probable), thus triggering a requirement different from accruing a reasonably estimable amount—that is, the requirement to disclose (a) the nature of the contingent loss, and (b) an estimate of the possible loss or range of loss *or* a statement that such estimate cannot be made. ASC 450-20-50-4. No one disputes that 3M disclosed the nature of the contingent losses related to PFAS. But, instead of estimating a range of loss, 3M stated that it could not estimate the range—something explicitly allowed by ASC 450. Plaintiffs maintain that 3M had access to specific objective information to estimate a range of loss. (Pls' Br. at 24–27.)

In making this argument, Plaintiffs rely heavily on *In re Perrigo Co. PLC Securities Litigation*, 435 F. Supp. 3d 571 (S.D.N.Y. 2020). In *Perrigo*, the defendants, upon learning of a tax liability of €1.6 billion from Ireland's tax authority, told investors that the liability "cannot be quantified at this stage" but "could be material." *Id.* at 586–87. The court held that even if the company " 'disagreed'... and intended to contest" the tax liability, the company had a duty to quantify its exposure under ASC 450. *Id.* at 586. The court rejected the defendants' position, which would have allowed a reporting entity that intended to contest an amount at issue to "avoid quantifying and reporting its exposure by saying that it disagreed with the claimant's position and there was, as of yet, no final determination on the amount of any deficiency." *Id.* at 587. *Perrigo* rightly decided that "when an issue is 'open to considerable interpretation,' an entity nonetheless must estimate the possible loss *where such an estimate can be made* and disclose that exposure to loss if the issue is resolved adversely." *Id.* (emphasis added).

*Perrigo* presents a different scenario entirely than the one presented here. In *Perrigo*, a governmental authority had calculated a specific undisclosed amount of a tax liability (€1.6B). *See id.* at 587 ("There is no question that after receipt of the Audit Findings Letter such a figure was reasonably calculable. Irish Revenue provided the number to Perrigo."). Here, in contrast, 3M was addressing multiple, early-stage litigations asserting varying environmental claims. And in the AG Litigation, a dispositive motion was outstanding.

The Complaint offers no particularities suggesting that 3M could provide a reasonable range of estimated liability. Thus, *Perrigo* does not assist Plaintiffs.

**\*13** Plaintiffs point to the SEC Staff Accounting Bulletin ("SAB") No. 114, which states that "environmental remediation liabilities typically are of such significance that detailed disclosures regarding the judgments and assumptions underlying the recognition and measurement of the liabilities are necessary to prevent the financial statements from being misleading." (Pls' Br. at 26.) But SAB No. 114 also notes that if a disclosure involves a loss contingency covered by ASC 450, it must include an estimate of possible loss *or* state that such an estimate cannot be made. (Defs' Ann. G at 135.) The Class Period coincides with the early stages of much of the PFAS-related litigation. (*E.g.*, Compl. ¶ 89 (alleging that "[s]ince 2015, numerous other cases have been filed against 3M ... for claims relating to, among other things, the PFAS contamination of Alabama's waterways, the additional remediation required to removes PFAS from municipal water supplies, and the damage caused by PFAS to public health and property."); *id.* ¶¶ 99–100 (alleging "approximately 120 class action and other lawsuits ... filed against 3M ... relating to the damages caused by PFAS contained in 3M-made AFF Foam" were consolidated into an MDL in 2018).) Plaintiffs offer no factual allegations showing that cost estimates for the PFAS-related liabilities were anything but difficult to derive because of uncertainties about a variety of factors. [17]

#### 2. Future Charges' Effect on Consolidated Financial Position

Plaintiffs also allege fraud in 3M's assurances that future losses would not have a material impact on 3M were knowingly misleading because Defendants were aware of 3M's large and increasing PFAS-related liabilities. (Pls' Br. at 9, 15, 27–31; Compl. ¶¶ 118, 144–52.) The challenged statement is as follows: Although 3M "cannot estimate its exposure to all legal proceedings, it currently believes that such future charges, if any, would not have a material adverse effect on [3M's] consolidated financial position." (Compl. ¶¶ 156, 171, 188.) Plaintiffs also challenge 3M's statement that while it "cannot predict with certainty the future costs of such cleanup activities, capital expenditures or operating costs for environmental compliance, [3M] does not believe they will have a material adverse effect on its capital expenditures, earnings or competitive position." [18] (*Id.* ¶¶ 154, 70, 187.)

Again Plaintiffs allege nothing in the Complaint that 3M knew different—no contrary facts or knowledge that 3M had and was hiding. And reasonable investors do not read sentences in financial statements in isolation. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) ("[A]n investor reads each statement within [a financial disclosure] document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information."). Here, those statements were surrounded by cautions: 3M's financial statements included warnings that "unfavorable rulings or developments could occur" that could lead 3M to "change current estimates of liabilities" or "make such estimates for matters previously not susceptible of reasonable estimates," that "there can be no certainty that [3M] may not ultimately incur charges in excess of presently recorded liabilities," and that developments "could result in future charges that could have a material adverse effect on [3M's] results of operations or cash flows in the period in which they are recorded." (*E.g.*, Defs' Ex. 3 (2016 Form 10-K) at 12, 112.) And, importantly, the statements include pages of descriptions of 3M's PFAS-related proceedings. (*E.g., id.* at 116–19.) Without any allegation indicating that 3M had possession of contrary facts, its statement of belief about the future impact of litigation cannot be the basis for a securities fraud claim.

