IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


IN RE THE CHEMOURS COMPANY
SECURITIES LITIGATION

                          C.A. No. 1:19-CV-01911-CFC




                    Friday, January 14, 2022
                           10:00 a.m.
                    Motion To Dismiss Hearing



                       844 King Street
                     Wilmington, Delaware


BEFORE: THE HONORABLE COLM F. CONNOLLY
United States District Court Judge



APPEARANCES:

            PRICKETT, JONES & ELLIOTT, P.A.
            BY:  BRUCE E. JAMESON, ESQ.
            BY:  SAMUEL L. CLOSIC, ESQ.


                          -and-

            SAXENA WHITE
            BY:  MAYA S. SAXENA, ESQ.
            BY:  LESTOR R. HOOKER

                  Counsel for the Plaintiff

APPEARANCES CONTINUED:


        FRIEDLANDER & GORRIS P.A.
        BY:  CHRISTOPHER FOULDS, ESQ.

                        -and-

        WACHTELL, LIPTON, ROSEN & KATZ
        BY:  JONATHAN M. MOSES, ESQ.
        BY:  DANIEL J. HARPER, ESQ.
        BY:  NOAH B. YAVITZ, ESQ.
        BY:  JUSTIN BROOKE, ESQ.
                  Counsel for the Defendants


                  _ _ _ _ _ _ _ _ _ _

P R O C E E D I N G S

(The proceedings commenced in Courtroom 4B at 10:00 a.m.)

**THE COURT:**  Just before we start, I'm about 30 feet away from you all, so I'm not wearing a mask.  I've been vaccinated, boosted and tested negative at 3:30 yesterday.

If you are vaccinated and boosted, if you feel comfortable speaking, I would invite you, I encourage you actually, if you're comfortable, to remove the mask, so we can hear you clearly.  It's hard to recognize people with the mask on and now a beard too.

**MR. JAMESON:**  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MR. JAMESON:**  Your Honor, the beard I've had for probably 15 years at this point, so that's not new.

**THE COURT:**  Really?

**MR. JAMESON:**  Yes.

**THE COURT:**  Man, maybe it's -- all right.  My bad.

**MR. JAMESON:**  Good morning, Your Honor.  Bruce Jameson of Prickett Jones on behalf of the plaintiff, New York State Teachers Retirement System.

I rise just to do introductions.  I always know I'm in trouble when I need notes to make introductions.  But with me at counsel table is Maya Saxena, Lester Hooker, also Joseph White from the Maya Saxena's firm.

Ms. Saxena will make the argument today.

Also from my office is Sam Closic. And finally, Your Honor, there are two representatives of the New York State Teachers Retirement System here sitting back there, Joseph Indelicato and Dawn Ampansiri are here as well.

Thank you, Your Honor.

**THE COURT:** Thank you.

For the defense.

**MR. FOULDS:** Good morning, Your Honor, Chris Foulds from Friedlander & Gorris on behalf of the defendants. I'm joined by Johnathan Moses from the Wachtell Law firm, as well as his colleague, Daniel Harper. We have two member of the Wachtell team on the phone, Noah Yavitz and Justin Brooke.

**THE COURT:** Have you all checked to see that they're on?

**MR. FOULDS:** I believe that they are on.

**THE COURT:** Great.

**MR. FOULDS:** We also have two client representatives, Lyn Brantely and Nicole Lengel.

**THE COURT:** Great. Thank you.

So before we get started, because I think some of the folks here practice a lot in Chancery, we have the most respect for Chancery Court. I don't know often you have been here, especially in recent times.

So it's certainly not my preference, in ways it's embarrassing, that I'm not getting to this case earlier. I

need you to understand what we face here.  Because as busy as they are in Chancery, it pales in comparison to what we face here.  I have about 600 cases, as do each of the members of District Court.  I have over 300 patent cases and 600 civil cases, 300 patent cases, all four of us do.

We've reached the point now where pretty much, on average every day, a substantive motion is filed.  So that if we were to meet our civil justice reform act reporting requirements, which require the disposition of opinions or rather disposition of motions within six months of filing, we couldn't do it unless we issued an opinion every day, counting weekends and holidays.  That's impossible.

One of the mechanisms I use is, obviously, I look at is there physical harm or something to prioritize cases.  We are basically in triage.

The other thing I do and it happened in this case, so I want to alert you to it.  I want you folks to think about it and spread the word.

This is a difficult case, a lot to learn and a lot to master.  I started to master it in the summer.  And as I started to parse through, where is the false statement.  There are multiple filings here, multiple false statements.

I think the briefing at the time, which is very good briefing, but it conflates false statements and things.

I look to the SEC filings.  There's no tabs, and I

know we are in Covid times.  It was difficult to do.  I issued an oral order, said please file hard copies with tabs and suggested it might be a good idea to highlight.

But at that point, you went to the bottom of the pile.  And then I turned to my other, you know, motion day and not to mention had five trials in the last three months.

I say that because I want to personally be able to efficiently and quickly adjudicate, consistent with the Rule of Federal Procedure one, to give speedy justice, and I don't want you to think that it wasn't because we weren't paying attention or weren't working hard.

So with that caveat, let's go forward with oral argument, and I hope that you will be mindful of the oral order I issued in preparing for this oral argument.  It makes things go more efficiently.

All right.  It's the defense motion.  I may, at times, ask to you step aside and have the plaintiffs answer.  I thought, particularly, in terms of the falsity issues.

Go ahead.

**MR. MOSES:**  Thank you, Your Honor.  And I appreciate the burden this Court is under and many Courts are under.

And my name is Johnathan Moses from Wachtell, Lipton, Rosen & Katz.  And we do very much thank you for the opportunity the Court has given us to answer your questions and address this matter.  May it please the Court.

Your Honor, I'm going to go straight into the Court's questions and take them in turn, and then maybe address a few other points.

I do think the questions get to the nub of the matter and very much why there actually is a very straightforward basis to dismiss this case, which I do think it should be dismissed, of course.

Your first question concerns the statements in certain of certain of Chemours regular SEC filings the 10-Ks and 10-Qs, setting forth potential environmental remediation costs, quote, deemed remote and disclosed on the topic of accrued amounts. Your question:  For each report what specific allegations in the complaint plausibly imply that the time the report was filed, defendant's believed that the maximum potential liability for remediation costs would exceed the sum total identified in the report?

And the short answer, Your Honor, I'm going to submit, and I think I will argue this morning, I hope successfully, is that there is no specific allegation in the complaint that plausibly applies defendant believes the maximum potential liability would exceed the remediation costs.  None.

I think it makes sense to begin with the actual disclosure because this is a disclosure case.  And Your Honor has focused on disclosure that is found in a section of Chemours audited financial reports regarding enviromental

remediation liability.

Your Honor, I'm going to hand up a slide deck.

THE COURT:  Yeah.  Did you not -- do you have a slide that you are going to put on the screen?

MR. MOSES:  We are going to do it in paper, if that's okay.

THE COURT:  That's fine.

MR. MOSES:  I have a copy, obviously, for my colleague here at the bar.  I have three copies.  I have been generous in that regard.  And two copies for the Court.

THE COURT:  Great.  Thank you.

MR. MOSES:  Your Honor, what I've done, as we get past the title page, is have a page here where we have the first two pages of this enviromental remediation disclosure.  This is actually from the 2016 10-K, which was published in February 2017, right at the start of the purported class period.  That's why I chose it.

THE COURT:  Right.

MR. MOSES:  Actually, that's when you first see this deemed remote language.  It's at pages 55 to 58 of that 10-K. I've only sort of visualized the first two pages of it.  I did that just to make clear, this is part of a very lengthy and detailed disclosure of remediation issues.

The language you focused on, Your Honor, is the language around the accrual about -- which statements

management's opinion in this case, it's $278 million as of year end 2016.  And then the language about what might be deemed remote, under adverse changes and circumstances, the potential liability in this case is estimated to be $535 million.

**THE COURT:**  Now, I don't know.  Maybe it would be helpful if you want to almost concede this point.  You spent a lot of your briefing on this.

This is not a maximum liability disclosure, right, and the way you just paraphrased it, I think, is telling.  You left out "range up to."  And I think the "up to" language -- the way I look at this right now is you disclosed more than you had to, and you admit that in your brief.  When you disclose more than you have to, you have to make sure whatever you disclose is accurate.

**MR. MOSES:**  Absolutely, Your Honor.

**THE COURT:**  So you spend a lot of time in your brief saying, we don't have to disclose maximum liabilities; we have to disclose GAAP liability, and I agree with that.  I think it misses the point.

**MR. MOSES:**  Your Honor, I appreciate your question, and you do read our brief correct.  We do think "deemed remote," which this is very clear is different than maximum.  We deemed remote.  Remote is a GAAP term.  It means slight.

**THE COURT:**  What is "deemed remote"?

**MR. MOSES:**  Remote is a GAAP term that means slight.

It is a --

THE COURT:  No, no.  What in your statement is deemed remote?

MR. MOSES:  What is deemed remote is that these costs, which are identified there, it is deemed remote that those costs will eventuate under those adverse changes in circumstances.

THE COURT:  I don't read it that way.  Maybe a jury decides that.  But I think it's plausible.  It's very obtuse wording.  It's the adverse changes in circumstances that are what's deemed remote.

MR. MOSES:  Your Honor, that's fine.  But the point is that we're not saying, this is the absolute maximum of all time.  I will get to it in a second, but this was how they wanted to characterize the Delaware complaint and response to Vice Chancellor Glasscock's opinion.

THE COURT:  I don't want to get into how to characterize the complaint in Chancery Court.  I am talking about how to characterize SEC filing.

MR. MOSES:  Your Honor, we think remote means slight.

THE COURT:  I agree with you.

MR. MOSES:  We think slight is different than maximum.

THE COURT:  That's apples and oranges.  That's my point.  The disclosure says, "Considerable uncertainly exists with respect to enviromental remediation costs and under

adverse changes in circumstances although deemed remote."

What is being deemed remote is there's a slight chance that the circumstances will change adversely.

MR. MOSES:  Yes.  And those circumstances, management's estimate at this time is what would be the cost would be $535 million on top of the accrued.

THE COURT:  Well, I mean, you can argue that's what you meant to say.  It's not clear.  It's subject to multiple interpretations, I think.

I think the most reasonable reading of it is what I put in my order that I am assuming for argument's sake.  I only bring this up because when you did the paraphrasing, you skipped "may range up to."  I think that language coupled with -- there's a slight chance.

The way I read it is like, look, there's only a slight chance that the circumstances are going to change adversely, but if they do, our liability could be up to blank.

MR. MOSES:  Your Honor, I am actually not quibbling with that wording.

THE COURT:  That sounds to me, for what it's worth, an awkward way to do it, but it's saying that's what maximum liability is.

MR. MOSES:  Your Honor, we do argue in the brief that the term "remote" is slight.  This is a GAAP disclosure.  GAAP has made clear that they don't use the term maximum, and there

are different things.

Your Honor, I wanted to start and take your question head on because I think even taking, making this equivalent with what you said in your order, potential maximum liability. I don't think there's anything that shows at the time these disclosure were made, that management believed that some other number was the number.

THE COURT:  Right.  I think you're onto something. That's good.

MR. MOSES:  I want to take your question head on.  In my notes here, I was going to get to it.  Your Honor, let me quibble with your question at the end.  I know you should take a judge's question head on.

THE COURT:  I jumped the gun.

So your point is going to be:  Where in this Chancery Court complaint is there any disclosure that the enviromental remediation costs are going to be for year -- I forget, one year 827, one year 763 --

MR. MOSES:  Exactly, Your Honor.  That's our -- yes, we think there's nothing -- the slide in a second which makes that point.

Your Honor, before I get to it.  We are talking about a particular animal here, remediation costs.  Remediation costs are not litigation liabilities.  Remediation costs are not capital expenditures.  They are not ongoing expenditures.

Chemours, you are spending all the time related to protecting the environment.

And so remediation is a specific thing. It is understood to be a specific thing. There is a reference to the accounting notes, note three, which describes further how they do it.

And, of course, they make clear, and this is also relevant. There is a high degree of uncertainty around all of this.

And so, Your Honor, if you can go to the next slide, and we just brought this out. This is not a dispute over what GAAP applies. ASC41030, this is the second slide, Your Honor. Enviromental remediation is a specific GAAP concept.

There's not a dispute that ASC41030 governs this GAAP thing called remediation cost. We just set out a slide. This is -- you know, we made the same point in our brief, in our briefs.

What it is is remediation of sites, in response to government orders or that are required by government orders. It is not voluntary abatement costs. It is not natural resource damages and toxic torts. It is not litigation.

And I think that's important, Your Honor, because, actually, the table that you got that range that you put in your order, they actually conflated there both the remediation disclosures and some, but not all, of the litigation accruals.

And it's really important that we keep them separate.

And we actually did the math, and, just for the record, we think the actual range was 676 million to 813 million.  The table is at Paragraph 113 of their complaint.

THE COURT:  Sorry.  I knew I had it marked.  So you actually quibble with the table itself?

MR. MOSES:  I do, Your Honor.

THE COURT:  I don't think you did in your briefing.  In fairness to you, there's a lot of stuff being thrown --

MR. MOSES:  We asked for more pages, which Your Honor graciously agreed to give us.

It's a minor quibble.  The numbers aren't that different.  The record should be accurate.  I believe the math will be 676 to 813 million, but the point is the substantive point.  We are talking about what was said about remediation costs, not litigation liability, not capital expenditures, not ongoing expenditures.

THE COURT:  Right.  So they've got 1.1 billion, which I don't actually see in the Chancery.  That's the New Jersey expert.

MR. MOSES:  That's an expert.

THE COURT:  That's a litigation demand.

MR. MOSES:  It is a litigation demand.  New Jersey said we've got an expert that says it's 1.1 billion.  We don't agree.  We are actively litigating that case in the courts of

the New Jersey.

THE COURT:  Do you see any environmental remediation numbers in the Chancery Court complaint?

MR. MOSES:  The Fayetteville number, the 200 million is enviromental remediation number.

THE COURT:  Anything else?

MR. MOSES:  I think part of the New Jersey number will eventually be whatever it ends up being, enviromental remediation.

THE COURT:  Do you agree what's alleged right now, you can't figure out whether --

MR. MOSES:  I agree it's ambiguous.  I don't want to suggest that we would say all of it would be litigation.

Your Honor, I'm going to dissect that $2.5 billion number.

THE COURT:  Maybe it is more efficient to have them dissect it.  It's your motion, but they've got to be able to say --

MR. MOSES:  All right.  Your Honor, before I do that, because I do think --

THE COURT:  No, no.

MR. MOSES:  I thought were you asking me to concede the podium.  No?

THE COURT:  No.  You want to make a point.  Go ahead.

MR. MOSES:  The point I wanted to make, something else

in your order.  Your order -- of course, we were reading it, like, you know, like kremlinologists here for the tea leaves. We saw the potential maximum liability for sure.

The other thing you focus on was belief.  We think that's exactly right.  They have to show subjective falsity, and they have to show subjective falsity whether you view this as an opinion, which we think it is.  Accounting estimates are opinion.  We cited some case, even their case.

**THE COURT:**  Assume for argument's sake that you did make a disclosure in the Chancery Court complaint that directly addressed enviromental remediation, potential maximum liability, and then assume that so far, I'd say that's enough. If you stated that explicitly in the Chancery Court complaint that for year, I guess we would have to have your fixed numbers, but for 2016, our potential maximum liability for remediation was a billion dollars.  You are saying it is 827 in your securities filing.  Just assume their table right now, is accurate.  I mean, I think it's problem for you, right.

But let's go to your opinion.  I mean, if you state publicly that our maximum potential liability is 827, when you really believe it's a billion, how are you not on the hook for that?

**MR. MOSES:**  No.  Your Honor, that's subjective falsity though.  They will have evidence.

**THE COURT:**  You will argue it is an opinion.

**MR. MOSES:**  No, Your Honor.  If it's an opinion, the only way for them to proceed is by pleading subjective falsity, and what they rely on to plead subjective falsity is the Delaware complaint and these confidential witnesses.

I don't think either of them show subjective falsity in regard to these disclosures at the time they were made.

The other thing, however, Your Honor, this is also a forward-looking statement up to -- it's a forward-looking statement about --

**THE COURT:**  You are saying nobody could ever be on the hook for coming in and saying the maximum potential we would ever face is a billion dollars.

**MR. MOSES:**  I'm not saying that, Your Honor.  What I'm saying --

**THE COURT:**  When would it be actionable?

**MR. MOSES:**  If they were to plead subjective falsity that's the Edinburgh case in the Third Circuit.  It's the Omnicare case in the Supreme Court.

If you plead -- if something is an opinion, it is protected unless they can prove subjective falsity.

There's a separate issue though here, okay, which is these accounting estimates of the potential maximum, in your words, liability okay, in the future under adverse changes and circumstances is a forward-looking statement.  It is accompanied by --

**THE COURT:** Disclosures.

**MR. MOSES:** -- enumerable cautionary statements about adverse changes in circumstances and technology changes, et cetera. Under the plain language of the PSLRA, that is protected.

**THE COURT:** Okay.

**MR. MOSES:** And so we would submit that in this particular instance, if you agree with us, that that cautionary language is sufficient, it is absolutely protected, but, at a minimum, they have to show subjective falsity. They can't simply say, look, it's different. They have to show these defendants believed it was different.

**THE COURT:** One of them signed a verified complaint.

**MR. MOSES:** That would be good evidence if the verified evidence says what they say it says.

**THE COURT:** Right. I mean, assuming it says what they say, what else would you possibly have to allege to get over those subjective falsity?

**MR. MOSES:** Your Honor, if it were apples to apples, as opposed to apples to oranges or worse, then I guess it would be pretty good evidence of subjective falsity. I don't think it is though, Your Honor.

And, you know, they rely on this $2.5 billion number. I think we said they cited -- we counted they cited it 90 times in their complaint. In their briefs, it is also, this number

is the hard specific facts that they point to get within some of the cases they cite of the evidence that that was believed to be wrong.

But it simply isn't what they say it is.  And Your Honor has order intuited that.  I am happy to go through and give you -- you know, point out why we don't think it is.

**THE COURT:**  No, no.  It's proving a negative, right.

But let me ask you this:  First of all, is there such a thing as a partial motion to dismiss part of the claim?

**MR. MOSES:**  Of course, you can.  We would encourage you to dismiss all of it.  It would certainly simplify matters and could --

**THE COURT:**  I know Courts do it all the time.  I've done it.  But do the rules allow me to do it?

**MR. MOSES:**  I believe they do, Your Honor.  You can grant a motion in part and --

**THE COURT:**  How about this --

**MR. MOSES:**  I'll ask Mr. Harper, most recently out of law school, to confirm for me.

**THE COURT:**  -- Rule 56 explicitly says you can move and get granted partial summary judgment.  Where in Rule 12 does it say you can move for partial dismissal of the claim?

**MR. MOSES:**  I don't know that one can move for partial dismissal of the claim; although, people do, Your Honor.  I actually don't know, Your Honor, and Courts, all the time,

dismiss motions in part. So I do think you could do that in your discretion.

THE COURT: I thought having to brief it, I am not sure you're right. There is recent case law where courts have held you can't.

MR. MOSES: Really, okay.

THE COURT: Precisely because the rule is clear, it doesn't mention partial in Rule 12, and it does in Rule 56. I have a case. It is a public record. It is Walmart, the Government sued Walmart.

The case is stayed pending Supreme Court decisions this coming term, but the Government in that case says you can't, and cited a few cases.

I thought about it here. I'm afraid to take that approach because we're already the four busiest judges in the country with securities filings, and I am afraid if I did --

MR. MOSES: Your Honor, I am not encouraging you to do it.

THE COURT: No, I know. I was curious if you had opinions on it.

MR. MOSES: I've seen judges do it all the time.

THE COURT: And I have done it.

MR. MOSES: But, you know, sometimes judges do things that we all get into the pattern of doing something, and it turns out someone looks at the rule and says you can't do it.

THE COURT:  There are only three claims here.  I think there are ten SEC filings.  What is it?

MR. MOSES:  There's -- well, there's -- we attached that Appendix A.  There are dozens of statements that they say are false.

THE COURT:  Yeah, they have also challenging how many.  Hold on a second.  I wrote it down.  Yeah, there's ten.  There's ten securities filings I challenged.  They rammed them into one claim, which makes it hard.

MR. MOSES:  As these cases are typically brought, they list a bunch of statements they say are false.  Some are in securities filings.  Some are in earnings calls or CNBC calls or the famous speech Mr. Vergnano gave at Delaware Chamber of Commerce to his fellow Delawareans over what was happening in Chemours and --

THE COURT:  They are all actionable.

MR. MOSES:  They claimed they are all actionable as 10(b)(5).

THE COURT:  You debate that?

MR. MOSES:  No, I don't debate that.  If, in fact, they, you know, meet the, you know, they're false, and they can show scienter and lost causation, they are actionable.

But the -- and then they have the 28 claim, which is always thrown in as well, but really rises and falls within -- these cases are always pleaded but never broken out by

statement or at least that's in my experience.  Ms. Saxena has even more experience and can comment on that.  That's how I've seen them.

**THE COURT:**  Okay.  Let me do this.  One of the ways I kind of decide I will have to approach this is because of the way the complaint is pled, it has to relate in part to what we have just been discussing.

I'm going to go with looking at the plaintiff's summary of the six categories of false statements.  We've already dealt with the first one.

**MR. MOSES:**  Your Honor, I think --

**THE COURT:**  Let's turn to the second one, all right.

**MR. MOSES:**  Okay, Your Honor.

**THE COURT:**  The second one is going to be, basically, assertions that certain liabilities were not estimable.

**MR. MOSES:**  Okay.

**THE COURT:**  Now, what I surmise is that there's ten paragraphs in the complaint where it's alleged that Chemours falsely stated in an SEC report that a range of losses for benzene-related litigation cannot be reasonably tested.

**MR. MOSES:**  Right.

**THE COURT:**  Now, in three of those paragraphs, the SEC reported questions filed after November 1, 2018.  This becomes, in my mind, important.  And the reason why, in my mind, it's important, the reason why I am going to put it on plaintiffs

they have got to be much more precise in identifying the false statements, it's because the complaint alleges that in the Chancery Court complaint, Chemours said that DuPont had shared with Chemours in late 2018.  So I'm thinking late 2018, I'm willing to say a reasonable investor would plausibly understand that to mean the last quarter of 2018.

So according to the Chancery Court complaint, DuPont shared this, quote, more comprehensive study, end quote, of DuPont's -- and this is another quote -- benzyne-related liabilities including defense costs, unquote.  That I'm, again, quoting, value the potential maximum costs of those liabilities at over $111 million, end quote.

Now, so in my mind, a reasonable investor, could infer from the way Chemours characterized the DuPont study is more comprehensive, that at the time Chemours filed the last three reports, it could have reasonably estimated the benzene-related liabilities, including the costs.  Because how could you possibly say you have this more comprehensive study that valued the potential liability at 111, and then, at the same time, say you're unable to reasonably estimate what those costs are in the SEC filings.

So that seems to be a problem for you.  How do you respond?

**MR. MOSES:**  Your Honor, I respond in two ways.  I actually think, just because I want to be accurate.  I think we

alleged in the complaint that came at the end of '17 in the Delaware complaint.

THE COURT:  Really?

MR. MOSES:  It will be --

THE COURT:  Hold on.

MR. MOSES:  I want to make sure we are accurate.  I certainly don't want to mislead the Court.

THE COURT:  That's fine.

MR. MOSES:  Your Honor --

THE COURT:  Hold on.  Hold on.

MR. MOSES:  Sure.

THE COURT:  I appreciate the candor, I really do.

So you have the word "2017" in the paragraph.  It's at paragraph 94.  What you say there is you say, quote, this is from the Court of Chancery complaint.  "In 2017, when DuPont studied the availability of insurance for benzene liability, it commissioned a more comprehensive study by a consultant."  And then in parenthesis it says, "not shared with Chemours until late 2018.

MR. MOSES:  I stand corrected, Your Honor.  So it was the 2017 study.

THE COURT:  Right.  So my mind is reading it in the light most favorable to them, Chemours is not in possession of this  late 2018.  So there is no way you can be accused, based on that study, filing a false SEC report before the first seven

reports are out.

**MR. MOSES:**  I'm glad we cleared it up.  I'm looking at the chart I had.  It is a 2017 study.  I didn't want to misstate.

Your Honor, our response is, whether it was '17 or '18, this is not our estimate.  It's DuPont's estimate, and it's --

**THE COURT:**  You are characterizing it.  When you say -- you are choosing to use the words, "it's a more comprehensive study."

**MR. MOSES:**  It is --

**THE COURT:**  Such that, you are willing to say, DuPont made a false statement.

**MR. MOSES:**  We are saying it is a more comprehensive study for purposes of potential maximum liability, including defense costs.

What a reasonably possible estimate is something other than potentially maximum liability.  It is something which, you know, what are the outcomes of these litigations.  Your Honor, we don't think we --

**THE COURT:**  Isn't that a jury question?

**MR. MOSES:**  I don't think so, Your Honor.  They have to plead subjective disbelief.  This is not our number.  This is a number we are saying that DuPont put out there.

**THE COURT:**  It is a number that you are willing to go

to a lawsuit over.  You have to be endorsing the number in some way.

MR. MOSES:  We're saying that DuPont -- this is evidence of DuPont's process in coming up with potential maximums at the time of the spin was flawed, something they did afterwards, as you point out in 2017, given to us, according to the complaint, in 2018.

We are not saying this is our reasonably possible estimate.  This is what we think the right reasonably possible number is.

Again, these are all things, which are estimates that go to, require subjective disbelief.  You know, it is basically this wholesale adoption of the Delaware complaint, and honestly, that's a theme that's going to run through all of my responses.

But on that one, that's basically our response.  This is not our number, and it is not a reasonably possible number.

THE COURT:  Anything else you want to respond on that one?

MR. MOSES:  Your Honor, I mean I guess I would say, Your Honor, the benzene liability, there is an accrual.  There is a disclosure that it could be worse than the accrual.

THE COURT:  Right.  Even if there is, I am only focusing on -- I get pretty literal.  I think that's what I'm supposed to be.

The question I'm focusing on is whether the statement that the range of losses cannot be reasonably estimated. That's the only issue. Frankly, in the big scheme of this case is a small thing anyway.

**MR. MOSES:** I don't think there's loss causation on that number.

**THE COURT:** We will get to that. That's why the first one is where they want to center the case.

On this one, I want to give you the benefit because as you can tell, I am inclined to let the case go forward on this limited statement, three SEC reports, and it would be: Could you reasonably estimate that cost? I'm thinking it's a jury question or maybe it needs expert testimony.

**MR. MOSES:** Your Honor, they also have to show scienter.

**THE COURT:** I am on the false statements. Scienter, we will get to scienter again. We have somebody filled out under oath this complaint.

**MR. MOSES:** They have to show an intent. They have to show strong inference there was scienter here.

**THE COURT:** Well, I mean, you know, they want the company, the theory is a pretty, at first blush, compelling one. It's that your client is in really, really bad shape, and it got screwed by DuPont, and it's been telling its investors everything is hunky-dory; everything is under control, and then

files this complaint to go after DuPont when it finally has to, but it's been misleading folks.  That's part of --

MR. MOSES:  That's their narrative, Your Honor.  Their theory is, we did it to keep the stock price high.

That's not enough to plead scienter.  It's not enough for -- to say the company is doing well to plead scienter. They have to show we are going it for some ill purpose.  I want to sell my stock personally.  They point to stock sales that we think are relatively minor pursuant to 10b5-1 plans.

THE COURT:  Do you agree -- your name again?

MS. SAXENA:  Maya Saxena, Your Honor.

THE COURT:  Do you agree that it's not enough for scienter to show that they, essentially, misled to jack up the price of the company?

MS. SAXENA:  Absolutely not, Your Honor.  I think it's -- there's ample evidence in the complaint that --

THE COURT:  Answered my question.  Thank you.

They are going to say no.  And you are telling me that -- frankly, I'm going to have to look it up myself -- it's not good enough to allege -- we are just alleging here -- allege scienter to say that the motivation, not the motivation, the purpose of the false statements was to raise the price of the stock, really.

MR. MOSES:  What I'm saying is interest in success of the companies is not enough.  We cite the *Avaya* case, Your

Honor, at 276 pin cite.  And, you know, that's our understanding of the law.

If they show -- Your Honor, at end of the day, you have to weigh if they showed a strong inference of scienter based on all of their allegations.

THE COURT:  Right.  We're at the pleading stage.  Maybe we get to summary judgment.  The only evidence they have is they were just trying to maintain the price of the Chemours stock.

MR. MOSES:  But the PSLRA requires the Court, and that's the purpose of the PSLRA, was to basically have a higher standard at the pleading stage for these kinds of cases, to weed out the ones that shouldn't proceed because there is obviously a terrorem effect once they get past the motion stage.  That is the purpose of it.

So, Your Honor, not to burden the Court, this is -- you know, that's why these motions are so intensely done in these kinds of cases.  This is -- strong inference of scienter is a very important thing to consider at this stage.

Your Honor, on benzene I would just say, there's no allegation that Mr. Newman got the report before he signed the complaint in 2019.  Even assuming he did, reasonably possible, is different than --

THE COURT:  You mean reasonable estimate?

MR. MOSES:  -- is different than something that is

done for insurer maximum -- reasonably estimable for purposes of a reasonably possible disclosure.  That's their allegation, Your Honor.

THE COURT:  Okay.

MR. MOSES:  All right.  Your Honor.  That one wasn't in your order.  I'm glad we addressed it.

THE COURT:  Partly wasn't in my order because I do think both sides, you know, are really, really focused on the first category of false statement, which is the maximum liability.

MR. MOSES:  Your Honor, actually, they pleaded this case saying that that whole $2.5 billion should have been accrued, and we were insolvent from day one.  That's in Paragraph 1 of their complaint.

They pleaded this case as if these were probable and estimable amounts that should have been accrued.  That clearly wasn't right.  They backtracked in response to our motion to say, oh, no, what we really meant is these were maximums that should have been disclosed in that deemed remote place or these show there was a reasonably possible estimate.

So they actually backtracked on their case.  They said this is not really a GAAP case.  But Your Honor, it is a GAAP case because the question is -- these are GAAP disclosures, what is reasonably possible, estimable and reasonably possible. What is -- what should be accrued, what is --

THE COURT:  I agree with you there are GAAP.  I think, I'm not sure I agree with you.  I am inclined not to agree with you on the maximums, the GAAP issue.

Let's just keep walking through.  I think they've got problems.

MR. MOSES:  Good.

THE COURT:  Problems on their Chancery Court complaint.  We will hear from them.

Let me walk though some of the ones where I want to make sure I give you an opportunity.  As I say, I focused principally of the falsity issues at this point.

