# Exhibit 4

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2017**

| (Commission File Number) | (Exact Name of Registrant as Specified in Its Charter)<br>(Address of Principal Executive Offices) (Zip Code)<br>(Telephone Number) | (State or Other Jurisdiction of Incorporation or Organization) | (IRS Employer Identification No.) |
|---|---|---|---|
| 001-09516 | **ICAHN ENTERPRISES L.P.**<br>**767 Fifth Avenue, Suite 4700**<br>**New York, NY 10153**<br>**(212) 702-4300** | Delaware | 13-3398766 |
| 333-118021-01 | **ICAHN ENTERPRISES HOLDINGS L.P.**<br>**767 Fifth Avenue, Suite 4700**<br>**New York, NY 10153**<br>**(212) 702-4300** | Delaware | 13-3398767 |

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Depositary Units of Icahn Enterprises L.P. Representing Limited Partner Interests | NASDAQ Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined by Rule 405 of the Securities Act.

Icahn Enterprises L.P. Yes ☒ No ☐   Icahn Enterprises Holdings L.P. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.

Icahn Enterprises L.P. Yes ☐ No ☒   Icahn Enterprises Holdings L.P. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Icahn Enterprises L.P. Yes ☒ No ☐   Icahn Enterprises Holdings L.P. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Icahn Enterprises L.P. Yes ☒ No ☐   Icahn Enterprises Holdings L.P. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act (Check One):

| Icahn Enterprises L.P. | | Icahn Enterprises Holdings L.P. | |
|---|---|---|---|
| Large Accelerated Filer ☒ | Accelerated Filer ☐ | Large Accelerated Filer ☐ | Accelerated Filer ☐ |
| Non-accelerated Filer ☐ | Smaller Reporting Company ☐ | Non-accelerated Filer ☒ | Smaller Reporting Company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Icahn Enterprises L.P. Yes ☐ No ☒   Icahn Enterprises Holdings L.P. Yes ☐ No ☒

The aggregate market value of Icahn Enterprises' depositary units held by non-affiliates of the registrant as of June 30, 2017, the last business day of the registrant's most recently completed second fiscal quarter, based upon the closing price of depositary units on the Nasdaq Global Select Market on such date was $839 million.

As of March 1, 2018, there were 173,576,769 of Icahn Enterprises' depositary units outstanding.

**ICAHN ENTERPRISES L.P.**
**ICAHN ENTERPRISES HOLDINGS L.P.**

**TABLE OF CONTENTS**

| | | Page No. |
|---|---|---|
| | Explanatory Note and Forward-Looking Statements | 1 |
| | **PART I** | |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 26 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 28 |
| Item 4. | Mine Safety Disclosures | 28 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Security Holder Matters and Issuer Purchases of Equity Securities | 29 |
| Item 6. | Selected Financial Data | 31 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 53 |
| Item 8. | Financial Statements and Supplementary Data | 58 |
| Item 9. | Changes In and Disagreements With Accountants on Accounting and Financial Disclosure | 125 |
| Item 9A. | Controls and Procedures | 125 |
| Item 9B. | Other Information | 127 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 128 |
| Item 11. | Executive Compensation | 132 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Security Holder Matters | 136 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 138 |
| Item 14. | Principal Accountant Fees and Services | 142 |
| | **PART IV** | |
| Item 15. | Exhibits and Financial Statement Schedules | 143 |
| Item 16. | Form 10-K Summary | 143 |

i

**ICAHN ENTERPRISES L.P. AND SUBSIDIARIES**
**ICAHN ENTERPRISES HOLDINGS L.P. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### 15. Changes in Accumulated Other Comprehensive Loss.

Changes in accumulated other comprehensive loss consists of the following:

| | Post-Employment Benefits, Net of Tax | Hedge Instruments, Net of Tax | Translation Adjustments and Other, Net of Tax | Total |
|---|---|---|---|---|
| | (in millions) | | | |
| Balance, December 31, 2016 | $ (614) | $ (22) | $ (948) | $ (1,584) |
| Other comprehensive income before reclassifications, net of tax | 30 | 2 | 124 | 156 |
| Reclassifications from accumulated other comprehensive income (loss) to earnings | 20 | (3) | - | 17 |
| Other comprehensive income (loss), net of tax | 50 | (1) | 124 | 173 |
| Balance, December 31, 2017 | $ (564) | $ (23) | $ (824) | $ (1,411) |

