IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re The Chemours Company Securities Litigation* | Civil Action No. 19-1911-CFC CLASS ACTION |

Bruce E. Jameson, Marcus E. Montejo, Stephen D. Dargitz, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware

     *Liaison Counsel for the Class*

Mary Sikra Thomas, Bruce E. Jameson PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Maya S. Saxena, Joseph E. White, III, Lester R. Hooker, Dianne M. Pitre, SAXENA WHITE P.A., Boca Raton, Florida; Steven B. Singer, Kyla Grant, SAXENA WHITE P.A., White Plains, New York; David R. Kaplan, SAXENA WHITE P.A., San Diego, California

     *Counsel for Lead Plaintiff New York State Teachers' Retirement System and Lead Counsel for the Class*

Joel Friedlander, Jeffrey Gorris, Christopher Foulds, Christopher P. Quinn, FRIEDLANDER & GORRIS P.A., Wilmington, Delaware

     *Counsel for Defendant*

**<u>MEMORANDUM OPINION</u>**

February 24, 2022
Wilmington, Delaware

*Colm F. Connolly*

COLM F. CONNOLLY
CHIEF JUDGE

Lead Plaintiff New York State Teachers' Retirement System filed the Consolidated Class Action Complaint (the Complaint) in this securities suit against the Chemours Company, Mark P. Vergnano, and Mark E. Newman.  D.I. 30 ¶¶ 18–22.  Vergnano was at all relevant times Chemours's President and CEO.  Newman was at all relevant times Chemours's Senior Vice President and Chief Financial Officer.  D.I. 30 ¶ 22.  The Complaint alleges two claims, each arising from a series of alleged misrepresentations in annual and quarterly reports Chemours filed with the Securities Exchange Commission (SEC) between February 16, 2017, and August 1, 2019 (the Class Period).  Count I of the Complaint alleges that all three Defendants violated § 10(b) of the Securities Exchange Act of 1934.  Count II alleges that Vergano and Newman violated § 20(a) of the Exchange Act.  D.I. 30 ¶¶ 303–318.

Pending before me is Defendants' motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  D.I. 34.

## I.   BACKGROUND

Because I am assessing the merits of a Rule 12(b)(6) motion to dismiss, I accept as true all factual allegations in the Complaint and in documents explicitly relied upon in the Complaint.  *See Mgmt. Sci. Assocs., Inc. v. Datavant, Inc.*, 510

F. Supp. 3d 238, 244 (D. Del. 2020).  The following background information is
based on those allegations.

Chemours is a Delaware corporation that produces industrial and specialty
chemical products.  It was formed in 2015 as a spin-off of the performance
chemicals division of the DuPont Company.  DuPont orchestrated the spin-off as
part of a plan to try to off-load its historical environmental liabilities.  D.I. 30 ¶ 3.
Pursuant to a separation agreement that established the terms of the spin-off,
Chemours assumed at the time of its formation many of these liabilities and agreed
to indemnify DuPont for certain contingent liabilities.  D.I. 30 ¶ 40.  The liabilities
included among other things remediation costs for certain contaminated sites and
legal claims arising out of DuPont's manufacture of perfluorooctanoic acid
(PFOA), perfluoroalkyl and polyfluoroalkyl substances (PFAS), and benzene.  D.I.
30 ¶ 40.

Under Delaware law, DuPont's board could not approve the spin-off unless
it could establish that Chemours would be solvent and viable as an independent
company at the time of its inception.  D.I. 30 ¶ 57.  To that end, the board obtained
from a financial adviser a solvency opinion.  In issuing that opinion, the adviser
relied on "High End (Maximum) Realistic Exposure" calculations certified by
DuPont's management for the environmental liabilities and indemnification
obligations Chemours assumed under the separation agreement.  D.I. 30 ¶ 60.

2

The spin-off was completed on July 1, 2015, and Chemours's stock began trading on the New York Stock Exchange on that date. Chemours struggled from the outset. Its stock price plummeted by some 85% soon after its formation. D.I. 30 ¶ 41.

Vergnano recognized "right from the start" that because of Chemours's inherited liabilities "investors were worried if [Chemours] was going to be solvent." D.I. 30 ¶ 45 (underline omitted). To assuage investor concerns, Vergnano touted a so-called "Transformation Plan" put in place by Chemours to enhance its ability to pay back its debts over time. D.I. 30 ¶¶ 43–45. In a similar vein, Newman assured investors during Chemours's first earnings call in August 2015 that he, Vergnano, and other members of Chemours's executive team had previously run DuPont's performance chemicals division; that they had been personally monitoring the liabilities inherited from DuPont for a long time; and that Chemours's inherited environmental liabilities were "well understood and well managed." D.I. 30 ¶ 46 (underline omitted).

On February 7, 2017, Chemours filed with the SEC the first of ten annual (Form 10-K) and quarterly (Form 10-Q) reports that fall within the Class Period. D.I. 30 ¶ 5. Consistent with SEC regulations, Chemours stated in each of the reports that the financial disclosures in the respective report were prepared in accordance with the Generally Accepted Accounting Principles (GAAP). *See, e.g.,*

3

D.I. 43-3 at 9 ("The accompanying interim consolidated financial statements have

been prepared in accordance with generally accepted accounting principles in the

United States of America (GAAP) . . . .").[1]  All ten reports were signed by

Vergnano and Newman; and, according to the Complaint, all ten contained

statements that "dramatically mischaracterized Chemours'[s] true financial

condition and vastly understated [Chemours]'s liabilities from decades of

environmental pollution."  D.I. 30 ¶ 1.

_____

[1] The Exchange Act provides the SEC with the authority to prescribe among other things rules for reporting earnings statements and balance sheets.  15 U.S.C. § 78m(b)(1).  The Sarbanes-Oxley Act of 2002 permits the SEC to "recognize, as 'generally accepted' for purposes of the securities laws, any accounting principles established by a standard setting body" meeting certain criteria.  15 U.S.C. § 77s(b)(1); Commission Guidance Regarding the Financial Accounting Standards Board's Accounting Standards Codification, 74 Fed. Reg. 42,772, 42,772 (Aug. 25, 2009).  The SEC, in turn, recognizes the Financial Accounting Standards Board (FASB) as the entity that establishes and maintains "generally accepted" accounting standards in the United States.  Commission Statement of Policy Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter, 68 Fed. Reg. 23,333, 23,333 (May 1, 2003).  The FASB establishes and maintains GAAP.  About the FASB, Fin. Accounting Standards Board. (Sept. 2021), https://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495.  GAAP are codified in the Accounting Standards Codification (ASC).  Accounting Standards Codification § 105-10-05-1, Fin. Accounting Standards Board (Accessed Feb. 24, 2022), https://asc.fasb.org/section&trid=6532146.  SEC Regulation S-X provides that "[f]inancial statements filed with the [SEC] [that] are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate . . . unless the [SEC] has otherwise provided."  17 C.F.R. § 210.4-01(a)(1); *see also* 17 C.F.R. § 210.8-01(a) (requiring "smaller reporting companies" to use GAAP).

The Complaint alleges that Defendants "admitted the falsity of the[se] statements" in a complaint Chemours filed against DuPont in May 2019 in the Delaware Court of Chancery.  D.I. 30 ¶ 1.  Nine of the 320 paragraphs in the sprawling, 162-page Complaint filed in this action effectively summarize the totality of Plaintiff's allegations and its theory of liability:

> 5.    . . . .  Beginning with the Company's 2016 Form 10- K filed on February 17, 2017 at the start of the Class Period—and in each of the Company's quarterly and annual reports filed after that—Chemours added language that it had never used before with respect to its disclosed maximum liability ranges, stating that there was only a "remote" chance that the Company's liabilities would exceed its accruals "up to" those specified maximum amounts.   Defendants also celebrated the purported success of their "transformation plan," emphatically proclaiming that Chemours in "no way" had been "set up to fail," and repeatedly touting Chemours'[s] "strong" and "de-risked" balance sheet that sparked a "turnaround" that was "nothing short of remarkable."

> 6.    Investors and securities analysts heavily relied on and credited Defendants' statements, including Chemours'[s] purported maximum liability caps.  Indeed, on the heels of these representations, analysts concluded that Chemours had "healed tremendously from its spin-out of DuPont," noting that the Company had "reduced its risk portfolio" and "reduced litigation risk" because its "balance sheet [and] liabilities [were] cleaned up."  Fueled by Defendants' assurances, the Company's stock price soared, peaking at over $58 per share on October 24, 2017.

