# EXHIBIT A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number 001-36794



# The Chemours Company
(Exact Name of Registrant as Specified in Its Charter)

| **Delaware** | **46-4845564** |
|---|---|
| (State or other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**1007 Market Street, Wilmington, Delaware 19801**
(Address of Principal Executive Offices)
Registrant's Telephone Number: **(302) 773-1000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbols(s) | Name of Exchange on Which Registered |
|---|---|---|
| Common Stock ($.01 par value) | CC | New York Stock Exchange |

Securities are registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐
Smaller reporting company ☐          Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes ☐  No ☒

The aggregate market value of common stock held by non-affiliates of the registrant as of June 28, 2019, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $3.9 billion. As of February 10, 2020, 164,006,272 shares of the company's common stock, $0.01 par value, were outstanding.

**Documents Incorporated by Reference**

Portions of the registrant's definitive proxy statement relating to its 2020 annual meeting of shareholders (the "2020 Proxy Statement") are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. The 2020 Proxy Statement will be filed with the U. S. Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

*Environmental Overview*

Chemours, due to the terms of the Separation-related agreements with DuPont, is subject to contingencies pursuant to environmental laws and regulations that in the future may require further action to correct the effects on the environment of prior disposal practices or releases of chemical substances, which are attributable to DuPont's activities before it spun-off Chemours. Much of this liability results from CERCLA, the Resource Conservation and Recovery Act, and similar state and global laws. These laws require Chemours to undertake certain investigative, remediation, and restoration activities at sites where Chemours conducts or once conducted operations or at sites where Chemours-generated waste was disposed. The accrual also includes estimated costs related to a number of sites identified for which it is probable that environmental remediation will be required, but which are not currently the subject of enforcement activities.

Chemours accrues for remediation activities when it is probable that a liability has been incurred and a reasonable estimate of the liability can be made. Where the available information is sufficient to estimate the amount of liability, that estimate has been used. Where the available information is only sufficient to establish a range of probable liability, and no point within the range is more likely than any other, the lower end of the range has been used. Estimated liabilities are determined based on existing remediation laws and technologies and the Company's planned remedial responses, which are derived from in-depth environmental studies, sampling, testing, and analyses. Inherent uncertainties exist in such evaluations, primarily due to unknown environmental conditions, changing governmental regulations regarding liability, and emerging remediation technologies. These accruals are adjusted periodically as remediation efforts progress and as additional technological, regulatory, and legal information becomes available. Environmental liabilities and expenditures include claims for matters that are liabilities of DuPont and its subsidiaries, which Chemours may be required to indemnify pursuant to the separation-related agreements. These accrued liabilities are undiscounted and do not include claims against third parties. Costs related to environmental remediation are charged to expense in the period that the associated liability is accrued.

The following table sets forth the components of the Company's environmental remediation liabilities at December 31, 2019 and 2018, and for the five sites that are deemed the most significant by management, including Fayetteville as further discussed below.

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Chambers Works, Deepwater, New Jersey | $ 20 | $ 18 |
| East Chicago, Indiana | 17 | 21 |
| Fayetteville Works, Fayetteville, North Carolina | 201 | 75 |
| Pompton Lakes, New Jersey | 43 | 45 |
| USS Lead, East Chicago, Indiana | 13 | 15 |
| All other sites | 112 | 117 |
| **Total accrued environmental remediation** | $ 406 | $ 291 |

The following table sets forth the current and long-term components of the Company's environmental remediation liabilities and their balance sheet locations at December 31, 2019 and 2018.

|  | Balance Sheet Location | December 31, 2019 | December 31, 2018 |
|---|---|---|---|
| Environmental Remediation: |  |  |  |
| Current environmental remediation | Other accrued liabilities (Note 19) | $ 74 | $ 139 |
| Long-term environmental remediation | Other liabilities (Note 21) | 332 | 152 |
| **Total environmental remediation** |  | $ 406 | $ 291 |

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

The time-frame for a site to go through all phases of remediation (investigation and active clean-up) may take about 15 to 20 years, followed by several years of OM&M activities. Remediation activities, including OM&M activities, vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, and diverse regulatory requirements, as well as the presence or absence of other potentially responsible parties. In addition, for claims that Chemours may be required to indemnify DuPont pursuant to the Separation-related agreements, Chemours, through DuPont, has limited available information for certain sites or is in the early stages of discussions with regulators. For these sites in particular, there may be considerable variability between the clean-up activities that are currently being undertaken or planned and the ultimate actions that could be required. Therefore, considerable uncertainty exists with respect to environmental remediation costs and, under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $530 above the amount accrued at December 31, 2019.

For the years ended December 31, 2019, 2018, and 2017, Chemours incurred environmental remediation expenses of $200, $101, and $48, respectively.

