# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE THE CHEMOURS COMPANY SECURITIES LITIGATION | C.A. NO. 1:19-CV-01911-CFC<br>Hon. Colm F. Connolly<br><br><u>CLASS ACTION</u> |
| This Document Relates To:<br><br>ALL ACTIONS. | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF LEAD PLAINTIFF'S MOTION FOR PARTIAL RECONSIDERATION <u>OR REARGUMENT</u>

**PRICKETT JONES & ELLIOTT, P.A**

Bruce E. Jameson (Bar No. 2931)
Marcus E. Montejo (Bar No. 4890)
Samuel L. Closic (Bar No. 5468)
1310 King Street
Wilmington, Delaware 19801
Telephone: (302) 888-6500

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**

Maya S. Saxena
Joseph E. White, III
Lester R. Hooker
Dianne M. Pitre
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Telephone: (561) 394-3399

Steven B. Singer
Kyla Grant
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551

David R. Kaplan
12750 High Bluff Drive, Suite 475
San Diego, California 92130
Telephone: (858) 997-0860

*Counsel for Lead Plaintiff New York State Teachers' Retirement System and Lead Counsel for the Class*

**March 30, 2022**

Lead Plaintiff New York State Teachers' Retirement System ("Plaintiff") files this reply in further support of its motion seeking partial reconsideration of the Court's February 24, 2022 order on Defendants' motion to dismiss (ECF Nos. 57-58, the "Order"), and pursuant to the Court's oral order issued at the parties' hearing before the Court on March 24, 2022.

Defendants' primary contention in their opposition is that their admission during the January 14, 2022 hearing that the $200 million Fayetteville liability set forth in the Chancery Court Complaint was "[a]n environmental remediation number" is meaningless because they also asserted during the hearing (in cursory fashion) that the $200 million figure included "abatement" costs, and "abatement" (what Defendants define as "prospective environmental protection measures" or efforts to "stop[] the emissions," Opp. at 3, 4 n.1) is not "remediation." *See* Opp. at 4-6; ECF No. 51 at 61:17-19. Defendants' sole support for this argument is a single slide they offered at the hearing which states, without any analysis or explanation, that the "abatement" efforts at Fayetteville were not "remediation" pursuant to GAAP provision ASC 410-30-15-3(b). There are several fatal flaws in this argument.

*First*, ASC 410-30-15-3(b) nowhere categorically excludes "abatement" efforts from "remediation," nor does it even mention the word "abatement." Rather, that provision states that "[p]ollution control costs . . . that are required upon the

1

cessation of operations or sale of facilities"—*i.e.*, specific costs incurred in a very particular circumstance—are "different from environmental remediation liabilities." *See* Ex. 2 at 115.  Such costs are clearly not at issue here, as there indisputably was no "cessation of operations or sale" of Fayetteville Works in connection with the $200 million in costs resulting from the February 2019 Consent Order.

*Second*, Defendants tellingly omit that every definition of "remediation" that may be relevant to this case clearly includes "abatement" efforts as Defendants have defined them—including from the very same GAAP accounting guidance Defendants so heavily rely upon.  For example:

- ASC 410-30 defines "Costs Associated with Remediation" to include "cleanup costs," which that provision states are comprised of "containment, removal, [and] remedial action."  That provision then defines "Removal Action" to include "<u>actions in response to the threat of release</u>" of a hazardous substance, and "<u>other actions needed to prevent, minimize or mitigate damage . . to the environment</u>." The provision defines "Remedial Action" to include actions taken to "<u>alleviate [] or eliminate a threat of the release of an existing hazardous substance that could potentially harm human health or the environment</u>."  *See* Ex. 2, ASC 410-30-05-23; ASC 410-30-20 (at 110, 122-23).

- The federal environmental statute CERCLA defines "remedial action" to include actions taken "in the event of <u>a release or threatened release of a hazardous substance into the environment</u>," and "<u>to prevent or minimize the release of hazardous substances so they do not migrate to cause substantial danger</u> to present or future public health . . . or the environment."  42 U.S.C. §9601(24).

- The Separation Agreement between DuPont and Chemours (*see* Ex. 3 at 25) defines "Remediation" to include actions required to "<u>prevent the Release of Hazardous Substances (including by way of vapor intrusion)</u>

so that they do not migrate, endanger or threaten to endanger" the environment.

Each of these definitions makes crystal clear that "remediation" efforts unquestionably include "environmental protection measures" taken to stop current and future emissions (*i.e.*, what Defendants call "abatement"). Furthermore, Defendants' own 2019 Form 10-K states that the "abatement" efforts at Fayetteville were included in the $201 million remediation accrual. For example, in describing the Company's "Environmental Expenditures," the Form 10-K states that "[w]e incur costs for pollution abatement activities including . . . air pollution controls and waste water treatment"—and that "[t]he charges described in this section include $201 million accrued for costs associated with the proposed Consent Order between us and the NC DEQ." Ex. 1 at 50. Indeed, in the Form 10-K's more detailed discussion of the $201 million remediation accrual in the financial notes, Defendants describe at length numerous "abatement" efforts—including the thermal oxidizer designed to reduce PFAS emissions and various groundwater filtration and treatment systems. Ex. 1 at F-52, F-53.

