# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2018**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-36794**

# The Chemours Company
(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **46-4845564** |
| (State or other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**1007 Market Street, Wilmington, Delaware 19899**
(Address of Principal Executive Offices)

**(302) 773-1000**
(Registrant's Telephone Number)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large Accelerated Filer ☒ | Accelerated Filer ☐ |
| Non-Accelerated Filer ☐ | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

The registrant had 177,911,882 shares of common stock, $0.01 par value, outstanding at April 30, 2018.



EXHIBIT
3
Kirsch

**The Chemours Company**

<div style="background-color:red; color:white; text-align:center">TABLE OF CONTENTS</div>

|  |  |  | Page |
|---|---|---|---|
| **Part I** | **Financial Information** |  |  |
| Item 1. | Interim Consolidated Financial Statements |  |  |
|  | Interim Consolidated Statements of Operations (Unaudited) |  | 2 |
|  | Interim Consolidated Statements of Comprehensive Income (Unaudited) |  | 3 |
|  | Interim Consolidated Balance Sheets |  | 4 |
|  | Interim Consolidated Statements of Stockholders' Equity (Unaudited) |  | 5 |
|  | Interim Consolidated Statements of Cash Flows (Unaudited) |  | 6 |
|  | Notes to the Interim Consolidated Financial Statements (Unaudited) |  | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations |  | 38 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk |  | 57 |
| Item 4. | Controls and Procedures |  | 57 |
|  |  |  |  |
| **Part II** | **Other Information** |  |  |
| Item 1. | Legal Proceedings |  | 58 |
| Item 1A. | Risk Factors |  | 59 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds |  | 59 |
| Item 3. | Defaults Upon Senior Securities |  | 60 |
| Item 4. | Mine Safety Disclosures |  | 60 |
| Item 5. | Other Information |  | 60 |
| Item 6. | Exhibits |  | 60 |
|  |  |  |  |
| **Exhibit Index** |  |  | 61 |
|  |  |  |  |
| **Signature** |  |  | 62 |

1

PART I.  FINANCI AL INFORMATION

**Item 1.    INTERIM CONSOLIDATED FINANCIAL STATEMENTS**

**The Chemours Company**
**Interim Consolidated Statements of Operations (Unaudited)**
*(Dollars in millions, except per share amounts)*

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2018 | | 2017 |
| Net sales | $ | 1,730 | $ | 1,437 |
| Cost of goods sold | | 1,193 | | 1,081 |
| Gross profit | | 537 | | 356 |
| Selling, general, and administrative expense | | 143 | | 150 |
| Research and development expense | | 20 | | 19 |
| Restructuring, asset-related, and other charges, net | | 10 | | 12 |
| Total expenses | | 173 | | 181 |
| Equity in earnings of affiliates | | 12 | | 7 |
| Interest expense, net | | (52) | | (51) |
| Other income, net | | 57 | | 42 |
| **Income before income taxes** | | 381 | | 173 |
| Provision for income taxes | | 84 | | 22 |
| **Net income** | | 297 | | 151 |
| Less: Net income attributable to non-controlling interests | | — | | 1 |
| **Net income attributable to Chemours** | $ | 297 | $ | 150 |
| | | | | |
| **Per share data** | | | | |
| Basic earnings per share of common stock | $ | 1.63 | $ | 0.82 |
| Diluted earnings per share of common stock | | 1.58 | | 0.79 |
| Dividends per share of common stock | | — | | 0.03 |

*See accompanying notes to the interim consolidated financial statements.*

2

**The Chemours Company**
**Interim Consolidated Statements of Comprehensive Income (Unaudited)**
*(Dollars in millions)*

| | Three Months Ended March 31, | | | | | |
| | 2018 | | | 2017 | | |
| | Pre-tax | Tax | After-tax | Pre-tax | Tax | After-tax |
|---|---|---|---|---|---|---|
| Net income | $ 381 | $ (84) | $ 297 | $ 173 | $ (22) | $ 151 |
| Other comprehensive (loss) income: | | | | | | |
| Unrealized loss on net investment hedge | (34) | 8 | (26) | (10) | — | (10) |
| Cumulative translation adjustment | 108 | — | 108 | 103 | — | 103 |
| Defined benefit plans: | | | | | | |
| Additions to accumulated other comprehensive loss: | | | | | | |
| Effect of foreign exchange rates | (9) | — | (9) | (10) | 2 | (8) |
| Reclassifications to net income: | | | | | | |
| Amortization of actuarial loss | 4 | (1) | 3 | 5 | (1) | 4 |
| Defined benefit plans, net | (5) | (1) | (6) | (5) | 1 | (4) |
| Other comprehensive income | 69 | 7 | 76 | 88 | 1 | 89 |
| Comprehensive income | 450 | (77) | 373 | 261 | (21) | 240 |
| Less: Comprehensive income attributable to non-controlling interests | — | — | — | 1 | — | 1 |
| Comprehensive income attributable to Chemours | $ 450 | $ (77) | $ 373 | $ 260 | $ (21) | $ 239 |

*See accompanying notes to the interim consolidated financial statements.*

3

**The Chemours Company**
**Interim Consolidated Balance Sheets**
*(Dollars in millions, except per share amounts)*

| | (Unaudited) March 31, 2018 | December 31, 2017 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,434 | $ 1,556 |
| Accounts and notes receivable, net | 1,083 | 919 |
| Inventories | 992 | 935 |
| Prepaid expenses and other | 75 | 83 |
| Total current assets | 3,584 | 3,493 |
| Property, plant, and equipment | 8,719 | 8,511 |
| Less: Accumulated depreciation | (5,614) | (5,503) |
| Property, plant, and equipment, net | 3,105 | 3,008 |
| Goodwill and other intangible assets, net | 165 | 166 |
| Investments in affiliates | 166 | 173 |
| Other assets | 464 | 453 |
| **Total assets** | $ 7,484 | $ 7,293 |
| **Liabilities** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,121 | $ 1,075 |
| Current maturities of long-term debt | 14 | 15 |
| Other accrued liabilities | 487 | 558 |
| Total current liabilities | 1,622 | 1,648 |
| Long-term debt, net | 4,141 | 4,097 |
| Deferred income taxes | 244 | 208 |
| Other liabilities | 475 | 475 |
| Total liabilities | 6,482 | 6,428 |
| Commitments and contingent liabilities | | |
| **Equity** | | |
| Common stock (par value $0.01 per share; 810,000,000 shares authorized; 185,903,112 shares issued and 178,537,554 shares outstanding at March 31, 2018; 185,343,034 shares issued and 182,956,628 shares outstanding at December 31, 2017) | 2 | 2 |
| Treasury stock at cost (7,365,558 shares at March 31, 2018; 2,386,406 shares at December 31, 2017) | (361) | (116) |
| Additional paid-in capital | 846 | 837 |
| Retained earnings | 876 | 579 |
| Accumulated other comprehensive loss | (366) | (442) |
| Total Chemours stockholders' equity | 997 | 860 |
| Non-controlling interests | 5 | 5 |
| Total equity | 1,002 | 865 |
| **Total liabilities and equity** | $ 7,484 | $ 7,293 |

*See accompanying notes to the interim consolidated financial statements.*

4

**The Chemours Company**
**Interim Consolidated Statements of Stockholders' Equity (Unaudited)**
*(Dollars in millions)*

| | Common Stock | | Treasury Stock | | Additional Paid-In Capital | (Accumulated Deficit) Retained Earnings | Accumulated Other Comprehensive (Loss) Income | Non-controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Capital | Earnings | (Loss) Income | Interests | |
| Balance at January 1, 2017 | 182,600,533 | $ 2 | — | $ — | $ 789 | $ (114) | $ (577) | $ 4 | $ 104 |
| Common stock issued - compensation plans | 415,518 | — | — | — | — | — | — | — | — |
| Exercise of stock options, net | 1,382,363 | — | — | — | 20 | — | — | — | 20 |
| Stock-based compensation expense | — | — | — | — | 6 | — | — | — | 6 |
| Cancellation of unissued stock awards withheld to cover taxes | — | — | — | — | (7) | — | — | — | (7) |
| Net income | — | — | — | — | — | 150 | — | 1 | 151 |
| Dividends paid | — | — | — | — | — | (5) | — | — | (5) |
| Other comprehensive income | — | — | — | — | — | — | 89 | — | 89 |
| Balance at March 31, 2017 | 184,398,414 | $ 2 | — | $ — | $ 808 | $ 31 | $ (488) | $ 5 | $ 358 |
| | | | | | | | | | |
| Balance at January 1, 2018 | 182,956,628 | $ 2 | 2,386,406 | $ (116) | $ 837 | $ 579 | $ (442) | $ 5 | $ 865 |
| Common stock issued - compensation plans | 286,618 | — | — | — | — | — | — | — | — |
| Exercise of stock options, net | 273,460 | — | — | — | 5 | — | — | — | 5 |
| Purchases of treasury stock at cost | (4,979,152) | — | 4,979,152 | (245) | — | — | — | — | (245) |
| Stock-based compensation expense | — | — | — | — | 9 | — | — | — | 9 |
| Cancellation of unissued stock awards withheld to cover taxes | — | — | — | — | (5) | — | — | — | (5) |
| Net income | — | — | — | — | — | 297 | — | — | 297 |
| Other comprehensive income | — | — | — | — | — | — | 76 | — | 76 |
| Balance at March 31, 2018 | 178,537,554 | $ 2 | 7,365,558 | $ (361) | $ 846 | $ 876 | $ (366) | $ 5 | $ 1,002 |

*See accompanying notes to the interim consolidated financial statements.*

5

**The Chemours Company**
**Interim Consolidated Statements of Cash Flows (Unaudited)**
*(Dollars in millions)*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Cash flows from operating activities** | | |
| Net income | $ 297 | $ 151 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 70 | 71 |
| Gain on sale of assets and businesses | (42) | (16) |
| Equity in earnings of affiliates, net | 17 | (7) |
| Amortization of deferred financing costs and issuance discount | 3 | 3 |
| Deferred tax provision | 35 | 5 |
| Other operating charges and credits, net | 8 | 10 |
| Decrease (increase) in operating assets: | | |
| Accounts and notes receivable, net | (150) | (103) |
| Inventories and other operating assets | (29) | (31) |
| (Decrease) increase in operating liabilities: | | |
| Accounts payable and other operating liabilities | (13) | (42) |
| Cash provided by operating activities | 196 | 41 |
| **Cash flows from investing activities** | | |
| Purchases of property, plant, and equipment | (102) | (69) |
| Proceeds from sales of assets and businesses, net | 39 | 9 |
| Foreign exchange contract settlements, net | 5 | (3) |
| Cash used for investing activities | (58) | (63) |
| **Cash flows from financing activities** | | |
| Debt repayments | (4) | (4) |
| Purchases of treasury stock at cost | (240) | — |
| Proceeds from exercised stock options, net | 5 | 20 |
| Tax payments related to withholdings on vested restricted stock units | (1) | — |
| Payment of dividends | (31) | (5) |
| Cash (used for) provided by financing activities | (271) | 11 |
| Effect of exchange rate changes on cash and cash equivalents | 11 | 7 |
| **Decrease in cash and cash equivalents** | (122) | (4) |
| **Cash and cash equivalents at January 1,** | 1,556 | 902 |
| **Cash and cash equivalents at March 31,** | $ 1,434 | $ 898 |
| | | |
| **Supplemental cash flows information** | | |
| Non-cash investing and financing activities: | | |
| Changes in property, plant, and equipment included in accounts payable | $ (1) | $ 14 |
| Obligations incurred under build-to-suit lease arrangement | 11 | — |
| Purchases of treasury stock not settled by quarter-end | 15 | — |
| Tax payments accrued for withholdings on vested restricted stock units | 4 | — |

*See accompanying notes to the interim consolidated financial statements.*

6

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

## Note 1. Background, Description of the Business, and Basis of Pre sentation

The Chemours Company (Chemours, or the Company) is a leading, global provider of performance chemicals that are key inputs in end-products and processes in a variety of industries. The Company delivers customized solutions with a wide range of industrial and specialty chemical products for markets, including plastics and coatings, refrigeration and air conditioning, general industrial, electronics, mining, and oil refining. The Company's principal products include refrigerants, industrial fluoropolymer resins, sodium cyanide, performance chemicals and intermediates, and titanium dioxide ($TiO_2$) pigment. Chemours' business consists of three reportable segments: Fluoroproducts, Chemical Solutions, and Titanium Technologies. The Fluoroproducts segment is a leading, global provider of fluoroproducts, including refrigerants and industrial fluoropolymer resins. The Chemical Solutions segment is a leading, North American provider of industrial chemicals used in gold production, industrials, and consumer applications. The Titanium Technologies segment is a leading, global provider of $TiO_2$ pigment, a premium white pigment used to deliver whiteness, brightness, opacity, and protection in a variety of applications.

The accompanying interim consolidated financial statements have been prepared in accordance with generally accepted accounting principles (GAAP) in the United States of America (U.S.) for interim financial information. In the opinion of management, all adjustments (consisting of normal, recurring adjustments) considered necessary for a fair statement of the results for interim periods have been included. The Company's results for interim periods should not be considered indicative of its results for a full year, and the year-end consolidated balance sheet does not include all of the disclosures required by GAAP. As such, these interim consolidated financial statements should be read in conjunction with the *Consolidated Financial Statements* and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2017.

Unless the context otherwise requires, references herein to "The Chemours Company," "Chemours," "the Company," "our Company," "we," "us," and "our" refer to The Chemours Company and its consolidated subsidiaries. References herein to "DuPont" refer to E. I. du Pont de Nemours and Company, a Delaware corporation, and its consolidated subsidiaries (other than Chemours and its consolidated subsidiaries), unless the context otherwise requires.

## Note 2. Recent Accounting Pronouncements

*Accounting Guidance Issued and Not Yet Adopted*

*Leases*

In February 2016, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2016-02, *Leases (Topic 842)* (ASU No. 2016-02), which supersedes the leases requirements in Topic 840. The core principle of ASU No. 2016-02 is that a lessee should recognize on the balance sheet the lease assets and lease liabilities that arise from all lease arrangements with terms greater than 12 months. Recognition of these lease assets and lease liabilities represents a change from previous GAAP, which did not require lease assets and lease liabilities to be recognized for operating leases. Qualitative disclosures along with specific quantitative disclosures will be required to provide enough information to supplement the amounts recorded in the financial statements so that users can understand more about the nature of an entity's leasing activities.

The Company will be required to recognize and measure leases at the beginning of the earliest period presented using a modified retrospective approach, which includes a number of optional practical expedients that the Company may elect to apply. The provisions of ASU No. 2016-02 are effective for the Company's fiscal year beginning January 1, 2019, including interim periods within that fiscal year. At adoption, the Company will recognize a right-of-use asset and a lease liability initially measured at the present value of its operating lease payments. The Company is currently evaluating the impacts of adopting this guidance on its financial position, results of operations, and cash flows.

7

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

*Derivatives and Hedging*

In August 2017, the FASB issued ASU No. 2017-12, *Derivatives and Hedging (Topic 815)* (ASU No. 2017-12), which simplifies financial statement reporting for qualifying hedging relationships by eliminating the requirement to separately measure and report hedge ineffectiveness. For net investment hedges, the entire change in fair value of the hedging instruments is recorded in the currency translation adjustment section of other comprehensive income or loss. Pursuant to the amendments, these amounts are required to be subsequently reclassified to earnings in the same income statement line item in which the earnings effect of the hedged item is presented when the hedged item affects earnings. The provisions of ASU No. 2017-12 are effective for the Company's fiscal year beginning January 1, 2019, including interim periods within that fiscal year. Early adoption is permitted in any interim period. The amendments in this update will be applied to hedging relationships existing on the date of adoption, which includes a cumulative-effect adjustment to eliminate any ineffectiveness recorded to accumulated other comprehensive income or loss with a corresponding adjustment to the opening balance of retained earnings as of the beginning of the fiscal year in which adoption occurred. Presentation and disclosure amendments are required to be applied prospectively. Chemours is currently evaluating the timing of adoption and does not expect that the adoption of this guidance will have a significant impact on its financial position, results of operations, and cash flows.

*Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*

In February 2018, the FASB issued ASU No. 2018-02, *Income Statement – Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income* (ASU No. 2018-02), which allows for a reclassification from accumulated other comprehensive income or loss to retained earnings for stranded tax effects resulting from U.S. tax reform. The amendments in this update also require certain disclosures about stranded tax effects. ASU No. 2018-02 is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. The Company does not expect that the adoption of this guidance will have a significant impact on its financial position.

***Recently Adopted Accounting Guidance***

*Revenue from Contracts with Customers*

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)* (ASU No. 2014-09). The objective of this standard is to remove inconsistent practices with regard to revenue recognition between GAAP and International Financial Reporting Standards. The standard intends to improve the comparability of revenue recognition practices across entities, industries, jurisdictions, and capital markets. Subsequent to the issuance of ASU No. 2014-09, the FASB issued multiple clarifying updates in connection with the standard (collectively, Topic 606).

Effective January 1, 2018, Chemours adopted the new revenue recognition guidance contained in Topic 606 using the modified retrospective transition method. The Company elected to utilize a practical expedient allowed under the modified retrospective transition method to apply the new standard only to contracts that are not completed on the date of initial adoption. In applying this guidance, the Company evaluated its population of open contracts with customers on January 1, 2018 and determined that the impact of adopting Topic 606 was not material to its consolidated financial statements as a whole, and no cumulative adjustment to the Company's opening retained earnings balance was required. As a result of applying this new guidance, there are changes to the classification of certain amounts in the consolidated statements of operations. Certain royalty income amounts for trademark licensing arrangements that were previously reflected as a component of other income, net in the consolidated statements of operations will now be reflected as a component of net sales, which amounted to $2 for the three months ended March 31, 2018. Additionally, certain expenses related to the Company's provision of technical services to customers that were previously reflected as a component of selling, general, and administrative expense in the consolidated statements of operations will now be reflected as a component of the cost of goods sold, which amounted to $1 for the three months ended March 31, 2018. Under the modified retrospective transition method, the Company's comparative financial information as of and for the three months ended March 31, 2017 and as of December 31, 2017 has not been restated, and as such, continues to be reported using the accounting standards in effect during those time periods.

8

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

The following table sets forth the impacts of the adoption of Topic 606 on the Company's consolidated statements of operations for the three months ended March 31, 2018.

| | Three Months Ended March 31, 2018 | | |
| --- | --- | --- | --- |
| | Without Topic 606 | Topic 606 Adjustments | As Reported |
| Net sales | $ 1,728 | $ 2 | $ 1,730 |
| Cost of goods sold | 1,192 | 1 | 1,193 |
| Gross profit | 536 | 1 | 537 |
| Selling, general, and administrative expense | 144 | (1) | 143 |
| Research and development expense | 20 | — | 20 |
| Restructuring, asset-related, and other charges, net | 10 | — | 10 |
| Total expenses | 174 | (1) | 173 |
| Equity in earnings of affiliates | 12 | — | 12 |
| Interest expense, net | (52) | — | (52) |
| Other income, net | 59 | (2) | 57 |
| **Income before income taxes** | 381 | — | 381 |
| Provision for income taxes | 84 | — | 84 |
| **Net income** | 297 | — | 297 |
| Less: Net income attributable to non-controlling interests | — | — | — |
| **Net income attributable to Chemours** | $ 297 | $ — | $ 297 |

The adoption of Topic 606 did not impact the Company's consolidated balance sheets or consolidated statements of cash flows as of and for the three months ended March 31, 2018 and is not expected to have a material impact on the Company's financial position, results of operations, or cash flows in future periods.

*Classification of Certain Cash Receipts and Cash Payments*

In August 2016, the FASB issued various updates to ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments* (ASU No. 2016-15), which clarifies and amends the presentation and classification of certain cash receipts and cash payments in the statement of cash flows. The provisions of ASU No. 2016-15 are effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years, and are to be applied using a retrospective transition method. The Company adopted ASU No. 2016-15 on January 1, 2018, the impact of which was not material to its cash flows. There were no adjustments to prior periods resulting from the retrospective application of this guidance.

*Clarifying the Definition of a Business*

In January 2017, the FASB issued ASU No. 2017-01, *Business Combinations (Topic 805): Clarifying the Definition of a Business* (ASU No. 2017-01), which changes the definition of a business to assist entities in evaluating whether a transaction should be accounted for as an acquisition (or disposal) of assets or a business. ASU No. 2017-01 is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. The Company adopted this guidance on January 1, 2018, the result of which is not expected to have a significant impact on its financial position, results of operations, or cash flows.

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

*Retirement Benefits*

In March 2017, the FASB issued ASU No. 2017-07, *Compensation - Retirement Benefits (Topic 715)* (ASU No. 2017-07), which requires that employers offering their employees defined benefit pension plans disaggregate the service cost component from the other components of net benefit cost. The amendments also provide explicit guidance on how to present the service cost component and the other components of net benefit cost in the income statement and allow only the service cost component of net benefit cost to be eligible for capitalization. The provisions of ASU No. 2017-07 are effective for fiscal years beginning after December 31, 2017, as well as interim periods within those fiscal years, and should be applied retrospectively for the presentation of the service cost component and the other components of net periodic pension cost and net periodic post-retirement benefit cost in the income statement, and prospectively for the capitalization of the service cost component of net periodic pension cost and net periodic post-retirement benefit in assets. The Company adopted this guidance on January 1, 2018, which resulted in a reclassification of non-operating pension income from the operating expense captions of the consolidated statements of operations to other income, net for the three months ended March 31, 2017.

The following table sets forth a reclassification of the Company's non-operating pension and other post-retirement employee benefit income for the three months ended March 31, 2017.

| | Three Months Ended March 31, 2017 | | |
| | As Reported | ASU 2017-07 Adjustments | As Reclassified |
|---|---|---|---|
| Net sales | $ 1,437 | $ — | $ 1,437 |
| Cost of goods sold | 1,079 | 2 | 1,081 |
| Gross profit | 358 | (2) | 356 |
| Selling, general, and administrative expense | 144 | 6 | 150 |
| Research and development expense | 19 | — | 19 |
| Restructuring, asset-related, and other charges, net | 12 | — | 12 |
| Total expenses | 175 | 6 | 181 |
| Equity in earnings of affiliates | 7 | — | 7 |
| Interest expense, net | (51) | — | (51) |
| Other income, net | 34 | 8 | 42 |
| **Income before income taxes** | 173 | — | 173 |
| Provision for income taxes | 22 | — | 22 |
| **Net income** | 151 | — | 151 |
| Less: Net income attributable to non-controlling interests | 1 | — | 1 |
| **Net income attributable to Chemours** | $ 150 | $ — | $ 150 |

## Note 3. Significant Transactions and Events

*Sale of Land in Linden, New Jersey*

In March 2016, the Company entered into an agreement to sell a 210-acre plot of land that formerly housed a DuPont manufacturing site in Linden, New Jersey. The land was assigned to Chemours in connection with its separation from DuPont, and the Company completed the sale in March 2018 for a gain of $42 and net cash proceeds of $39. As part of the sales agreement, the buyer has agreed to assume certain costs associated with ongoing environmental remediation activities at the site amounting to $3, which have been reflected as a component of prepaid expenses and other in the consolidated balance sheets. Chemours remains responsible for certain other ongoing environmental remediation activities at the site, which were previously accrued as a component of other liabilities in the consolidated balance sheets. Substantially all of the assets associated with the Linden site had been written-off or fully depreciated prior to its sale.

10

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

## Note 4. Net Sales

*Revenue Recognition*

Prior to the adoption of Topic 606, Chemours recognized revenue when the earnings process was complete. Revenue for product sales was recognized when product was shipped to the customer in accordance with the terms of the agreement, when title and the risk of loss were transferred, when collectability was reasonably assured, and when pricing was fixed or determinable. Any payments received in advance were recorded as deferred revenue and recognized as shipments were made and title, ownership, and the risk of loss were transferred to the customer. The Company accrued for sales returns and other allowances based on its historical experience, with cash sales incentives reflected as a reduction in revenue and non-cash sales incentives reflected as a charge to the cost of goods sold contemporaneously with the related revenue or selling expense, depending on the nature of the incentive. Amounts billed to customers for shipping and handling fees were included in net sales, and the costs incurred by the Company for the delivery of goods were classified as a component of the cost of goods sold in the consolidated statements of operations. Taxes on revenue-producing transactions were excluded from net sales.

Licensing and royalty income was recognized as a component of other income, net in the consolidated statements of operations in accordance with agreed upon terms, when performance obligations were satisfied, when collectability was reasonably assured, and when pricing was fixed or determinable.

With the adoption of Topic 606, Chemours recognizes revenue using a five-step model resulting in revenue being recognized as performance obligations within a contract have been satisfied. The steps within that model include: (i) identifying the existence of a contract with a customer; (ii) identifying the performance obligations within the contract; (iii) determining the contract's transaction price; (iv) allocating the transaction price to the contract's performance obligations; and, (v) recognizing revenue as the contract's performance obligations are satisfied. A contract with a customer exists when: (i) the Company enters into an enforceable agreement that defines each party's rights regarding the goods or services to be transferred, and the related payment terms; (ii) the agreement has commercial substance; and, (iii) it is probable that the Company will collect the consideration to which it is entitled to in the exchange. A performance obligation is a promise in a contract to transfer a distinct good or service, or a series of distinct goods or services to a customer and serves as the unit of account for Topic 606. The transaction price is the customary amount of consideration that the Company expects to be entitled to in exchange for a transfer of the promised goods or services to a customer, excluding any amounts collected by the Company on behalf of third-parties (e.g., sales and use taxes). Judgment is required to apply the principles-based, five-step model for revenue recognition outlined in Topic 606. Management is required to make certain estimates and assumptions about the Company's contracts with its customers, including, among others, the nature and extent of its performance obligations, its transaction price amounts and any allocations thereof, the critical events which constitute satisfaction of its performance obligations, and when control of any promised goods or services is transferred to its customers.

The Company's revenue from contracts with customers is reflected in the consolidated statements of operations as net sales, the vast majority of which represents product sales that consist of a single performance obligation. Product sales to customers are made under a purchase order (PO), or in certain cases, in accordance with the terms of a master services agreement (MSA) or similar arrangement, which documents the rights and obligations of each party to the contract. When a customer submits a PO for product or requests product under an MSA, a contract for a specific quantity of distinct goods at a specified price is created, and the Company's performance obligation under the contract is satisfied when control of the product is transferred to the customer, which is indicated by shipment of the product and transfer of title and the risk of loss to the customer. Revenue is recognized on consignment sales when control transfers to the customer, generally at the point of customer usage of the product. The transaction price for product sales is generally the amount specified in the PO or in the request under an MSA; however, as is common in Chemours' industry, the Company offers variable consideration in the form of rebates, volume discounts, early payment discounts, pricing based on formulas or indices, price matching, and guarantees to certain customers. Such amounts are included in the Company's estimated transaction price using either the expected value method or the most-likely amount, depending on the nature of the variable consideration included in the contract. The Company regularly assesses its customers' creditworthiness, and product sales are made based on established credit limits. Payment terms for the Company's invoices are typically less than 90 days.

11

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

The Company also licenses the right to access certain of its trademarks to customers under specified terms and conditions in certain arrangements, which is recognized as a component of net sales in the consolidated statements of operations under Topic 606. Under such arrangements, the Company may receive a royalty payment for a trademark license that is entered into on a stand-alone basis or incorporated into an overall product sales arrangement. Royalty income is generally based on customer sales and recognized under the sales-based exception as the customer sale occurs. When minimum guaranteed royalty amounts are included in the transaction price, the Company recognizes royalty income ratably over the license period for the minimum amount. When there is no consideration specified for the use of the Company's trademark, the entire transaction price is recognized in connection with the transfer of control of product. Royalty income resulting from the right to use the Company's technology is considered outside the scope of Topic 606 as it is not a part of the Company's ongoing major or central activities, and consistent with past practice, is recognized as a component of other income, net in the consolidated statements of operations in accordance with agreed upon terms, when performance obligations are satisfied, when collectability is reasonably assured, and when pricing is fixed or determinable.