### 3. Inactionable Opinions

**\*14** 3M argues that its accruals and beliefs about the effect of future PFAS-related charges are protected opinions. (ECF No. 91 ("Defs' Br.") at 29–31; Pls' Br. at 34–35; ECF No. 103 ("Defs' Reply") at 12); *e.g., In re Hertz Glob. Holdings, Inc. Sec. Litig.,* No. CV 13-7050, 2017 WL 1536223, at \*11 (D.N.J. Apr. 27, 2017) (holding that loss contingency determinations under ASC 450 are opinions), *aff'd*, 905 F.3d 106 (3d Cir. 2018). Opinions are actionable under the Exchange Act only if: (1) the speaker did not hold the stated belief; (2) the statements "contain embedded statements of fact"; or (3) the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare,* 575 U.S. at 184–89; (*see* Defs' Br. at 30 (applying *Omnicare* standard); Pls' Br. at 35 (same).)

*Honest Belief.* Plaintiffs argue that Defendants did not honestly hold their beliefs because they knew that 3M failed to address PFAS-related losses it was "likely to incur" and

painted a misleading picture of its liabilities. (Pls' Br. at 35.) Plaintiffs point to (1) the Minnesota Attorney General's expert opinion that the State suffered $5 billion in damages and (2) the SEC's questioning of 3M's failure to record any liability for the AG Litigation before it settled. (*Id.* (citing Compl. ¶¶ 11, 116.) But neither of these factual allegations "demonstrate that Defendants were aware, at the time that [3M] released its financial statements, that they knew or believed that the [accruals] already taken in those statements were inaccurate." *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 399 (S.D.N.Y. 2020) (finding that plaintiffs failed to allege facts plausibly showing that defendants held anything but an "honest belief" that they had adequately stated warranty reserves, such as facts showing the reserves did not represent a fair estimate of probable expenses when estimated); *see Podraza,* 790 F.3d at 839 ("Plaintiffs have not demonstrated the SEC correspondence did notify Defendants their accounting was incorrect."). 3M disclosed the Minnesota Attorney General's expert opinion (which it disputed) in its 2017 Form 10-K before the settlement. (Defs' Ex. 8 at 124.) And while the SEC questioned 3M about its failure to record any liability before the settlement, 3M provided a detailed explanation as to why its disclosures satisfied ACS 450, and the SEC took no further action.[19] *See Podraza,* 790 F.3d at 839 (observing "[t]here was never a formal inquiry or enforcement action by the SEC, nor any finding of misconduct or fraud" where SEC asked defendant to explain its accounting).

*Embedded Facts.* Plaintiffs also insist that 3M's accruals contain embedded facts in the form of artificially low dollar amounts for 3M's PFAS-related liabilities. Plaintiffs maintain that those amounts were based on "an evaluation of currently available facts with respect to each individual site" and "the evaluation of currently available facts to implement" 3M's settlement agreements with certain state agencies and requirements to address PFAS found near certain manufacturing and former disposal sites. (Pls' Br. at 35–36 (citing Compl. ¶¶ 125, 153).) But, as discussed above, Plaintiffs fail to allege specific facts showing that 3M's accruals and statements about the effect of future PFAS-related liabilities were false when made.

*Omissions.* Finally, Plaintiffs insist that Defendants omitted material facts about billions of dollars of additional liabilities from 3M's accruals for environmental liabilities. (Pls' Br. at 36.) "[M]eeting the standard for omissions 'is no small task for an investor.'" *Chapman,* 466 F. Supp. 3d at 404 (quoting *Omnicare,* 575 U.S. at 194). According to Plaintiffs,

3M's projections are actionable because Defendants offered them without a "reasonable basis." (Pls' Br. at 36 (citing *Brogren v. Pohlad*, 960 F. Supp. 1401, 1408 (D. Minn. 1997).) 3M stated the basis for its accruals, which was inherently subjective. Moreover, 3M explained to investors that "[d]evelopments may occur that could affect [3M's] current assessment," and that unfavorable developments, including a significant judicial ruling or judgement, or could lead 3M to "change current estimates of liabilities" or "make such estimates for matters previously not susceptible of reasonable estimates." (*E.g.*, Defs' Ex. 8 (2017 Form 10-K) at 12, 127.) Plaintiffs fail to allege undisclosed facts "cutting the other way" from Defendants' opinion about the adequacy of 3M's accruals. *Omnicare*, 575 U.S. at 189.

### 4. Roman's and Gangestad's Statements

**\*15**  Plaintiffs argue that Roman and Gangestad made false and misleading statements that were not opinions because they conveyed reliability and certainty. (Pls' Br. at 31–34, 36–37.)

*Roman*. Plaintiffs contend that Roman made false statements during the April 24, 2018 earnings call. They argue that Roman's denial that investors "could reasonably expect to hear news of [other] shoes, however small, dropping," was false given the "non-public internal documents in 3M's possession which demonstrated its massive liability." (Pls' Br. at 31 (citing first Compl. ¶ 173, then *id.* ¶ 115.)