MR. MOSES:  Your Honor, if I could --

THE COURT:  Give me a second.

MR. MOSES:  Oh, sure.  I think 5B --

THE COURT:  Give me a second.  I'm not as fast as you are.

MR. MOSES:  I've been studying for my oral exam all week long.

5B.3, Your Honor, is the material impact one is not in your order if you want me to address that.

THE COURT:  No.  Let's talk about -- is it Vergnano?

MR. MOSES:  Yes, sir.

THE COURT:  His statement about the PFOA.

MR. MOSES:  That was an accurate statement, Your Honor.  What it concerned was the Ohio MDO, which at the time

was what was viewed as the big overhang on the company. It was accurate for two reasons. This is disclosed in the 10-K as well and the Q, I think, after the settlement was reached.

It not only wrapped up these cases, it also said in part, in place a sharing mechanism with DuPont for those cases, 50-50 and going forward.

So what Mr. Vergnano was saying, we've all been worried about these cases; we feel like they are behind us now because we've reached -- we've, A, reached a deal with plaintiffs, and we have also reached a deal with DuPont for the big amount of money we have to pay now and potential dollars, which may or may not occur, that we have to pay in the future.

**THE COURT:** The fact you really only settled at that 3,500 of 70,000 cases. You say, look, that's implicitly he's referencing that when he's talking about we made arrangements to dispose of these other case out there in the future.

**MR. MOSES:** Exactly. And this is an important point too, Your Honor. There is pages of disclosures on these Ohio cases, these drinking waters actions they are called in the K and the Q, pages of disclosure that go through these cases, where they are.

I think this actually relates to Your Honor's question immediately before, they criticize us for not having estimated amounts, for not having accruals higher than we have for these cases. These are highly complex cases. They involve

complicated questions of causation, complicated question of disease etiology, and, you know, that may go to a jury.

These are cases which, you know, companies can't estimate for.  They would be misleading to estimate for them. What they can do is get extensive disclosures of cases that are public dockets that investors can make their own judgments about, and that's exactly what they did.

So I do think it was an accurate statement, but more than that, I think they have been incredibly detailed in their disclosures around these cases.

Another example of where they criticize us on the reasonably possible disclosure -- you asked about benzene. They talk about New Jersey too.  They say, look, that $1.1 billion, that was done by some paid expert for the state. That's not reasonably possible.

THE COURT:  I don't think your going to have much. Don't worry about that.

MR. MOSES:  Okay.  But I think it goes to the slide of hand that's going on here.  They take things that we say, look, this is a potential maximum.  They say you should have used it for all these other GAAP purposes.  We just don't agree with that, Your Honor.

THE COURT:  All right.  Anything else you want to say?

MR. MOSES:  Well, Your Honor, you had asked some questions on the GenX liability, supposed downplaying of the

GenX liabilities in North Carolina, this plant along the Cape Fear River.

This is one where the question was posed to plaintiffs. Let me just say my piece now and Ms. Saxena can respond. And if I have anything to add, I'll jump up, and Your Honor may or may not let me speak.

**THE COURT:** I'll let you speak.

**MR. MOSES:** But the statements that they said that were challenged, and, again, I don't think this is what this case is really about. The cases that they challenge were statements that Chemours or these officials were speaking, believed that the emissions did not make Cape Fear River or the drinking water in this community unsafe.

That is our position, and we are litigating that. They were true statement. The fact that there are studies that showed GenX may be under certain circumstances harmful doesn't mean that those emissions are harmful.

There is another point about Fayetteville because this is another one, where I think I told you I agreed it was remediation liability. I just want to make this point.

They suggest we somehow went from the $2 million that was alluded to in the complaint or alleged in the Delaware complaint as DuPont's number at the spin to the $200 million that we eventually accrued in 2019 after the settlement with the state of North Carolina.

To be clear, we denied liability in the settlement, but people settle cases all the time when they deny liability.

The -- as if nothing happened in between, and I think it really goes to that complicated judgments that these people at Chemours need to make, the legal department and accounting department.

They started making disclosures on this the very beginning of the class period, in the spring of 2017.  That disclosure gets more and more robust.  It is now multiple pages.  They start making accruals for it.  They tell shareholders we are spending more money as capital expenditures on it.  They even tell shareholders, we can't estimate the final outcome of this, but it could be material.  That was one where they made a judgment.  This is one that could be material.  They could shut down the plant, for example.

Your Honor, I think that story, if we follow it through the disclosures, if you follow those disclosures, it really shows these are very complicated issues that require fine judgment.

That's why we believe this issue of belief allows you to dismiss the whole thing, you know, unless you find that perfect match, which we don't think there is, Your Honor.

The last thing I want to address is, which you, again, you mentioned some other statements, but, Your Honor, I kind of know when the time is up for me, but you did at the 5B.6.

That's their GAAP case, which is now put all the way to the back. Again, that means you have to accept that those things in the Delaware complaint should be accrued. Clearly, that's not the case. We had a nifty slide here that I really wanted to show.

THE COURT: Go ahead.

MR. MOSES: Your Honor, the next slide was $2.5 billion liability dissected. We've already discussed enough about that.

The next slide with the green and the red on it, the kind of Christmassy-looking slide there, Your Honor. That's Vice Chancellor Glasscock versus the plaintiffs. Their allegations, directly contrary to how Vice Chancellor Glasscock understood this complaint, understood the argument before him, and I do think he really underscores how this case ultimately is based on a mischaracterization and misrepresentation of that complaint.

Your Honor, I will sit down and reserve any further comments after Ms. Saxena speaks.

THE COURT: All right. Thank you.

MR. MOSES: Thank you, Your Honor.

MS. SAXENA: Good morning, Your Honor.

THE COURT: Good morning.

MS. SAXENA: May it please the Court again. It's Maya Saxena on behalf of the plaintiffs.

**THE COURT:** Hold on a second.

**MS. SAXENA:** Sure.

**THE COURT:** Okay. Go ahead.

**MS. SAXENA:** Thank you, Your Honor.

So I know Your Honor has some very specific questions about some of the categories, but just as a backdrop for this case, the way that I see it is this is really a tale of two Chemours. You have, as DuPont I think very accurately characterized it, you have a company that's been telling a strikingly different --

**THE COURT:** I got it. I'm not jury. I have articulated that very point to your colleague.

**MS. SAXENA:** You have.

**THE COURT:** What your problem is, as far as I'm concerned is, you are missing specifics.

**MS. SAXENA:** Sure.

**THE COURT:** Right. Let's assume for argument's sake, I am inclined to do this anyway. I agree with you that language -- I forgot.

Before I forget, I do want to ask you one question, which is when you come back up to the podium, and I don't know if you can do this, but can you show me any other filings. It did occur to me that I think the language about the remote, it's just so, in my mind, awkward, that it just invites multiple plausible interpretations.

I am curious, is that language that's routinely used in SEC filings?  Could you point to me, you know, hundreds or dozens of SEC filings that have used that language?  I'd be interested in that before I forget.

All right.  So go ahead.  Your problems with the SEC, let's assume for argument's sake, I agree that awkward language, there's no such thing is remote liability.  Clearly, remote is used, right, to distinguish or to kind of make clear what you do have to disclose, in terms of reasonably possible, that kind of thing.

They didn't have to disclose maximum liability, but they chose to.  My question indicates what I want to know: Where in that Chancery Court complaint you have evidence that assuming you are right about what they said in the SEC filings, that it was false, all right.  Can you walk me through that?

**MS. SAXENA:**  Absolutely, Your Honor.

If I may take a second to address the question you posed to defense counsel.  It is not only awkward, but it's false, and it is extremely rare.  I don't think I've ever seen this type of high-end number in a filing.

**THE COURT:**  I'm not talking about the number.  I'm talking about --

**MS. SAXENA:**  The language.

**THE COURT:**  --  the wordsing.  "Remote" seems to me, the better reading of the phrase is it is remote is modifying

the likelihood of an adverse change in circumstances.

**MS. SAXENA:**  Absolutely correct.  They put that language in there for specific reasons.

**THE COURT:**  I want to know is that language, that exact kind of wording, does it appear routinely in files?  I don't know.

Walk me through where in the Chancery Court complaint, let's do this.  Let's start with your chart.

First of all, do you agree that you probably should revise the chart to the numbers that your friend across the bar said?

**MR. MOSES:**  Yes and no.  What Your Honor has asked for in those categories of SEC filings do relate to specifically enviromental remediation issues.  Our chart includes both.  So for purposes of today's discussion, the numbers that I'm going to be --

**THE COURT:**  How did you do that?  The accruals in your chart refer to remediation accruals, right?

**MS. SAXENA:**  The accruals do.

**THE COURT:**  Why would you then mix apples and oranges and say you're going to have these remote potential maximums when you know in the SEC filings, it is discussing those with respect to accruals solely for enviromental remediation?

**MS. SAXENA:**  Well, in many of these instances, Your Honor, these, I would call them remediation liabilities, do

have both components.  So there's litigation, and there's environmental remediation costs, which often kind of are grouped together for the way that they discuss it.

But in taking Your Honor's comment, we have addressed today's presentation just on enviromental remediation liabilities.

THE COURT:  So you are changing your chart.  So let's look at Q4, 2016.  I'm looking at Paragraph 113 of your complaint.  For that, you say the total accruals were 292.  That's undisputed, right, 292?  Agrees with that.

MS. SAXENA:  That's correct, Your Honor.

THE COURT:  You agree it's 292?

MR. MOSES:  Sorry.

THE COURT:  That's all right.  You don't have a debate with the total accrual number in the chart, right?  It's just that it's only enviromental remediation accrual.

MR. MOSES:  Your Honor, I haven't done the math on their chart.  I think Ms. Saxena just said they've added accruals, other than the Ohio MDL accruals, 335.  It is obviously not there.  That 292 may not be right.  I don't know, Your Honor.

THE COURT:  What do you say?  It's no longer 827.  What is it?

MS. SAXENA:  Your Honor, I'm happy to go through.  I'm focusing on the maximums now rather than the accruals.

**THE COURT:** It says the maximum can only be defined relative to the accruals, right?

**MS. SAXENA:** Correct. Partially correct, Your Honor. We have the accruals, which as defendant acknowledges in their papers, those are based on probable and estimable numbers.

The maximum numbers, which are these high-end numbers, are not based on those. They are based in part on information from DuPont. They are also based on information that we allege, very specifically, defendants knew at the time. And they knew at the time that those high-end numbers that they put in the filings were false, and I --

**THE COURT:** Let's get to what the number is. That's what I care about. If you look at my order, I quote the relevant language from the SEC filings, right?

**MS. SAXENA:** Correct.

**THE COURT:** It says that basically the language we're dealing with is, quote, considerable uncertainty exists with respect to environmental remediation costs and under adverse changes the circumstances, although deemed remote, the potential liability may range up to approximately -- and that's where we have the identified excess sum -- above the specific disclosed amount that was accrued.

That is the formula that is in every SEC filing.

**MS. SAXENA:** That's correct.

**THE COURT:** And you're sticking by the disclosed

amount accrued in your chart in Paragraph 113, right?

**MS. SAXENA:** Yes, Your Honor.

**THE COURT:** All right. And then in the last column of that chart, you said you are going to revise the total amount.

**MS. SAXENA:** To remove the pure litigation costs.

**THE COURT:** So for Q4, 2016, you had remote potential maximums of 535, and so you had a total amount --

**MS. SAXENA:** The total would be 813 million when you extrapolate those litigation costs.

**THE COURT:** Show me in the Chancery Court complaint how you get to show that that 813 number is false.

**MS. SAXENA:** Absolutely.

**THE COURT:** Let's do that.

**MS. SAXENA:** I would just kind of preface my discussion with the fact that it's not just based on the verified complaint. We have additional detail in the complaint that supports --

**THE COURT:** You can point it out if you want.

**MS. SAXENA:** Sure.

**THE COURT:** Start with the complaint. Show me how I get that 813 is a false number.

**MS. SAXENA:** Absolutely.

So the first thing that we know at this time, and Your Honor will forgive me for talking about the Ohio MDL litigation, but the Ohio MDL litigation is one of the main

reasons that defendants knew at the time that we were issuing the statement that the numbers that they had received from DuPont about the maximums, the numbers would form a basis of their own SEC filings, where as they said "wildly off base." They use very, very colorful adjectives.

THE COURT:  We are talking about the enviromental remediation costs, right?

MS. SAXENA:  Correct.  And the only purpose that I bring it up for is the fact that it put them on notice that everything they had received from DuPont at the time, at the time of the spin-off, was, as they said, I think extremely colorful language, spectacularly, staggeringly astonishingly, breathtakingly low.

THE COURT:  Right.

MS. SAXENA:  So the purpose of the -- of me bringing up the litigation is just to show at this point in time, they are on notice that the numbers they received from DuPont are across the board way off, and that relates, as Your Honor brought in the benzene litigation too, that instead --

THE COURT:  I will tell you something.  I have to go to a funeral.  I don't have all day.

MS. SAXENA:  Sure.

THE COURT:  You still haven't gotten me the number.

MS. SAXENA:  Sure.

THE COURT:  I've read your complaint.  I've got the

flavor.  I've got the narrative.  What I need are the numbers.

MS. SAXENA:  You got it.

THE COURT:  All right.

MS. SAXENA:  Okay.

THE COURT:  Show me you really think I've got it.

MS. SAXENA:  At the time they get these litigation numbers, they go back in, and they commission a study by Mr. Kirsch, and say go through all of our enviromental remediation issues, plug the holes, as he calls it.  He comes up with a number for environmental remediation costs of $2 billion.  That's in 2018.

THE COURT:  Where is that in the record?  Where is it in the complaint?

MS. SAXENA:  It is in the complaint, Your Honor.

THE COURT:  I'm sorry.  It is?

MS. SAXENA:  It is in our complaint.

THE COURT:  Where?

MS. SAXENA:  And that is in --

THE COURT:  You are saying DuPont commissioned this study?

MS. SAXENA:  Chemours commissioned the study.

THE COURT:  I meant Chemours.

MS. SAXENA:  Correct.  I'll give you the exact paragraph.

THE COURT:  That's what my order directed you to do.

MS. SAXENA:  Right.

THE COURT:  Is it 127?

MS. SAXENA:  It is.  It starts at 127, 128.  It's that entire section, Your Honor.

THE COURT:  All right.

MS. SAXENA:  That's the first thing we have, that they were on not this significant event, and they went in, based on that, and commissioned their own study.

And I can discuss this specific witness, if Your Honor would like me to, because they did submit a declaration where he sort of partially changed his story.

THE COURT:  Right away, I'm confused.  We are dealing with fourth quarter 2016, and you are directing me to an exhaustive presentation, according to the complaint, that was given in the spring of 2018.

MS. SAXENA:  Correct.

THE COURT:  Two years after the fact.  How does that possibly show that the statement in the 2016, 4th quarter filing was false?

MS. SAXENA:  Because, Your Honor, it goes to their belief in that high-end number.

THE COURT:  It is 2018, after the fact.

MS. SAXENA:  Correct.

THE COURT:  How could it possibly be showing you what they found in 2016?

**MS. SAXENA:** Because it gave them notice that their numbers were correct.

**THE COURT:** They filed the 2016 4th quarter SEC documents before they commissioned the study in question, correct?

**MS. SAXENA:** Let me continue through the numbers.

**THE COURT:** Yes or no?

**MS. SAXENA:** Yes, Your Honor.

**THE COURT:** That has no bearing of the falsity of the statement made in 2016. You would agree with that, right?

**MS. SAXENA:** Well, actually, Your Honor, the 2016 were the MDL litigations, which then put them on notice, and then caused them to commission the study. So this litigation occurred in 2016 but --

**THE COURT:** Let me suggest something to you. I think it's always good to lead with your best argument.

**MS. SAXENA:** You're absolutely right.

**THE COURT:** I mean, you are not. If that's the best, you might as well sit down.

**MS. SAXENA:** It is not the best.

**THE COURT:** Give me your best argument.

**MS. SAXENA:** It is not the best.

**THE COURT:** What's the best evidence that when Chemours filed its fourth quarter 2016 report, and it declared, according to you, that the accruals were 292, right, and it

stated the remote accruals, to use your language, were 535. You are telling me that, which is a total -- came up with total of 813, correct?

MS. SAXENA:  Correct.

THE COURT:  What's the evidence that as of that filing date, which would have been, I think it's February 17, 2017.

MS. SAXENA:  That's correct, Your Honor.

THE COURT:  As of February 2017, what evidence is there that Chemours knew that 813 million figure was false?

MS. SAXENA:  Understood.  So there's three things in addition to what I've already mentioned.  One of those things is the Carneys Point litigation which relates to the Chambers Works.  I think there's some misunderstanding about the nature of this specific item because there's a lot of discussion about it being purely a litigation cost.  It's not.  This particular item is based on New Jersey's remediation statute.

THE COURT:  Point me to the Chancery Court complaint or your complaint that spells out this litigation.

MS. SAXENA:  Absolutely.  So that would be in Paragraphs 276 and 277 of our amended complaint as well as --

THE COURT:  Let me read it.  276 to what?

MS. SAXENA:  277.

THE COURT:  What else?

MS. SAXENA:  We also have additional references to the Carneys Point situation in Paragraph 86, Paragraph -- also

Paragraph 87 and 88 of the verified complaint.

**THE COURT:**  Eighty-six, 87, 88 are the Chancery Court complaint?

**MS. SAXENA:**  Eighty-six is our complaint, and Paragraphs 83, 87 and 88 of the verified complaint, as well as 89 and 90 of the verified complaint.

I think what's important here is that --

**THE COURT:**  Hold up.  I will start with 276 of your complaint.

**MS. SAXENA:**  Uh-huh.  Would Your Honor like me to continue or do you want to take a moment?

**THE COURT:**  I'd like to read it.  Hold on.

Show me in Paragraph 276 of your complaint where facts are alleged that plausibly imply that Chemours knew in February 2017 that it had liabilities for enviromental remediation that exceeded $813 million.

**MS. SAXENA:**  I apologize.  It's also 86 and 89, which are referenced.

**THE COURT:**  Let's start with 276.  Show me where in Paragraph 276 of your complaint, there are factual allegations from which it can be plausibly inferred that Chemours falsely stated in February of 2017 that its maximum enviromental remediation liabilities would be $813 million.

**MS. SAXENA:**  Absolutely, Your Honor.  Well, first of all, this particular complaint is talking about --

THE COURT:  Can you just show me in the language in the paragraph.

MS. SAXENA:  Yes.  A licensed sited remediation professional showed that based on --

THE COURT:  Where are you reading from, what line?

MS. SAXENA:  I'm on the bottom of Paragraph 276.

THE COURT:  It begins -- this is the sentence "indeed in 2016," right?

MS. SAXENA:  Yes.

THE COURT:  Okay.  "The township of Carneys Point submitted to Chemours calculations by a licensed site remediation professional."  That doesn't show -- that does not show that Chemours falsely stated that its maximum remediation costs would be 813 million.  That shows what the township of Carneys Point thought, not Chemours.

MS. SAXENA:  Well, Your Honor, I would then ask you to look at Paragraph 86.

THE COURT:  So you've given up on 276?

MS. SAXENA:  No, Your Honor.  They are all read together.  That paragraph specifically refers to these earlier paragraphs.

THE COURT:  Why does it matter what the township of Carneys Point --

MS. SAXENA:  It matters because the statute under which this is brought is a remediation statute, and DuPont, the

remediation statute is a state-run software, uses a state-run software system to calculate, not litigation costs, but remediation costs.

So under the program that they used, they used DuPont's own historical documents to come up with these numbers.

**THE COURT:**  Let me ask you something.  See that pink pen on your table?

**MS. SAXENA:**  Yes.

**THE COURT:**  Do you like that color?

**MS. SAXENA:**  Sort of.

**THE COURT:**  I don't.  So do you think you just made a false statement because I don't like the color, and you think it's sort of okay?

**MS. SAXENA:**  But, Your Honor, the fact remains with respect to the New Jersey issue, which I'm discussing, there's a couple of things that I think Your Honor may be overlooking.

Number one, the nature of the damage that's alleged there isn't a litigation issue.  It's remediation.  These are pure remediation costs for the cost of what they define as 80 years of environment damage that will take over a thousand years to clean up.

So what they are specifically talking about and quibbling about is remediation.  It's not litigation.

And how they knew it at the time?  Well, their own

director of remediation is the one who is alleged to have been on site.

THE COURT:  Is this in Paragraph 276?

MS. SAXENA:  This is in Paragraph 87.

THE COURT:  Let's do it this way.  You have shown me 276, and I reject the argument.

What's your next paragraph?  I would prioritize it. Remember, your best to your worst.

All right.  So what's your next best?

MS. SAXENA:  So Number 86, Number 87.

THE COURT:  This is in your complaint.

MS. SAXENA:  Correct.  I apologize.  This is our amended complaint, 86, 87.

THE COURT:  Hold on a second.

MS. SAXENA:  Eighty-eight.

THE COURT:  All right.  Show me in 86.

MS. SAXENA:  Okay.  Eighty-six is really the background of it, saying that 1.1 billion figure is not just a prayer for relief.  It's not just a prayer for relief because of the things we alleged subsequently.

THE COURT:  Can I just make sure, you agree the $1.1 billion figure comes from the expert employed by the New Jersey municipality that was suing Chemours, correct?

MS. SAXENA:  Yes.  Based on DuPont's historical numbers.  I think that's an important distinction.

**THE COURT:**  Okay.

**MS. SAXENA:**  As you go into Paragraph 87, I think this is where it really becomes clear that you're talking about a remediation statute.  You are not talking about a litigation expense.  And the fact that these calculations, these data inputs, came from DuPont's own numbers.

Paragraph 88, I think this is where you get the knowledge.  Paragraph 88 talks about Sheryl Telford, who's DuPont's former director or remediation, who transitioned to Chemours, and talking about the fact that look at the motivation.  Why did you she, despite there was this ongoing process of trying to dispute the numbers, why did she not acknowledge the 1.1 billion?  Well, it was because of the motivation.

If that $1.1 billion number was disclosed, DuPont knew through Telford, and Chemours knew, that the spin-off could not have been legally effectuated.

There's a very strong, powerful motivation at the time for not disclosing this number.  And, in fact, Carneys Point alleges that she intentionally concealed it.

We also know in the later paragraph, Paragraph 276, that there were letters exchanged on this exact point, and you're talking about them acknowledging even a small number, and saying look, New Jersey is not accepting that.

So they knew that there was a very significant amount

of remediation costs that were going to come, that were going to come due at this point.

And in fact, in the verified complaint, which Your Honor refers to, they cite this as one of specific bases for why they were, as they call it, insolvent at the time.

They can't say in the verified complaint, oh, this is a very significant issue; this is something that we may even incur additional costs in excess of the 1.1 billion, and then on the other hand say, oh it's just a prayer for relief.  Those two versions of events can't be reconciled.

So Your Honor asked for other items that existed at that point.

**THE COURT:**  I have yet to hear, just so it's clear, any specific reference to a specific factual allegation that shows or plausibly implies that Chemours made a false statement, but you are going to have your opportunity.

What's ironic to me is given the briefing and the complaint, you have yet to direct me to anything in the Chancery Court complaint that would show that Chemours had a belief about enviromental remediation costs that would undermine, or I shouldn't say "undermine," that would establish that they had knowledge that the statements they made in your chart are reflected.  I'm still waiting on it.

**MS. SAXENA:**  Paragraph 92 of the verified complaint is where they acknowledge that this $1.1 billion amount is a

significant amount.

THE COURT: Let me get it, Paragraph 92. Incidentally we're still talking though. So you think 92 is referring to 1.1 billion?

MS. SAXENA: Correct.

THE COURT: That figure, undisputed that figure comes from an expert retained by the adversary of Chemours in litigation, against Chemours?

MS. SAXENA: I would add the caveat to that, Your Honor, that it's based on an analysis of DuPont's own documents.

THE COURT: Fair enough. How many times are we in litigation where two opinions are based on numbers provided by one party? Okay. That's as good as you can do is point me to Paragraph 92?

MS. SAXENA: There's actually several paragraphs in the verified complaint that relate specifically to the Carneys Point issue, and I think I've mentioned some of them. The verified complaint 89 and 90, 88, 86, and I believe I just mentioned 92.

Again, Your Honor, we're not talking, here, about the probable and estimable costs that were recognized at the time.

THE COURT: I actually lean toward you on that. I get it. If you showed me a number in the Chancery Court complaint where Chemours said to DuPont, you lied to us; our maximum

enviromental remediation costs were a billion dollars, the case would go forward on that.  Right, I'm waiting for to you show it to me.

MS. SAXENA:  Your Honor, I think that we have that.

THE COURT:  I have given you every opportunity to show it to me.

MS. SAXENA:  At the time that they made the statements about New Jersey, you are talking about them having an accrual of 101 million across all four of the sites, a number they received from DuPont of the 337 million, which they call completely baseless and off base and staggering low, so --

THE COURT:  I'm lost.  I'm on paragraph -- I'm on your table, Paragraph 113.  How does what you said possibly relate to that?  I'm sorry.

MS. SAXENA:  Well, it relates to that amount, Your Honor.  They know that the numbers they received from DuPont were spectacularly off base.

THE COURT:  So say I grant you that they were on notice that they should be suspect of DuPont numbers, how do you -- other than that, do you have any other evidence or allegations, facts, from which I would plausibly infer that Chemours knew the $813 million figure was inaccurate?

MS. SAXENA:  I think the facts are what I discussed, Your Honor, that they -- they're saying at this time, the maximum, in addition to the accrual, is 535 million above what

we're telling you.  535 million defies logic.

You have the Carneys Point number.  Even if they discounted by a third, you are still talking about a number that would be well in excess when you combine the other New Jersey sites of well over 535 million.  The numbers just don't add up.

**THE COURT:**  Anything else you want to talk about the maximum liability?

**MS. SAXENA:**  Yes, Your Honor.  The Fayetteville issue I think is one that defendants concede is a remediation cost.  With respect to the Fayetteville, the Fayetteville plant, this was the Cape Fear GenX emission.

The verified complaint states they knew the complaint had been discharging PFAS for over 30 years.

**THE COURT:**  Hold up, hold up.  I'm referring to Paragraph 81 of the verified complaint.  Okay.

**MS. SAXENA:**  They knew that this particular plant had been discharging the GenX substances into the Cape Fear River for over 30 years.  Their number in hand at that time was 2.09 million.

There's significant evidence of how they knew their number at the time would exceed the maximums because we reference the Blue Ribbon Panel.  The Blue Ribbon Panel was something DuPont commissioned at the time defendant Vergnano headed the Chemical Performance Unit at DuPont then switched

over to Chemours.  The Blue Ribbon Panel was something that was commissioned by DuPont at the time to assess the costs of remediating Fayetteville.

That panel again, I know it was commissioned in 2010, and I'm referring to Paragraphs 81, 92, 93, 95 and 96 of our complaint.  So they knew that Blue Ribbon Panel had been commissioned to undertake the study.

The purpose of the study wasn't to say, how can we improve our plant or how can we enhance the site?  It was specifically to address remediation issues.

That Blue Ribbon Panel calculated that in order to just stop the emissions into the Cape Fear River, and that's just abatement.  That is not remediation, which you are talking about emissions that go back to 1980.  So you're just talking about abatement.  Abatement, alone, would have cost $60 million.

THE COURT:  How much?

MS. SAXENA:  Sixty.

THE COURT:  So let's talk look at your table at Paragraph 113.  And then tell me, so what number does what you just said about the 60 million, what number is false based on that?  And not only false, but that shows that Chemours knew it was false?

MS. SAXENA:  $535 million number, the maximum accrual range.

THE COURT:  Why?  Because 60 million --

MS. SAXENA:  60 million is the tip of the iceberg.

THE COURT:  How do you get 535 is false?

MS. SAXENA:  Well, because, I am including it with the New Jersey sites and also --

THE COURT:  You mean 1.1 billion?

MS. SAXENA:  The 1.1 billion.

THE COURT:  I don't agree with you on 1.1 billion.

I am not going to say that it's plausible to infer from that, that Chemours knew the 813 million or any of these numbers were false.  That's gone.

So now you are pointing up to me a number about 60 million, which is almost one-tenth of the number that you are alleging is insufficient.  How would that possibly show Chemours knew it's false?

MS. SAXENA:  One point on the New Jersey issue, Your Honor.  You are talking about them having in hand a maximum number of 337 million for all four sites.

THE COURT:  Where is that?

MS. SAXENA:  That's -- that was the number they received from DuPont.

THE COURT:  Where?  Show me.

Actually, I will accept it.  Who cares.  They think DuPont underestimated.  Maybe they think DuPont underestimated by $20 million.

Where is your evidence?  Where is the fact -- we are at the pleading.  Where is the factual allegation that gets you from 340 to over 813?

MS. SAXENA:  The factual allegation, Your Honor, and again, you noted is at the pleading stage.  What did they know at the time that caused them to believe these maximums were off?

THE COURT:  Even if they are off, off by how much?  What's the factual allegation from which I can infer that they thought the 340 million was so off that it was more than 813 million?  Where is the factual allegation for that?

MS. SAXENA:  Again, Your Honor, I understand you have a dispute on the Carneys Point issue.

THE COURT:  This is helpful because, really, it boils down to:  In order for to you prevail, you've got to persuade me that the Carneys Point experts estimate of 1.1 billion is the equivalent of Chemours believing that its maximum liability exceeded 1.1 billion.

MS. SAXENA:  Not that item alone, Your Honor.  Not that item alone.  We have the fact --

THE COURT:  What else do you have that exceeds 813 million besides --

MS. SAXENA:  I think you have the reasonable inference that at this time, based on everything they knew, from the process, from their involvement in the DuPont spin-off process,

where they learned across the board that these numbers were completely and dramatically understated.  From the time of the spin-off, they know the numbers that they are receiving from DuPont are completely baseless.

And yet in many instances, their numbers don't even reflect DuPont's numbers, which they call spectacularly and staggering low.

So do we -- under the Avaya case, we don't have to specific documents, specific meetings but --

THE COURT:  You have to come up with something specific that will get you above 813 million.  You would agree with that?

MS. SAXENA:  Correct.

THE COURT:  What gets you above 813 million?  So I can write it down.  I have 1.1 billion from Carneys Point.  What else?

MS. SAXENA:  You have 1.1 billion.  You have the fact that they know their number from New Jersey, excuse me, Your Honor, their number from DuPont of 373 million was far off base.

THE COURT:  I know for sure, they think, if I accept your understanding of the Chancery Court complaint, I can at least say Chemours believed its liabilities from enviromental remediation exceeded 375 million; is what you're going to say, right?

**MS. SAXENA:**  Exceeded 337 million.

**THE COURT:**  All right.  So I know that.  Exceeded.  What else do I know?

**MS. SAXENA:**  We have the Carneys Point remediation number.  We have the Fayetteville.

**THE COURT:**  That's 1.1 billion.  What else?

**MS. SAXENA:**  The Fayetteville number, minimum, 60 million.  That 60 million isn't remediation.  That 60 million is abatement.  So it's the tip of the iceberg.