### 16. Other Income, Net.

Other income, net consists of the following:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| | (in millions) | | |
| Gain on acquisition | $ - | $ - | $ 5 |
| Realized and unrealized loss on derivatives, net (Note 6) | (70) | (19) | (29) |
| Other derivative (loss) income | (41) | 66 | - |
| Dividend expense | (10) | (14) | - |
| Loss on extinguishment of debt | (16) | (5) | (2) |
| Equity earnings from non-consolidated affiliates | 71 | 64 | 62 |
| Foreign currency transaction loss | (11) | (1) | (10) |
| Tax settlement gain | 61 | - | - |
| Predecessor claim settlement | - | 3 | - |
| Other | 24 | 13 | 9 |
| | $ 8 | $ 107 | $ 35 |

### 17. Commitments and Contingencies.

*Environmental Matters*

Due to the nature of our business, certain of our subsidiaries' operations are subject to numerous existing and proposed laws and governmental regulations designed to protect the environment, particularly regarding plant wastes and emissions and solid waste disposal. Our consolidated environmental liabilities were $50 million and $50 million as of December 31, 2017 and 2016, respectively, primarily within our Automotive, Energy and Metals segments and which are included in accrued expenses and other liabilities in our consolidated balance sheets. We do not believe that environmental matters will have a material adverse impact on our consolidated results of operations and financial condition.

*Automotive*

Federal-Mogul is a defendant in lawsuits filed, or the recipient of administrative orders issued or demand letters received, in various jurisdictions pursuant to the Federal Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA") or other similar national, provincial or state environmental remedial laws. These laws provide that responsible parties may be liable to pay for remediating contamination resulting from hazardous substances that were discharged into the environment by them, by prior owners or occupants of property they currently own or operate, or by others

116

**ICAHN ENTERPRISES L.P. AND SUBSIDIARIES**
**ICAHN ENTERPRISES HOLDINGS L.P. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

to whom they sent such substances for treatment or other disposition at third party locations. Federal-Mogul has been notified by the EPA, other national environmental agencies and various provincial and state agencies that it may be a potentially responsible party ("PRP") under such laws for the cost of remediating hazardous substances pursuant to CERCLA and other national and state or provincial environmental laws. PRP designation often results in the funding of site investigations and subsequent remedial activities.

Many of the sites that are likely to be the costliest to remediate are often current or former commercial waste disposal facilities to which numerous companies sent wastes. Despite the potential joint and several liability which might be imposed on Federal-Mogul under CERCLA and some of the other laws pertaining to these sites, its share of the total waste sent to these sites has generally been small. Federal-Mogul believes its exposure for liability at these sites is limited.

Federal-Mogul has also identified certain other present and former properties at which it may be responsible for cleaning up or addressing environmental contamination, in some cases as a result of contractual commitments and/or federal or state environmental laws. Federal-Mogul is actively seeking to resolve these actual and potential statutory, regulatory and contractual obligations. Although difficult to quantify based on the complexity of the issues, Federal-Mogul has accrued amounts corresponding to its best estimate of the costs associated with such regulatory and contractual obligations on the basis of available information from site investigations and the professional judgment of consultants.

Our Automotive segment's total environmental liabilities, determined on an undiscounted basis, were $16 million and $16 million as of December 31, 2017 and 2016, respectively. Federal-Mogul believes that recorded environmental liabilities will be adequate to cover its estimated liability for its exposure in respect to such matters. In the event that such liabilities were to significantly exceed the amounts recorded by Federal-Mogul, our Automotive segment's results of operations could be materially affected. At December 31, 2017, Federal-Mogul estimates additional losses above and beyond its best estimate of required remediation costs could range up to $24 million.

*Energy*

The petroleum and nitrogen fertilizer businesses are subject to various stringent federal, state, and local Environmental Health and Safety ("EHS") rules and regulations. Liabilities related to EHS matters are recognized when the related costs are probable and can be reasonably estimated. Estimates of these costs are based upon currently available facts, existing technology, site-specific costs, and currently enacted laws and regulations. In reporting EHS liabilities, no offset is made for potential recoveries.

On August 1, 2016, a subsidiary of CVR Energy ("CRCT") received a Notice of Probably Violation, Proposed Civil Penalty and Proposed Compliance Order (the "NOPV") from the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (the "PHMSA"). The NOPV alleges violations of the Pipeline Safety Regulations, Title 49, Code of Federal Regulations. The alleged violations include alleged failures (during various time periods) to (i) conduct quarterly notification drills, (ii) maintain certain required records, (iii) utilize certain required safety equipment (including line markers), (iv) take certain pipeline integrity management activities, (v) conduct certain cathodic protection testing, and (vi) make certain atmospheric corrosion inspections. The preliminary assessed civil penalty is less than $1 million and the NOPV contained a compliance order outlining remedial compliance steps to be undertaken by CRCT. CRCT paid a portion of the penalty and contested and requested mitigation of the remainder, and also requested reconsideration of the proposed compliance order. In November 2017, CRCT received a final order from PHMSA assessing a revised civil penalty of less than $1 million. CRCT paid the remainder of the penalty and has completed all items required by the compliance order.