> 7.    . . . [A]ll of these statements were patently false.  In [the Chancery Court Complaint] signed and verified by Defendant Newman, and originally filed under seal in Delaware Chancery Court on May 13, 2019 . . . ,

Chemours asserted that prior to the spinoff, DuPont engaged in a "sham" process of deliberately certifying "systematically and spectacularly wrong" maximum estimates for each of Chemours'[s] inherited liabilities in order to claim that it was complying with Delaware law, which required that spun off companies be viable and solvent. However, in reality, and in Chemours' own words, the previously undisclosed liabilities were so "huge," "radical and extraordinary," and "staggering"—and, rather than "remote," virtually inevitable—that Chemours admitted "in no uncertain terms" that, "as of the date of the spin, Chemours was insolvent" in violation of Delaware law [if the liability caps did not apply, D.I. 42-1 ¶ 10].

8.     .... Significantly, the [Chancery Court] Complaint identified approximately $2.5 billion in imminent environmental liabilities—a staggering amount that was nearly eight times Chemours' $313 million in Class Period accruals; dwarfed the maximum liability amounts that Defendants asserted were only "remotely" possible, which averaged less than $500 million; and greatly exceeded its available cash of $700 million, net assets of $816 million, and even its market capitalization of $2.4 billion at the end of the Class Period. . . .

9.     There can be no doubt that Defendants—who, along with other Chemours' senior executives, had over 120 years of combined experience at DuPont, and who were the same individuals who directly operated the sites inherited from DuPont—at all times were fully aware of the Company's overwhelming and undisclosed liabilities. By Defendants' own admission, they knew from Chemours' inception that DuPont's estimated maximums for the inherited liabilities were "baseless concoction[s]," and that, in truth, these liabilities were so massive that they rendered Chemours legally "insolvent." . . .

10.     In addition, highly placed former employees of DuPont and Chemours—including some of the most

senior officers of the Company—further confirmed Defendants' direct knowledge of and participation in the fraud. Former employees who worked directly with Defendants unequivocally confirmed that "Chemours leadership knew exactly the extent of the liabilities they were taking over" and that Defendants were personally confronted during the Class Period with a detailed account calculating the need for billions in environmental remediation costs. Despite these facts, from the time of the spinoff and throughout the Class Period, Defendants did nothing to properly account for Chemours' staggering liabilities.

11.    Defendants' fraud was exposed in a series of disclosures that gradually revealed Defendants' fraud and Chemours'[s] true financial condition. In early May 2019, a prominent analyst presented research showing that Chemours'[s] true liabilities were substantially greater than what it had disclosed, triggering a 15% drop in Chemours'[s] stock price. Chemours vehemently denied that was the case and asserted that it was adequately reserved for any potential liabilities.

12.    However, contemporaneous with those denials, Chemours filed its lawsuit against DuPont under seal in which it admitted that its liabilities were so large that they rendered the Company insolvent. When the lawsuit was unsealed in late June, Chemours'[s] stock price plunged another 15%, and stunned analysts reported that Chemours had now "quantified potential high-end liabilities of approximately $2.5 billion" that were "materially higher than expected."

13.    Finally, on August 1, 2019, Chemours reported a significant and unexpected increase in PFAS litigation coupled with a substantial reduction in free cash flow guidance, and the stock fell another 19% to close at $14.69 per share on August 2, 2019. All told, these disclosures wiped out $2 billion in market capitalization, and have caused massive losses to investors who purchased

7

Chemours common stock at artificially inflated prices during the Class Period.

D.I. 30 ¶¶ 5–13 (emphases and some alterations in the original; footnotes omitted).

## II.   LEGAL STANDARDS

### A.   Sections 10(b) and 20(a) of the Exchange Act

Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5, the SEC's corresponding implementing regulation, makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim for securities fraud under Rule 10b-5, a plaintiff "must plead (1) a material misrepresentation or omission, (2) scienter, (3) a connection

between the misrepresentation or omission and the purchase or sale of a security,

(4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss

causation." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018); *see*

*also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (identifying same

elements).  An individual's liability for fraudulent misrepresentations made in

violation of Rule 10b-5 can be imputed to the company that employs the

individual. *See Institutional Invs. Grp. v. Avaya, Inc.,* 564 F.3d 242, 251–52 (3d

Cir. 2009) (holding that "liability for [two employees'] statements, if they were

fraudulent, can also be imputed to [the company the employees worked for]

because '[a] corporation is liable for statements by employees who have apparent

authority to make them.'" (citation omitted) (last alteration in the original)).

Section 20(a) of the Exchange Act creates a derivative cause of action

against individuals who exercise control of a "controlled person," including a

corporation, that has violated § 10(b).  15 U.S.C. § 78t(a); *Avaya*, 564 F.3d at 252.

To establish a violation of § 20(a), a plaintiff must prove that a third party under

the defendant's control violated the Exchange Act and that the defendant was a

"culpable participant" in the unlawful conduct.  *Belmont v. MB Inv. Partners, Inc.*,

708 F.3d 470, 484 (3d Cir. 2013).

## B.    Pleading Standards

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to plaintiffs.  *Umland v. Planco Financial*, 542 F.3d 59, 64 (3d Cir. 2008).  The court may consider only the allegations in the complaint and the documents incorporated into the complaint by reference and matters of which the court may take judicial notice.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

In general, to state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  And it must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Deciding whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679 (citation omitted).

10

Plaintiffs alleging a claim in securities fraud must also satisfy the heightened

pleading standards imposed by the Private Securities Litigation Reform Act

(PSLRA).  15 U.S.C. § 78u-4(b); *see also Avaya*, 564 F.3d at 252–53.  As the

Court explained in *Avaya*:

> The PSLRA provides two distinct pleading requirements,
> both of which must be met in order for a complaint to
> survive a motion to dismiss.  First, under 15 U.S.C. §
> 78u–4(b)(1), the complaint must "specify each allegedly
> misleading statement, why the statement was misleading,
> and, if an allegation is made on information and belief,
> all facts supporting that belief with particularity."
> Second, the complaint must, "with respect to each act or
> omission alleged to violate this chapter, state with
> particularity facts giving rise to a strong inference that
> the defendant acted with the required state of mind." 15
> U.S.C. § 78u–4(b)(2).
>
> Significantly, both provisions require facts to be pleaded
> "with particularity."  As we have explained, this
> particularity language echoes precisely Rule 9(b).
> Indeed, although the PSLRA replaced Rule 9(b) as the
> pleading standard governing private securities class
> actions, Rule 9(b)'s particularity requirement is
> comparable to and effectively subsumed by the
> requirements of § 78u–4(b)(1) of the PSLRA.  This
> standard requires plaintiffs to plead the who, what, when,
> where, and how: the first paragraph of any newspaper
> story.  Section 78u–4(b)(1) adds an additional
> requirement where "an allegation regarding a defendant's
> statement or omission is made on information and
> belief." 15 U.S.C. § 78u–4(b)(1).  In those circumstances,
> plaintiffs must also state with particularity all facts on
> which that belief is formed.  That is, when allegations are
> made on information and belief, the complaint must not
> only state the allegations with factual particularity, but
> must also describe the sources of information with

11

particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where, and how of the information those sources convey.

The PSLRA's requirement for pleading scienter, on the other hand, marks a sharp break with Rule 9(b).  Under § 78u–4(b)(2), a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b).  Instead, under the PSLRA's "exacting" pleading standard for scienter, any private securities complaint alleging that the defendant made a false or misleading statement must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

564 F.3d at 252–53 (cleaned up).

## III.   DISCUSSION

Defendants argue three independent grounds for dismissal of Plaintiff's § 10(b) claim: (1) Plaintiff failed to plead that Defendants made any actionable materially false or misleading statements or omissions, (2) Plaintiff failed to plead particularized facts supporting a strong inference of scienter, and (3) Plaintiff failed to plead that the alleged misrepresentations caused Chemours stockholders to suffer any loss.  D.I. 35 at 4.[2]  Defendants seek dismissal of the § 20(a) claim for failure to plead the underlying § 10(b) securities fraud.  D.I. 35 at 4.

---

[2] Defendants also argue without elaboration in a footnote in their briefing that "a number of the challenged statements were made before October 8, 2017, which is two years before this litigation commenced," and that "[a]ny claim based on disclosures [made] prior to that date" are barred by the statute of limitations.  D.I. 35 at 15 n.8.  And they argue in another footnote that "Chemours's forward-

## A.   Actionable False Statements and Omissions

Defendants argue that Plaintiff "has not pleaded that any of th[e] disclosures [made in Chemours's SEC filings] were false," D.I. 35 at 16, and that the alleged misstatements in the challenged SEC reports are "otherwise inactionable" because they are opinions, mere puffery, and protected by the PSLRA's safe harbor, D.I. 35 at 25–31.  Plaintiff counters that the Complaint "adequately alleges" five categories of actionable misrepresentations: (1) false statements about maximum remediation liabilities, D.I. 37 at 18–21; (2) false statements that certain liabilities and ranges of losses were not estimable, D.I. 37 at 22–23; (3) false statements that asserted liabilities would have no material impact on Chemours, D.I. 37 at 23–24; (4) false statements that "project[ed] a façade of financial strength through additional plain language assurances," D.I. 37 at 24; and (5) financial disclosures inconsistent with GAAP, D.I. 37 at 28–32.[3]

---

looking disclosures are also protected [from liability] under the 'bespeaks caution' doctrine." D.I. 35 at 29 n.15 (citation omitted).  These "passing reference[s] to an issue will not suffice to bring that issue before this court."  *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 202–03 (3d Cir. 2004) (internal quotation marks and citation omitted); *see also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.") (citation omitted)).