***Fayetteville Works, Fayetteville, North Carolina***

Fayetteville has been in operation since the 1970s and is located next to the Cape Fear River southeast of the City of Fayetteville, North Carolina. Hexafluoropropylene oxide dimer acid ("HFPO Dimer Acid," sometimes referred to as "GenX" or "C3 Dimer Acid") is manufactured at Fayetteville. The Company has operated the site since its separation from DuPont in 2015.

The Company believes that discharges from Fayetteville to the Cape Fear River, site surface water, groundwater, and air emissions have not impacted the safety of drinking water in North Carolina. The Company is cooperating with a variety of ongoing inquiries and investigations from federal, state, and local authorities, regulators, and other governmental entities.

*Consent Order with North Carolina Department of Environmental Quality ("NC DEQ")*

In September 2017, the NC DEQ issued a 60-day notice of intent to suspend the National Pollutant Discharge Elimination System ("NPDES") permit for Fayetteville, and the State of North Carolina filed an action in North Carolina state court regarding site discharges, seeking a temporary restraining order and preliminary injunction, as well as other relief, including abatement and site correction. The state court entered a partial consent order resolving NC DEQ's motion for a temporary restraining order.

In November 2017, NC DEQ informed the Company that it was suspending the NPDES permit for Fayetteville. The Company thereafter commenced the capture and separate disposal of all process wastewater from Fayetteville related to the Company's own operations.

In June 2018, the North Carolina Legislature enacted legislation (i) granting the governor the authority, in certain circumstances, to require a facility with unauthorized PFAS discharges to cease operations, and (ii) granting the governor the authority, in certain circumstances, to direct the NC DEQ secretary to order a PFAS discharger to establish permanent replacement water supplies for parties whose water was contaminated by the discharge.

In July 2018, Cape Fear River Watch ("CFRW"), a non-profit organization, sued NC DEQ in North Carolina state court, seeking to require NC DEQ to take additional actions at Fayetteville. On August 29, 2018, CFRW sued the Company in North Carolina federal court for alleged violations of the Clean Water Act ("CWA") and the Toxic Substances Control Act ("TSCA"), seeking declaratory and injunctive relief and penalties.

In February 2019, the North Carolina Superior Court for Bladen County approved a Consent Order ("CO") between NC DEQ, CFRW and the Company, resolving the State's and CFRW's lawsuits and other matters (including Notices of Violation ("NOVs") issued by the State). Under the terms of the CO, Chemours paid $13 in March 2019 to cover a civil penalty and investigative costs and agreed to certain compliance measures (with stipulated penalties for failures to do so), including the following:

- Install a thermal oxidizer to control all PFAS in process streams from certain processes at Fayetteville at an efficiency of 99.99%;
- Develop, submit, and implement, subject to approval from NC DEQ and CFRW, a plan for interim actions that are economically and technologically feasible to achieve the maximum PFAS reduction from Fayetteville to the Cape Fear River within a two-year period;
- Develop and implement, subject to approval, a Corrective Action Plan that complies with North Carolina's groundwater standards and guidance provided by NC DEQ. At a minimum, the Corrective Action Plan must require Chemours to reduce the total loading of PFAS originating from Fayetteville to surface water by at least 75% from baseline, as defined by the CO; and,
- Provide and properly maintain permanent drinking water supplies, including via whole-building filtration units and reverse osmosis ("RO") units to qualifying surrounding properties with private drinking water wells.

F-51

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

The following table sets forth the components of the Company's accrued environmental remediation liabilities related to PFAS at Fayetteville at December 31, 2019 and 2018.

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| On-site remediation | $ 155 | $ 10 |
| Off-site groundwater remediation | 46 | 65 |
| **Total accrued liabilities** | $ 201 | $ 75 |

The following table sets forth the current and long-term components of the Company's accrued environmental remediation liabilities related to PFAS at Fayetteville and their balance sheet locations at December 31, 2019 and 2018.

|  | Balance Sheet Location | December 31, 2019 | December 31, 2018 |
|---|---|---|---|
| Current accrued liabilities | Other accrued liabilities (Note 19) | $ 20 | $ 75 |
| Long-term accrued liabilities | Other liabilities (Note 21) | 181 | — |
| **Total accrued liabilities** |  | $ 201 | $ 75 |

*Emissions to air*

Fayetteville operates multiple permitted air discharge stacks, blowers, and vents as part of its manufacturing activities. A thermal oxidizer ("TO") became fully operational at the site on December 27, 2019, and Chemours switched to the permitted operating scenario for the TO on December 31, 2019 as set forth in the CO. The TO is designed to reduce aerial PFAS emissions from Fayetteville, and, within 90 days of installation, Chemours and North Carolina Division of Air Quality will conduct testing to confirm whether the TO is destroying 99.99% of all PFAS air emissions routed to it, utilizing a 2017 baseline. Environmental costs are capitalized and subsequently depreciated if the costs extend the useful life of the property, increase the property's capacity, and/or reduce or prevent contamination from future operations.