*Third*, Defendants' attempt to chalk up the fact that they accrued $201 million in remediation costs for Fayetteville in the fourth quarter of 2019—the exact same amount of costs Chemours stated the Consent Order would require it to incur—to a mere "coincidence" because the Consent Order also required certain other "capital expenditures" is unavailing. Opp. at 7. According to the same GAAP guidance

3

Defendants rely on, "remediation" costs expressly include environmental "capital" expenditures—in other words, the two are one and the same and not mutually exclusive. *See* Ex. 2, ASC 410-30-25-17 to 25-18, at 132 (stating that "it may be appropriate to capitalize environmental remediation costs" if "[t]he costs extend the life, increase the capacity, or improve the safety or efficiency of property owned by the entity"). Indeed, Defendants' own 2019 Form 10-K clearly states, under "Environmental Remediation," that "[o]ur environmental liabilities include . . . certain accruable costs associated with on-site capital projects." Ex. 1 at 51.

Defendants' contention that the "thermal oxidizer" installed at Fayetteville is not a remediation cost because it was a "capital expenditure" meant to abate future emissions is therefore erroneous. Opp. at 7. This is evidenced by the fact that Defendants' discussion of the thermal oxidizer in the 2019 Form 10-K—which, again, is included in the "Environmental Remediation" section[1]—tracks the above-cited GAAP guidance regarding the capitalization of remediation costs almost

---

[1] Defendants argue that the fact that the "thermal oxidizer" is also discussed under the "capital expenditures" section in the Form 10-K means that it was not a "remediation" cost (Opp. at 7)—but as stated above, even if it was a "capital expenditure," it was unquestionably still a remediation "capital expenditure" that was required by the Consent Order with North Carolina (*i.e.*, not voluntary). Moreover, the section of the Form 10-K Defendants cite mentions the thermal oxidizer only in passing, and in fact specifically directs the reader to "Note 22" for "further discus[sion]"—which is the note discussing Chemours's environmental remediation liabilities and accruals. Ex. 1 at 45, F-52; Opp. at 7.

exactly, stating that the costs associated with the thermal oxidizer may be "capitalized . . . if the costs extend the useful life of the property, increase the property's capacity, and/or reduce or prevent contamination from future operations." Ex. 1 at F-52.[2]

Finally, Defendants also contend that Plaintiff's other grounds for reconsideration—*i.e.*, the fact that Defendants made false denials in response to the May 6, 2019 corrective disclosure—should be discounted because Plaintiff did not allege those denials as false statements. Opp. at 9. However, the purpose of those allegations was to show that Defendants' false denials—which were issued in direct response to the May 6, 2019 corrective disclosure that the Court sustained, and were fully credited by analysts (¶139)—prevented the market from understanding the full truth regarding Chemours's PFAS exposure. Nor did Defendants' denials solely pertain to PFAS litigation (as opposed to remediation), as Defendants contend. Opp. at 9-10. Defendants specifically denied, for example, that there was any issue at Fayetteville because the GenX there was purportedly "manufactured and recycled . . . in accordance with an EPA consent order" (¶139)—yet Defendants indisputably knew by this time (mid-May 2019) that they had already entered into the February 2019 Consent Order with NC DEQ that would cost them "in excess of $200 million."

---

[2] Defendants' reliance on this same language in support of their argument that the thermal oxidizer was not a remediation cost is therefore clearly misplaced. Opp. at 7.

5

¶94. Defendants also told analysts that Chemours's lawsuit against DuPont had nothing to do with PFAS—despite the fact that they had just filed the Chancery Court Complaint regarding Chemours's massive inherited PFAS liabilities only two days prior. ¶139. Particularly in light of the fact that analysts fully credited these denials (*see id.*), investors did not fully understand that Chemours faced much more significant exposure from its inherited PFAS liabilities than what it had previously represented—to the point that it was forced to sue its former parent for $4 billion—until the Chancery Court Complaint was unsealed.

For these reasons, and those set forth in Plaintiff's prior briefing (ECF No. 61), Plaintiff's motion for reconsideration should be granted.

Dated: March 30, 2022

Respectfully Submitted,

/s/      *Bruce E. Jameson*
Bruce E. Jameson (Bar No. 2931)
Marcus E. Montejo (Bar No. 4890)
Samuel L. Closic (Bar No. 5468)
**PRICKETT JONES & ELLIOTT, P.A**
1310 King Street
Wilmington, Delaware 19801
Telephone: (302) 888-6500
Facsimile: (302) 658-8111
bejameson@prickett.com
memontejo@prickett.com
slclosic@prickett.com

*Liaison Counsel for the Class*

6

Maya Saxena
Joseph E. White III
Lester R. Hooker
Dianne M. Pitre
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

Steven B. Singer
Kyla Grant
**SAXENA WHITE P.A.**
10 Bank Street
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 216-2220
ssinger@saxenawhite.com
kgrant@saxenawhite.com

David R. Kaplan
**SAXENA WHITE P.A.**
12750 High Bluff Drive, Suite 475
San Diego, California 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

*Counsel for Lead Plaintiff New York State
Teachers' Retirement System and Lead
Counsel for the Class*