Consistent with the fact that the vast majority of the Company's payment terms are less than 90 days from the point at which control of the promised goods or services is transferred, no adjustments have been made for the effects of a significant financing component under Topic 606. Additionally, the Company has elected to recognize incremental costs associated with obtaining contracts as an expense when incurred if the amortization period of the assets that the Company would have recognized is one year or less. Amounts billed to customers for shipping and handling fees are considered a fulfillment cost and are included in net sales, and the costs incurred by the Company for the delivery of goods are classified as a component of the cost of goods sold in the consolidated statements of operations.

*Disaggregation of Net Sales*

The following table sets forth a disaggregation of the Company's net sales by geographic region, product group, and segment for the three months ended March 31, 2018.

| | | Three Months Ended March 31, 2018 | | | |
| | Fluoroproducts | Chemical Solutions | Titanium Technologies | Total | |
|---|---|---|---|---|---|
| **Net sales by geographic region (1)** | | | | | |
| North America | $ 303 | $ 81 | $ 233 | $ 617 | |
| Asia Pacific | 153 | 19 | 242 | 414 | |
| Europe, the Middle East, and Africa | 222 | 5 | 247 | 474 | |
| Latin America (2) | 54 | 39 | 132 | 225 | |
| **Total net sales** | $ 732 | $ 144 | $ 854 | $ 1,730 | |
| | | | | | |
| **Net sales by product group** | | | | | |
| Fluorochemicals | $ 395 | $ — | $ — | $ 395 | |
| Fluoropolymers | 337 | — | — | 337 | |
| Mining solutions | — | 66 | — | 66 | |
| Performance chemicals and intermediates | — | 78 | — | 78 | |
| Titanium dioxide and other minerals | — | — | 854 | 854 | |
| **Total net sales** | $ 732 | $ 144 | $ 854 | $ 1,730 | |

(1)    Net sales are attributed to countries based on customer location.

(2)    Latin America includes Mexico.

Substantially all of the Company's net sales are derived from goods and services transferred at a point in time.

12

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

*Contract Balances*

The Company's assets and liabilities from contracts with customers constitute accounts receivable - trade, deferred revenue, and customer rebates. An amount for accounts receivable - trade is recorded when the right to consideration under a contract becomes unconditional. An amount for deferred revenue is recorded when consideration is received prior to the conclusion that a contract exists, or when a customer transfers consideration prior to the Company satisfying its performance obligations under a contract. Customer rebates represent an expected refund liability to a customer based on a contract. In contracts with customers where a rebate is offered, it is generally applied retroactively based on the achievement of a certain sales threshold. As revenue is recognized, the Company estimates whether or not the sales threshold will be achieved to determine the amount of variable consideration to include in the transaction price.

The following table sets forth the Company's contract balances from contracts with customers at March 31, 2018 and December 31, 2017.

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Accounts receivable - trade, net (1) | $ 1,016 | $ 847 |
| Customer rebates | 54 | 83 |

    (1)    Accounts receivable - trade, net includes trade notes receivable of $3 and $1 and is net of allowances for doubtful accounts of $6 and $5 at March 31, 2018 and December 31, 2017, respectively. Such allowances are equal to the estimated uncollectible amounts.

The Company's deferred revenue balance as of March 31, 2018 and December 31, 2017 was not significant. Additionally, changes in the Company's deferred revenue balance resulting from additions for advance payments and deductions for amounts recognized in net sales during the three months ended March 31, 2018 were not significant. For the three months ended March 31, 2018, the amount of revenue recognized from performance obligations satisfied in prior periods (e.g., due to changes in transaction price) was not significant.

There were no other contract asset balances or capitalized costs associated with obtaining or fulfilling customer contracts as of March 31, 2018 or December 31, 2017.

*Remaining Performance Obligations*

Certain of the Company's MSA or other arrangements contain take-or-pay clauses, whereby customers are required to purchase a fixed minimum quantity of product during a specified period, or pay the Company for such orders, even if not requested by the customer. The Company considers these take-or-pay clauses to be an enforceable contract, and as such, the legally-enforceable minimum amounts under such an arrangement are considered to be outstanding performance obligations on contracts with an original expected duration greater than one year. As of March 31, 2018, Chemours had $87 of remaining performance obligations. The Company expects to recognize approximately 20% of its remaining performance obligations as revenue in 2018, an additional 25% in 2019, and the balance thereafter. The Company applies the practical expedient in Topic 606 and does not include remaining performance obligations that have original expected durations of one year or less, or amounts for variable consideration allocated to wholly-unsatisfied performance obligations or wholly-unsatisfied distinct goods that form part of a single performance obligation, if any. Amounts for contract renewals that are not yet exercised as of March 31, 2018 are also excluded.

**Note 5. Restructuring, Asset-related, and Other Charges, Net**

The following table sets forth the components of the Company's restructuring, asset-related, and other charges, net for the three months ended March 31, 2018 and 2017.

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2018 | 2017 |
| Employee separation charges | $ 3 | $ — |
| Decommissioning and other charges, net | 7 | 12 |
| **Total restructuring, asset-related, and other charges, net** | $ 10 | $ 12 |

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

The following table sets forth the impacts of the Company's restructuring programs to segment earnings for the three months ended March 31, 2018 and 2017.

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | | 2017 | |
| Plant and product line closures: | | | | |
| Fluoroproducts | $ | — | $ | 3 |
| Chemical Solutions | | 1 | | 5 |
| Titanium Technologies | | — | | 4 |
| Total plant and product line closures | | 1 | | 12 |
| 2017 Restructuring Program | | 9 | | — |
| **Total restructuring, asset-related, and other charges, net** | $ | 10 | $ | 12 |

### Plant and Product Line Closures

In August 2015, in an effort to improve the profitability of the Company's Fluoroproducts segment, management approved the closure of certain production lines in the segment's U.S. manufacturing plants. For the three months ended March 31, 2017, the Company recorded additional decommissioning and dismantling-related charges of $3 for certain of these production lines. At December 31, 2017, the Company had substantially completed all actions related to the restructuring activities for certain of its production lines, which amounted to $17 in the aggregate, excluding non-cash asset-related charges.

In the fourth quarter of 2015, the Company announced the completion of the strategic review of its Reactive Metals Solutions (RMS) business and the decision to stop production at its Niagara Falls, New York manufacturing plant. The RMS plant had approximately 200 employees and contractors impacted by this action, and production stopped at the plant in September 2016, when the Company immediately began actions to decommission the plant. For the three months ended March 31, 2018 and 2017, the Company recorded additional decommissioning and dismantling-related charges of $1 and $5, respectively. The Company expects to incur approximately $3 in additional restructuring charges for similar activities through the end of 2018, which will be expensed as incurred. As of March 31, 2018, the Company incurred, in the aggregate, $32 in restructuring charges related to these activities, excluding non-cash asset-related charges.

In August 2015, the Company announced the closure of its Edge Moor, Delaware manufacturing plant. The Edge Moor plant produced $TiO_2$ pigment for use in the paper industry and certain other applications where demand had steadily declined, resulting in under-used capacity at the plant. In addition, the Company permanently closed one under-used $TiO_2$ production line at its New Johnsonville, Tennessee plant. The Company stopped production at its Edge Moor plant in September 2015, and immediately began decommissioning the plant. For the three months ended March 31, 2017, the Company recorded additional decommissioning and dismantling-related charges of $4. The Company substantially completed these activities in 2017, which amounted to $60 in the aggregate, excluding non-cash asset-related charges. The Company sold the land where the plant was located for $10 in the first quarter of 2017.

In the first quarter of 2018, the Company began a project to demolish and remove several dormant, unused buildings at its Chambers Works site in Deepwater, New Jersey, which were assigned to Chemours in connection with its separation from DuPont. For the three months ended March 31, 2018, the Company incurred less than $1 in decommissioning and dismantling-related charges associated with these efforts. The Company expects to incur approximately $30 in additional restructuring charges related to its Chambers Works site through the end of 2020, which will be reflected in Corporate and Other, and will be expensed as incurred.

### 2017 Restructuring Program

In 2017, the Company announced certain restructuring activities designed to further the cost savings and productivity improvements outlined under management's transformation plan. These activities include, among other efforts: (i) outsourcing and further centralizing certain business process activities; (ii) consolidating existing, outsourced third-party information technology (IT) providers; and, (iii) implementing various upgrades to the Company's current IT infrastructure.

In 2017, the Company also announced a voluntary separation program (VSP) for certain eligible U.S. employees in an effort to better manage the anticipated future changes to its workforce. Employees who volunteered for, and were accepted under the VSP will receive certain financial incentives above the Company's customary involuntary termination benefits to end their employment with Chemours after providing a mutually agreed-upon service period. Approximately 300 employees will separate from the Company by the end of 2018. An accrual representing the majority of these termination benefits, amounting to $18, was recognized in the fourth quarter of 2017. The remaining incremental, one-time financial incentives under the VSP will be recognized over the period that each participating employee continues to provide service to Chemours.

14

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

For the three months ended March 31, 2018, the Company recorded additional charges of $9 related to its 2017 program. No such charges were recorded for the three months ended March 31, 2017. The cumulative amount incurred, in the aggregate, for the Company's 2017 program amounted to $41 at March 31, 2018.

As a result of its 2017 program, the Company expects to incur charges for restructuring-related activities and termination benefits of approximately $20 through the end of 2018, which will be expensed as incurred.

The following table sets forth the change in the Company's employee separation-related liabilities associated with its restructuring programs for the three months ended March 31, 2018.

| | Titanium Technologies Site Closures | | Fluoroproducts Lines Shutdown | | Chemical Solutions Site Closures | | 2015 Global Restructuring Program | | 2017 Restructuring Program | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2017 | $ | 1 | $ | — | $ | 2 | $ | 1 | $ | 23 | $ | 27 |
| Charges to income | | — | | — | | — | | — | | 3 | | 3 |
| Payments | | — | | — | | (1) | | — | | (5) | | (6) |
| Balance at March 31, 2018 | $ | 1 | $ | — | $ | 1 | $ | 1 | $ | 21 | $ | 24 |

At March 31, 2018, there are no significant outstanding liabilities related to the Company's decommissioning and other restructuring-related charges.

## Note 6. Other Income, Net

The following table sets forth the components of the Company's other income, net for the three months ended March 31, 2018 and 2017.

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| Leasing, contract services, and miscellaneous income | $ | 3 | $ | 8 |
| Royalty income (1) | | 5 | | 5 |
| Gain on sale of assets and businesses (2) | | 42 | | 16 |
| Exchange gains, net (3) | | — | | 5 |
| Non-operating pension and other post-retirement employee benefit income | | 7 | | 8 |
| **Total other income, net** | $ | 57 | $ | 42 |

(1)  Royalty income for the three months ended March 31, 2018 is primarily from technology licensing. Royalty income for the three months ended March 31, 2017 is primarily from technology and trademark licensing, portions of which are now reflected as a component of net sales in the consolidated statements of operations with the Company's adoption of Topic 606.

(2)  For the three months ended March 31, 2018, gain on sale includes a $42 gain associated with the sale of the Company's Linden, New Jersey site. For the three months ended March 31, 2017, gain on sale includes a $12 gain associated with the sale of the Company's Edge Moor, Delaware site and a $4 gain associated with the sale of the Company's land in Repauno, New Jersey that was previously deferred and realized upon meeting certain milestones.

(3)  Exchange gains, net includes gains and losses on foreign currency forward contracts.

## Note 7. Income Taxes

For the three months ended March 31, 2018 and 2017, Chemours recorded a provision for income taxes of $84 and $22, respectively, resulting in effective income tax rates of approximately 22% and 13%, respectively. The Company's provision for income taxes for the three months ended March 31, 2018 is inclusive of income tax expenses of $10 related to asset sales that took place in the first quarter of 2018 and $8 related to the impact of certain U.S. tax reform provisions, which are offset by $5 in income tax benefits related to windfalls on share-based payments. The Company's income tax provision for the three months ended March 31, 2017 is inclusive of income tax expenses of $6 related to asset sales that took place in the first quarter of 2017, which are offset by $10 in income tax benefits related to windfalls on share-based payments. The remaining change in the Company's effective tax rate from the prior year is primarily attributable to changes in its geographic mix of earnings.

15

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

In connection with the new federal tax legislation commonly referred to as the Tax Cut and Jobs Act (Tax Act), the Company recorded provisional estimates for U.S. tax reform in its provision for income taxes for the year ended December 31, 2017 amounting to a net benefit of $3. Staff Accounting Bulletin No. 118 (SAB No. 118) issued by the U.S. Securities and Exchange Commission allows registrants to record provisional estimates for the Tax Act during a measurement period not to exceed one year from the enactment date, which was December 22, 2017. The impacts of the Tax Act may differ from the Company's provisional estimates due to many factors, including, but not limited to, changes to its interpretations of the provisions in the Tax Act, U.S. Internal Revenue Service and U.S. Treasury guidance that may be issued, and actions that the Company may take.

For the three months ended March 31, 2018, the Company has not recorded any adjustments to its provisional estimates. The Company is still evaluating the effects of the Tax Act's provisions on its consolidated financial statements; however, the Company expects to complete its evaluation within the applicable measurement period, pursuant to SAB No. 118. As such, the Company's provisional estimates for the Tax Act could change significantly within this period, resulting in a material impact to its financial position, results of operations, or cash flows.

Each year, Chemours and/or its subsidiaries file income tax returns in U.S. federal and state jurisdictions and non-U.S. jurisdictions. These tax returns are subject to examination and possible challenge by the cognizant taxing authorities. Positions challenged by the taxing authorities may be settled or appealed by Chemours. As a result, income tax uncertainties are recognized in Chemours' consolidated financial statements in accordance with accounting for income taxes under Topic 740, *Income Taxes* , when applicable.

**Note 8. Earnings Per Share of Common Stock**

Reconciliations of the numerators and denominators for the Company's basic and diluted earnings per share (EPS) calculations for the three months ended March 31, 2018 and 2017 are set forth in the following table.

| | | Three Months Ended March 31, | | |
| --- | --- | --- | --- | --- |
| | | 2018 | | 2017 |
| Numerator: | | | | |
| Net income attributable to Chemours | $ | 297 | $ | 150 |
| Denominator: | | | | |
| Weighted-average number of common shares outstanding - basic | | 182,069,982 | | 183,408,309 |
| Dilutive effect of the Company's employee compensation plans | | 6,263,215 | | 5,741,621 |
| Weighted-average number of common shares outstanding - diluted | | 188,333,197 | | 189,149,930 |
| | | | | |
| Basic earnings per share of common stock | $ | 1.63 | $ | 0.82 |
| Diluted earnings per share of common stock | | 1.58 | | 0.79 |

The following table sets forth the average number of stock options that were anti-dilutive and, therefore, were not included in the Company's diluted EPS calculations for the three months ended March 31, 2018 and 2017.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| Average number of stock options | — | 169,118 |

16

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

### Note 9. Accounts and Notes Receivable, Net

The following table sets forth the components of the Company's accounts and notes receivable, net at March 31, 2018 and December 31. 2017.

| | March 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Accounts receivable - trade, net (1) | $ | 1,016 | $ | 847 |
| VAT, GST, and other taxes (2) | | 57 | | 54 |
| Other receivables (3) | | 10 | | 18 |
| **Total accounts and notes receivable, net** | $ | 1,083 | $ | 919 |

(1) Accounts receivable - trade, net includes trade notes receivable of $3 and $1 and is net of allowances for doubtful accounts of $6 and $5 at March 31, 2018 and December 31, 2017, respectively. Such allowances are equal to the estimated uncollectible amounts.

(2) Value added tax (VAT) and goods and services tax (GST) for various jurisdictions.

(3) Other receivables consist of notes receivable, advances, and other deposits.

Accounts and notes receivable are carried at amounts that approximate fair value. Bad debt expense was approximately $1 for the three months ended March 31, 2018 and 2017.

### Note 10. Inventories

The following table sets forth the components of the Company's inventories at March 31, 2018 and December 31, 2017.

| | March 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Finished products | $ | 695 | $ | 648 |
| Semi-finished products | | 164 | | 164 |
| Raw materials, stores, and supplies | | 326 | | 313 |
| Inventories before LIFO adjustment | | 1,185 | | 1,125 |
| Less: Adjustment of inventories to LIFO basis | | (193) | | (190) |
| **Total inventories** | $ | 992 | $ | 935 |

Inventory values, before last-in, first-out (LIFO) adjustment, are generally determined by the average cost method, which approximates current cost. Inventories are valued under the LIFO method at substantially all U.S. locations, which comprised $542 and $509, or 46% and 45%, of inventories before the LIFO adjustments at March 31, 2018 and December 31, 2017, respectively. The remainder of inventory held in international locations and certain U.S. locations is valued under the average cost method.

### Note 11. Property, Plant, and Equipment, Net

The following table sets forth the components of the Company's property, plant, and equipment, net at March 31, 2018 and December 31, 2017.

| | March 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Equipment | $ | 7,047 | $ | 6,961 |
| Buildings | | 905 | | 875 |
| Construction-in-progress | | 608 | | 520 |
| Land | | 123 | | 119 |
| Mineral rights | | 36 | | 36 |
| Property, plant, and equipment | | 8,719 | | 8,511 |
| Less: Accumulated depreciation | | (5,614) | | (5,503) |
| **Total property, plant, and equipment, net** | $ | 3,105 | $ | 3,008 |

Depreciation expense amounted to $69 and $70 for the three months ended March 31, 2018 and 2017, respectively. Property, plant, and equipment, net includes gross assets under capital leases of $7 at March 31, 2018 and December 31, 2017, and a build-to-suit lease asset of $19 and $8 at March 31, 2018 and December 31, 2017, respectively.

17

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

## Note 12. Other Assets

The following table sets forth the components of the Company's other assets at March 31, 2018 and December 31, 2017.

| | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Capitalized repair and maintenance costs | $ 102 | $ 117 |
| Pension assets (1) | 282 | 260 |
| Deferred income taxes | 46 | 40 |
| Miscellaneous (2) | 34 | 36 |
| Total other assets | $ 464 | $ 453 |

(1)  Pension assets represent the funded status of certain of the Company's long-term employee benefit plans.

(2)  Miscellaneous includes deferred financing fees related to the Company's senior secured revolving credit facility of $8 and $9 at March 31, 2018 and December 31, 2017, respectively, and Company-owned life insurance policies on former key executives of a U.S. subsidiary. These life insurance policies have a cash surrender value of $64 at March 31, 2018 and December 31, 2017, and are presented net of outstanding loans from the policy issuer of $64 and $63 at March 31, 2018 and December 31, 2017, respectively.

## Note 13. Accounts Payable

The following table sets forth the components of the Company's accounts payable at March 31, 2018 and December 31, 2017.

| | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Trade payables | $ 1,094 | $ 1,008 |
| Dividends payable (1) | — | 31 |
| VAT and other payables | 27 | 36 |
| Total accounts payable | $ 1,121 | $ 1,075 |

(1)  Represents a $0.17 per share dividend declared in December 2017, which was paid on March 15, 2018 to the Company's shareholders of record as of the close of business on February 15, 2018.

## Note 14. Other Accrued Liabilities

The following table sets forth the components of the Company's other accrued liabilities at March 31, 2018 and December 31, 2017.

| | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Compensation and other employee-related costs | $ 94 | $ 174 |
| Employee separation costs (1) | 24 | 27 |
| Accrued litigation (2) | 10 | 13 |
| Environmental remediation (2) | 75 | 66 |
| Income taxes | 68 | 58 |
| Customer rebates | 54 | 83 |
| Deferred income | 5 | 8 |
| Accrued interest | 69 | 24 |
| Miscellaneous (3) | 88 | 105 |
| Total other accrued liabilities | $ 487 | $ 558 |

(1)  Represents the current portion of accrued employee separation costs related to the Company's restructuring activities.

(2)  Represents the current portions of accrued litigation and environmental remediation, which are discussed further in "Note 17 – Commitments and Contingent Liabilities."

(3)  Miscellaneous primarily includes accrued utility expenses, property taxes, an accrued indemnification liability, the current portion of the Company's asset retirement obligations, and other miscellaneous expenses.

18

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

## Note 15. Debt

The following table sets forth the components of the Company's debt at March 31, 2018 and December 31, 2017.

| | March 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Senior secured term loans: | | | | |
| Tranche B-1 Dollar Term Loan due May 2022 | $ | 921 | $ | 923 |
| Tranche B-1 Euro Term Loan due May 2022 (€393 at March 31, 2018 and €395 at December 31, 2017) | | 487 | | 469 |
| Senior unsecured notes: | | | | |
| 6.625% due May 2023 | | 1,158 | | 1,158 |
| 7.000% due May 2025 | | 750 | | 750 |
| 6.125% due May 2023 (€295 at March 31, 2018 and December 31, 2017) | | 365 | | 350 |
| 5.375% due May 2027 | | 500 | | 500 |
| Capital lease obligations | | 2 | | 3 |
| Build-to-suit lease obligation | | 19 | | 8 |
| **Total debt** | | 4,202 | | 4,161 |
| Less: Unamortized issue discounts | | (8) | | (8) |
| Less: Unamortized debt issuance costs | | (39) | | (41) |
| Less: Current maturities of long-term debt | | (14) | | (15) |
| **Total long-term debt, net** | $ | 4,141 | $ | 4,097 |

### Senior Secured Credit Facilities

The Company's credit agreement, as amended, provides for seven-year, senior secured term loans and a five-year, $750 senior secured revolving credit facility (Revolving Credit Facility). No borrowings were outstanding under the Revolving Credit Facility at March 31, 2018 or December 31, 2017; however, Chemours had $106 and $101 in letters of credit issued and outstanding under this facility at March 31, 2018 and December 31, 2017, respectively. At March 31, 2018, the effective interest rates on the class of term loans denominated in U.S. dollars (Dollar Term Loan) and the class of term loans denominated in euros (Euro Term Loan) were 4.15% and 3.00%, respectively. Also, at March 31, 2018, commitment fees on the Revolving Credit Facility were assessed at a rate of 0.20% per annum.

As discussed more fully in "Note 23 – Subsequent Events," on April 3, 2018, the Company entered into an amended and restated credit agreement with respect to its senior secured credit facilities.

### Build-to-suit Lease Obligation

In October 2017, Chemours executed a build-to-suit lease agreement to construct a new 312,000-square-foot research and development facility on the Science, Technology, and Advanced Research campus of the University of Delaware (UD) in Newark, Delaware (The Chemours Discovery Hub). The land on which The Chemours Discovery Hub will be located is leased to a third-party owner-lessor by UD, and Chemours will act as the construction agent and ultimate lessee of the facility based on the Company's agreement with the owner-lessor. Project costs paid by the owner-lessor are reflected in the Company's consolidated balance sheets as construction-in-progress within property, plant, and equipment, and a corresponding build-to-suit lease liability within long-term debt. Through March 31, 2018, project costs paid by the owner-lessor amounted to $19. Construction of The Chemours Discovery Hub is expected to be completed by early 2020.

### Maturities

Debt maturities related to the Company's senior secured term loans under the amended and restated credit agreement are discussed more fully in "Note 23 – Subsequent Events." Debt maturities related to the Company's Notes (collectively, the 2023 Notes, the 2025 Notes, the Euro Notes, and the 2027 Notes) in 2023 and beyond will be $2,773.

### Debt Fair Value

The fair values of the Dollar Term Loan, the Euro Term Loan, the 2023 Notes, the 2025 Notes, the Euro Notes, and the 2027 Notes at March 31, 2018 were $922, $490, $1,217, $812, $383, and $502, respectively. The estimated fair values of the Dollar Term Loan, the Euro Term Loan, and the Notes are based on quotes received from third-party brokers, and are classified as Level 2 financial instruments in the fair value hierarchy.

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

## Note 16. Other Liabilities

The following table sets forth the components of the Company's other liabilities at March 31, 2018 and December 31, 2017.

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Environmental remediation (1) | $ 179 | $ 187 |
| Employee-related costs (2) | 131 | 123 |
| Accrued litigation (1) | 50 | 48 |
| Asset retirement obligations | 44 | 43 |
| Deferred income | 5 | 6 |
| Miscellaneous (3) | 66 | 68 |
| **Total other liabilities** | $ 475 | $ 475 |

(1)   The Company's accrued environmental remediation and accrued litigation liabilities are discussed further in "Note 17 – Commitments and Contingent Liabilities."

(2)   Employee-related costs primarily represent liabilities associated with the Company's long-term employee benefits plans.

(3)   Miscellaneous primarily includes an accrued indemnification liability of $50 and $52 at March 31, 2018 and December 31, 2017, respectively.

## Note 17. Commitments and Contingent Liabilities

### Litigation

In addition to the matters discussed below, Chemours, by virtue of its status as a subsidiary of DuPont prior to the separation, is subject to or required under the separation-related agreements executed prior to the separation to indemnify DuPont against various pending legal proceedings arising out of the normal course of Chemours' business including product liability, intellectual property, commercial, environmental, and anti-trust lawsuits. It is not possible to predict the outcomes of these various proceedings. Except for the litigation specific to PFOA (collectively, perfluorooctanoic acids and its salts, including the ammonium salt) and GenX and other perfluorinated and polyfluorinated compounds for which separate assessments are provided below, while management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the aforementioned proceedings, it does not believe any such loss would have a material impact on Chemours' consolidated financial position, results of operations, or liquidity. Disputes between Chemours and DuPont may also arise with respect to indemnification matters, including disputes based on matters of law or contract interpretation. If and to the extent these disputes arise, they could materially adversely affect Chemours.

### Asbestos

In the separation, DuPont assigned its asbestos docket to Chemours. At March 31, 2018 and December 31, 2017, there were approximately 1,600 lawsuits pending against DuPont alleging personal injury from exposure to asbestos. These cases are pending in state and federal court in numerous jurisdictions in the U.S. and are individually set for trial. A small number of cases are pending outside the U.S. Most of the actions were brought by contractors who worked at sites between 1950 and the 1990s. A small number of cases involve similar allegations by DuPont employees or household members of contractors or DuPont employees. Finally, certain lawsuits allege personal injury as a result of exposure to DuPont products.

At March 31, 2018 and December 31, 2017, Chemours had an accrual of $38 related to this matter. Chemours reviews this estimate and related assumptions quarterly.

### Benzene

In the separation, DuPont assigned its benzene docket to Chemours. As of March 31, 2018 and December 31, 2017, there were 18 and 17 cases pending against DuPont alleging benzene-related illnesses, respectively. These cases consist of premises matters involving contractors and deceased former employees who claim exposure to benzene while working at DuPont sites primarily in the 1960s through the 1980s, and product liability claims based on alleged exposure to benzene found in trace amounts in aromatic hydrocarbon solvents used to manufacture DuPont products such as paints, thinners, and reducers.

20

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

A benzene case (Hood v. DuPont) was tried to a verdict in Texas state court on October 20, 2015. Plaintiffs alleged that Mr. Hood ' s Acute Myelogenous Leukemia was the result of 24 years of occupational exposure to trace benzene found in DuPont automotive paint products and that DuPont negligently failed to warn him that its paints, reducers, and thinners contained benzene that could cause cancer or leukemia. The jury found in the plainti ffs' favor, awarding $6.9 in compensatory damages and $1.5 in punitive damages. In March 2016, acting on the Company ' s motion, the court struck the punitive award. Through DuPont, Chemours has filed an appeal on the remaining award based upon substantial e rrors made at the trial court level. Plaintiffs filed a cross appeal.

Management believes that a loss is reasonably possible related to these matters; however, given the evaluation of each benzene matter is highly fact-driven and impacted by disease, exposure, and other factors, a range of such losses cannot be reasonably estimated at this time.

*PFOA*

Prior to the fourth quarter of 2014, the performance chemicals segment of DuPont made PFOA at its Fayetteville, North Carolina plant and used PFOA as a processing aid in the manufacture of fluoropolymers and fluoroelastomers at certain sites including: Washington Works, Parkersburg, West Virginia; Chambers Works, Deepwater, New Jersey; Dordrecht Works, Netherlands; Changshu Works, China; and, Shimizu, Japan. These sites are now owned and/or operated by Chemours.