Even as included in the Complaint, Plaintiffs take Roman's comments out of context. During the call, an analyst asked Roman if the settlement of the AG Litigation was a precedent for other states, noting, "[t]here's been a lot of media mudslinging around different scenarios, most of which seems highly improbable." (Compl. ¶ 173; Defs' Ex. 10 at 5 (ECF pagination).) Roman responded, "This is a unique situation. This is our home state and something that we've been working on with [Minnesota regulators] for a number of years. This is a unique situation in both the nature of the case as well as the process that we're working through with them." (Defs' Ex. 10 at 5; *see* Compl. ¶¶ 119–120.) Nothing in the Complaint suggests that the AG Litigation settlement was not unique, or that 3M has entered into similar settlements with other parties.

*Gangestad*. Plaintiffs contend that Gangestad made false statements during the May 19, 2019 investor conference in which he stated that 3M's liability around five manufacturing sites and disposal of PFAS was "ring-fenced," (Compl. ¶

196), because he impermissibly "created an impression of a state of affairs that materially differed from reality." (Pls' Br. at 32 (cleaned up, citing *Freedman v. St. Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1114 (D. Minn. 2014)).) In their brief, Plaintiffs claim this statement was false because 3M was conducting a new investigation into the possible presence of PFAS at other facilities. In July 2019 (two months after Gangestad's "ring-fenced" statement), 3M disclosed that "for the past several months, 3M has been conducting a thorough search for former landfill in [two Alabama counties] to test for any waste that may include PFAS." (Compl. ¶¶ 140–42, 198–99.) Given the short time frame between Gangestad's statement and this disclosure, it is reasonable to infer that Gangestad knew of these investigations. *See In re Grand Casinos Sec. Lit.,* 988 F. Supp. 1273, 1283 (D. Minn. 1997) ("[W]hile the underlying facts on which plaintiffs rely are not contemporaneous with defendants' allegedly false statements, they create a strong inference that defendants knew there were significant problems when the statements were made.").

But allegations that Gangestad knew of the other investigations, standing alone, do not reasonably imply that he knew the extent of their potential effect on 3M's financials. Plaintiffs point to 3M's recording of another charge of $214 million for "environmental matters and ligation related to its historical manufacture and disposal" of PFAS in January 2020, and another $100 million for additional PFAS-related liabilities since then. (Pls' Br. at 33 (quoting Pls' Ex. 13 at 5–6).) But this is again fraud by hindsight. *Elam*, 544 F.3d at 927. Back in May 2019, Gangestad explained that 3M was "putting our best estimate together of what we think" the "probable" liability would be. (Defs' Ex. 21 at 8.) And the July disclosure of 3M's continued search for PFAS in Alabama tracked 3M's repeated disclosures that it was "continuing to make progress in its work, under the supervision of state regulators, to address its historic disposal of [PFAS]-containing waste associated with manufacturing operations in Decatur, Alabama." (Defs' Ex. 3 at 116 (2016 Form 10-K); Defs' Ex. 8 at 121 (2017 Form 10-K); Defs' Ex. 16 at 114 (2107 Form 10-K).)

### 5. Safe Harbor

**\*16**  3M also places the Complaint's allegations in the protection of the PSLRA's safe harbor. This provision of the statute protects defendants from liability when they have made forward-looking statements that are (1) accompanied by meaningful cautionary language, (2) immaterial, or (3)

made without actual knowledge that the statements were false or misleading. *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920–21 (8th Cir. 2015) (citing 15 U.S.C. § 78u–5(c)(1)). Defendants contend that their alleged misstatements were forward-looking and accompanied by meaningful cautionary language, and that the Complaint does not plead facts showing Defendants had actual knowledge that the statements were false or misleading.

When considering whether a statement is forward-looking, "the determinative factor is not the tense of the statement; instead, the key is whether its truth or falsity is discernible only after it is made." *Id.* at 921 (quotation marks and citation omitted). Forward-looking statements include statements "containing a projection of ... financial items," statements "of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management," and statements "of the assumptions underlying or relating to [the forward looking] statements." 15 U.S.C. § 78u-5(i). Defendants' statements about the extent of 3M's potential liability in pending PFAS-related litigation and the impact from future charges on 3M's financial position are forward-looking, as their truth or falsity were discernible only after Defendants made them. *See generally* ⚠*TCF Banking & Sav., F.A. v. Arthur Young & Co.*, 706 F. Supp. 1408, 1412 (D. Minn. 1988) ("The establishment of a bad debt reserve involves economic forecasting, not the reporting of known facts.").

Plaintiffs assert that certain statements were not forward-looking because they included historical financial facts when made. The safe harbor does not protect statements of past or present facts, or a combination of "false or misleading statements about past or present facts with forward-looking statements." *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 729 (D. Minn. 2019) (citing 🚩 *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).) Plaintiffs point to 3M's statements that its accruals for "other environmental liabilities" were "based upon an evaluation of currently available facts." (Compl. ¶¶ 153, 159, 162, 165, 169, 176, 182, 186.) But like reserves, accruals are estimates of liabilities an entity will pay in the future. *See* 🚩 *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 902 (8th Cir. 2005) (explaining reserves are estimates of liabilities and expenses a company will pay in the future). And Gangestad's statement that "we looked at all the discussions going on in all of the sites, all the litigation and putting our best estimate together of what we think all of those costs *will be*," refers

to Defendants' prediction of costs relating to future litigation outcomes. (Compl. ¶ 196 (emphasis added).)