**THE COURT:**  It is not remediation.  We are only talking remediation here.

**MS. SAXENA:**  I apologize, Your Honor.  I misspoke.

So the remediation would include, first of all, you have to stop what you're doing; you are discharging.

**THE COURT:**  You think it includes abatement?

**MS. SAXENA:**  Correct.

**THE COURT:**  Do you dispute it includes abatement?

**MR. MOSES:**  We absolutely dispute that, Your Honor.  Chart makes it plain.

**MS. SAXENA:**  I think evidence of the fact that it is --

**THE COURT:**  I will give it to you.  Let's say 60 million for abatement and counts as remediation.

**MS. SAXENA:**  Which is just the tip of the iceberg.  The actual amount that they knew at the time was 200 million

for Fayetteville based on all --

THE COURT:  Where is that?

MS. SAXENA:  Those same paragraph references, Your Honor.

THE COURT:  Show me where it says 2 million.

MS. SAXENA:  That would be Paragraph 86.

THE COURT:  Can you show the line where it says it.  I don't see anything in the 200 million in this paragraph.

MS. SAXENA:  I apologize, Your Honor.  It is the verified complaint, 86.

THE COURT:  Sorry.  What did you say?  What number?

MS. SAXENA:  Paragraph 86 of the verified complaint has $200 million figure.

THE COURT:  Okay.  Let's give it to you.  Let's say it is 200 million for argument's sake, and this is Paragraph 86 of the Chancery Court complaint.

All right.  What else?

MS. SAXENA:  And then in Paragraph 86 of our complaint, we talk about the number that they received from DuPont that -- actually, it goes from Paragraph 84 to 86, where -- and this again, I apologize goes later into the class period, but in Paragraph 85 of our complaint, we talk about them having received an upward adjustment from DuPont of 620 million.  Now that $620 million figure is remediation across all four of the New Jersey sites including Carneys

Point.

THE COURT:  Hold on a second.

MS. SAXENA:  Sure.

THE COURT:  This is a $620 million estimate for enviromental remediation costs for all sites; is that right?

MS. SAXENA:  No.  All four New Jersey sites.  In total the sites that they inherited from DuPont are probably about over 80 sites.  That $620 million figure refers only to the four inherited New Jersey sites.

I am jumping ahead a little bit because Your Honor seems quite ready to dismiss the allegations about the maximum numbers with respect to New Jersey completely.  However, we're talking about the 2017 statements.  And as you move into the class period, there is more and more information that shows that at various points chronologically --

THE COURT:  Let's stick with you agree, this is 2018.  Let's stick with the 2016 for right now.

MS. SAXENA:  Sure.

THE COURT:  So where you are is you have the 1.1 billion for Carneys Point.  You have 337 million, that is the four.  Right?

MS. SAXENA:  Correct.

THE COURT:  You have 60 million abatement.  You are going to call enviromental remediation.  They disagree.  Put it in your tally right now.  And then you have the 200 million

from Paragraph 86 of the Chancery Court complaint.

**MS. SAXENA:**  The 200 million would include the 60 million.

**THE COURT:**  It would include?

**MS. SAXENA:**  Yes.

**THE COURT:**  Oh, okay.  Anything else?

**MS. SAXENA:**  That for 2017 is what we allege.

**THE COURT:**  Now.  When I add them up, if I don't count the 1.1 billion from Carneys Point, you have a total of 537 million.  You are way under 813 million.

Let's go to 2017.  Let's go back to Paragraph 113. What I'd like to do, I don't have that much time.  I want you to give it your best shot.

If you want, pick your best year that has your best evidence, and, again, I use the word evidence.  I mean, allegations.

Go ahead.  Give it your best.

**MS. SAXENA:**  So in that case let's look at 2018.

**THE COURT:**  Hold on a second.  Let me pull it up.

**MS. SAXENA:**  Sure.

**THE COURT:**  So which quarter?

**MS. SAXENA:**  Referring to the 2017 form 10-K, which was filed on February 16 of 2018.

**THE COURT:**  So in your table, where is it?

**MS. SAXENA:**  In the table --

**THE COURT:**  Is it the fourth quarter one?

**MS. SAXENA:**  It would be included in the fourth quarter.

**THE COURT:**  The number you had is $763 million?

**MS. SAXENA:**  Correct.

**THE COURT:**  Has that number been revised?

**MS. SAXENA:**  To exclude litigation costs.

**THE COURT:**  What is it now?

**MS. SAXENA:**  It would be 760.  Did Your Honor say 763?

**THE COURT:**  Well, the table says 763.

**MS. SAXENA:**  That's still accurate because litigation numbers were reflected in that one.

**THE COURT:**  Okay.  So you have to show that, and that, essentially, you are going to show now allegations that show that as of early 2019, Chemours knew that its maximum liability for enviromental remediation exceeded 763 million, right?

**MS. SAXENA:**  Yep.

**THE COURT:**  Go through it.  What's number one?

**MS. SAXENA:**  Number one is the fact that by this time, and I'm referring to the verified complaint, at Paragraphs 83 and 88, that they had in hand, the $620 million figure, which would include remediation across all four of the sites.

And when I give the number, again, I just want to preface it by the fact that in defendant's own words, these numbers they use great adjectives "staggeringly,

astonishingly."

THE COURT:  Let's just go with the numbers.  Give me the paragraphs.  So you are saying we have allegations that they knew that for the four New Jersey sites alone, they had maximum liability for environmental remediation, 620 million.

MS. SAXENA:  Correct.

THE COURT:  Show me the sites, so I make sure I get them written down correctly.

MS. SAXENA:  This would be 83 and 88 of the verified complaint, the Chancery Court.

THE COURT:  Hold on a second.  I don't see anything in 83.  Eighty-three is referring to the Fayetteville Works.

MS. SAXENA:  Eighty-eight.

THE COURT:  Eighty-eight, okay.  So you have Paragraph 88.

MS. SAXENA:  Correct.  You have the $620 million figure.  I will refer Your Honor to Paragraphs 130, 131 and 214 of our amended complaint.

THE COURT:  Paragraphs 130, 131 and what?

MS. SAXENA:  214.

THE COURT:  Of this complaint?

MS. SAXENA:  Of our complaint, as well as.  Sorry, I'll throw another one out there, 121.

THE COURT:  And 121, all right.

MS. SAXENA:  Those references are talking about

Kirsch's evaluation, which by this time, defendant's had actual knowledge of, because they had commissioned it again, as we discussed, when they received the notification of the 3,500 lawsuits and the fact that that settlement was way off.  They then commissioned it and they then had it in hand.

THE COURT:  Let's go through it.  Let's start with 121.

MS. SAXENA:  121 is talking about the fact, this goes to the declaration that they put in, where he changes his story, and says, oh these aren't actually remediation costs; it was capital enhancement project.

THE COURT:  Walk me through it.  121, there's no numbers.

MS. SAXENA:  Defendants attempt to say that this is actually a capital cost, and 121 is talking about the fact that the former CFO of the Fluoroproducts Division said they actually had a practice of calling remediation costs capital enhancement costs or capital projects because they didn't want to disclose the true remediation costs to the market.

THE COURT:  Okay.  So 121.  What's next, 130?

MS. SAXENA:  Yep, 130.  We are talking about Mr. Kirsch's the commencement of his evaluation, itself, where he was ordered to go across all the inherited sites and figure out how much it would cost to, as he referred to it, plug these holes.  And that --

THE COURT:  Hold on, please.

MS. SAXENA:  Sorry.

THE COURT:  131.

MS. SAXENA:  131, 132.

THE COURT:  Hold on.  I'm reading 131.  You want to say 132 as well?

MS. SAXENA:  132 just describes defendant's knowledge that they weren't surprised by these numbers.

THE COURT:  What else?

MS. SAXENA:  I think it's important that at this time that CW3, which is Kirsch, says these are ongoing meetings, and it culminated in an August 2018 presentation to the board.  So this information was all known by the time of the 2017 year end, sorry, May 4 of 2018.

THE COURT:  Okay.

MS. SAXENA:  And then if you want to break down the math.

THE COURT:  No.  Is there anything else you want to point me to?

MS. SAXENA:  At that time, in addition to 620, the 200 and the 2 billion.

THE COURT:  Is the 620 included in the 2 billion?

MS. SAXENA:  It would be, Your Honor.  It would be the floor, correct.

THE COURT:  Anything else?

**MS. SAXENA:**  At that time, I can discuss the insider selling, which, again, goes to their state of mind, but I think Your Honor wants to discuss the numbers.

**THE COURT:**  This is a much better falsity than anything you have raised so far.

**MS. SAXENA:**  Sure.  I apologize.  I thought, Your Honor, kind of wanted to move chronologically.

**THE COURT:**  I said to give your best argument first.

**MS. SAXENA:**  I gave you my best last.

**THE COURT:**  That's 2018.

Do you have any other evidence?  So when I look at your table, this is the second to last line in your table.  Now you've got the first quarter of 2019.  I guess you would say it applies to that too.

**MS. SAXENA:**  It does.

**THE COURT:**  Anything else you want to point me to, any earlier SEC filings?

**MS. SAXENA:**  No, Your Honor.  I think we've covered those.

**THE COURT:**  Really, you only have two.  You really only have two, assuming I accept this.  I want to hear the other side on this $2 billion report.

**MS. SAXENA:**  Sure.

**THE COURT:**  You've only pointed, if I get rid of Carneys Point, I don't see -- I will give you one more

opportunity.  I don't see any allegation from which it could be plausibly inferred that Chemours knew that these purportedly maximum liability statements that are set forth in your table of Paragraph 114 is false.  I don't see it.

I want to hear what they have to say about the last two because you have an allegation that they were aware of a report created by an employee that said their liabilities exceeded $2 billion, right?

**MS. SAXENA:**  Correct.  I think, Your Honor, the only point I would add on that is that the securities laws really don't require us to identify with specificity when we've alleged exactly that this was an ongoing thing.

As they admit in their verified complaint, this was a four-year process that they had objected to these maximums.  This was an ongoing process.  We do allege a lot of facts on 2017.  They get stronger and stronger as the class period continues.

**THE COURT:**  Okay.  Let's here from the defense.  Falsity, we have other things to cover.

**MS. SAXENA:**  Sure.

**THE COURT:**  I'm sorry.  You know, I have to finish.  We only finished false maximums.  We have to hustle.  Let's quickly talk about the other categories of false statements that you've got.  All right.  So let's look through your brief.

**MS. SAXENA:**  Okay.

THE COURT: 5B.4 you say that defendants falsely asserted Chemours was transformed with a solid balance sheet and PFAS liability behind us.

Can you show the facts that category of plausible falsehood.

MS. SAXENA: So the statements in this kind of qualitative category of statements are ones that kind of taken together really portray a very misleading picture of the company's financial condition, created a very different risk profile than what investors believed they were investigating in. They believed they were investing in a company that had a maximum capital of --

THE COURT: The maximum capital, you've got some legs on that argument. Let's just stick with this: Where are the falsehoods here?

You can't just say, well, you know, taken together there's some amorphous concept out there that somebody might have a different view. That's not good enough.

So show me the specific allegations from which there's a plausible inference of falsity.

MS. SAXENA: Sure. With respect to that statement that Your Honor is referring to, there's a little bit more in it than just the 3,500 cases settlement. They also talk about their liabilities being mature and other statement.

THE COURT: Show them to me. I am the one who has to

write an opinion.  I can't do it by, well, there is this vague allegation.  Show them to me.

MS. SAXENA:  All right.  So Your Honor is talking about, I believe, the statements in Paragraph 176 of our complaint that talk about the liabilities being behind us.

THE COURT:  Actually, just so you know, I'm talking about what I asked you to do in my oral order.  Come in here and tell me for each challenged SEC report, identify the specific allegations in the complaint that you said plausibly imply the defendants made false statements as you discuss here.

So go ahead and walk me through it.

Let's start with the first section, Defendants lawsuit was transformed with a solid balance sheet and PFAS liabilities behind us.

MS. SAXENA:  So when you are talking about the fact that these, they said these liabilities are behind us, and they have a solid balance sheet, our contention is that these statements were materially false and misleading because at the time these cases were settled, they knew that they didn't have sufficient capacity to fund these litigations on their own.

In fact, as the verified complaint alleges, had they not gotten that cash infusion from DuPont at the time, they would have been considered, as they themselves characterize it, a fraudulent transfer, a fraudulent conveyance under Delaware law.

So you are talking about them saying our liabilities are behind us, and this overhang is behind us, when they are, in fact, at the same time in possession of significant information, which indicates that they knew these maximums were wrong.  And that even this one event, put their entire corporate existence in jeopardy.

The other types of statements I think are covered in this section are the statements about the Moody's credit upgrades.  I think those appear in a couple of instances in the complaint.  I think those are also very significant because they are very factually able to be discerned as false.  They say as one of the reasons pointing to the success of their --

THE COURT:  Let me say this.  You state on page 24 of your brief that "defendant's repeatedly promoted a strong solid and de-risked balance sheet."  For example, Paragraph 234.  Paragraph 234.  Go to Paragraph 234 of your complaint.

It reads:  Defendant knew, stated that the company's net leverage ratio continued to be low at approximately 1.6X and asserted that we believed that our de-risked balance sheet gives us the ability to execute our strategy through any potential economic cycle while returning the majority of our cash flow to shareholders.

Where are the facts from which it could be plausibly inferred that that statement by defendant Newman was false?

**MS. SAXENA:**  Your Honor, how can you be de-risked and

have a clean balance sheet when you know that you have inherited liabilities of 2.5 billion outstanding that you don't disclose to the market?

THE COURT:  What is a de-risked balance sheet?

MS. SAXENA:  Talking about amount of leverage that they have.

THE COURT:  Show me in the complaint where there are facts that show that the statement that he says, "We believe that our de-risked balance sheet gives us the ability to execute our strategy through any potential economic cycle" is false.

MS. SAXENA:  I would say Paragraph 176, where we talk about the company speaking about the debt and legal liabilities as if they were in the past tense when they already knew the numbers that formed the basis for their high-end numbers were dramatically understated.

Paragraph 180, again, referring to the fact that they knew about these inherited liabilities.  So a statement, as they put it, they're focusing on the statements being literally true and not materially false and misleading.

Our contention is that these statements are all materially false and misleading because they depicted a very, very different type of company that investors were investing in, a very different risk profile.  I think that's best indicated by two different things.  You have the Moody's

downgrade immediately after the verified complaint is filed, which says they're being downgraded because of the existence of these previously undisclosed liabilities.  And you've got Sun Trust coming out and saying, once the amount of these liabilities come to market, that this is a different company. These maximums were more than we thought.  And, again, downgrading the company because of these statements and the false impression that they created.

And the statements that I am a referring to about Moody's and the analyst 190, 196, 200, 203 of our amended complaint.

Your Honor, I'm happy to discuss one of the last statements that Your Honor identified in the order, which was a statement about them being set up to fail, if you would like me to briefly address that before I sit down.

**THE COURT:**  Let's talk about Section 5, defendants falsity downplayed GenX liability.  So you've got in your brief you say specifically, "Defendant's told the public that the level of GenX in the river was safe and does not pose any harm to human health," unquote.

Where are the specific allegations from which I can infer that that was a false statement when it was made?

**MS. SAXENA:**  So the GenX statements are Paragraphs 183 and 184 of our complaint.

**THE COURT:**  Okay.

MS. SAXENA:  Paragraph 186.

THE COURT:  Hold on.  Let's do it one at a time.  So let's start with what the false statement that's alleged, right.  What is the false statement alleged?  According to your brief, it's that the defendant said that GenX river was safe, didn't pose any harm.

MS. SAXENA:  Correct.

THE COURT:  Where in 83 is there evidence that Chemours made a false statement?

MS. SAXENA:  I apologize.  183 is the statement itself.  I'm referring to Paragraph 186 that talks about -- 186 talks more about the abatement and then --

THE COURT:  Let's do this --

MS. SAXENA:  Paragraph 200 addresses that.

THE COURT:  I want to know where in the allegation a fact that shows that the statement was false?

MS. SAXENA:  That would be in Paragraph 200.

THE COURT:  200, okay.

MS. SAXENA:  Where we --

THE COURT:  Let me get there, so I can get to it.  Okay.

MS. SAXENA:  We talk about in Paragraph 200 the fact that by this time, they already had the 2009 EPA consent order.

THE COURT:  Show me where it says that we know that they knew that their statement about GenX was false.  Walk me

through 200.  Where is it?

MS. SAXENA:  It's also in Paragraph 90 to 99.

THE COURT:  Let's start with 200.  Show me in 200 where it is.

MS. SAXENA:  Sure.  So in 200, we're talking about the studies that they had in their possession.

THE COURT:  That doesn't show it was false.

I'm sure you have at your house various books that say certain things that you don't agree with, right.  Just because you are in possession of some kind of report or statement doesn't mean that you know and believe, more importantly, that you believe it's a false statement.

So that's not going to cut it, they are in possession of numerous studies.

What else do you want to show me in paragraph 200?

MS. SAXENA:  That was the purpose of Paragraph 200.

THE COURT:  That's gone.  What's next?

MS. SAXENA:  So Paragraph 92 talks about --

THE COURT:  All right.  Hold up.  I've got Paragraph 92.

MS. SAXENA:  -- talks about, again, the EPA consent order.

THE COURT:  People enter consent decrees all the time without --

MS. SAXENA:  Your Honor, I will clearly admit that

this --

THE COURT:  You want to pull this from the complaint? That would make my life alot --

MS. SAXENA:  Sure.

THE COURT:  See, this is the problem you set up, right.  You have something that's -- I'm not saying I am not going to dismiss it.  You have something that's good, but you file a complaint that is over 160 pages.  And in your brief, you identified six categories of false statement.  It is littered with quotes, allegations of falsity, but there's no specific allegations backing them up.  And so you undermine your good argument because I'm spending time focusing on Section 5B or, yeah, 4 through 5B.6, trying to figure out where that specific allegations to show that Nemours made knowingly false statement.  I don't see any.

Now the purpose of the oral argument to focus you, so you can give them to me.  What would make my day great is to say you know what, this is all about the maximum liability.  We will get rid of all those allegations.  Otherwise, you've got to walk through them all and tell me where in the complaint there's plausible allegations of falsity.

MS. SAXENA:  You are right, Your Honor.  I think as a plaintiff's bar, we tend to believe we have to put in more than less.  Given Your Honor's docket, I apologize.

THE COURT:  You don't have to apologize.

You make -- I mean, can I take it that you agree that there's really not six categories of false statements.  There's three.

The first three, including in the three is the benzene liability, but I can get rid of -- I can write my opinion by saying, you know what, 160 pages, lots of allegations, ten SEC filings challenge other statements made outside the context of SEC filings, and plaintiffs, they identified three categories of false statements, and that's what I'm going to focus on.

**MS. SAXENA:**  I think the maximum liabilities you are absolutely correct on the benzene.

I think the only point I would add on this kind of second category of statements, and I agree that the GenX is absolutely not our best foot forward.  So the only statements I would really draw your Honor's attention to, and for purposes of brevity, I'm just going to kind of summarize them, is the credit upgrade statements that they make repeatedly in this section of statements Your Honor identified for us that --

**THE COURT:**  Let's do this.

**MS. SAXENA:**  Okay.

**THE COURT:**  I can't leave here with that.  It's too much work for me.  So in your brief, you identified six categories.  First, you say defendants asserted false liability max.  You are sticking with that, right?

**MS. SAXENA:**  Yes.

**THE COURT:** Okay. And although you are agreeing that there are no specific allegations to support plausible inferences of false statements in the first SEC filings except if I buy 1.1 billion Carneys Point argument.

**MS. SAXENA:** Correct.

**THE COURT:** Good. I understand the arguments.

You are sticking with the defendants -- that there are plausible allegations that defendants falsely asserted that certain liabilities were not estimable, and a range of losses could not be estimated. That's Section 5B.2 of your brief, correct?

**MS. SAXENA:** That's correct.

**THE COURT:** I get that. Paragraph 5B.3 you are sticking with that there are allegations that plausibly imply that defendants falsely asserted Chemours liabilities had no material impact.

**MS. SAXENA:** Correct.

**THE COURT:** We get to 5B.4, where you had alleged in your brief that defendants falsely asserted Chemours was transformed with a solid balance sheet PFAS liabilities behind us. Are you maintaining that?

**MS. SAXENA:** Yes, Your Honor.

**THE COURT:** Then you need to show me where there are specific allegations of falsity. You only have about seven minutes.

MS. SAXENA:  Okay.

THE COURT:  Before we do that, let's get to paragraph 5B.5 you allege in your brief, that the complaint contains allegations that defendants falsely downplayed GenX liabilities.  Sounds like you are going to withdraw that?

MS. SAXENA:  Correct.

THE COURT:  By "withdraw it," I am going to withdraw it from the complaint.

MS. SAXENA:  That's fine.

THE COURT:  They are gone.  They are not actionable. We are not going forward on that.

MS. SAXENA:  That's fine, Your Honor.

THE COURT:  All right.  Do you want to do the same with 5B.4?

MS. SAXENA:  5B.4.

THE COURT:  "Defendants falsely asserted Chemours transformed with a solid balance sheet and PFAS behind us."

MS. SAXENA:  I don't think we should withdraw it. I understand Your Honor's --

THE COURT:  What do you want to -- then narrow it. What is it you are going to say about specific allegations of falsity?

MS. SAXENA:  The specific allegations of falsity are the undisclosed liability maximums that they have.

THE COURT:  That's in Section 1.

**MS. SAXENA:** They are also in this section.

**THE COURT:** They might be. But they are covered by -- to the extent that they are covered by 5B.1, they are already covered.

**MS. SAXENA:** Okay. I didn't understand.

**THE COURT:** Is there anything else that you want under this section to maintain as actionable statements?

**MS. SAXENA:** By Your Honor saying they are covered in the earlier section, would you include the Moody's upgrade that they talk about their credit profile?

**THE COURT:** No.

**MS. SAXENA:** If Your Honor would allow me, I will skip to that.

**THE COURT:** Fine. Where is it in the brief?

**MS. SAXENA:** Okay. So the comments I'm referring to that has the Moody's upgrade.

**THE COURT:** Looks like Paragraph 201 of the complaint; is that right?

**MS. SAXENA:** I think that is correct. I've got it here. Yes. Your Honor, exactly correct.

So you are talking about the fact that they are really touting, at this point, the fact that because they have these liabilities that as they say earlier in the class period are well understood and well managed, and they talk about balance sheet transformation that Moody's goes ahead and accepts those

statements and upgrades them.  If you look at paragraph --

THE COURT:  How is that false?

MS. SAXENA:  It's false because --

THE COURT:  Did Moody's upgrade it?

MS. SAXENA:  They did upgrade it, but as soon as they found out about the true number of liabilities that were disclosed in the verified complaint, they downgrade them.

THE COURT:  How do you know?  What's the evidence at the time he said, quote, this is according to your complaint. "This improvement has been recognized by our rating agencies with the recent Moody's and S&P upgrades resulting in strong BD credit profile."

Where is the evidence at the time Newman made that statement, he knew it was false?  It sounds like you don't even think it's false.  There was Moody's and S&P upgrade.

MS. SAXENA:  There was an S&P upgrade, but they didn't disclose that it was based on completely false information. That upgrade is based on the amount of debt and liabilities that the company has, and this company has an overhang of undisclosed liabilities.

THE COURT:  Where's the evidence that he knew that it was -- you are not even alleging that it's false.  You may say the upgrade isn't good, but there was an upgrade.

MS. SAXENA:  There was an upgrade.  Again, Your Honor, it was based on information that was false.  So had the market

known, as they later was revealed, about the liabilities, they wouldn't have had an upgrade.  That's what they say later.

**THE COURT:**  It is a disclosure case.  It is not a fraud case defrauding Moody's.  It's a disclosure case, okay.

**MS. SAXENA:**  Again, Your Honor, those statements were very material to the market.  This was a market that, even before the class period, was very intently focused on what the defendants were saying about their liabilities and their ability to manage those liabilities.

So when they come out and say things like that --

**THE COURT:**  So where is it alleged that he gave false statements to Moody's?

**MS. SAXENA:**  It's not that he gave false statements to Moody's.

**THE COURT:**  False information.  Sorry.

**MS. SAXENA:**  Well, all of the numbers that were used in the financial numbers that Moody's would use to assess a company's credit worthiness in their public filings, that would be based on all of their public filings, and that we allege to be false.

So not only did he know by virtue of his role in the DuPont spin-off process, where he was confronted with the maximums and refused to sign off on them because he had no understanding of the basis for how they came up with, other than knowing that they excluded two very important categories.

So what we're saying is that at the time that they make those statements about Moody's upgrading them, they know about this overhang of massive liability, whether it's the 1 billion or 2 billion or the 2 billion that they had.  They know their true risk profile at the time and don't disclose it.

So Moody's is basing their evaluation on information that's completely false.  That information is conveyed to the market.  The market accepts it, and it's false.

THE COURT:  Where is it alleged they gave false information to Moody's.

MS. SAXENA:  It's not specifically alleged that they gave false information to Moody's, Your Honor.  It's alleged that they falsely touted that Moody's upgrade knowing that Moody's upgrade had no basis and was based on false information.  So they made a statement about their credit worthiness while knowing that, in fact, at that time --

THE COURT:  Are you saying there is an omission?

MS. SAXENA:  It is -- it is both an omission and a misleading statement, Your Honor.

It is an omission in the sense that they knew about these liabilities, whether you call it a billion in just environmental remediation or you call it 2 billion, which is what Kirsch said it was.  They know about these numbers, and they don't disclose them.

It's also false and misleading because it shows that

the market had accepted the fact that they had a much different credit risk profile than they did.

THE COURT:  Are there any false statement that fall into the category 5B.4 that you are not withdrawing?

MS. SAXENA:  The GAAP statements?

THE COURT:  I am on 5B.4 of your brief.  Under the category of defendants falsely asserted Chemours was transformed with solid balance sheet and PFAS liabilities behind us.

What I understand so far you said is statements that fall in that category are effectively withdrawn from the complaint except the statement about Moody's in Paragraph 201. Is there anything else?

MS. SAXENA:  The other statement --

THE COURT:  I want to make sure for the record we're good on that, that you agree with that.

MS. SAXENA:  I don't necessarily agree that they are all withdrawn.

THE COURT:  What, then, are you maintaining under this category other than Moody's?

MS. SAXENA:  We would still maintain that the statements in Paragraphs 165 and 167, particularly 167, where they are talking about their liabilities being fairly steady and mature and known.

THE COURT:  166 and 167.

**MS. SAXENA:**  167 talks about them having a fairly steady mature liability.

**THE COURT:**  Okay.  Fairly steady mature liability, where are the allegations in the complaint to show that is a knowingly false statement?

**MS. SAXENA:**  Again, Your Honor, we are referring to the fact that they know about over $2 billion in liabilities that they don't disclose.  So it's kind of the opposite of what they are saying.

They are saying we have these liabilities that are well understood and well managed and are mature and steady.  And then on the other hand, they are saying in the verified complaint, oh, we have got all these 2.4, 2.5 billion in massive liabilities that we have been objecting to over the course of four years.  Those two statements are entirely contradictory.

**THE COURT:**  When was the statement made in Paragraph 167?

**MS. SAXENA:**  February of 2017.

**THE COURT:**  So it's two years before the filing of the Chancery Court complaint?

**MS. SAXENA:**  It is two years before the filing of the complaint.  Kind of going back to the categories I articulated and how they kind of develop knowledge and various points --

**THE COURT:**  So show me where, and, again, when is

defendant Newman made the statement in 167 on what date?

**MS. SAXENA:**  This was made February '16.

**THE COURT:**  February 2016.  Show me.  Please point me to allegations of fact that in February of 2016, Newman believed that Chemours did not expect that its environmental liabilities to be fairy steady and mature.

**MS. SAXENA:**  I would point Your Honor, again, to paragraphs references in the verified complaint that I mentioned before.

**THE COURT:**  You are going to have to tell me what they are.

**MS. SAXENA:**  Sure.  So those would be Paragraph 83 of the verified complaint.  You are talking about $337 million figure that they characterize as grossly understated.

**THE COURT:**  Where?

**MS. SAXENA:**  Talking about the verified complaint.

**THE COURT:**  I am looking at it. 83 is talking about Fayetteville.

**MS. SAXENA:**  I apologize, Your Honor.  It's 88.

**THE COURT:**  88 is talking about the 2019 lawsuit and 2018 revision of liability estimates.  How do you get to 2016?

**MS. SAXENA:**  So 2016 --

**THE COURT:**  Actually, in fairness to defense, I can't give you anymore, and it really is unfair.  It really is for you to load all this up.  I am trying to think of a way to deal

with the situation.

Let me hear from the defense.

**MS. SAXENA:** Sure.

**THE COURT:** I think the only real issue with respect to the maximum liability has to deal with the last two SEC filings and whether the Kirsch report is sufficient to create a triable issue of fact on whether there's been a knowing false statement. So how do you respond to that?

**MR. MOSES:** I respond the way we responded in our brief, Your Honor.

**THE COURT:** I don't remember.

**MR. MOSES:** I will tell you. I apologize, Your Honor.

As their complaint makes clear, Mr. Kirsch was talking about plug all the holes. Those things, and actually if you read the allegations in order, in the complaint they make this point: Well, they don't -- they do some things are not required by law; therefore, need to be remediation liabilities. There are other things that Mr. Kirsch used to plug all the holes.

**THE COURT:** Capital and all that.

**MR. MOSES:** Yeah. That is not remediation liability.

**THE COURT:** Help me out. First of all, where is it in the brief since --

**MR. MOSES:** Your Honor, it is our brief at 35 to 38, we talk about the confidential witnesses.

THE COURT:  Hold up.

MR. MOSES:  This is actually a slide that we put in. It's slide six.

THE COURT:  Okay.  This is on scienter.

MR. MOSES:  It is on scienter in the context of the brief.  It does go to falsity as well because if it is not a remediation liability, it does not go to what the deemed remote figure is.

THE COURT:  I got you.  I am at 12(b)(6), not pleading standard.  How on the falsehood -- we will deal with scienter in a second.  Let's deal with falsehood.

MR. MOSES:  Your Honor, I think it's when you are dealing with confidential witnesses, where they call these people up, and they say, they hear the word remediation, they say remediation liability, but the allegations made clear that they are actually talking about plugging holes, not about required, what's required by law.

Your Honor, we cite a case in our papers.  Your Honor can take that all that context into account about how to assess plausibility of allegation about our confidential witness.

We did put in a declaration for Mr. Kirsch, that makes clear at this point, but I don't think you have to get to that because the allegations they make clear, this is not required; therefore, it's not remediation liability.