Certain subsidiaries of CVR Energy ("CRRM" and "CRT") have agreed to perform corrective actions at the Coffeyville, Kansas refinery and the now-closed Phillipsburg, Kansas terminal facility, pursuant to Administrative Orders on Consent issued under the Resources Conservation and Recovery Act ("RCRA") to address historical contamination by the prior owners (RCRA Docket No. VII-94-H-20 and Docket No. VII-95 H-11, respectively). Wynnewood Refining Company, LLC ("WRC") and the Oklahoma Department of Environmental Quality ("ODEQ") have entered into a Consent Order (Case No. 15-056) to resolve certain legacy environmental issues related to historical groundwater contamination and the operation of a wastewater conveyance.

As of December 31, 2017 and 2016, our Energy segment had environmental accruals of $4 million and $5 million, respectively. CVR Energy's management periodically reviews and, as appropriate, revises its environmental accruals. Based on current information and regulatory requirements, CVR Energy's management believes that the accruals established for environmental expenditures are adequate.

In January 2014, the EPA issued an inspection report to the Wynnewood refinery related to a RCRA compliance evaluation inspection conducted in March 2013. In February 2014, ODEQ notified WRC that it concurred with the EPA's

117

**ICAHN ENTERPRISES L.P. AND SUBSIDIARIES**
**ICAHN ENTERPRISES HOLDINGS L.P. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

inspection findings and would be pursuing enforcement. WRC and ODEQ entered into a Consent Order in June 2015 resolving all alleged non-compliance associated with the RCRA compliance evaluation inspection, as well as issues related to possible soil and groundwater contamination associated with the prior owner's operation of the refinery. The Consent Order requires WRC to take certain corrective actions, including specified groundwater remediation and monitoring measures pursuant to a work plan and replacement of a wastewater conveyance to be approved by ODEQ. ODEQ approved the work plan submitted by WRC on February 1, 2016 and the replacement of a wastewater conveyance on August 15, 2016. WRC is in the process of implementing the specified groundwater remediation and monitoring measures. The costs of complying with the Consent Order are estimated to be approximately $4 million.

Environmental expenditures are capitalized when such expenditures are expected to result in future economic benefits. Capital expenditures incurred for environmental compliance and efficiency of the operations were $16 million, $17 million and $36 million for the years ended December 31, 2017, 2016 and 2015, respectively.

*Metals*

PSC Metals has been designated as a PRP under U.S. federal and state superfund laws with respect to certain sites with which PSC Metals may have had a direct or indirect involvement. It is alleged that PSC Metals and its subsidiaries or their predecessors transported waste to the sites, disposed of waste at the sites or operated the sites in question. In addition, one of PSC Metals' Knoxville, Tennessee locations was the subject of investigations by the State of Tennessee under the federal Superfund law. These investigations were performed by the State of Tennessee pursuant to a contract with the EPA. PSC Metals has entered into Tennessee's Voluntary Clean-Up Oversight and Assistance Program ("VOAP") and expects to enter into a settlement with the Tennessee Department of Environment and Conservation ("TDEC") in the future. Currently, PSC Metals believes that it has adequately reserved for the cost of any potential future remediation associated with its Knoxville location, but cannot fully assess the impact of all costs or liabilities associated with TDEC's investigations. With respect to all other matters in which PSC Metals has been designated as a PRP under U.S. federal and state superfund laws, PSC Metals has reviewed the nature and extent of the allegations, the number, connection and financial ability of other named and unnamed PRPs and the nature and estimated cost of the likely remedy. Based on reviewing the nature and extent of the allegations, PSC Metals has estimated its liability to remediate these other sites to be immaterial as of both December 31, 2017 and 2016. If it is determined that PSC Metals has liability to remediate those sites and that more expensive remediation approaches are required in the future, PSC Metals could incur additional obligations, which could be material to its operations.

In November and December of 2011, PSC Metals received three notices of violation ("NOV") from the Missouri Department of Natural Resources ("MDNR") for hazardous waste and water violations related to its Festus, Missouri location. PSC Metals has entered into a settlement with MDNR that resolves these NOVs. Currently, PSC Metals believes that it has established adequate reserves for the cost of this settlement. In addition, PSC Metals believes that it has a claim for indemnification against the prior owner of the facility associated with the above-referenced notices of violation. MDNR and PSC Metals, as part of the resolution of MDNR's NOVs, have undertaken sampling for lead at residences near PSC Metals' Festus yard. Approximately 67 residences were sampled and tested, and of those, approximately 15 tested above residential standards for lead contamination. PSC Metals has entered into a settlement agreement with MDNR which resolves MDNR's claims and required limited soil remediation at the 15 residences. PSC Metals has complied with the terms of the settlement agreement and expects its obligations under the settlement agreement to terminate in the near future. PSC Metals believes that it has adequately reserved for the cost of compliance with the settlement agreement. Additionally, PSC Metals believes that liability for off-site contamination was retained by the prior owner of the Festus yard and accordingly, it would have a claim for indemnification against the prior owner.