[3] Plaintiff initially argued that the Complaint also adequately alleged false statements about Chemours's discharges of the chemical GenX into the Cape Fear River, but it withdrew that contention at oral argument.  D.I. 51 at 81, ll. 2–13.

13

### 1.   Statements About Maximum Remediation Liabilities

According to Plaintiff:

> In each of Chemours'[s] annual and quarterly SEC filings during the Class Period, Defendants set forth Chemours'[s] maximum possible environmental remediation liability by asserting that the "potential liability may range up to" certain specific limits above the Company's GAAP accruals, but only "under adverse changes in circumstances," which they "deemed" highly unlikely, *i.e.*, "remote."

> Each of these statements was materially false and misleading when made.  The [Chancery Court Complaint] specifically itemized *$2.5 billion* of inherited liabilities as of the time of the spin-off.   Moreover, Defendants specifically informed the Court of Chancery that the $2.5 billion included "probable" losses and was a low figure that was "*nowhere near the maximum*."  By contrast, Defendants' Class Period representations of maximum "potential liability" specified only, on average, "up to" *$780 million* in total liability.  In other words, Defendants' maximum liability "up to" figures indisputably represented *less than one-third* of the conservative liability itemized in the [Chancery Court pleading].

D.I. 37 at 18–19 (emphases in the original; footnotes and citations omitted).

Plaintiff also alleges that a report and presentations shared with Defendants by nonparty Paul Kirsch (identified in the Complaint as "Confidential Witness 3") show that Defendants falsely represented in the challenged SEC reports Chemours's maximum liability figures.  D.I. 37 at 15; D.I. 30 ¶¶ 127–133.

Defendants' threshold argument appears to be that Chemours never disclosed maximum liabilities in the challenged SEC reports.  *See* D.I. 35 at 1–2,

14

17–19.  According to Defendants, the "maximum estimates" Chemours accused

DuPont in the Chancery Court Complaint of understating "were supposed to reflect

Chemours's maximum possible exposure going forward" as an independent

company in 2015 and "were not intended to comply with GAAP."  D.I. 35 at 1.

Defendants insist that "[m]aximium exposure is not an accounting concept" and

that GAAP does not require a company to disclose its best estimate of its

maximum liability.  D.I. 35 at 17.

Defendants are correct that "maximum exposure" is not a GAAP concept

and that companies are not required to disclose in their SEC reports estimates of

their maximum potential liabilities. (Indeed, in 2010, the FASB rejected a proposal

to require disclosure for loss contingencies of either "[t]he amount of the claim or

assessment" or "the entity's best estimate of the maximum exposure to loss"

because disclosure of "maximum exposure to loss" would be "too costly,"

"prejudicial," and misleading.  Proposed Accounting Standards Update:

Contingencies (Topic 450): Disclosure of Certain Loss Contingencies 40, Fin.

Standards Accounting Board (July 20, 2010),

https://asc.fasb.org/imageRoot/73/6954873.pdf; D.I. 42-9 at 40.)  But Defendants'

argument misses the point.  As Defendants concede in their briefing, Chemours

"disclosed more than it had to by providing, starting in February 2017, higher

clean-up costs that might result 'under adverse changes in circumstances, although

15

deemed remote.'" D.I. 35 at 24. And once Chemours chose to make that disclosure—even if not required by GAAP or otherwise—it had to speak truthfully. *See Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir. 1991) ("Under Rule 10b–5, . . . the lack of an independent duty [to disclose] does not excuse a material lie."); *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading.").

A reasonable investor could have plausibly inferred from the language Defendants used to "provide" in the challenged SEC reports Chemours's "higher clean-up costs" that Chemours was disclosing its maximum potential remediation liabilities. In each of the challenged SEC reports, Chemours stated in both the report's Notes to the Financial Statements and the report's section titled Management's Discussion and Analysis of Financial Condition and Results of Operation (MD&A) that "considerable uncertainty exists with respect to environmental remediation costs and, under adverse changes in circumstances, although deemed remote, the potential liability may range *up to* approximately [an identified excess sum] above [a specific disclosed amount accrued]." D.I. 43-3 at 20 (emphasis added). A plausible, indeed a reasonable, reading of this awkwardly phrased statement is that Defendants believed (1) that there was only a remote (i.e.,

16

slight) possibility that Chemours would incur its maximum potential liability, and
(2) that that maximum potential liability would not exceed (i.e., "may range up to")
the sum total of the identified excess sum plus the specific disclosed amount
accrued.  Thus, by this statement and the disclosure of the excess sums and the
amounts accrued, Defendants effectively represented in each of the challenged
SEC reports that they believed Chemours's maximum potential remediation
liabilities were capped at the sums of those two figures.  According to the
Complaint, those sums ranged from $763 million to $827 million, and averaged
$780 million.  D.I. 30 ¶ 113.

> ### a.   Whether Plaintiff Alleged False Maximum Liability Disclosures

The question then is whether Plaintiff has alleged in the Complaint facts
sufficient to plausibly imply that Defendants did not in fact believe that
Chemours's environmental remediation liabilities were capped at the sums
disclosed in the SEC reports.  Plaintiff says it has done so, and it points to its
allegation that Chemours "specifically itemized" in the Chancery Court Complaint
"$2.5 billion of inherited liabilities as of the time of the spin-off" and its
allegations concerning Kirsch's report and presentations.

> ### 1)   The Chancery Court Complaint

Chemours alleged in the Chancery Court Complaint that it faced damages
claims and judgments arising out of the liabilities it inherited from DuPont that

17

totaled approximately $2.5 billion. Plaintiff alleges that Defendants "admitted" in the Chancery Court Complaint that this $2.5 billion figure consisted of six liabilities: (1) $335 million incurred for a settlement of a multi-district litigation filed against DuPont in Ohio; (2) $111 million "for benzene liability"; (3) $194 million "for inherited PFAS liability"; (4) $200 million in remediation costs for the Fayetteville Works site in North Carolina; (5) $1.1 billion sought by a New Jersey municipality in a lawsuit to recover remediation costs for the Chambers Works site in New Jersey; and (6) $620 million in remediation costs for four New Jersey sites. D.I. 30 ¶ 111.

The first three liabilities are not alleged to be for environmental remediation and therefore a reasonable juror could not draw any inferences based on those liabilities about Defendants' knowledge of Chemours's maximum environmental remediation liabilities. There are no allegations in the Complaint that the "benzene liability" and "PFAS liability" were for environmental remediation costs. And Plaintiff alleges in the Complaint that the multi-district litigation that resulted in the $335 million settlement was for medical-based tort claims brought by 3,500 individuals exposed to PFOA. *See* D.I. 30 at ¶¶ 74, 111.

With respect to the fourth item, Plaintiff alleges that "Defendants admitted to, and specifically quantified [in the Chancery Court Complaint] . . . over $200 million for the remediation of Fayetteville Works site." D.I. 30 ¶ 111. But this

allegation mischaracterizes the Chancery Court Complaint.  Here is what

Chemours in fact alleged in the Chancery Court Complaint:

> In February 2019, after extensive negotiations with the
> State, Chemours entered a consent order with North
> Carolina to settle the State's claims on terms that were
> subject to public comment and approved as fair and
> appropriate by the Court.  Among other things, the
> consent order requires Chemours to adopt the very-same
> abatement technology that DuPont previously declined to
> install and to undertake extensive remediation regarding
> the cumulative effects of DuPont's long-running
> historical emissions.  The cost to Chemours will be in
> excess of $200 million . . . .

D.I. 42-1 ¶ 86.  Thus, Chemours admitted only that in February 2019—i.e., after all

but two of the challenged SEC reports were filed—it entered into a consent decree

that would at some point cause it to incur $200 million in costs and that some

unstated portion of those costs would be allocated for remediation efforts.  Since

Chemours did not allege in the Chancery Court Complaint how much of the $200

million was for remediation costs, it cannot be plausibly inferred from the

Chancery Court Complaint's allegation about the Fayetteville Works consent

decree that Defendants misrepresented in any SEC report its maximum potential

remediation liabilities.