*Off-site replacement drinking water supplies*

The CO requires the Company to provide permanent replacement drinking water supplies, including via connection to public water supply, whole building filtration units and/or RO units, to qualifying surrounding residents, businesses, schools, and public buildings with private drinking water wells. The qualifying area residents whose drinking water wells have tested above the state provisional health goal of 140 parts per trillion (ppt) for GenX may be eligible for public water or a whole building filtration system. Area residents whose drinking water wells have tested above 10 ppt for GenX or other perfluorinated compounds ("Table 3 Compounds") are eligible for three under-sink RO units.  The Company provides bottled drinking water to a residence when it becomes eligible for a replacement drinking water supply, and continues to provide delivery of bottled drinking water to these homeowners until the eligible supply is established or installed.

The Company's estimated liability for off-site replacement drinking water supplies is based on management's assessment of the current facts and circumstances for this matter, which are subject to various assumptions that include, but are not limited to, the number of affected surrounding properties, response rates to the Company's offer, the type of water treatment systems selected (i.e., whole building filtration or RO units), the cost of the selected water treatment systems, and any related operation, maintenance, and monitoring ("OM&M") requirements, assessed fines and penalties, and other charges contemplated by the CO. For off-site drinking water supplies, OM&M is accrued for 20 years on an undiscounted basis based on the Company's current plans under the CO. It is estimated that $46 of disbursements related to off-site replacement drinking water supplies will be made over approximately 20 years.

F-52

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

*On-site surface water and groundwater remediation*

Abatement and remediation measures already taken by Chemours, including the capture and separate disposal of its operations' process wastewater and other interim actions, have addressed and abated nearly all PFAS discharges from the Company's continuing operations at Fayetteville. However, the Company continues to have active dialogue with NC DEQ and other stakeholders regarding the potential remedies that are both economically and technologically feasible to achieve the CO objectives related to site surface water and groundwater.

In the fourth quarter of 2019, the Company completed and submitted its Cape Fear River PFAS Loading Reduction Plan - Supplemental Information Report and Corrective Action Plan ("CAP") to NC DEQ. The Supplemental Information Report provides information to support the evaluation of potential remedial options to reduce PFAS loadings to surface waters, including interim alternatives. The CAP describes potential remediation activities to address PFAS in on-site groundwater and surface waters at the site, in accordance with the requirements of the CO and the North Carolina groundwater standards, and builds on the previous submissions to NC DEQ. The NC DEQ has made the CAP available for public review and comment until March 6, 2020.

The Company's estimated liability for the remediation activities that are probable and estimable is based on the CAP and management's assessment of the current facts and circumstances, which are subject to various assumptions including the transport pathways (being pathways by which PFAS reaches the Cape Fear River) which will require remedial actions, the types of site surface water and on-site remedies and treatment systems selected and implemented, the estimated cost of such potential remedies and treatment systems, and any related OM&M requirements, and other charges contemplated by the CO.

The CAP also addresses remediation of on-site groundwater and proposes an interim action of extraction of groundwater from existing monitoring wells and treatment prior to discharge. Chemours also proposes to simultaneously proceed with detailed design and engineering of a permanent on-site groundwater treatment system alternative, including collection of extensive pre-design data, while holding a final decision on which alternative should be selected, with approval by NC DEQ, until that design and engineering work is complete (approximately two years). The actual cost of a permanent on-site groundwater treatment system primarily depends on the determination of certain significant design details, notably the actual barrier wall installation method (i.e., slurry wall vs. steel sheets), configuration of extraction wells, and extraction rates.

Accordingly, in the fourth quarter of 2019, based on the CO, the CAP, and management's plans, which are based on current regulations and technology, the Company accrued an additional $132 related to the estimated cost of on-site remediation. The incremental estimated remediation liability, based on current potential remedial options, is primarily comprised of $42 of construction costs, which are projected to be paid through 2025, and $88 of related OM&M requirements, which is projected to be paid over a period of approximately 20 years. The final costs of any selected remediation will depend primarily on the final approved design and actual labor and material costs.

It is possible that issues relating to site discharges in various transport pathways, the selection of remediation alternatives to achieve PFAS loading reductions, or the operating effectiveness of the TO could result in further litigation and/or regulatory demands with regards to Fayetteville, including potential permit modifications. It is also possible that, as additional data is collected on the transport pathways and dialogue continues with NC DEQ and other stakeholders, the type or extent of remediation actions required to achieve the objectives committed to in the CO may change (increase or decrease). If such issues arise, or if the CO is amended, an additional loss is reasonably possible, but not estimable at this time.

F-53