Chemours recorded accruals of $16 and $14 related to the PFOA matters discussed below at March 31, 2018 and December 31, 2017, respectively. Specific to the PFOA MDL Settlement (also discussed below), the Company recorded an accrual of $335 at December 31, 2016, which was paid in installments of $15 and $320 during the second and third quarters of 2017, respectively.

These accruals also include charges related to DuPont's obligations under agreements with the U.S. Environmental Protection Agency (EPA) and voluntary commitments to the New Jersey Department of Environmental Protection. These obligations and voluntary commitments include surveying, sampling, and testing drinking water in and around certain Company sites offering treatment or an alternative supply of drinking water if tests indicate the presence of PFOA in drinking water at or greater than the national health advisory. A provisional health advisory level was set by the EPA in 2009 at 0.4 parts per billion (ppb) that includes PFOA in drinking water. In May 2016, the EPA announced a health advisory level of 0.07 ppb that includes PFOA in drinking water. As a result, Chemours recorded an additional $4 in the second quarter of 2016 based on management's best estimate of the impact of the new health advisory level on the Company's obligations to the EPA, which have expanded the testing and water supply commitments previously established. Based on prior testing, the Company has initiated additional testing and treatment in certain additional locations in and around the Chambers Works and Washington Works plants. The Company will continue to work with the EPA regarding the extent of work that may be required with respect to these matters.

In February 2018, the State of Ohio initiated litigation against DuPont regarding historical PFOA emissions from the Washington Works site. Chemours is an additional named defendant. Ohio alleges damage to natural resources and seeks damages including remediation and other costs and punitive damages. This action is in its early stages and it is not possible at this point to predict the timing, course, or outcome.

<u>Drinking Water Actions</u>

In August 2001, a class action, captioned Leach v. DuPont, was filed in West Virginia state court alleging that residents living near the Washington Works facility had suffered, or may suffer, deleterious health effects from exposure to PFOA in drinking water.

DuPont and attorneys for the class reached a settlement in 2004 that binds about 80,000 residents. In 2005, DuPont paid the plaintiffs' attorneys' fees and expenses of $23 and made a payment of $70, which class counsel designated to fund a community health project. DuPont funded a series of health studies which were completed in October 2012 by an independent science panel of experts (C8 Science Panel). The studies were conducted in communities exposed to PFOA to evaluate available scientific evidence on whether any probable link exists, as defined in the settlement agreement, between exposure to PFOA and human disease. The C8 Science Panel found probable links, as defined in the settlement agreement, between exposure to PFOA and pregnancy-induced hypertension, including preeclampsia, kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, and diagnosed high cholesterol.

21

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

In May 2013, a panel of three independent medical doctors released its initial recommendations for screening and diagnostic testing of eligible class members. In September 2014, the medical panel recommended follow-up screening and diagnostic testing three years after initial testing, based on individual results. The medical panel has not communicated its anticipated schedule for completion of its protocol. DuPont is obligated to fund up to $235 for a medical monitoring program for eligible class members and, in addition, administrativ e cost associated with the program, including class counsel fees. In January 2012, DuPont, put $1 in an escrow account to fund medical monitoring as required by the settlement agreement. The court-appointed director of medical monitoring established the pr ogram to implement the medical panel's recommendations and the registration process, as well as eligibility screening, is ongoing. Diagnostic screening and testing is ongoing and associated payments to service providers are being disbursed from the escrow account. As of March 31, 2018, approximately $1 has been disbursed from the escrow account related to medical monitoring. While it is probable that the Company will incur costs related to the medical monitoring program discussed above, such costs cannot be reasonably estimated due to uncertainties surrounding the level of participation by eligible class members and the scope of testing.

In addition, under the Leach settlement agreement, DuPont must continue to provide water treatment designed to reduce the level of PFOA in water to six area water districts and private well users. At separation, this obligation was assigned to Chemours, which is included in the accrual amounts recorded as of March 31, 2018.

Under the Leach settlement, class members may pursue personal injury claims against DuPont only for those human diseases for which the C8 Science Panel determined a probable link exists. Approximately 3,500 lawsuits were filed in various federal and state courts in Ohio and West Virginia and consolidated in multi-district litigation (MDL) in Ohio federal court.

Settlement of MDL between DuPont and MDL Plaintiffs

In March 2017, DuPont entered into an agreement with the MDL plaintiffs' counsel providing for a global settlement of all cases and claims in the MDL, including all filed and unfiled personal injury cases and claims that are part of the plaintiffs' counsel's claim inventory, as well as cases that have been tried to a jury verdict (MDL Settlement). The total settlement amount is $670.7 in cash, with half paid by Chemours and half paid by DuPont. DuPont's payment was not subject to indemnification or reimbursement by Chemours, and Chemours accrued $335 associated with this matter at December 31, 2016. In exchange for payment of the total settlement amount, DuPont and Chemours received a complete release of all claims by the settling plaintiffs. The MDL Settlement was entered into solely by way of compromise and settlement and is not in any way an admission of liability or fault by DuPont or Chemours. As of September 30, 2017, Chemours had paid the full $335 accrued under the MDL Settlement.

Settlement between DuPont and Chemours Related to MDL

DuPont and Chemours agreed to a limited sharing of potential future PFOA costs (indemnifiable losses, as defined in the separation agreement between DuPont and Chemours) for a period of five years. During that five-year period, Chemours will annually pay future PFOA costs up to $25 and, if such amount is exceeded, DuPont will pay any excess amount up to the next $25 (which payment will not be subject to indemnification by Chemours), with Chemours annually bearing any further excess costs under the terms of the separation agreement. After the five-year period, this limited sharing agreement will expire, and Chemours' indemnification obligations under the separation agreement will continue unchanged. Chemours has also agreed that it will not contest its indemnification obligations to DuPont under the separation agreement for PFOA costs on the basis of ostensible defenses generally applicable to the indemnification provisions under the separation agreement, including defenses relating to punitive damages, fines or penalties, or attorneys' fees, and waives any such defenses with respect to PFOA costs. Chemours has, however, retained other defenses, including as to whether any particular PFOA claim is within the scope of the indemnification provisions of the separation agreement.

Post-MDL Settlement Injury Matters

All MDL lawsuits were dismissed or resolved through the MDL Settlement.

The MDL Settlement does not resolve PFOA personal-injury claims of plaintiffs who did not have cases or claims in the MDL or personal-injury claims based on diseases first diagnosed after February 11, 2017. Since the resolution of the MDL, personal-injury cases have been filed in West Virginia, Ohio, and New York courts. The New York matters, which are not part of the Leach class, are brought by three individual plaintiffs alleging negligence and other claims in the release of perfluorinated compounds, including PFOA, into drinking water, and seeking compensatory and punitive damages against current and former owners and suppliers of a manufacturing facility in Hoosick Falls, New York.

Management believes that the probability of loss is reasonably possible but not estimable at this time due to various reasons including, among others, that the proceedings are in early stages and there are significant factual issues to be resolved.

22

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

Water Districts

In May 2017, the Water Works and Sewer Board of the Town of Centre, Alabama filed suit against numerous carpet manufacturers located in Dalton, Georgia and suppliers and former suppliers, including DuPont, in Alabama state court. The complaint alleges negligence, nuisance, and trespass in the release of perfluorinated compounds, including PFOA, into a river leading to the town's water source, and seeks compensatory and punitive damages.

In February 2018, the New Jersey-American Water Company, Inc. (NJAW), filed suit against DuPont and Chemours in New Jersey federal court alleging that discharges of perfluorochemicals, in violation of the New Jersey Compensation and Control Act, were made into groundwater utilized in the NJAW Penns Grove water system. NJAW alleges that damages include costs associated with remediating, operating, and maintaining its system, and attorney fees.

Management believes that the probability of loss as to these matters is remote.

PFOA Summary

Chemours accrued $335 associated with the MDL Settlement at December 31, 2016, of which all $335 had been paid as of December 31, 2017. There could be additional lawsuits filed related to DuPont's use of PFOA, its manufacture of PFOA, or its customers' use of DuPont products that may not be within the scope of the MDL Settlement. Any such litigation could result in Chemours incurring additional costs and liabilities. Management believes it is reasonably possible that the Company could incur losses related to other PFOA matters in excess of amounts accrued, but any such losses are not estimable at this time due to various reasons including, among others, that such matters are in early stages and have significant factual issues to be resolved.

*U.S. Smelter and Lead Refinery, Inc.*

Six lawsuits, including one putative class action, are pending against DuPont by area residents concerning the U.S. Smelter and Lead Refinery multi-party Superfund site in East Chicago, Indiana. Five of the lawsuits allege that Chemours is now responsible for DuPont environmental liabilities. The lawsuits include allegations for personal injury damages, property diminution, and damages under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA, often referred to as Superfund). At separation, DuPont assigned Chemours its former plant site, which is located south of the residential portion of the Superfund area, and its responsibility for the environmental remediation at the Superfund site. DuPont has requested that Chemours defend and indemnify it, and Chemours has agreed to do so under a reservation of rights. Management believes a loss is reasonably possible, but not estimable at this time due to various reasons including, among others, that such matters are in early stages and have significant factual issues to be resolved.

*GenX and Other Perfluorinated and Polyfluorinated Compounds*

As reported in the press and noted in public statements by the Company, governmental agencies and local community members have made inquiries and engaged in discussions with the Company with respect to the discharge of the polymerization processing aid HFPO Dimer Acid (sometimes referred to as GenX or C3 Dimer) and perfluorinated and polyfluorinated compounds from the Company's facility in Fayetteville, North Carolina into the Cape Fear River, groundwater, and air. The Company believes that such discharges have not impacted the safety of drinking water in North Carolina. The Company has commenced capturing and separately disposing process wastewater from the Fayetteville facility and is cooperating with a variety of ongoing inquiries and investigations from federal, state, and local authorities, regulators, and other governmental entities, including responding to federal grand jury subpoenas, issued in connection with an ongoing investigation being conducted by the U.S. Attorney's Office for the Eastern District of North Carolina and the Environmental and Natural Resources Division of the U.S. Department of Justice.

23

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

In September 2017, the North Carolina Department of Environmental Quality (NC DEQ) issued a 60-day notice of intent to suspend the permit for the Fayetteville facility and the State of North Carolina filed an action in North Carolina state court regarding the discharges seeking a temporary restraining order and preliminary injunction, as well as other relief incl uding abatement and site correction. A partial consent order was entered partially resolving the state's action in return for the Company's agreement to continue and supplement the voluntary wastewater-disposal measures it had previously commenced and to p rovide certain information. In November 2017, NC DEQ informed the Company that it was suspending the process wastewater discharge permit for the Fayetteville facility. The Company thereafter commenced the capture and separate disposal of all process wastew ater from the Fayetteville facility related to the Company's own operations. In April 2018, the North Carolina Department of Air Quality (NC DAQ) issued a 60-day Notice of Intent to modify the Fayetteville site's air emissions permit to ensure that air emi ssions do not contribute or cause violations of groundwater rules. The NC DEQ amended its complaint regarding air emissions and groundwater. The Company continues to take action in response to these issues and will continue efforts to reach final resolutio n. It is possible that issues relating to groundwater deposition and/or air emissions could result in further litigation or regulatory demands with regard to the Fayetteville facility, including potential permit modifications that, if effected, could affec t the facility's continued operations.

Civil actions have been filed against the Company and DuPont in North Carolina federal court relating to discharges from the Fayetteville site. These actions include, a consolidated action brought by water systems seeking damages and injunctive relief, a consolidated purported class action seeking medical monitoring and property damage and/or other monetary and injunctive relief on behalf of the putative classes of property owners and residents in areas near or that draw drinking water from the Cape Fear River, and an action by private well owners seeking compensatory and punitive damages. It is possible that additional litigation may be filed against the Company and/or DuPont concerning the discharges. The Company believes it has valid defenses to such litigation including that the discharges did not impact the safety of drinking water or cause any damages or injury.

It is not possible at this point to predict the timing, course, or outcome of the governmental and regulatory inquiries, the notices issued by NC DEQ and NC DAQ, the action brought by North Carolina, and the other litigation, and it is possible that these matters could materially affect the Company's results and operations. In addition, local communities, organizations, and federal and state regulatory agencies have raised questions concerning HFPO Dimer Acid at certain other manufacturing sites operated by the Company, and it is possible that similar developments to those described above and centering on the Fayetteville site could arise in other locations.

*Environmental*

Chemours, due to the terms of its separation-related agreements with DuPont, is subject to contingencies pursuant to environmental laws and regulations that in the future may require further action to correct the effects on the environment of prior disposal practices or releases of chemical substances by Chemours or other parties. Much of this liability results from CERCLA, the Resource Conservation and Recovery Act, and similar state and global laws. These laws require Chemours to undertake certain investigative, remediation, and restoration activities at sites where Chemours conducts or once conducted operations or at sites where Chemours-generated waste was disposed. The accrual also includes estimated costs related to a number of sites identified for which it is probable that environmental remediation will be required, but which are not currently the subject of enforcement activities.

At March 31, 2018 and December 31, 2017, the consolidated balance sheets included a liability relating to these matters of $254 and $253, respectively, which, in management's opinion, is appropriate based on existing facts and circumstances. The time-frame for a site to go through all phases of remediation (investigation and active clean-up) may take about 15 to 20 years, followed by several years of operation, maintenance, and monitoring (OM&M) activities. Remediation activities, including OM&M activities, vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, diverse regulatory requirements, as well as the presence or absence of other potentially responsible parties. In addition, for claims that Chemours may be required to indemnify DuPont pursuant to the separation-related agreements, Chemours, through DuPont, has limited available information for certain sites or is in the early stages of discussions with regulators. For these sites in particular, there may be considerable variability between the clean-up activities that are currently being undertaken or planned and the ultimate actions that could be required. Therefore, considerable uncertainty exists with respect to environmental remediation costs and, under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $510 above the amount accrued at March 31, 2018.

For the three months ended March 31, 2018 and 2017, Chemours incurred environmental remediation expenses of $11 and $9, respectively.

Based on existing facts and circumstances, management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations, or cash flows in any given year, as such obligation can be satisfied or settled over many years.

24

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

## Note 18. Equity

### *Share Repurchase Program*

On November 30, 2017, the Company's board of directors approved a share repurchase program authorizing the purchase of shares of Chemours' issued and outstanding common stock in an aggregate amount not to exceed $500, plus any associated fees or costs in connection with the Company's share repurchase activity. Under the share repurchase program, shares of Chemours' common stock may be purchased on the open market from time to time, subject to management's discretion, as well as general business and market conditions. The Company's share repurchase program became effective on November 30, 2017 and continues through its expiration on December 31, 2020. The program may be suspended or discontinued at any time. All common shares purchased under the share repurchase program are held as treasury stock and are accounted for using the cost method.

Under the share repurchase program, the Company purchased an additional 4,979,152 shares of Chemours' issued and outstanding common stock during the first quarter of 2018, which amounted to $245 at an average share price of $49.17 per share. Of the 4,979,152 shares purchased by the Company, 324,600 shares amounting to $15 settled subsequent to March 31, 2018. As of March 31, 2018, the Company has purchased a cumulative 7,365,558 shares of Chemours' issued and outstanding common stock, which amounted to $361 at an average share price of $49.05 per share. The aggregate amount of Chemours' common stock that remained available for purchase under the share repurchase program at March 31, 2018 was $139.

## Note 19. Financial Instruments

### *Derivative Instruments*

#### *Objectives and Strategies for Holding Derivative Instruments*

In the ordinary course of business, Chemours enters into contractual arrangements (derivatives) to reduce its exposure to foreign currency risks. The Company has established a derivative program to be utilized for financial risk management. This program reflects varying levels of exposure coverage and time horizons based on an assessment of risk. The derivative program operates within Chemours' financial risk management policies and guidelines.

#### *Foreign Currency Forward Contracts*

Chemours uses foreign currency forward contracts to reduce its net exposure, by currency, related to non-functional currency-denominated monetary assets and liabilities of its operations so that exchange gains and losses resulting from exchange rate changes are minimized. These derivative instruments are not part of a cash flow hedge program or a fair value hedge program, and have not been designated as a hedge. Although all of the forward contracts are subject to an enforceable master netting agreement, Chemours has elected to present the derivative assets and liabilities on a gross basis on its consolidated balance sheets. No collateral has been required for these contracts. All gains and losses resulting from the revaluation of the derivative assets and liabilities are recognized in other income, net in the consolidated statements of operations during the period in which they occurred. Gains and losses on the Company's derivative instruments are intended to be offset by any gains or losses on the underlying asset or liability.

At March 31, 2018, there were 20 foreign currency forward contracts outstanding, with an aggregate notional U.S. dollar equivalent of $547. There were no foreign currency forward contracts outstanding at December 31, 2017. Chemours recognized in other income, net of the consolidated statements of operations, a net gain of $4 and a net loss of $1 for the three months ended March 31, 2018 and 2017, respectively.

#### *Net Investment Hedge - Foreign Currency Borrowings*

Chemours designated its Euro Notes and Euro Term Loan as a hedge of its net investments in certain of its international subsidiaries that use the euro as their functional currency in order to reduce the volatility in stockholders' equity caused by the changes in foreign currency exchange rates of the euro with respect to the U.S. dollar. Chemours uses the spot method to measure the effectiveness of its net investment hedge. For each reporting period, the change in the carrying value of the Euro Notes and the Euro Term Loan due to remeasurement of the effective portion are reported in accumulated other comprehensive loss on the consolidated balance sheets, and the remaining change in the carrying value of the ineffective portion, if any, is recognized in other income, net in the consolidated statements of operations. Chemours evaluates the effectiveness of its net investment hedge quarterly. Chemours did not record any ineffectiveness for the three months ended March 31, 2018 or 2017. The Company recognized pre-tax losses of $34 and $10 on its net investment hedges within accumulated other comprehensive loss for the three months ended March 31, 2018 and 2017, respectively.

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

*Fair Value of Derivative Instrumen ts*

The following table sets forth the fair value of the Company's derivative assets and liabilities, and their level within the fair value hierarchy, at March 31, 2018 and December 31, 2017.

| | | Fair Value Using Level 2 Inputs | |
|---|---|---|---|
| | Balance Sheet Location | March 31, 2018 | December 31, 2017 |
| Asset derivatives: | | | |
| Foreign currency forward contracts | Accounts and notes receivable, net | $ 1 | $ — |
| **Total asset derivatives** | | $ 1 | $ — |
| | | | |
| Liability derivatives: | | | |
| Foreign currency forward contracts | Other accrued liabilities | $ 2 | $ — |
| **Total liability derivatives** | | $ 2 | $ — |

The Company's foreign currency forward contracts are classified as Level 2 financial instruments within the fair value hierarchy as the valuation inputs are based on quoted prices and market observable data of similar instruments. For derivative assets and liabilities, standard industry models are used to calculate the fair value of the various financial instruments based on significant observable market inputs, such as foreign exchange rates and implied volatilities obtained from various market sources. Market inputs are obtained from well-established and recognized vendors of market data, and subjected to tolerance/quality checks.

## Note 20. Long-term Employee Benefits

Chemours sponsors defined benefit pension plans for certain of its employees in various jurisdictions outside of the U.S. The Company's net periodic pension income is based on estimated values and an extensive use of assumptions about the discount rate, expected return on plan assets, and the rate of future compensation increases received by its employees.

The following table sets forth the Company's net periodic pension income and amounts recognized in other comprehensive income (loss) for the three months ended March 31, 2018 and 2017.

| | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Net periodic pension (cost) income: | | |
| Service cost | $ (4) | $ (4) |
| Interest cost | (4) | (4) |
| Expected return on plan assets | 15 | 17 |
| Amortization of actuarial loss | (4) | (5) |
| Net periodic pension income | 3 | 4 |
| Changes in plan assets and benefit obligations recognized in other comprehensive income: | | |
| Amortization of actuarial loss | 4 | 5 |
| Benefit recognized in other comprehensive income | 4 | 5 |
| **Total net periodic pension income and benefit recognized in comprehensive income** | $ 7 | $ 9 |

The Company made cash contributions of $4 to its pension plans during the three months ended March 31, 2018, and expects to make additional cash contributions of $11 to its pension plans during the remainder of 2018.

26

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

## Note 21. Stock-based Compensation

Total stock-based compensation cost included in the consolidated statements of operations was $9 and $6 for the three months ended March 31, 2018 and 2017, respectively.

The Chemours Company 2017 Equity and Incentive Plan and The Chemours Company Equity and Incentive Plan provide for grants to certain employees, independent contractors, or non-employee directors of the Company of different forms of awards, including stock options, restricted stock units (RSUs), and performance share units (PSUs). The Chemours Compensation Committee determines the long-term incentive awards mix and may authorize new grants annually.

### Stock Options

In the three months ended March 31, 2018, Chemours granted approximately 470,000 non-qualified stock options to certain of its employees, which will vest over a three-year period and expire 10 years from the date of grant. The fair value of the stock options is based upon the Black-Scholes valuation model.

The following table sets forth the assumptions used to determine the fair value of stock option awards granted during the three months ended March 31, 2018.

| | Three Months Ended March 31, 2018 |
|---|---|
| Risk-free interest rate | 2.64% |
| Expected term (years) | 6.00 |
| Volatility | 47.56% |
| Dividend yield | 1.40% |
| **Fair value per stock option** | $ 20.55 |

The Company recorded $5 and $1 in stock-based compensation expense specific to its stock options for the three months ended March 31, 2018 and 2017, respectively. At March 31, 2018, approximately 6,770,000 stock options remain outstanding.

### Restricted Stock Units

In the three months ended March 31, 2018, Chemours granted approximately 110,000 RSUs to certain of its employees, which will vest over a three-year period and, upon vesting, convert one-for-one to Chemours' common stock. The fair value of the RSUs is based upon the market price of the underlying common stock as of the grant date.

The Company recorded $2 and $4 in stock-based compensation expense specific to its RSUs for the three months ended March 31, 2018 and 2017, respectively. At March 31, 2018, approximately 970,000 RSUs remain non-vested.

### Performance Share Units

In the three months ended March 31, 2018, Chemours granted approximately 140,000 PSUs to key senior management employees, which, upon vesting, convert one-for-one to Chemours' common stock if specified performance goals, including certain market-based conditions, are met over the three-year performance period specified in the grant, subject to exceptions through the respective vesting period of three years. Each grantee is granted a target award of PSUs, and may earn between 0% and 200% of the target amount depending on the Company's performance against stated performance goals.

A portion of the fair value of PSUs was estimated at the grant date based on the probability of satisfying the market-based conditions associated with the PSUs using the Monte Carlo valuation method, which assesses probabilities of various outcomes of market conditions. The other portion of the fair value of the PSUs is based on the fair market value of the Company's stock at the grant date, regardless of whether the market-based condition is satisfied.

The Company recorded $2 and $1 in stock-based compensation expense specific to its PSUs for the three months ended March 31, 2018 and 2017, respectively. At March 31, 2018, approximately 810,000 PSUs at 100% of the target amount remain non-vested.

27

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

*Employee Stock Purchase Plan*

On January 26, 2017, the Company's board of directors approved The Chemours Company Employee Stock Purchase Plan (ESPP), which was approved by Chemours' stockholders on April 26, 2017. Under the ESPP, a total of 7,000,000 shares of Chemours' common stock is reserved and authorized for issuance to participating employees, as defined by the ESPP, which excludes executive officers of the Company. The ESPP provides for consecutive 12-month offering periods, each with four purchase periods beginning and ending on the calendar quarters within those offering periods. The initial offering period under the ESPP began on October 2, 2017. Participating employees are eligible to purchase the Company's common stock at a discounted rate equal to 95% of its fair value on the last trading day of each purchase period. In the first quarter of 2018, the Company executed an open market transaction to purchase Company stock on behalf of ESPP participants. Total purchases amounted to less than $1, which was used to purchase approximately 12,000 shares of Chemours' common stock for the purchase period ending December 31, 2017.

## Note 22. Segment Information

Chemours' reportable segments are: Fluoroproducts, Chemical Solutions, and Titanium Technologies. Corporate costs and certain legal and environmental expenses that are not allocated to the reportable segments and foreign exchange gains and losses are reflected in Corporate and Other.

Segment sales include transfers to another reportable segment. Certain products are transferred between segments on a basis intended to reflect, as nearly as practicable, the market value of the products. These product transfers were limited and were not significant for each of the periods presented. Depreciation and amortization includes depreciation on research and development facilities and the amortization of other intangible assets, excluding any write-downs of assets.

Adjusted earnings before interest, taxes, depreciation, and amortization (Adjusted EBITDA) is the primary measure of segment profitability used by the Company's Chief Operating Decision Maker and is defined as income (loss) before income taxes, excluding the following:

- interest expense, depreciation, and amortization;
- non-operating pension and other post-retirement employee benefit costs, which represent the components of net periodic pension (income) costs excluding the service cost component;
- exchange (gains) losses included in other income (expense), net;
- restructuring, asset-related, and other charges, net;
- asset impairments;
- (gains) losses on sale of business or assets; and,
- other items not considered indicative of the Company's ongoing operational performance and expected to occur infrequently.

The following table sets forth certain summary financial information for the Company's reportable segments and Corporate and Other for the three months ended March 31, 2018 and 2017.

| Three Months Ended March 31, | Fluoroproducts | | Chemical Solutions | | Titanium Technologies | | Corporate and Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | | | | | | | | | | |
| Net sales to external customers | $ | 732 | $ | 144 | $ | 854 | $ | — | $ | 1,730 |
| Adjusted EBITDA | | 206 | | 11 | | 294 | | (43) | | 468 |
| Depreciation and amortization | | 28 | | 5 | | 30 | | 7 | | 70 |
| **2017** | | | | | | | | | | |
| Net sales to external customers | $ | 652 | $ | 139 | $ | 646 | $ | — | $ | 1,437 |
| Adjusted EBITDA | | 155 | | 12 | | 159 | | (41) | | 285 |
| Depreciation and amortization | | 26 | | 4 | | 33 | | 8 | | 71 |

28

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

The following table sets forth a reconciliation of Adjusted EBITDA to the Company's consolidated net income before income taxes for the three months ended March 31, 2018 and 2017.

| | Three Months Ended March 31, | | |
|---|---|---|---|
| | 2018 | | 2017 |
| Income before income taxes | $ 381 | $ | 173 |
| Interest expense, net | 52 | | 51 |
| Depreciation and amortization | 70 | | 71 |
| Non-operating pension and other post-retirement employee benefit income | (7) | | (8) |
| Exchange gains | — | | (5) |
| Restructuring, asset-related, and other charges, net | 10 | | 12 |
| Gain on sale of assets and businesses (1) | (42) | | (16) |
| Legal and other charges (2) | 4 | | 7 |
| **Adjusted EBITDA** | $ 468 | $ | 285 |

(1) For the three months ended March 31, 2018, gain on sale includes a $42 gain associated with the sale of the Company's Linden, New Jersey site. For the three months ended March 31, 2017, gain on sale includes a $12 gain associated with the sale of the Company's Edge Moor, Delaware site and a $4 gain associated with the sale of the Company's land in Repauno, New Jersey that was previously deferred and realized upon meeting certain milestones.

(2) Includes litigation settlements, water treatment accruals, and other charges.

## Note 23. Subsequent Events

*Acquisition of ICOR International, Inc.*

On April 2, 2018, the Company, through its wholly-owned subsidiary, The Chemours Company FC, LLC, entered into a Stock Purchase Agreement (SPA) to acquire all of the outstanding stock of ICOR International, Inc. (ICOR), a closely-held private company that produces, sells, and distributes replacement refrigerant gases for use in commercial, industrial, and automotive refrigerant applications, for $35 in total consideration. Pursuant to the terms of the SPA, the Company paid $32 at closing in the all-cash acquisition, which is subject to customary working capital and other adjustments within a specified time period. The acquisition of ICOR complements the Company's existing portfolio of product offerings within the Fluoroproducts segment, as well as provides the Company with access to ICOR's established customer base and assembled workforce. The Company will account for the acquisition of ICOR as a business combination, and as such, all assets acquired and liabilities assumed will be recorded at their estimated fair values, and the excess of the consideration transferred over the fair value of the net assets acquired will be recorded as goodwill within the Fluoroproducts segment.