The Court also finds that the Complaint lacks facts showing that the Defendants had actual knowledge of falsity. As a result, the alleged forward-looking statements are not actionable. *In re Gander Mountain Co. Sec. Litig.*, No. 05-CV-183 (DWF/AJB), 2006 WL 140670, at *13 (D. Minn. Jan. 17, 2006). The Court thus need not reach the issue as to whether Defendants accompanied their statements with meaningful cautionary language. *Id.*

For the reasons above, the Court finds that the Complaint fails to plead the existence of any facts or further particularities showing that Defendants had access to, or knowledge of, information contradicting their public statements when they were made, and thus fails to satisfy the heightened PSLRA pleading requirement.

**B. Scienter**

 **\*17** In addition to meeting the requisite misstatement standard, Plaintiffs must meet the PSLRA's scienter requirement. The Complaint must allege with particularity facts supporting a "strong inference" that Defendants acted with the requisite scienter. *Ferris*, 395 F.3d at 854 (citations omitted). Scienter is "the intent to deceive, manipulate, or defraud," 🚩*Navarre*, 299 F.3d at 741, and "requires a showing of reckless or intentional wrongdoing." *Podraza v. Whiting*, 790 F.3d 828, 836 (8th Cir. 2015) (citation and quotation marks omitted).

*1. Allegations of Scienter*

Plaintiffs can establish scienter from: (1) allegations of "motive and opportunity" to defraud; (2) facts showing "a mental state embracing an intent to deceive, manipulate or defraud"; or (3) conduct that rises to "severe recklessness." [20] *Podraza*, 790 F.3d at 836 (citation omitted). In determining whether alleged facts support a "strong inference of scienter," the court must consider inferences favoring the plaintiff as well as plausible, nonculpable explanations for the defendant's conduct. 🚩*Tellabs*, 551 U.S. at 323, 324. An inference of scienter must be "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." 🚩*Id.* at 324. The court takes the factual allegations as true, and, assessing them collectively, determines whether a reasonable person

would find "the inference of scienter at least as strong as any opposing inference." *Id.* at 326. Courts have found a strong inference of scienter when the defendants knew or had access to information suggesting that their public statements were materially inaccurate. *Navarre,* 299 F.3d at 746 (citing *Green Tree,* 270 F.3d at 665).

Defendants argue that the Complaint blocks each of the avenues to scienter because it: (1) fails to plead motive to defraud, (2) fails to plead intent to defraud, and (3) fails the standard for severely reckless conduct. (Defs' Br. at 34–41.)

### a. Motive to Defraud

Plaintiffs allege that the Individual Defendants' trading activity was suspicious, suggesting a motive to commit fraud. (Compl. ¶¶ 228–35; Pls' Br. at 50–54); *see In re Medtronic Inc., Sec. Litig.,* 618 F. Supp. 2d 1016, 1038 (D. Minn. 2009) ("[T]he suspicious timing of stock sales can create an inference of scienter."), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.,* 621 F.3d 800 (8th Cir. 2010). Although insider trading is "not inherently suspicious," it becomes so "when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Navarre,* 299 F.3d at 747 (quotation marks and citations omitted). Plaintiffs must allege more than that the Individual Defendants benefitted from trading because of a false or misleading statement; to give rise to the requisite inference of scienter, "the insider trades have to be 'unusual,' either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *Id.* (quoting *Green Tree,* 270 F.3d at 659). The possibility of an innocent explanation for the timing of a defendant's stock sale "is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations." *In re EVCI Colls Holding Corp. Sec. Litig.,* 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006).

**\*18** The Complaint fails to allege facts that show unusual insider trading. Plaintiffs assert that the amount of the Individual Defendants' stock sales was unusual because Thulin and Gangestad earned significantly more proceeds during the Class Period than they did in the two years before it.[21] (Compl. ¶ 229.) But proceeds are not necessarily

profits; the Complaint fails to allege that any of the Individual Defendants made an unusual "amount of profit" during the Class Period. *Navarre,* 299 F.3d at 747.

Nor does the Complaint claim an unusual "portion of stockholdings sold" by the Individual Defendants. *Id.* This is no surprise, as each of the Individual Defendants sold only a small fraction of their 3M stock during the Class Period. (Defs' Ann. B (Gangestad sold 5.27%; Roman sold 1.72%; Thulin sold 10.85%)); *see Navarre,* 299 F.3d at 747 (holding that the sale of 10% and 32% of an insider's stock interest, standing alone, failed to meet the strong-inference-of-scienter standard). "[W]here a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened." *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 140 (S.D.N.Y. 1999). Indeed, all of the Individual Defendants increased their 3M holdings during the Class Period. (*See* Defs' Ann. A (Gangestad increased 113.56%; Roman increased 89.05%; Thulin increased 20.50%).) That the Individual Defendants increased their holdings during this time weakens the allegation of suspicious insider trading.[22] *Medtronic,* 618 F. Supp. 2d at 1037; *see Cornelia I. Crowell GST Tr. v. Possis Med., Inc.,* 519 F.3d 778, 783 (8th Cir. 2008) (affirming district court's finding that plaintiffs failed to establish scienter where "several of the insider's holdings actually increased" during the class period); *In re Ceridian Corp. Sec. Litig.,* 542 F.3d 240, 247 (8th Cir. 2008) (agreeing with the district court that allegations of motive did not support a strong inference of scienter where insiders "increased their total share holdings during the class period").