Your Honor, on a 12(b)(6) motion in thinking about

whether they met their 9(b) pleading standard of specificity and why, can take that all into account.  That's what I got Your Honor.

I'm going to do it quick.  I think I can do it quick.

On Kirsch, that's our position.  It is not until September 2018 or whatever, August 2018, whatever they allege. It is not remediation liability.

Your Honor can also take into account that in September 2018, Chemours disclosed a corporate responsibility program, which is what Mr. Kirsch was talking about.  This was good governance stuff.  This is corporate stuff, voluntary. They would do it if they could.  Not remediation liability, which is what they disclosed.  That's Kirsch.

THE COURT:  Okay.

MR. MOSES:  All right.

THE COURT:  That's the only one they've got.  Maybe I will take your advice, right.  My problem is I only have a few minutes left.

MR. MOSES:  I understand.

THE COURT:  And I begged the plaintiff to come in here.  I told them what I was looking for.  They didn't do it. It is still a mismatch.  It took how long to get to the best statements, 218 the last two SEC reports.

You know, think about all the stuff we are talking about.  2016 false statements, they are pointing to statements

from 2019 supposed to somehow show falsity three years earlier. So it's frustrated.

I shouldn't have to do the job of the plaintiff, but I want to do justice. And but at some point, you know, we only do so much stuff. You want to choose to bring a 160-page complaint, and you can't succinctly and directly point the Court to the alleged false statements should be the end of it. The burden is on you.

What do you think I should do with the rest of this stuff? I think we've gotten enough clarity on the false statements that I can address on. What do I do about the rest of it?

**MR. MOSES:** Your Honor, Ms. Saxena has withdrawn the GenX 5B.4. Thank goodness for small things.

I think to the extent they have not here justified it, you should dismiss it. I think you should dismiss the other elements as well. They had plenty of opportunity. I think you should dismiss it with prejudice. Even the things they attempt to justify, we made argument, obviously, why you should dismiss that as well.

You know, Your Honor, the other obvious issue is when these cases go forward and the plaintiffs put up everything under the sun, if Your Honor were to let this go past go, it makes everything more burdensome. It makes it more difficult to resolve these cases if that's where the parties want to go.

I think you should prune it completely.  You should prune it as much as you can, and I think, for example, the loss causation argument we make, which we didn't spend time on today, I think they are well briefed, give you an opportunity to get out of a lot of this case.

I think your insight into timing gives an opportunity to get out a lot of this case.

I will make a point on timing.  They assume that we knew everything at the time of the spin that we alleged in the Delaware complaint.  Your Honor knows that is not true.

I mean, when you file a complaint like that, you do a lot of work.  You learn a lot of things.  You make some allegations that doesn't mean people at Chemours, they haven't alleged when people knew things other than Kirsch.  They do allege that.  I'll give them that.  We don't think it is what they say.

The $620 million number which they talk about, which is plainly a DuPont number, and what it is, and we talk about this in our reply brief is from something DuPont did in September 2018 in connection with the DowDuPont.

I think everyone in Delaware knows has been kind of ejecting different parts of itself, and that was where that number came from.  That's where we found that number.

**THE COURT:**  The truth is that number alone doesn't get them anywhere.  They have to get over --

MR. MOSES:  813.

THE COURT:  -- 813.  So 620 million doesn't get them there.  What gets them there is the Kirsch report, that's --

MR. MOSES:  Your Honor, I have given you my best shot with the Kirsch report.  I think it's right.  Your Honor will, obviously, consider it.

Can I address one last thing, Your Honor?  I can tell we've burdened the Court's time enough.

On this Moody's upgrade and the transformation, if you look at those allegations, and I'm not going to go through them again, but I wrote them down.  What they talk about is balance sheets, right, gives us the flexibility in one of them to return cash.

That is precisely what the case before Vice Chancellor Glasscock was about.  Those derivative plaintiffs said you shouldn't have been returning cash to shareholders because you should have been accruing the $2.5 billion.  That is what they allege in those paragraphs.  They are saying we didn't have balance sheet flexibility because we didn't accrue $2.5 billion.  It should be out of the case, absolutely should be out of the case.

THE COURT:  They didn't argue really.  I didn't hear argument.

MR. MOSES:  They were trying to say no, no, this is about maximum liability.  That is not what they allege in those

paragraphs.

Your Honor, one last thing on materiality. Again, this is a point we make in our brief. They misquote our filings. What we say in remediation liability, it won't be material in any one year.

THE COURT: Actually, hold up on that. I want to find something. I thought about that.

MR. MOSES: I've gotten to the point where I have the stack of papers, and I'm not sure where what I want to say is, but hold on.

This is page seven of our reply brief, and we use --

THE COURT: Do me a favor, give me one second please.

MR. MOSES: Take your time, Your Honor.

THE COURT: I don't need to address that.

I've already concluded, and I'm going to stick with it, that the statements fall under 5B.3 of their brief, certain statement or statements of certain liabilities have no impact. They are not going to go. There's no plausible allegation of falsity. Partly, a bunch of them, right away, they truncate the quote. They don't have the language at any given year. They don't identify anywhere in their briefing a factual allegation from which you could infer that was a false statement. So yes.

MR. MOSES: Thank you, Your Honor. I will just leave you with this: I think that we've addressed some of the

specifics here the best we could.

I do think Your Honor is correct on focusing on subject disbelief, but I do think these are forward-looking statements, and Your Honor can under the PSLRA, if you find the cautionary statement is robust enough, I believe it is, for those deemed remote disclosures, find it is protected.

And then the other thing I would say is that scienter is not --

**THE COURT:**  Let me ask you --

**MR. MOSES:**  Yes.

**THE COURT:**  If I recall, way back, I found there was safe harbor.  I found in the alternative is my recollection. There are not a lot of cases out there where courts say this is safe harbor.

**MR. MOSES:**  There aren't a lot.  I think Courts are reluctant to do it.  This may be one where you should because this is one where they are clearly trying to do more.  They --

**THE COURT:**  It's like it makes it so easy.  That's going to get rid of --

**MR. MOSES:**  I think congress was intending to encourage people to do these kind of forward-looking statements and said if you really are robust in your cautionary language, you are okay because we want to protect you.  We don't want these kinds of suits after the fact.

You see how plaintiff is stretching this Kirsch

declaration, which I think based on -- doesn't mean what they say.  Addendums in other cases and PSLRA was about preventing the cost of having to litigate.

THE COURT:  I get that.  I'll tell you what really though gives me pause, it's that language you use with respect to remote.

Did you, by any chance --

MR. MOSES:  I think the gremlins --

THE COURT:  Did the gremlins come up with anything?

MR. MOSES:  Nothing from the team in New York.

THE COURT:  I will give the parties, both sides, an opportunity to submit examples or letter briefing on that issue because that really gives me pause.

MR. MOSES:  I think one thing we will say in our letter briefing -- I will say this so Ms. Saxena and her team can think about it.

Even if you were to say that the plausible reading is the one you said today.  I'm willing to stipulate to that, but that there is a plausible reading in that.

THE COURT:  I don't want you to contest that in the briefing.

MR. MOSES:  No, I'm not --

THE COURT:  Point to me here is ten other companies.  This is routine language.  Everybody knows it.  I want to know or and you are telling me, my inclination, I think you are

probably right.

MS. SAXENA:  Thank goodness you think I'm right on something, Your Honor.

THE COURT:  No, no.  You have to pick your shots.  You know, like I said, listen, compared to the patent cases because they get de novo review on everything, they don't drop any argument.  It is not effective advocacy.  Pick your battles.

MR. MOSES:  Your Honor, I would make this point on that:  I think the issue of scienter applies to it.  I think even if you were to conclude it's conceivably false here for pleading purposes, it means potential maximum.  This is an unusual disclosure, and here's evidence that they --

THE COURT:  I don't think you can make an argument the other way.  Why come up with crafty language?  I think that's the narrative.  I do think the defendants paint a compelling --

MR. MOSES:  You would have to conclude that there's an allegation that they did this to come up with crafty language.

THE COURT:  Well, there's implicitly in that allegation that they did this intentionally, that they absolutely knew this was coming, and they were purposefully using this weird language to --

MR. MOSES:  I think --

THE COURT:  Yeah.

MR. MOSES:  I think they were trying to be helpful to the shareholders, not give more, not less, which is what they

actually allege.

Your Honor, thank you so much for your time. We appreciate the Court's attention to this matter.

THE COURT: Thank you all. Have a good day.

The letter briefs, so you have until -- I'm going into three trials. I am going to lose momentum, which disappoints me.

How fast can you get me these to me?

MR. MOSES: Are we going t do it simultaneously?

THE COURT: Yes.

MR. MOSES: Why don't you --

THE COURT: Here is bunch of cases. Maybe you say we can't find anything or we found this is how people talk about remote liability, if there is such a thing.

MR. MOSES: Your Honor, one week from today.

THE COURT: Week from today will work. Does that work?

MS. SAXENA: Yes, it does.

I'd also like to throw out there, given Your Honor's statements about the various categories, we are also happy to replead a complaint in conformance with the comments Your Honor made today, if that would assist Your Honor.

THE COURT: This is what -- I mean, part of me would absolutely embrace that, but, you know, the problem is -- and that's why I said I was trying to figure out a good way to

address this.

We have not had argument on GAAP, you know little bit of GAAP argument from the defense.  None from the plaintiff.  I haven't really thought through the GAAP, frankly, on the falsity.  I was hoping to get some particulars here.

But I do generally agree with the defendant.  I think that really falls into the safe harbor and falls into statements as long as there's sufficient disclaimers.  Frankly, a lot is opinion.  This is not -- you know, these are estimates.

For instance, on false statements, I will tell you right now where I am.  You have not alleged anything plausible except for possibly the last two statements based on the Kirsch report.

What I need to do is think about is that a 12(b)(6) issue that I should decide.  I need to think about it.  I don't need more briefing on that.

If I conclude with the defendants that they are right, that maybe I can't rely on this Kirsch declaration or other arguments that they made, and I get rid of it, I don't want to replead and start all over.

I'm not going to -- I mean, the impact statements, they are going to go.  The benzene liability, there's some that are going to go.  As I mentioned, the timing is off.  There are some I need to think about.  And I've gotten through a lot of

the other ones in my mind.  I am not inclined to say, no, go ahead and replead before I write.

MS. SAXENA:  Thank you, Your Honor.  I will just throw out on the Kirsch statements that we have a couple of other things there.  We have the fact that he says in his statements these -- the characterization that he's making will be documented in the board's minutes.

So, again, as to whether it relates to a 12(b)(6), it doesn't because --

THE COURT:  I will look at that.  I will say this:  I would invite and encourage, if you realize, look, we're not going to win these arguments, and you would like to withdraw those allegations, I would certainly welcome it and invite it. And I mean, I'm going to wait all week, at least, until I get your papers, so just think about it.

MS. SAXENA:  Thank you, Your Honor.  We will do it.

THE COURT:  You have a week.  Good arguments.

MR. FOULDS: [3]  4/8 4/15 4/17
MR. JAMESON: [4]  3/11 3/13 3/16 3/18
MR. MOSES: [118]
MS. SAXENA: [226]
THE COURT: [350]

## $

$1.1 [4]  33/14 51/22 52/15 53/25
$1.1 billion [3]  33/14 51/22 53/25
$111 [1]  23/12
$111 million [1]  23/12
$2 [5]  34/21 44/11 69/22 70/8 87/7
$2 billion [3]  44/11 69/22 87/7
$2 million [1]  34/21
$2.5 [6]  15/14 18/23 30/12 36/8 94/17 94/20
$2.5 billion [4]  15/14 18/23 36/8 94/20
$20 [1]  58/25
$20 million [1]  58/25
$200 [2]  34/23 62/13
$200 million [2]  34/23 62/13
$278 [1]  9/1
$278 million [1]  9/1
$337 [1]  88/13
$337 million [1]  88/13
$535 [3]  9/4 11/6 57/24
$535 million [3]  9/4 11/6 57/24
$60 [1]  57/16
$60 million [1]  57/16
$620 [6]  62/24 63/4 63/8 65/21 66/16 93/17
$620 million [6]  62/24 63/4 63/8 65/21 66/16 93/17
$763 [1]  65/4
$763 million [1]  65/4
$813 [3]  48/16 48/23 55/22
$813 million [2]  48/23 55/22

## '

'16 [1]  88/2
'17 [2]  24/1 25/5
'18 [1]  25/6

## -

-and [2]  1/19 2/4

## 1

1 billion [1]  85/4
1.1 [6]  58/7 60/15 60/17 61/6 63/19 64/9
1.1 billion [11]  14/18 14/24 51/18 52/13 53/8 54/4 58/6 58/8 59/16 59/18 80/4
1.6X [1]  73/18
10 [1]  21/18
10-K [4]  8/15 8/20 32/2 64/22
10-Ks [1]  7/9
10-Qs [1]  7/9
101 million [1]  55/9
10:00 [2]  1/7 3/2
10b5-1 [1]  28/9
111 [1]  23/19

113 [6]  14/4 40/8 42/1 55/13 57/20 64/11
114 [1]  70/4
12 [6]  19/21 20/8 90/9 90/25 100/15 101/8
121 [7]  66/23 66/24 67/7 67/8 67/12 67/15 67/20
127 [2]  45/2 45/3
128 [1]  45/3
130 [4]  66/17 66/19 67/20 67/21
131 [5]  66/17 66/19 68/3 68/4 68/5
132 [3]  68/4 68/6 68/7
14 [1]  1/7
15 [1]  3/14
16 [1]  64/23
160 [2]  78/8 79/6
160-page [1]  92/5
165 [1]  86/22
166 [1]  86/25
167 [6]  86/22 86/22 86/25 87/1 87/18 88/1
17 [1]  47/6
176 [2]  72/4 74/12
180 [1]  74/17
183 [2]  75/23 76/10
184 [1]  75/24
186 [3]  76/1 76/11 76/11
190 [1]  75/10
196 [1]  75/10
1980 [1]  57/14
1:19-CV-01911-CFC [1]  1/4

## 2

2 billion [4]  68/22 85/4 85/4 85/22
2 million [1]  62/5
2.09 million [1]  56/20
2.4 [1]  87/13
2.5 billion [2]  74/2 87/13
200 [12]  68/20 75/10 76/14 76/17 76/18 76/22 77/1 77/3 77/3 77/5 77/15 77/16
200 million [6]  15/4 61/25 62/8 62/15 63/25 64/2
2009 [1]  76/23
201 [2]  82/17 86/12
2010 [1]  57/4
2016 [20]  8/15 9/2 16/15 40/8 42/6 45/13 45/18 45/25 46/3 46/10 46/11 46/14 46/24 49/8 63/17 88/3 88/4 88/21 88/22 91/25
2017 [18]  8/16 24/13 24/15 24/21 25/3 26/6 35/8 47/6 47/8 48/15 48/22 63/13 64/7 64/11 64/22 68/13 70/16 87/19
2018 [21]  22/23 23/4 23/4 23/6 24/19 24/24 26/7 44/11 45/15 45/22 63/16 64/18 64/23 68/12 68/14 69/10 88/21 91/6 91/6 91/9 93/20
2019 [6]  29/22 34/24 65/15 69/13 88/20 92/1
2022 [1]  1/7
203 [1]  75/10
214 [2]  66/17 66/20
218 [1]  91/23
234 [3]  73/15 73/16 73/16

24 [1]  73/13
276 [2]  29/1 47/20 47/24 48/8 48/13 48/19 48/20 49/6 49/18 51/3 51/6 52/21
277 [2]  47/20 47/22
28 [1]  21/23
292 [5]  40/9 40/10 40/12 40/20 46/25

## 3

3,500 [3]  32/14 67/3 71/23
30 [2]  56/14 56/19
30 feet [1]  3/3
300 [2]  5/4 5/5
335 [1]  40/19
337 million [4]  55/10 58/18 61/1 63/20
340 [1]  59/3
340 million [1]  59/10
35 [1]  89/24
373 million [1]  60/19
375 million [1]  60/24
38 [1]  89/24
3:30 [1]  3/5

## 4

4B [1]  3/2
4th [2]  45/18 46/3

## 5

50 [1]  32/6
50-50 [1]  32/6
535 [3]  42/7 47/1 58/3
535 million [3]  55/25 56/1 56/5
537 million [1]  64/10
55 [1]  8/20
56 [2]  19/20 20/8
58 [1]  8/20
5B [2]  31/14 78/13
5B.1 [1]  82/3
5B.2 [1]  80/10
5B.3 [3]  31/19 80/13 95/16
5B.4 [7]  71/1 80/18 81/14 81/15 86/4 86/6 92/14
5B.5 [1]  81/3
5B.6 [2]  35/25 78/13

## 6

60 million [10]  57/21 58/1 58/2 58/13 61/8 61/8 61/9 61/23 63/23 64/3
600 [2]  5/3 5/4
620 [2]  68/20 68/22
620 million [3]  62/24 66/5 94/2
676 [1]  14/14
676 million [1]  14/3

## 7

70,000 [1]  32/14
760 [1]  65/9
763 [3]  12/18 65/9 65/10
763 million [1]  65/16

## 8

80 [2]  50/20 63/8
81 [2]  56/16 57/5
813 [6]  42/11 42/21 47/3 59/3 94/1 94/2
813 million [11]  14/4 14/14 42/8 47/9 49/14 58/10 59/11

59/22 60/11 60/14 64/10
82 [4]  12/18 16/16 16/20 40/22
83 [7]  48/5 65/20 66/9 66/12 76/8 88/12 88/17
84 [1]  62/20
844 [1]  1/10
85 [1]  62/22
86 [14]  47/25 48/17 49/17 51/10 51/13 51/16 54/19 62/6 62/10 62/12 62/15 62/18 62/20 64/1
87 [7]  48/1 48/2 48/5 51/4 51/10 51/13 52/2
88 [11]  48/1 48/2 48/5 52/7 52/8 54/19 65/21 66/9 66/15 88/19 88/20
89 [3]  48/6 48/17 54/19

## 9

90 [4]  18/24 48/6 54/19 77/2
92 [8]  53/24 54/2 54/3 54/15 54/20 57/5 77/18 77/20
93 [1]  57/5
94 [1]  24/14
95 [1]  57/5
96 [1]  57/5
99 [1]  77/2

## A

a.m [2]  1/7 3/2
abatement [10]  13/20 57/13 57/15 57/15 61/9 61/15 61/17 61/23 63/23 76/12
ability [3]  73/20 74/9 84/9
able [3]  6/7 15/17 73/11
about [133]
above [4]  41/21 55/25 60/11 60/14
absolute [1]  10/13
absolutely [16]  9/15 18/9 28/15 38/16 39/2 42/12 42/22 46/17 47/19 48/24 61/18 79/11 79/14 94/20 98/20 99/24
accept [4]  36/2 58/23 60/21 69/21
accepted [1]  86/1
accepting [1]  52/24
accepts [2]  82/25 85/8
accompanied [1]  17/25
according [6]  23/7 26/6 45/14 46/25 76/4 83/9
account [3]  90/19 91/2 91/8
accounting [4]  13/5 16/7 17/22 35/5
accrual [8]  8/25 26/21 26/22 40/15 40/16 55/8 55/25 57/24
accruals [15]  13/25 32/24 35/10 39/17 39/18 39/19 39/23 40/9 40/19 40/19 40/25 41/2 41/4 46/25 47/1
accrue [1]  94/19
accrued [9]  7/11 11/6 30/13 30/16 30/25 34/24 36/3 41/22 42/1
accruing [1]  94/17
accurate [9]  9/14 14/13 16/18 23/25 24/6 31/24 32/2 33/8 65/11
accurately [1]  37/8

## A

accused [1] 24/24
acknowledge [2] 52/13 53/25
acknowledges [1] 41/4
acknowledging [1] 52/23
across [7] 39/10 43/18 55/9 60/1 62/25 65/22 67/23
act [1] 5/8
actionable [6] 17/15 21/16 21/17 21/22 81/10 82/7
actions [1] 32/19
actively [1] 14/25
actual [4] 7/22 14/3 61/25 67/1
actually [30] 3/8 7/5 8/15 8/19 11/18 13/23 13/24 14/2 14/6 14/19 19/25 23/25 30/11 30/21 32/22 46/11 54/16 54/23 58/23 62/20 67/10 67/15 67/17 72/6 88/23 89/14 90/2 90/16 95/6 99/1
add [6] 34/5 54/9 56/6 64/8 70/10 79/12
added [1] 40/18
Addendums [1] 97/2
addition [3] 47/11 55/25 68/20
additional [3] 42/16 47/24 53/8
address [11] 6/25 7/2 31/20 35/23 38/17 57/10 75/15 92/11 94/7 95/14 100/1
addressed [4] 16/11 30/6 40/4 95/25
addresses [1] 76/14
adjectives [2] 43/5 65/25
adjudicate [1] 6/8
adjustment [1] 62/23
admit [3] 9/12 70/13 77/25
adoption [1] 26/13
adversary [1] 54/7
adverse [8] 9/3 10/6 10/10 11/1 17/23 18/3 39/1 41/18
adversely [2] 11/3 11/16
advice [1] 91/17
advocacy [1] 98/7
afraid [2] 20/14 20/16
after [9] 22/23 28/1 32/3 34/24 36/19 45/17 45/22 75/1 96/24
afterwards [1] 26/6
again [28] 23/10 26/11 27/17 28/10 34/9 35/23 36/2 36/24 54/21 57/4 59/5 59/12 62/21 64/15 65/23 67/2 69/2 74/17 75/6 77/21 83/24 84/5 87/6 87/25 88/7 94/11 95/2 101/8
against [1] 54/8
agencies [1] 83/10
agree [27] 9/18 10/21 14/25 15/10 15/12 18/8 28/10 28/12 31/1 31/2 31/2 33/21 37/18 38/6 39/9 40/12 46/10 51/21 58/8 60/11 63/16 77/9 79/1 79/13 86/16 86/17 100/6
agreed [2] 14/11 34/19
agreeing [1] 80/1
Agrees [1] 40/10
ahead [10] 6/19 15/24 36/6 37/3 38/5 63/10 64/17 72/11 82/25 101/2
alert [1] 5/17
all [82] 3/4 3/17 4/13 5/5 6/16

10/13 13/1 13/8 13/25 15/13 15/19 19/8 19/11 19/13 19/25 20/21 20/24 21/16 21/17 22/21 26/11 26/14 29/5 30/5 31/17 32/7 33/21 33/23 35/2 36/1 36/20 38/5 38/15 39/9 40/14 42/3 43/21 44/3 44/8 45/5 48/25 49/19 51/9 51/16 55/9 58/18 61/2 61/13 62/1 62/17 62/25 63/5 63/6 65/22 66/24 67/23 68/13 70/24 72/3 74/21 77/19 77/23 78/18 78/19 78/20 81/13 84/16 84/19 86/18 87/13 88/25 89/14 89/18 89/20 89/22 90/19 91/2 91/15 91/24 99/4 100/21 101/14
allegation [17] 7/19 29/21 30/2 53/14 59/2 59/4 59/9 59/11 70/1 70/6 72/2 76/15 90/20 95/18 95/22 98/17 98/19
allegations [33] 7/12 29/5 36/13 48/20 55/21 63/11 64/16 65/14 66/3 71/19 72/9 75/21 78/10 78/11 78/14 78/19 78/21 79/6 80/2 80/8 80/14 80/24 81/4 81/21 81/23 87/4 88/4 89/15 90/15 90/23 93/13 94/10 101/13
allege [13] 18/17 28/20 28/21 41/9 64/7 70/15 81/3 84/19 91/6 93/15 94/18 94/25 99/1
alleged [20] 15/10 22/18 24/1 34/22 48/14 50/18 51/1 51/20 70/12 76/3 76/4 80/18 84/11 85/9 85/11 85/12 92/7 93/9 93/14 100/12
alleges [3] 23/2 52/20 72/21
alleging [3] 28/20 58/14 83/22
allow [2] 19/14 82/12
allows [1] 35/20
alluded [1] 34/22
almost [2] 9/6 58/13
alone [5] 57/15 59/19 59/20 66/4 93/24
along [1] 34/1
alot [1] 78/3
already [8] 20/15 22/10 36/8 47/11 74/14 76/23 82/3 95/15
also [24] 3/23 4/1 4/17 13/7 17/7 18/25 21/6 27/14 32/4 32/10 41/8 47/24 47/25 48/17 52/21 58/5 71/23 73/10 77/2 82/1 85/25 91/8 99/19 99/20
alternative [1] 96/12
although [4] 11/1 19/24 41/19 80/1
always [4] 3/21 21/24 21/25 46/16
am [28] 10/18 11/11 11/18 19/5 20/3 20/16 20/17 22/25 26/23 27/10 27/16 31/2 37/18 38/1 58/4 58/9 63/10 71/25 75/9 78/6 81/7 86/6 88/17 88/25 90/9 99/6 100/12 101/1
ambiguous [1] 15/12
amended [4] 47/20 51/13 66/18 75/10
amorphous [1] 71/17
amount [13] 32/11 41/22 42/1 42/4 42/7 52/25 53/25 54/1

55/15 61/25 74/5 75/4 83/18 15/19 19/8 19/11 19/13 19/25 amounts [3] 7/11 30/16 32/24
Ampansiri [1] 4/4
ample [1] 28/16
analysis [1] 54/10
analyst [1] 75/10
animal [1] 12/23
another [5] 23/9 33/11 34/18 34/19 66/23
answer [3] 6/17 6/24 7/17
Answered [1] 28/17
any [20] 12/16 15/2 36/18 37/22 53/14 55/20 58/10 69/11 69/16 70/1 73/20 74/10 75/19 76/6 78/15 86/3 95/5 95/20 97/7 98/6
anymore [1] 88/24
anything [19] 12/5 15/6 26/18 33/23 34/5 53/18 56/7 62/8 64/6 66/11 68/18 68/25 69/5 69/16 82/6 86/13 97/9 99/13 100/12
anyway [2] 27/4 37/18
anywhere [2] 93/25 95/21
apologize [11] 48/17 51/12 61/12 62/9 62/21 69/6 76/10 78/24 78/25 88/19 89/12
appear [2] 39/5 73/9
APPEARANCES [2] 1/15 2/1
Appendix [1] 21/4
apples [5] 10/23 18/19 18/19 18/20 39/20
applies [4] 7/20 13/12 69/14 98/9
appreciate [4] 6/20 9/20 24/12 99/3
approach [2] 20/15 22/5
approximately [2] 41/20 73/18
are [215]
aren't [3] 14/12 67/10 96/15
argue [5] 7/18 11/7 11/23 16/25 94/22
argument [19] 3/25 6/13 6/14 36/14 46/16 46/21 51/6 69/8 71/14 78/12 78/16 80/4 92/19 93/3 94/23 98/7 98/13 100/2 100/3
argument's [5] 11/11 16/9 37/17 38/6 62/15
arguments [4] 80/6 100/20 101/12 101/17
around [3] 8/25 13/8 33/10
arrangements [1] 32/15
articulated [2] 37/12 87/23
as [82] 4/4 4/10 4/11 5/1 5/1 5/3 5/20 8/12 9/1 16/7 18/20 19/9 21/10 21/17 21/24 26/6 27/9 30/15 31/10 31/15 31/15 32/1 32/2 34/23 35/3 35/11 37/6 37/8 37/14 37/14 41/4 43/4 43/11 43/18 44/9 46/19 47/5 47/8 47/20 47/20 48/5 48/5 50/20 52/2 53/4 53/5 54/14 54/14 61/23 63/13 65/15 66/22 66/22 67/2 67/24 68/6 70/13 70/16 72/10 72/21 72/23 73/11 73/12 74/14 74/18 78/22 82/7 82/23 83/5 83/5 84/1 88/14 89/13 90/6 92/17 92/20 93/2 93/2 100/8 100/8 100/24

101/8
ASC4 4030 [2] 93/12 73/14
aside [1] 6/17
ask [7] 6/17 19/8 19/18 37/20 49/16 50/7 96/9
asked [6] 14/10 33/12 33/24 39/12 53/11 72/7
asking [1] 15/22
asserted [8] 71/2 73/19 79/23 80/8 80/15 80/19 81/16 86/7
assertions [1] 22/15
assess [3] 57/2 84/17 90/19
assist [1] 99/22
assume [6] 16/9 16/12 16/17 37/17 38/6 93/8
assuming [5] 11/11 18/16 29/22 38/14 69/21
astonishingly [2] 43/12 66/1
attached [1] 21/3
attempt [2] 67/14 92/18
attention [3] 6/10 79/15 99/3
audited [1] 7/25
August [2] 68/12 91/6
August 2018 [1] 68/12
availability [1] 24/16
Avaya [2] 28/25 60/8
average [1] 5/7
aware [1] 70/6
away [3] 3/4 45/12 95/19
awkward [4] 11/21 37/24 38/6 38/18