Certain of PSC Metals' facilities are environmentally impaired in part as a result of operating practices at the sites prior to their acquisition by PSC Metals and as a result of PSC Metals' operations. PSC Metals has established procedures to periodically evaluate these sites, giving consideration to the nature and extent of the contamination. PSC Metals has provided for the remediation of these sites based upon its management's judgment and prior experience. PSC Metals has estimated the liability to remediate these sites to be $28 million and $28 million at December 31, 2017 and 2016, respectively. PSC Metals believes, based on past experience, that the vast majority of these environmental liabilities and costs will be assessed and paid over an extended period of time. PSC Metals believes that it will be able to fund such costs in the ordinary course of business. Estimates of PSC Metals' liability for remediation of a particular site and the method and ultimate cost of remediation require a number of assumptions that are inherently difficult to make, and the ultimate outcome may be materially different from current estimates. Moreover, because PSC Metals has disposed of waste materials at numerous third-party disposal facilities, it is possible that PSC Metals will be identified as a PRP at additional sites. The impact of such future events cannot be estimated at the current time.

**ICAHN ENTERPRISES L.P. AND SUBSIDIARIES**
**ICAHN ENTERPRISES HOLDINGS L.P. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Asset Retirement Obligations*

Our Automotive segment has identified sites with contractual obligations and several sites that are closed or expected to be closed and sold. In connection with these sites, our Automotive segment has accrued $15 million and $15 million as of December 31, 2017 and 2016, respectively, for asset retirement obligations ("ARO"), primarily related to anticipated costs of removing hazardous building materials at its facilities, and has considered impairment issues that may result from capitalization of these ARO amounts.

*Renewable Fuel Standards*

CVR Refining is subject to the Renewable Fuel Standard which requires refiners to either blend "renewable fuels" with their transportation fuels or purchase renewable fuel credits, known as renewable identification numbers ("RINs"), in lieu of blending.

In December 2015, 2016, and 2017, the EPA published in the Federal Register final rules establishing the renewable fuel volume mandates for 2016, 2017, and 2018, and the biomass-based diesel volume mandates for 2017, 2018, and 2019, respectively. The volumes included in the EPA's final rules increased each year, but were lower, with the exception of the volumes for biomass-based diesel, than the volumes required by the Clean Air Act. The EPA used its waiver authorities to lower the volumes, but its decision to do so for the 2014-2016 compliance years was challenged in the U.S. Court of Appeals for the District of Columbia Circuit. In July 2017, the court vacated the EPA's decision to reduce the renewable volume obligation for 2016 under one of its waiver authorities, and remanded the rule to the EPA for further reconsideration. The EPA has not yet reproposed the 2016 renewable volume obligations. The EPA also has articulated a policy that high RINs prices incentivize additional investments in renewable fuel blending and distribution infrastructure.

RINs expense was $249 million, $206 million and $124 million for years ended December 31, 2017, 2016 and 2015, respectively. RINs expense includes the impact of recognizing the petroleum business' uncommitted biofuel blending obligation at fair value based on market prices at each reporting date. As of December 31, 2017 and 2016, the petroleum business' biofuel blending obligation was $28 million and $186 million, respectively, which is included in accrued expenses and other liabilities in our consolidated balance sheets.

*Litigation*

From time to time, we and our subsidiaries are involved in various lawsuits arising in the normal course of business. We do not believe that such normal routine litigation will have a material effect on our financial condition or results of operations.

*Automotive*

On March 3, 2017, certain purported former stockholders of Federal-Mogul Holdings Corporation filed a petition in the Delaware Court of Chancery seeking an appraisal of the value of common stock they claim to have held at the time of the January 23, 2017 merger of IEH FM Holdings, LLC into Federal-Mogul Holdings Corporation. IEH FM Holdings, LLC was a wholly owned subsidiary of Icahn Enterprises. Federal-Mogul Holdings LLC filed an answer to the petition on March 28, 2017. A second petition for appraisal was filed by purported former stockholders of Federal-Mogul Holdings Corporation on May 1, 2017. The two cases were consolidated on May 10, 2017, captioned *In re Appraisal of Federal-Mogul Holdings LLC, C.A. No. 2017-0158-AGB*. Discovery is ongoing and a trial date has not yet been set. Federal-Mogul believes that it has a meritorious defense and intends to vigorously defend the matter.