The fifth and largest liability item discussed in the Chancery Court

Complaint concerns a lawsuit brought by Carneys Point, a New Jersey

municipality, to recover environmental remediation costs related to a former

DuPont site called Chambers Works. Plaintiff alleges that an "independent" expert
retained by Carneys Point had assessed the Chambers Works' remediation costs at
$1.1 billion. D.I. 30 ¶¶ 86–89. And it alleges that "Chemours effectively admitted
in the [Chancery Court] Complaint that the Carneys Point lawsuit was so
meritorious that [Chemours] was highly likely to actually incur the $1.1 billion
cost . . . ." D.I. 30 ¶ 86. Chemours, however, made no such admission. Rather,
Chemours alleged in the Chancery Court Complaint that Carneys Point "brought
suit against DuPont seeking over $1 billion to address alleged clean-up costs . . . ."
D.I. 42-1 ¶ 92. Neither that allegation nor the fact that an expert hired by
Chemours's litigation adversary assessed the Chambers Works site's remediation
costs at $1.1 billion implies in any way that Defendants believed that Chemours's
maximum potential remediation liabilities were $1.1 billion.

The last liability item discussed in the Chancery Court Complaint concerns
four New Jersey sites Chemours inherited from DuPont. According to Plaintiff,
Chemours alleged in the Chancery Court Complaint that when DuPont provided it
with a $620 million estimate for remediation costs for those sites, "it [was] evident
(again) that the 'maximum' potential liability [was] not what DuPont certified it
was." D.I. 30 ¶ 83 (alterations in original; underline removed). This is a fair
summary of Chemours's allegations in the Chancery Court Complaint; and a
reasonable juror could plausibly infer from those allegations that Chemours

believed at the time it filed the Chancery Court Complaint in May 2019 that its maximum potential remediation liabilities for the four New Jersey sites in question were more than $620 million.

Plaintiff also alleges that Chemours's counsel told the Chancery Court that Chemours had "been objecting to the interpretation of [DuPont's] estimated liability maximums [for the four sites] for four years," D.I. 30 ¶ 158 (emphasis removed)—i.e., since the spin-off was consummated in 2015. This alleged statement provides a plausible basis to infer that Defendants believed in 2018 that Chemours's maximum liabilities for the four New Jersey sites exceeded $620 million. Accordingly, the $620 million estimate bears on the environmental remediation liability maximums disclosed in the 2018 Form 10-K, filed on February 15, 2019, and the Q1 2019 Form 10-Q, filed May 3, 2019. D.I. 30 ¶¶ 235, 243. Every maximum liability sum disclosed in those reports, however, exceeds $620 million. D.I. 30 ¶ 113. It follows, then, that Chemours's allegations in the Chancery Court about DuPont's liability estimates for the four New Jersey sites are not by themselves sufficient to plausibly imply that Defendants falsely stated Chemours's maximum liabilities in the challenged SEC reports.

In summary, Chemours's allegations in the Chancery Court Complaint— individually and collectively—do not plausibly imply that Defendants made false

representations in the challenged SEC reports about Chemours's maximum
potential environmental remediation liabilities.

### 2)    Kirsch's Report and Presentations

Kirsch served as the President of Chemours's Fluoroproducts business from
June 2016 to October 2019.  According to the Complaint, Kirsch "conducted an
exhaustive evaluation of total environmental remediation costs (not taking into
account potential related litigation) that would be required to clean up problematic
sites Company-wide," and compiled a detailed report of his findings which he
presented "directly to [Vergnano and Newman] (and then the Chemours' board)
stating that the Company's current environmental remediation costs would be $2
billion."  D.I. 30 ¶ 129.  The Complaint alleges that Kirsch began his analysis in
"early 2018"; prepared the report "in the spring of 2018"—by which time
Vergnano and Newman "were fully aware of the very high $2 billion expenditure
[Kirsch] planned to recommend to the board"; and presented his findings to
Chemours's board in "August 2018."  D.I. 30 ¶¶ 130–31.  The Complaint further
alleges that "Vergnano categorized these costs as coming from the 'capital budget,'
and not environmental remediation accruals—meaning they would not have to be
disclosed as an environmental liability in the Company's public filings."  D.I. 30 ¶
132.

A rational juror could plausibly infer from these alleged facts that, beginning in the Spring of 2018, Defendants believed that Chemours's environmental remediation liabilities were approximately two billion dollars. That sum far exceeds the sum totals Chemours said its liabilities could range "up to" in each of the challenged SEC reports. D.I. 30 ¶ 113. Accordingly, Plaintiff has alleged false statements about liability maximums in the five challenged reports filed beginning in the Spring of 2018 (i.e., beginning with Chemours's Q1 2018 Form 10-Q filed on May 4, 2018). Kirsch's report and presentations, however, do not provide a factual basis from which to infer that Defendants knew that their statements about liability maximums in the challenged SEC reports filed before the Spring of 2018 were false.

Defendants contend that Plaintiff has misstated the purpose and findings of Kirsch's report and presentations. And they submitted in support of their motion a sworn declaration in which Kirsch states that his report and presentations "did not concern environmental remediation obligations" but instead "were part of a publicly disclosed Corporate Responsibility Commitment program through which Chemours hoped by 2030 to significantly reduce its environmental footprint and demonstrate its leadership on environmental issues within the chemical industry." D.I. 42-10 at 1–2. Although Kirsch's declaration would be relevant to a motion to strike pursuant to Rule 12(f), to impose sanctions pursuant to Rule 11, or for

summary judgment pursuant to Rule 56, the declaration presents matters outside the pleadings, and, therefore, I will not consider it in assessing the merits of the pending motion.  Assuming, as I must at this stage, that the allegations in the Complaint are true, the alleged contents of Kirsch's report and presentations plausibly imply that Defendants knew that their disclosures about the environmental liability maximums in the SEC reports filed after the Spring of 2018 were false.  (Indeed, Defendants admit as much in their briefing.  *See* D.I. 35 at 38 (noting that "the Complaint implies" that Kirsch's presentation and its reported contents constituted "an analysis of Chemours's environmental remediation costs in the GAAP sense.").)

### b. Whether The Alleged False Maximum Liability Disclosures are Inactionable Opinions or Fall Within the PSLRA's Safe Harbor

Defendants argue that "[e]ven if Plaintiff had identified any error in Chemours's environmental liability disclosures, they would nevertheless be inactionable because they were accurate statements of opinion."  D.I. 35 at 25. Statements of opinion, however, are "actionable under the securities laws if they are not honestly believed and lack a reasonable basis."  *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (citation omitted).  And for the reasons just noted, Plaintiff has alleged facts that plausibly imply that Defendants did not believe that the maximum remediation liability disclosures in the five

challenged SEC reports filed beginning in the Spring of 2018 were true.

Accordingly, those disclosures do not constitute inactionable opinions.

Defendants also argue that the challenged maximum liability statements are

not actionable because they are forward-looking and were accompanied by

meaningful cautionary statements and, therefore, are protected from suit by the

PSLRA's so-called "safe harbor" codified at 15 U.S.C. § 78u–5(c)(1).  But § 78u–

5(b)(2)(A) of the PSLRA provides that, with exceptions not applicable here, the

safe harbor "shall not apply to a forward-looking statement that is included in a

financial statement prepared in accordance with generally accepted accounting

principles."  The maximum remediation disclosures at issue here were included in

the challenged SEC reports' notes to financial statements, all of which were

prepared in accordance with GAAP.  D.I. 43-6 at 24; Chemours, Quarterly Report

(Form 10-Q), at 30 (Aug. 3, 2018); Chemours, Quarterly Report (Form 10-Q), at

30 (Nov. 2, 2018); D.I. 43-10 at F-46; D.I. 43-13 at 25.  Consistent with SEC filing

norms, the challenged SEC reports repeatedly refer to the notes in question as

"notes *to* the financial statements."  But the notes are undoubtedly part of the

financial statements.  *See* Disclosure Update and Simplification, 81 Fed. Reg.

51,608, 51,623-26 (Aug. 4, 2016) (repeating seven times that "disclosures in the

notes to the financial statements . . . are not subject to safe harbor protections under

the PSLRA"); Statement of Financial Accounting Concepts No. 8: Conceptual

Framework for Financial Reporting, at 1–2, Fin. Accounting Standards Bd. (Dec. 2021), https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176179245223 (discussing importance of notes to financial statements); *cf. United States v. Denedo*, 556 U.S. 904, 921 (2009) (Roberts, C.J.) (concurring) (noting that "footnotes are part of an opinion").  Indeed, Defendants themselves expressly stated in the two most recent challenged SEC reports that the "notes are an integral part of [Chemours's] . . . financial statements."  D.I. 43-10 at F-10; D.I. 43-13 at 7. Accordingly, the disclosures set forth in the notes to the financial statements are excluded from safe-harbor protection under § 78u–5(b)(2)(A).