*Amended and Restated Credit Agreement*

On April 3, 2018, the Company entered into an amended and restated credit agreement that provides for a seven-year, senior secured term loan facility and a five-year, $800 senior secured revolving credit facility (New Revolving Credit Facility) (collectively, the New Senior Secured Credit Facilities).

The senior secured term loan facility provides for a class of term loans, denominated in U.S. dollars, in an aggregate principal amount of $900 (New Dollar Term Loan) and a class of term loans, denominated in euros, in an aggregate principal amount of €350 (New Euro Term Loan) (collectively, the New Term Loans). The proceeds of the New Term Loans, together with cash on hand, were primarily used to prepay in full all outstanding amounts under the Company's existing credit agreement, which amounted to $921 and €393 at March 31, 2018. The New Dollar Term Loan bears a variable interest rate equal to, at the election of the Company, adjusted LIBOR plus 1.75% or adjusted base rate plus 0.75%, subject to an adjusted LIBOR or an adjusted base rate floor of 0.00% or 1.00%, respectively. The New Euro Term Loan bears a variable interest rate equal to adjusted EURIBOR plus 2.00%, subject to an adjusted EURIBOR floor of 0.50%. The New Term Loans will mature on April 3, 2025, and are subject to acceleration in certain circumstances.

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

The proceeds of any loans made under the New Revolving Credit Facility can be used for working capital need s and other general corporate purposes, including permitted acquisitions and other transactions, as defined under the amended and restated credit agreement. The New Revolving Credit Facility bears a variable interest rate range based on the Company's total net leverage ratio, as defined in the amended and restated credit agreement, between (i) a 0.25% and a 1.00% spread for adjusted base rate loans, and (ii) a 1.25% and a 2.00% spread for LIBOR and EURIBOR loans. In addition, the Company is required to pay a commitment fee on the average daily unused amount of the New Revolving Credit Facility within an interest rate range based on its total net leverage ratio, between 0.10% and 0.25%. The New Revolving Credit Facility will mature on April 3, 2023, and is su bject to acceleration in certain circumstances.

The amended and restated credit agreement also modifies or eliminates certain provisions of the Company's existing credit agreement, including certain negative covenants to allow for further flexibility. Under the amended and restated credit agreement, solely with respect to the New Revolving Credit Facility, the Company is required to not exceed a maximum senior secured net leverage ratio of: (i) 2.50 to 1.00 in each quarter through June 30, 2018; (ii) 2.25 to 1.00 in each quarter through December 31, 2018; and, (iii) 2.00 to 1.00 in each quarter beginning January 1, 2019, through the date of maturity. The Company's minimum interest coverage ratio requirements under the existing credit agreement were eliminated in the amended and restated credit agreement. In addition, the amended and restated credit agreement contains customary affirmative and negative covenants that, among other things, limit or restrict the Company's and its subsidiaries' ability, subject to certain exceptions, to incur additional indebtedness or liens, pay dividends, and engage in certain transactions, including mergers, acquisitions, asset sales, or investments, outside of specified carve-outs. The amended and restated credit agreement also contains customary representations and warranties and events of default, which are substantially similar to those in the existing credit agreement. The Company was in compliance with its debt covenants at March 31, 2018.

The Company's obligations under the New Senior Secured Credit Facilities are guaranteed on a senior secured basis by all of its material domestic subsidiaries, which are also guarantors of the Company's outstanding notes, subject to certain exceptions. The obligations under the New Senior Secured Credit Facilities are also, subject to certain exceptions, secured by a first priority lien on substantially all of the Company's assets and substantially all of the assets of its wholly-owned, material domestic subsidiaries, including 100% of the stock of certain of its domestic subsidiaries and 65% of the stock of certain of its foreign subsidiaries.

The Company has required quarterly payments related to the New Senior Secured Credit Facilities equivalent to 1.00% per annum through December 2024, with the balance due at maturity. Principal maturities on the New Senior Secured Credit Facilities over the next five years are $10 for the remainder of 2018, approximately $13 in each year from 2019 to 2022, and approximately $1,270 in 2023 and beyond. Also, following the end of each fiscal year commencing on the year ended December 31, 2019, on an annual basis, the Company is required to make additional principal payments depending on leverage levels, as defined in the amended and restated credit agreement, equivalent to up to 50% of excess cash flows based on certain leverage targets with step-downs to 25% and 0% as actual leverage decreases to below a 3.50 to 1.00 leverage target.

The transaction resulted in a net prepayment of the Company's total outstanding senior secured debt balance by approximately $75, based on the euro exchange rate on April 3, 2018. The Company is currently evaluating the accounting treatment for its amended and restated credit agreement, including the treatment of any related transaction costs.

*Share Repurchase Program*

In connection with its share repurchase program, the Company purchased an additional 764,786 shares of Chemours' issued and outstanding common stock in April 2018, which amounted to $39.

30

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

## Note 24. Guarantor Condensed Consolidating Financial Information

The following guarantor financial information is included in accordance with Rule 3-10 of Regulation S-X (Rule 3-10) in connection with the issuance of the Notes by The Chemours Company (Parent Issuer). The Notes are fully and unconditionally guaranteed, jointly and severally, on a senior unsecured unsubordinated basis, in each case, subject to certain exceptions, by the Parent Issuer and by certain of its subsidiaries (together, the Guarantor Subsidiaries). Each of the Guarantor Subsidiaries is 100% owned by the Company. None of the other subsidiaries of the Company, either direct or indirect, guarantee the Notes (together, Non-Guarantor Subsidiaries). The Guarantor Subsidiaries, excluding the Parent Issuer, will be automatically released from those guarantees upon the occurrence of certain customary release provisions.

The following condensed consolidating financial information is presented to comply with the Company's requirements under Rule 3-10:

- the condensed consolidating statements of comprehensive income for the three months ended March 31, 2018 and 2017;

- the condensed consolidating balance sheets at March 31, 2018 and December 31, 2017; and,

- the condensed consolidating statements of cash flows for the three months ended March 31, 2018 and 2017.

The condensed consolidating financial information is presented using the equity method of accounting for the Company's investments in its 100% owned subsidiaries. Under the equity method, the investments in subsidiaries are recorded at cost and adjusted for the Company's share of its subsidiaries' cumulative results of operations, capital contributions, distributions, and other equity changes. The elimination entries principally eliminate investments in subsidiaries and intercompany balances and transactions. The financial information included herein should be read in conjunction with the consolidated financial statements presented and the related notes.

31

The Chemours Company
Notes to the Interim Consolidated Financial Statements (Unaudited)
*(Dollars in millions, except per share amounts)*

**Condensed Consolidating Statements of Comprehensive Income**

| | Three Months Ended March 31, 2018 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Parent Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations and Adjustments | Consolidated |
| Net sales | $ — | $ 1,017 | $ 1,174 | $ (461) | $ 1,730 |
| Cost of goods sold | — | 798 | 871 | (476) | 1,193 |
| Gross profit | — | 219 | 303 | 15 | 537 |
| Selling, general, and administrative expense | 10 | 102 | 40 | (9) | 143 |
| Research and development expense | — | 19 | 1 | — | 20 |
| Restructuring, asset-related, and other charges, net | — | 9 | 1 | — | 10 |
| Total expenses | 10 | 130 | 42 | (9) | 173 |
| Equity in earnings of affiliates | — | — | 12 | — | 12 |
| Equity in earnings of subsidiaries | 331 | — | — | (331) | — |
| Interest (expense) income, net | (56) | 2 | 2 | — | (52) |
| Intercompany interest income (expense), net | 13 | 1 | (14) | — | — |
| Other income (expense), net | 9 | 73 | (16) | (9) | 57 |
| Income before income taxes | 287 | 165 | 245 | (316) | 381 |
| (Benefit from) provision for income taxes | (10) | 50 | 45 | (1) | 84 |
| Net income | 297 | 115 | 200 | (315) | 297 |
| Less: Net income attributable to non-controlling interests | — | — | — | — | — |
| Net income attributable to Chemours | $ 297 | $ 115 | $ 200 | $ (315) | $ 297 |
| Comprehensive income attributable to Chemours | $ 373 | $ 117 | $ 299 | $ (416) | $ 373 |

32

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

**Condensed Consolidating Statements of Comprehensive Income**

| | Parent Issuer | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations and Adjustments | | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Three Months Ended March 31, 2017 | | | | | |
| Net sales | $ | — | $ | 960 | $ | 894 | $ | (417) | $ | 1,437 |
| Cost of goods sold | | — | | 795 | | 706 | | (420) | | 1,081 |
| Gross profit | | — | | 165 | | 188 | | 3 | | 356 |
| Selling, general, and administrative expense | | 7 | | 114 | | 35 | | (6) | | 150 |
| Research and development expense | | — | | 18 | | 1 | | — | | 19 |
| Restructuring, asset-related, and other charges, net | | — | | 11 | | 1 | | — | | 12 |
| Total expenses | | 7 | | 143 | | 37 | | (6) | | 181 |
| Equity in earnings of affiliates | | — | | — | | 7 | | — | | 7 |
| Equity in earnings of subsidiaries | | 172 | | — | | — | | (172) | | — |
| Interest (expense) income, net | | (51) | | (1) | | 1 | | — | | (51) |
| Intercompany interest income (expense), net | | 16 | | — | | (16) | | — | | — |
| Other income, net | | 6 | | 42 | | — | | (6) | | 42 |
| **Income before income taxes** | | 136 | | 63 | | 143 | | (169) | | 173 |
| (Benefit from) provision for income taxes | | (14) | | 5 | | 30 | | 1 | | 22 |
| **Net income** | | 150 | | 58 | | 113 | | (170) | | 151 |
| Less: Net income attributable to non-controlling interests | | — | | — | | 1 | | — | | 1 |
| **Net income attributable to Chemours** | $ | 150 | $ | 58 | $ | 112 | $ | (170) | $ | 150 |
| **Comprehensive income attributable to Chemours** | $ | 239 | $ | 59 | $ | 210 | $ | (269) | $ | 239 |

33

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

**Condensed Consolidating Balance Sheets**

| | Parent Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations and Adjustments | Consolidated |
|---|---|---|---|---|---|
| | | | March 31, 2018 | | |
| **Assets** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ — | $ 470 | $ 964 | $ — | $ 1,434 |
| Accounts and notes receivable, net | — | 367 | 716 | — | 1,083 |
| Intercompany receivable | 19 | 1,175 | 589 | (1,783) | — |
| Inventories | — | 419 | 647 | (74) | 992 |
| Prepaid expenses and other | — | 45 | 30 | — | 75 |
| Total current assets | 19 | 2,476 | 2,946 | (1,857) | 3,584 |
| Property, plant, and equipment | — | 6,538 | 2,181 | — | 8,719 |
| Less: Accumulated depreciation | — | (4,484) | (1,130) | — | (5,614) |
| Property, plant and equipment, net | — | 2,054 | 1,051 | — | 3,105 |
| Goodwill and other intangible assets, net | — | 151 | 14 | — | 165 |
| Investments in affiliates | — | — | 166 | — | 166 |
| Investment in subsidiaries | 4,844 | — | — | (4,844) | — |
| Intercompany notes receivable | 1,150 | — | — | (1,150) | — |
| Other assets | 30 | 103 | 353 | (22) | 464 |
| **Total assets** | $ 6,043 | $ 4,784 | $ 4,530 | $ (7,873) | $ 7,484 |
| **Liabilities** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ — | $ 626 | $ 495 | $ — | $ 1,121 |
| Current maturities of long-term debt | 14 | — | — | — | 14 |
| Intercompany payable | 827 | 589 | 367 | (1,783) | — |
| Other accrued liabilities | 85 | 240 | 163 | (1) | 487 |
| Total current liabilities | 926 | 1,455 | 1,025 | (1,784) | 1,622 |
| Long-term debt, net | 4,120 | 21 | — | — | 4,141 |
| Intercompany notes payable | — | — | 1,150 | (1,150) | — |
| Deferred income taxes | — | 156 | 111 | (23) | 244 |
| Other liabilities | — | 384 | 91 | — | 475 |
| Total liabilities | 5,046 | 2,016 | 2,377 | (2,957) | 6,482 |
| Commitments and contingent liabilities | | | | | |
| **Equity** | | | | | |
| Total Chemours stockholders' equity | 997 | 2,768 | 2,148 | (4,916) | 997 |
| Non-controlling interests | — | — | 5 | — | 5 |
| Total equity | 997 | 2,768 | 2,153 | (4,916) | 1,002 |
| **Total liabilities and equity** | $ 6,043 | $ 4,784 | $ 4,530 | $ (7,873) | $ 7,484 |

**The Chemours Company**
**Notes to the Interim Consolidated Financial Statements (Unaudited)**
*(Dollars in millions, except per share amounts)*

**Condensed Consolidating Balance Sheets**

| | Parent Issuer | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations and Adjustments | | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | | | December 31, 2017 | | | | | | |
| **Assets** | | | | | | | | | |
| Current assets: | | | | | | | | | |
| Cash and cash equivalents | $ | — | $ | 761 | $ | 795 | $ | — | $ | 1,556 |
| Accounts and notes receivable, net | | — | | 308 | | 611 | | — | | 919 |
| Intercompany receivable | | 3 | | 904 | | 581 | | (1,488) | | — |
| Inventories | | — | | 394 | | 631 | | (90) | | 935 |
| Prepaid expenses and other | | — | | 57 | | 15 | | 11 | | 83 |
| Total current assets | | 3 | | 2,424 | | 2,633 | | (1,567) | | 3,493 |
| Property, plant, and equipment | | — | | 6,449 | | 2,062 | | — | | 8,511 |
| Less: Accumulated depreciation | | — | | (4,438) | | (1,065) | | — | | (5,503) |
| Property, plant and equipment, net | | — | | 2,011 | | 997 | | — | | 3,008 |
| Goodwill and other intangible assets, net | | — | | 152 | | 14 | | — | | 166 |
| Investments in affiliates | | — | | — | | 173 | | — | | 173 |
| Investment in subsidiaries | | 4,393 | | — | | — | | (4,393) | | — |
| Intercompany notes receivable | | 1,150 | | — | | — | | (1,150) | | — |
| Other assets | | 23 | | 115 | | 328 | | (13) | | 453 |
| **Total assets** | $ | 5,569 | $ | 4,702 | $ | 4,145 | $ | (7,123) | $ | 7,293 |
| **Liabilities** | | | | | | | | | |
| Current liabilities: | | | | | | | | | |
| Accounts payable | $ | 31 | $ | 606 | $ | 438 | $ | — | $ | 1,075 |
| Current maturities of long-term debt | | 15 | | — | | — | | — | | 15 |
| Intercompany payable | | 542 | | 581 | | 365 | | (1,488) | | — |
| Other accrued liabilities | | 34 | | 343 | | 181 | | — | | 558 |
| Total current liabilities | | 622 | | 1,530 | | 984 | | (1,488) | | 1,648 |
| Long-term debt, net | | 4,087 | | 10 | | — | | — | | 4,097 |
| Intercompany notes payable | | — | | — | | 1,150 | | (1,150) | | — |
| Deferred income taxes | | — | | 127 | | 105 | | (24) | | 208 |
| Other liabilities | | — | | 388 | | 87 | | — | | 475 |
| Total liabilities | | 4,709 | | 2,055 | | 2,326 | | (2,662) | | 6,428 |
| Commitments and contingent liabilities | | | | | | | | | |
| **Equity** | | | | | | | | | |
| Total Chemours stockholders' equity | | 860 | | 2,647 | | 1,814 | | (4,461) | | 860 |
| Non-controlling interests | | — | | — | | 5 | | — | | 5 |
| Total equity | | 860 | | 2,647 | | 1,819 | | (4,461) | | 865 |
| **Total liabilities and equity** | $ | 5,569 | $ | 4,702 | $ | 4,145 | $ | (7,123) | $ | 7,293 |

35

The Chemours Company
Notes to the Interim Consolidated Financial Statements (Unaudited)
*(Dollars in millions, except per share amounts)*

**Condensed Consolidating Statements of Cash Flows**

| | Three Months Ended March 31, 2018 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Parent Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations and Adjustments | Consolidated |
| **Cash flows from operating activities** | | | | | |
| Cash (used for) provided by operating activities $ | (17) $ | 33 $ | 180 $ | — $ | 196 |
| **Cash flows from investing activities** | | | | | |
| Purchases of property, plant, and equipment | — | (80) | (22) | — | (102) |
| Proceeds from sales of assets and businesses, net | — | 39 | — | — | 39 |
| Intercompany investing activities | — | (288) | — | 288 | — |
| Foreign exchange contract settlements, net | — | 5 | — | — | 5 |
| Cash used for investing activities | — | (324) | (22) | 288 | (58) |
| **Cash flows from financing activities** | | | | | |
| Debt repayments | (4) | — | — | — | (4) |
| Purchases of treasury stock at cost | (240) | | | | (240) |
| Intercompany financing activities | 288 | | | (288) | — |
| Proceeds from exercised stock options, net | 5 | — | — | — | 5 |
| Tax payments related to withholdings on vested restricted stock units | (1) | — | — | — | (1) |
| Payment of dividends | (31) | — | — | — | (31) |
| Cash provided by (used for) financing activities | 17 | — | — | (288) | (271) |
| Effect of exchange rate changes on cash and cash equivalents | — | — | 11 | — | 11 |
| **(Decrease) increase in cash and cash equivalents** | — | (291) | 169 | — | (122) |
| **Cash and cash equivalents at beginning of the period** | — | 761 | 795 | — | 1,556 |
| Cash and cash equivalents at end of the period $ | — $ | 470 $ | 964 $ | — $ | 1,434 |

36

The Chemours Company
Notes to the Interim Consolidated Financial Statements (Unaudited)
*(Dollars in millions, except per share amounts)*

**Condensed Consolidating Statements of Cash Flows**

| | Three Months Ended March 31, 2017 | | | | |
|---|---|---|---|---|---|
| | Parent Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations and Adjustments | Consolidated |
| **Cash flows from operating activities** | | | | | |
| Cash (used for) provided by operating activities | $ (3) | $ (2) | $ 46 | $ — | $ 41 |
| **Cash flows from investing activities** | | | | | |
| Purchases of property, plant, and equipment | — | (50) | (19) | — | (69) |
| Proceeds from sales of assets and businesses, net | — | 9 | — | — | 9 |
| Intercompany investing activities | — | 8 | — | (8) | — |
| Foreign exchange contract settlements, net | — | (3) | — | — | (3) |
| Cash used for investing activities | — | (36) | (19) | (8) | (63) |
| **Cash flows from financing activities** | | | | | |
| Intercompany short-term borrowing repayments, net | (8) | — | — | 8 | — |
| Debt repayments | (4) | — | — | — | (4) |
| Proceeds from exercised stock options, net | 20 | — | — | — | 20 |
| Payment of dividends | (5) | — | — | — | (5) |
| Cash provided by financing activities | 3 | — | — | 8 | 11 |
| Effect of exchange rate changes on cash and cash equivalents | — | — | 7 | — | 7 |
| **(Decrease) increase in cash and cash equivalents** | — | (38) | 34 | — | (4) |
| **Cash and cash equivalents at beginning of the period** | — | 224 | 678 | — | 902 |
| Cash and cash equivalents at end of the period | $ — | $ 186 | $ 712 | $ — | $ 898 |

37

**The Chemours Company**

## Item 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*This Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) supplements the unaudited Interim Consolidated Financial Statements and the related notes thereto included elsewhere herein to help provide an understanding of our financial condition, changes in our financial condition, and the results of our operations for the periods presented. Unless the context otherwise requires, references herein to "The Chemours Company," "Chemours," "the Company," "our Company," "we," "us," and "our" refer to The Chemours Company and its consolidated subsidiaries. References herein to "DuPont" refer to E. I. du Pont de Nemours and Company, a Delaware corporation, and its consolidated subsidiaries (other than Chemours and its consolidated subsidiaries), unless the context otherwise requires.*

*This MD&A should be read in conjunction with the unaudited Interim Consolidated Financial Statements and the related notes thereto included in Item 1 of this Quarterly Report on Form 10-Q, as well as our audited Consolidated Financial Statements and the related notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2017.*

*This section and other parts of this Quarterly Report on Form 10-Q contain forward-looking statements, within the meaning of the federal securities laws, that involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact. The words "believe," "expect," "anticipate," "plan," "estimate," "target," "project," and similar expressions, among others, generally identify "forward-looking statements," which speak only as of the date the statements were made. The matters discussed in these forward-looking statements are subject to risks, uncertainties, and other factors that could cause actual results to differ materially from those set forth in the forward-looking statements.*

*Our forward-looking statements are based on certain assumptions and expectations of future events that may not be accurate or realized. These statements, as well as our historical performance, are not guarantees of future performance. Forward-looking statements also involve risks and uncertainties that are beyond our control. Additionally, there may be other risks and uncertainties that we are unable to identify at this time or that we do not currently expect to have a material impact on our business. Factors that could cause or contribute to these differences include, but are not limited to, the risks, uncertainties, and other factors discussed in the Forward-looking Statements and the Risk Factors sections in our Annual Report on Form 10-K for the year ended December 31, 2017. We assume no obligation to revise or update any forward-looking statement for any reason, except as required by law.*

### Overview

We are a leading, global provider of performance chemicals that are key inputs in end-products and processes in a variety of industries. We deliver customized solutions with a wide range of industrial and specialty chemical products for markets, including plastics and coatings, refrigeration and air conditioning, general industrial, electronics, mining, and oil refining. Our principal products include refrigerants, industrial fluoropolymer resins, sodium cyanide, performance chemicals and intermediates, and titanium dioxide ($TiO_2$) pigment. Our business consists of three reportable segments: Fluoroproducts, Chemical Solutions, and Titanium Technologies. The Fluoroproducts segment is a leading, global provider of fluoroproducts, including refrigerants and industrial fluoropolymer resins. The Chemical Solutions segment is a leading, North American provider of industrial chemicals used in gold production, industrials, and consumer applications. The Titanium Technologies segment is a leading, global provider of $TiO_2$ pigment, a premium white pigment used to deliver whiteness, brightness, opacity, and protection in a variety of applications.

Our positions within each of these businesses reflect the strong value proposition we provide to our customers based on our long history and reputation in the chemical industry for safety, quality, and reliability.

### Recent Developments

In March 2018, we sold a plot of land that formerly housed a DuPont manufacturing facility in Linden, New Jersey for a gain of $42 million and net cash proceeds of $39 million.

In March 2018, a civil association in Mexico filed a complaint against the governmental authorities involved in the permitting process of our new Mining Solutions facility under construction in Laguna, Mexico. The claimant sought and obtained a suspension of our construction permits. We, as an intervener, have filed an appeal. We have declared force majeure with our vendors while plant construction is idled. Our project permits fully comply with the laws and regulations at the federal, state, and municipal levels and we are working with local and federal authorities, along with community leaders, to address the complaint.

38

**The Chemours Company**

In April 2018, we completed the acquisition of all of the outstanding stock of ICOR International, Inc. (ICOR), a closely-held private company that produces, sells, and distributes replacem ent refrigerant gases for use in commercial, industrial, and automotive applications for $35 million in total consideration. We paid $32 million in cash at closing, which is subject to customary working capital and other adjustments within a specified time period. We are still working through our preliminary purchase price allocation, including the initial estimates of fair value for our acquired tangible and identifiable intangible assets, if any, and the fair value of the liabilities assumed. We expect to finalize our accounting for the acquisition of ICOR within one year of the acquisition date. The acquisition of ICOR is not expected to have a material impact on our results of operations or cash flows.

In April 2018, we entered into an amended and restated credit agreement that provides for a seven-year, senior secured term loan facility and a five-year, $800 million senior secured revolving credit facility (New Revolving Credit Facility) (collectively, the New Senior Secured Credit Facilities). The New Senior Secured Credit Facilities replace our senior secured debt under our existing credit agreement, the details of which are discussed further under the heading "Credit Facilities and Notes" within this *MD&A* and in "Note 23 – Subsequent Events" to the *Interim Consolidated Financial Statements* .

**Our First Quarter 2018 Results and Business Highlights**

*Results of Operations*

- Our net sales for the three months ended March 31, 2018 amounted to $1.7 billion, representing a 20% increase when compared with net sales of $1.4 billion for the three months ended March 31, 2017.

- Our net income attributable to Chemours for the three months ended March 31, 2018 amounted to $297 million, representing a 98% increase when compared with net income attributable to Chemours of $150 million for the three months ended March 31, 2017.

- Our basic and diluted earnings per share (EPS) for the three months ended March 31, 2018 amounted to $1.63 per share and $1.58 per share, respectively, representing increases of approximately 100% when compared with basic and diluted EPS of $0.82 per share and $0.79 per share, respectively, for the three months ended March 31, 2017.

- Our adjusted earnings before interest, taxes, depreciation, and amortization (Adjusted EBITDA) for the three months ended March 31, 2018 amounted to $468 million, representing a 64% increase when compared with Adjusted EBITDA of $285 million for the three months ended March 31, 2017.

Our results of operations for the three months ended March 31, 2018 when compared with the same period in 2017 reflected a higher global average selling price and our customers' preference for Ti-Pure TM TiO 2 pigment in our Titanium Technologies segment, strong demand for Opteon TM refrigerants, higher price for our base refrigerant offerings, and increased demand and price for our fluoropolymer products within our Fluoroproducts segment, and solid demand for our Mining Solutions and Performance Chemicals and Intermediates products in our Chemical Solutions segment. Increases to our results of operations from the aforementioned items were partially offset by higher costs for certain raw materials and higher distribution expenses during the first quarter of 2018.

**The Chemours Company**

The following table sets forth our results of operations for the three months ended March 31, 2018 and 2017.

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| *(Dollars in millions, except per share amounts)* | **2018** | | **2017** | |
| Net sales | $ | 1,730 | $ | 1,437 |
| Cost of goods sold | | 1,193 | | 1,081 |
|   Gross profit | | 537 | | 356 |
| Selling, general, and administrative expense | | 143 | | 150 |
| Research and development expense | | 20 | | 19 |
| Restructuring, asset-related, and other charges, net | | 10 | | 12 |
|   Total expenses | | 173 | | 181 |
| Equity in earnings of affiliates | | 12 | | 7 |
| Interest expense, net | | (52) | | (51) |
| Other income, net | | 57 | | 42 |
| **Income before income taxes** | | 381 | | 173 |
| Provision for income taxes | | 84 | | 22 |
| **Net income** | | 297 | | 151 |
| Less: Net income attributable to non-controlling interests | | — | | 1 |
| **Net income attributable to Chemours** | $ | 297 | $ | 150 |
| | | | | |
| **Per share data** | | | | |
|   Basic earnings per share of common stock | $ | 1.63 | $ | 0.82 |
|   Diluted earnings per share of common stock | | 1.58 | | 0.79 |

*Net Sales*

The following table sets forth the impact of price, volume, currency, and portfolio and/or other changes on our total net sales for the three months ended March 31, 2018.

| | Three Months Ended March 31, 2018 |
|---|---|
| **Change in net sales from prior period** | |
| Price | 10% |
| Volume | 6% |
| Currency | 4% |
| Portfolio/other | —% |
| **Total change in net sales** | 20% |

Our net sales increased by $293 million, or 20%, to $1.7 billion for the three months ended March 31, 2018 when compared with $1.4 billion for the three months ended March 31, 2017. This increase reflected a 10% improvement in price, primarily attributable to our Titanium Technologies segment, and a 6% increase in volume, which was driven by higher demand in all of our segments. Additionally, our net sales benefitted 4% from favorable currency movement during the first quarter of 2018, primarily attributable to movements of the euro and the Japanese yen against the U.S. dollar.

*Cost of goods sold*

Our cost of goods sold increased by $112 million, or 10%, to $1.2 billion for the three months ended March 31, 2018 when compared with $1.1 billion for the three months ended March 31, 2017. This increase was primarily attributable to an increase in our net sales volume, as well as increased costs for certain raw materials, higher distribution expenses, and changes in product mix during the first quarter of 2018. This increase was partially offset by a reduction in costs associated with our transformation activities during the first quarter of 2017 .