Plaintiffs assert that the timing of the Individual Defendants' stock sales is unusual because the Individual Defendants sold "a significant number of shares" in the weeks before 3M announced the AG Litigation settlement. (Pls' Br. at 51; Compl. ¶¶ 230–34.) "Trades made a short time before a negative public announcement are suspiciously timed." *Oxford Health,* 187 F.R.D. at 139 (finding that the timing of trades " 'suspicious' enough, along with the other evidence, to support a strong inference of scienter"). The Complaint alleges that Thulin sold around $15 million of shares on January 31, Gangestad sold $419,000 of shares on February 1, and $1.02 million of shares on February 2, and Roman sold over $1 million of shares on February 2. (*Id.* ¶ 228, 231–32.) But these sales were a small fraction of the Individual Defendants' holdings at the time. (*See* Defs' Ann.

B (Gangestad sold 1.63% of his holdings, and Roman sold 2.94% of his holdings, in Feb. 2018; Thulin sold 5.61% of his holdings in Jan. 2018).) And the Individual Defendants made these sales "in connection with the exercise of [ ] option[s]," which "are not suspicious." *Medtronic*, 618 F. Supp. 2d at 1038; (*e.g.*, Defs' Ex. 41 at 2 n.1 (Form 4 reporting Roman's Feb. 2018 sale—his only sale during the Class Period—was "the exercise of a 3M stock option by means of a cashless-sell-to-cover method (selling enough shares to cover option share purchase price, fees and taxes, then retaining remaining shares)"). Gangestad's and Thulin's pre-settlement sales tracked their routine of exercising options. (*See* Defs' Exs. 34, 40, 44 (Form 4s showing Gangestad's stock sales on Feb. 13, 2017, Feb. 1, 2018, and Feb. 7, 2019, respectively); Defs' Exs. 39, 42, 43, 46 (Form 4s showing Thulin's stock sales on Jan. 31, 2018, Jan. 30, 2019, Jan. 31, 2019, and Mar. 29, 2019, respectively).)

 **\*19**  Even if the Court considered the timing of the Individual Defendants' stock sales to be suspicious, "such timing is insufficient to establish a strong inference of scienter in the absence of any other information indicating unusual insider trading." *Medtronic Inc.*, 618 F. Supp. 2d at 1038.

### b. Intent to Deceive, Manipulate, or Defraud

When a complaint does not show motive and opportunity, other allegations tending to show scienter must be "particularly strong" to meet the PSLRA standard. *Green Tree*, 270 F.3d at 660. Plaintiffs contend that the Complaint alleges facts showing a "mental state embracing an intent to deceive, manipulate, or defraud." (Pls' Br. at 41–49.) They claim that (1) 3M's internal documents and PFAS-related litigation, (2) the statements by Roman and Gangestad, and (3) the AG Litigation settlement establish Defendants' knowledge. None of these arguments is persuasive.

*Internal 3M Documents and Lawsuits*. The Complaint alleges that internal 3M documents from the 1950s to the late 1990s show that 3M knew that PFAS was toxic, non-biodegradable, accumulating in the bodies of animals and its employees, and emanating from its plants to nearby water sources. (Compl. ¶¶ 41–56.) Given these facts, Defendants allegedly knew that PFAS created massive environmental, human health, and other negative consequences. (*Id.* ¶ 63.) In 1998, 3M released scientific data to the EPA, and in 2018, the Minnesota Attorney General posted internal documents showing that

3M had been aware of the dangers of PFAS since the 1970s. (*Id.* ¶¶ 58, 115.) Plaintiffs assert that "Defendants' awareness of 3M's probable PFAS-related liability grew as more lawsuits were filed" and significant litigation-related developments occurred. (Pls' Br. at 43–44 (citing Compl. ¶¶ 89–91, 99).) They also contend that news reports notified Defendants of "3M's *probable* liability related to its manufacture, distribution, and disposal of PFAS." (Pls' Br. at 44 (emphasis added, citing Compl. ¶¶ 70, 72–73, 81).)

While these factual allegations support the assertion that 3M's additional PFAS-related liability was reasonably *possible* (rather than probable), 3M disclosed its PFAS-related contingencies in its financial statements. *See* ASC 450-20-50-4 (requiring disclosure of reasonably possible losses). But Plaintiffs claim that the Defendants misled investors by understating 3M's PFAS-related liability, and the Complaint points to nothing in these internal documents, lawsuits, or news reports that conflict with 3M's statements about its inability to reasonably estimate the amount of its future PFAS-related liability.