## B

back [8] 4/3 36/2 37/21 44/7 57/14 64/11 87/23 96/11
backdrop [1] 37/6
background [1] 51/18
backing [1] 78/11
backtracked [2] 30/17 30/21
bad [2] 3/17 27/23
balance [14] 71/2 72/13 72/17 73/15 73/19 74/1 74/4 74/9 80/20 81/17 82/24 86/8 94/11 94/19
bar [3] 8/9 39/10 78/23
base [4] 43/4 55/11 55/17 60/20
based [24] 24/24 29/5 36/16 41/5 41/7 41/7 41/8 42/15 45/7 47/16 49/4 51/24 54/10 54/13 57/21 59/24 62/1 83/17 83/18 83/25 84/19 85/14 97/1 100/13
baseless [2] 55/11 60/4
bases [1] 53/4
basically [6] 5/15 22/14 26/12 26/16 29/11 41/16
basing [1] 85/6
basis [5] 7/6 43/3 74/15 84/24 85/14
battles [1] 98/7
BD [1] 83/11
be [82] 6/3 6/7 6/13 7/6 9/2 9/4 9/5 11/5 11/6 11/17 12/15 12/17 13/4 14/13 14/14 15/8 15/13 15/17 17/10 17/15 18/14 18/21 19/3 22/14 22/20 23/1 23/22 23/25 24/4 24/24 26/1 26/22 26/25 27/2 27/11 30/25 33/4 34/16 35/1 35/13 35/14 36/3 38/3 39/16 40/20 41/1

be... [36]  42/8 45/24 47/19 48/21 48/23 49/14 50/17 53/10 55/19 56/4 62/6 65/2 65/9 66/9 68/23 68/23 70/1 73/11 73/18 73/23 73/25 76/17 80/10 82/2 84/19 84/20 88/6 88/12 89/17 92/7 94/20 94/21 95/4 96/16 98/24 101/6
beard [2]  3/10 3/13
bearing [1]  46/9
because [58]  4/20 5/1 6/7 6/10 7/23 11/12 12/3 13/22 15/20 20/7 20/15 22/5 23/2 23/17 23/25 27/9 29/13 30/7 30/23 32/9 34/18 45/10 45/20 46/1 47/14 49/24 50/13 51/19 52/13 56/22 58/1 58/4 59/14 63/10 65/11 67/2 67/18 70/6 72/18 73/10 74/22 75/2 75/7 77/9 78/12 82/22 83/3 84/23 85/25 90/6 90/23 94/16 94/19 96/16 96/23 97/13 98/5 101/9
becomes [2]  22/23 52/3
been [27]  3/4 4/22 8/9 22/7 27/24 28/2 30/12 30/16 30/19 31/17 32/7 33/9 37/9 47/6 51/1 52/17 56/14 56/18 57/6 65/6 72/23 83/10 87/14 89/7 93/21 94/16 94/17
before [20]  1/12 3/3 4/20 12/22 15/19 24/25 29/21 32/23 36/14 37/20 38/4 46/4 75/15 81/2 84/7 87/20 87/22 88/9 94/14 101/2
begged [1]  91/20
begin [1]  7/22
beginning [1]  35/8
begins [1]  49/7
behalf [3]  3/19 4/9 36/25
behind [10]  32/8 71/3 72/5 72/14 72/16 73/2 73/2 80/20 81/17 86/9
being [10]  11/2 14/9 15/8 47/15 71/24 72/5 74/19 75/2 75/14 86/23
belief [4]  16/4 35/20 45/21 53/20
believe [13]  4/15 14/13 16/21 19/15 35/20 54/19 59/6 72/4 74/8 77/11 77/12 78/23 96/5
believed [10]  7/14 12/6 18/12 19/2 34/12 60/23 71/10 71/11 73/19 88/5
believes [1]  7/20
believing [1]  59/17
benefit [1]  27/9
benzene [10]  22/20 23/16 24/16 26/21 29/20 33/12 43/19 79/4 79/11 100/23
benzene-related [2]  22/20 23/16
benzyne [1]  23/9
benzyne-related [1]  23/9
besides [1]  59/22
best [19]  46/16 46/18 46/20 46/21 46/22 46/23 51/8 51/9 64/13 64/14 64/14 64/17 69/8 69/9 74/24 79/14 91/22 94/4

96/1
better [2]  38/25 69/4
between [1]  35/3
big [3]  27/3 32/1 32/11
billion [44]  14/18 14/24 15/14 16/16 16/21 17/12 18/23 30/12 33/14 36/8 44/11 51/18 51/22 52/13 52/15 53/8 53/25 54/4 55/1 58/6 58/7 58/8 59/16 59/18 60/15 60/17 61/6 63/20 64/9 68/21 68/22 69/22 70/8 74/2 80/4 85/4 85/4 85/4 85/21 85/22 87/7 87/13 94/17 94/20
bit [3]  63/10 71/22 100/2
blank [1]  11/17
Blue [5]  56/23 56/23 57/1 57/6 57/11
blush [1]  27/22
board [3]  43/18 60/1 68/12
board's [1]  101/7
boils [1]  59/14
books [1]  77/8
boosted [2]  3/5 3/6
both [6]  13/24 30/8 39/14 40/1 85/18 97/11
bottom [2]  6/4 49/6
Brantely [1]  4/18
break [1]  68/16
breathtakingly [1]  43/13
brevity [1]  79/16
brief [25]  9/12 9/16 9/21 11/23 13/16 20/3 70/24 73/14 75/17 76/5 78/8 79/22 80/10 80/19 81/3 82/14 86/6 89/10 89/23 89/24 90/6 93/19 95/3 95/11 95/16
briefed [1]  93/4
briefing [10]  5/23 5/24 9/7 14/8 53/17 95/21 97/12 97/15 97/21 100/17
briefly [1]  75/15
briefs [3]  13/17 18/25 99/5
bring [3]  11/12 43/9 92/5
bringing [1]  43/15
broken [1]  21/25
BROOKE [2]  2/7 4/12
brought [4]  13/11 21/10 43/19 49/25
BRUCE [2]  1/17 3/18
bunch [3]  21/11 95/19 99/12
burden [3]  6/21 29/16 92/8
burdened [1]  94/8
burdensome [1]  92/24
busiest [1]  20/15
busy [1]  5/1
buy [1]  80/4

## C

C.A [1]  1/4
calculate [1]  50/2
calculated [1]  57/11
calculations [2]  49/11 52/5
call [8]  39/25 53/5 55/10 60/6 63/24 85/21 85/22 90/13
called [2]  13/15 32/19
calling [1]  67/17
calls [3]  21/12 21/12 44/9
came [5]  24/1 47/2 52/6 84/24 93/23
can [53]  3/8 11/7 13/10 17/20

19/10 19/15 19/20 19/22 19/23 21/21 22/2 24/24 27/10 30/5 33/6 34/4 37/22 37/22 38/15 41/1 42/18 45/9 48/21 49/1 51/21 54/14 57/8 57/9 59/9 60/14 60/22 62/7 69/1 71/4 73/25 75/21 76/20 78/17 79/1 79/5 79/5 90/19 91/2 91/4 91/8 92/11 93/2 94/7 94/7 96/4 97/16 98/13 99/8
can't [16]  15/11 18/10 20/5 20/13 20/25 33/3 35/12 53/6 53/10 71/16 72/1 79/21 88/23 92/6 99/13 100/19
candor [1]  24/12
cannot [2]  22/20 27/2
capacity [1]  72/20
Cape [5]  34/1 34/12 56/12 56/18 57/12
capital [10]  12/25 14/16 35/11 67/11 67/15 67/17 67/18 71/12 71/13 89/20
care [1]  41/13
cares [1]  58/23
Carneys [17]  47/12 47/25 49/10 49/15 49/23 52/19 54/17 56/2 59/13 59/16 60/15 61/4 62/25 63/20 64/9 69/25 80/4
Carolina [2]  34/1 34/25
case [43]  4/25 5/16 5/19 7/6 7/23 9/1 9/4 14/25 16/8 16/8 17/17 17/18 20/4 20/9 20/11 20/12 27/3 27/8 27/10 28/25 30/12 30/15 30/21 30/22 30/23 32/16 34/10 36/1 36/4 36/15 37/7 55/1 60/8 64/18 84/3 84/4 84/4 90/18 93/5 93/7 94/14 94/20 94/21
cases [32]  5/3 5/4 5/5 5/5 5/14 19/2 20/13 21/10 21/25 29/12 29/18 32/4 32/5 32/8 32/14 32/19 32/20 32/25 32/25 33/3 33/5 33/10 34/10 35/2 71/23 72/19 92/22 92/25 96/13 97/2 98/5 99/12
cash [4]  72/22 73/22 94/13 94/16
categories [11]  22/9 37/6 39/13 70/23 78/9 79/2 79/8 79/23 84/25 87/23 99/20
category [8]  30/9 71/4 71/7 79/13 86/4 86/7 86/11 86/20
causation [4]  21/22 27/5 33/1 93/3
caused [2]  46/13 59/6
cautionary [4]  18/2 18/8 96/5 96/22
caveat [2]  6/12 54/9
center [1]  27/8
certain [8]  7/8 7/9 22/15 34/16 77/9 80/9 95/16 95/17
certainly [4]  4/24 19/11 24/7 101/13
cetera [1]  18/4
CFC [1]  1/4
CFO [1]  67/16
challenge [2]  34/10 79/7
challenged [3]  21/8 34/9 72/8
challenging [1]  21/6
Chamber [1]  21/13

Chambers [1]  47/12
chance [4]  11/2 11/14 11/16 97/7
Chancellor [4]  10/16 36/12 36/13 94/14
Chancery [25]  4/21 4/22 5/2 10/18 12/15 14/19 15/3 16/10 16/13 23/3 23/7 24/15 31/7 38/13 39/7 42/10 47/17 48/2 53/19 54/24 60/22 62/16 64/1 66/10 87/21
change [3]  11/3 11/16 39/1
changed [1]  45/11
changes [9]  9/3 10/6 10/10 11/1 17/23 18/3 18/3 41/19 67/9
changing [1]  40/7
characterization [1]  101/6
characterize [5]  10/15 10/18 10/19 72/23 88/14
characterized [2]  23/14 37/9
characterizing [1]  25/8
chart [12]  25/3 39/8 39/10 39/14 39/18 40/7 40/15 40/18 42/1 42/4 53/23 61/19
checked [1]  4/13
Chemical [1]  56/25
CHEMOURS [51]  1/3 7/9 7/25 13/1 21/15 22/18 23/3 23/4 23/14 23/15 24/18 24/23 29/8 34/11 35/5 37/8 44/21 44/22 46/24 47/9 48/14 48/21 49/11 49/13 49/15 51/23 52/10 52/16 53/15 53/19 54/7 54/8 54/25 55/22 57/1 57/22 58/10 58/15 59/17 60/23 65/15 70/2 71/2 76/9 80/15 80/19 81/16 86/7 88/5 91/9 93/13
choose [1]  92/5
choosing [1]  25/9
chose [2]  8/17 38/12
Chris [1]  4/8
Christmassy [1]  36/11
Christmassy-looking [1]  36/11
CHRISTOPHER [1]  2/3
chronologically [2]  63/15 69/7
Circuit [1]  17/17
circumstances [12]  9/3 10/7 10/10 11/1 11/3 11/4 11/16 17/24 18/3 34/16 39/1 41/19
cite [5]  19/2 28/25 29/1 53/4 90/18
cited [4]  16/8 18/24 18/24 20/13
civil [2]  5/4 5/8
claim [5]  19/9 19/22 19/24 21/9 21/23
claimed [1]  21/17
claims [1]  21/1
clarity [1]  92/10
class [7]  8/16 35/8 62/21 63/14 70/16 82/23 84/7
clean [2]  50/22 74/1
clear [14]  8/22 9/22 11/8 11/25 13/7 20/7 35/1 38/8 52/3 53/13 89/13 90/15 90/22 90/23
cleared [1]  25/2
clearly [6]  3/9 30/16 36/3 38/7 77/25 96/17
client [2]  4/17 27/23

**C**

CLOSIC [2] 1/17 4/1
CNBC [1] 21/12
colleague [3] 4/11 8/8 37/12
COLM [1] 1/12
color [2] 50/10 50/13
colorful [2] 43/5 43/12
column [1] 42/3
combine [1] 56/4
come [12] 37/21 50/5 53/1 53/2 60/10 72/7 75/5 84/10 91/20 97/9 98/14 98/17
comes [3] 44/9 51/22 54/6
comfortable [2] 3/7 3/8
coming [5] 17/11 20/12 26/4 75/4 98/20
commenced [1] 3/2
commencement [1] 67/22
comment [2] 22/2 40/4
comments [3] 36/19 82/15 99/21
Commerce [1] 21/14
commission [2] 44/7 46/13
commissioned [11] 24/17 44/19 44/21 45/8 46/4 56/24 57/2 57/4 57/7 67/2 67/5
community [1] 34/13
companies [3] 28/25 33/3 97/23
company [13] 1/3 27/22 28/6 28/14 32/1 37/9 71/11 74/13 74/23 75/5 75/7 83/19 83/19
company's [3] 71/9 73/17 84/18
compared [1] 98/5
comparison [1] 5/2
compelling [2] 27/22 98/15
complaint [115]
completely [7] 55/11 60/2 60/4 63/12 83/17 85/7 93/1
complex [1] 32/25
complicated [4] 33/1 33/1 35/4 35/18
components [1] 40/1
comprehensive [6] 23/8 23/15 23/18 24/17 25/10 25/14
concealed [1] 52/20
concede [3] 9/6 15/22 56/10
conceivably [1] 98/10
concept [2] 13/13 71/17
concerned [2] 31/25 37/15
concerns [1] 7/8
conclude [3] 98/10 98/16 100/18
concluded [1] 95/15
condition [1] 71/9
confidential [4] 17/4 89/25 90/13 90/20
confirm [1] 19/19
conflated [1] 13/24
conflates [1] 5/24
conformance [1] 99/21
confronted [1] 84/22
confused [1] 45/12
congress [1] 96/20
connection [1] 93/20
CONNOLLY [1] 1/12
consent [3] 76/23 77/21 77/23
consider [2] 29/19 94/6

considerable [2] 10/24 41/17
considered [1] 72/23
consistent [1] 6/8
consultant [1] 24/17
contains [1] 81/3
contention [2] 72/17 74/21
contest [1] 97/20
context [3] 79/7 90/5 90/19
continue [2] 46/6 48/11
continued [2] 2/1 73/18
continues [1] 70/17
contradictory [1] 87/16
contrary [1] 36/13
control [1] 27/25
conveyance [1] 72/24
conveyed [1] 85/7
copies [3] 6/2 8/9 8/10
copy [1] 8/8
corporate [3] 73/6 91/9 91/11
correct [37] 9/21 39/2 40/11 41/3 41/3 41/15 41/24 43/8 44/23 45/16 45/23 46/2 46/5 47/3 47/4 47/7 51/12 51/23 54/5 60/13 61/16 63/22 65/5 66/6 66/16 68/24 70/9 76/7 79/11 80/5 80/11 80/12 80/17 81/6 82/19 82/20 96/2
corrected [1] 24/20
correctly [1] 66/8
cost [10] 11/5 13/15 27/12 47/15 50/20 56/10 57/15 67/15 67/24 97/3
costs [39] 7/10 7/15 7/21 10/4 10/6 10/25 12/17 12/23 12/23 12/24 13/20 14/16 23/10 23/11 23/17 23/20 25/16 40/2 41/18 42/5 42/9 43/7 44/10 49/14 50/2 50/3 50/20 53/1 53/8 53/20 54/22 55/1 57/2 63/5 65/7 67/10 67/17 67/18 67/19
could [22] 11/17 17/10 19/12 20/1 23/13 23/16 23/17 26/22 27/11 31/12 35/13 35/14 35/15 38/2 45/24 52/16 70/1 73/23 80/10 91/12 95/22 96/1
couldn't [1] 5/11
counsel [4] 1/22 2/8 3/23 38/18
count [1] 64/8
counted [1] 18/24
counting [1] 5/11
country [1] 20/16
counts [1] 61/23
couple [3] 50/17 73/9 101/4
coupled [1] 11/13
course [5] 7/7 13/7 16/1 19/10 87/15
COURT [36] 1/1 1/12 4/22 5/4 6/21 6/24 6/25 8/10 10/18 12/16 15/3 16/10 16/13 17/18 20/11 23/3 23/7 24/7 24/15 29/10 29/16 31/7 36/24 38/13 39/7 42/10 47/17 48/2 53/19 54/24 60/22 62/16 64/1 66/10 87/21 92/7
Court's [3] 7/1 94/8 99/3
Courtroom [1] 3/2
courts [7] 6/21 14/25 19/13 19/25 20/4 96/13 96/15
cover [1] 70/19

covered [6] 69/18 73/7 82/2 82/3 82/4 82/8
Covid [1] 6/1
crafty [2] 98/14 98/17
create [1] 89/6
created [3] 70/7 71/9 75/8
credit [7] 73/8 79/17 82/10 83/12 84/18 85/15 86/2
criticize [2] 32/23 33/11
culminated [1] 68/12
curious [2] 20/19 38/1
cut [1] 77/13
CV [1] 1/4
CW3 [1] 68/11
cycle [2] 73/21 74/10

**D**

damage [2] 50/18 50/21
damages [1] 13/21
DANIEL [2] 2/6 4/11
data [1] 52/5
date [2] 47/6 88/1
Dawn [1] 4/4
day [8] 5/7 5/11 6/5 29/3 30/13 43/21 78/17 99/4
de [6] 73/15 73/19 73/25 74/4 74/9 98/6
de-risked [5] 73/15 73/19 73/25 74/4 74/9
deal [6] 32/9 32/10 88/25 89/5 90/10 90/11
dealing [3] 41/17 45/12 90/13
dealt [1] 22/10
debate [3] 21/19 21/20 40/14
debt [2] 74/13 83/18
decide [2] 22/5 100/16
decides [1] 10/9
decisions [1] 20/11
deck [1] 8/2
declaration [5] 45/10 67/9 90/21 97/1 100/19
declared [1] 46/24
decrees [1] 77/23
deemed [16] 7/11 8/20 9/2 9/21 9/23 9/24 10/2 10/4 10/5 10/11 11/1 11/2 30/19 41/19 90/7 96/6
defendant [8] 7/20 41/4 56/24 73/17 73/24 76/5 88/1 100/6
defendant's [6] 7/14 65/24 67/1 68/7 73/14 75/18
defendants [22] 2/8 4/9 18/12 41/9 43/1 56/10 67/14 71/1 72/10 72/12 75/16 79/23 80/7 80/8 80/15 80/19 81/4 81/16 84/8 86/7 98/15 100/18
defense [9] 4/7 6/16 23/10 25/16 38/18 70/18 88/23 89/2 100/3
defies [1] 56/1
define [1] 50/20
defined [1] 41/1
defrauding [1] 84/4
degree [1] 13/8
DELAWARE [12] 1/2 1/10 10/15 17/4 21/13 24/2 26/13 34/22 36/3 72/24 93/10 93/21
Delawareans [1] 21/14
demand [2] 14/22 14/23
denied [1] 35/1

deny [1] 35/2
department [2] 35/5 35/6
depicted [1] 74/22
derivative [1] 94/15
describes [2] 13/5 68/7
despite [1] 52/11
detail [1] 42/16
detailed [2] 8/23 33/9
develop [1] 87/24
did [32] 8/3 8/21 11/12 14/2 14/8 16/9 20/16 26/5 28/4 29/22 33/7 34/12 35/25 37/23 39/17 45/10 52/11 52/12 59/5 62/11 65/9 83/4 83/5 84/21 86/2 88/5 90/21 93/19 97/7 97/9 98/17 98/19
didn't [13] 25/3 38/11 67/18 72/19 76/6 82/5 83/16 91/21 93/3 94/18 94/19 94/22 94/22
different [17] 9/22 10/22 12/1 14/13 18/11 18/12 29/23 29/25 37/10 71/9 71/18 74/23 74/24 74/25 75/5 86/1 93/22
difficult [3] 5/19 6/1 92/24
direct [1] 53/18
directed [1] 44/25
directing [1] 45/13
directly [3] 16/10 36/13 92/6
director [2] 51/1 52/9
disagree [1] 63/24
disappoints [1] 99/6
disbelief [3] 25/23 26/12 96/3
discerned [1] 73/11
discharging [3] 56/14 56/18 61/14
disclaimers [1] 100/8
disclose [12] 9/12 9/13 9/17 9/18 38/9 38/11 67/19 74/3 83/17 85/5 85/24 87/8
disclosed [10] 7/11 9/11 30/19 32/2 41/22 41/25 52/15 83/7 91/9 91/13
disclosing [1] 52/19
disclosure [19] 7/23 7/23 7/24 8/14 8/23 9/8 10/24 11/24 12/6 12/16 16/10 26/22 30/2 32/20 33/12 35/9 84/3 84/4 98/12
disclosures [11] 13/25 17/6 18/1 30/23 32/18 33/5 33/10 35/7 35/17 35/17 96/6
discounted [1] 56/3
discretion [1] 20/2
discuss [6] 40/3 45/9 69/1 69/3 72/10 75/12
discussed [3] 36/8 55/23 67/3
discussing [3] 22/7 39/22 50/16
discussion [3] 39/15 42/15 47/14
disease [1] 33/2
dismiss [12] 1/8 7/6 19/9 19/11 20/1 35/21 63/11 78/7 92/16 92/16 92/18 92/19
dismissal [2] 19/22 19/24
dismissed [1] 7/7
dispose [1] 32/16
disposition [2] 5/9 5/10
dispute [6] 13/11 13/14 52/12 59/13 61/17 61/18
dissect [2] 15/14 15/17

**D**

dissected [1] 36/8
distinction [1] 51/25
distinguish [1] 38/8
DISTRICT [4] 1/1 1/2 1/12 5/4
Division [1] 67/16
do [108]
docket [1] 78/24
dockets [1] 33/6
documented [1] 101/7
documents [4] 46/4 50/5 54/11 60/9
does [14] 19/22 20/8 39/5 45/17 49/12 49/22 55/13 57/20 69/15 75/19 90/6 90/7 99/16 99/18
doesn't [10] 20/8 34/16 49/12 77/7 77/11 93/13 93/24 94/2 97/1 101/9
doing [3] 20/24 28/6 61/14
dollars [4] 16/16 17/12 32/11 55/1
don't [71] 4/22 6/9 9/5 9/17 10/8 10/17 11/25 12/5 14/8 14/19 14/24 15/12 17/5 18/21 19/6 19/23 19/25 21/20 24/7 25/20 25/22 27/5 33/16 33/17 33/21 34/9 35/22 37/21 38/19 39/6 40/14 40/20 43/21 50/12 50/13 56/5 58/8 60/5 60/8 62/8 64/8 64/12 66/11 69/25 70/1 70/4 70/11 74/2 77/9 78/15 78/25 81/18 83/14 85/5 85/24 86/17 87/8 89/11 89/16 90/22 93/15 95/14 95/20 95/21 96/23 97/20 98/6 98/13 99/11 100/16 100/20
done [7] 8/12 19/14 20/22 29/17 30/1 33/14 40/17
dory [1] 27/25
DowDuPont [1] 93/20
down [10] 21/7 35/15 36/18 46/19 59/15 60/15 66/8 68/16 75/15 94/11
downgrade [2] 75/1 83/7
downgraded [1] 75/2
downgrading [1] 75/7
downplayed [2] 75/17 81/4
downplaying [1] 33/25
dozens [2] 21/4 38/3
dramatically [2] 60/2 74/16
draw [1] 79/15
drinking [2] 32/19 34/13
drop [1] 98/6
due [1] 53/2
DuPont [39] 23/3 23/7 23/14 24/15 25/12 25/24 26/3 27/24 28/1 32/5 32/10 37/8 41/8 43/3 43/10 43/17 44/19 49/25 52/15 54/25 55/10 55/16 55/19 56/24 56/25 57/2 58/21 58/24 58/24 59/25 60/4 60/19 62/20 62/23 63/7 72/22 84/22 93/18 93/19
DuPont's [10] 23/9 25/6 26/4 34/23 50/5 51/24 52/6 52/9 54/10 60/6

**E**

each [3] 5/3 7/12 72/8
earlier [6] 4/25 49/20 69/17 82/9 82/23 92/1
early [1] 65/15
earnings [1] 21/12
easy [1] 96/18
economic [2] 73/21 74/10
Edinburgh [1] 17/17
effect [1] 29/14
effective [1] 98/7
effectively [1] 86/11
effectuated [1] 52/17
efficient [1] 15/16
efficiently [2] 6/8 6/15
eight [3] 51/15 66/13 66/14
Eighty [7] 48/2 48/4 51/15 51/17 66/12 66/13 66/14
Eighty-eight [3] 51/15 66/13 66/14
Eighty-six [3] 48/2 48/4 51/17
Eighty-three [1] 66/12
either [1] 17/5
ejecting [1] 93/22
elements [1] 92/17
ELLIOTT [1] 1/16
else [20] 15/6 15/25 18/17 26/18 33/23 47/23 56/7 59/21 60/16 61/3 61/6 62/17 64/6 68/9 68/18 68/25 69/16 77/15 82/6 86/13
embarrassing [1] 4/25
embrace [1] 99/24
emission [1] 56/12
emissions [4] 34/12 34/17 57/12 57/14
employed [1] 51/22
employee [1] 70/7
encourage [4] 3/7 19/10 96/21 101/11
encouraging [1] 20/17
end [13] 9/2 12/12 23/8 23/12 24/1 29/3 38/20 41/6 41/10 45/21 68/14 74/15 92/7
endorsing [1] 26/1
ends [1] 15/8
enhance [1] 57/9
enhancement [2] 67/11 67/18
enough [12] 16/12 28/5 28/5 28/12 28/20 28/25 36/9 54/12 71/18 92/10 94/8 96/5
enter [1] 77/23
entire [2] 45/4 73/5
entirely [1] 87/15
enumerable [1] 18/2
enviromental [22] 7/25 8/14 10/25 12/16 13/13 15/5 15/8 16/11 39/14 39/23 40/5 40/16 43/6 44/8 48/15 48/22 53/20 55/1 60/23 63/5 63/24 65/16
environment [2] 13/2 50/21
environmental [8] 7/10 15/2 40/2 41/18 44/10 66/5 85/22 88/5
EPA [2] 76/23 77/21
equivalent [2] 12/3 59/17
especially [1] 4/23
ESQ [8] 1/17 1/17 1/20 2/3 2/6 2/6 2/7 2/7
essentially [2] 28/13 65/14
establish [1] 53/21
estimable [7] 22/15 30/1 30/16 30/24 41/5 54/22 80/9
estimate [14] 41/5 23/20 23/6 25/6 25/17 26/9 27/12 29/24 30/20 33/4 33/4 35/12 59/16 63/4
estimated [5] 9/4 23/16 27/2 32/23 80/10
estimates [5] 16/7 17/22 26/11 88/21 100/10
et [1] 18/3
etiology [1] 33/2
evaluation [3] 67/1 67/22 85/6
even [18] 12/3 16/8 22/2 26/23 29/22 35/12 52/23 53/7 56/2 59/8 60/5 73/5 83/14 83/22 84/6 92/18 97/17 98/10
event [2] 45/7 73/5
events [1] 53/10
eventually [2] 15/8 34/24
eventuate [1] 10/6
ever [3] 17/10 17/12 38/19
every [4] 5/7 5/11 41/23 55/5
Everybody [1] 97/24
everyone [1] 93/21
everything [8] 27/25 27/25 43/10 59/24 92/22 92/24 93/9 98/6
evidence [24] 16/24 18/14 18/15 18/21 19/2 26/4 28/16 29/7 38/13 46/23 47/5 47/8 55/20 56/21 59/1 61/20 64/15 64/15 69/11 76/8 83/8 83/13 83/21 98/12
exact [3] 39/5 44/23 52/22
exactly [6] 12/19 16/5 32/17 33/7 70/12 82/20
exam [1] 31/17
example [4] 33/11 35/15 73/15 93/2
examples [1] 97/12
exceed [3] 7/15 7/21 56/22
exceeded [7] 48/16 59/18 60/24 61/1 61/2 65/16 70/8
exceeds [1] 59/21
except [3] 80/3 86/12 100/13
excess [3] 41/21 53/8 56/4
exchanged [1] 52/22
exclude [1] 65/7
excluded [1] 84/25
excuse [1] 60/18
execute [2] 73/20 74/10
exhaustive [1] 45/14
existed [1] 53/11
existence [2] 73/6 75/2
exists [2] 10/24 41/17
expect [1] 88/5
expenditures [5] 12/25 12/25 14/16 14/17 35/11
expense [1] 52/5
experience [2] 22/1 22/2
expert [7] 14/20 14/21 14/24 27/13 33/14 51/22 54/7
experts [1] 59/16
explicitly [2] 16/13 19/20
extensive [1] 33/5
extent [2] 82/3 92/15
extrapolate [1] 42/9
extremely [2] 38/19 43/11

**F**

face [3] 5/1 5/2 17/12
fact [36] 21/20 32/13 34/15 42/15 43/9 45/17 45/22 50/15 52/5 52/10 52/19 53/3 59/1 59/20 60/17 61/20 65/19 65/24 67/4 67/8 67/15 72/15 72/21 73/3 74/17 76/16 76/22 82/21 82/22 85/16 86/1 87/7 88/4 89/7 96/24 101/5
facts [8] 19/1 48/13 55/21 55/23 70/15 71/4 73/23 74/8
factual [7] 48/20 53/14 59/2 59/4 59/9 59/11 95/21
factually [1] 73/11
fail [1] 75/14
Fair [1] 54/12
fairly [3] 86/23 87/1 87/3
fairness [2] 14/9 88/23
fairy [1] 88/6
fall [3] 86/3 86/11 95/16
falls [3] 21/24 100/7 100/7
false [79] 5/21 5/22 5/24 21/5 21/11 21/21 22/9 23/1 24/25 25/13 27/16 28/22 30/9 38/15 38/19 41/11 42/11 42/21 45/19 47/9 50/13 53/15 57/21 57/22 57/23 58/3 58/11 58/15 70/4 70/22 70/23 72/10 72/18 73/11 73/24 74/11 74/20 74/22 75/8 75/22 76/3 76/4 76/9 76/16 76/25 77/7 77/12 78/9 78/15 79/2 79/9 79/23 80/3 83/2 83/3 83/14 83/15 83/17 83/22 83/25 84/11 84/13 84/15 84/20 85/7 85/8 85/9 85/12 85/14 85/25 86/3 87/5 89/7 91/25 92/7 92/10 95/22 98/10 100/11
falsehood [3] 71/5 90/10 90/11
falsehoods [1] 71/15
falsely [11] 22/19 48/21 49/13 71/1 80/8 80/15 80/19 81/4 81/16 85/13 86/7
falsity [27] 6/18 16/5 16/6 16/23 17/2 17/3 17/5 17/16 17/20 18/10 18/18 18/21 31/11 46/9 69/4 70/19 71/20 75/17 78/10 78/21 80/24 81/22 81/23 90/6 92/1 95/19 100/5
famous [1] 21/13
far [5] 16/12 37/14 60/19 69/5 86/10
fast [2] 31/15 99/8
favor [1] 95/12
favorable [1] 24/23
Fayetteville [11] 15/4 34/18 56/9 56/11 56/11 57/3 61/5 61/7 62/1 66/12 88/18
Fear [5] 34/2 34/12 56/12 56/18 57/12
February [10] 8/16 47/6 47/8 48/15 48/22 64/23 87/19 88/2 88/3 88/4
February 16 [1] 64/23
February 17 [1] 47/6
February 2016 [1] 88/3
February 2017 [3] 8/16 47/8 48/15
Federal [1] 6/9