On September 29, 2016, September 30, 2016, October 12, 2016 and October 19, 2016, respectively, four putative class actions, captioned *Skybo v. Ninivaggi et al.*, C.A. No. 12790, *Lemanchek v. Ninivaggi et al.*, C.A. No. 12791, *Raul v. Ninivaggi et al.*, C.A. No. 12821 and *Mercado v. Ninivaggi et al.*, C.A. No. 12837, were filed in the Court of Chancery of the State of Delaware against the Board of Directors of Federal-Mogul (the "FM Board") and Icahn Enterprises, Icahn Enterprises Holdings, certain of their affiliates and Icahn Enterprises' Board of Directors (the "Icahn Defendants"), and, in the case of *Raul*, Federal-Mogul. The complaints allege that, among other things, the FM Board breached its fiduciary duties by approving the proposed Merger Agreement, that the Icahn Defendants breached their fiduciary duties to the minority stockholders of Federal-Mogul and/or aided and abetted the FM Board's breaches of its fiduciary duties, as well as alleging certain material misstatements and omissions in the Schedule 14D-9 filed by Federal-Mogul (the "Schedule 14D-9"). The complaints allege that, among other things, the then-Offer Price was inadequate and, together with that the Merger Agreement, was the result of a flawed and unfair sales process and conflicts of interest of the FM Board and the special committee of independent directors of Federal-Mogul (the "Special Committee"), alleging that the Special Committee and Federal-Mogul's management lacked independence from the Icahn Defendants. In addition, the complaints allege that the Merger Agreement contains certain allegedly preclusive deal protection provisions, including a no-solicitation provision, an information rights provision and a

119

**ICAHN ENTERPRISES L.P. AND SUBSIDIARIES**
**ICAHN ENTERPRISES HOLDINGS L.P. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

matching rights provision. Among other things, the complaints sought to enjoin the transactions contemplated by the Merger Agreement, as well as award costs and disbursements, including reasonable attorneys' and experts' fees. The *Raul* and *Mercado* complaints further seek to rescind the transaction or award rescissory damages, or (in the case of *Raul*) award a quasi-appraisal remedy in the event that the transaction was consummated, as well as award money damages. On October 28, 2016, all four actions were consolidated under the caption *In re Federal-Mogul Holdings, Inc. Stockholder Litigation*, C.A. No. 12790-CB (the "Delaware Action"). On March 6, 2017, plaintiffs filed a consolidated amended complaint that does not name Federal-Mogul as a defendant. Among other things, the consolidated amended complaint also adds allegations regarding the commencement and extension of the Offer, the increase in the Offer price, the closing of the transaction, Federal-Mogul's subsequent performance and public statements, Mr. Ninivaggi's post-merger employment with Icahn Enterprises and the independence of the chairman of the Special Committee. The Icahn Defendants have moved to dismiss the amended complaint and discovery was stayed pending determination of that motion. In lieu of proceeding with the October 12, 2017 hearing on the Icahn Defendants' motion to dismiss, the plaintiffs in the Delaware Action dismissed the Delaware Action, without prejudice as to the named plaintiffs.

On October 5, 2016, a putative class action captioned *Sanders v. Federal-Mogul Holdings Corporation et al.*, C.A. No. 16-155387 was filed in the Circuit Court for Oakland County of the State of Michigan against Federal-Mogul, the FM Board and the Icahn Defendants (the "Michigan Action"). The complaint alleges, among other things, that the FM Board breached its fiduciary duties and that Federal-Mogul and the Icahn Defendants aided and abetted the FM Board's breaches of its fiduciary duties, as well as alleging certain material misstatements and omissions in the Schedule 14D-9. The complaint alleges that, among other things, the then-Offer Price was unfair and the result of an unfair sales process that included conflicts of interest. In addition, the complaint alleges that the Merger Agreement contains certain allegedly preclusive deal protection provisions, including a no-solicitation provision, an information rights provision and a matching rights provision. Among other things, the complaint sought to enjoin the transactions contemplated by the Merger Agreement, or, in the event that the transactions were consummated, rescind the transactions or award rescissory damages, as well as award money damages and costs, including reasonable attorneys' and experts' fees. On March 6, 2017, the plaintiffs filed an amended complaint which, among other things, dropped Federal-Mogul as a defendant. The amended complaint also: named certain additional Icahn-affiliated individuals and entities as defendants; deleted various allegations relating to process and purported disclosure deficiencies; added allegations regarding the commencement and extension of the Offer, the increase in the Offer price, the closing of the transaction, Federal-Mogul's subsequent performance and public statements, Mr. Ninivaggi's post-merger employment with Icahn Enterprises, and the independence of certain directors; and eliminated the request for injunctive relief given the consummation of the transaction. On April 4, 2017, the Court entered a stipulated order staying the Michigan Action pending final determination of the Delaware Action. On October 16, 2017, the plaintiffs in the Michigan Action dismissed the Michigan Action, without prejudice as to the named plaintiffs.