Finally, Defendants argue that § 78u–5(b)(2)(A)'s "exclusion should not apply here because the remediation disclosures were also made, nearly verbatim, in the Management's Discussion and Analysis ('MD&A') section" of the challenged SEC reports.  D.I. 56 at 2.  Defendants cite no case law to support this proposition, and I can understand why.  Were courts to adopt this line of reasoning, parties could avoid § 78u–5(b)(2)(A)'s exclusion simply by repeating the entirety of their financial statements in the MD&A sections of their SEC reports.  That would render § 78u–5(b)(2)(A) nugatory.

In sum, Defendants' alleged false disclosures about environmental liability maximums in the challenged SEC reports filed after the Spring of 2018 are neither inactionable opinion nor immunized from suit under the PSLRA's safe harbor.

### 2.      Statements About The Estimableness of Certain Liabilities

Plaintiff alleges in 12 paragraphs of the Complaint that Defendants falsely stated in the challenged SEC reports that "a range of losses" for Chemours's benzene-related liabilities "cannot be reasonably estimated at this time."  D.I. 30 ¶¶ 108, 172, 173, 182, 192, 198, 209, 215, 222, 229, 240, 248.  Plaintiff argues that a juror could plausibly infer that Defendants knew these statements were false from Chemours's "admi[ssion] [in the Chancery Court Complaint] that DuPont had given it a detailed 'comprehensive study' specifically quantifying its inherited benzene litigation as amounting to no less than $111 million . . . ."  D.I. 30 ¶ 104. The problem with this argument is that Chemours alleged in the Chancery Court Complaint that the DuPont study had estimated that *the maximum potential* benzene liabilities were at least $111 million.  D.I. 30 ¶ 106.  As Plaintiff acknowledges in the Complaint, GAAP requires disclosure only of *probable* and *reasonably possible* liabilities.  *See* D.I. 30 ¶¶ 257, 259–60.  The fact that Chemours was aware of or even agreed with DuPont's estimate of the maximum possible benzene liabilities does not imply that Chemours could reasonably

estimate a range of the probable or reasonably possible losses it could incur from its inherited benzene liabilities.

I also agree with Defendants that their statements about the estimableness of the benzene-related losses are inactionable opinions.  D.I. 35 at 25.  Defendants' possession or adoption of DuPont's *maximum* liability estimate does not support Plaintiffs' conclusory allegation that Defendants did not honestly believe they were incapable of estimating a *likely* range of benzene liabilities.

Plaintiff also alleges in paragraph 250 of the Complaint that Chemours "false[ly] and misleading[ly]" stated in its Q1 2019 Form 10-Q that its "liabilities relating" to "several lawsuits filed by the NJ DEP in March 2019" were "not estimable."  D.I. 30 ¶ 250.  According to the Complaint, Defendants "admitted" in the Chancery Court Complaint that "Chemours was aware of estimates by DuPont that its environmental liabilities in New Jersey would be approximately $620 million" and that "New Jersey's lawsuits threatened [Chemours] with 'staggeringly expensive' costs well into the 'hundreds of millions of dollars.'"  D.I. 30 ¶ 250.

But here is what Chemours actually "admitted" in the Chancery Court Complaint with respect to ongoing lawsuits in New Jersey:

> Recently, the State of New Jersey has instituted litigation concerning environmental liabilities arising from DuPont's historical activities there.  In March 2019, New Jersey filed several lawsuits against DuPont and Chemours, warning that the costs of compensating the State for DuPont's legacy environmental liabilities across

> multiple sites in the State could be "staggeringly
> expensive," and seeking compensatory and punitive
> damages.  At the time of the spin-off, DuPont certified
> that the "maximum" Chemours could have to pay for
> total New Jersey environmental liabilities was $337
> million, divided among different sites in the State.  In
> 2018, in connection with the DowDuPont spin-off,
> DuPont revised its liability estimate upward to
> approximately $620 million.  But New Jersey criticized
> even DuPont's upward-revised estimates, claiming it
> "implausible" that these amounts could represent "good-
> faith estimates of [DuPont's historical New Jersey]
> environmental obligations and liabilities."  Although
> Chemours is defending against New Jersey's claims and
> the matters are in their early stages, it is evident (again)
> that the "maximum" potential liability is not what
> DuPont certified it was.

D.I. 42-1 ¶ 88.  None of these assertions plausibly imply that Chemours falsely

stated in its first quarter 10-Q for 2019 that its liabilities relating to the lawsuits

filed by New Jersey were not estimable.  A reasonable investor would not infer

from New Jersey's "warn[ings]" to DuPont and Chemours about their potential

liabilities in those suits that Chemours could estimate those liabilities; nor would a

reasonable investor infer from Chemours's assertion that DuPont had understated

the "maximum potential liability" for those suits that Chemours was in a position

to estimate the actual outcome of and liabilities associated with the lawsuits.

I also agree with Defendants that these "environmental liability disclosures"

are inactionable statements of opinion.  D.I. 35 at 25.  The fact that Defendants

knew of or even adopted DuPont's *maximum* liability estimates provides no

plausible basis on which to assert that Chemours did not honestly believe that it

lacked sufficient information to adequately estimate its *likely* New Jersey liabilities

or that such an assertion lacked a reasonable basis.

Accordingly, to the extent Plaintiff's claims are based on allegations that

Defendants were not able to estimate Chemours's liabilities, I will dismiss them.

### 3.    Statements That Certain Liabilities Had No Impact

According to Plaintiff, the Complaint alleges that Defendants falsely stated

in each of the ten challenged SEC reports "that '[m]anagement does not believe

that any loss, in excess of amounts accrued, related to remediation activities in any

individual site will have a material impact on [Chemours's] financial position.'"

D.I. 37 at 23 (citing D.I. 30 ¶¶ 169, 179, 189, 195, 206, 212, 219, 224, 235, 243)

(first alteration in the original).  Plaintiff argues that allegations in the Complaint

about Chemours's potential financial exposure for remediation costs and litigation

liability provide "details" of how "these statements were materially false and

misleading when made." D.I. 37 at 23.  For example, Plaintiff alleges that, "[i]n

the [Chancery Court] Complaint, Defendants admitted that they were

unequivocally told by DuPont prior to the Class Period that remediation costs for

Chemours'[s] New Jersey sites alone would be $337 million, and during the Class

Period, $620 million—highly material amounts that constituted 34% and 62%,

respectively, of the Company's annual net income." D.I. 30 ¶ 171 (emphasis removed).

This argument is based on truncated and misleading quoting from the Complaint (and the SEC reports). The Complaint in fact alleges that Defendants falsely stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities in any individual site will have a material impact on [Chemours's] financial position, results of operations or cash flows *at any given year, as such obligation can be satisfied or settled over many years*." D.I. 30 ¶ 169–70 (underline in the original) (italics added) (first alteration in original); *see also* D.I. 30 ¶¶ 179–80, 189–90, 195–96, 206–07, 212–13, 219–20, 224–25, 235–36, 243–44. Thus, in the New Jersey example above, the $337 or $620 million were total values for liability, not liabilities Chemours would need to incur "at any given year . . . ." As Plaintiff identifies no factual allegations in the Complaint from which it could be plausibly inferred that this statement was false, I will dismiss Plaintiffs' claims to the extent they are based on this statement.

Defendants also assert—and I agree—that these accounting judgments are inactionable opinions. D.I. 35 at 25-26. The statements about the materiality of the impact of any individual site were included in GAAP filings and clearly reflect an accounting judgment. They are therefore opinions. *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017)

31

("GAAP standards are often subjective. They involve a range of possible treatments instead of a single objective set of calculations."), aff'd sub nom. *Hertz Glob. Holdings*, 905 F.3d 106. Plaintiff's factual allegations provide no plausible basis for alleging that Defendants' statements were not "honestly believed" or that they lacked a "reasonable basis" because knowing maximum potential *total* liabilities provides no basis for estimating *likely* liabilities in any particular year. The accounting judgments' status as an inactionable opinion provides another, independent ground to dismiss Plaintiffs' claims to the extent they are based on those judgments.