*Selling, general, and administrative expense*

Our selling, general, and administrative expense decreased by $7 million, or 5%, to $143 million for the three months ended March 31, 2018 when compared with $150 million for the three months ended March 31, 2017. This decrease was primarily attributable to a reduction in costs associated with our transformation activities during the first quarter of 2017, which was partially offset by increased costs for long-term employee-related compensation and higher environmental expenses during the first quarter of 2018 .

**The Chemours Company**

*Research and development expense*

Our research and development expense was largely unchanged at $20 million and $19 million for the three months ended March 31, 2018 and 2017, respectively.

*Restructuring, asset-related, and other charges, net*

Our restructuring, asset-related, and other charges amounted to $10 million and $12 million for the three months ended March 31, 2018 and 2017, respectively. For the three months ended March 31, 2018, restructuring, asset-related, and other charges represented continued progress on our business process and information technology outsourcing efforts of $6 million, and $3 million in additional severance accruals under our 2017 restructuring program. Additionally, we incurred $1 million for decommissioning and dismantling-related charges related to the closure of our Reactive Metals Solutions (RMS) manufacturing facility in Niagara Falls, New York. For the three months ended March 31, 2017, restructuring, asset-related, and other charges represented decommissioning and dismantling-related charges of $5 million for the closure of our RMS manufacturing facility, $4 million for the closure of our TiO$_2$ pigment manufacturing facility in Edge Moor, Delaware, and $3 million for the closure of certain of our production lines in the Fluoroproducts segment .

*Interest expense, net*

Our interest expense, net was largely unchanged at $52 million and $51 million for the three months ended March 31, 2018 and 2017, respectively. During the first quarter of 2018, we incurred additional interest charges in connection with our offering of a $500 million aggregate principal amount of senior unsecured notes in May 2017, which was partially offset by increases in interest income and capitalized interest during the first quarter of 2018, as well as a reduction in interest charges attributable to the repricing of our senior secured term loans in April 2017.

*Other income, net*

Our other income, net amounted to $57 million and $42 million for the three months ended March 31, 2018 and 2017, respectively. For the three months ended March 31, 2018, our other income, net was primarily attributable to a $42 million gain from the sale of our Linden, New Jersey site, and $7 million in non-operating pension and other post-retirement employee benefit income, primarily attributable to our pension plan in the Netherlands. For the three months ended March 31, 2017, our other income, net was primarily attributable to: a $12 million gain from the sale of our Edge Moor, Delaware site; a $4 million gain from the sale of our land in Repauno, New Jersey that was previously deferred and realized upon meeting certain milestones; $8 million in non-operating pension and other post-retirement employee benefit income, primarily attributable to our pension plan in the Netherlands; and, $5 million in foreign exchange gains, primarily attributable to a weakening of the U.S. dollar against the Mexican peso .

*Provision for income taxes*

Our provision for income taxes amounted to $84 million and $22 million for the three months ended March 31, 2018 and 2017, respectively, which represented effective income tax rates of 22% and 13%, respectively. The $62 million increase in our provision for income taxes for the three months ended March 31, 2018 when compared with the same period in 2017 was primarily attributable to increased profitability, changes in our geographic mix of earnings, and additional tax expense generated by certain provisions of U.S. tax reform, such as those resulting from Global Intangibles Low Tax Income .

41

The Chemours Company

## Segment Reviews

Adjusted EBITDA is the primary measure of segment performance used by our Chief Operating Decision Maker (CODM) and is defined as income (loss) before income taxes, excluding the following:

- interest expense, depreciation, and amortization;

- non-operating pension and other post-retirement employee benefit costs, which represent the component of net periodic pension (income) costs excluding the service cost component;

- exchange (gains) losses included in other income (expense), net;

- restructuring, asset-related, and other charges, net;

- asset impairments;

- (gains) losses on sale of business or assets; and,

- other items not considered indicative of our ongoing operational performance and expected to occur infrequently.

A reconciliation of Adjusted EBITDA to net income attributable to Chemours for the three months ended March 31, 2018 and 2017 is included in "Non-GAAP Financial Measures" in this *MD&A* .

The following table sets forth our total Adjusted EBITDA by segment for the three months ended March 31, 2018 and 2017.

| | | Three Months Ended March 31, | | |
| --- | --- | --- | --- | --- |
| (Dollars in millions) | | 2018 | | 2017 |
| Fluoroproducts | $ | 206 | $ | 155 |
| Chemical Solutions | | 11 | | 12 |
| Titanium Technologies | | 294 | | 159 |
| Corporate and Other | | (43) | | (41) |
| **Total Adjusted EBITDA** | $ | 468 | $ | 285 |

### *Fluoroproducts*

The following chart sets forth the net sales, Adjusted EBITDA, and Adjusted EBITDA margin amounts for our Fluoroproducts segment for the three months ended March 31, 2018 and 2017.



| | | Three Months Ended March 31, | | |
| --- | --- | --- | --- | --- |
| (Dollars in millions) | | 2018 | | 2017 |
| Segment net sales | $ | 732 | $ | 652 |
| Adjusted EBITDA | | 206 | | 155 |
| Adjusted EBITDA margin | | 28% | | 24% |

42

**The Chemours Company**

The following table sets forth the impacts of price, volume, currency, and portfolio and/or other changes on our Fluoroproducts segment's net sales for the three months ended March 31, 2018.

| Change in segment net sales from prior period | Three Months Ended March 31, 2018 |
|---|---|
| Price | —% |
| Volume | 8% |
| Currency | 4% |
| Portfolio/other | —% |
| **Total change in segment net sales** | 12% |

*Segment Net Sales*

Segment net sales increased by $80 million, or 12%, for the three months ended March 31, 2018 when compared with the same period in 2017. This increase was primarily attributable to an 8% increase in volume, driven by the continued adoption of Opteon $^{TM}$ refrigerants, primarily in Europe and the U.S., as well as higher demand for our fluoropolymer products. Additionally, segment net sales benefitted 4% from favorable currency movement, primarily attributable to the euro and the Japanese yen against the U.S. dollar , while price remained flat during the first quarter of 2018.

*Adjusted EBITDA and Adjusted EBITDA Margin*

Segment Adjusted EBITDA increased by $51 million, or 33%, and segment Adjusted EBITDA margin increased by approximately 400 basis points for the three months ended March 31, 2018 when compared with the same period in 2017. These increases were primarily attributable to the aforementioned increase in volume, which was partially offset by higher costs for certain raw materials, distribution expenses, product mix, and water treatment costs.

**Chemical Solutions**

The following chart sets forth the net sales, Adjusted EBITDA, and Adjusted EBITDA margin amounts for our Chemical Solutions segment for the three months ended March 31, 2018 and 2017.



Chemical Solutions Segment Results of Operations

| (Dollars in millions) | Three Months Ended March 31, 2018 | Three Months Ended March 31, 2017 |
|---|---|---|
| Segment net sales | $ 144 | $ 139 |
| Adjusted EBITDA | 11 | 12 |
| Adjusted EBITDA margin | 8% | 9% |

43

**The Chemours Company**

The following table sets forth the impacts of price, volume, currency, and portfolio and/or other changes on our Chemical Solutions segment's net sales for the three months ended March 31, 2018.

| Change in segment net sales from prior period | Three Months Ended March 31, 2018 |
|---|---|
| Price | —% |
| Volume | 3% |
| Currency | 1% |
| Portfolio/other | —% |
| Total change in segment net sales | 4% |

*Segment Net Sales*

Segment net sales increased by $5 million, or 4%, for the three months ended March 31, 2018 when compared with the same period in 2017. This increase was primarily attributable to a 3% increase in volume, driven by higher demand for our Mining Solutions and Performance Chemicals and Intermediates products, and 1% from favorable currency movement.

*Adjusted EBITDA and Adjusted EBITDA Margin*

Segment Adjusted EBITDA decreased by $1 million, or 8%, and segment Adjusted EBITDA margin decreased by approximately 100 basis points for the three months ended March 31, 2018 when compared with the same period in 2017. These decreases were primarily attributable to higher raw materials costs, costs related to the construction of our new mining facility in Laguna, Mexico, and lower licensing income during the first quarter of 2018.

**Titanium Technologies**

The following chart sets forth the net sales, Adjusted EBITDA, and Adjusted EBITDA margin amounts for our Titanium Technologies segment for the three months ended March 31, 2018 and 2017.



Titanium Technologies Segment Results of Operations

| (Dollars in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Segment net sales | $ 854 | $ 646 |
| Adjusted EBITDA | 294 | 159 |
| Adjusted EBITDA margin | 34% | 25% |

44

**The Chemours Company**

The following table sets forth the impacts of price, volume, currency, and portfolio and/or other changes on our Titanium Technologies segment's net sales for the three months ended March 31, 2018.

| Change in segment net sales from prior period | Three Months Ended March 31, 2018 |
|---|---|
| Price | 22% |
| Volume | 5% |
| Currency | 5% |
| Portfolio/other | —% |
| **Total change in segment net sales** | 32% |

*Segment Net Sales*

Segment net sales increased by $208 million, or 32%, for the three months ended March 31, 2018 when compared with the same period in 2017. This increase was primarily attributable to a 22% increase in price and a 5% increase in volume, driven by a higher global average selling price and our customers' preference for Ti-Pure ™ TiO$_2$ pigment. Additionally, segment net sales benefitted 5% from favorable currency movement, primarily attributable to the euro against the U.S. dollar.

*Adjusted EBITDA and Adjusted EBITDA Margin*

Segment Adjusted EBITDA increased by $135 million, or 85%, and segment Adjusted EBITDA margin increased by approximately 900 basis points for the three months ended March 31, 2018 when compared with the same period in 2017. These increases were primarily attributable to the aforementioned increases in price and volume, which were partially offset by anticipated increases in costs for certain raw materials and higher distribution expenses.

**Corporate and Other**

Corporate costs and certain legal and environmental expenses that are not allocated to the segments, stock-based compensation costs, and foreign exchange gains and losses arising from the remeasurement of balances in currencies other than the functional currency of the legal entity are reflected in Corporate and Other. Corporate and Other costs remain largely unchanged at $43 million and $41 million for the three months ended March 31, 2018 and 2017, respectively.

<u>**Growth Expectations and Outlook**</u>

On December 1, 2017, we held our first investor day, during which we described how we expect each of our businesses to contribute to our overall growth. For our Fluoroproducts segment, we are optimizing our fluorochemicals product mix with the expansion of Opteon ™ refrigerants capacity and renewing our fluoropolymers portfolio through application development. For our Chemical Solutions segment, we are expanding our capacity to meet demand for our Mining Solutions products. For our Titanium Technologies segment, we are implementing a value stabilization strategy in order to seek to reduce volatility for our Ti-Pure ™ TiO$_2$ pigment earnings. To the extent we are successful in implementing such plans, as to which no assurance can be given, we identified key financial targets through 2020, including goals for our future net sales growth, Adjusted EBITDA margin improvement, Adjusted EPS, Free Cash Flows (FCF), and Return on Invested Capital (ROIC). For further discussion regarding the risks associated with meeting our key financial targets for 2020 and the factors that may affect our ability to achieve these targets, see *Item 1A – Risk Factors* of our Annual Report on Form 10-K for the year ended December 31, 2017. For further discussion regarding our use of non-GAAP financial measures and reconciliations to their closest GAAP financial measures, see "Non-GAAP Financial Measures" within this *MD&A* .

We expect our earnings growth to meet or exceed our three-year targets. Our 2018 results will be driven by the expectation that (i) average prices for our TiO$_2$ pigment will be above 2017 average prices, (ii) there will be continued transition to Opteon ™ refrigerants, (iii) there will be increased demand for our fluoropolymer products, and (iv) there will be strong demand for our Mining Solutions products. We expect our capital expenditures to be between $475 million and $525 million, which will be driven largely by capital expenditures associated with our new Opteon ™ plant under construction in Corpus Christi, Texas and our Mining Solutions plant under construction in Laguna, Mexico. Our outlook for 2018 reflects our current visibility and expectations based on market factors, such as currency movements, TiO$_2$ pigment pricing, and end-market demand, and our ability to meet these targets is subject to numerous risks, such as those described in *Item 1A – Risk Factors* of our Annual Report on Form 10-K for the year ended December 31, 2017.

45

The Chemours Company

## Liquidity and Capital Resources

Our primary sources of liquidity are cash generated from operations, available cash, and borrowings under our debt financing arrangements, which are described in further detail below. We believe these sources are sufficient to fund our planned operations and to meet our interest, dividend, and contractual obligations. Our financial policy seeks to (i) selectively invest in organic and inorganic growth to enhance our portfolio, including certain strategic capital investments, (ii) return cash to shareholders through dividends and share repurchases, and (iii) maintain appropriate leverage by using free cash flows to repay outstanding borrowings. Subject to approval by our board of directors, we may raise additional capital or borrowings from time to time, or seek to refinance our existing debt. There can be no assurance that future capital or borrowings will be available to us, and the cost and availability of new capital or borrowings could be materially impacted by market conditions. Further, the decision to refinance our existing debt is based on a number of factors, including general market conditions and our ability to refinance on attractive terms at any given point in time. Any attempts to raise additional capital or borrowings, or refinance our existing debt, could cause us to incur significant charges. Such charges could have a material impact on our financial position, results of operations, or cash flows.

Our operating cash flows generation is driven by, among other things, the general global economic conditions at any point in time and its resulting impact on demand for our products, raw materials and energy prices, and industry-specific issues, such as production capacity and utilization. We have generated strong operating cash flows through various industry and economic cycles, evidencing the operating strength of our businesses.

We anticipate making significant payments for interest, capital expenditures, dividends, and other actions over the next 12 months, which we expect to fund through cash generated from operations, available cash, and borrowings. We further anticipate that our operations and existing debt financing arrangements will provide us with sufficient liquidity over the next 12 months. The availability under our New Revolving Credit Facility, which is discussed further under the heading "Credit Facilities and Notes," is subject to the last 12 months of consolidated EBITDA, as defined in the amended and restated credit agreement.

At March 31, 2018, we had total cash and cash equivalents of $1.4 billion, of which, $964 million was held by our foreign subsidiaries. All of our cash and cash equivalents held by our foreign subsidiaries is readily convertible into currencies used in our operations, including the U.S. dollar. Cash and earnings of our foreign subsidiaries are generally used to finance their operations and capital expenditures. At March 31, 2018, management believed that sufficient liquidity was available in the U.S., and it is our intention to indefinitely reinvest the undistributed earnings of our foreign subsidiaries outside of the U.S.; however, we continue to evaluate this assertion as a result of U.S. tax reform. From time to time, we evaluate opportunities to repatriate cash from foreign jurisdictions. Our current plans consider repatriating cash only at levels that would result in minimal or no net adverse tax consequences in the near term.

No deferred tax liabilities have been recognized with regard to the $964 million of cash and cash equivalents held by our foreign subsidiaries at March 31, 2018, or on our undistributed earnings. The potential tax implications of the repatriation of unremitted earnings are driven by facts at the time of distribution; however, due to the U.S. deemed repatriation transition tax as a result of U.S. tax reform, the incremental cost to repatriate earnings would be reduced if a distribution was made in the future.

### Cash Flows

The following table sets forth a summary of our net cash provided by (used for) our operating, investing, and financing activities for the three months ended March 31, 2018 and 2017.

| (Dollars in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Cash provided by operating activities | $ 196 | $ 41 |
| Cash used for investing activities | (58) | (63) |
| Cash (used for) provided by financing activities | (271) | 11 |

### Operating Activities

We received $196 million and $41 million in cash flows from our operating activities for the three months ended March 31, 2018 and 2017, respectively. The $155 million increase in our operating cash inflows for the three months ended March 31, 2018 when compared with the same period in 2017 was primarily attributable to improvements in our net income, which amounted to $297 million and $151 million for the three months ended March 31, 2018 and 2017, respectively.

46

**The Chemours Company**

*Investing Activities*

We used $58 million and $63 million in cash flows for our investing activities for the three months ended March 31, 2018 and 2017, respectively. For the three months ended March 31, 2018, our investing cash outflows were primarily attributable to capital expenditures of $102 million, which were partially offset by net proceeds of $39 million from the sale of assets and businesses, primarily associated with the sale of our Linden, New Jersey site, and $5 million in foreign exchange contract settlements, net. For the three months ended March 31, 2017, our investing cash outflows were primarily attributable to capital expenditures of $69 million and $3 million in foreign exchange contract settlements, net, which were partially offset by net proceeds of $9 million from the sale of assets and businesses, primarily associated with the sale of our Edge Moor, Delaware site.

*Financing Activities*

We used $271 million for, and received $11 million in cash flows from, our financing activities for the three months ended March 31, 2018 and 2017, respectively. For the three months ended March 31, 2018, our financing cash outflows were primarily attributable to purchases of approximately 4,980,000 shares of our issued and outstanding common stock under our share repurchase program for $240 million, $31 million in payments for dividends during the first quarter of 2018, and $4 million in debt repayments for our senior secured term loans. For the three months ended March 31, 2017, our financing cash inflows were primarily attributable to $20 million in net proceeds from the exercise of employee stock options, which were partially offset by $5 million in payments for dividends during the first quarter of 2017, and $4 million in debt repayments for our senior secured term loans.

*Current Assets*

The following table sets forth the components of our current assets at March 31, 2018 and December 31, 2017.

| (Dollars in millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| Cash and cash equivalents | $ | 1,434 | $ | 1,556 |
| Accounts and notes receivable, net | | 1,083 | | 919 |
| Inventories | | 992 | | 935 |
| Prepaid expenses and other | | 75 | | 83 |
| **Total current assets** | $ | 3,584 | $ | 3,493 |

Our accounts and notes receivable, net increased by $164 million, or 18%, to $1.1 billion at March 31, 2018 from $919 million at December 31, 2017. This increase was primarily attributable to an increase in our net sales during the first quarter of 2018 when compared with the fourth quarter of 2017.

Our inventories increased by $57 million, or 6%, to $992 million at March 31, 2018 from $935 million at December 31, 2017. This increase was primarily attributable to a build-up of inventory to meet anticipated demand, primarily in Europe and the U.S.

Our prepaid expenses and other was largely unchanged at $75 million and $83 million at March 31, 2018 and December 31, 2017, respectively.

*Current Liabilities*

The following table sets forth the components of our current liabilities at March 31, 2018 and December 31, 2017.

| (Dollars in millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| Accounts payable | $ | 1,121 | $ | 1,075 |
| Current maturities of long-term debt | | 14 | | 15 |
| Other accrued liabilities | | 487 | | 558 |
| **Total current liabilities** | $ | 1,622 | $ | 1,648 |

Our accounts payable increased by $46 million, or 4%, to $1.1 billion at March 31, 2018 from $1.1 billion at December 31, 2017. This increase was primarily attributable to the timing of vendor payments.

Our current maturities of long-term debt was largely unchanged at $14 million and $15 million at March 31, 2018 and December 31, 2017, respectively.

47

**The Chemours Company**

Our other accrued liabilities decreased by $71 million, or 13%, to $487 million at March 31, 2018 from $558 million at December 31, 2017. This decrease was primarily attributable to a reduct ion in accrued compensation and employee-related costs, consistent with payments of accrued performance-related compensation during the first quarter of 2018, which was partially offset by an increase in accrued interest, consistent with the timing of our semi-annual interest payments on our senior unsecured notes.

*Credit Facilities and Notes*

Our credit agreement, as amended, provides for seven-year senior, secured term loans and a five-year, $750 million senior secured revolving credit facility (Revolving Credit Facility). The proceeds of any loans made under the Revolving Credit Facility can be used for capital expenditures, acquisitions, working capital needs, and other general corporate purposes. Availability under the Revolving Credit Facility is subject to certain covenant limitations. At March 31, 2018, the facility had a full borrowing capacity of $750 million, from which we had $106 million in letters of credit issued and outstanding.

On April 3, 2018, we entered into an amended and restated credit agreement that provides for the New Senior Secured Credit Facilities, which replaced our existing credit agreement. The senior secured term loan facility provides for a class of term loans, denominated in U.S. dollars, in an aggregate principal amount of $900 million (New Dollar Term Loan) and a class of term loans, denominated in euros, in an aggregate principal amount of €350 million (New Euro Term Loan) (collectively, the New Term Loans). The proceeds of the New Term Loans, together with cash on hand, were primarily used to prepay in full all outstanding amounts under our existing credit agreement, which amounted to $921 million and €393 million at March 31, 2018. The New Dollar Term Loan bears a variable interest rate equal to, at our election, adjusted LIBOR plus 1.75% or adjusted base rate plus 0.75%, subject to an adjusted LIBOR or an adjusted base rate floor of 0.00% or 1.00%, respectively. The New Euro Term Loan bears a variable interest rate equal to adjusted EURIBOR plus 2.00%, subject to an adjusted EURIBOR floor of 0.50%. The New Term Loans will mature on April 3, 2025, and are subject to acceleration in certain circumstances.

The proceeds of any loans made under the New Revolving Credit Facility can be used for working capital needs and other general corporate purposes, including permitted acquisitions and other transactions, as defined under the amended and restated credit agreement. The New Revolving Credit Facility bears a variable interest rate range based on our total net leverage ratio, as defined in the amended and restated credit agreement, between (i) a 0.25% and a 1.00% spread for adjusted base rate loans, and (ii) a 1.25% and a 2.00% spread for LIBOR and EURIBOR loans. In addition, we are required to pay a commitment fee on the average daily unused amount of the New Revolving Credit Facility within an interest rate range based on our total net leverage ratio, between 0.10% and 0.25%. The New Revolving Credit Facility will mature on April 3, 2023, and is subject to acceleration in certain circumstances.

The amended and restated credit agreement also modifies or eliminates certain provisions of our existing credit agreement, including certain negative covenants to allow for further flexibility. Under the amended and restated credit agreement, solely with respect to the New Revolving Credit Facility, we are required to not exceed a maximum senior secured net leverage ratio of: (i) 2.50 to 1.00 in each quarter through June 30, 2018; (ii) 2.25 to 1.00 in each quarter through December 31, 2018; and, (iii) 2.00 to 1.00 in each quarter beginning January 1, 2019, through the date of maturity. Our minimum interest coverage ratio requirements under the existing credit agreement were eliminated in the amended and restated credit agreement. In addition, the amended and restated credit agreement contains customary affirmative and negative covenants that, among other things, limit or restrict our and our subsidiaries' ability, subject to certain exceptions, to incur additional indebtedness or liens, pay dividends, and engage in certain transactions, including mergers, acquisitions, asset sales, or investments, outside of specified carve-outs. The amended and restated credit agreement also contains customary representations and warranties and events of default, which are substantially similar to those in the existing credit agreement. We were in compliance with our debt covenants at March 31, 2018.

Our obligations under the New Senior Secured Credit Facilities are guaranteed on a senior secured basis by all of our material domestic subsidiaries, which are also guarantors of our outstanding notes, subject to certain exceptions. The obligations under the New Senior Secured Credit Facilities are also, subject to certain exceptions, secured by a first priority lien on substantially all of our assets and substantially all of the assets of our wholly-owned, material domestic subsidiaries, including 100% of the stock of certain of our domestic subsidiaries and 65% of the stock of certain of our foreign subsidiaries.

The transaction resulted in a net prepayment of our total outstanding senior secured debt balances by approximately $75 million, based on the euro exchange rate on April 3, 2018. We are currently evaluating the accounting treatment for our amended and restated credit agreement, including the treatment of any related transaction costs.

48

The Chemours Company

*Supplier Financing*

We maintain global paying services agreements with several financial institutions. Under these agreements, the financial institutions act as our paying agents with respect to accounts payable due to our suppliers who elect to participate in the program. The agreements allow our suppliers to sell their receivables to one of the participating financial institutions at the discretion of both parties on terms that are negotiated between the supplier and the respective financial institution. Our obligations to our suppliers, including the amounts due and scheduled payment dates, are not impacted by our suppliers' decisions to sell their receivables under this program. At March 31, 2018, total payment instructions from us amounted to $142 million. Pursuant to their agreement with one of the financial institutions, certain suppliers may elect to be paid early at their discretion. The available capacity under these programs can vary based on the number of investors and/or financial institutions participating in these programs at any point in time.

*Contractual Obligations*

Our contractual obligations at March 31, 2018 did not significantly change from the contractual obligations previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2017.

*Off Balance Sheet Arrangements*

Information with respect to our guarantees is included in "Note 20 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* in our Annual Report on Form 10-K for the year ended December 31, 2017. Historically, we have not made significant payments to satisfy guarantee obligations; however, we believe we have the financial resources to satisfy these guarantees in the event required. Any remaining guarantees outstanding at March 31, 2018 were insignificant.

## Critical Accounting Policies and Estimates

Our significant accounting policies are described in "Critical Accounting Policies and Estimates" within *MD&A* and "Note 3 – Summary of Significant Accounting Policies" to the *Consolidated Financial Statements* in our Annual Report on Form 10-K for the year ended December 31, 2017. Aside from the critical accounting policies and estimates set forth below, there have been no material changes to the critical accounting policies and estimates previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2017.

*Revenue from Contracts with Customers*

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2014-09, *Revenue from Contracts with Customers (Topic 606)* (ASU No. 2014-09). The objective of this standard is to remove inconsistent practices with regard to revenue recognition between GAAP and International Financial Reporting Standards. The standard intends to improve the comparability of revenue recognition practices across entities, industries, jurisdictions, and capital markets. Subsequent to the issuance of ASU No. 2014-09, the FASB issued multiple clarifying updates in connection with the standard (collectively, Topic 606).

Effective January 1, 2018, we adopted the new revenue recognition guidance contained in Topic 606 using the modified retrospective transition method. With the adoption of Topic 606, we recognize revenue using a five-step model resulting in revenue being recognized as performance obligations within a contract have been satisfied. The steps within that model include: (i) identifying the existence of a contract with a customer; (ii) identifying the performance obligations within the contract; (iii) determining the contract's transaction price; (iv) allocating the transaction price to the contract's performance obligations; and, (v) recognizing revenue as the contract's performance obligations are satisfied. A contract with a customer exists when: (i) we enter into an enforceable agreement that defines each party's rights regarding the goods or services to be transferred, and the related payment terms; (ii) the agreement has commercial substance; and, (iii) it is probable that we will collect the consideration to which we are entitled to in the exchange. A performance obligation is a promise in a contract to transfer a distinct good or service, or a series of distinct goods or services to a customer and serves as the unit of account for Topic 606. The transaction price is the customary amount of consideration that we expect to be entitled to in exchange for a transfer of the promised goods or services to a customer, excluding any amounts collected by us on behalf of third-parties (e.g., sales and use taxes). Judgment is required to apply the principles-based, five-step model for revenue recognition outlined in Topic 606. Management is required to make certain estimates and assumptions about our contracts with customers, including, among others, the nature and extent of our performance obligations, our transaction price amounts and any allocations thereof, the critical events which constitute satisfaction of our performance obligations, and when control of any promised goods or services is transferred to our customers.

**The Chemours Company**

Our revenue from contracts with customers is reflecte d in the consolidated statements of operations as net sales, the vast majority of which represents product sales that consist of a single performance obligation. Product sales to customers are made under a purchase order (PO), or in certain cases, in accor dance with the terms of a master services agreement (MSA) or similar arrangement, which documents the rights and obligations of each party to the contract. When a customer submits a PO for product or requests product under an MSA, a contract for a specific quantity of distinct goods at a specified price is created, and our performance obligation under the contract is satisfied when control of the product is transferred to the customer, which is indicated by shipment of the product and transfer of title and the risk of loss to the customer. Revenue is recognized on consignment sales when control transfers to the customer, generally at the point of customer usage of the product. The transaction price for product sales is generally the amount specified in the P O or in the request under an MSA; however, as is common in our industry, we offer variable consideration in the form of rebates, volume discounts, early payment discounts, pricing based on formulas or indices, price matching, and guarantees to certain cust omers. Such amounts are included in our estimated transaction price using either the expected value method or the most-likely amount, depending on the nature of the variable consideration included in the contract. We regularly assess our customers' creditw orthiness, and product sales are made based on established credit limits. Payment terms for our invoices are typically less than 90 days.