*Individual Defendants' Statements*. Plaintiffs argue that statements made by Roman and Gangestad establish scienter because they touched on specific issues in their public statements.[23] (Pls' Br. at 46); *Roberti v. OSI Sys., Inc.*, No. CV 13-9174-MWF VBKX, 2015 WL 1985562, at \*12 (C.D. Cal. Feb. 27, 2015) ("By making detailed factual statements, contradicting important data to which the Individual Defendants had access, a strong inference arises that they knowingly misled the public as to its clear meaning.") (quotation omitted, cleaned up). They point to Roman's statements that the AG Litigation settlement was "a unique situation," and "something we've been working on with them for a number of years," and that 3M "establish[ed] reserves that help us resolve the litigation that is related to environmental matters." (Compl. ¶¶ 119, 124.) They also cite Gangestad's statement that the PFAS-related liability for the five manufacturing sites was "ring-fenced." (*Id.* ¶ 137.) But these statements do not contradict important information to which Roman or Gangestad had access at the time about the probability or estimates of additional PFAS-related liability, nor do the statements admit that they were aware of such information earlier. *Roberti*, 2015 WL 1985562, at \*12; *cf. In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) (finding that omitting actual circumstances that contradicted defendants' answers to specific analyst questions about pricing and sales trends presented "an obvious risk of misleading investors").

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**\*20** *The AG Litigation Settlement*. Plaintiffs argue that the size of the AG Litigation settlement and its proximity to the disclosures in 3M's 2017 Form 10-K support a strong inference of scienter. (Pls' Br. at 47.) The 2017 Form 10-K accrued $25 million for PFAS-related liabilities as of December 31, 2017. (Compl. ¶ 109.) 3M announced the $850 million settlement within two weeks after filing the Form 10-K. (*Id.* ¶ 106.) The "sheer size" of a several hundred-million-dollar write down can add to the inference that "the defendants must have been aware the problem was brewing." *Green Tree*, 270 F.3d at 666. But here, Defendants disclosed the AG Litigation, including (1) the expert opinion estimating damages at $5 billion, (2) that trial was to begin in February, (3) that the court had urged the parties to resolve the litigation before trial, and (4) that 3M recorded no liability for litigation because it believed such liability was not probable or reasonably estimable. (Defs' Ex. 8 at 124); *see Luna*, 2016 WL 5930655, at \*8 ("[A]ny inference that defendants intended to deceive investors is negated by [the company's] full disclosure of the ... judgment and the company's decision not accrue a reserve."). 3M's summary judgment motion was still pending, which if granted, would have reduced 3M's liability to zero.

The Complaint does not allege specific facts suggesting that when 3M filed its 2017 Form 10-K, Defendants knew that the AG Litigation would likely settle and what that settlement amount (or range of amounts) would be. Plaintiffs argue that "it would be absurd to suggest that Defendants were not aware of the probability that [3M] would incur significant [PFAS-related] liability," (Pls' Br. at 49), but they do not allege specific facts suggesting that such liability was probable, that is, had "at least a 70% chance of occurrence." (Defs' Ann. D at 3.) Nor do they allege that Defendants were aware of, and did not disclose, information from which they could reasonably estimate the PFAS-related liability beyond what 3M had disclosed.

Moreover, Defendants' scienter is contradicted: in response to the SEC's request that 3M explain why it accrued nothing for the AG Litigation before settlement, 3M offered the SEC a thorough explanation of its decision. *See Podraza*, 790 F.3d at 838 & n.4 (inferring nonfraudulent intent where Defendants offered and stood by a thorough explanation made to the SEC).

Accepting all factual allegations as true and considering the Complaint as a whole, the Court finds that the Complaint does not allege facts showing a mental state embracing an intent to deceive, manipulate, or defraud.

### c. Reckless Conduct

Recklessness conduct involves "highly unreasonable omissions or misrepresentations that involve ... an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Green Tree*, 270 F.3d at 654 (citations omitted). Simple or even inexcusable negligence does not suffice. *Id.*

Plaintiffs argue that because Defendants knew the requirements of ASC 450—that accrual is required for probable and reasonably estimable losses—their failure to timely accrue more for PFAS-related liabilities was "at least reckless." (Pls' Br. at 49–50.) It points to 3M's increase of reserves from $28 million for PFAS-related liabilities in February 2018 (just before the AG Litigation settled) to $235 million in April 2019, as probative of scienter. (*Id.* at 50 (citing Compl. ¶¶ 109, 122, 126).) In support, Plaintiffs cite case law in which the complaints alleged scienter is based on several GAAP violations. (*Id.* (citing *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 n.10 (S.D.N.Y. 2010).) But the Complaint does not allege any GAAP violations, and thus does not plead a violation of GAAP "with sufficient particularity to provide independent evidence of scienter." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1070 (C.D. Cal. 2008). And 3M's accruals for PFAS-related liabilities "were not sufficiently troublesome as to raise problems with [3M's] independent auditors." *Id.*; *see Podraza*, 790 F.3d at 838 ("The inference of scienter is contradicted by the fact that ... [the company's] independent auditor[ ] stated [the company's] financial documents complied with GAAP.").

**\*21** Because the Complaint does not satisfy the PSLRA's heightened standard for pleading scienter, the Court grants Defendants' motion to dismiss Count I of the Complaint.[24]

*2. "Core Operations" Theory*.

Plaintiffs allege that the fraud relates to the "core business and operations of 3M such that knowledge may be imputed to Defendants." (Compl. ¶ 227.) Under the core operations theory, "misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives give[ ] rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *Urb. Outfitters*, 103 F. Supp. 3d at 653–54 (citation omitted); *CenturyLink*, 403 F. Supp. 3d at 731 ("At the motion to dismiss stage, it is reasonable to assume that top management were aware of matters central to that business's operation.") (quotation marks and citation omitted). The Eighth Circuit has not yet decided whether plaintiffs can use the core operations theory to plead scienter. *See Elam*, 544 F.3d at 929 (noting the Fifth and Ninth Circuits have rejected the core operations theory); (Pls' Br. at 42 & n.24 (acknowledging same)).