**F**

feel [2]  3/6 32/8
feet [1]  3/3
fellow [1]  21/14
few [3]  7/2 20/13 91/17
figure [17]  15/11 47/9 51/18 51/22 54/6 54/6 55/22 62/13 62/24 63/8 65/21 66/17 67/23 78/13 88/14 90/8 99/25
file [3]  6/2 78/8 93/11
filed [8]  5/7 7/14 22/23 23/15 46/3 46/24 64/23 75/1
files [2]  28/1 39/5
filing [10]  5/10 10/19 16/17 24/25 38/20 41/23 45/19 47/5 87/20 87/22
filings [25]  5/22 5/25 7/9 20/16 21/2 21/8 21/12 23/21 37/22 38/2 38/3 38/14 39/13 39/22 41/11 41/14 43/4 69/17 79/7 79/8 80/3 84/18 84/19 89/6 95/4
filled [1]  27/17
final [1]  35/13
finally [2]  4/1 28/1
financial [3]  7/25 71/9 84/17
find [5]  35/21 95/6 96/4 96/6 99/13
fine [7]  8/7 10/12 24/8 35/19 81/9 81/12 82/14
finish [1]  70/21
finished [1]  70/22
firm [2]  3/24 4/10
first [22]  7/8 8/13 8/19 8/21 19/8 22/10 24/25 27/7 27/22 30/9 39/9 42/23 45/6 48/24 61/13 69/8 69/13 72/12 79/4 79/23 80/3 89/22
five [1]  6/6
fixed [1]  16/14
flavor [1]  44/1
flawed [1]  26/5
flexibility [2]  94/12 94/19
floor [1]  68/24
flow [1]  73/22
Fluoroproducts [1]  67/16
focus [3]  16/4 78/16 79/9
focused [5]  7/24 8/24 30/8 31/10 84/7
focusing [6]  26/24 27/1 40/25 74/19 78/12 96/2
folks [3]  4/21 5/17 28/2
follow [2]  35/16 35/17
foot [1]  79/14
forget [3]  12/17 37/20 38/4
forgive [1]  42/24
forgot [1]  37/19
form [2]  43/3 64/22
formed [1]  74/15
former [2]  52/9 67/16
formula [1]  41/23
forth [2]  7/10 70/3
forward [12]  6/12 17/8 17/8 17/24 27/10 32/6 55/2 79/14 81/11 92/22 96/3 96/21
forward-looking [5]  17/8 17/8 17/24 96/3 96/21
FOULDS [2]  2/3 4/8
found [7]  7/24 45/25 83/6

93/23 96/11 96/12 99/13
four [12]  5/5 20/15 55/9 58/18 62/25 63/6 63/9 63/21 65/22 66/4 70/14 87/15
four-year [1]  70/14
fourth [4]  45/13 46/24 65/1 65/2
frankly [4]  27/3 28/19 100/4 100/8
fraud [1]  84/4
fraudulent [2]  72/24 72/24
Friday [1]  1/7
FRIEDLANDER [2]  2/3 4/9
friend [1]  39/10
frustrated [1]  92/2
fund [1]  72/20
funeral [1]  43/21
further [2]  13/5 36/18
future [3]  17/23 32/12 32/16

**G**

GAAP [19]  9/18 9/23 9/25 11/24 11/24 13/12 13/13 13/14 30/22 30/22 30/23 31/1 31/3 33/21 36/1 86/5 100/2 100/3 100/4
gave [7]  21/13 46/1 69/9 84/11 84/13 85/9 85/12
generally [1]  100/6
generous [1]  8/9
GenX [13]  33/25 34/1 34/16 56/12 56/18 75/17 75/19 75/23 76/5 76/25 79/13 81/4 92/14
get [51]  4/20 7/4 8/12 10/14 10/17 12/11 12/22 18/17 19/1 19/21 20/24 26/24 27/7 27/17 29/7 29/14 33/5 41/12 42/11 42/21 44/6 52/7 54/2 54/23 58/3 60/11 66/7 69/24 70/16 76/20 76/20 78/19 79/5 80/13 80/18 81/2 88/21 90/22 91/22 93/5 93/7 93/24 93/25 94/2 96/19 97/4 98/6 99/8 100/5 100/20 101/14
gets [4]  35/9 59/2 60/14 94/3
getting [1]  4/25
give [24]  6/9 14/11 19/6 27/9 31/10 31/13 31/15 44/23 46/21 61/22 62/14 64/13 64/17 65/23 66/2 69/8 69/25 78/17 88/24 93/4 93/15 95/12 97/11 98/25
given [10]  6/24 26/6 45/15 49/18 53/17 55/5 78/24 94/4 95/20 99/19
gives [6]  73/20 74/9 93/6 94/12 97/5 97/13
glad [2]  25/2 30/6
Glasscock [3]  36/12 36/13 94/15
Glasscock's [1]  10/16
go [45]  6/12 6/15 6/19 7/1 13/10 15/24 16/19 19/5 22/8 25/25 26/12 27/10 28/1 32/20 33/2 36/6 37/3 38/5 40/24 43/20 44/7 44/8 52/2 55/2 57/14 64/11 64/11 64/17 65/18 66/2 67/6 67/23 72/11 73/16 90/6 90/7 92/22 92/23 92/23 92/25 94/10 95/18 100/23 100/24 101/1

goes [8]  33/18 35/4 45/20 52/20 62/21 67/8 69/2 82/25
going [53]  7/1 7/17 8/2 8/4 8/5 11/16 12/11 12/15 12/17 15/14 22/8 22/14 22/25 26/14 28/7 28/18 28/19 32/6 33/16 33/19 39/15 39/21 42/4 53/1 53/1 53/16 58/9 60/24 63/24 65/14 77/13 78/7 79/9 79/16 81/5 81/7 81/11 81/21 87/23 88/10 91/4 94/10 95/15 95/18 96/19 99/5 99/6 99/9 100/22 100/23 100/24 101/12 101/14
gone [3]  58/11 77/17 81/10
good [25]  3/11 3/12 3/18 4/8 5/23 6/3 12/9 18/14 18/21 28/20 31/6 36/22 36/23 46/16 54/14 71/18 78/7 78/12 80/6 83/23 86/16 91/11 99/4 99/25 101/17
goodness [2]  92/14 98/2
GORRIS [2]  2/3 4/9
got [26]  13/23 14/18 14/24 15/17 23/1 27/24 29/21 31/4 37/11 43/25 44/1 44/2 44/5 59/15 69/13 70/24 71/13 75/3 75/17 77/19 78/19 82/19 87/13 90/9 91/2 91/16
gotten [5]  43/23 72/22 92/10 95/8 100/25
governance [1]  91/11
government [4]  13/19 13/19 20/10 20/12
governs [1]  13/14
graciously [1]  14/11
grant [2]  19/16 55/18
granted [1]  19/21
great [5]  4/16 4/19 8/11 65/25 78/17
green [1]  36/10
gremlins [2]  97/8 97/9
grossly [1]  88/14
grouped [1]  40/3
guess [4]  16/14 18/20 26/20 69/13
gun [1]  12/14

**H**

had [42]  3/13 6/6 9/11 14/5 20/19 23/3 25/3 33/24 36/4 42/6 42/7 43/2 43/10 48/15 53/19 53/22 56/14 56/17 57/6 65/4 65/21 66/4 67/1 67/2 67/5 67/17 70/14 71/11 72/21 76/23 77/6 80/15 80/18 83/25 84/2 84/23 85/4 85/14 86/1 86/1 92/17 100/2
hand [8]  8/2 33/19 53/9 56/19 58/17 65/21 67/5 87/12
happened [2]  5/16 35/3
happening [1]  21/14
happy [4]  19/5 40/24 75/12 99/20
harbor [3]  96/12 96/14 100/7
hard [5]  3/9 6/2 6/11 19/1 21/9
harm [3]  5/14 75/19 76/6
harmful [2]  34/16 34/17
HARPER [3]  2/6 4/11 19/18
has [21]  6/24 7/24 11/25 19/5 22/1 22/6 28/1 37/5 39/12 46/9

62/13 64/14 65/6 71/25 82/16 83/10 83/19 89/19 89/5 92/13 93/21
have [165]
haven't [4]  40/17 43/23 93/13 100/4
having [8]  20/3 32/23 32/24 55/8 58/17 62/23 87/1 97/3
he [19]  29/21 29/22 36/15 44/9 44/9 45/11 67/9 67/23 67/24 74/8 83/9 83/14 83/21 84/11 84/13 84/21 84/22 84/23 101/5
he's [3]  32/14 32/15 101/6
head [3]  12/3 12/10 12/13
headed [1]  56/25
health [1]  75/20
hear [8]  3/9 31/8 53/13 69/21 70/5 89/2 90/14 94/22
Hearing [1]  1/8
held [1]  20/5
Help [1]  89/22
helpful [3]  9/6 59/14 98/24
her [1]  97/15
here [35]  4/3 4/4 4/21 4/22 5/1 5/3 5/22 8/9 8/13 12/11 12/23 16/2 17/21 20/14 21/1 27/20 28/20 33/19 36/4 48/7 54/21 61/11 70/18 71/15 72/7 72/10 79/21 82/20 91/21 92/15 96/1 97/23 98/10 99/12 100/5
here's [1]  98/12
high [7]  13/8 28/4 38/20 41/6 41/10 45/21 74/15
high-end [5]  38/20 41/6 41/10 45/21 74/15
higher [2]  29/11 32/24
highlight [1]  6/3
highly [1]  32/25
him [1]  36/14
his [8]  4/11 21/14 31/23 45/11 67/9 67/22 84/21 101/5
historical [2]  50/5 51/24
hold [20]  21/7 24/5 24/10 24/10 37/1 48/8 48/12 51/14 56/15 56/15 63/2 64/19 66/11 68/1 68/5 76/2 77/19 90/1 95/6 95/10
holes [5]  44/9 67/25 89/14 89/19 90/16
holidays [1]  5/12
honestly [1]  26/14
Honor [178]
Honor's [6]  32/22 40/4 78/24 79/15 81/19 99/19
HONORABLE [1]  1/12
hook [2]  16/21 17/11
HOOKER [2]  1/21 3/23
hope [2]  6/13 7/18
hoping [1]  100/5
house [1]  77/8
how [42]  10/14 10/17 10/19 13/5 16/21 19/17 21/6 22/2 23/17 23/22 36/13 36/15 39/17 42/11 42/20 45/17 45/24 50/25 54/12 55/13 55/19 56/21 57/8 57/9 57/17 58/3 58/14 59/8 67/24 73/25 83/2 83/8 84/24 87/24 88/21 89/8 90/10 90/19 91/22 96/25 99/8 99/13
however [2]  17/7 63/12

**H**

huh [1] 48/10
human [1] 75/20
hundreds [1] 38/2
hunky [1] 27/25
hunky-dory [1] 27/25
hustle [1] 70/22

**I**

I'd [5] 16/12 38/3 48/12 64/12 99/19
I'll [7] 19/18 34/5 34/7 44/23 66/23 93/15 97/4
I'm [68] 3/3 3/4 3/21 4/9 4/25 7/1 7/17 8/2 15/14 17/13 17/13 20/14 22/8 23/4 23/4 23/10 25/2 25/2 26/24 27/1 27/12 28/19 28/24 30/6 31/2 31/15 37/11 37/14 38/21 38/21 39/15 40/8 40/24 40/24 44/15 45/12 49/6 50/16 53/23 55/2 55/12 55/12 55/12 55/14 56/15 57/5 65/20 68/5 70/21 72/6 75/12 76/11 77/8 78/6 78/12 79/9 79/16 82/15 91/4 94/10 95/9 95/15 97/18 97/22 98/2 99/5 100/22 101/14
I've [20] 3/4 3/13 8/12 8/21 19/13 20/21 22/2 31/17 38/19 43/25 43/25 44/1 44/5 47/11 54/18 77/19 82/19 95/8 95/15 100/25
iceberg [3] 58/2 61/9 61/24
idea [1] 6/3
identified [8] 7/16 10/5 41/21 75/13 78/9 79/8 79/18 79/22
identify [3] 70/11 72/8 95/21
identifying [1] 23/1
ill [1] 28/7
immediately [2] 32/23 75/1
impact [4] 31/19 80/16 95/17 100/22
implicitly [2] 32/14 98/18
implies [1] 53/15
imply [4] 7/13 48/14 72/10 80/14
important [10] 13/22 14/1 22/24 22/25 29/19 32/17 48/7 51/25 68/10 84/25
importantly [1] 77/11
impossible [1] 5/12
impression [1] 75/8
improve [1] 57/9
improvement [1] 83/10
inaccurate [1] 55/22
Incidentally [1] 54/2
inclination [1] 97/25
inclined [4] 27/10 31/2 37/18 101/1
include [5] 61/13 64/2 64/4 65/22 82/9
included [2] 65/2 68/22
includes [3] 39/14 61/15 61/17
including [6] 23/10 23/17 25/15 58/4 62/25 79/4
incredibly [1] 33/9
incur [1] 53/8
indeed [1] 49/7
Indelicato [1] 4/4

indicated [1] 74/25
indicates [2] 38/12 73/4
infer [6] 23/13 55/21 58/9 59/8 75/22 95/22
inference [5] 27/20 29/4 29/18 59/23 71/20
inferences [1] 80/3
inferred [3] 48/21 70/2 73/24
information [13] 41/7 41/8 63/14 68/13 73/4 83/17 83/25 84/15 85/6 85/7 85/10 85/12 85/15
infusion [1] 72/22
inherited [5] 63/7 63/9 67/23 74/2 74/18
inputs [1] 52/6
insider [1] 69/1
insight [1] 93/6
insolvent [2] 30/13 53/5
instance [2] 18/8 100/11
instances [3] 39/24 60/5 73/9
instead [1] 43/19
insufficient [1] 58/14
insurance [1] 24/16
insurer [1] 30/1
intending [1] 96/20
intensely [1] 29/17
intent [1] 27/19
intentionally [2] 52/20 98/19
intently [1] 84/7
interest [1] 28/24
interested [1] 38/4
interpretations [2] 11/9 37/25
introductions [2] 3/21 3/22
intuited [1] 19/5
investigating [1] 71/10
investing [2] 71/11 74/23
investor [2] 23/5 23/13
investors [4] 27/24 33/6 71/10 74/23
invite [3] 3/7 101/11 101/13
invites [1] 37/24
involve [1] 32/25
involvement [1] 59/25
ironic [1] 53/17
is [407]
isn't [5] 19/4 25/21 50/19 61/8 83/23
issue [17] 17/21 27/3 31/3 35/20 50/16 50/19 53/7 54/18 56/9 58/16 59/13 89/4 89/7 92/21 97/12 98/9 100/16
issued [3] 5/11 6/1 6/14
issues [7] 6/18 8/23 31/11 35/18 39/14 44/9 57/10
issuing [1] 43/1
it [335]
it's [90] 3/9 3/17 4/24 4/24 6/16 8/20 9/1 10/9 10/9 10/10 11/8 11/8 11/20 11/21 14/1 14/12 14/24 15/12 15/17 16/18 16/21 17/1 17/8 17/17 18/11 19/7 22/18 22/24 23/2 24/13 25/6 25/7 25/9 27/12 27/23 27/24 28/2 28/5 28/12 28/16 28/19 36/24 37/24 38/18 40/12 40/15 40/16 40/22 42/15 45/3 46/16 47/6 47/15 48/17 50/14 50/19 50/24 51/19 53/9 53/13 54/10 58/9 58/15 61/9 68/10

76/5 77/2 77/12 79/21 83/3 83/15 83/22 84/4 84/13 86/3 85/8 85/11 85/12 85/25 87/8 87/20 88/19 90/3 90/12 90/24 92/2 94/5 96/18 97/5 98/10
item [4] 47/14 47/16 59/19 59/20
items [1] 53/11
its [8] 27/24 46/24 48/22 49/13 59/17 60/23 65/15 88/5
itself [4] 14/6 67/22 76/11 93/22

**J**

jack [1] 28/13
JAMESON [2] 1/17 3/18
January [1] 1/7
jeopardy [1] 73/6
Jersey [18] 14/19 14/23 15/1 15/7 33/13 50/16 51/23 52/24 55/8 56/5 58/5 58/16 60/18 62/25 63/6 63/9 63/12 66/4
Jersey's [1] 47/16
job [1] 92/3
Johnathan [2] 4/10 6/22
joined [1] 4/10
JONATHAN [1] 2/6
JONES [2] 1/16 3/19
Joseph [2] 3/23 4/3
Judge [1] 1/12
judge's [1] 12/13
judges [3] 20/15 20/21 20/23
judgment [4] 19/21 29/7 35/14 35/19
judgments [2] 33/6 35/4
jump [1] 34/5
jumped [1] 12/14
jumping [1] 63/10
jury [5] 10/8 25/21 27/12 33/2 37/11
just [53] 3/3 3/21 8/22 9/9 13/11 13/15 14/2 16/17 22/7 23/25 28/20 29/8 29/20 31/4 33/21 34/4 34/20 37/6 37/24 37/24 40/5 40/15 40/18 42/14 42/15 43/16 49/1 50/12 51/18 51/19 51/21 53/9 53/13 54/19 56/5 57/12 57/13 57/14 57/21 61/24 65/23 66/2 68/7 71/14 71/16 71/23 72/6 77/9 79/16 85/21 95/24 101/3 101/15
justice [3] 5/8 6/9 92/4
justified [1] 92/15
justify [1] 92/19
JUSTIN [2] 2/7 4/12

**K**

KATZ [2] 2/5 6/23
keep [3] 14/1 28/4 31/4
kind [19] 22/5 35/24 36/11 38/8 38/10 39/5 40/2 42/14 69/7 71/6 71/7 77/10 79/12 79/16 87/8 87/23 87/24 93/21 96/21
kinds [3] 29/12 29/18 96/24
King [1] 1/10
Kirsch [17] 44/8 68/11 85/23 89/6 89/13 89/18 90/21 91/5 91/10 91/13 93/14 94/3 94/5 96/25 100/13 100/19 101/4

Kirsch's [2] 67/1 67/22
knew [35] 14/5 41/9 41/10 43/1 47/9 48/14 50/25 52/15 52/16 52/25 55/22 56/13 56/17 56/21 57/6 57/22 58/10 58/15 59/24 61/25 65/15 66/4 70/2 72/19 73/4 73/17 74/14 74/18 76/25 83/14 83/21 85/20 93/9 93/14 98/20
know [68] 3/21 4/22 6/1 6/5 9/5 12/12 13/16 16/2 18/23 19/6 19/13 19/23 19/25 20/19 20/23 21/21 21/21 25/19 26/12 27/21 29/1 29/17 30/8 33/2 33/3 35/21 35/25 37/5 37/21 38/2 38/12 39/4 39/6 39/22 40/20 42/23 52/21 55/16 57/4 59/5 60/3 60/18 60/21 61/2 61/3 70/21 71/16 72/6 74/1 76/15 76/24 77/11 78/18 79/6 83/8 84/21 85/2 85/5 85/23 87/7 91/24 92/4 92/21 97/24 98/5 99/24 100/2 100/9
knowing [4] 84/25 85/13 85/16 89/7
knowingly [2] 78/14 87/5
knowledge [5] 52/8 53/22 67/2 68/7 87/24
known [3] 68/13 84/1 86/24
knows [3] 93/10 93/21 97/24
kremlinologists [1] 16/2
Ks [1] 7/9

**L**

language [28] 8/20 8/24 8/25 9/2 9/10 11/13 18/4 18/9 37/19 37/23 38/1 38/3 38/7 38/23 39/3 39/4 41/14 41/16 43/12 47/1 49/1 95/20 96/22 97/5 97/24 98/14 98/17 98/21
last [14] 6/6 23/6 23/15 35/23 42/3 69/9 69/12 70/5 75/12 89/5 91/23 94/7 95/2 100/13
late [4] 23/4 23/4 24/19 24/24
later [4] 52/21 62/21 84/1 84/2
law [7] 4/10 19/19 20/4 29/2 72/25 89/17 90/17
laws [1] 70/10
lawsuit [3] 26/1 72/12 88/20
lawsuits [1] 67/4
lead [1] 46/16
lean [1] 54/23
learn [2] 5/19 93/12
learned [1] 60/1
least [3] 22/1 60/23 101/14
leave [2] 79/21 95/24
leaves [1] 16/2
left [2] 9/9 91/18
legal [2] 35/5 74/13
legally [1] 52/17
legs [1] 71/13
Lengel [1] 4/18
lengthy [1] 8/22
less [2] 78/24 98/25
Lester [1] 3/23
LESTOR [1] 1/21
let [19] 12/11 19/8 22/4 27/10 31/9 34/4 34/6 34/7 46/6 46/15 47/21 50/7 54/2 64/19 73/13 76/20 89/2 92/23 96/9

**L**

let's [39] 6/12 16/19 22/12 31/4 31/21 37/17 38/6 39/8 39/8 40/7 41/12 42/13 48/19 51/5 57/19 61/22 62/14 62/14 63/16 63/17 64/11 64/11 64/18 66/2 67/6 67/6 70/18 70/22 70/24 71/14 72/12 75/16 76/2 76/3 76/13 77/3 79/19 81/2 90/11
letter [3] 97/12 97/15 99/5
letters [1] 52/22
level [1] 75/19
leverage [2] 73/18 74/5
liabilities [44] 9/17 12/24 22/15 23/10 23/11 23/17 34/1 39/25 40/6 48/15 48/23 60/23 70/7 71/24 72/5 72/13 72/16 73/1 74/2 74/13 74/18 75/3 75/5 79/10 80/9 80/15 80/20 81/5 82/23 83/6 83/18 83/20 84/1 84/8 84/9 85/21 86/8 86/23 87/7 87/10 87/14 88/6 89/17 95/17
liability [55] 7/15 7/21 8/1 9/4 9/8 9/18 11/17 11/22 12/4 14/16 16/3 16/12 16/15 16/20 17/23 23/19 24/16 25/15 25/18 26/21 30/10 33/25 34/20 35/1 35/2 36/8 38/7 38/11 41/20 56/8 59/17 65/15 66/5 70/3 71/3 75/17 78/18 79/5 79/23 81/24 85/3 87/2 87/3 88/21 89/5 89/21 90/7 90/15 90/24 91/7 91/12 94/25 95/4 99/14 100/23
licensed [2] 49/3 49/11
lied [1] 54/25
life [1] 78/3
light [1] 24/23
like [20] 11/15 16/2 16/2 32/8 45/10 48/10 48/12 50/10 50/13 64/12 75/14 81/5 82/17 83/14 84/10 93/11 96/18 98/5 99/19 101/12
likelihood [1] 39/1
limited [1] 27/11
line [3] 49/5 62/7 69/12
LIPTON [2] 2/5 6/22
list [1] 21/11
listen [1] 98/5
literal [1] 26/24
literally [1] 74/19
litigate [1] 97/3
litigating [2] 14/25 34/14
litigation [29] 1/4 12/24 13/21 13/25 14/16 14/22 14/23 15/13 22/20 40/1 42/5 42/9 42/25 42/25 43/16 43/19 44/6 46/13 47/12 47/15 47/18 50/2 50/19 50/24 52/4 54/8 54/13 65/7 65/11
litigations [3] 25/19 46/12 72/20
littered [1] 78/10
little [3] 63/10 71/22 100/2
load [1] 88/25
logic [1] 56/1
long [3] 31/18 91/22 100/8

longer [1] 40/22
look [22] 5/13 5/25 9/11 11/15 18/11 28/19 32/14 33/13 33/17 40/8 41/13 49/17 52/10 52/24 57/19 64/18 69/11 70/24 83/1 94/10 101/10 101/11
looking [11] 17/8 17/8 17/24 22/8 25/2 36/11 40/8 88/17 91/21 96/3 96/21
looks [2] 20/25 82/17
lose [1] 99/6
loss [2] 27/5 93/2
losses [3] 22/19 27/2 80/9
lost [2] 21/22 55/12
lot [16] 4/21 5/19 5/19 9/7 9/16 14/9 47/14 70/15 93/5 93/7 93/12 93/12 96/13 96/15 100/9 100/25
lots [1] 79/6
low [4] 43/13 55/11 60/7 73/18
Lyn [1] 4/18

**M**

made [26] 11/25 12/6 13/16 17/6 25/13 32/15 35/14 46/10 50/12 53/15 53/22 55/7 72/10 75/22 76/9 78/14 79/7 83/13 85/15 87/17 88/1 88/2 90/15 92/19 99/22 100/20
main [1] 42/25
maintain [3] 29/8 82/7 86/21
maintaining [2] 80/21 86/19
majority [1] 73/21
make [31] 3/22 3/25 8/22 9/13 13/7 15/24 15/25 16/10 24/6 31/10 33/6 34/12 34/20 35/5 38/8 51/21 66/7 78/3 78/17 79/1 79/17 85/2 86/15 89/15 90/23 93/3 93/8 93/12 95/3 98/8 98/13
makes [10] 6/14 7/22 12/20 21/9 61/19 89/13 90/21 92/24 92/24 96/18
making [4] 12/3 35/7 35/10 101/6
Man [1] 3/17
manage [1] 84/9
managed [2] 82/24 87/11
management [1] 12/6
management's [2] 9/1 11/5
many [5] 6/21 21/6 39/24 54/12 60/5
marked [1] 14/5
market [9] 67/19 74/3 75/5 83/25 84/6 84/6 85/8 85/8 86/1
mask [3] 3/4 3/8 3/9
massive [2] 85/3 87/14
master [2] 5/20 5/20
match [1] 35/22
material [6] 31/19 35/13 35/15 80/16 84/6 95/5
materiality [1] 95/2
materially [3] 72/18 74/20 74/22
math [4] 14/2 14/13 40/17 68/17
matter [4] 6/25 7/4 49/22 99/3
matters [2] 19/11 49/24
mature [6] 71/24 86/24 87/2 87/3 87/11 88/6

max [1] 79/24
maximum [44] 7/14 7/20 9/8 9/17 9/22 10/13 10/22 11/21 11/25 12/4 16/3 16/11 16/15 16/20 17/11 17/22 23/11 25/15 25/18 30/1 30/9 33/20 38/11 41/1 41/6 48/22 49/13 54/25 55/25 56/8 57/24 58/17 59/17 63/11 65/15 66/5 70/3 71/12 71/13 78/18 79/10 89/5 94/25 98/11
maximums [15] 26/5 30/18 31/3 39/21 40/25 42/7 43/3 56/22 59/6 70/14 70/22 73/4 75/6 81/24 84/23
may [18] 6/16 6/25 11/13 32/12 32/12 33/2 34/6 34/6 34/16 36/24 38/17 40/20 41/20 50/17 53/7 68/14 83/22 96/16
MAYA [5] 1/20 3/23 3/24 28/11 36/24
maybe [11] 3/17 7/2 9/5 10/8 15/16 27/13 29/7 58/24 91/16 99/12 100/19
MDL [4] 40/19 42/24 42/25 46/12
MDO [1] 31/25
me [97] 3/22 11/20 12/11 15/22 19/8 19/14 19/19 22/4 28/18 31/9 31/13 31/15 31/20 34/4 34/6 35/25 37/22 37/23 38/2 38/15 38/24 39/7 42/10 42/20 42/24 43/15 43/23 44/5 45/10 45/13 46/6 46/15 46/21 47/2 47/17 47/21 48/10 48/13 48/19 49/1 50/7 51/5 51/16 53/17 53/18 54/2 54/14 54/24 55/3 55/6 57/20 58/12 58/22 59/16 60/18 62/5 64/19 66/2 66/7 67/12 68/19 69/16 71/19 71/25 72/2 72/8 72/11 73/13 74/7 75/14 76/20 76/24 76/25 77/3 77/15 78/17 78/20 79/22 80/23 82/12 87/25 88/3 88/3 88/10 89/2 89/22 95/12 95/12 96/9 97/5 97/13 97/23 97/25 99/7 99/8 99/8 99/23
mean [20] 11/7 16/18 16/19 18/16 23/6 26/20 27/21 29/24 34/17 46/18 58/6 64/15 77/11 79/1 93/11 93/13 97/1 99/23 100/22 101/14
means [5] 9/23 9/25 10/20 36/2 98/11
meant [3] 11/8 30/18 44/22
mechanism [1] 32/5
mechanisms [1] 5/13
meet [2] 5/8 21/21
meetings [2] 60/9 68/11
member [1] 4/11
members [1] 5/3
mention [2] 6/6 20/8
mentioned [6] 35/24 47/11 54/18 54/20 88/9 100/24
met [1] 91/1
might [5] 6/3 9/2 46/19 71/17 82/2
million [67] 9/1 9/4 11/6 14/3 14/4 14/14 15/4 23/12 34/21 34/23 42/8 47/9 48/16 48/23

49/14 55/9 55/10 55/22 55/25 56/1 56/5 56/20 57/16 57/21 57/24 58/1 58/2 58/10 58/13 58/18 58/25 59/10 59/11 59/22 60/11 60/14 60/19 60/24 61/1 61/8 61/8 61/9 61/23 61/25 62/5 62/8 62/13 62/15 62/24 62/24 63/4 63/8 63/20 63/23 63/25 64/2 64/3 64/10 64/10 65/4 65/16 65/21 66/5 66/16 88/13 93/17 94/2
mind [7] 22/24 22/24 23/13 24/22 37/24 69/2 101/1
mindful [1] 6/13
minimum [2] 18/10 61/7
minor [2] 14/12 28/9
minutes [3] 80/25 91/18 101/7
mischaracterization [1] 36/16
mislead [1] 24/7
misleading [8] 28/2 33/4 71/8 72/18 74/20 74/22 85/19 85/25
misled [1] 28/13
mismatch [1] 91/22
misquote [1] 95/3
misrepresentation [1] 36/16
misses [1] 9/19
missing [1] 37/15
misspoke [1] 61/12
misstate [1] 25/4
misunderstanding [1] 47/13
mix [1] 39/20
modifying [1] 38/25
moment [1] 48/11
momentum [1] 99/6
money [2] 32/11 35/11
months [2] 5/10 6/6
Moody's [22] 73/8 74/25 75/10 82/9 82/16 82/25 83/4 83/11 83/15 84/4 84/12 84/14 84/17 85/2 85/6 85/10 85/12 85/13 85/14 86/12 86/20 94/9
more [31] 6/15 9/11 9/12 14/10 15/16 22/2 23/1 23/8 23/14 23/18 24/17 25/9 25/14 33/8 35/9 35/9 35/11 59/10 63/14 63/14 69/25 71/22 75/6 76/12 77/11 78/23 92/24 92/24 96/17 98/25 100/17
morning [7] 3/11 3/12 3/18 4/8 7/18 36/22 36/23
MOSES [3] 2/6 4/10 6/22
most [4] 4/21 11/10 19/18 24/23
motion [10] 1/8 5/7 6/5 6/16 15/17 19/9 19/16 29/14 30/17 90/25
motions [3] 5/10 20/1 29/17
motivation [5] 28/21 28/21 52/11 52/14 52/18
move [5] 19/20 19/22 19/23 63/13 69/7
Mr. [10] 19/18 21/13 29/21 32/7 44/8 67/22 89/13 89/18 90/21 91/10
Mr. Harper [1] 19/18
Mr. Kirsch [5] 44/8 89/13 89/18 90/21 91/10
Mr. Kirsch's [1] 67/22
Mr. Newman [1] 29/21
Mr. Vergnano [2] 21/13 32/7

**M**

Ms [6] 22/1 34/4 36/19 40/18 92/13 97/15
Ms. [1] 3/25
Ms. Saxena [1] 3/25
much [15] 5/6 6/23 7/5 23/1 33/16 57/17 59/8 64/12 67/24 69/4 79/22 86/1 92/5 93/2 99/2
multiple [5] 5/22 5/22 11/8 35/9 37/25
municipality [1] 51/23
my [35] 3/17 4/1 4/24 6/5 6/22 8/8 10/23 11/11 12/11 22/1 22/24 22/24 23/13 24/22 26/14 28/8 28/17 30/7 31/17 34/4 37/24 38/12 41/13 42/14 44/25 69/9 72/7 78/3 78/17 79/5 91/17 94/4 96/12 97/25 101/1
myself [1] 28/19