On April 25, 2014, a group of plaintiffs brought an action against Federal-Mogul Products, Inc. ("FM Products"), a wholly-owned subsidiary of Federal-Mogul, alleging injuries and damages associated with the discharge of chlorinated hydrocarbons by the former owner of a facility located in Kentucky. Since 1998, when FM Products acquired the facility, it has been cooperating with the applicable regulatory agencies on remediating the prior discharges pursuant to an order entered into by the facility's former owner. Federal-Mogul does not currently believe the outcome of this litigation will have a material impact on its financial statements.

120

**ICAHN ENTERPRISES L.P. AND SUBSIDIARIES**
**ICAHN ENTERPRISES HOLDINGS L.P. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Unconditional Purchase Obligations*

The minimum required payments for CVR Energy's unconditional purchase obligations are as follows:

|  | Unconditional Purchase Obligations[1] |
|---|---|
|  | (in millions) |
| 2018 | $ 165 |
| 2019 | 124 |
| 2020 | 101 |
| 2021 | 90 |
| 2022 | 85 |
| Thereafter | 542 |
|  | $ 1,107 |

[1]This amount includes $699 million payable ratably over thirteen years pursuant to petroleum transportation service agreements between Coffeyville Resources Refining Marketing, LLC ("CRRM") and each of TransCanada Keystone Limited Partnership and TransCanada Keystone Pipeline, LP (together, "TransCanada"). The purchase obligation reflects the exchange rate between the Canadian dollar and the U.S. dollar as of December 31, 2017, where applicable. Under the agreements, CRRM receives transportation of at least 25,000 barrels per day of crude oil with a delivery point at Cushing, Oklahoma for a term of twenty years on TransCanada's Keystone pipeline system.

Additionally, in the normal course of business, CVR Energy has long-term commitments to purchase oxygen, nitrogen, electricity, storage capacity, water and pipeline transportation services. For the years ended December 31, 2017, 2016 and 2015, total expense of $209 million, $151 million and $136 million, respectively, was incurred related to long-term commitments.

*Other Matters*

*FRA Directive*

On September 30, 2016, the Federal Railroad Administration ("FRA") issued Railworthiness Directive ("RWD") No. 2016-01 (the "Original Directive"). The Original Directive addressed, among other things, certain welding practices in one weld area in specified DOT 111 tank railcars manufactured between 2009 and 2015 by ARI and ACF. Our Railcar segment met and corresponded with the FRA following the issuance of the Original Directive to express its concerns with the Original Directive and its impact on our Railcar segment, as well as the industry as a whole.

On November 18, 2016 (the "Issuance Date"), the FRA issued RWD No. 2016-01 [Revised] (the "Revised Directive"). The Revised Directive changed and superseded the Original Directive in several ways.

The Revised Directive required owners to identify their subject tank railcars and then from that population identify the 15% of subject tank railcars then in hazardous materials service with the highest mileage in each tank car owner's fleet. Visual inspection of each of the subject tank railcars is required by the car operator prior to putting any railcar into service. Owners must ensure appropriate inspection, testing and repairs, if needed, within twelve months of the Issuance Date for the 15% of their subject tank railcars identified to be in hazardous materials service with the highest mileage. The FRA reserved the right to impose additional test and inspection requirements for the remaining tank railcars subject to the Revised Directive.

The FRA also reserved the right to seek civil penalties or to take any other appropriate enforcement action for violation of the Federal Hazardous Materials Regulations that have occurred.

Although the Revised Directive addressed some of our Railcar segment's concerns and clarified certain requirements of the Original Directive, our Railcar segment identified significant issues with the Revised Directive. As a result, in December 2016, our Railcar segment sought judicial review of and relief from the Revised Directive by filing a petition for review against the FRA in the United States Court of Appeals for the District of Columbia Circuit.

On August 17, 2017, our Railcar segment entered into a settlement agreement with the FRA, which covered the subject railcars owned by our Railcar segment. This agreement, among other things, extended the deadline for our Railcar segment to complete the inspection, testing and repairs, if needed, for the 15% identified railcars to December 31, 2017. Adding clarity regarding certain unknown requirements referenced in the Revised Directive, under the settlement agreement, our Railcar segment is required to inspect, test, and if necessary repair the remaining 85% subject tank railcars at the next tank railcar qualification, scheduled routine or regular maintenance, shopping or repair event, but no later than December 31, 2025.