The Complaint also alleges that, in Chemours's 10-Qs filed in November 2018 and May 2019 and its 10-K for 2018 filed in February 2019, Defendants falsely stated that "while management believes it is reasonably possible that Chemours could incur losses in excess of amounts accrued, if any, for" PFOA and PFAS litigation for which Chemours was obligated to indemnify DuPont, "it does not believe any such loss would have a material impact on the Company's consolidated financial position, results of operation, or cash flows." D.I. 30 ¶¶ 227–28, 238–39, 246–47 (underline in one of the originals). Plaintiff argues that the Complaint plausibly implies that these statements were false because it alleges that

> [a]lthough in its public filings Chemours had never accrued more than $101 million in remediation costs for

> four highly polluted New Jersey sites, the [Chancery
> Court Complaint] admitted that DuPont told Defendants
> before the Class Period that the maximum remediation
> costs for these sites could be *$337 million*; Chemours
> was informed during the Class Period that these costs
> would be $620 million—an amount which the [Chancery
> Court Complaint] noted was "implausibly" low; and an
> expert using Chemours'[s] own documents estimated the
> liability at *$1.1 billion* for just *one* of those sites.

D.I. 37 (citing D.I. 30 ¶¶ 81–89, 111–112) (emphases in original).

But none of these allegations plausibly imply that Chemours believed any

loss for PFOA and PFAS litigation liabilities beyond any accrued loss would have

a material impact on the Chemours's consolidated financial position, results of

operation, or cash flows; and, thus, none of these allegations plausibly imply that

Defendants made false statements in Chemours's 10-Qs filed in November 2018

and May 2019 or its 10-K for 2018 filed in February 2019. First, Chemours did

not "admit" in the Chancery Court Complaint that DuPont (or anyone else)

informed it that remediation costs for the New Jersey sites "would be" $620

million. Rather, the Chancery Court Complaint alleges that DuPont revised the

initial maximum liability estimate of $337 million it provided before the spin-off

upwards to $620 million in 2018. D.I. 42-1 ¶ 88. In other words, DuPont told

Chemours that, in DuPont's estimation, remediation liability *could be* up to $620

million. "Would be" and "could be" are of course two completely different things.

DuPont's estimates of potential maximum liabilities, alone, have no bearing on

whether Chemours believed the liability would affect its financial position.
Second, saying the Chancery Court Complaint "noted" that $620 million was an
"implausibly low" amount is misleading.  The Chancery Complaint expressly
states that *New Jersey*—i.e., the plaintiff that sued Chemours and DuPont—
claimed that $337 million and $620 million were "implausible."  Third, as the
Complaint itself acknowledges, the alleged expert who estimated the liability of
one of the New Jersey sites at $1.1 billion was employed by the New Jersey
municipality that filed the suit against DuPont and Chemours.

    The challenged statements concerning materiality are also opinions, and
Plaintiff has not plausibly alleged that Defendants did not honestly believe them or
lacked a reasonable basis to assert them.  As discussed above, Defendants'
knowledge of Chemours's maximum possible liabilities does not demonstrate that
they knew of or could estimate its likely liabilities.

    Accordingly, I will dismiss Plaintiff's claims to the extent that they are
based on allegations that Defendants falsely stated that any loss for PFOA and
PFAS litigation liabilities, beyond any accrued loss, would have no material impact
on Chemours's consolidated financial position, results of operation, or cash flows.

### 4.    Statements about "Financial Strength"

    Plaintiff argues that the Complaint alleges that Defendants made numerous
false statements "to project a façade of financial strength through additional plain

language assurances to investors." D.I. 37 at 24. They point, for example, to

allegations that Defendants falsely and "repeatedly promoted a 'strong,' 'solid' and

'de-risked' balance sheet . . . and touted a complete 'transformation' along with a

higher credit profile." D.I. 37 at 24 (citations omitted); *see also* D.I. 30 ¶¶ 165,

168, 193, 201, 203, 205, 207, 218, 230, 231–32, 233–34, 236 (making similar

allegations). But these general statements of optimism are pure puffery and "too

vague to be actionable." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir.

2010) (internal quotations and citations omitted). They are also immaterial, as no

reasonable investor would rely upon such platitudes or "consider [them] important

in deciding how to [act]." *Aetna*, 617 F.3d at 283 (second alteration in original)

(internal quotations and citations omitted).

Plaintiff also cites allegations in the Complaint that Defendants falsely

"claimed to have achieved their 'key target' of dramatically lowering

Chemours'[s] 'net leverage ratio,'" D.I. 37 at 24, that Vergnano falsely stated in

public that "Chemours had been in '[n]o way' 'set up to fail,'" D.I. 37 at 25

(alterations in the original); and that Vergnano falsely stated during a television

interview in March 2017 that "Chemours'[s] [PFOA] liability was 'behind us,'"

D.I. 37 at 24.[4] But Plaintiff's allegations that these statements are false turn on

---

[4] Plaintiff argues in its brief that Vergnano stated that Chemours's "PFAS
liabilities" were "behind us," D.I. 37 at 25, but the Complaint alleges that

its allegation that Chemours admitted in the Chancery Court Complaint that it was insolvent at the time of its formation. *See* D.I. 30 ¶ 180 (alleging that "the Company had not 'reached our goal' of reducing its net leverage ratio to below 3x because of its 'transformation plan,' nor had it achieved 'balance sheet flexibility.' Rather, as Defendants have now admitted in the [Chancery Court] Complaint, Chemours'[s] environmental remediation and litigation liabilities were so massive, amounting to <u>over $2.46 billion</u>, that they far outweighed the Company's net assets and rendered it <u>insolvent</u> as a matter of law from the time of the spin-off and throughout the Class Period." (underlines in original)); D.I. 30 ¶ 232 (alleging that "Vergnano's staunch denial that 'no way' had Chemours been 'set up to fail' is directly contradicted by Chemours'[s] admission in the [Chancery Court] Complaint that Chemours was indeed set up to fail . . . [because] DuPont had rendered Chemours insolvent in violation of Delaware law"); D.I. 30 ¶ 176 (alleging, "in direct contrast to Vergnano's repeated statements, that the Company's environmental liabilities were not 'behind us,' . . . . [because] Defendants admitted in the [Chancery Court] Complaint that the Company's environmental remediation and litigation liabilities amount to over <u>$2.46 billion,</u> a staggering amount that rendered the Company insolvent

---

Vergnano stated that Chemours's PFOA liabilities were "behind us," D.I. 30 ¶¶ 77, 174–76.

as a matter of law from the time of the spin-off through the Class Period"
(underline in the original)).  Chemours, however, did not admit in the Chancery
Court Complaint that it was or had been insolvent.  Rather, it alleged that if
DuPont's certified maximum liabilities did not cap Chemours's indemnification
and contribution obligations, then Chemours would have been insolvent at the
time of its spin-off.  D.I. 42-1 ¶¶ 10, 107, 123.  And, since the spin-off could
have occurred under Delaware law only if Chemours had not been insolvent,
Chemours sought a declaration from the Court of Chancery that DuPont was
bound by the certified maximums and not entitled to indemnification or
contribution from Chemours beyond those maximums.  D.I. 42-1 ¶¶ 102–10.

Plaintiff alleges that Vergnano's statement that Chemours's PFOA liability
was "behind us" "was false for the additional reason that, as Defendants well
knew, the Ohio MDL settlement resolved only a fraction of the Company's
massive environmental liabilities."  D.I. 30 ¶ 176.  But this allegation about the
Ohio MDL settlement does not plausibly imply a false statement for two reasons.
First, the settlement in question allegedly covered only 3,500 out of 70,000
potential cases.  D.I. 30 ¶ 77, 176.  Plaintiff does not, however, allege any facts that
claims from individuals beyond those 3,500 were probable as of March 2017,
when Vergnano made the challenged statement.  Quite the contrary, the Complaint
alleges that the Ohio MDL included only 3,500 individuals because a "Science

37

Panel" determined in 2012 that "there were 'probable links' between PFOA exposure and six serious diseases," and only "3,500 individuals c[a]m[e] forward as having been diagnosed with one of the six diseases due to PFOA exposure from Washington Works . . . ." D.I. 30 ¶ 36.  Thus, by the Plaintiffs' own telling, the 3,500 individuals who came forward were the 3,500 individuals to whom Chemours likely had liabilities.

Second, Plaintiff alleges that "personal injury cases arising from PFOA exposure at Washington Works [(a site Chemours inherited from DuPont)] increased tenfold from the third quarter of 2017 to the third quarter of 2018" with some of the cases seeking high damages amounts due to "the same type of PFOA exposure as in the Ohio MDL litigation . . . ." D.I. 30 ¶ 78, 282.  But Vergnano made his "behind us" statement in March 2017—i.e., before the third quarter of 2017.  Thus, Plaintiff has failed to demonstrate that a reasonable investor would plausibly have understood Vergnano's statement to be false at the time he spoke.