We also license the right to access certain of our trademarks to customers under specified terms and conditions in certain arrangements, which is recognized as a component of net sales in the consolidated statements of operations under Topic 606. Under such arrangements, we may receive a royalty payment for a trademark license that is entered into on a stand-alone basis or incorporated into an overall product sales arrangement. Royalty income is generally based on customer sales and recognized under the sales-based exception as the customer sale occurs. When minimum guaranteed royalty amounts are included in the transaction price, we recognize royalty income ratably over the license period for the minimum amount. When there is no consideration specified for the use of our trademark, the entire transaction price is recognized in connection with the transfer of control of product. Royalty income resulting from the right to use our technology is considered outside the scope of Topic 606 as it is not a part of our ongoing major or central activities, and consistent with past practice, is recognized as a component of other income, net in the consolidated statements of operations in accordance with agreed upon terms, when performance obligations are satisfied, when collectability is reasonably assured, and when pricing is fixed or determinable.

Consistent with the fact that the vast majority of our payment terms are less than 90 days from the point at which control of the promised goods or services is transferred, no adjustments have been made for the effects of a significant financing component under Topic 606. Additionally, we have elected to recognize incremental costs associated with obtaining contracts as an expense when incurred if the amortization period of the assets that we would have recognized is one year or less. Amounts billed to customers for shipping and handling fees are considered a fulfillment cost and are included in net sales, and the costs incurred by us for the delivery of goods are classified as a component of the cost of goods sold in the consolidated statements of operations.

The adoption of Topic 606 is not expected to have a material impact on our financial position, results of operations, or cash flows in future periods.

*U.S. Income Tax Reform*

In December 2017, the U.S. enacted new federal tax legislation commonly referred to as the Tax Cuts and Jobs Act (Tax Act), which, except for certain provisions, is effective for tax years beginning on or after January 1, 2018. The Tax Act significantly changes existing U.S. tax law and includes numerous provisions that will affect businesses, such as: (i) reducing the U.S. federal corporate tax rate from 35% to 21%; (ii) requiring companies to pay a one-time transition tax on certain unrepatriated earnings of foreign subsidiaries; (iii) generally eliminating U.S. federal income taxes on dividends from foreign subsidiaries; (iv) requiring a current inclusion in U.S. federal taxable income of certain earnings of controlled foreign corporations; (v) eliminating the corporate alternative minimum tax (AMT) and changing how existing AMT credits can be realized; (vi) creating the base erosion anti-abuse tax, a new minimum tax; (vii) creating a new limitation on deductible interest expense; (viii) changing rules related to uses and limitations of net operating loss carryforwards created in tax years beginning after December 31, 2017; and, (ix) creating the global intangibles low-tax income inclusions.

We have performed preliminary analyses of the 2017 impacts of the Tax Act in accordance with the U.S. Securities and Exchange Commission's (SEC) Staff Accounting Bulletin No. 118 (SAB No. 118), which allows us to record provisional amounts during a measurement period not to exceed one year from the enactment date. Under these preliminary analyses, we recorded additional GAAP tax benefits in the fourth quarter of 2017 amounting to $3 million. The impacts of the Tax Act may differ from our provisional estimates due to many factors, including, but not limited to, changes to our interpretation of the provisions in the Tax Act, U.S. Internal Revenue Service and U.S. Treasury guidance that may be issued, and actions that we may take. For the three months ended March 31, 2018, we did not record any adjustments to our provisional estimates.

Management is still evaluating the effects of the Tax Act's provisions on our consolidated financial statements; however, we expect to complete our analyses within the applicable measurement period, pursuant to SAB No. 118. As such, our provisional estimates for the Tax Act could change significantly within this period, resulting in a material impact to our financial position, results of operations, or cash flows.

50

**The Chemours Company**

## Recent Accounting Pronouncements

See "Note 2 – Recent Accounting Pronouncements" to the *Interim Consolidated Financial Statements* for a discussion about our recent accounting pronouncements.

## Environmental Matters

Consistent with our values and our Environment, Health, and Safety policy, we are committed to preventing releases to the environment at our manufacturing sites to keep our people and communities safe, and to be good stewards of the environment. We are also subject to environmental laws and regulations relating to the protection of the environment. We believe that, as a general matter, our policies, standards, and procedures are properly designed to prevent unreasonable risk of harm to people and the environment, and that our handling, manufacture, use, and disposal of hazardous substances are in accordance with applicable environmental laws and regulations.

### Environmental Remediation

Mainly because of past operations, operations of predecessor companies, or past disposal practices, we, like many other similar companies, have clean-up responsibilities and associated remediation costs, and are subject to claims by other parties, including claims for matters that are liabilities of DuPont and its subsidiaries that we may be required to indemnify pursuant to the separation-related agreements executed prior to our separation from DuPont.

Our environmental reserve includes estimated costs related to a number of sites for which it is probable that environmental remediation will be required, whether or not subject to enforcement activities, as well as those obligations that result from environmental laws such as the Comprehensive Environmental Response Compensation and Liability Act (CERCLA, often referred to as Superfund), the Resource Conservation and Recovery Act (RCRA), and similar federal, state, local, and foreign laws. These laws require certain investigative, remediation, and restoration activities at sites where we conduct or once conducted operations or at sites where our generated waste was disposed. At March 31, 2018 and December 31, 2017, we recorded environmental remediation accruals of $254 million and $253 million, respectively, relating to these matters which, in management's opinion, are appropriate based on existing facts and circumstances.

Our remediation portfolio is relatively mature, with many of our sites under active clean-up moving towards final completion. As remediation efforts progress, sites move from the investigation phase (Investigation) to the active clean-up phase (Active Remediation), and as construction is completed at Active Remediation sites, those sites move to the operation, maintenance, and monitoring (OM&M), or closure phase. As final clean-up activities for some significant sites are completed over the next several years, we expect our annual payments related to these active sites to decline over time. The time frame for a site to go through all phases of remediation (Investigation and Active Remediation) may take about 15 to 20 years, followed by several years of OM&M activities. Remediation activities, including OM&M activities, vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, and diverse regulatory requirements, as well as the presence or absence of other potentially responsible parties (PRPs). In addition, for claims that we may be required to indemnify DuPont pursuant to the separation-related agreements, we, through DuPont, have limited available information for certain sites or are in the early stages of discussions with regulators. For these sites in particular, there may be considerable variability between the clean-up activities that are currently being undertaken or planned and the ultimate actions that could be required. Therefore, considerable uncertainty exists with respect to environmental remediation costs, and, under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $510 million above the amount accrued at March 31, 2018. In general, uncertainty is greatest and the range of potential liability is widest in the Investigation phase, narrowing over time as regulatory agencies approve site remedial plans. As a result, uncertainty is reduced, and sites ultimately move into OM&M, as needed. As more sites advance from Investigation to Active Remediation to OM&M or closure, the upper end of the range of potential liability is expected to decrease over time.

Some remediation sites will achieve site closure and will require no further action to protect people and the environment and comply with laws and regulations. At certain sites, we expect that there will continue to be some level of remediation activity due to ongoing OM&M of remedial systems. In addition, portfolio changes, such as an acquisition or divestiture, or notification as a PRP for a multi-party Superfund site, could result in additional remediation activity and potentially additional accrual.

Management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows at any given year, as such obligation can be satisfied or settled over many years. For additional information, refer to the "Environmental Matters" section of *MD&A* included in our Annual Report on Form 10-K for the year ended December 31, 2017.

**The Chemours Company**

While there are many remediation sites that contribute to the total environmental remediation accrual, the following table sets forth the sites that are the most significant.

| (Dollars in millions) | | March 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| Beaumont, Texas | $ | 12 | $ | 12 |
| Chambers Works, New Jersey | | 18 | | 19 |
| East Chicago, Indiana | | 20 | | 20 |
| Pompton Lakes, New Jersey | | 54 | | 55 |
| USS Lead, East Chicago, Indiana | | 22 | | 26 |
| All other sites | | 128 | | 121 |
| **Total accrued environmental remediation** | $ | 254 | $ | 253 |

The five sites listed above represent approximately 50% of our reserve as of March 31, 2018 and December 31, 2017. We expect to spend, in the aggregate, approximately $80 million over the next three years. For all other sites, we expect to spend approximately $90 million over the next three years.

*Beaumont Works, Beaumont, Texas*

Beaumont Works began operations in 1954 in Beaumont, Jefferson County, Texas. Over the years, Beaumont Works has produced a number of basic chemicals and elastomer products including acrylonitrile, ammonia, methanol, methyl methacrylate, caprolactam, Hypalon® synthetic rubber, Nordel® hydrocarbon rubber, and blended tetraethyl lead with halo-carbon solvent/stabilizers. With our sale of the aniline production unit to The Dow Chemical Company (Dow) in 2016, we have no ongoing manufacturing operations on the site. Dow and Lucite International, Inc. (Lucite) remain as long-term manufacturing tenants.

As site owner, we remain responsible for remediation of historical chemical releases from past operations and are conducting this work under a RCRA hazardous waste post-closure permit and Compliance Plan (CP) issued by the State of Texas. The hazardous waste permit includes provisions to manage wastes and to investigate and mitigate releases. The CP is a component of the permit and includes mitigation and monitoring requirements, including a groundwater remediation system that was installed in 1991 to control chemical migration and protect adjacent water bodies. In addition, several solid waste management unit closures have been conducted and areas of past release addressed through interim measures to protect people and the environment. Over the years, extensive site studies have been completed and a final investigation report (Affected Property Assessment Report, or APAR, under the Texas Risk Reduction Program) for the entire site was approved by the state in 2014. We have recently completed a Remedial Action Plan (RAP), currently under agency review, to address all remaining historical solid waste management units and areas of concern identified in these studies, and we expect to have this RAP approved in 2018.

The remediation accrual for Beaumont addresses remaining work identified in the RAP under review by the state, as well as post-closure care and monitoring and ongoing operation of the groundwater remediation system. A portion of the accrual also addresses an outstanding Natural Resource Damage claim by state and federal trustees directed to impacts on marshlands within the plant property.

*Chambers Works, Deepwater, New Jersey*

The Chambers Works complex is located on the eastern shore of the Delaware River in Deepwater, Salem County, New Jersey. The site comprises the former Carneys Point Works in the northern area and the Chambers Works manufacturing area in the southern area. Site operations began in 1892 when the former Carneys Point smokeless gunpowder plant was constructed at the northern end of Carneys Point. Site operations began in the manufacturing area around 1914 and included the manufacture of dyes, aromatics, elastomers, chlorofluorocarbons, and tetraethyl lead. We continue to manufacture a variety of fluorochemicals and finished products at Chambers Works. In addition, three tenants operate processes at Chambers Works including steam/electricity generation, industrial gas production, and the manufacture of intermediate chemicals. As a result of over 100 years of continuous industrial activity, site soils and groundwater have been impacted by chemical releases.

In response to identified groundwater contamination, a groundwater interceptor well system (IWS) was installed in 1970, which was designed to contain contaminated groundwater and restrict off-site migration. Additional remediation is being completed under a federal RCRA Corrective Action Permit. The site has been studied extensively over the years, and more than 25 remedial actions have been completed to date and engineering and institutional controls put in place to ensure protection of people and the environment. In the fourth quarter of 2017, a site perimeter sheet pile barrier intended to more efficiently contain groundwater was completed.

Remaining work beyond continued operation of the IWS and groundwater monitoring includes completion of various targeted studies onsite and in adjacent water bodies to close investigation data gaps, as well as selection and implementation of final remedies under RCRA Corrective Action for various solid waste management units and areas of concern not yet addressed through interim measures.

52

**The Chemours Company**

*East Chicago, Indiana*

East Chicago is a former manufacturing facility owned by us in East Chicago, Lake County, Indiana. The approximate 440-acre site is bounded to the south by the east branch of the Grand Calumet River, to the east and north by residential and commercial areas, and to the west by industrial areas, including a former lead processing facility. The inorganic chemicals unit on site produced various chloride, ammonia, and zinc products and inorganic agricultural chemicals beginning in 1892 until 1986. Organic chemical manufacturing began in 1944, consisting primarily of chlorofluorocarbons production. Current operations, including support activities, now cover 28 acres of the site. The remaining business was sold to W. R. Grace Company (Grace) in early 2000, and Grace operates the unit as a tenant. Approximately 172 acres of the site were never developed and are managed by The Nature Conservancy for habitat preservation.

A comprehensive evaluation of soil and groundwater conditions at the site was performed as part of the RCRA Corrective Action process. Studies of historical site impacts began in 1983 in response to preliminary CERCLA actions undertaken by the U.S. Environmental Protection Agency (EPA). The EPA eventually issued an Administrative Order on Consent for the site in 1997. The order specified that remediation work be performed under RCRA Corrective Action authority. Work has proceeded under the RCRA Corrective Action process since that time.

Subsequent investigations included the preparation of initial environmental site assessments and multiple phases of investigation. In 2002, as an interim remedial measure, two 2,000-foot long permeable reactive barrier treatment walls were installed along the northern property boundary to address migration of chemicals in groundwater. Since that time, the investigation process has been completed and approved by the EPA, and the final remedy for the site has been selected by the EPA and posted for public comment.

*Pompton Lakes, New Jersey*

During the 20th century, blasting caps, fuses, and related materials were manufactured at Pompton Lakes, Passaic County, New Jersey. Operating activities at the site were ceased in the mid-1990s. The primary contaminants in the soil and sediments are lead and mercury. Groundwater contaminants include volatile organic compounds. Under the authority of the EPA and the New Jersey Department of Environmental Protection, remedial actions at the site are focused on investigating and cleaning-up the area. Groundwater monitoring at the site is ongoing, and we have installed and continue to install vapor mitigation systems at residences within the groundwater plume. In addition, we are further assessing groundwater conditions. In June 2015, the EPA issued a modification to the site's RCRA permit that requires us to dredge mercury contamination from a 36-acre area of the lake and remove sediment from two other areas of the lake near the shoreline. The remediation activities commenced when permits and implementation plans were approved in May 2016, and work on the lake dredging project is expected to be complete in 2018.

*U.S. Smelter and Lead Refinery, Inc., East Chicago, Indiana*

The U.S. Smelter and Lead Refinery, Inc. (USS Lead) Superfund site is located in the Calumet neighborhood of East Chicago, Lake County, Indiana. The site includes the former USS Lead facility along with nearby commercial, municipal, and residential areas. The primary compounds of interest are lead and arsenic which may be found in soils within the impacted area. The EPA is directing and organizing remediation on this site, and we are one of a number of parties working cooperatively with the EPA on the safe and timely completion of this work. DuPont's former East Chicago manufacturing facility was located adjacent to the site, and DuPont assigned responsibility for the site to us in the 2015 separation-related agreement.

The USS Lead Superfund site was listed on the National Priorities List in 2009. To facilitate negotiations with PRPs, the EPA divided the residential part of the USS Lead Superfund site into three zones, referred to as Zone 1, Zone 2, and Zone 3. The division into three zones resulted in Atlantic Richfield Co. and DuPont entering into an agreement in 2014 with the EPA and the State of Indiana to reimburse the EPA's costs to implement clean-up in Zone 1 and Zone 3. More recently, in March 2017, we and three other parties (Atlantic Richfield Co., DuPont, and the U.S. Metals Refining Co.) entered into an administrative order on consent to reimburse the EPA's costs to clean-up a portion of Zone 2. The EPA is continuing its efforts to identify additional PRPs for the USS Lead Superfund site clean-up, including the remainder of Zone 2. The EPA has scheduled negotiations with some of these parties. The EPA has stated its intention to issue a unilateral order to PRPs to complete the Zone 2 work. There is uncertainty as to whether the parties who receive the unilateral order will be able to reach an allocation and agree to comply with it.

The environmental accrual for USS Lead is based on the Record of Decision (ROD) and Statement of Work currently in place for Zone 1 and Zone 3, as well as the current estimate of our share of the EPA's Zone 2 clean-up cost. The EPA has announced its intent to reconsider the ROD for Zone 1, and the result of that review could increase or decrease our future obligations.

**PFOA**

See our discussion under the heading "PFOA" in "Note 17 – Commitments and Contingent Liabilities" to the *Interim Consolidated Financial Statements* .

**The Chemours Company**

The following table sets forth a reconciliation of Adjusted EBITDA, Adjusted Net Income, and Adjusted EPS to our net income attributable to Chemours for the three months ended March 31, 2018 and 2017.

| (Dollars in millions, except per share amounts) | | Three Months Ended March 31, | | |
|---|---|---|---|---|
| | | 2018 | | 2017 |
| **Net income attributable to Chemours** | $ | 297 | $ | 150 |
| Non-operating pension and other post-retirement employee benefit income | | (7) | | (8) |
| Exchange gains | | — | | (5) |
| Restructuring, asset-related, and other charges, net | | 10 | | 12 |
| Gain on sale of assets or businesses (1) | | (42) | | (16) |
| Legal and other charges (2) | | 4 | | 7 |
| Adjustments made to income taxes (3,5) | | (5) | | (10) |
| Provision for income taxes relating to reconciling items (4,5) | | 9 | | 1 |
| **Adjusted Net Income** | | 266 | | 131 |
| Net income attributable to non-controlling interests | | — | | 1 |
| Interest expense, net | | 52 | | 51 |
| Depreciation and amortization | | 70 | | 71 |
| All remaining provision for income taxes (5) | | 80 | | 31 |
| **Adjusted EBITDA** | $ | 468 | $ | 285 |
| | | | | |
| **Per share data** | | | | |
| Basic earnings per share of common stock | $ | 1.63 | $ | 0.82 |
| Diluted earnings per share of common stock | | 1.58 | | 0.79 |
| Adjusted basic earnings per share of common stock | | 1.46 | | 0.72 |
| Adjusted diluted earnings per share of common stock | | 1.41 | | 0.70 |

(1) For the three months ended March 31, 2018, gain on sale includes a $42 million gain associated with the sale of our Linden, New Jersey site. For the three months ended March 31, 2017, gain on sale includes a $12 million gain associated with the sale of our Edge Moor, Delaware site and a $4 million gain associated with the sale of our land in Repauno, New Jersey that was previously deferred and realized upon meeting certain milestones.

(2) Includes litigation settlements, water treatment accruals, and other charges.

(3) Includes the removal of certain discrete income tax impacts within our provision for income taxes. For the three months ended March 31, 2018 and 2017, the adjustment is primarily attributable to windfall benefits on our share-based payments of $5 million and $10 million, respectively.

(4) The income tax impacts included in this caption are determined using the applicable rates in the taxing jurisdictions in which income or expense occurred and include both current and deferred income tax expense or benefit based on the nature of the non-GAAP financial measure.

(5) The total provision for income taxes reconciles to the amount reported in the consolidated statements of operations for the three months ended March 31, 2018 and 2017.

The following table sets forth a reconciliation of FCF to our cash flows provided by operating activities for the three months ended March 31, 2018 and 2017.

| (Dollars in millions) | | Three Months Ended March 31, | | |
|---|---|---|---|---|
| | | 2018 | | 2017 |
| Cash flows provided by operating activities | $ | 196 | $ | 41 |
| Less: Purchases of property, plant, and equipment | | (102) | | (69) |
| **Free Cash Flows** | $ | 94 | $ | (28) |

55

**The Chemours Company**

The following table sets forth a reconciliation of invested capital, net, a component of ROIC, to our total debt, equity, and cash and cash equivalents amounts for the three months ended March 31, 2018 and 2017.

| (Dollars in millions) | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2018 | | 2017 |
| Adjusted EBITDA (1) | $ 1,605 | $ | 979 |
| Less: Depreciation and amortization (1) | (272) | | (289) |
| **Adjusted EBIT** | 1,333 | | 690 |
| | | | |
| Total debt | 4,155 | | 3,552 |
| Total equity | 1,002 | | 358 |
| Less: Cash and cash equivalents | (1,434) | | (898) |
| **Invested capital, net** | $ 3,723 | $ | 3,012 |
| | | | |
| Average invested capital (2) | $ 3,327 | $ | 3,257 |
| | | | |
| **Return on Invested Capital** | 40.1% | | 21.2% |

(1)  Based on amounts for the trailing twelve months ended March 31, 2018 and 2017. Reconciliations of Adjusted EBITDA to net income (loss) attributable to Chemours are provided on a quarterly basis. See the preceding table for the reconciliation of Adjusted EBITDA to net income attributable to Chemours for the three months ended March 31, 2018 and 2017.

(2)  Average invested capital is based on a five-quarter trailing average of invested capital, net.

56

The Chemours Company

## Item 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to changes in foreign currency exchange rates because of our global operations. As a result, we have assets, liabilities, and cash flows denominated in a variety of foreign currencies. We are also exposed to changes in the prices of certain commodities that we use in production. Changes in these rates and commodity prices may have an impact on our future cash flows and earnings. We manage these risks through normal operating and financing activities and, when deemed appropriate, through the use of derivative financial instruments. We do not enter into derivative financial instruments for trading or speculative purposes.

We enter into foreign currency forward contracts to minimize volatility in earnings related to the foreign exchange gains and losses resulting from remeasuring monetary assets and liabilities that we hold which are denominated in non-functional currencies. These derivatives are stand-alone and have not been designated as a hedge. At March 31, 2018, there were 20 foreign currency forward contracts outstanding, with an aggregate notional U.S. dollar equivalent of $547 million, the fair value of which amounted to $1 million of net unrealized loss. There were no foreign currency forward contracts outstanding at December 31, 2017. We recognized a net gain of $4 million and a net loss $1 million within other income, net of the consolidated statements of operations for the three months ended March 31, 2018 and 2017, respectively, related to our foreign currency forward contracts.

We designated our euro notes and our senior secured term loan denominated in euros as a hedge of our net investment in certain of our international subsidiaries that use the euro as their functional currency in order to reduce the volatility in stockholders' equity caused by the changes in foreign currency exchange rates of the euro with respect to the U.S. dollar. At the beginning of every quarter, we use the spot method to measure the effectiveness of the net investment hedge. We did not record any ineffectiveness for the three months ended March 31, 2018 or 2017. We recognized pre-tax losses of $34 million and $10 million on our net investment hedges within accumulated other comprehensive loss for the three months ended March 31, 2018 and 2017, respectively.

Our risk management programs and the underlying exposure are closely correlated, such that the potential loss in value for the risk management portfolio described above would be largely offset by the changes in the value of the underlying exposure. See "Note 19 – Financial Instruments" to the *Interim Consolidated Financial Statements* for further information.

### Additional Information

See Part II, Item 7A, *Quantitative and Qualitative Disclosures About Market Risk* , in our Annual Report on Form 10-K for the year ended December 31, 2017 for additional information related to our utilization of financial instruments and an analysis of the sensitivity of these instruments. There have been no material changes in the market risks previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2017, other than as set forth above.

## Item 4. CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in our reports filed or submitted under the Securities Exchange Act of 1934 (Exchange Act) is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC. These controls and procedures also provide reasonable assurance that information required to be disclosed in such reports is accumulated and communicated to management, including our Chief Executive Officer (CEO) and Chief Financial Officer (CFO), to allow timely decisions regarding required disclosures.

As of March 31, 2018, our CEO and CFO, together with management, conducted an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) under the Exchange Act. Based on that evaluation, the CEO and CFO have concluded that these disclosure controls and procedures are effective at the reasonable assurance level.

### Changes in Internal Control over Financial Reporting

There have been no changes in our internal control over financial reporting that occurred during the quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

The Chemours Company

## PART II. OTHER INFORMATION

**Item 1. LEGAL PROCEEDINGS**

### Legal Proceedings

We are subject to various legal proceedings, including, but not limited to, product liability, patent infringement, antitrust claims, and claims for property damage or personal injury. Information regarding certain of these matters is set forth below and in "Note 17 – Commitments and Contingent Liabilities" within the *Interim Consolidated Financial Statements* .

### Litigation

#### *PFOA: Environmental and Litigation Proceedings*

For purposes of this report, the term PFOA means collectively perfluorooctanoic acid and its salts, including the ammonium salt, and does not distinguish between the two forms. Information related to this and other litigation matters is included in "Note 17 – Commitments and Contingent Liabilities" within the *Interim Consolidated Financial Statements* .

#### *Fayetteville, North Carolina*

The following actions related to Fayetteville, North Carolina, as discussed in "Note 17 – Commitments and Contingent Liabilities" within the *Interim Consolidated Financial Statements* , are filed in the U.S. District Court for the Eastern District of North Carolina, Southern Division:

- *Carey et al. vs. E. I. DuPont de Nemours and Company* (7:17-cv-00189-D; 7:17-cv-00197-D; and, 7:17-cv-00201-D);

- *Cape Fear Public Utility Authority vs. The Chemours Company FC, LLC et al. and Brunswick County v. DowDuPont et al.* (7:17-cv-00195-D and 7:17-cv-00209-D); and,

- *Dew et al. vs. E. I. DuPont de Nemours and Company et al. (17:18-cv-00030-D)* .

### Environmental Proceedings

#### *LaPorte Plant, LaPorte, Texas*

The EPA conducted a multimedia inspection at the DuPont LaPorte, Texas facility in January 2008. DuPont, the EPA, and the U.S. Department of Justice began discussions in the fall of 2011 relating to the management of certain materials in the facility's waste water treatment system, hazardous waste management, flare, and air emissions. These negotiations continue. We operate a fluoroproducts production facility at this site.

#### *Dordrecht, Netherlands*

We have received requests from the local environmental agency (DCMR, formerly under the jurisdiction of OZHZ), the Labor Inspectorate (iSZW), the Inspectorate for Environment and Transportation (ILT), and the Water Authority (RWS) in the Netherlands for information and documents regarding the Dordrecht site's operations. We have complied with the requests, and the agencies will decide whether additional information is warranted. Since the publication of reports by the National Institute for Public Health and the Environment (RIVM) in May 2017 and iSZW in July 2017, no further documents related to these completed reports have been requested. We continue to cooperate with the authorities in responding to information requests related to a preliminary investigation initiated by a public prosecutor, although we have not received notice of any specific legal action.

The Chemours Company

*Fayetteville, North Carolina*

Upon notifying the North Carolina Department of Environmental Quality (NC DEQ) of findings from groundwater studies conducted on the site, we received, on September 6, 2017, a Notice of Violation (NOV) and Notice of Intent to Enforce from NC DEQ pursuant to North Carolina groundwater quality standards. Since then, we have been conducting further studies on-site and off-site in cooperation with NC DEQ to better understand the nature and extent of environmental contamination involving certain perfluorinated compounds related to our Fayetteville, North Carolina operations. These studies are ongoing and will be used to determine what groundwater-focused remedial actions, if any, may be necessary to protect people and the environment and comply with the state's standards. On February 12, 2018, NC DEQ issued an NOV related to groundwater on and around the site which directs us to respond with source control measures. We continue to take action in response to the NOV and will continue to cooperate with NC DEQ.

## Item 1A. RISK FACTORS

There have been no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2017.

## Item 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

### Issuer Purchases of Equity Securities

*Share Repurchase Program*

On November 30, 2017, our board of directors approved a share repurchase program authorizing the purchase of shares of our issued and outstanding common stock in an aggregate amount not to exceed $500 million, plus any associated fees or costs in connection with our share repurchase activity. Under the share repurchase program, shares of our common stock may be purchased in the open market from time to time, subject to management's discretion, as well as general business and market conditions. Our share repurchase program became effective on November 30, 2017 and continues through its expiration on December 31, 2020. The program may be suspended or discontinued at any time. All common shares purchased under the share repurchase program are held as treasury stock and are accounted for using the cost method. Our share repurchase program was announced to the public on December 1, 2017.

The following table sets forth the purchases of our issued and outstanding common stock under the share repurchase program for the three months ended March 31, 2018.

| (Dollars in millions, except per share amounts)<br><br>Period | Total Number of Shares Purchased (1) | | Average Price Paid per Share (2) | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares That May Yet be Purchased Under the Plans or Programs (2) | |
|---|---|---|---|---|---|---|
| Month ended January 31, 2018 | 654,241 | $ | 51.23 | 654,241 | $ | 350 |
| Month ended February 28, 2018 | 1,124,196 | | 50.06 | 1,124,196 | | 294 |
| Month ended March 31, 2018 | 3,200,715 | | 48.44 | 3,200,715 | | 139 |
| Total | 4,979,152 | $ | 49.17 | 4,979,152 | $ | 139 |

(1)   The total number of shares purchased under the share repurchase program is determined using trade dates for the related transactions.