To attribute knowledge to the Individual Defendants under the core operations theory, Plaintiffs must show that the relevant information "was known within the company at that time." *Elam*, 544 F.3d at 929. The Complaint alleges the Individual Defendants "would have been aware of key facts related to [3M's] operations and major litigations," and "the issues associated with 3M's PFAS-related liabilities" because of their positions as CEO and CFO. (Compl. ¶ 218.) Even if the Court assumes the Individual Defendants were aware of matters central to 3M's operation, for the reasons above, the Complaint does not sufficiently allege that Defendants knew crucial information contradicting its statements that it was unable to provide a reasonable estimate for additional PFAS-related contingent liabilities when they made the statements. Plaintiffs' speculation that "this information must have existed and must have been known ... is plainly insufficient to support an inference of scienter." *Elam*, 544 F.3d at 930.

**II. Section 20(a) Claim**

Because Plaintiffs fail to state a claim for securities fraud, there can be no secondary liability against the Individual Defendants as "controlling persons." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 n.12 (8th Cir. 1997) (affirming dismissal of controlling person liability claims, including § 20(a) claims, where plaintiffs presented no actionable claim for violating §§ 11, 12(2), 10(b), or Rule 10b–5). The Section 20(a) claim against the Individual Defendants is therefore dismissed.

**CONCLUSION**

Based on the foregoing and on all the files, records, and proceedings herein, the Defendants' Motion to Dismiss (ECF No. 89) is GRANTED. The Complaint is DISMISSED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

**All Citations**

Slip Copy, 2021 WL 4482987

**Footnotes**

1    PFAS is an abbreviation of "per- and polyfluoroalkyl substances," a class of synthetic compounds developed by 3M. (ECF No. 44 ¶ 4.)

2    According to the EPA, "the data strongly suggest that PCBs [polychlorinated biphenyls] are probable human carcinogens." U.S. Env't Prot. Agency, *Learn about Polychlorinated Biphenyls (PCBs)*, https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs, (last visited, Sept. 29, 2021).

3    Plaintiffs' Exhibits are found at ECF No. 101.

4    Defendants' Exhibits are found at ECF No. 92.

5    Defendants' Annexes are found at ECF No. 103.

6    While the Complaint defines the quarterly report filed on April 26, 2019, as the "1Q18 Form 10-Q," (Compl. ¶ 131), the "1Q18" appears to be a typographical error. The Court understands the report to be the 1Q19 Form 10-Q.

7   3M's quarterly financial disclosures refer to its annual disclosure for more information about 3M's process for disclosing liabilities for legal proceedings. (*E.g.*, Defs' Ex. 5 at 31 (1Q17 Form 10-Q); Defs' Ex. 6 at 36 (2Q17 Form 10-Q); Defs' Ex. 7 at 37 (3Q17 Form 10-Q); Defs' Ex. 13 at 32 (1Q18 Form 10-Q); Defs' Ex. 14 at 37 (2Q18 Form 10-Q); Defs' Ex. 15 at 38 (3Q18 Form 10-Q).)

8   At oral argument, 3M confirmed that only "other environmental liabilities" related to PFAS liabilities, and that "environmental remediation liabilities" are unrelated to PFAS. The parties thus agreed that "environmental remediation liabilities" are not at issue.

9   By "kitchen sink" pleading, the Court understands Defendants to mean a securities fraud complaint that reproduces SEC filings, press releases, and transcripts of conference calls, without providing "any indication as to what specific statements within these communications are alleged to be false or misleading." *Novastar,* 579 F.3d at 882–83. The Eighth Circuit has found that this practice "does not satisfy the PSLRA's requirement of pleading with sufficient particularity because it does not identify 'what' statements were allegedly false or misleading." *Id.*

10  While Plaintiffs highlighted statements about "environmental remediation" accruals, they do not allege that those accruals—which are unrelated to PFAS—are false. (Defs' Reply at 4.) At the hearing, Plaintiffs' counsel acknowledged that they do not challenge accruals unrelated to PFAS, and so do not challenge the "environmental remediation" accruals. Similarly, although Plaintiffs highlighted statements about Defendants' litigation risk factor disclosures in the Complaint, they do not allege that these statements are false. (*Id.*)

11  All three of these adjectives, it would seem, describe $5 billion, the amount estimated by the AG's expert and disclosed by 3M.

12  In *Bank of America*, the plaintiffs alleged that sometime during the class period, it became probable that AIG would sue BoA, and that BoA should have disclosed the potential lawsuit, which could have resulted in a loss of between zero and $10 billion. 980 F. Supp. 2d at 576. A New York Times article had estimated the potential loss and AIG had disclosed it to the public. *Id.* at 576–77. The court explained that "there is no duty to disclose information to one who reasonably should be aware of it. Where allegedly undisclosed material information is in fact readily accessible in the public domain, ... a defendant may not be held liable for failing to disclose this information." *Id.* at 576 (internal quotation marks and citations omitted). The court found that the defendants were not required to disclose either the imminence of the suit or the loss range: "[n]o reasonable investor could have been aware of these public disclosures and ignorant of the potential imminence and amount of the AIG suit because the salient details of the potential litigation were encompassed by what was communicated to the market." *Id.* at 577.