**N**

name [2] 6/22 28/10
narrative [3] 28/3 44/1 98/15
narrow [1] 81/20
natural [1] 13/20
nature [2] 47/13 50/18
necessarily [1] 86/17
need [11] 3/22 5/1 35/5 44/1 80/23 89/17 95/14 100/15 100/16 100/17 100/25
needs [1] 27/13
negative [2] 3/5 19/7
Nemours [1] 78/14
net [1] 73/18
never [1] 21/25
new [23] 3/14 3/19 4/2 14/19 14/23 15/1 15/7 33/13 47/16 50/16 51/22 52/24 55/8 56/4 58/5 58/16 60/18 62/25 63/6 63/9 63/12 66/4 97/10
Newman [5] 29/21 73/24 83/13 88/1 88/4
next [7] 13/10 36/7 36/10 51/7 51/9 67/20 77/17
Nicole [1] 4/18
nifty [1] 36/4
no [44] 1/4 5/25 7/19 10/2 10/2 15/21 15/21 15/23 15/24 16/23 17/1 19/7 19/7 20/19 21/20 24/24 28/18 29/20 30/18 31/21 38/7 39/12 40/22 46/7 46/9 49/19 63/6 67/12 68/18 69/18 78/10 80/2 80/15 82/11 84/23 85/14 94/24 94/24 95/17 95/18 97/22 98/4 98/4 101/1
NOAH [2] 2/7 4/12
nobody [1] 17/10
None [2] 7/21 100/3
North [2] 34/1 34/25
not [134]
note [1] 13/5
noted [1] 59/5
notes [3] 3/22 12/11 13/5
nothing [3] 12/20 35/3 97/10
notice [5] 43/9 43/17 46/1 46/12 55/19
notification [1] 67/3
November [1] 22/23
November 1 [1] 22/23

nove [1] 98/6
now [25] 3/10 5/6 9/5 9/11 15/10 16/17 22/17 22/22 23/13 32/8 32/11 34/4 35/9 36/1 40/25 58/12 62/24 63/17 63/25 64/8 65/8 65/14 69/12 78/16 100/12
nub [1] 7/4
number [62] 12/7 12/7 15/4 15/5 15/7 15/15 18/23 18/25 25/23 25/24 25/25 26/1 26/10 26/17 26/17 27/6 34/23 38/20 38/21 40/15 41/12 42/11 42/21 43/23 44/10 45/21 50/18 51/10 51/10 52/15 52/19 52/23 54/24 55/9 56/2 56/3 56/19 56/22 57/20 57/21 57/24 58/12 58/13 58/18 58/20 60/18 60/19 61/5 61/7 62/11 62/19 65/4 65/6 65/18 65/19 65/23 83/6 93/17 93/18 93/23 93/23 93/24
numbers [41] 14/12 15/3 16/15 39/10 39/15 41/5 41/6 41/6 41/10 43/2 43/3 43/17 44/1 44/7 46/2 46/6 50/6 51/25 52/6 52/12 54/13 55/16 55/19 56/5 58/11 60/1 60/3 60/5 60/6 63/12 65/12 65/25 66/2 67/13 68/8 69/3 74/15 74/15 84/16 84/17 85/23
numerous [1] 77/14

**O**

oath [1] 27/18
objected [1] 70/14
objecting [1] 87/14
obtuse [1] 10/9
obvious [1] 92/21
obviously [6] 5/13 8/8 29/14 40/20 92/19 94/6
occur [2] 32/12 37/23
occurred [1] 46/14
off [17] 43/4 43/11 43/18 52/16 55/11 55/17 59/7 59/8 59/8 59/10 59/25 60/3 60/19 67/4 84/22 84/23 100/24
office [1] 4/1
officials [1] 34/11
often [2] 4/22 40/2
oh [7] 30/18 31/14 53/6 53/9 64/6 67/10 87/13
Ohio [5] 31/25 32/18 40/19 42/24 42/25
okay [39] 8/6 17/21 17/23 18/6 20/6 22/4 22/13 22/16 30/4 33/18 37/3 44/4 49/10 50/14 51/17 52/1 54/14 56/16 62/14 64/6 65/13 66/14 67/20 68/15 70/18 70/25 75/25 76/18 76/21 79/20 80/1 81/1 82/5 82/15 84/4 87/3 90/4 91/14 96/23
omission [3] 85/17 85/18 85/20
Omnicare [1] 17/18
once [2] 29/14 75/4
one [55] 5/13 6/9 12/17 12/18 18/13 19/23 21/9 22/4 22/10 22/12 22/14 26/16 26/19 27/8 27/9 27/23 30/5 30/13 31/19 34/3 34/19 35/13 35/14 37/20

42/25 47/11 50/18 51/1 53/4 54/14 56/10 58/13 58/16 65/5 65/12 65/18 65/19 66/23 69/25 71/25 73/5 73/12 75/12 76/2 91/16 94/7 94/12 95/2 95/5 95/12 96/16 96/17 97/14 97/18 99/15
one-tenth [1] 58/13
ones [4] 29/13 31/9 71/7 101/1
ongoing [6] 12/25 14/17 52/11 68/11 70/12 70/15
only [30] 8/21 11/11 11/15 17/2 21/1 26/23 27/3 29/7 32/4 32/13 38/18 40/16 41/1 43/8 57/22 61/10 63/8 69/20 69/21 69/24 70/9 70/22 79/12 79/14 80/24 84/21 89/4 91/16 91/17 92/4
opinion [12] 5/11 9/1 10/16 16/7 16/8 16/19 16/25 17/1 17/19 72/1 79/5 100/9
opinions [3] 5/9 20/20 54/13
opportunity [9] 6/24 31/10 53/16 55/5 70/1 92/17 93/4 93/6 97/12
opposed [1] 18/20
opposite [1] 87/8
oral [7] 6/2 6/12 6/13 6/14 31/17 72/7 78/16
oranges [3] 10/23 18/20 39/20
order [20] 6/2 6/13 11/11 12/4 13/24 16/1 16/1 19/5 30/6 30/7 31/20 41/13 44/25 57/11 59/15 72/7 75/13 76/23 77/22 89/15
ordered [1] 67/23
orders [2] 13/19 13/19
other [39] 5/16 6/5 7/3 12/6 16/4 17/7 25/17 32/16 33/21 35/24 37/22 40/19 53/9 53/11 55/20 55/20 56/4 69/11 69/22 70/19 70/23 71/24 73/7 79/7 84/24 86/14 86/20 87/12 89/18 92/16 92/21 93/14 96/7 97/2 97/23 98/14 100/19 101/1 101/4
Otherwise [1] 78/19
our [53] 5/8 9/21 11/17 12/19 13/16 13/16 16/15 16/20 25/5 25/6 25/23 26/8 26/16 26/17 29/1 30/17 34/14 39/14 44/8 44/16 47/20 48/4 51/12 54/25 57/5 57/9 62/18 62/22 66/18 66/22 72/4 72/17 73/1 73/19 73/20 73/21 74/9 74/10 74/21 75/10 75/24 79/14 83/10 89/9 89/24 90/18 90/20 91/5 93/19 95/3 95/3 95/11 97/14
out [32] 9/10 13/11 13/15 15/11 19/6 19/18 20/25 21/25 25/1 25/24 26/6 27/17 29/13 32/16 42/18 47/18 66/23 67/24 71/17 75/4 78/13 83/6 84/10 89/22 93/5 93/7 94/20 94/21 96/13 99/19 99/25 101/4
outcome [1] 35/13
outcomes [1] 25/19
outside [1] 79/7
outstanding [1] 74/2
over [18] 5/4 13/11 18/17 21/14 23/12 26/1 50/21 56/5

56/14 56/19 57/1 59/3 63/8 78/8 87/7 87/14 93/25 100/21 85/3
overhang [4] 32/1 73/2 83/19
overlooking [1] 50/17
own [9] 33/6 43/4 45/8 50/5 50/25 52/6 54/10 65/24 72/20

**P**

P.A [2] 1/16 2/3
page [5] 8/13 8/13 73/13 92/5 95/11
pages [9] 8/14 8/20 8/21 14/10 32/18 32/20 35/10 78/8 79/6
paid [1] 33/14
paint [1] 98/15
pales [1] 5/2
panel [6] 56/23 56/23 57/1 57/4 57/6 57/11
paper [1] 8/5
papers [4] 41/5 90/18 95/9 101/15
paragraph [66] 14/4 24/13 24/14 30/14 40/8 42/1 44/24 47/25 47/25 48/1 48/13 48/20 49/2 49/6 49/17 49/20 51/3 51/4 51/7 52/2 52/7 52/8 52/21 52/21 53/24 54/2 54/15 55/12 55/13 56/16 57/20 62/3 62/6 62/8 62/12 62/15 62/18 62/20 62/22 64/1 64/11 66/15 70/4 72/4 73/15 73/16 73/16 74/12 74/17 76/1 76/11 76/14 76/17 76/22 77/2 77/15 77/16 77/18 77/20 80/13 81/2 82/17 83/1 86/12 87/18 88/12
Paragraph 1 [1] 30/14
Paragraph 113 [5] 14/4 40/8 42/1 55/13 57/20
Paragraph 167 [1] 87/18
Paragraph 176 [2] 72/4 74/12
Paragraph 180 [1] 74/17
Paragraph 186 [2] 76/1 76/11
Paragraph 200 [4] 76/14 76/17 76/22 77/16
Paragraph 201 [2] 82/17 86/12
Paragraph 234 [3] 73/15 73/16 73/16
Paragraph 276 [4] 48/13 48/20 51/3 52/21
Paragraph 81 [1] 56/16
Paragraph 83 [1] 88/12
Paragraph 84 [1] 62/20
Paragraph 85 [1] 62/22
Paragraph 86 [5] 47/25 49/17 62/6 62/15 64/1
Paragraph 87 [3] 48/1 51/4 52/2
Paragraph 88 [3] 52/7 52/8 66/15
Paragraph 90 [1] 77/2
Paragraph 92 [5] 53/24 54/2 54/15 77/18 77/20
paragraphs [16] 22/18 22/22 47/20 48/5 49/21 54/16 57/5 65/20 66/3 66/17 66/19 75/23 86/22 88/8 94/18 95/1
Paragraphs 165 [1] 86/22
Paragraphs 83 [1] 48/5
paraphrased [1] 9/9

**P**

paraphrasing [1] 11/12
parenthesis [1] 24/18
parse [1] 5/21
part [10] 8/22 15/7 19/9 19/16 20/1 22/6 28/2 32/5 41/7 99/23
partial [5] 19/9 19/21 19/22 19/23 20/8
partially [2] 41/3 45/11
particular [5] 12/23 18/8 47/15 48/25 56/17
particularly [2] 6/18 86/22
particulars [1] 100/5
parties [2] 92/25 97/11
Partly [2] 30/7 95/19
parts [1] 93/22
party [1] 54/14
past [4] 8/12 29/14 74/14 92/23
patent [3] 5/4 5/5 98/5
pattern [1] 20/24
pause [2] 97/5 97/13
pay [2] 32/11 32/12
paying [1] 6/10
pen [1] 50/8
pending [1] 20/11
people [10] 3/9 19/24 35/2 35/4 77/23 90/14 93/13 93/14 96/21 99/13
perfect [1] 35/22
Performance [1] 56/25
period [7] 8/17 35/8 62/22 63/14 70/16 82/23 84/7
personally [2] 6/7 28/8
persuade [1] 59/15
PFAS [6] 56/14 71/3 72/13 80/20 81/17 86/8
PFOA [1] 31/23
phone [1] 4/12
phrase [1] 38/25
physical [1] 5/14
pick [3] 64/14 98/4 98/7
picture [1] 71/8
piece [1] 34/4
pile [1] 6/4
pin [1] 29/1
pink [1] 50/7
place [2] 30/19 32/5
plain [2] 18/4 61/19
plainly [1] 93/18
plaintiff [6] 1/22 3/19 91/20 92/3 96/25 100/3
plaintiff's [2] 22/8 78/23
plaintiffs [9] 6/17 22/25 32/10 34/4 36/12 36/25 79/8 92/22 94/15
plans [1] 28/9
plant [5] 34/1 35/15 56/11 56/17 57/9
plausibility [1] 90/20
plausible [12] 10/9 37/25 58/9 71/4 71/20 78/21 80/2 80/8 95/18 97/17 97/19 100/12
plausibly [11] 7/13 7/20 23/5 48/14 48/21 53/15 55/21 70/2 72/9 73/23 80/14
plead [6] 17/3 17/16 17/19 25/23 28/5 28/6
pleaded [3] 21/25 30/11 30/15

pleading [8] 17/2 29/6 29/12 59/2 59/5 90/9 91/1 98/11
please [6] 6/2 6/25 36/24 69/4 88/3 95/12
pled [1] 22/6
plenty [1] 92/17
plug [4] 44/9 67/24 89/14 89/18
plugging [1] 90/16
podium [2] 15/23 37/21
point [65] 3/14 5/6 6/4 9/6 9/19 10/12 10/24 12/15 12/21 13/16 14/14 14/15 15/24 15/25 19/1 19/6 26/6 28/8 31/11 32/17 34/18 34/20 37/12 38/2 42/18 43/16 47/12 47/17 47/25 49/10 49/15 49/23 52/19 52/22 53/2 53/12 54/14 54/18 56/2 58/16 59/13 59/16 60/15 61/4 63/1 63/20 64/9 68/19 69/16 69/25 70/10 79/12 80/4 82/22 88/3 88/7 89/16 90/22 92/4 92/6 93/8 95/3 95/8 97/23 98/8
pointed [1] 69/24
pointing [3] 58/12 73/12 91/25
points [3] 7/3 63/15 87/24
portray [1] 71/8
pose [2] 75/19 76/6
posed [2] 34/3 38/18
position [2] 34/14 91/5
possession [5] 24/23 73/3 77/6 77/10 77/13
possible [12] 25/17 26/8 26/9 26/17 29/22 30/2 30/20 30/24 30/24 33/12 33/15 38/9
possibly [7] 18/17 23/18 45/18 45/24 55/13 58/14 100/13
potential [23] 7/10 7/14 7/20 9/3 12/4 16/3 16/11 16/15 16/20 17/11 17/22 23/11 23/19 25/15 26/4 32/11 33/20 39/21 41/20 42/6 73/21 74/10 98/11
potentially [1] 25/18
powerful [1] 52/18
practice [2] 4/21 67/17
prayer [3] 51/19 51/19 53/9
precise [1] 23/1
precisely [2] 20/7 94/14
preface [2] 42/14 65/24
preference [1] 4/24
prejudice [1] 92/18
preparing [1] 6/14
presentation [3] 40/5 45/14 68/12
pretty [4] 5/6 18/21 26/24 27/22
prevail [1] 59/15
preventing [1] 97/2
previously [1] 75/3
price [4] 28/4 28/14 28/22 29/8
PRICKETT [2] 1/16 3/19
principally [1] 31/11
prioritize [2] 5/14 51/7
probable [3] 30/15 41/5 54/22
probably [4] 3/14 39/9 63/7 98/1
problem [6] 16/18 23/22 37/14 78/5 91/17 99/24
problems [3] 31/5 31/7 38/5
Procedure [1] 6/9

proceed [2] 17/2 29/13
proceedings [1] 3/2
process [7] 26/4 52/12 59/25 59/25 70/14 70/15 84/22
professional [2] 49/4 49/12
profile [6] 71/10 74/24 82/10 83/12 85/5 86/2
program [2] 50/4 91/10
project [1] 67/11
projects [1] 67/18
promoted [1] 73/14
protect [1] 96/23
protected [4] 17/20 18/5 18/9 96/6
protecting [1] 13/1
prove [1] 17/20
provided [1] 54/13
proving [1] 19/7
prune [2] 93/1 93/2
PSLRA [5] 18/4 29/10 29/11 96/4 97/2
public [5] 20/9 33/6 75/18 84/18 84/19
publicly [1] 16/20
published [1] 8/15
pull [2] 64/19 78/2
pure [2] 42/5 50/20
purely [1] 47/15
purported [1] 8/16
purportedly [1] 70/2
purpose [9] 28/7 28/22 29/11 29/15 43/8 43/15 57/8 77/16 78/16
purposefully [1] 98/20
purposes [6] 25/15 30/1 33/21 39/15 79/15 98/11
pursuant [1] 28/9
put [18] 8/4 11/11 13/23 22/25 25/24 36/1 39/2 41/10 43/9 46/12 63/24 67/9 73/5 74/19 78/23 90/2 90/21 92/22

**Q**

Q4 [2] 40/8 42/6
Qs [1] 7/9
qualitative [1] 71/7
quarter [9] 23/6 45/13 45/18 46/3 46/24 64/21 65/1 65/3 69/13
question [19] 7/8 7/12 9/20 12/2 12/10 12/12 12/13 25/21 27/1 27/13 28/17 30/23 32/22 33/1 34/3 37/20 38/12 38/17 46/4
questions [7] 6/24 7/2 7/4 22/23 33/1 33/25 37/5
quibble [3] 12/12 14/6 14/12
quibbling [2] 11/18 50/24
quick [2] 91/4 91/4
quickly [2] 6/8 70/23
quite [1] 63/11
quote [10] 7/10 23/8 23/8 23/9 23/12 24/14 41/13 41/17 83/9 95/20
quotes [1] 78/10
quoting [1] 23/11

**R**

raise [1] 28/22
raised [1] 69/5

rammed [1] 21/8
range [9] 9/16 11/13 13/23 14/3 22/19 27/2 41/20 57/25 80/9
rare [1] 38/19
rather [2] 5/10 40/25
rating [1] 83/10
ratio [1] 73/18
RE [1] 1/3
reached [5] 5/6 32/3 32/9 32/9 32/10
read [8] 9/21 10/8 11/15 43/25 47/21 48/12 49/19 89/15
reading [8] 11/10 16/1 24/22 38/25 49/5 68/5 97/17 97/19
reads [1] 73/17
ready [1] 63/11
real [1] 89/4
realize [1] 101/11
really [40] 3/15 14/1 16/21 20/6 21/24 24/3 24/12 27/23 27/23 28/23 30/8 30/8 30/18 30/22 32/13 34/10 35/4 35/18 36/4 36/15 37/7 44/5 51/17 52/3 59/14 69/20 69/20 70/10 71/8 79/2 79/15 82/21 88/24 88/24 94/22 96/22 97/4 97/13 100/4 100/7
reason [2] 22/24 22/25
reasonable [5] 11/10 23/5 23/13 29/24 59/23
reasonably [18] 22/20 23/16 23/20 25/17 26/8 26/9 26/17 27/2 27/12 29/22 30/1 30/2 30/20 30/24 30/24 33/12 33/15 38/9
reasons [4] 32/2 39/3 43/1 73/12
recall [1] 96/11
received [9] 43/2 43/10 43/17 55/10 55/16 58/21 62/19 62/23 67/3
receiving [1] 60/3
recent [3] 4/23 20/4 83/11
recently [1] 19/18
recognize [1] 3/9
recognized [2] 54/22 83/10
recollection [1] 96/12
reconciled [1] 53/10
record [5] 14/3 14/13 20/9 44/12 86/15
red [1] 36/10
refer [2] 39/18 66/17
reference [3] 13/4 53/14 56/23
referenced [1] 48/18
references [4] 47/24 62/3 66/25 88/8
referencing [1] 32/15
referred [1] 67/24
referring [12] 54/3 56/15 57/5 64/22 65/20 66/12 71/22 74/17 75/9 76/11 82/15 87/6
refers [3] 49/20 53/4 63/8
reflect [1] 60/6
reflected [2] 53/23 65/12
reform [1] 5/8
refused [1] 84/23
regard [2] 8/10 17/6
regarding [1] 7/25
regular [1] 7/9

**R**

reject [1]  51/6
relate [4]  22/6 39/13 54/17 55/13
related [4]  13/1 22/20 23/9 23/16
relates [5]  32/22 43/18 47/12 55/15 101/8
relative [1]  41/2
relatively [1]  28/9
relevant [2]  13/8 41/14
relief [3]  51/19 51/19 53/9
reluctant [1]  96/16
rely [3]  17/3 18/23 100/19
remains [1]  50/15
remediating [1]  57/3
remediation [81]  7/10 7/15 7/21 8/1 8/14 8/23 10/25 12/17 12/23 12/23 12/24 13/3 13/13 13/15 13/18 13/24 14/15 15/2 15/5 15/9 16/11 16/16 34/20 39/14 39/18 39/23 39/25 40/2 40/5 40/16 41/18 43/7 44/9 44/10 47/16 48/16 48/23 49/3 49/12 49/13 49/25 50/1 50/3 50/19 50/20 50/24 51/1 52/4 52/9 53/1 53/20 55/1 56/10 57/10 57/13 60/24 61/4 61/8 61/10 61/11 61/13 61/23 62/24 63/5 63/24 65/16 65/22 66/5 67/10 67/17 67/19 85/22 89/17 89/21 90/7 90/14 90/15 90/24 91/7 91/12 95/4
remember [2]  51/8 89/11
remote [30]  7/11 8/20 9/3 9/22 9/23 9/23 9/24 9/25 10/3 10/4 10/5 10/11 10/20 11/1 11/2 11/24 30/19 37/23 38/7 38/8 38/24 38/25 39/21 41/19 42/6 47/1 90/7 96/6 97/6 99/14
remove [2]  3/8 42/5
repeatedly [2]  73/14 79/17
replead [3]  99/21 100/21 101/2
reply [2]  93/19 95/11
report [15]  7/12 7/13 7/16 22/19 24/25 29/21 46/24 69/22 70/7 72/8 77/10 89/6 94/3 94/5 100/14
reported [1]  22/23
reporting [1]  5/8
reports [5]  7/25 23/16 25/1 27/11 91/23
representatives [2]  4/2 4/17
require [4]  5/9 26/12 35/18 70/11
required [5]  13/19 89/17 90/17 90/17 90/23
requirements [1]  5/9
requires [1]  29/10
reserve [1]  36/18
resolve [1]  92/25
resource [1]  13/21
respect [10]  4/21 10/25 39/23 41/18 50/16 56/11 63/12 71/21 89/4 97/5
respond [6]  23/23 23/24 26/18 34/5 89/8 89/9
responded [1]  89/9
response [5]  10/15 13/18 25/5

26/16 30/17
responses [1]  26/13
responsibility [1]  91/9
rest [2]  92/9 92/11
resulting [1]  83/11
retained [1]  54/7
Retirement [2]  3/20 4/3
return [1]  94/13
returning [2]  73/21 94/16
revealed [1]  84/1
review [1]  98/6
revise [2]  39/10 42/4
revised [1]  65/6
revision [1]  88/21
Ribbon [5]  56/23 56/23 57/1 57/6 57/11
rid [5]  69/24 78/19 79/5 96/19 100/20
right [82]  3/17 6/16 8/16 8/18 9/8 9/11 12/8 14/18 15/10 15/19 16/5 16/17 16/18 18/16 19/7 20/4 22/12 22/21 24/22 26/9 26/23 29/6 30/5 30/17 33/23 36/20 37/17 38/5 38/8 38/14 38/15 39/18 40/10 40/14 40/15 40/20 41/2 41/14 42/1 42/3 43/7 43/14 44/3 45/1 45/5 45/12 46/10 46/17 46/25 49/8 51/9 51/16 55/2 60/25 61/2 62/17 63/5 63/17 63/21 63/25 65/16 66/24 70/8 70/24 72/3 76/4 77/9 77/19 78/6 78/22 79/24 81/13 82/18 91/15 91/17 94/5 94/12 95/19 98/1 98/2 100/12 100/18
rise [1]  3/21
rises [1]  21/24
risk [4]  71/9 74/24 85/5 86/2
risked [5]  73/15 73/19 73/25 74/4 74/9
river [6]  34/2 34/12 56/18 57/12 75/19 76/5
robust [3]  35/9 96/5 96/22
role [1]  84/21
ROSEN [2]  2/5 6/23
routine [1]  97/24
routinely [2]  38/1 39/5
rule [7]  6/8 19/20 19/21 20/7 20/8 20/8 20/25
rules [1]  19/14
run [3]  26/14 50/1 50/1

**S**

safe [5]  75/19 76/5 96/12 96/14 100/7
said [32]  6/2 12/4 14/15 14/24 18/24 23/3 30/21 32/4 34/8 38/14 39/11 40/18 42/4 43/4 43/11 54/25 55/13 57/21 67/16 69/8 70/7 72/9 72/16 76/5 83/9 85/23 86/10 94/15 96/22 97/18 98/5 99/25
sake [5]  11/11 16/9 37/17 38/6 62/15
sales [1]  28/8
Sam [1]  4/1
same [5]  13/16 23/19 62/3 73/3 81/13
SAMUEL [1]  1/17
saw [1]  16/3

SAXENA [12]  1/20 1/20 3/23 3/25 22/1 28/11 34/4 36/9 36/25 40/18 92/13 97/15
Saxena's [1]  3/24
say [81]  6/7 11/8 15/13 15/18 16/12 18/11 18/15 18/17 19/4 19/22 21/4 21/11 23/5 23/18 23/19 24/14 24/14 25/9 25/12 26/20 28/6 28/18 28/21 29/20 30/18 31/10 32/14 33/13 33/19 33/20 33/23 34/4 39/21 40/9 40/22 44/8 53/6 53/9 53/21 55/18 57/8 58/9 60/23 60/24 61/22 62/11 62/14 65/9 67/14 68/6 69/13 70/5 71/1 71/16 73/12 73/13 74/12 75/18 77/8 78/18 79/23 81/21 82/23 83/22 84/2 84/10 90/14 90/15 93/16 94/24 95/4 95/9 96/7 96/13 97/2 97/14 97/15 97/17 99/12 101/1 101/10
saying [32]  9/17 10/13 11/21 16/16 17/10 17/11 17/13 17/14 25/14 25/24 26/3 26/8 28/24 30/12 32/7 44/19 51/18 52/24 55/24 66/3 73/1 75/4 78/6 79/6 82/8 84/8 85/1 85/17 87/9 87/10 87/12 94/18
says [20]  10/24 14/24 18/15 18/15 18/16 19/20 20/12 20/25 24/18 41/1 41/16 62/5 62/7 65/10 67/10 68/11 74/8 75/2 76/24 101/5
scheme [1]  27/3
school [1]  19/19
scienter [16]  21/22 27/15 27/16 27/17 27/20 28/5 28/6 28/13 28/21 29/4 29/18 90/4 90/5 90/10 96/7 98/9
screen [1]  8/4
screwed [1]  27/24
SEC [26]  5/25 7/9 10/19 21/2 22/19 22/22 23/21 24/25 27/11 38/2 38/3 38/5 38/14 39/13 39/22 41/14 41/23 43/4 46/3 69/17 72/8 79/6 79/8 80/3 89/5 91/23
second [18]  10/14 12/20 13/12 21/7 22/12 22/14 31/13 31/15 37/1 38/17 51/14 63/2 64/19 66/11 69/12 79/13 90/11 95/12
section [12]  7/24 45/4 72/12 73/8 75/16 78/13 79/18 80/10 81/25 82/1 82/7 82/9
securities [6]  1/4 16/17 20/16 21/8 21/12 70/10
see [14]  4/13 8/19 14/19 15/2 37/7 50/7 62/8 66/11 69/25 70/1 70/4 78/5 78/15 96/25
seems [3]  23/22 38/24 63/11
seen [3]  20/21 22/3 38/19
sell [1]  28/8
selling [1]  69/2
sense [2]  7/22 85/20
sentence [1]  49/7
separate [2]  14/1 17/21
September [3]  91/6 91/9 93/20
September 2018 [3]  91/6 91/9 93/20
set [4]  13/15 70/3 75/14 78/5

setting [1]  7/10
settle [1]  35/2
settled [2]  32/13 72/19
settlement [5]  32/3 34/24 35/1 67/4 71/23
seven [3]  24/25 80/24 95/11
several [1]  54/16
shape [1]  27/23
shared [3]  23/3 23/8 24/18
shareholders [5]  35/11 35/12 73/22 94/16 98/25
sharing [1]  32/5
she [3]  52/11 52/12 52/20
sheet [13]  71/2 72/13 72/17 73/15 73/19 74/1 74/4 74/9 80/20 81/17 82/25 86/8 94/19
sheets [1]  94/12
Sheryl [1]  52/8
short [1]  7/17
shot [2]  64/13 94/4
shots [1]  98/4
should [25]  7/6 12/12 14/13 30/12 30/16 30/19 30/25 33/20 36/3 39/9 55/19 81/18 92/7 92/9 92/16 92/16 92/18 92/19 93/1 93/1 94/17 94/20 94/20 96/16 100/16
shouldn't [4]  29/13 53/21 92/3 94/16
show [54]  16/5 16/6 17/5 18/10 18/11 21/22 27/14 27/19 27/20 28/7 28/13 29/3 30/20 36/5 37/22 42/10 42/11 42/20 43/16 44/5 45/18 48/13 48/19 49/1 49/12 49/13 51/16 53/19 55/2 55/5 58/14 58/22 62/5 62/7 65/13 65/14 65/14 66/7 71/4 71/19 71/25 72/2 74/7 74/8 76/24 77/3 77/7 77/15 78/14 80/23 87/4 87/25 88/3 92/1
showed [4]  29/4 34/16 49/4 54/24
showing [1]  45/24
shown [1]  51/5
shows [8]  12/5 35/18 49/14 53/15 57/22 63/14 76/16 85/25
shut [1]  35/15
side [1]  69/22
sides [2]  30/8 97/11
sign [1]  84/23
signed [2]  18/13 29/21
significant [7]  45/7 52/25 53/7 54/1 56/21 73/3 73/10
simplify [1]  19/11
simply [2]  18/11 19/4
simultaneously [1]  99/9
since [1]  89/23
sir [1]  31/22
sit [3]  36/18 46/19 75/15
site [3]  49/11 51/2 57/9
sited [1]  49/3
sites [15]  13/18 55/9 56/5 58/5 58/18 62/25 63/5 63/6 63/7 63/8 63/9 65/22 66/4 66/7 67/23
sitting [1]  4/3
situation [2]  47/25 89/1
six [9]  5/10 22/9 48/2 48/4 51/17 78/9 79/2 79/22 90/3