121

**ICAHN ENTERPRISES L.P. AND SUBSIDIARIES**
**ICAHN ENTERPRISES HOLDINGS L.P. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

However, the settlement agreement permits our Railcar segment to: (i) if the FRA does not impose a similar requirement by July 31, 2018 on other owners' railcars subject to the Revised Directive, suspend compliance with this requirement until such time as the FRA imposes requirements on all 85% railcars subject to the Revised Directive, and (ii) elect to be governed by any different requirements later imposed by the FRA on other owners' railcars subject to the Revised Directive. In addition, the settlement agreement also provides that railcars owned by our Railcar segment are no longer required to have a surface inspection performed when the railcars are being inspected pursuant to the Revised Directive. The description above includes a summary of the terms of the settlement agreement. Finally, as part of the settlement agreement, our Railcar segment dismissed its lawsuit against the FRA.

Our Railcar segment has evaluated its potential exposure related to the Revised Directive and has a remaining loss contingency reserve of $9 million, as of December 31, 2017, to cover its probable and estimable liabilities with respect to our Railcar segment's response to the Revised Directive. The loss contingency reserve takes into account information available as of December 31, 2017 and our Railcar segment's contractual obligations in its capacity as both a manufacturer and owner of railcars subject to the Revised Directive. This amount is included in accrued expenses and other liabilities on the consolidated balance sheets. This amount will continue to be evaluated as our Railcar segment's and its customers' compliance with the Revised Directive and the settlement agreement progress. Actual results could differ from this estimate.

It is reasonably possible that a loss exists in excess of the amount accrued by our Railcar segment. However, the amount of potential costs and expenses expected to be incurred for compliance with the Revised Directive in excess of the loss contingency reserve of $9 million cannot be reasonably estimated at this time.

*Pension Obligations*

Mr. Icahn, through certain affiliates, owns 100% of Icahn Enterprises GP and approximately 91.0% of Icahn Enterprises' outstanding depositary units as of December 31, 2017. Applicable pension and tax laws make each member of a "controlled group" of entities, generally defined as entities in which there is at least an 80% common ownership interest, jointly and severally liable for certain pension plan obligations of any member of the controlled group. These pension obligations include ongoing contributions to fund the plan, as well as liability for any unfunded liabilities that may exist at the time the plan is terminated. In addition, the failure to pay these pension obligations when due may result in the creation of liens in favor of the pension plan or the Pension Benefit Guaranty Corporation ("PBGC") against the assets of each member of the controlled group.

As a result of the more than 80% ownership interest in us by Mr. Icahn's affiliates and our ownership of more than 80% in certain of our subsidiaries, we and certain of our subsidiaries are subject to the pension liabilities of entities in which Mr. Icahn has a direct or indirect ownership interest of at least 80%. ACF and Federal-Mogul, are the sponsors of several pension plans. All the minimum funding requirements of the Internal Revenue Code, as amended, and the Employee Retirement Income Security Act of 1974, as amended by the Pension Protection Act of 2006, for these plans have been met as of December 31, 2017 and 2016. If the plans were voluntarily terminated, they would be underfunded by approximately $424 million and $613 million as of December 31, 2017 and 2016, respectively. These results are based on the most recent information provided by the plans' actuaries. These liabilities could increase or decrease, depending on a number of factors, including future changes in benefits, investment returns, and the assumptions used to calculate the liability. As members of the controlled group, we would be liable for any failure of ACF and Federal-Mogul to make ongoing pension contributions or to pay the unfunded liabilities upon a termination of the pension plans of ACF and Federal-Mogul. In addition, other entities now or in the future within the controlled group in which we are included may have pension plan obligations that are, or may become, underfunded and we would be liable for any failure of such entities to make ongoing pension contributions or to pay the unfunded liabilities upon termination of such plans.

The current underfunded status of the pension plans of ACF and Federal-Mogul requires them to notify the PBGC of certain "reportable events," such as if we cease to be a member of the ACF and Federal-Mogul controlled group, or if we make certain extraordinary dividends or stock redemptions. The obligation to report could cause us to seek to delay or reconsider the occurrence of such reportable events.

Starfire Holding Corporation ("Starfire") which is 99.4% owned by Mr. Icahn, has undertaken to indemnify us and our subsidiaries from losses resulting from any imposition of certain pension funding or termination liabilities that may be imposed on us and our subsidiaries or our assets as a result of being a member of the Icahn controlled group. The Starfire indemnity (which does not extend to pension liabilities of our subsidiaries that would be imposed on us as a result of our interest in these subsidiaries and not as a result of Mr. Icahn and his affiliates holding more than an 80% ownership interest in us, and as such would not extend to the unfunded pension termination liability for Federal-Mogul) provides, among other things, that so long as such contingent liabilities exist and could be imposed on us, Starfire will not make any distributions to its stockholders that

**ICAHN ENTERPRISES L.P. AND SUBSIDIARIES**
**ICAHN ENTERPRISES HOLDINGS L.P. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

would reduce its net worth to below $250 million. Nonetheless, Starfire may not be able to fund its indemnification obligations to us.