Vergnano's "behind us" statement is inactionable for two additional reasons.  First, it is too vague for a reasonable investor to rely on and is therefore immaterial.  Second, whether a liability is "behind" an organization is a subjective judgment made based on particular facts and circumstances, and, since the Complaint alleges no facts to infer that Defendants knew or should have known at

38

the time Vergnano made the "behind us" statements that the statements were false, Vergnano's judgment is an inactionable statement of opinion.

For these reasons, to the extent Plaintiff's claims are based on Defendants' statements about Chemours's financial strength, I will dismiss them.

### 5.    Financial Disclosures Inconsistent with GAAP

It is undisputed that GAAP requires accrual of a contingent loss if the loss is deemed "probable" and "reasonably estimable" and that GAAP requires disclosure of a "reasonably possible" contingent loss. D.I. 37 at 28; D.I. 35 at 7. Plaintiff alleges in broad terms that Defendants' accruals and disclosures with respect to "aggregate environmental remediation and litigation," the Chambers Works site, and Chemours's PFOA-related litigation violated these requirements. D.I. 37 at 28. In Plaintiff's words: "[A]ll record evidence indicates Defendants' accruals and related disclosures were grossly inadequate." D.I. 37 at 29. The "evidence" Plaintiff points to in support of this assertion consists only of Chemours's allegations in the Chancery Court Complaint that it inherited from DuPont maximum potential liabilities of $2.5 billion in the aggregate and $620 million for four New Jersey sites and that an expert retained by Chemours's adversary in the Carneys Point litigation opined that the remediation liability for the Chambers Works site was $1.1 billion. *See* D.I. 37 at 29–32. A rational juror, however, could not plausibly infer from these allegations that Chemours's contingent losses

for its aggregate environmental remediation and litigation, Chambers Works, and
PFOA-related litigation were probable, reasonably possible, or reasonably
estimable.

Plaintiff also argues that the challenged SEC reports' accruals for losses
related to the Fayetteville Works site violated GAAP.  D.I. 30 ¶¶ 102, 273–275.[5]
According to Plaintiff:

> Defendants knew from the start of the Class Period that
> Chemours'[s] probable and estimable remediation
> expenses would be far more substantial than the
> Company represented.  As the [Chancery Court]
> Complaint alleges, DuPont spent just $2.3 million
> remediating at the Fayetteville Works site prior to the
> spin-off, despite a Blue Ribbon Panel concluding that
> $60 million in required costs were required to end the
> subject discharges.  See ¶¶90-92.  Even after Chemours
> signed a consent order with the State of North Carolina in
> February 2019, pursuant to which Chemours was
> admittedly required to spend "at least $200 million" in
> remediation costs, Defendants failed to report this cost in
> the Company's financial statements.  It was not until
> Chemours'[s] Q4 2019 Form 10-Q, filed after the Class
> Period, that Chemours belatedly recognized a
> Fayetteville Works remediation accrual of $201 million
> . . . .

---

[5] Plaintiff argues in its brief that "Defendants never even disclosed, let alone
accrued, the $200 million [for Fayetteville Works remediation] through the Class
Period end."  D.I. 37 at 29 (citing D.I. 30 ¶ 275).  But the Complaint does not
allege a failure to disclose.  Plaintiff alleges in paragraph 275 of the Complaint that
"Chemours did not disclose any specific accrual until the Q3 2018 Form 10-Q,"
but failure to "disclose" an "accrual" alleges a failure to accrue, not a failure to
disclose.

D.I. 30 ¶ 275.

That Defendants were aware that the cost of implementing measures to prevent future discharges into the Cape Fear River would be $60 million, D.I. 30 ¶ 93, provides no evidence that Chemours had a probable liability, much less that any loss was reasonably estimable.  Plaintiff alleges that Vergnano knew of the Blue Ribbon Panel's recommendation before the Class Period, D.I. 30 ¶ 95; that a DuPont executive testified that Defendants knew "[some]thing" about the Fayetteville liabilities before 2015, D.I. 30 ¶ 96; that Chemours argued in a June 15, 2017 meeting with North Carolina's Department of Environmental Quality that Chemours's emissions were permissible and that it had attempted to abate such emissions, D.I. 30 ¶¶ 98–100; and that Confidential Witness 1 said Defendants failed to follow the Blue Ribbon Panel's recommendation because Chemours was myopically focused on short-term profit, D.I. 30 ¶ 101.  These alleged facts, however, do not plausibly imply that Defendants knew it was probable that Chemours would face liabilities arising from the Fayetteville Works site or that Chemours could reasonably estimate what those liabilities were.

Defendants admitted in the Chancery Court Complaint that the consent decree required "among other things" that Chemours "adopt . . . abatement technology that DuPont previously declined to install and to undertake extensive remediation regarding the cumulative effects of DuPont's long-running historical

emissions." D.I. 42-1 ¶ 86. They further admitted that the cost to implement the

consent decree "*will be* in excess of $200 million." D.I. 42-1 ¶ 86 (emphasis

added). But it does not follow from these admissions that Chemours should have

accrued $200 million in the first quarter of 2019. Under GAAP, the requirement

that a loss must be probable to be accrued "is intended to proscribe accrual of

losses that relate to future periods." Accounting Standards Codification § 450-20-

25-3, Fin. Standards Accounting Board (Accessed Feb. 24, 2022),

https://asc.fasb.org/section&trid=2127173; D.I. 42-3 at 18. Chemours's belief in

the first quarter of 2019 that the total cost to implement all the consent decree's

requirements over time would eventually exceed $200 million did not mean that

Chemours had to accrue $200 million in the first quarter of 2019. Chemours in

fact accrued $83 million for the consent decree in its Q1 2019 Form 10-Q, $58

million of which was accrued as litigation costs. D.I. 43-13 at 24.[6] Plaintiff points

to no alleged facts that plausibly imply that Defendants did not honestly believe

that this accrual (which is an opinion) was adequate or that it lacked a reasonable

basis. (In its 2019 Form 10-K, Chemours accrued "$201 million [] for costs of the

proposed Consent Order" associated with "remediation" and "toxicology studies."

D.I. 43-18 at 50.)

---

[6] Chemours's 2018 10-K, dated February 15, 2019, disclosed a "proposed Consent
Order" with North Carolina for which it "accrued" $75 million. D.I. 43-10 at 34.

Thus, to the extent any allegations in the Complaint are based upon financial accruals and disclosures inconsistent with GAAP, I will dismiss them.

* * * *

In summary, Plaintiff has alleged that Defendants falsely stated in Chemours's Q1, Q2, and Q3 2018 Form 10-Qs, 2018 Form 10-K, and Q1 2019 Form 10-Q that Chemours's liabilities would only be "up to" between $763 and $780 million.  D.I. 30 ¶¶ 113, 213, 220, 225, 236, 244.  The Complaint's allegations about the content and sharing of Kirsch's report and presentations—all of which I must assume to be true—plausibly imply that Defendants knew at the time these five SEC reports were filed that Chemours's remediation liabilities exceeded $2 billion and that, therefore, Defendants' disclosures about maximum remediation liabilities were false.  D.I. 30 ¶¶ 127–33.  The safe harbor does not protect Defendants' false statements because, even if Defendants provided adequate cautionary language, Defendants' statements were included in financial statements prepared in accordance with GAAP.  15 U.S.C. § 78u–5(b)(2)(A); D.I. 43-6 at 24; Chemours, Quarterly Report (Form 10-Q), at 30 (Aug. 3, 2018); Chemours, Quarterly Report (Form 10-Q), at 30 (Nov. 2, 2018); D.I. 43-10 at F-46; D.I. 43-13 at 25.  To the extent Plaintiff's claims are based on any other alleged false statements, I will dismiss them.  Thus, I evaluate scienter and loss causation

only with respect to Defendants' alleged false statements about maximum remediation liabilities.

**B.    Scienter**

In order to plead a securities fraud claim, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).  To plead that required state of mind—i.e., scienter—the plaintiff must allege facts from which it can be plausibly inferred that the defendant acted with an "intent to deceive, manipulate, or defraud" with "a knowing or reckless state of mind."  *Avaya*, 564 F.3d at 252. The "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

The alleged facts here make reckless or conscious fraud on the part of the Defendants as plausible as any opposing inference.  Plaintiff alleges that Defendants were aware in the Spring of 2018 that Kirsch's report and presentations estimated environmental remediation liabilities of $2 billion but represented in five contemporaneous SEC reports that Chemours's potential exposure for environmental remediation would only be "up to" $763 to $780 million.  D.I. 30 ¶ 113; *see, e.g.*, D.I. 43-10 at F-46.  Thus, accepting as true the allegations in the Complaint, on five occasions Defendants knowingly made false statements about

44

Chemours's maximum remediation liabilities.  Those statements, when considered

in light of Defendants' awareness of the Kirsch report and presentations, were

conscious acts of fraud sufficient to show scienter.  *See Alaska Electrical Pension

Fund v. Pharmacia Corp.*, 554 F.3d 342, 351–52 (3d Cir. 2009) (citing *Tellabs*,

551 U.S. at 313) (finding that a pharmaceutical company's alleged "bad faith

misrepresentation of scientific data" was sufficient to show scienter); *see also In re

Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *8 (D. Del. Feb. 7,

2020) (noting that "[c]ourts regularly draw an inference of scienter where

'Defendants had access to internal forecasts and the company's financial data'

indicating" the falsity of the company's disclosures).