(2)   The average price paid per share and approximate dollar value of shares that may yet be purchased under the share repurchase program exclude fees, commissions, and other charges for the related transactions.

As of March 31, 2018, we have purchased a cumulative 7,365,558 shares of our issued and outstanding common stock under the share repurchase program, which amounted to $361 million at an average share price of $49.05 per share. The aggregate amount of our common stock that remained available for repurchase at March 31, 2018 was $139 million.

Subsequent to March 31, 2018, we purchased an additional 764,786 shares of our issued and outstanding common stock under the share repurchase program, which amounted to $39 million at an average price of $50.58 per share.

59

**The Chemours Company**

### Item 3. DEFAULTS UPON SENIOR SECURITIES

None.

### Item 4. MINE SAFETY DISCLOSURES

Information regarding mine safety and other regulatory actions at the Company's surface mine in Starke, Florida is included in *Exhibit 95* to this report.

### Item 5. OTHER INFORMATION

None.

### Item 6. EXHIBITS

See the "Exhibit Index" for the exhibits filed or incorporated by reference with/in this Quarterly Report on Form 10-Q.



**The Chemours Company**

<div style="background-color:#8B0000;color:white">EXHIBIT INDEX</div>

| Exhibit Number | Description |
|---|---|
| 2.1 | Amendment No. 1, dated August 24, 2017, to the Separation Agreement, dated as of July 1, 2015, by and between E. I. du Pont de Nemours and Company and The Chemours Company (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on August 25, 2017). |
| 3.1 | Company's Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 3.2 | Company's Amended and Restated Bylaws (incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.1 | Amended and Restated Credit Agreement, dated as of April 3, 2018, among The Chemours Company, the Lenders and Issuing Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on April 3, 2018). |
| 10.2* | The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors. |
| 10.3* | Form of Deferred Stock Unit Terms for Nonemployee Directors under the Company's Equity and Incentive Plan. |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of the Company's Principal Executive Officer. |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of the Company's Principal Financial Officer. |
| 32.1 | Section 1350 Certification of the Company's Principal Executive Officer. The information contained in this Exhibit shall not be deemed filed with the Securities and Exchange Commission nor incorporated by reference in any registration statement filed by the registrant under the Securities Act of 1933, as amended. |
| 32.2 | Section 1350 Certification of the Company's Principal Financial Officer. The information contained in this Exhibit shall not be deemed filed with the Securities and Exchange Commission nor incorporated by reference in any registration statement filed by the registrant under the Securities Act of 1933, as amended. |
| 95 | Mine Safety Disclosures |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

* Management contract or compensatory plan or arrangement.

**The Chemours Company**

<div style="background-color:red;color:white;text-align:center;font-weight:bold;">SIGNATURE</div>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE CHEMOURS COMPANY
(Registrant)

Date:    May 4, 2018 _____

By:    /s/ Mark E. Newman _____

Mark E. Newman
Senior Vice President and Chief Financial Officer
(As Duly Authorized Officer and Principal Financial Officer)

62

Exhibit 10.2

**THE CHEMOURS COMPANY
STOCK ACCUMULATION AND DEFERRED
COMPENSATION PLAN FOR DIRECTORS
(as amended and restated effective [        ], 2018)**

## 1. PURPOSE OF THE PLAN

The purpose of The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors (the "Plan") is to permit Directors to defer the payment of all or a specified part of their compensation for services performed as Directors.

This Plan is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("Code") and the rulings and regulations issued thereunder (collectively, "Code Section 409A") and shall be administered and construed in accordance with such requirements.

## 2. ELIGIBILITY

Members of the Board of Directors of the Company who are not employees of the Company or any of its subsidiaries or affiliates shall be eligible under this Plan to defer compensation for services performed as Directors.

## 3. ADMINISTRATION AND AMENDMENT

The Plan shall be administered by the Compensation Committee of the Board of Directors (the "Committee"). The decision of the Committee with respect to any questions arising as to the interpretation of this Plan, including the severability of any and all of the provisions thereof, shall be final, conclusive and binding. The Board of Directors of the Company reserves the right to modify the Plan from time to time, or to terminate the Plan entirely, provided, however, that (1) no modification of the Plan shall operate to annul an election already in effect for the current calendar year or any preceding calendar year; (2) that the foregoing shall not preclude any amendment necessary or desirable to conform to changes in applicable law, including, but not limited to, changes in the Code; and (3) upon termination of the Plan, except to the extent otherwise permitted under Code Section 409A, all balances will be distributed in accordance with the terms of the Plan as in effect on the date of termination.

The Committee is authorized, subject to the provisions of the Plan, from time to time to establish such rules and regulations as it deems appropriate for the proper administration of the Plan, and to make such determinations and take such steps in connection therewith as it deems necessary or advisable.

4.  **COMPLIANCE WITH SECTION 16 OF THE EXCHANGE ACT / CHANGE IN LAW**

It is the Company's intent that the Plan comply in all respects with Rule 16b-3 of the Exchange Act, or its successor, and any regulations promulgated thereunder. If any provision of this Plan is found not to be in compliance with such rule and regulations, the provision shall be deemed null and void, and the remaining provisions of the Plan shall continue in full force and effect. All transactions under this Plan shall be executed in accordance with the requirements of Section 16 of the Exchange Act and the regulations promulgated thereunder.

The Board of Directors may, in its sole discretion, modify the terms and conditions of this Plan in response to and consistent with any changes in applicable law, rule or regulation.

5.  **ELECTION TO DEFER AND FORM OF PAYMENT**

On or before December 31 of any calendar year, a Director may elect to defer the payment of all or a specified part of all fees (both cash and equity awards) payable to the Director for services as a Director during the following calendar year.

To the extent permitted under Code Section 409A, any person who shall become a Director during any calendar year, and who was not a Director of the Company on the preceding December 31, may elect, within thirty days after election to the Board, to defer in the same manner the receipt of the payment of all or a specified part of fees (both cash and equity awards) not yet earned for the remainder of that calendar year.

At the time a Director elects to defer his/her fees (either cash or equity awards) for a calendar year, he/she must also elect:

i.      the payment event for such deferred amounts (for cash fees, a specified calendar year, separation from service (within the meaning of Code Section 409A) or a specified calendar year following separation from service, and for equity awards, either a specified grant date anniversary or separation from service (within the meaning of Code Section 409A));

ii.     with respect to cash fees deferred to separation from service, the form of payment (lump sum or equal annual installments) and the number of equal annual installments, if applicable;

iii.    with respect to cash fees deferred to separation from service where the Director elects to have the payment(s) made or commence in a calendar year following the separation from service, the calendar year following his/her separation from service (not to be later than the fifth (5 th ) calendar year following the separation from service) in which payment(s) of such deferred amount(s) shall be made or commence, as applicable. For purposes of clarity, calendar year in this context refers to the sequential calendar year following separation from service (for example, first calendar year, second calendar year, etc.); and

iv.      with respect to deferred cash fees, whether the deferred amounts will be deemed invested in an interest bearing account or in the Company stock fund account.

Amounts deferred to a specified year shall be payable only in a lump sum during the specified calendar year. Unless expressly provided otherwise in a deferral election form, if amounts are payable in equal annual installments, the first annual installment shall be made (a) in the month following the separation from service (if the Director has elected to have installments commence upon separation from service) or (b) in the calendar year elected by the Director (if the Director has elected pursuant to (iii) above to have the installments commence in a specified calendar year following separation from service), with remaining installments paid in successive calendar years until all installments have been paid. Unless expressly provided otherwise in a deferral election form, if the Director has elected to have deferred cash fees paid in a single lump sum upon separation from service, the payment shall be made in the month following the separation from service.

Except for elections made by directors of DuPont in respect of 2015, e lections shall be made in writing on an election form provided by the Company. All such elections as to deferral and form of payment are irrevocable.

## 6.    DIRECTORS' ACCOUNTS

Deferred cash fees deemed invested in the interest bearing account shall be held in the general funds of the Company and shall be credited to an account in the name of the Director. The deferred fees deemed invested in the interest bearing account will bear interest at a rate corresponding to the average 30-year Treasury securities rate applicable for the quarter (or at such other rate as may be specified by the Committee from time to time). Interest will be compounded quarterly and will also be deferred. If the rate changes, the new rate will apply to all deferred cash amounts beginning with the following quarter. Cash fees deemed invested in the Company stock fund account shall be allocated to each Director's account based on the closing price of the Company's common stock as reported on the Composite Tape of the New York Stock Exchange ("Stock Price") on the date the fees would otherwise have been paid. The Company shall not be required to reserve or otherwise set aside shares of common stock for the payment of its obligations hereunder, but shall make available as and when required a sufficient number of shares of common stock to meet the needs of the Plan. Beginning in 2018, any deferred equity awards will be denominated in the form of Deferred Stock Units granted under The Chemours Company Equity and Incentive Plan (the "Equity and Incentive Plan"). Deferred Stock Units are notional units (not actual shares of stock), each having a value equal to one share of the Company's common stock. The terms and conditions of the Deferred Stock Units, including dividend equivalent rights, will be governed by a Deferred Stock Unit award agreement and the Equity and Incentive Plan. Upon settlement, one share of Company common stock will be issued for each Deferred Stock Unit, with any fraction thereof being paid in cash. An amount equal to any cash dividends (or the fair market value of dividends paid in property other than dividends payable in common stock of the Company) payable on the number of shares represented by the number of stock units in each Director's account and/or the Director's Deferred Stock Units will be allocated, as applicable, to each Director's stock unit account in the form of additional stock units or, with respect to Deferred Stock Units, as additional Deferred Stock Units, based upon the Stock Price on the dividend payment date. Any stock dividends payable on such number of shares will be allocated in the form of additional stock units

or Deferred Stock Units, as applicable . If adjustments are made to outstanding shares of common stock as a result of split-ups, recapitalizations, mergers, consolidations and the like, an appropriate adjustment shall also be made in the number of stock units in a Director ' s stock unit account and, in accordance with the Equity and Incentive Plan, in the number of Deferred Stock Units . Neither s tock units in a Director's stock unit account nor Deferred Stock Units shall entitle any person to rights of a stockholder unless and until shares of Company common stock have been issued to that person with respect to the stock units or Deferred Stock Unit, as applicable .

7.    **PAYMENT FROM DIRECTORS' ACCOUNTS**

Subject to Section 8, the aggregate amount of deferred fees, together with interest and dividend equivalents accrued thereon, and Deferred Stock Units shall be paid in accordance with the e lections made by the Director as provided in Article 5. Amounts credited to a Director's account in cash shall be paid in cash and amounts credited in stock units and Deferred Stock Units shall be paid in one share of common stock of the Company for each stock unit or Deferred Stock Unit, as applicable, except that a cash payment will be made with any final installment for any fraction of a stock unit or Deferred Stock Unit remaining in the Director's account. Such fractional share shall be valued at the closing Stock Price on the date of settlement.

8.    **PAYMENT IN EVENT OF DEATH**

A Director may file with the Secretary of the Committee a written designation of a beneficiary for his or her account under the Plan on such form as may be prescribed by the Committee, and may, from time to time, amend or revoke such designation. If a Director should die before all deferred amounts credited to the Director's account have been distributed, the balance of any deferred fees and interest and dividend equivalents then in the Director's account, together with the Director's Deferred Stock Units, if any, shall be paid to the Director's designated beneficiary as soon as practicable after the Director's death. If the Director did not designate a beneficiary, or in the event that the beneficiary designated by the Director shall have predeceased the Director, the balance in the Director's account and Deferred Stock Units shall be paid as soon as practicable to the Director's estate.

9.    **NONASSIGNABILITY**

During a Director's lifetime, the right to any Deferred Stock Units or deferred fees, including interest and dividend equivalents thereon, shall not be transferable or assignable, except as may otherwise be provided in rules established by the Committee.

10.    **GOVERNING LAW**

The validity and construction of the Plan shall be governed by the laws of the State of Delaware.

11.    **CODE SECTION 409A**

To the extent that an amount is payable or a Deferred Stock Unit is settled in connection with a Director's retirement or other separation from service as Director of the Company, no amounts shall be paid hereunder and no Deferred Stock Units will be settled on account thereof unless such retirement or separation from service constitutes a separation from service within the meaning of

Code Section 409A.    To the extent that an amount is payable promptly at the beginning of a calendar year, whether as a result of a Director ' s deferral election or the terms of a prior plan document, such amount shall be paid no later than the last day of that calendar year.    Each amount to be paid or benefit to be provided to a Director pursuant to this Plan that constitutes deferred compensation subject to Code Section 409A shall be construed as a separate identified payment for purposes of Code Section 409A.

**Exhibit 10.3**

**AWARD TERMS OF DEFERRED STOCK UNITS**
**GRANTED TO A NONEMPLOYEE DIRECTOR**
**UNDER THE CHEMOURS COMPANY EQUITY AND INCENTIVE PLAN**

| | |
|---|---|
| **Introduction** | You have been granted vested Deferred Stock Units (the " Award ") under The Chemours Company Equity and Incentive Plan (the " Equity and Incentive Plan ") in accordance with your Annual Deferral Election Form (the " Deferral Election Form ") under The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors (the " Deferred Compensation Plan " and, together with the Equity and Incentive Plan, the " Plans "). The Award is subject to these Award Terms and the terms of the Plans and your Deferral Election Form, which are hereby incorporated by reference. For purposes of the Equity and Incentive Plan, the Award shall be considered an "Other Stock-Based Award." To the extent that an Award Term conflicts with the Plans, the Plans shall govern. Unless otherwise defined herein, the terms defined in the Equity and Incentive Plan shall have the same defined meanings in these Award Terms, including any appendices to these Award Terms (hereinafter, collectively referred to as the " Agreement "). A copy of the Deferred Compensation Plan and your Deferral Election Form are available upon request. A copy of the Equity and Incentive Plan, and related materials, such as the Equity and Incentive Plan prospectus, are available upon request or on the Merrill Lynch website at:<br><br>www.benefits.ml.com |

**Date of Grant [     ]** ("Date of Grant")

**Type of Award** Deferred Stock Units

| | |
|---|---|
| **Number of Deferred Stock Units Awarded** | [   ] |
| **Dividend Equivalents** | Dividends payable on the shares of Stock represented by your Deferred Stock Units (including whole and fractional Deferred Stock Units) will be allocated to your account in the form of additional Deferred Stock Units (whole and fractional) based upon the closing Stock price on the date of the dividend payment. Any such additional Deferred Stock Units will be subject to the same terms and conditions as the Deferred Stock Units to which they relate. |
| **Vesting** | The Award is 100% vested. |
| **Shareholder Rights** | Deferred Stock Units are not shares of Stock. They represent an unfunded and unsecured right to receive shares of Stock upon settlement. Until the Deferred Stock Units are settled, you will not have any voting rights, the right to receive dividends (but you will have the right to receive additional Deferred Stock Units to the extent dividends are paid, as described above) or other rights of a shareholder. |
| **Settlement** | The Deferred Stock Units will be settled (meaning one share of Stock will be issued to you or your beneficiary (or estate, if there is no beneficiary), as applicable, for each Deferred Stock Unit, with any fractional Deferred Stock Unit |

paid in cash) on the distribution date or event you elected in your Deferral Election Form , or if earlier, as soon as practicable after your death .   The value of any fractional Deferred Stock Unit will be based on the closing price of a share of S tock on the Deferred Stock Unit settlement date .

**Taxes**

The Deferred Stock Units are subject to various taxes upon settlement.  For U.S. residents, the Company is not required nor does it withhold taxes relating to the Deferred Stock Units; however, the Company will report proceeds on a Form 1099-MISC.  You are encouraged to consult a tax professional on more specifics.

**Severability**

The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**Waiver**

You acknowledge that a waiver by the Company of breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement, or of any subsequent breach of this Agreement.

**Appendix**

Notwithstanding any provisions in these Award Terms, the Deferred Stock Units shall be subject to the additional terms and conditions set forth in Appendix A to this Agreement and to any special terms and provisions as set forth in Appendix B for your country, if any.  Moreover, if you relocate to one of the countries included in Appendix B, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons.  Appendix A and B constitute part of these Award Terms.

**Imposition of Other Requirements**

The Company reserves the right to impose other requirements on your participation in Plans, on the Deferred Stock Units and on any shares of Stock issued under the Equity and Incentive Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

**APPENDIX A**

**ADDITIONAL TERMS AND CONDITIONS**

This Appendix includes additional terms and conditions that govern the Deferred Stock Units. These terms and conditions are in addition to, or, if so indicated, in place of, the terms and conditions set forth in the Award Terms. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Award Terms or the Equity and Incentive Plan.

| | |
|---|---|
| **Data Privacy** | *You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this Agreement and any other Deferred Stock Unit grant materials by and among the Company and its Subsidiaries or Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plans.* |
| | *You understand that the Company may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number (e.g., resident registration number), salary, nationality, job title, any stock or directorships held in the Company, details of all Deferred Stock Units or any other entitlement to stock awarded, canceled, exercised, vested, unvested or outstanding in your favor, for the exclusive purpose of implementing, administering and managing the Plans ("Data").* |

*You understand that Data will be transferred to any third parties assisting the Company with the implementation, administration and management of the Plans. You understand that the recipients of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting the Company's Corporate Secretary. You authorize the Company, its Subsidiaries and Affiliates, and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plans to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing your participation in the Plans. You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plans. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consent herein, in any case without cost, by contacting in writing the Company's Corporate Secretary. Further, you understand that you are providing the consent herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your status or service and career with the Company will not be affected; the only consequence of refusing or withdrawing your consent is that the Company would not be able to grant you Deferred Stock Units or other awards or administer or maintain such awards (i.e., the award would be null and void). Therefore, you understand that refusing or withdrawing*

*your consent may affect your ability to participate in the Plans. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact the Company's Corporate Secretary .*

| | |
|---|---|
| **Nature of Grant** | By participating in the Plans, you acknowledge, understand and agree that: |

(a)the Plans are established voluntarily by the Company, they are discretionary in nature and may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plans; (b) the grant of the Deferred Stock Units is voluntary and occasional and does not create any contractual or other right to receive future grants, or benefits in lieu of Deferred Stock Units, even if Deferred Stock Units have been granted in the past; (c) all decisions with respect to future grants of Deferred Stock Units, if any, will be at the sole discretion of the Company; (d) you are voluntarily participating in the Plans; (e) the Deferred Stock Units are not intended to replace any pension rights or compensation; (f) unless otherwise agreed with the Company, the Deferred Stock Units and the shares of Stock subject to the Deferred Stock Units, and the income and value of same, are not granted as consideration for, or in connection with, any service you may provide as a director of a Subsidiary or Affiliate; (g) the Deferred Stock Units and the income and value of same are not part of normal or expected compensation for any purpose including, without limitation, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; (h) the future value of the underlying shares of Stock is unknown, indeterminable and cannot be predicted with certainty; (i) for purposes of the Deferred Stock Units, your service relationship will be considered terminated as of the date you are no longer actively providing services to the Company or one of its Subsidiaries or Affiliates (regardless of the reason for such termination and whether or not later found to be invalid or in breach of laws in the jurisdiction where you reside or provide services, and the Committee shall have the exclusive discretion to determine when you are no longer actively providing services for purposes of the Deferred Stock Units (including whether you may still be considered to be providing services while on an approved leave of absence); (j) unless otherwise provided in the Plans or by the Company in its discretion, the Deferred Stock Units and the benefits evidenced by this Agreement do not create any entitlement to have the Deferred Stock Units or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the shares of the Company; and (k) neither the Company, nor any Subsidiary or Affiliate shall be liable for any foreign exchange rate fluctuation between your local currency and the U.S. dollar that may affect the value of the Deferred Stock Units or of any amount due to you pursuant to the settlement of the Deferred Stock Units or the subsequent sale of any shares of Stock acquired upon settlement.

| | |
|---|---|
| **No Advice Regarding Grant** | The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding your participation in the Plan, or your acquisition or sale of the underlying shares of Stock. You are hereby advised to consult with your own personal tax, legal and financial advisors regarding your participation in the Plan s before taking any action related to the Plan s . |
| **Venue** | Any and all disputes relating to, concerning or arising from this Agreement, or relating to, concerning or arising from the relationship between the parties evidenced by the Deferred Stock Units or this Agreement, shall be brought and heard exclusively in the United States District Court for the District of Delaware or the Delaware Superior Court, New Castle County. Each of the parties hereby represents and agrees that such party is subject to the personal jurisdiction of said courts; hereby irrevocably consents to the jurisdiction of such courts in any legal or equitable proceedings related to, concerning or arising from such dispute, and waives, to the fullest extent permitted by law, any objection which such party may now or hereafter have that the laying of the venue of any legal or equitable proceedings related to, concerning or arising from such dispute which is brought in such courts is improper or that such proceedings have been brought in an inconvenient forum . |
| **Language** | If you have received this Agreement or any other document related to this Agreement translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control. |
| **Electronic Delivery and Acceptance** | The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plans by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plans through an on-line or electronic system established and maintained by the Company or a third party designated by the Company. |
| **Insider Trading/Market Abuse Laws** | You acknowledge that, depending on your country of residence, you may be subject to insider trading restrictions and/or market abuse laws, which may affect your ability to acquire or sell shares of Stock or rights to shares of Stock (e.g., Deferred Stock Units) under the Plans during such times as you are considered to have "inside information" regarding the Company (as defined by the laws in your country). Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under the Company's insider trading policy.  You acknowledge that it is your responsibility to comply with any applicable restrictions, and you are advised to speak to your personal advisor on this matter. |
| **Foreign Asset/ Account Reporting Requirements** | Your country may have certain foreign asset and/or account reporting requirements which may affect your ability to acquire or hold shares of Stock under the Plans or cash received from participating in the Plans (including from any sale proceeds arising from the sale of shares of Stock) in a brokerage or bank account outside your country.  You may be required to report such accounts, assets or transactions to the tax or other authorities in your country.  You also may be required to repatriate sale proceeds or other funds received as a result of your participation in the Plans to your country through a designated bank or broker and/or within a certain time after receipt. You acknowledge that it is your responsibility to comply with such regulations, and you should consult your personal legal advisor for any details. |

## APPENDIX B

### COUNTRY-SPECIFIC TERMS AND CONDITIONS

This Appendix includes additional terms and conditions that govern the Deferred Stock Units granted to you under the Plans if you reside in one of the countries listed herein. These terms and conditions are in addition to, or if so indicated, in place of the terms and conditions set forth in the Award Terms or Appendix A.

You should be aware that local exchange control laws may apply to you as a result of your participation in the Plans. By accepting the Deferred Stock Units, you agree to comply with applicable exchange control laws associated with your participation in the Plans. If you have any questions regarding your responsibilities in this regard, you agree to seek advice from your personal legal advisor, at your own cost, and further agree that neither the Company nor any Subsidiary or Affiliate will be liable for any fines or penalties resulting from your failure to comply with applicable laws.

If you are a citizen or resident of a country other than the one in which you are currently working or are considered a resident of another country for local law purposes, the terms and conditions contained herein may not be applicable to you, and the Company shall, in its discretion, determine to what extent the terms and conditions contained herein shall apply to you.

### CANADA

**Deferred Stock Units Settled in Shares Only** . Notwithstanding any discretion contained in Section 6(b)(iii) of the Equity and Incentive Plan, or any provision in this Agreement to the contrary, Deferred Stock Units granted to you in Canada will be settled in shares of Stock only.

**Securities Law Information** . You are permitted to sell shares of Stock acquired under the Award through a broker acceptable to the Company, provided the resale of shares of Stock acquired under the Award takes place outside of Canada through the facilities of a stock exchange on which the shares of Stock are listed. The shares of Stock are currently listed on the New York Stock Exchange.

6

**Exhibit 31.1**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER

I, Mark P. Vergnano, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of The Chemours Company;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    May 4, 2018

By:    /s/ Mark P. Vergnano

Mark P. Vergnano
President and Chief Executive Officer

<div align="right">**Exhibit 31.2**</div>

## CERTIFICATION OF CHIEF FINANCIAL OFFICER

I, Mark E. Newman, certify that:

1. I have reviewed this quarterly report on Form 10-Q of The Chemours Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

| | |
|---|---|
| Date: | May 4, 2018 |
| By: | /s/ Mark E. Newman |

<div align="center" style="margin-left:40%">

Mark E. Newman
Senior Vice President and
Chief Financial Officer

</div>

Exhibit 32.2

**Certification of CFO Pursuant to
18 U.S.C. Section 1350,
As Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report of The Chemours Company (the "Company") on Form 10-Q for the period ended March 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Mark E. Newman, as Chief Financial Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Mark E. Newman

Mark E. Newman
Senior Vice President and Chief Financial Officer
May 4, 2018

**Exhibit 95**

## MINE SAFETY DISCLOSURES

The company owns and operates a surface mine near Starke, Florida. The following table provides information about citations, orders and notices issued from the Mine Safety and Health Administration (MSHA) under the Federal Mine Safety and Health Act of 1977 (Mine Act) for the quarter ended March 31, 2018.

| Mine (MSHA Identification Number) | Section 104 S&S [1] Citations (#) | Section 104(b) Orders (#) | Section 104(d) Citations and Orders (#) | Section 110(b)(2) Violations (#) | Section 107(a) Orders (#) | Total Dollar Value of MSHA Assessments Proposed ($) | Total Number of Mining Related Fatalities (#) | Received Notice of Pattern of Violations Under Section 104(e) (yes/no) | Received Notice of Potential to Have Pattern Under Section 104(e) (yes/no) | Legal Actions Pending as of Last Day of Period (#) | Legal Actions Initiated During Period (#) | Legal Actions Resolved During Period (#) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Starke, FL (0800225) | — | — | — | — | — | $ — | — | No | No | — | — | — |

[1]   S&S refers to significant and substantial violations of mandatory health or safety standards under section 104 of the Mine Act.

# EXHIBIT 4

EX-10.36 2 cc-ex1036_241.htm EX-10.36

**Exhibit 10.36**



The Chemours Company
1007 Market Street
PO Box 2047
Wilmington, DE 19899

302-773-1000 t
chemours.com

April 8, 2016

Paul C. Kirsch
[address redacted]

Dear Paul,

On behalf of The Chemours Company, it is a pleasure to offer you employment as the President, Fluoroproducts for Chemours.  Your position will be based in Wilmington, DE.  We would like to work towards a mid-May start date.

Please be advised this offer of employment is contingent upon approval by our Board of Directors. Based upon the terms of this offer of employment, your anticipated position with Chemours, and Chemours' status as a U.S. public company, you and Chemours are subject to certain requirements under U.S. federal securities laws.  Accordingly, upon your acceptance of this offer of employment with Chemours, you agree to keep strictly confidential the terms of this offer of employment, you agree not disclose the identity of Chemours to your present employer until after Chemours makes a public announcement in accordance with applicable securities laws, and you (and members of your family) agree to refrain from transacting in Chemours common stock, or instructing others to do so on your behalf, until informed by Chemours that you are no longer subject to this restriction.

**Annual Base Salary**

Effective the day you report to work, we will pay you $550,000.00 yearly while employed. Future pay increases will be based on your performance and approval of the compensation committee consistent with our salary policy.

**Annual Incentive Plan (AIP)**

You will be eligible for participation in the Annual Incentive Plan (AIP), which is typically payable in February of the following year.  The target value of your AIP award is seventy-five percent (75%) of your annual base salary or $412,500 for the year ending December 31, 2016.  To receive the AIP award, you must be an employee at the end of the performance period.

**Long Term Incentives (LTI)**

You will be eligible to receive Long-Term Incentives (LTI) under the Chemours Equity and Incentive Plan. The grant is subject to approval by the Compensation



EXHIBIT
4
Kirsch
PENGAD 800-631-6989

Committee of the Board of Directors. LTI is usually granted in February of each year. The target value of your LTI award beginning in 2017 is $900,000. The amount of your actual award can vary depending on company performance.