13  Plaintiffs maintain that *Bayer* "further held that 'the amount of the loss could reasonably be estimated, as required by GAAP' once defendants were forced to withdraw Baycol from the market, which made 'defendants' statements regarding litigation reserves ... materially misleading.' " (Pls' Br. at 20 (quoting *Bayer*, 2004 WL 2190357, at *12).) But Plaintiffs quote *Bayer* out of context. In considering whether the plaintiffs had alleged that *pre*-withdrawal claims were reasonably estimable, the *Bayer* court found that they had not: "plaintiffs have sufficiently alleged that by August 2000 defendants possessed information making it more likely than not that a loss contingency would arise, [but] *plaintiffs do not allege that the amount of the loss could reasonably be estimated, as required by GAAP.* Accordingly, *plaintiffs have not alleged* that defendants' pre-withdrawal statements concerning Bayer's financial performance were inconsistent with recognized accounting standards and thus materially misleading." 2004 WL 2190357, at *12 (emphasis added, citations omitted).

14  A loan loss reserve is "a current reserve against likely credit losses in a company's portfolio." *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 578 (S.D.N.Y. 2010).

15  Plaintiffs also cite *Green Tree* as supporting their argument that the adequacy of reserves is a question of fact that cannot render the Complaint inadequate. (Pls' Br. at 16 (citing *Green Tree,* 270 F.3d at 666).) But

the Eighth Circuit focused on the issue of scienter in *Green Tree*. 270 F.3d at 654 ("The question before us is whether the facts pleaded in the complaints adequately plead scienter.").

16    *Cf. In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1070 (C.D. Cal. 2008) ("[G]iven the discretion inherent in the setting of loan loss reserves, and the use of independent auditors, Plaintiffs have not adequately pled particularized facts that show that the loan loss levels were, in fact, so low that they were false and misleading.").

17    ASC 410 acknowledges that "[i]n the early stages of [estimating environmental remediation liabilities], cost estimates can be difficult to derive because of uncertainties about a variety of factors.... [I]n many cases, early estimates later require significant revision." ASC 410-30-25-7; *see also* ASC 410-30-25-2 (explaining that the amount of environmental remediation costs is not generally fixed and determinable at a specific time, but "become estimable over a continuum of events and activities that help to frame, define, and verify the liability").

18    For example, 3M's 2017 Form 10-K stated that for sites "at which remediation activity is largely complete ... [3M] believes the exposure to loss in excess of the amount accrued would not be material to [3M's] consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, [3M] cannot estimate a possible loss or range of loss in excess of the associated established accruals ...." (Compl. ¶ 169; Defs' Ex. 8 (2017 Form 10-K) at 127.) It is no surprise that 3M would believe exposure above an accrued amount would not be material for sites where activity is "largely complete." Nor is it surprising that 3M could not estimate the possible loss for remediation that was largely ongoing. *See generally* ASC 410-30-25-7; ASC 410-30-25-2.

19    The Court notes that the SEC's failure to act does not determine the merits of Plaintiffs' claim that Defendants made false and misleading statements. 15 U.S.C. § 78z.

20    As noted above, the Complaint does not specifically allege GAAP violations. Even if it had, allegations of GAAP violations, standing alone, cannot raise a strong inference of scienter. *Podraza*, 790 F.3d at 838. "Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Ferris*, 395 F.3d at 855 (citation omitted); *see In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 981 (D. Minn. 2009) (explaining that false Sarbanes-Oxley Act certifications "are probative of scienter only if they are accompanied by 'allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it.' ") (citation omitted).

21    The Complaint alleges that Thulin earned $36.5 million in proceeds from 3M stock sales during the Class Period, as compared with the $7.7 million in proceeds he earned in 2015 and 2016. (Compl. ¶ 230.) Gangestad allegedly earned more than $2.8 million in proceeds form 3M stock sales during the Class Period, as compared with the $238,727 in proceeds earned in 2015 and 2016. (*Id.*) The Complaint is silent about Roman's pre-Class Period sales.

22    Courts are also to consider "the number of insiders involved" in determining whether stock sales were unusual. *Navarre*, 299 F.3d at 747 (citation omitted). The Complaint alleges that "other senior Company executives" sold 3M stock during the Class Period, but does not attribute any alleged misstatement to them. (Compl. ¶ 228; *id.* Appx. E.) The Court finds these executives' stock sales to be irrelevant to show the Individual Defendants acted with the requisite scienter. *See Navarre*, 299 F.3d at 748 ("[T]rading must coincide with false or misleading statements—a missing link in this case."); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 834 n. 12 (C.D. Cal. 1998) (finding that transactions by unnamed insiders were irrelevant to alleging scienter against the named defendants).

23    Plaintiffs assert that even if Roman and Gangestad were not knowledgeable about the matters on which they spoke, they were actionably reckless making such statements. (Pls' Br. at 47 n.31.)

24    Because the Court finds that Plaintiffs fail to sufficiently allege false or misleading representations and scienter, it does not address Plaintiffs' allegations of loss causation.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.    20