**S**

Sixty [1]  57/18
skip [1]  82/12
skipped [1]  11/13
slide [13]  8/2 8/3 12/20 13/10
 13/12 13/15 33/18 36/4 36/7
 36/10 36/11 90/2 90/3
slight [8]  9/23 9/25 10/20
 10/22 11/2 11/14 11/15 11/24
small [3]  27/4 52/23 92/14
so [126]
software [2]  50/1 50/2
solely [1]  39/23
solid [7]  71/2 72/13 72/17
 73/14 80/20 81/17 86/8
some [27]  4/20 12/6 13/25
 16/8 19/1 21/11 21/12 26/1
 28/7 31/9 33/14 33/24 35/24
 37/5 37/6 47/13 54/18 71/13
 71/17 77/10 89/16 92/4 93/12
 95/25 100/5 100/23 100/25
somebody [2]  27/17 71/17
somehow [2]  34/21 92/1
someone [1]  20/25
something [21]  5/14 12/8
 15/25 17/19 20/24 25/17 25/18
 26/5 29/25 43/20 46/15 50/7
 53/7 56/24 57/1 60/10 78/6
 78/7 93/19 95/7 98/3
sometimes [1]  20/23
soon [1]  83/5
sorry [10]  14/5 40/13 44/15
 55/14 62/11 66/22 68/2 68/14
 70/21 84/15
sort [4]  8/21 45/11 50/11 50/14
sounds [3]  11/20 81/5 83/14
speak [2]  34/6 34/7
speaking [3]  3/7 34/11 74/13
speaks [1]  36/19
specific [26]  7/12 7/19 13/3
 13/4 13/13 19/1 37/5 39/3
 41/21 45/9 47/14 53/4 53/14
 53/14 60/9 60/9 60/11 71/19
 72/9 75/21 78/11 78/14 80/2
 80/24 81/21 81/23
specifically [8]  39/13 41/9
 49/20 50/23 54/17 57/10 75/18
 85/11
specificity [2]  70/11 91/1
specifics [2]  37/15 96/1
spectacularly [3]  43/12 55/17
 60/6
speech [1]  21/13
speedy [1]  6/9
spells [1]  47/18
spend [2]  9/16 93/3
spending [3]  13/1 35/11 78/12
spent [1]  9/6
spin [8]  26/5 34/23 43/11
 52/16 59/25 60/3 84/22 93/9
spin-off [5]  43/11 52/16 59/25
 60/3 84/22
spread [1]  5/18
spring [2]  35/8 45/15
stack [1]  95/9
stage [5]  29/6 29/12 29/15
 29/19 59/5
staggering [2]  55/11 60/7
staggeringly [2]  43/12 65/25

stand [1]  24/20
standard [3]  29/12 90/10 91/1
start [13]  3/3 8/16 12/2 35/7
 39/8 42/20 48/8 48/19 67/6
 72/12 76/3 77/3 100/21
started [4]  4/20 5/20 5/21 35/7
starts [1]  45/3
state [9]  3/19 4/2 16/19 33/14
 34/25 50/1 50/1 69/2 73/13
state-run [2]  50/1 50/1
stated [6]  16/13 22/19 47/1
 48/22 49/13 73/17
statement [49]  5/21 10/2 17/8
 17/9 17/24 22/1 25/13 27/1
 27/11 30/9 31/23 31/24 33/8
 34/15 43/2 45/18 46/10 50/13
 53/16 71/21 71/24 73/24 74/8
 74/18 75/14 75/22 76/3 76/4
 76/9 76/10 76/16 76/25 77/10
 77/12 78/9 78/15 83/14 85/15
 85/19 86/3 86/12 86/14 87/5
 87/17 88/1 89/8 95/17 95/23
 96/5
statements [66]  5/22 5/24 7/8
 8/25 18/2 21/4 21/11 22/9 23/2
 27/16 28/22 34/8 34/11 35/24
 53/22 55/7 63/13 70/3 70/23
 71/6 71/7 72/4 72/10 72/18
 73/7 73/8 74/19 74/21 75/7
 75/9 75/13 75/23 79/2 79/7
 79/9 79/13 79/14 79/17 79/18
 80/3 82/7 83/1 84/5 84/12
 84/13 85/2 86/5 86/10 86/22
 87/15 91/23 91/25 91/25 92/7
 92/11 95/16 95/17 96/4 96/21
 99/20 100/8 100/11 100/13
 100/22 101/4 101/5
states [3]  1/1 1/12 56/13
statute [5]  47/16 49/24 49/25
 50/1 52/4
stayed [1]  20/11
steady [5]  86/23 87/2 87/3
 87/11 88/6
step [1]  6/17
stick [4]  63/16 63/17 71/14
 95/15
sticking [4]  41/25 79/24 80/7
 80/14
still [7]  43/23 53/23 54/3 56/3
 65/11 86/21 91/22
stipulate [1]  97/18
stock [5]  28/4 28/8 28/8 28/23
 29/9
stop [2]  57/12 61/14
story [3]  35/16 45/11 67/10
straight [1]  7/1
straightforward [1]  7/5
strategy [2]  73/20 74/10
Street [1]  1/10
stretching [1]  96/25
strikingly [1]  37/10
strong [6]  27/20 29/4 29/18
 52/18 73/14 83/11
stronger [2]  70/16 70/16
studied [1]  24/16
studies [3]  34/15 77/6 77/14
study [17]  23/8 23/14 23/18
 24/17 24/21 24/25 25/3 25/10
 25/15 44/7 44/20 44/21 45/8
 46/4 46/13 57/7 57/8

studying [1]  31/17
stuff [6]  14/9 91/11 91/11
 91/24 92/5 92/10
subject [2]  11/8 96/3
subjective [13]  16/5 16/6 16/23
 17/2 17/3 17/5 17/16 17/20
 18/10 18/18 18/21 25/23 26/12
submit [4]  7/17 18/7 45/10
 97/12
submitted [1]  49/11
subsequently [1]  51/20
substances [1]  56/18
substantive [2]  5/7 14/14
success [2]  28/24 73/12
successfully [1]  7/18
succinctly [1]  92/6
such [4]  19/8 25/12 38/7 99/14
sued [1]  20/10
sufficient [4]  18/9 72/20 89/6
 100/8
suggest [3]  15/13 34/21 46/15
suggested [1]  6/3
suing [1]  51/23
suits [1]  96/24
sum [2]  7/15 41/21
summarize [1]  79/16
summary [3]  19/21 22/9 29/7
summer [1]  5/20
sun [2]  75/3 92/23
support [1]  80/2
supports [1]  42/17
supposed [3]  26/25 33/25 92/1
Supreme [2]  17/18 20/11
sure [30]  9/13 16/3 20/4 24/6
 24/11 31/2 31/10 31/14 37/2
 37/16 42/19 43/22 43/24 51/21
 60/21 63/3 63/18 64/20 66/7
 69/6 69/23 70/20 71/21 77/5
 77/8 78/4 86/15 88/12 89/3
 95/9
surmise [1]  22/17
surprised [1]  68/8
suspect [1]  55/19
switched [1]  56/25
system [3]  3/20 4/3 50/2

**T**

table [14]  3/23 13/23 14/4 14/6
 16/17 50/8 55/13 57/19 64/24
 64/25 65/10 69/12 69/12 70/3
tabs [2]  5/25 6/2
take [15]  7/2 12/2 12/10 12/12
 20/14 33/19 38/17 48/11 50/21
 79/1 90/19 91/2 91/8 91/17
 95/13
taken [2]  71/7 71/16
taking [2]  12/3 40/4
tale [1]  37/7
talk [19]  31/21 33/13 56/7
 57/19 62/19 62/22 70/23 71/23
 72/5 74/12 75/16 76/22 82/10
 82/24 89/25 93/17 93/18 94/11
 99/13
talking [43]  10/18 12/22 14/15
 32/15 38/21 38/22 42/24 43/6
 48/25 50/23 52/3 52/4 52/10
 52/23 54/3 54/21 55/8 56/3
 57/13 57/14 58/17 61/11 63/13
 66/25 67/8 67/15 67/21 72/3
 72/6 72/15 73/1 74/5 77/5

82/21 86/23 88/13 88/16 88/17
 88/20 89/13 90/16 91/10 91/24
talks [6]  52/8 76/11 76/12
 77/18 77/21 87/1
tally [1]  63/25
tea [1]  16/2
Teachers [2]  3/20 4/3
team [3]  4/12 97/10 97/15
technology [1]  18/3
Telford [2]  52/8 52/16
tell [12]  27/10 35/10 35/12
 43/20 57/20 72/8 78/20 88/10
 89/12 94/7 97/4 100/11
telling [7]  9/9 27/24 28/18 37/9
 47/2 56/1 97/25
ten [6]  21/2 21/7 21/8 22/17
 79/6 97/23
tend [1]  78/23
tense [1]  74/14
tenth [1]  58/13
term [5]  9/23 9/25 11/24 11/25
 20/12
terms [2]  6/18 38/9
terrorem [1]  29/14
tested [2]  3/5 22/20
testimony [1]  27/13
than [23]  9/11 9/12 9/22 10/22
 25/18 26/22 29/23 29/25 32/24
 33/9 40/19 40/25 55/20 59/10
 69/4 71/10 71/23 75/6 78/23
 84/25 86/2 86/20 93/14
thank [17]  4/5 4/6 4/19 6/20
 6/23 8/11 28/17 36/20 36/21
 37/4 92/14 95/24 98/2 99/2
 99/4 101/3 101/16
that [607]
that's [93]  3/14 5/12 8/5 8/7
 8/17 8/19 10/12 10/23 10/23
 11/7 11/21 12/9 12/19 13/22
 14/19 14/21 14/22 16/5 16/12
 16/23 17/17 22/1 22/2 24/8
 26/14 26/14 26/16 26/24 27/3
 27/7 28/2 28/3 28/5 29/1 29/11
 29/17 30/2 30/13 32/14 33/7
 33/15 33/19 35/20 36/1 36/3
 36/11 37/9 38/1 40/10 40/11
 40/14 41/12 41/20 41/24 44/11
 44/25 45/6 46/18 47/7 50/18
 51/25 54/14 57/12 58/11 58/20
 61/6 65/11 69/10 71/18 74/24
 76/3 77/13 77/17 78/6 78/7
 79/9 80/10 80/12 81/9 81/12
 81/25 84/2 85/7 91/2 91/5
 91/13 91/16 92/25 93/23 94/3
 96/18 98/14 99/25
their [52]  14/4 16/8 16/17
 18/25 18/25 28/3 28/3 29/5
 30/2 30/14 30/21 31/7 33/6
 33/9 36/1 36/12 40/18 41/4
 43/4 45/8 45/20 46/1 50/25
 56/19 56/21 59/25 60/5 60/18
 60/19 69/2 70/7 70/13 71/24
 72/20 73/5 73/12 74/15 76/25
 77/6 82/10 84/8 84/8 84/18
 84/19 85/5 85/6 85/15 86/23
 89/13 91/1 95/16 95/21
them [47]  7/2 14/1 15/16 17/2
 17/5 18/13 21/8 22/3 24/23
 31/8 33/4 39/25 43/9 46/1
 46/12 46/13 52/23 54/18 55/8

| T | | | |
|---|---|---|---|
| them... [28] 58/17 59/6 62/23 64/8 66/8 71/25 72/2 73/1 75/14 78/11 78/17 78/20 79/16 83/1 83/7 84/23 85/2 85/24 87/1 91/21 93/15 93/25 94/2 94/3 94/10 94/11 94/12 95/19 | 47/11 50/17 51/20 70/19 74/25 77/9 84/10 89/14 89/16 89/18 92/14 92/18 93/12 93/14 101/24 | transfer [1] 72/24 transformation [2] 82/23 94/9 transformed [5] 71/2 72/13 80/20 81/17 86/8 | 44/10 47/2 48/8 49/18 50/5 50/22 50/6 56/6 56/15 58/12 60/10 64/8 64/19 75/14 77/19 78/5 78/11 84/24 88/25 90/1 90/14 92/22 95/6 97/9 98/14 |
| theme [1] 26/14 | think [144] | transitioned [1] 52/9 | 98/17 |
| themselves [1] 72/23 | thinking [3] 23/4 27/12 90/25 | triable [1] 89/7 | upgrade [15] 79/17 82/9 82/16 |
| then [28] 6/5 7/2 9/2 16/12 | third [2] 17/17 56/3 | triage [1] 5/15 | 83/4 83/5 83/15 83/16 83/18 |
| 18/20 21/23 23/19 24/18 27/25 | this [210] | trials [2] 6/6 99/6 | 83/23 83/23 83/24 84/2 85/13 |
| 39/20 42/3 46/12 46/12 49/16 | those [38] 10/5 10/6 11/4 | trouble [1] 3/22 | 85/14 94/9 |
| 53/8 56/25 57/20 62/18 63/25 | 18/18 22/22 23/11 23/20 32/5 | true [6] 34/15 67/19 74/20 | upgrades [3] 73/9 83/1 83/11 |
| 67/5 67/5 68/16 76/12 80/23 | 34/17 35/17 36/2 39/13 39/22 | 83/6 85/5 93/10 | upgrading [1] 85/2 |
| 81/20 86/19 87/12 96/7 | 41/5 41/7 41/10 42/9 47/11 | truncate [1] 95/19 | upward [1] 62/23 |
| theory [2] 27/22 28/4 | 53/9 62/3 66/25 69/19 73/9 | Trust [1] 75/4 | us [23] 5/5 6/24 14/11 18/8 |
| there [73] 4/2 4/3 5/14 5/21 | 73/10 78/19 82/25 84/5 84/9 | truth [1] 93/24 | 26/6 32/8 32/23 33/11 54/25 |
| 7/5 7/19 10/5 11/25 12/16 13/4 | 85/2 87/15 88/12 89/14 94/10 | trying [8] 29/8 52/12 78/13 | 70/11 71/3 72/5 72/14 72/16 |
| 13/8 13/24 19/8 20/4 21/1 21/2 | 94/15 94/18 94/25 96/6 101/13 | 88/25 94/24 96/17 98/24 99/25 | 73/2 73/2 73/20 74/9 79/18 |
| 21/4 24/14 24/24 25/24 26/21 | though [6] 16/24 17/21 18/22 | turn [2] 7/2 22/12 | 80/21 81/17 86/9 94/12 |
| 26/21 26/23 27/20 29/13 30/20 | 31/9 54/3 97/5 | turned [1] 6/5 | use [10] 5/13 11/25 25/9 43/5 |
| 31/1 32/16 32/18 34/15 34/18 | thought [10] 6/18 15/22 20/3 | turns [1] 20/25 | 47/1 64/15 65/25 84/17 95/11 |
| 35/22 36/11 39/3 40/20 47/9 | 20/14 49/15 59/10 69/6 75/6 | two [23] 4/2 4/11 4/17 8/10 | 97/5 |
| 48/20 50/19 52/11 52/22 52/25 | 95/7 100/4 | 8/13 8/21 23/24 32/2 37/7 | used [8] 33/20 38/1 38/3 38/8 |
| 63/14 66/23 68/18 71/17 72/1 | thousand [1] 50/21 | 45/17 53/10 54/13 69/20 69/21 | 50/4 50/4 84/16 89/18 |
| 74/7 76/8 76/20 80/2 80/7 | three [15] 6/6 8/9 13/5 21/1 | 70/6 74/25 84/25 87/15 87/20 | uses [1] 50/1 |
| 80/14 80/23 82/6 83/15 83/16 | 22/22 23/15 27/11 47/10 66/12 | 87/22 89/5 91/23 100/13 | using [1] 98/21 |
| 83/23 83/24 85/17 86/3 86/13 | 79/3 79/4 79/4 79/8 92/1 99/6 | type [2] 38/20 74/23 | |
| 89/18 94/3 94/3 96/11 96/13 | through [25] 5/21 19/5 26/14 | types [1] 73/7 | V |
| 96/13 96/15 97/19 99/14 99/19 | 31/4 32/20 35/17 38/15 39/7 | typically [1] 21/10 | vaccinated [2] 3/5 3/6 |
| 100/24 101/5 | 40/24 44/8 46/6 52/16 65/18 | | vague [1] 72/1 |
| there's [41] 5/25 11/2 11/14 | 67/6 67/12 70/24 72/11 73/20 | U | value [1] 23/11 |
| 11/15 12/5 12/20 13/14 14/9 | 74/10 77/1 78/13 78/20 94/10 | Uh [1] 48/10 | valued [1] 23/18 |
| 17/21 21/3 21/3 21/7 21/8 | 100/4 100/25 | Uh-huh [1] 48/10 | various [4] 63/15 77/8 87/24 |
| 22/17 27/5 28/16 29/20 38/7 | throw [3] 66/23 99/19 101/3 | ultimately [1] 36/15 | 99/20 |
| 40/1 40/1 47/10 47/13 47/14 | thrown [2] 14/9 21/24 | unable [1] 23/20 | Vergnano [4] 21/13 31/21 32/7 |
| 50/16 52/18 54/16 56/21 67/12 | time [63] 5/23 7/13 9/16 10/14 | uncertainly [1] 10/24 | 56/24 |
| 71/17 71/19 71/22 78/10 78/21 | 11/5 12/5 13/1 17/6 19/13 | uncertainty [2] 13/8 41/17 | verified [25] 18/13 18/15 42/16 |
| 79/2 79/2 89/7 95/18 98/16 | 19/25 20/21 23/15 23/19 26/5 | under [22] 6/21 6/21 9/3 10/6 | 48/1 48/5 48/6 53/3 53/6 53/24 |
| 98/18 100/8 100/23 | 31/25 35/2 35/25 41/9 41/10 | 10/25 17/23 18/4 27/18 27/25 | 54/17 54/19 56/13 56/16 62/10 |
| therefore [2] 89/17 90/24 | 42/23 43/1 43/10 43/11 43/16 | 34/16 41/18 49/24 50/4 60/8 | 62/12 65/20 66/9 70/13 72/21 |
| these [78] 10/4 12/5 17/4 17/6 | 44/6 50/25 52/18 53/5 54/22 | 64/10 72/24 82/6 86/6 86/19 | 75/1 83/7 87/12 88/8 88/13 |
| 17/22 18/11 21/10 21/25 25/19 | 55/7 55/24 56/19 56/22 56/24 | 92/23 95/16 96/4 | 88/16 |
| 26/11 29/12 29/17 29/18 30/15 | 57/2 59/6 59/24 60/2 61/25 | underestimated [2] 58/24 | versions [1] 53/10 |
| 30/18 30/19 30/23 32/4 32/8 | 64/12 65/19 67/1 68/10 68/13 | 58/24 | versus [1] 36/12 |
| 32/16 32/18 32/19 32/20 32/24 | 68/20 69/1 72/19 72/22 73/3 | undermine [3] 53/21 53/21 | very [29] 5/23 6/23 7/5 7/5 |
| 32/25 33/3 33/10 33/21 34/11 | 76/2 76/23 77/23 78/12 83/9 | 78/11 | 8/22 9/22 10/9 29/19 35/7 |
| 35/4 35/18 39/21 39/24 39/25 | 83/13 85/1 85/5 85/16 93/3 | undermine [1] 36/15 | 35/18 37/5 37/8 37/12 41/9 |
| 41/6 44/6 49/20 50/5 50/19 | 93/9 94/8 95/13 99/2 | underscores [1] 36/15 | 43/5 43/5 52/18 52/25 53/7 |
| 52/5 52/5 58/10 59/6 60/1 | times [5] 4/23 6/1 6/16 18/24 | understand [8] 5/1 23/5 59/12 | 71/8 71/9 73/10 73/11 74/22 |
| 65/24 67/10 67/24 68/8 68/11 | 54/12 | 80/6 81/19 82/5 86/10 91/19 | 74/23 74/24 84/6 84/7 84/25 |
| 70/2 70/14 72/16 72/16 72/17 | timing [3] 93/6 93/8 100/24 | understanding [3] 29/2 60/22 | Vice [4] 10/16 36/12 36/13 |
| 72/19 72/20 73/4 74/18 74/21 | tip [3] 58/2 61/9 61/24 | 84/24 | 94/14 |
| 75/3 75/4 75/6 75/7 82/22 | title [1] 8/13 | understated [3] 60/2 74/16 | view [2] 16/6 71/18 |
| 85/21 85/23 87/10 87/13 90/13 | today [6] 3/25 93/4 97/18 | 88/14 | viewed [1] 32/1 |
| 92/22 92/25 96/3 96/21 96/24 | 99/15 99/16 99/22 | understood [6] 13/4 36/14 | virtue [1] 84/21 |
| 99/8 100/9 101/6 101/12 | today's [2] 39/15 40/5 | 36/14 47/10 82/24 87/11 | visualized [1] 8/21 |
| they [300] | together [4] 40/3 49/20 71/8 | undertake [1] 57/7 | voluntary [2] 13/20 91/11 |
| they're [5] 4/13 21/21 55/24 | 71/16 | undisclosed [3] 75/3 81/24 | |
| 74/19 75/2 | told [3] 34/19 75/18 91/21 | 83/20 | W |
| they've [5] 14/18 15/17 31/4 | too [6] 3/10 32/18 33/13 43/19 | undisputed [2] 40/10 54/6 | WACHTELL [4] 2/5 4/10 4/12 |
| 40/18 91/16 | 69/14 79/21 | unfair [1] 88/24 | 6/22 |
| thing [21] 5/16 13/3 13/4 13/15 | took [1] 91/22 | Unit [1] 56/25 | wait [1] 101/14 |
| 16/4 17/7 19/9 27/4 29/19 | top [1] 11/6 | UNITED [2] 1/1 1/12 | waiting [2] 53/23 55/2 |
| 35/21 35/23 38/7 38/10 42/23 | topic [1] 7/11 | unless [3] 5/11 17/20 35/21 | walk [7] 31/9 38/15 39/7 67/12 |
| 45/6 70/12 94/7 95/2 96/7 | torts [1] 13/21 | unquote [2] 23/10 75/20 | 72/11 76/25 78/20 |
| 97/14 99/14 | total [10] 7/15 40/9 40/15 42/4 | unsafe [1] 34/13 | walking [1] 31/4 |
| things [23] 5/24 6/14 12/1 | 42/7 42/8 47/2 47/2 63/6 64/9 | until [4] 24/18 91/5 99/5 | Walmart [2] 20/9 20/10 |
| 20/23 26/11 33/19 36/2 47/10 | touted [1] 85/13 | 101/14 | want [56] 5/17 5/17 6/7 6/9 9/6 |
| | touting [1] 82/22 | unusual [1] 98/12 | 10/17 12/10 15/12 15/24 23/25 |
| | toward [1] 54/23 | up [45] 8/2 9/10 9/10 11/12 | 24/6 24/7 25/3 26/18 27/8 27/9 |
| | township [3] 49/10 49/14 | 11/13 11/17 15/8 17/8 25/2 | 27/21 28/7 31/9 31/20 33/23 |
| | 49/22 | 26/4 28/13 28/19 32/4 34/5 | |
| | toxic [1] 13/21 | 35/25 37/21 41/20 43/9 43/16 | |

**W**

want... [35]  34/20 35/23 37/20 38/12 39/4 42/18 48/11 56/7 64/12 64/14 65/23 67/18 68/5 68/16 68/18 69/16 69/21 70/5 76/15 77/15 78/2 81/13 81/20 82/6 86/15 92/4 92/5 92/25 95/6 95/9 96/23 96/23 97/20 97/24 100/20
wanted [5]  10/15 12/2 15/25 36/4 69/7
wants [1]  69/3
was [112]
wasn't [5]  6/10 30/5 30/7 30/17 57/8
water [1]  34/13
waters [1]  32/19
way [22]  9/9 9/10 10/8 11/15 11/21 17/2 22/6 23/14 24/24 26/2 36/1 37/7 40/3 43/18 51/5 64/10 67/4 88/25 89/9 96/11 98/14 99/25
ways [3]  4/24 22/4 23/24
we [184]
we're [13]  10/13 20/15 26/3 29/6 41/16 54/3 54/21 56/1 63/12 77/5 85/1 86/15 101/11
we've [12]  5/6 14/24 22/9 32/7 32/9 32/9 36/8 69/18 70/11 92/10 94/8 95/25
wearing [1]  3/4
weed [1]  29/13
week [5]  31/18 99/15 99/16 101/14 101/17
weekends [1]  5/12
weigh [1]  29/4
weird [1]  98/21
welcome [1]  101/13
well [38]  4/4 4/10 11/7 21/3 21/24 27/21 28/6 32/3 33/24 39/24 46/11 46/19 47/20 48/5 48/24 49/16 50/25 52/13 55/15 56/4 56/5 58/4 65/10 66/22 68/6 71/16 72/1 82/24 82/24 84/16 87/11 87/11 89/16 90/6 92/17 92/20 93/4 98/18
went [3]  6/4 34/21 45/7
were [57]  5/8 12/6 15/22 16/1 17/6 17/16 18/19 22/15 29/8 30/13 30/15 30/18 34/9 34/10 34/11 34/15 40/9 41/11 43/1 45/7 46/2 46/11 46/25 47/1 52/22 53/1 53/1 53/5 54/22 55/1 55/17 55/18 58/11 59/6 60/1 65/12 70/6 71/10 71/11 72/18 72/19 73/4 74/14 74/15 74/23 75/6 80/9 83/6 84/5 84/8 84/16 92/23 94/24 97/17 98/10 98/20 98/24
weren't [3]  6/10 6/11 68/8
what [132]
what's [14]  10/11 15/10 46/23 47/5 48/7 51/7 51/9 53/17 59/9 65/18 67/20 77/17 83/8 90/17
whatever [4]  9/13 15/8 91/6 91/6
when [34]  3/22 8/19 9/12 11/12 16/20 17/15 24/15 25/8 28/1 32/15 35/2 35/25 37/21

39/22 42/8 46/23 56/4 64/8 65/23 67/3 69/11 70/11 72/15 73/2 74/1 74/14 75/22 84/10 87/17 87/25 90/12 92/21 93/11 93/14
where [80]  5/6 5/21 8/13 12/15 19/21 20/4 22/18 27/8 31/9 32/21 33/11 34/3 34/19 35/14 38/13 39/7 41/21 43/4 44/12 44/12 44/17 45/10 48/13 48/19 49/5 52/3 52/7 53/25 54/13 54/25 58/19 58/22 59/1 59/1 59/2 59/11 60/1 62/2 62/5 62/7 62/21 63/19 64/24 67/9 67/22 71/14 73/23 74/7 74/12 75/21 76/8 76/15 76/19 76/24 77/1 77/4 78/13 78/20 80/18 80/23 82/14 83/13 84/11 84/22 85/9 86/22 87/4 87/25 88/15 89/22 90/13 92/25 93/22 93/23 95/8 95/9 96/13 96/16 96/17 100/12
Where's [1]  83/21
whether [10]  15/11 16/6 25/5 27/1 85/3 85/21 89/6 89/7 91/1 101/8
which [67]  5/9 5/23 7/6 8/15 8/25 9/22 10/5 12/20 13/5 14/10 14/18 16/7 17/21 21/9 21/23 25/18 26/11 30/9 31/25 32/12 33/3 35/22 35/23 36/1 37/21 40/2 41/4 41/6 46/12 47/2 47/6 47/12 48/17 48/21 49/25 50/16 53/3 55/10 55/21 57/13 58/13 59/9 60/6 61/24 64/21 64/22 65/21 67/1 68/11 69/2 70/1 71/19 73/4 73/23 75/2 75/13 75/21 85/22 91/10 91/13 93/3 93/17 93/17 95/22 97/1 98/25 99/6
while [2]  73/21 85/16
WHITE [2]  1/20 3/24
who [4]  51/1 52/9 58/23 71/25
who's [1]  52/8
whole [2]  30/12 35/21
wholesale [1]  26/13
why [19]  7/5 8/17 19/6 22/24 22/25 27/7 29/17 35/20 39/20 49/22 52/11 52/12 53/5 58/1 91/2 92/19 98/14 99/11 99/25
wildly [1]  43/4
will [44]  3/25 6/13 7/18 10/6 10/14 11/3 14/14 15/7 16/24 16/25 22/5 24/4 27/7 27/17 31/8 36/18 42/24 43/20 48/8 50/21 58/23 60/11 61/22 66/17 69/25 77/25 78/19 82/12 89/12 90/10 91/17 93/8 94/5 95/24 97/11 97/14 97/15 99/16 100/11 101/3 101/6 101/10 101/10 101/16
willing [4]  23/5 25/12 25/25 97/18
Wilmington [1]  1/10
win [1]  101/12
withdraw [5]  81/5 81/7 81/7 81/18 101/12
withdrawing [1]  86/4
withdrawn [3]  86/11 86/18 92/13
within [3]  5/10 19/1 21/24

without [1]  77/24
witness [2]  45/9 90/20
witnesses [3]  17/4 89/25 90/13
won't [1]  95/4
word [4]  5/18 24/13 64/15 90/14
wording [3]  10/10 11/19 39/5
words [3]  17/23 25/9 65/24
wordsing [1]  38/24
work [4]  79/22 93/12 99/16 99/17
working [1]  6/11
Works [2]  47/13 66/12
worried [1]  32/8
worry [1]  33/17
worse [2]  18/20 26/22
worst [1]  51/8
worth [1]  11/20
worthiness [2]  84/18 85/16
would [84]  3/7 7/15 7/21 9/5 11/5 11/6 15/13 15/13 16/14 17/11 17/15 18/7 18/14 18/17 18/20 19/10 19/11 23/5 26/20 27/11 29/20 33/4 39/20 39/25 42/8 42/14 43/3 45/10 46/10 47/6 47/19 48/10 48/23 49/14 49/16 51/7 53/19 53/20 53/21 54/9 55/2 55/21 56/4 56/22 57/15 58/14 60/11 61/13 62/6 64/2 64/4 65/2 65/9 65/22 66/9 67/24 68/23 68/23 69/13 70/10 72/23 74/12 75/14 76/17 78/3 78/17 79/12 79/15 82/9 82/12 84/17 84/18 86/21 88/7 88/12 91/12 96/7 98/8 98/16 99/22 99/23 101/11 101/12 101/13
wouldn't [1]  84/2
wrapped [1]  32/4
write [4]  60/15 72/1 79/5 101/2
written [1]  66/8
wrong [2]  19/3 73/5
wrote [2]  21/7 94/11

**Y**

YAVITZ [2]  2/7 4/12
yeah [6]  8/3 21/6 21/7 78/13 89/21 98/23
year [10]  9/1 12/17 12/18 12/18 16/14 64/14 68/13 70/14 95/5 95/20
years [10]  3/14 45/17 50/21 50/22 56/14 56/19 87/15 87/20 87/22 92/1
Yep [2]  65/17 67/21
yes [21]  3/16 11/4 12/19 31/22 39/12 42/2 46/7 46/8 49/3 49/9 50/9 51/24 56/9 64/5 79/25 80/22 82/20 95/23 96/10 99/10 99/18
yesterday [1]  3/5
yet [3]  53/13 53/18 60/5
York [3]  3/19 4/2 97/10
you [439]
you're [12]  3/8 12/8 20/4 23/20 39/21 41/25 46/17 52/3 52/23 57/14 60/24 61/14
you've [9]  49/18 59/15 69/13 69/24 70/24 71/13 75/3 75/17 78/19
your [273]