*Other*

The U.S. Attorney's office for the Southern District of New York contacted Icahn Enterprises L.P. in September 2017 seeking production of information pertaining to our and Mr. Icahn's activities relating to the Renewable Fuels Standard and Mr. Icahn's role as an advisor to the President. We are cooperating with the request and are providing information in response to the subpoena. The U.S. Attorney's office has not made any claims or allegations against us or Mr. Icahn. We maintain a strong compliance program and, while no assurances can be made, we do not believe this inquiry will have a material impact on our business, financial condition, results of operations or cash flows.

*Consolidated Leases*

Consolidated future minimum lease payments under operating leases with initial terms of one or more years consist of the following at December 31, 2017:

| Year | Amount |
|---|---|
| | (in millions) |
| 2018 | $ 237 |
| 2019 | 222 |
| 2020 | 198 |
| 2021 | 170 |
| 2022 | 142 |
| Thereafter | 388 |
| | $ 1,357 |

Rent expense under operating leases for the years ended December 31, 2017, 2016 and 2015 was $264 million, $237 million and $145 million, respectively.

**18. Supplemental Cash Flow Information.**

Supplemental cash flow information consists of the following:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| | (in millions) | | |
| Cash payments for interest, net of amounts capitalized | $ 658 | $ 662 | $ 602 |
| Net cash payments (refunds) for income taxes | 150 | 87 | (1) |
| Acquisition of subsidiary common stock included in accrued expenses and other liabilities | 51 | - | - |
| Seller financing secured mortgages resulting from disposition of assets | 375 | - | - |
| Investment in subsidiaries prior to acquiring a controlling interest | - | 286 | 36 |
| LP unit issuance for remaining 25% interest in ARL | - | 35 | - |
| Fair value of subsidiary common units issued in an acquisition of business | - | 336 | - |
| Fair value of debt assumed in an acquisition of business | - | 368 | - |
| Capital expenditures included in accounts payable, accrued expenses and other liabilities | 80 | 89 | 88 |

123

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Icahn Enterprises L.P.**

By:  Icahn Enterprises G.P. Inc., its general partner

By:  /s/Keith Cozza

Keith Cozza
President, Chief Executive Officer and Director

Date: March 1, 2018

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons in the capacities indicated with respect to Icahn Enterprises G.P. Inc., the general partner of Icahn Enterprises L.P., and on behalf of the registrant and on the dates indicated below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/Keith Cozza<br>Keith Cozza | President, Chief Executive Officer and Director | March 1, 2018 |
| /s/SungHwan Cho<br>SungHwan Cho | Chief Financial Officer and Director | March 1, 2018 |
| /s/Peter Reck<br>Peter Reck | Chief Accounting Officer | March 1, 2018 |
| /s/Jack G. Wasserman<br>Jack G. Wasserman | Director | March 1, 2018 |
| /s/William A. Leidesdorf<br>William A. Leidesdorf | Director | March 1, 2018 |
| /s/James L. Nelson<br>James L. Nelson | Director | March 1, 2018 |
| <br>Carl C. Icahn | Chairman of the Board | March 1, 2018 |

152

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Icahn Enterprises Holdings L.P.**

By:  Icahn Enterprises G.P. Inc., its general partner

By:  /s/Keith Cozza

Keith Cozza
President, Chief Executive Officer and Director

Date: March 1, 2018

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons in the capacities indicated with respect to Icahn Enterprises G.P. Inc., the general partner of Icahn Enterprises Holdings L.P., and on behalf of the registrant and on the dates indicated below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/Keith Cozza<br>Keith Cozza | President, Chief Executive Officer and Director | March 1, 2018 |
| /s/SungHwan Cho<br>SungHwan Cho | Chief Financial Officer and Director | March 1, 2018 |
| /s/Peter Reck<br>Peter Reck | Chief Accounting Officer | March 1, 2018 |
| /s/Jack G. Wasserman<br>Jack G. Wasserman | Director | March 1, 2018 |
| /s/William A. Leidesdorf<br>William A. Leidesdorf | Director | March 1, 2018 |
| /s/James L. Nelson<br>James L. Nelson | Director | March 1, 2018 |
| <br>Carl C. Icahn | Chairman of the Board | March 1, 2018 |

153