The question, then is whether there is more plausible, nonculpable

explanation for Defendants' statements.  *Tellabs*, 551 U.S. at 314; *Hertz Glob.

Holdings*, 905 F.3d at 115 (upholding the district court's consideration of

inferences favorable to the defendant when evaluating nonculpable alternatives).

And here, again, relying on Kirsch's declaration, Defendants argue that Kirsch's

report and presentations concerned general corporate responsibility commitments

to "achieve a range of goals that far exceed[ed] regulatory requirements," rather

than environmental remediation liabilities.  D.I. 35 at 38.  But, as the Supreme

Court held in *Tellabs*, the test is whether "a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference

45

one could draw *from the facts alleged*." 551 U.S. at 324 (emphasis added). Thus, I must rely only on the factual allegations in the Complaint and may not consider the Kirsch declaration.

Defendants argue that their nonculpable explanation for Defendants' false statements about maximum remediation liabilities can be inferred from the following allegations in the Complaint: Kirsch began his investigation after Chemours "realized by doing the bare minimum it had exposed itself to significant liabilities[,]" D.I. 30 ¶ 129; Kirsch was evaluating "how much it would cost to 'plug all the holes' at each Chemours worksite and remediate the damage already done to the environment[,]" D.I. 30 ¶ 130; and Vergnano "categorized these costs as coming from the 'capital budget,'" D.I. 30 ¶ 132. But even if these facts plausibly imply that Kirsch was examining the cost of capital investments required to remediate environmental damage that Chemours was not under a present obligation to remediate, that inference is not more plausible or cogent than Plaintiff's allegation that Kirsch prepared and shared with Defendants "a detailed report tallying [Chemours's] remediation liabilities[,]" D.I. 30 ¶ 130, and that Defendants' false statements were made consciously and to deceive investors. Accordingly, Plaintiff has sufficiently pleaded scienter with regard to the maximum environmental remediation liabilities stated in the five most recent challenged SEC reports.

46

### C.    Loss Causation

Under the PSLRA, the plaintiff has "the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).  "The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007).  In cases such as this one, where the plaintiff alleges that a defendant's misrepresentation caused it losses in the form of reduced value of its stock, the plaintiff "must show that the revelation of that misrepresentation . . . was a substantial factor in causing a decline in the security's price . . . ." *Id.* at 425–26.  Plaintiff argues that the Complaint in this action meets this showing because it identifies three "corrective disclosures" "that each indisputably concerned the same subject matter as Defendants' false statements and caused immediate stock sell-offs and investor losses." D.I. 37 at 49.

The first corrective disclosure alleged in the Complaint is a presentation made by a hedge fund CEO at an investment conference on Monday, May 6, 2019. According to the Complaint, the CEO gave a "detailed presentation" during which he revealed previously undisclosed information" that showed that "Chemours faced '$4 to $6 billion' in environmental liabilities."  D.I. 30 ¶¶ 136–137 (underline omitted).  The Complaint alleges that "[o]n this news, Chemours'[s]

47

stock price plummeted over two trading days from $34.18 per share on Friday,

May 3, 2019 to $29.09 per share on Tuesday, May 7, 2019–a decline of nearly

15% that wiped out over $830 million in [Chemours's] market capitalization." D.I.

30 ¶ 138.

Defendants contend that the CEO's presentation "cannot be probative of loss

causation" because it did not "impart[ ] any 'new information' related to the

alleged fraud" and because "the purported share price 'reaction' to the presentation

had started days earlier, after a disappointing earnings release." D.I. 35 at 41.  But

both contentions are easily dismissed.  First, the Complaint expressly alleges that

the presentation revealed "previously undisclosed information" that showed that

Chemours environmental liabilities exceeded $4 billion, and I must accept this

allegation as true for purposes of deciding the pending motion.  Second, even if it

were the case that Chemours's stock price decreased days before the CEO's

presentation, the Complaint alleges that the stock price fell significantly and

immediately after the presentation.  That allegation allows for a plausible inference

that the presentation precipitated the 15% drop in the stock price; and whether the

unidentified "disappointing earnings release" contributed to that drop or was the

real cause for the drop is a matter for the jury to decide.  Thus, Plaintiff has

adequately alleged loss causation based on the alleged May 6, 2019, corrective disclosure.[7]

The same cannot be said with respect to the second and third alleged corrective disclosures. The Complaint identifies the unsealing of the Chancery Court Complaint as the second corrective disclosure. The Complaint alleges that the Chancery Court Complaint contained previously undisclosed information about Chemours's environmental liabilities that contradicted Chemours's prior misrepresentations, and it alleges that the unsealing of the Chancery Court Complaint on June 28, 2019, resulted in another 15% decline in the price of Chemours's stock. D.I. 30 ¶¶ 141–142, 145, 288. But as discussed above, the allegations in the Chancery Court Complaint do not plausibly imply that Defendants made any false representations. Accordingly, the public disclosure of the Chancery Court Complaint could not establish that Plaintiff suffered losses caused by Defendants' alleged false representations.

---

[7] The parties dispute the standard I should apply to determine whether the Complaint adequately pleads loss causation. Defendants argue that I should "follow the weight of authority" and apply the heightened requirements of Rule 9(b). D.I. 38 at 16 n.9. Plaintiff argues that "Rule 8(a) applies to loss causation." D.I. 37 at 48. The Third Circuit has not resolved this question, and I need not decide it here because the Complaint identifies the "who, what, when, where, and how" of the corrective disclosure and plausibly links it and Defendants' alleged misrepresentations with a significant drop in Chemours's stock price. It therefore provides sufficient detail of alleged loss causation to satisfy Rule 9(b).

Plaintiff identifies as the third corrective disclosure public statements by Chemours on August 1, 2019, that "disappointing financial results and increased liabilities," D.I. 30 ¶ 289, caused Chemours to "dramatically reduc[e] its full-year free cash flow outlook from prior guidance of over $550 million to only $100 million—indicating that, rather than a 'strong,' 'solid,' or 'flexible' balance sheet with ample room to deal with future liabilities, in reality [Chemours] had virtually no liquidity cushion to speak of," D.I. 30 ¶ 148.  This disclosure, however, says nothing about Chemours's maximum environmental remediation liabilities, and therefore, it can't be said to "correct" or reveal the falsity of Defendants' alleged misrepresentations about those liabilities.  Accordingly, it can't serve as evidence that the alleged false representations about environmental remediation liabilities caused Plaintiff to suffer losses.

### D.   Section 20(a)

Because I find that Plaintiff has adequately pleaded its claim for the underlying § 10(b) securities fraud, I also find that it has adequately pleaded its claims against Vergnano and Newman for violations of § 20(a) of the Exchange Act.  Plaintiff alleges that Vergnano is Chemours's President and CEO and that Newman is Chemours's Senior Vice President and COO and was previously its CFO.  D.I. 30 ¶¶ 20, 22.  Plaintiff alleges that both men "reviewed, approved, signed and certified Chemours'[s] quarterly and annual filings with the SEC on

50

Forms 10-Q and 10-K" throughout the Class Period; that they "had the power and influence to cause [Chemours] to engage in the unlawful conduct complained of [in the Complaint]"; and "did, directly or indirectly, control the conduct of Chemours's business."  D.I. 30 ¶¶ 21, 23, 27.  Since Plaintiff adequately alleges that Chemours falsely understated its maximum potential environmental remediation liabilities in the five most recent challenged SEC reports—and since Plaintiff adequately alleges that Vergnano and Newman knew the maximum liability amounts were false at the time they signed those SEC reports—Plaintiff has plausibly alleged that Vergnano and Newman are controlling persons who culpably participated in Chemours's violations of Section 10(b).  *See Belmont*, 708 F.3d at 484.

## IV.   CONCLUSION

For the foregoing reasons, I will grant in part and deny in part Defendants' motion to dismiss.  I will allow the claims to proceed insofar as they are based on the Complaint's allegations regarding the contents of the Kirsch report and presentations and the alleged false representations about Chemours's maximum environmental remediation liabilities in the five most recent SEC reports filed during the Class Period.  I will dismiss the claims in all other respects.

The Court will enter an Order consistent with this Memorandum Opinion.