For 2016, you will receive a LTI award with an estimated value of $600,000. Forty percent (40%) of the target value, approximately $240,000, will be granted in the form of nonqualified stock options featuring three-year equal graded vesting and a ten-year term. The exercise price of the stock options awarded will be set equal to the closing share price of Chemours common stock on the New York Stock Exchange on your first day of employment with Chemours. Sixty percent (60%) of the target value, approximately $360,000, will be granted in the form of performance share units for the three-year performance period 2016-2018 which will cliff vest December 31, 2018 subject to the satisfaction of performance conditions. The number of performance share units awarded will be determined by dividing the target value by the closing share price of Chemours common stock on the New York Stock Exchange on your first day of employment with Chemours.

**Signing Bonus**
We are pleased to offer you a signing bonus of $650,000.00. This sum is in consideration of: (1) the SAP incentive payment with an estimated value of $200,000 otherwise payable in July 2016; and (2) unvested Henkel Cash Performance Units with an estimated value of $450,000 also otherwise payable in July 2016. We respectfully require evidence of forfeiture be provided prior to payment. The bonus will be paid in one lump sum within sixty (60) days following the receipt of acceptable evidence. The signing bonus is taxable, and all regular payroll taxes will be withheld.

In the unlikely event that you voluntarily terminate your employment or the Company terminates your employment for cause, within 1 year of your date of hire, you agree and will be responsible for reimbursing the Company for the full signing bonus. In such a case, the balance owed will be deducted from any payment due to you at such time of termination, including salary, severance payments, bonuses, and vacation. By your signature on this employment offer, you specifically agree and authorize the Company to withhold any payments issued prior to termination of employment, if that termination occurs before 1 year of your date of hire. The signing bonus will not be considered for purposes of determining benefits under Chemours Compensation and Benefit Plans.

**Long-Term Incentive Buyout**
Chemours will provide you with a one-time award of time-vested Restricted Stock Units (RSU) with a grant date value of $720,000. The number of RSUs awarded will be determined by dividing the grant date value by the closing share price of Chemours common stock on the New York Stock Exchange on your first day of employment with Chemours. This sum is in consideration of the outstanding unvested Cash Performance Units which will presumably be forfeited upon termination of employment with your current employer. As with the signing bonus, we respectfully require evidence of forfeiture be provided prior to the

award being granted.  The RSU award will vest 40% on the first anniversary of the grant date, 40% on the second anniversary of the grant date, and 20% on the third anniversary of the grant date.

## Nonqualified Deferred Compensation

Our nonqualified Retirement Savings Restoration Plan ("RSRP") allows for deferral of compensation (up to 6% of compensation above the IRS compensation limit) on the same basis as provided under the qualified RSP plan. The RSRP provides a Company match of 100% of the first six percent of the employee's deferral.

Further, you will be provided the opportunity to participate in the Management Deferred Compensation Plan, which permits deferral of up to 60% of Base Salary, up to 60% of AIP and up to 100% of restricted stock units and performance share units (for eligible Corporate Officers).

Deferral elections are typically taken in May of each year.  An additional enrollment window is typically opened for new hires in November of each year.

## Stock Ownership Guidelines

Contingent upon approval by our Board of Directors, as a Section 16 officer you will be a "Covered Executive" under The Chemours Company Stock Ownership Guidelines.  Based upon your position at hire, you will have five (5) years to acquire and maintain ownership of at least three (3) times your annual base salary of Chemours common stock.  Ownership levels are measured and reviewed annually.

## Senior Executive Severance Plan

Contingent upon approval by our Board of Directors, as a Section 16 officer you will be eligible to participate in The Chemours Company Senior Executive Severance Plan.  Based on your position at hire you will be classified as a Tier 2 Participant.  In the event of a Qualifying Termination, you will be eligible to receive a lump sum Cash Payment equal to two times the Base Severance Payment (the sum of Base Salary and Target Annual Bonus), plus a pro-rated Target Annual Bonus for the calendar year in which the Date of Termination occurs, in addition to other benefits.

## Benefits

Chemours offers a comprehensive, flexible benefits program that enables you to create a personalized package of benefits for you and your family. You must enroll within 31 calendar days of your hire date or you will be enrolled in the default coverage for YOU only - your dependents are not defaulted into coverage. Medical, Dental and Life Insurance elections are effective as of your date of hire. Other elections will become effective the first of the month following your enrollment.  You will receive information shortly after your hire date with instructions for enrolling through [web address redacted]. This website, along with the Chemours Benefits Service Center at [phone number redacted], are

available to you for additional information and tools to help you select the right benefits programs for you and your family.

### Retirement Savings Plan (RSP)

The Chemours Retirement Savings Plan (RSP) includes the following: $1.00 matching Company contribution per $1.00 employee contribution up to 6% of pay - for which you are immediately vested.  (Pay for this purpose is generally total cash compensation, including overtime, STIP, Local Performance Based Compensation and/or Sales Incentive Compensation, if eligible and subject to pay exclusions as outlined in the Plan document.)

### Holidays

Chemours provides 12 paid holidays each year. For 2016, you are eligible for all remaining Company holidays. Paid holidays must be taken in the calendar year granted. The exact dates may vary from year to year and from site to site.

### Vacation

You will be provided four (4) weeks of vacation per year.

Under the Company vacation plan, you may carry a maximum of 40 hours of vacation forward to the next year, if not taken.  Because additional "paid time off" must be granted outside the Company vacation plan, it cannot be carried forward to the following year if not used.  Should employment with the Company cease, you will be paid for any unused vacation for which you are eligible, and, if you have taken vacation in excess of accrued vacation, it will be deducted from your final pay. However, no payment can be made for any unused "paid time off" that was granted to you.

### Relocation Benefits

Domestic Relocation benefits are being offered as part of your employment package. For additional details on the relocation benefits available to you, please see the attached Policy Summary. Once you have completed the hiring process a counselor from Weichert Relocation Resources Inc., our relocation vendor, will be in touch with you to begin the process. The relocation expenses paid to you will not be considered for purposes of determining benefits under Chemours Compensation and Benefit Plans.

In addition, for up to one year from your date of hire, Chemours will reimburse you for any personal expenses incurred for the movement of household goods from Amsterdam to the United States, not to exceed $10,000.

### Relocation Repayment Agreement

By your signature on this employment offer, and in consideration of payment/advance of relocation expenses from The Chemours Company (Company) or its affiliates, and in the event that you voluntarily resign your employment from the Company, the Company terminates your employment for

cause, or you decide not to relocate after receiving relocation benefits, you hereby agree to repay the Company all relocation expenses.

If employment termination occurs within the first 12 months of your relocation, you shall pay 100% of all monies given to you, paid on your behalf, or reimbursed to you under the relocation program; or, if employment termination occurs in 13 to 24 months after your relocation, you shall repay on a pro-rated basis.

As to any relocation expenses that you become obligated to repay to the Company, you agree and authorize the Company to withhold any payments issued prior to termination of employment, including salary, severance payments, bonuses, and vacation. You agree to repay any remaining relocation expenses within 30 days following the effective date of employment termination.

You also accept responsibility for any tax liabilities, credits and/or deductions that you may incur as a result of the agreement.

**<u>Conditions of Employment</u>**
As is customary, this offer is contingent upon the following:

- Accepting the Company Employee Agreement (copy enclosed for your reference, which you will be asked to sign on your first day of employment).

- Completing a medical evaluation within 30 days prior to reporting to work. This evaluation may include a physical examination and will include a test for the presence of drugs, including marijuana, in your system.   A positive test for drugs, other than prescribed for you by your physician will constitute grounds for withdrawing the offer.

- Presentation of sufficient document(s) of your choice to complete the I-9 Employment Eligibility Verification establishing your identity and employment eligibility as required by the Immigration Reform and Control Act of 1986 which makes it unlawful for an employer to hire an individual not authorized for employment in the U.S.

- Completing a background check with results that are acceptable to the Company.

Employment at the Company is at will. This means that your employment continues so long as both the Company and you agree that it should. Both the Company and you have the right to terminate the employment relationship at any time and for any or no reason.

We will need confirmation of your acceptance. As an acknowledgement of your acceptance, please sign the attached copy of this letter, scan and return to the attention of Beth Albright, Senior Vice President Human Resources, via email:  [email address redacted].  If you have any questions or wish to discuss the terms

of this offer, please contact Beth Albright directly at: [phone number redacted]. We would like to have your decision no later than April 15, 2016.

We have an exciting and diverse team of exceptional people and believe you will contribute significantly as the leader of the Fluoroproducts Business. We trust the work ahead will provide you with the challenges you are seeking and anticipate your arrival to Chemours.

Sincerely,

Mark Vergnano
President and Chief Executive Officer

I accept this offer of employment.

_____
Paul C. Kirsch

_____
Date

# EXHIBIT 5

EX-10.36 3 cc-ex1036_830.htm EX-10.36

**Exhibit 10.36**

## SEPARATION AGREEMENT AND RELEASE

This Separation Agreement and Release ("Agreement") is made and entered into by and between and The Chemours Company ("Employer") and Paul Kirsch ("Employee"), in connection with Employee's separation of employment with Employer, effective October 31, 2019 (the "Separation Date").

In consideration of the mutual promises and releases contained herein and other good and valuable consideration as set forth herein, it is hereby agreed as follows:

1.                                                                                                                                                      Termination and Severance.

    (a)    Employee shall remain employed until 5:00pm EDT on the Separation Date, at which time Employee's employment with Employer and all affiliates will terminate. Until the Separation Date, Employee agrees to perform work as requested including knowledge transfer to the new President Flouroproducts.

    (b)    Subject to Employee's compliance with the terms of this Agreement, including Employee's timely execution and return of this Agreement and Employee not revoking this Agreement after its execution, Employer will provide to Employee the payments and benefits described in Exhibit "A," which is attached hereto and made a part hereof.

(c) Employee agrees that payments and benefits described in Exhibit "A" are adequate to support the release and other terms in this Agreement. For the avoidance of doubt, if Employee revokes or does not timely return the executed Agreement, Employee shall not be entitled to the payments and benefits set forth in Exhibit A, other than the payment of any accrued but unpaid salary and accrued but unused vacation.

2.    Unless Employee first obtains Employer's written consent, Employee will not disclose or use at any time any trade secret, technical or nontechnical confidential information of Employer of which he became or becomes aware either before or after the Separation Date, except where such disclosure is required by law.

3.    For a period of two years following the Separation Date, Employee will not hire, recruit, solicit or induce any employee of Employer who possesses confidential information of Employer to terminate his or her employment with Employer and/or to seek employment with his or her new or prospective employer.

4.    Unless Employee first obtains Employer's written consent, for a period of thirteen (13) month's following the Separation Date, Employee will not engage in activities which are entirely or in part the same as, or similar to, activities in which he engaged as President with Employer for any person, company or entity in connection with products or services (existing or planned) that are entirely or in part the same as, similar to, or competitive with, any products or services (existing or planned) of Employer or its affiliates at any time during the thirteen (13) months preceding the Separation Date.



PENGAD 800-631-6989

EXHIBIT

5

Kirsch

5.    Employee agrees that he will not disparage Employer or any of the other Released Parties (as that terms is defined in Section 11(a)) or in any way communicate information to third parties for the purpose of damaging Employer's or any of the other Released Parties' business standing or reputation. Employer agrees that it will not disparage Employee or in any way communicate information to third parties for the purpose of damaging Employee's business standing or reputation.

6.    No Additional Benefits. Other than those payments and benefits described in this Agreement, Employee acknowledges and agrees that Employee is not entitled to any additional payments or benefits in connection with termination of Employee's employment with Employer, including without limitation, the accrual of any additional benefits.

7.    Tax Liability. Employee, on behalf of himself and his heirs, agrees that, in the event he incurs any tax liability resulting from any payments described herein, he shall be solely responsible for such taxes and shall indemnify and hold Employer harmless from such taxes, interest and penalties.

8.    Duty of Cooperation. Employee agrees to cooperate with Employer and to provide all information and sign any corporate records and instruments that Employer may reasonably request with respect to any matter involving Employee's employment relationship with Employer, the work Employee has performed, or present or former Employees of Employer, including but not limited to any litigation with respect to such matters.

9.    Acknowledgement No Claim for Wages or Compensation or FMLA Leave. Except for any payment referenced in Section 1 above, Employee acknowledges that Employee has been paid in full all compensation and benefits due to Employee as of the date of Employee's signature on this Agreement including, but not limited to, having received all wages, overtime, meal and rest break pay, salary, expense reimbursement, penalty, bonus or other compensation of any kind which Employee is due or to which Employee believes Employee may be entitled. To the extent permitted by law, Employee waives any claim for wages, salary, reimbursement, penalty, bonus or other compensation earned or accrued through the date Employee signs this Agreement. Employee further warrants that, if applicable, Employee has exercised without interference all leave rights available to Employee under the Family and Medical Leave Act.

10.   Age Discrimination Release Notification. This Agreement includes a release of all charges and claims under the Age Discrimination in Employment Act ("ADEA") and, therefore, pursuant to 29 U.S.C. § 626(f), Employee acknowledges that:

(a)    Employee is releasing claims Employee may have under the ADEA;

(b)    Employee has read and fully understands the terms of this Agreement;

(c)    Employee has agreed to execute this Agreement knowingly and voluntarily;

(d)    As with any legal document, Employee is advised to consult with an attorney of Employee's own choosing and to discuss all aspects of this Agreement with an attorney of Employee's own choosing before signing this Agreement;

(e)     Employee is releasing only those claims arising prior to the date of the effectiveness of this release;

(f)     Employee may sign at any time, but acknowledges that Employee has twenty one (21) days in which to consider this release of claims under the ADEA, which Employee acknowledges to be a reasonable and sufficient period of time for review, deliberation, and negotiation;

(g)     Employee has full knowledge of the implications of such settlement and release of claims; and

(h)     Employee may revoke Employee's release of claims under the ADEA for a period of seven (7) days from the date of Employee's execution of the Agreement by delivering a written notice of revocation to Employer, to David C. Shelton, Senior Vice President and General Counsel, 1007 Market Street, Wilmington DE 19898 or [email redacted].

(i)     No payment will be made until the revocation period has passed.

11.    Unconditional General Release.

(a)     Except as specifically provided elsewhere in this Agreement, in consideration of the benefits to Employee in this Agreement, the adequacy of which is hereby acknowledged, and as a material inducement to Employee to enter into this Agreement, Employee agrees for Employee's heirs and personal or legal representatives, that by Employee's signature, Employee is forever giving up and waiving any claims, whether known or unknown, Employee ever has had or may have against Employer, its affiliates, and their respective assigns, successors, employees, directors, officers, agents, advisors and representatives (the "Released Parties"), for any personal or monetary relief that is based, in whole or in part, on conduct that occurred by Employer on or before the date Employee signs this Agreement. Employee represents and warrants that Employee has no suits, claims, charges, complaints except as specifically provided elsewhere in this Agreement, in consideration of the benefits to Employee in this Agreement, the adequacy of which is hereby acknowledged, and as a material inducement to Employee to enter into this Agreement, Employee agrees for Employee's heirs and personal or legal representatives, that by Employee's signature, Employee is forever giving up and waiving any claims, whether known or unknown, Employee ever has had or may have against the Released Parties, for any personal or monetary relief that is based, in whole or in part, on conduct that occurred on or before the date Employee signs this Agreement.

(b)     By waiving such claims Employee understands that Employee is releasing the Released Parties from any liability or obligation for any expense, damage, or loss Employee did or might claim based on, among other things, the following: (a) Employee's employment with Employer and/or any affiliate, or the termination of that employment; (b) any Employer or affiliate policy, practice, contract, agreement, promise, publication, or other communication; (c) any tort

Page 3 of 9

or personal injury; (d) any policies, practices, laws or agreements governing the payment of wages, commissions or other compensation; (e) any laws governing employment discrimination, including, but not limited to, Title VII of the Civil Rights Act of 1964; Sections 1981 through 1988 of Title 42 of the United States Code; The Employee Retirement Income Security Act of 1974 ("ERISA") (except for any vested benefits under any tax qualified benefit plan); The Immigration Reform and Control Act; The Americans with Disabilities Act of 1990; The Age Discrimination in Employment Act of 1967 ("ADEA"); The Worker Adjustment and Retraining Notification Act; The Fair Credit Reporting Act; The Family and Medical Leave Act; The Genetic Information Nondiscrimination Act; The Equal Pay Act; The Sarbanes-Oxley Act retaliation provisions; The False Claims Act retaliation provisions; The Dodd-Frank Wall Street Reform and Consumer Protection Act retaliation provisions; The Older Worker Benefit Protection Act; and any similar federal, state, or local law or ordinance; (f) any claim of retaliation based on any federal, state, or local law or ordinance; (g) any laws or agreements that provide for punitive, exemplary or statutory damages; (h) any implied contract, covenant of good faith and fair dealing, or violation of public policy or claims that Employee was fraudulently induced to enter into this Agreement; interference with business opportunity or contracts, negligence, misrepresentation, fraud, detrimental reliance, personal injury, assault, battery, defamation, false light, invasion of privacy, infliction of emotional distress, retaliation, constructive discharge, or wrongful discharge; (i) any other federal, state or local law or ordinance relating to employment or benefits associated with employment; and (j) any laws or agreements that provide for payment of attorneys' fees, costs or expenses.

12.   Claims Not Waived and Cooperation with Governmental Entities. This Agreement does not waive any claim for breach of this Agreement or claims that Employee may have that by law cannot be waived or released. Employee is not waiving any rights he may have to: (a) his own vested or accrued employee benefits under Employer's health, welfare, or retirement plans as of the Separation Date; (b) benefits and/or the right to seek benefits under applicable workers' compensation and/or unemployment compensation statutes; (c) any bounty that may be recoverable as a result of participating in the Securities and Exchange Commission's whistleblower program, or any other bounty program for which recovery cannot be waived as a matter of law; (d) pursue claims which by law cannot be waived by signing this Agreement; (e) enforce this Agreement; and/or (f) challenge the validity of this Agreement. Further, notwithstanding any other provision of this Agreement (including the non disparagement provision and confidentiality provision), Employee may file a charge, or cooperate with any government agency (including but not limited to the Equal Employment Opportunity Commission ("EEOC")) for claims not covered in this release, although this Agreement does prohibit Employee from obtaining any personal or monetary relief for Employee based on such a charge or based on Employee's providing information to or cooperating with the EEOC or any other governmental agency or demands of any kind whatsoever currently pending against Employer with any local, state, or federal court or any governmental, administrative, investigative, civil rights or other agency or board.

Page 4 of 9

13. Non-Admission. Employee understands and agrees that Employer expressly denies any liability in connection with Employee's separation from employment or in connection with any dispute Employee may have with or about Employer. Employee further understands and agrees that Employer expressly denies any responsibility for any injury or loss Employee has or may allege.

14. Section 409A. It is intended that any amounts payable under this Agreement will either be exempt from or will comply with Section 409A of the Internal Revenue Code of 1986, as amended, and all regulations, guidance and other interpretive authority issued thereunder ("Section 409A") so as not to subject you to payment of any additional tax penalty or interest imposed under Section 409A, and this Agreement will be interpreted on a basis consistent with such intent. Any provision that would cause this Agreement or any payment hereof to fail to satisfy Section 409A shall have no force or effect until amended in the least restrictive manner necessary to comply with Section 409A, which amendment may be retroactive to the extent permitted by Section 409A. Notwithstanding anything to the contrary in this Agreement, if (and only if) necessary to comply with Section 409A, (a) no amount payable under this Agreement that constitutes nonqualified deferred compensation under Section 409A payable due to Employee's termination of employment will be payable until Employee has a "separation from service" within the meaning of Section 409A, and (b) amounts payable under this Agreement due to Employee's termination of employment that constitute nonqualified deferred compensation under Section 409A that are otherwise payable during the six (6) month period immediately following Employee's separation from service shall instead be paid on the first business day after the date that is six (6) months following Employee's separation from service (or, if earlier, Employee's date of death). For purposes of the application of Section 409A, each payment will be deemed a separate payment. Employer makes no representation that any or all of the payments described in this Agreement will be exempt from or comply with Section 409A and makes no undertaking to preclude Section 409A from applying to any such payment. Employee understands and agrees that Employee shall be solely responsible for the payment of any taxes, penalties, interest or other expenses incurred by Employee on account of noncompliance with Section 409A, and Employer, Employer's affiliates, and their respective employees, officers, directors, agents, advisors and representatives will not have any liability to Employee with respect to any taxes, penalties, interest or other costs or expenses Employee or any related party may incur with respect to or as a result of Section 409A or for damages for failing to comply with Section 409A.

15. Severability. If any portion or clause of this Agreement is void or deemed unenforceable for any reason, the unenforceable portion or clause shall be deemed severed from the remaining portions of this Agreement, which shall otherwise remain in full force.

16. No Assignment of Claims Released. Employee represents that Employee has not assigned, given or sold any portion of any claim represented to be released in this Agreement to anyone else.

17. Assignment; Successors. This Agreement shall inure to the benefit of and be enforceable by Employer's successors and assigns. Employee's rights and obligations under this Agreement are personal and shall not be subject in any manner to

Page 5 of 9

anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, levy, or charge.

18.    Governing Law and Venue. This Agreement shall be interpreted in accordance with the laws of the State of Delaware. Any dispute or controversy related to, or arising from, this Agreement shall be brought exclusively in the state or federal court located in New Castle County, Delaware. Employee submits to personal jurisdiction in these courts.

19.    DTSA Notification. Under the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; (b) is made to Employee's attorney in relation to a lawsuit for retaliation against Employee for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

20.    Effect of Agreement. Each of the Parties to this Agreement represents and warrants to the other that, except for the obligations contained in this Agreement and the Employee's Employment Agreement (which remains in effect), and the Certificate of Compliance, there are no other obligations of any kind between the parties. Employee agrees that in executing this Agreement Employee does not rely upon and has not relied upon any representation or statement not set forth in this Agreement with regard to the subject matter, basis or effect of this Agreement. Employee represents that Employee has carefully read the Agreement, that Employee has been fully and fairly advised as to its terms and that Employee executes this Agreement as Employee's own free act and deed.

Page 6 of 9

By signing and dating in the space provided below the parties are acknowledging their agreement to the foregoing:


                                            /s/ Paul Kirsch
Witness                                 EMPLOYEE'S SIGNATURE

Date: 9/27/19



                              and the Chemours Company


Date: 10/3/19            By: /s/ Mark Vergnano
                         Mark Vergnano
                         Chief Executive Officer, Chemours



Date: 9/27/19            By: /s/ David Shelton
                         David Shelton
                         Senior Vice-President & General Counsel, Chemours




Page 7 of 9

EXHIBIT "A"
PAUL KIRSCH

| Separation Date: | October 31, 2019 |
|---|---|
| Separation Benefit: | Under the Chemours Severance Pay Plan, a lump sum payment in the amount of Forty-Two Thousand Three Hundred Eight Dollars ($42,308), payable as a lump sum as soon as administratively practical (and in all events within thirty (30) days) following the Separation Date. |
| Notice Period | Under the Chemours Severance Pay Plan, a lump sum payment equivalent to two weeks' paid notice of termination, in the amount of Twenty-One Thousand One Hundred Fifty-Four Dollars ($21,154), payable as a lump sum as soon as administratively practical (and in all events within thirty (30) days) following the Separation Date. |
| 2019 Annual Incentive Program | A pro-rated 2019 Annual Incentive Plan award in the amount of Three Hundred Forty-Three Thousand Seven Hundred Fifty Dollars ($343,750), payable as a lump sum as soon as administratively practical (and in all events within thirty (30) days) following the Separation Date. This amount is equal to the Employee's target Annual Incentive Award pro-rated by the number of days worked during the performance period as of the Separation Date. |
| COBRA Payment | A lump sum payment in the amount of Five Thousand One Hundred Seventy-Eight Dollars ($5,178), which is equal to 3 months of Consolidated Omnibus Reconciliation Act ("COBRA") premiums for medical and dental coverage, payable as soon as administratively practical (and in all events within thirty (30) days) following the Separation Date. The lump sum payment was determined using 2019 COBRA rates based on the Employee's enrolled coverage. Employee is responsible for electing and paying for all COBRA coverage, |
| Agreement on Non-Competition, Non-Solicitation and Non-Disparagement | Under the terms of the Separation Agreement and Release, a lump sum payment in the amount of Five Hundred and Fifty-Nine Thousand Eight Hundred Thirty-Three Dollars ($595,833), payable as a lump sum as soon as administratively practical (and in all events within thirty (30) days) following the Separation Date. |

Page 1 of 2
Initials__

| Long-Term Incentives: | In accordance with the terms of applicable plan(s) and award agreements for separation related to lack of work, equity awards granted on June 1, 2016 will be treated as follows: |
|---|---|
| | Stock Options:    Stock Options, to the extent vested, will be exercisable through the date that is one year after the Separation Date, at which time the Stock Options will expire. |
| | In accordance with the terms of applicable plan(s) and award agreements for separation related to lack of work, equity awards granted on March 1, 2017, March 1, 2018 and March 1, 2019 will be treated as follows: |
| | Stock Options:    Stock Options, to the extent vested, will be exercisable through the date that is 90 days after the Separation Date, at which time the Stock Options will expire. Any unvested Options as of the Separation Date will be forfeited on the Separation Date. |
| | PSUs:All Performance Share Units are subject to the Restricted Period on the Separation Date and will be forfeited. |
| Earned but Unpaid Salary and Accrued but Unused Vacation: | All earned but unpaid salary and outstanding unused accrued but unused vacation in accordance with Employer's applicable vacation policy shall be payable as a lump sum as soon as administratively practical (and in all events within thirty (30) days) following the Separation Date. |
| Outplacement: | Executive outplacement and counseling services will be provided according to Employer's US policy. Estimated cost is $2,500, which is paid directly to the Company s outplacement partner.  The employee may elect to accept cash in lieu of the service provided. |
| Taxes: | All amounts described in this Exhibit A shall be subject to applicable federal, state, or local withholding, taxes, or other deductions or withholdings required by law or applicable benefit plans, if any, and shall be payable in accordance with Employer's ordinary payroll practices. |

EXHIBIT "B"

## THE CHEMOURS COMPANY
## CERTIFICATE OF COMPLIANCE

This to certify that in connection with the termination of my employment with The Chemours Company, I do not have in my possession, nor have I have failed to return, any records, documents, laboratory notebooks, data, specifications, materials, drawings, blueprints, reproductions, sketches, notes, reports, proposals, customer lists, computer software (including source or object code listings therefor), documentation accompanying computer software, flow charts, data structures, data files, algorithms, programs structures and logic, prototypes and like items or copies of the foregoing or any other documents, materials or written or computerized information belonging to The Chemours Company or to any of its subsidiaries, joint ventures, or affiliated companies, or to their clients customers, or licensees.

I further state that I have been advised that I am obligated to preserve in confidence and not use for my own benefit or for the benefit of any third party (including any future employer or client) any and all confidential and proprietary company information that I learned about during my employment with the company, including any such information relating to trade secrets; research initiatives and projects; manufacturing and research processes and methods; experimental and test results; computer software and code; data or information relating to company's products or services; mailing lists; cost and pricing information; lists of customers or prospective customers; marketing or strategy information; competitive intelligence; employee compensation information; and including any such confidential or proprietary information pertaining to any of company's subsidiaries, joint ventures, suppliers, customers, consultants or licensees. l understand that this Certificate of Compliance is not to be construed as a substitute for my Employment Agreement and that to the extent that I have obligations under such an agreement, I hereby state and affirm that I intend to comply with those obligations.

We also take this opportunity to remind you that under the Employee Agreement which you signed at the commencement of your employment with the company, you are obligated to preserve in confidence and not divulge or use for your own benefit or the benefit of any third party (including any future employer or client) any of the following: all confidential and proprietary information, knowledge, data, documents or other information relating to company's products, systems, manufacturing facilities, technology, research programs, know-how, designs, data, customer lists, shareholders or any other proprietary information pertaining to any business of The Chemours Company or any of its subsidiaries, parents, or affiliated companies, or information pertaining to any of company's suppliers, customers, consultants or licensees that you have learned during your term of employment.

/s/ Paul Kirsch
EMPLOYEE'S SIGNATURE


Paul Kirsch
PRINTED NAME of EMPLOYEE


10/2/19
DATE

Page 9 of 9