# EXHIBIT 6

# THE DEVIL THEY KNEW: PFAS CONTAMINATION AND THE NEED FOR CORPORATE ACCOUNTABILITY, PART II

# HEARING

BEFORE THE

## SUBCOMMITTEE ON ENVIRONMENT

OF THE

## COMMITTEE ON OVERSIGHT AND REFORM

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

SEPTEMBER 10, 2019

## Serial No. 116–58

Printed for the use of the Committee on Oversight and Reform



Available on: *http://www.govinfo.gov*
*http://www.oversight.house.gov* or
*http://www.docs.house.gov*

U.S. GOVERNMENT PUBLISHING OFFICE

37–952 PDF          WASHINGTON : 2019



EXHIBIT

6

Kirsch

## COMMITTEE ON OVERSIGHT AND REFORM

ELIJAH E. CUMMINGS, Maryland, *Chairman*

CAROLYN B. MALONEY, New York
ELEANOR HOLMES NORTON, District of Columbia
WM. LACY CLAY, Missouri
STEPHEN F. LYNCH, Massachusetts
JIM COOPER, Tennessee
GERALD E. CONNOLLY, Virginia
RAJA KRISHNAMOORTHI, Illinois
JAMIE RASKIN, Maryland
HARLEY ROUDA, California
KATIE HILL, California
DEBBIE WASSERMAN SCHULTZ, Florida
JOHN P. SARBANES, Maryland
PETER WELCH, Vermont
JACKIE SPEIER, California
ROBIN L. KELLY, Illinois
MARK DeSAULNIER, California
BRENDA L. LAWRENCE, Michigan
STACEY E. PLASKETT, Virgin Islands
RO KHANNA, California
JIMMY GOMEZ, California
ALEXANDRIA OCASIO-CORTEZ, New York
AYANNA PRESSLEY, Massachusetts
RASHIDA TLAIB, Michigan

JIM JORDAN, Ohio, *Ranking Minority Member*
PAUL A. GOSAR, Arizona
VIRGINIA FOXX, North Carolina
THOMAS MASSIE, Kentucky
MARK MEADOWS, North Carolina
JODY B. HICE, Georgia
GLENN GROTHMAN, Wisconsin
JAMES COMER, Kentucky
MICHAEL CLOUD, Texas
BOB GIBBS, Ohio
RALPH NORMAN, South Carolina
CLAY HIGGINS, Louisiana
CHIP ROY, Texas
CAROL D. MILLER, West Virginia
MARK E. GREEN, Tennessee
KELLY ARMSTRONG, North Dakota
W. GREGORY STEUBE, Florida
FRED KELLER, Pennsylvania

DAVID RAPALLO, *Staff Director*
BRITTENY JENKINS, *Subcommittee Staff Director*
JOSHUA ZUCKER, *Assistant Clerk*
CHRISTOPHER HIXON, *Minority Staff Director*
CONTACT NUMBER: 202-225-5051

————

## SUBCOMMITTEE ON ENVIRONMENT

HARLEY ROUDA, California, *Chairman*

KATIE HILL, California
RASHIDA TLAIB, Michigan
RAJA KRISHNAMOORTHI, Illinois
JACKIE SPEIER, California
JIMMY GOMEZ, California
ALEXANDRIA OCASIO-CORTEZ, New York

JAMES COMER, Kentucky, *Ranking Minority Member*
PAUL GOSAR, Arizona
BOB GIBBS, Ohio
CLAY HIGGINS, Louisiana
KELLY ARMSTRONG, North Dakota

(II)

# C O N T E N T S

———

|  | Page |
|---|---|
| Hearing held on September10, 2019 | 1 |

WITNESSES

**Panel One**

Robert A. Bilott, Partner, Taft Stettinius & Hollister LLP
Oral Statement ......... 2
Lori Swanson, Former Attorney General, State of Minnesota
Oral Statement ......... 6
Matthew Hardin (minority witness), Commonwealth Attorney, Greene County, Virginia
Oral Statement ......... 8

**Panel Two**

Denise R. Rutherford, Senior Vice President of Corporate Affairs, The 3M Company
Oral Statement ......... 25
Paul Kirsch, President of Fluoroproducts, The Chemours Company
Oral Statement ......... 26
Daryl Roberts, Chief Operations & Engineering Officer, DuPont de Nemours, Inc.
Oral Statement ......... 28

*Written opening statements and witnesses' written statements are available on the U.S. House of Representatives Repository at: https://docs.house.gov.*

INDEX OF DOCUMENTS

———

*The documents entered into the record for this hearing are listed below, and are available at: https://docs.house.gov.*

* Advanced Medical Technology Association Letter; submitted by Rep. Comer.

* 1961 Correspondence from Dorothy Hood; submitted by Rep. Tlaib.

* 1992 Dupont Study on Employee Cancer Rates; submitted by Rep. Tlaib.

* Billot Letter to FDA with Accompanying 3M Study; submitted by Rep. Speier.

* 1978 PFAS Navy Report; submitted by Rep. Wasserman Schultz.

* NDAA PFAS Letter signed by 162 House Members; submitted by Wasserman Schultz.

* Responsible Science Policy Coalition Presentation; submitted by Rep. Ocasio-Cortez.

* Richard Purdy Resignation Letter from 3M; submitted by Rep. Ocasio-Cortez.

* Questions for the Record: Chairman Rouda question to witness Rutherford, and responses.

* Questions for the Record: Rep. Keller's question to witness Roberts and DuPont officials, and responses.

# THE DEVIL THEY KNEW:
## PFAS CONTAMINATION AND THE NEED FOR CORPORATE ACCOUNTABILITY, PART II

————

**Tuesday, September 10, 2019**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON OVERSIGHT AND REFORM,
SUBCOMMITTEE ON ENVIRONMENT,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 2:03 p.m., in room 2154, Rayburn House Office Building, Hon. Harley Rouda (chairman of the subcommittee) presiding.

Present: Representatives Rouda, Hill, Tlaib, Krishnamoorthi, Speier, Ocasio-Cortez, Comer, Gosar, Gibbs, Armstrong, Keller, and Jordan (ex officio). Also present: Representatives Dingell, Fletcher, Sarbanes, Wasserman Schultz, and Kildee.

Mr. ROUDA. The committee will come to order. Without objection, the chair is authorized to declare a recess of the committee at any time.

This subcommittee is holding our third hearing on PFAS contamination focusing on the need for corporate accountability.

I now recognize myself for five minutes to give an opening statement.

As I mentioned, this is the third hearing this subcommittee has held on the dangers of perfluoroalkyl and polyfluoroalkyl substances, the manmade toxic chemicals known by their acronym PFAS. It is the second hearing that focuses on the role of industry and the contamination of Americans drinking water, groundwater, air, and food supplies with these chemicals.

If the subcommittee's last two hearings haven't made it abundantly clear, we're dealing with a national emergency here. PFAS chemicals have been linked to serious adverse health outcomes in humans, including low fertility, birth defects, suppression of the immune system, thyroid disease, and cancer.

The EPA has issued a health advisory on two of the most well known PFAS chemicals, PFOA and PFOS, and is currently in the process of determining how these chemicals should be regulated. The current assistant administrator for the Office of Water at the EPA, David Ross, agreed that PFAS contamination was, quote, a national emergency.

Several states have already taken steps to regulate these chemicals on their own. My point is this is not a small or emerging or ambiguous problem. It is a full-blown crisis that our government

2

has already acknowledged. So our goal here today is to demand accountability for this crisis.

Our first witnesses are both attorneys, Lori Swanson, the former attorney general of Minnesota, who led a massive case against the 3M Company on behalf of the state of Minnesota for the company's role in damaging the environment with perfluoroalkyl chemicals, including PFOS and PFOA.

After eight years of litigation, 3M settled the case with the state of Minnesota last year for $850 million, which is the largest environmental settlement in the state's history. That money will be used to clean up the sites that have contaminated Minnesotan residents.

Our second witness, Robert Bilott—did I pronounce that correctly? Bilott. Excuse me.—Robert Bilott was one of the first lawyers to successfully sue DuPont on behalf of people who had been exposed to PFAS chemicals and have suffered greatly as a result, losing their livelihoods, their health, and their family members.

Bucky Bailey, a witness at the subcommittee's July 24 hearing was one of the people Mr. Bilott defended. In 2017, DuPont and its spinoff company, Chemours, agreed to pay $671 million for polluting the area around a DuPont manufacturing plant in Parkersburg, West Virginia, the same plant where Bucky Bailey's mother was poisoned when she was pregnant with him.

Representatives from 3M, DuPont, and Chemours are here with us today. And let me say, we are not here to relitigate the cases these companies have already settled or quibble over each company's degree of liability. This subcommittee is not a court, and I am not a judge. This subcommittee is here today because we want more than legal accountability. Though legal accountability is great too, we want ethical accountability.

I look forward to the first panel of witnesses which will help us explain to the subcommittee why and how these companies got away with poisoning people for more than a half century. Because make no mistake, that is exactly what happened.

The documentation is clear. As early as the 1950's, in-house scientists at 3M and DuPont began discovering that PFAS chemicals were bioaccumulative, meaning they buildup in the body, justifying their nickname "forever chemicals," and toxic. And yet despite these consensus among scientists within both companies, DuPont and 3M continue to deny the toxicity of long-chain PFAS chemicals.

I want everyone in the room to really think about what it must be like to live next to a toxic waste dump with your family, your kids, that you never knew was a toxic dump. Imagine drinking and breathing toxic chemicals that you never knew were toxic, because the companies who made them never told you and suppressed the research that confirmed just how toxic the chemicals were. And as we'll learn from the testimony, these extensive—there's extensive documentation that confirms that this is exactly what these companies did.

I'm not editorializing here. And this isn't faux outrage. I'm not being hard on these companies just for show. These are peoples' lives we're talking about. I hope everyone watching here today will go and read more about this issue, learn more about the extent of what has been happening over the past several decades, because

3

what these companies have done is deeply immoral and shameful, and there's no other way to put it.

So I hope we don't waste our time today on phony debates over the science. It's almost 70 years since research on the toxicity of these chemicals began.

The evidence is clear and convincing. Enough is enough. And after hearing this important testimony today, this subcommittee plans on using the information learned to press these companies to admit that they know these chemicals are toxic and acknowledge their past conduct of concealing important scientific studies regarding PFAS toxicity. We will also urge them to work together with Congress to address this national emergency, which includes designating PFAS as a hazardous substance under the Superfund.

I respect these companies' long and storied histories here in the United States. And I respect the fact that these companies have made products that Americans want to buy and have made American's lives easier. But I'm a compassionate capitalist. I don't think for one second that I won't hold these companies accountable when they screw up. And these companies with us here today have screwed up and we need to hold them accountable for doing so.

I hope the people representing those companies here today will admit their mistakes so that we can all move forward and achieve what I believe is our common goal: to clean up contaminated sites, stop exposing innocent people to toxic chemicals, and making sure that all Americans have clean water, clean air.

Thank you. And I now invite the ranking member of the subcommittee, James Comer, to give a five-minute opening statement.

Mr. COMER. Thank you, Mr. Chairman.

We're here today for the subcommittee's third hearing this year on the large group of chemicals collectively known as PFAS. I appreciate the willingness of today's witnesses to appear before us.

As I've said at each of our hearings, potential drinking water contamination is frightening for any community. And I look forward in particular to hearing from our second panel of witnesses, 3M, DuPont, and Chemours, about their efforts to mitigate and remediate any contamination and to develop and use alternatives.

It's important to remember the reason that PFAS substitutes became so prevalent in the first place. They provide strength, durability, and resilience in a broad range of applications from nonstick cookware to firefighting foams that save lives.

I'd like to submit for the record a letter recently sent to Congress by the Advanced Medical Technology Association expressing, quote, deep concern about provisions being considered in the National Defense Authorization Act that would circumvent normal regulatory processes and treat all 5,000 PFAS compounds as a single class of chemicals without the adequate scientific data to make such a determination.

Why does the medical technology industry care about these proposed actions? Because the medical devices made by these companies have, for more than 50 years, been made with fluoropolymers, a PFAS compound. Tens of millions of these devices have been used by patients without demonstrating any adverse health effects. In fact, they've achieved the opposite. They've kept patients alive and healthy.

4

As I've told you before, Mr. Chairman, I'm committed to working with my colleagues on solutions that will contain any existing damage from legacy PFAS substances and reduce the risk of future harm. But I also hope that we as a body make responsible evidence-based, science-driven decisions. Any legislative or regulatory actions we consider should be based on a solid scientific understanding of the toxicity of specific compounds.

I would also like to note some level of discomfort with today's hearing makeup. Our second panel today made up of private sector companies agreed weeks ago to appear voluntarily before the committee. Only very late in the game did the majority announce they would be joined today by attorneys involved with multiple ongoing lawsuits with those same companies. One of those trials is actually set to begin in November, less than two months from now.

I'm a firm believer in the broad authority of congressional oversight, but I've become very concerned when Congress uses the tools in ways that can interfere with or give the appearance of interfering with ongoing litigation.

Broad investigative letters to companies seeking documents and information relevant to ongoing cases and last-minute surprise invitations to hearings for attorneys involved in multiple lawsuits against those companies may raise questions for some about the true purpose of these hearings.

I hope this subcommittee will commit to doing its best to refrain from interfering or appearing to interfere with ongoing litigation as we move forward.

Today, I hope we will spend some time discussing EPA's PFAS Action Plan which the agency released in February of this year. In it, EPA outlined a number of short-and long-term actions to minimize risk, increase scientific knowledge about the broad range of PFAS substances, prevent exposure, and cleanup existing contamination. The Plan also outlines EPA's actions to coordinate with other Federal agencies in state, local, and tribal governments to address the issue.

I look forward to hearing from our second panel of witnesses what their view of the Action Plan is and what they think can be done to make it more effective.

Thank you, Mr. Chairman, for today's hearing. And thank you for the witnesses who appeared before us.

Thank you. I yield back.

Mr. ROUDA. Thank you.

Now I want to welcome our first panel of witnesses. Robert Bilott, partner, Taft Stettinius and Hollister LLP; Lori Swanson, former attorney general, state of Minnesota; and Matthew Hardin, commonwealth's attorney, Greene County, Virginia.

If the three of you would please stand and raise your right hands, and I will swear you in.

Do you swear or affirm that the testimony you're about to give is the truth, the whole truth, and nothing but the truth, so help you God?

Please be seated.

Let the record reflect that the witnesses answered in the affirmative.

5

The microphones can be a bit sensitive, so please make sure you turn them on and—with that little button in front of you and that the microphone is close to you.

Without objection, your witness statement will be made a part of the record.

With that, Mr. Bilott, you are now recognized to give an oral presentation of your testimony.

### STATEMENT OF ROBERT A. BILOTT, PARTNER, TAFT STETTINIUS AND HOLLISTER, LLP

Mr. BILOTT. Thank you.

Good afternoon. Thank you for the opportunity to testify today.

My name is Rob Bilott, and I'm a partner with the law firm of Taft Stettinius and Hollister out of their Cincinnati, Ohio, and Northern Kentucky offices. I've represented injured parties, parties injured by PFAS contamination, for more than the last two decades. But I'm not here today speaking on behalf of any client, but I'm here in response to a request from this subcommittee for information about a pending nationwide public health threat posed by PFOS chemical contamination.

The public may only now be realizing the scope of this problem, but the companies that manufactured these chemicals have been aware of the risks for decades but failed to alert the rest of us. I know because I spent the last 20 years of my career in litigation with these companies, pulling out of their own internal files what was already there and was already known about the risk of these chemicals.

For example, by the 1960's and 1970's, DuPont had data in its files from animal studies showing toxic effects in multiple species: rats, dogs, rabbits, monkeys. Multiple different types of organ systems: the liver, the testes, the adrenals.

By the end of the 1970's, DuPont knew that PFOS was building up in the blood of humans and staying there for long periods of time. By the 1980's, DuPont was concerned about liver damage and birth defects among its own PFOS-exposed workers. DuPont even classified PFOA as a confirmed animal carcinogen, possible human carcinogen, by 1988 after a rat study showed that the chemical caused testicular tumors.

A second study emerged only a couple of years later confirming again, not only testicular tumors, but this time also pancreatic and liver tumors. During the 1980's and 1990's, the company also monitored and was concerned about increased cancer rates among its own workers.

During the 1980's and 1990's, DuPont even found the chemical in the local public drinking water supply as early as 1984 and at levels above its own internal safety guideline, but did not alert local officials or any of the members of the public drinking that water.

As this troubling evidence continued to mount over the years, DuPont, rather than stop using this material, actually went forward and constructed its own PFOA manufacturing facility in North Carolina to continue using and releasing even more of the chemical, even after 3M announced that it would stop any further manufacture back in 2000.

6

When the community drinking this contaminated water outside of DuPont's plant in West Virginia finally learned of the problem, DuPont publicly denied that there was any evidence of harm, denied its own internal science.

In response, we actually ended up sitting down with DuPont and created an independent panel of scientists back in 2004 whose purpose was to look at all of the existing evidence and conduct new studies of the impacted community members to determine what the real risks of drinking this in the water were. These independent scientists, referred to as the C8 Science Panel, ended up analyzing data from over 69,000 people, conducted over a dozen completely new studies, some of the most comprehensive human health studies done on any chemical ever.

They not only looked at that new data from the new studies, they took all of the evidence. They weighed all of the evidence, all of the animal studies, all of the human data, all of the available data, weighed it all to make a conclusion as to whether or not there were scientific links between drinking this in the water and actual human disease. That took seven years, over $30 million, to find out what the answer to that was.

By 2012, this independent panel of scientists had concluded, yes, drinking this in the water was linked with six different serious diseases, including two types of cancer: kidney cancer and testicular cancer. The same type of cancer, by the way, that was found in the rat studies decades earlier.

This is independent scientists who weighed all of the evidence. That independent scientific review has occurred. Independent scientists have looked at this data, all of the data, and confirmed links with human disease.

Unfortunately, despite all of this data that now exists, after years of litigation to pull this information out and to make it public after gag orders, protective orders, et cetera, now that this information is finally there, unfortunately, EPA still has not acted.

I first warned EPA 18 years ago, and we are still here. We have more than enough evidence. It's time to move forward and act to protect the American public.

Thank you.

Mr. ROUDA. Thank you, Mr. Bilott.

Ms. Swanson, you are now recognized for five minutes.

### STATEMENT OF LORI SWANSON, FORMER ATTORNEY GENERAL, STATE OF MINNESOTA

Ms. SWANSON. Thank you, Mr. Chairman, ranking member, members of the committee. I appreciate the opportunity and invitation to be here today.

In 2010, I was serving as attorney general of my state of Minnesota and filed a lawsuit against 3M Company for damaging my state's natural resources through its manufacture and disposal of PFAS. Our lawsuit alleged that 3M contaminated the aquifers that supplied drinking water to over 100,000 Minnesota residents.

The lawsuit settled last year on the morning the trial was to begin. The settlement required 3M to pay $850 million to the state of Minnesota to bring long-term clean drinking water solutions to my state and another $40 million in short-term solutions. I have

7

been told that it's the third largest natural resource damage recovery in the Nation's history.

The lawsuit lasted over seven years and involved the production of 27 million pages of documents, about 200 witness depositions, testimony of world-renowned scientists, and over 1,500 court filings. Public records and public trial exhibits in that lawsuit show that 3M knew but concealed information about the dangers of these chemicals for decades, some of which the public is just now discovering.

In many ways, Minnesota, my state, is ground zero, for the PFAS contamination that confronts the country. After the war, World War II, 3M bought the patent to develop PFAS and then started to manufacture these chemicals and ship them around the entire country. Unfortunately, 3M knew about the risks of the chemicals to the drinking water, the environment, and human health for decades but concealed its knowledge, subverted the science, and kept pushing the chemicals out the door.

In 2000, when it stopped making some forms of PFAS, 3M was making about one half a billion dollars a year from the products that were discontinued.

And what did 3M know about PFAS prior to the year 2000? I refer you to Exhibit A of my testimony. It shows that in 1997, 3M gave DuPont a material safety data sheet with the label that said: "Cancer: Warning: Contains a chemical which can cause cancer," citing 1983 and 1993 studies it conducted with DuPont. But 3M removed that label the same year and for decades sold PFAS without warning the public of its dangers.

We know that 3M told employees not to write things down about PFAS and to mark documents "attorney-client privilege," regardless of whether attorneys were even involved. We know that in 1998, a committee of 3M scientists recommended the company notify the EPA the chemicals were widely found in human blood, but a 3M executive overruled them.

Then in 1999, a 3M scientist blew the whistle on 3M. He resigned and sent his resignation letter to the EPA. And he said that 3M ecotoxicologists urged the company for two decades to perform ecological risk assessment of PFOS, but the company dragged its feet, and that the company misleadingly downplayed to regulators the presence of these chemicals through the food chain transference.

An issue in our lawsuit was what did 3M know and when did it know it. We know that throughout the 1950's, 3M's own animal studies found PFAS to be toxic. By the 1960's, it knew the chemicals don't degrade in the environment. In 1970, a company that purchased 3M's firefighting foam had to abandon a test of the product because all the fish died.

And then in 1975, two independent scientists, Dr. Warren Guy and Dr. Donald Taves, found fluorochemicals in blood banks throughout the country, and they called 3M to say we think your chemical is causing this. And 3M pled ignorance, in its words, claiming that Scotchgard didn't contain these chemicals, and concealing from the scientists who wanted a chemical footprint that information. In doing so, the company thwarted the broader scientific

8

community's understanding of the health impacts of these chemicals for a generation.

We know that 3M soon replicated the studies and confirmed that PFAS was found in human blood. In 1979, 3M's lawyers advised the company to conceal that PFOS was in human blood. We know that 3M concealed from the EPA for more than 20 years that PFAS was in human blood.

By 1976, 3M knew the chemicals were in the blood of workers at much higher levels but didn't make this public. By 1978, 3M knew the chemicals killed monkeys. We know that in 1981 the company knew that the chemicals caused abnormalities in pregnant rats. And by 1988, a company that purchased PFAS firefighting foam complained to 3M that it falsely claimed the product was biodegradable when it wasn't.

A few months later, a 3M employee wrote an internal memo that 3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable, but the company continued to sell them.

Testimony in our lawsuit showed that by 1993, 3M knew that there was some evidence that lactating goats transferred PFAS to their kids in milk and that it was likely that human mothers would do the same thing. But it wasn't until 23 years later that EPA issued a health advisory cautioning pregnant women and breast-fed infants to avoid these chemicals out of concern that, just like with goats, a mother can transfer the chemicals to her fetus or baby through the placenta or breast milk.

Mr. Chairman, members, I appreciate the opportunity to be here today and talk about these issues, and look forward to Congress being part of the solution.

Mr. ROUDA. Thank you very much.

The next witness, Mr. Hardin, who was just added to the witness list yesterday, and I just received your opening statement an hour ago, please proceed with five minutes of opening testimony.

### STATEMENT OF MATT HARDIN, COMMONWEALTH'S ATTORNEY, GREENE COUNTY

Mr. HARDIN. Thank you, Mr. Chairman and ranking member. Thank you as well to the members of the committee for inviting me to testify today.

My name is Matthew Hardin. And although I testify in my individual capacity, I currently serve as the chief prosecutor, which is called the commonwealth's attorney, in Greene County, Virginia. I was previously a litigator from 2014 to 2017, and I used federal and state freedom of information laws to obtain government documents nationwide.

I'm here today because many of the public records that I and my colleagues obtained detailed a campaign by plaintiffs' attorneys and activists to recruit, quote, a single sympathetic state attorney general or even grand juries convened by a district attorney, unquote, to subpoena records of private parties targeted by the tort bar.

This campaign was, in fact, successful, as headlines well document, and was followed by a coordinated effort by political donors, again with the assistance of activists, to enlist state law enforce-

9

ment apparatuses to investigate private parties and otherwise support a private agenda.

A report released by the Competitive Enterprise Institute and authored by Christopher Horner entitled, "Law Enforcement for Rent," details many of the documents I helped uncover. The lead plaintiff's attorney behind the effort to recruit attorneys general admitted the campaign's political nature in addition to its pursuit of financial settlements in an interview with The Nation Magazine.

Among other things, he said legislation is going nowhere, so litigation could potentially play an important role. Also, apparently recognizing the problematic nature of these collaborations, the same plaintiff's attorney worked with attorneys general offices against which I litigated, Vermont State and New York State, to mislead a reporter from The Wall Street Journal who called apparently to inquire about a separate issue entirely.

One Federal court noted this behavior asking: Does this reluctance to be open about collaborating with plaintiffs' attorneys and activists with a litigation agenda suggest that the attorneys general are trying to hide something from the public? My experience and the experience of others forced to litigate numerous open records requests to determine how public offices came to be used in this way suggests the answer is yes.

One public record I obtained in litigation in the Vermont courts was an agenda for a meeting among activists, prospective funders, attorneys general offices, and plaintiffs' lawyers titled "Potential State Causes of Action Against Major Carbon Producers." One academic hosting the meeting described it to attorneys general offices as a, quote, private event for staff from state attorney general offices, unquote, to pursue this agenda. One academic invited to address the gathering boasted in an email to a major donor to her institution and the host institution that this meeting was, quote, about going after climate denialism along with a bunch of state and local prosecutors nationwide, unquote.

It is difficult to imagine this being anything other than a national scandal and the subject of numerous Pulitzer Prize winning news stories if the players and agenda were different, which may be why so many media and constitutional watchdogs have chosen instead to avert their gaze. As such, this sort of behavior is becoming normalized and expanding to the point that congressional committees are apparently joining in.

Please note that if it is acceptable involving parties and issues you favor, it is also acceptable involving parties and issues you do not favor. If the growing use of public office to assist private litigants is permitted to stand here, what is the limiting principle dictating that the National Rifle Association, pro-life groups, or chemical and fossil fuel companies cannot also chair such use of law enforcement and otherwise use public office to support their end.

I come to this committee both as a prosecutor and to offer my experience on these matters as a civil litigator. I believe in the rule of law and that all citizens are entitled to participate in democracy and have their day in court, if they so choose. But I also appear today concerned that private donors and activist groups are seeking to thwart the fair and neutral workings of our democratic policy-

10

making and our litigation system, including our law enforcement apparatuses and court system.

Civil and criminal litigants are entitled to discovery under the rules of court that apply in their cases. The American system of justice is the envy of the world, and our courts are more than capable of applying those rules equitably.

But what I saw happening as a private litigator was a perversion of justice. Rather than filing suits and seeking their day in court like any other litigant, powerful special interests sought to enlist law enforcement to obtain public records seemingly to assist their tort litigation campaigns as well as to make policy through the use of law enforcement office. When tort lawyers teamed up with attorneys general using either common interests or succumbent agreements, the public showed an interest in what its government was up to, and many citizens and interested groups filed freedom of information or state-level equivalent requests. But those requests were frustrated over and over again as states attempted to hide these records.

The public has a potential interest or a substantial interest in learning how private law firms are recruiting elected officials to further private goals and what, if any, discussions these private attorneys have with the government.

I'm calling on this committee to let the justice system work the way it was intended to. Let's try civil cases in civil court, get prosecutors back in the business of prosecuting crime, and get Congress and this committee back focusing on its Article I responsibilities.

Thank you, Mr. Chairman.

Mr. ROUDA. Thank you, witnesses, for your opening statements.

At this time, the chair recognizes Representative Tlaib for questions.

Ms. TLAIB. Thank you, Mr. Chairman.

I really do appreciate, Mr. Bilott, that you're here at this subcommittee, and we really thank you for your important work that you've done to hold DuPont accountable for its decade of wrongdoing. I know from some of my own struggles to hold corporate polluters accountable in my own district that these are long, hard battles, and I appreciate the commitment you have made to our public health.

Michigan has the most PFAS sites in the country, at least 192 as of May 2019 out of at least 610 known sites across the country. Last year, when the state tested public water systems serving nearly 80 percent of our residents, 10 percent of those systems showed PFAS. And that PFAS in the water in our homes and our schools, in our workplaces showed up. In Melvindale, in my district, PFAS just oozed out of the ground into the roadway. And residents are still searching for answers about where it came from.

As construction began on the new international crossing, the Gordie Howe International Bridge, PFAS was found in the soil at the bridge site in Delray neighborhood in southwest Detroit right next to the Detroit River where drinking water is drawn from. This is a manmade crisis, and people like my residents back in the 13th District are the ones who suffer from it.

I want take some time here today and walk through some of the key documents that prove that DuPont knew of the dangers of

11

PFAS chemicals for decades and concealed this truth from Michiganders and all Americans, putting their greed over the public welfare.

First, Mr. Chairman, I would like to enter into the record a 1961 correspondence from Dorothy Hood, who had served as chief toxicologist for DuPont. In this correspondence, Ms. Hood states that PFAS should be handled, quote, with extreme care, and stated that animal studies conducted by DuPont found liver enlargement.

You have been engaged in extensive litigation against DuPont and have reviewed thousands, if not millions, of documents by the company. Based on your review of these documents, approximately when did DuPont become aware of the PFAS was toxic?

Mr. BILOTT. Thank you for your question, and thank you for the comments.

And, first of all, you know, you mentioned the fact that there has been such a widespread presence of PFAS detected in Michigan. That's because Michigan is one of the first states to comprehensively look for it and test. And unfortunately, I think what we are about to see is the same thing across the country as more places test.

Now, with respect to the information you mentioned from the DuPont files, it took many years to pull that information out of the DuPont documents. But what became very clear is that the company was well aware by the early 1960's, as reflected in that document you just referred to from 1961, that the chemical, PFOA in particular, was toxic and had various adverse effects. There were numerous laboratory studies going on within the DuPont Haskell Laboratory throughout the sixties and the seventies.

And what we tried to do, because there's so much information and so many documents from DuPont's own files, I submitted with my written testimony several court orders, actually, from a Federal court in Ohio where a lot of that evidence actually was presented to juries who reviewed all of that evidence, spent weeks going through all of this information. Tons of documents from within the DuPont files.

And those court orders, the reason I submitted them is because they give you a nice snapshot in summary of some of that key information, some of the key documents organized in chronological order that were reviewed by the court. And, in fact, when those documents were presented to juries in Federal court, those juries found that DuPont acted with conscious disregard of the risks that were reflected in those documents.

Ms. TLAIB. Any of those include documents—studies that they were aware of that PFAS was a health risk?

Mr. BILOTT. Oh, yes. Yes. There are plenty of documents within the files. Again, you're talking about documents that first started off with animal toxicity testing. And we know. We do the animal toxicity——

Ms. TLAIB. On top of your head, what are some of the things that they found in those studies? I know you submitted it for document—and, Mr. Chair, if I may, I'm going to submit a study that showed, in 1992, that showed that DuPont observed increasing cancer rates among DuPont employees at that time.

12

But in the process, I really want the public—for us to be, you know, very, very direct about what exactly was found in the studies specifically that was causing the cancer.

Mr. BILOTT. There were—the animal studies showed that PFOA actually caused cancer, liver tumors, pancreatic tumors, testicular tumors. DuPont had a corporate epidemiology department that actually tracked the incidence of cancer within the workers that were working at the plant handling PFOA. And repeatedly, the corporate epidemiology department found increases in cancers, including kidney cancers.

So there were animal study data that supported the risks to human health. And that's why the animal studies are done, to predict human health. And there was actual human data from the worker studies as well.

What was missing at that point in time was what it was doing in the community, which the science panel then filled in. So we have animal, worker, and community data.

Ms. TLAIB. Thank you so much.

Thank you, Mr. Chairman.

Mr. BILOTT. Thank you.

Mr. ROUDA. Thank you.

The chair now recognizes Representative Comer for five minutes of questioning.

Mr. COMER. Thank you.

I'm very interested in this issue, like everyone on the panel. And I'm very passionate about having clean drinking water. And I think that, you know, the role should be to figure out how can we ensure that every American is protected from this and that we have clean drinking water. I think the next panel will do—will be a more productive discussion than the first.

But we have some attorneys. And, Mr. Hardin, I wanted to focus on litigation issues and the legal process, because I tend to believe that sometimes the trial attorneys make things last longer—make things take longer. You know, we've got a problem here that needs to be fixed, and I worry that sometimes the ongoing litigation tends to delay the process.

But, Mr. Hardin, we've seen a trend in state attorneys general contracting with outside law firms to conduct environmental litigations on the state's behalf against corporations, correct? On what basis are these outside law firms paid, typically? On a contingency fee basis or how?

Mr. HARDIN. We have seen a rise in contingency fee agreements nationwide. And I think that that's part of the problem, is I think that it incentivizes private gain and it takes these offices away from litigating truly in the public's interest and toward litigating in a pecuniary interest.

Mr. COMER. I'm curious. In your experience, have state attorneys general been forthcoming and transparent about their relationship with outside law firms in these matters?

Mr. HARDIN. I would say that it's significantly less than transparent. I think that when people file open records requests, they're consistently frustrated. And we've learned a little bit, but I'm sure there's more to come out.

13

Mr. COMER. Mr. Hardin, you spoke on your work as a litigator using the Freedom of Information Act to obtain government documents as it pertained to a campaign by plaintiffs' attorneys to recruit, quote, sympathetic attorneys general. And you spoke about, in your opening testimony, the findings in that report.

There are many ongoing civil suits and many more likely to come. Do you see similarities between what you found with state attorneys general partnering with plaintiffs' attorneys and Congress potentially involving itself in ongoing litigation?

Mr. HARDIN. Yes. And I think that this—it was already bad enough when law enforcement was teaming up with private attorneys, because you're sort of blending private and public power. And now when Congress is putting its thumb on the scale through the oversight process, I think that just further thwarts the normal working of the judiciary.

Mr. COMER. Mr. Bilott, you led the class action lawsuit against DuPont in the early 2000's, which ultimately settled in 2004. Is that correct?

Mr. BILOTT. That's correct.

Mr. COMER. It's been reported that you and your firm earned $21.7 million from that settlement. Is that correct?

Mr. BILOTT. You know, we're talking about litigation that actually started in 1999 and stretched over 20 years. You know, we're talking about litigation that our firm financed and had to actually, you know, push forward for 20 years on its own. And does the firm actually end up getting paid at some point? Yes, the law firm ended up getting paid.

But the only way we know about what we know right now about PFAS was from that litigation, from the community members coming forward and actually pursuing claims and digging this information out of the companies. We would not know any of this today if it hadn't been for that litigation and the 20 years that it took to pull this information out of those companies' files.

The companies took steps to prevent the disclosure of that information. DuPont tried to get a gag order to prevent me from even speaking to the EPA about the health risks of these chemicals. Back in 2001, 3M got a blanket protective order in litigation in Minnesota to prevent any public disclosure of its internal documents. They kept those documents secret——

Mr. COMER. Okay. You've made your point.

Have you earned attorney's fees in connection with any subsequent PFAS-related lawsuits?

Mr. BILOTT. I am a partner with a law firm. Our law firm——

Mr. COMER. I'm familiar with the law firm.

Mr. BILOTT. Our law firm receives compensation.

Mr. COMER. So can you give us a ballpark figure on those fees, out of curiosity?

Mr. BILOTT. You know, I can't.

Mr. COMER. Was it a million? Less than a million? I'm just trying to learn more about——

Mr. BILOTT. I believe all of the fee awards were awarded by a court. The court determines what fees are appropriate for the attorneys based on the number of years of litigation.

14

Mr. COMER. Last question. My time's up. Do you have a book coming out in a few weeks about your life and the PFAS litigation?

Mr. BILOTT. Yes, there is a book. And, in fact, you know, people have been asking me, how did this happen? How is it that all of this information could be known about these chemicals? All of this information could be—could be known. This contamination can occur on a nationwide——

Mr. COMER. And this last thing, and I have to yield back. So you'll receive royalties on that book, correct?

Mr. BILOTT. I guess that would depend on whether or not the book sells. But I'm not here to talk about a book. I'm here to talk about what these companies knew about this information. I'm not here to talk about me. I'd like to talk about what we learned from these companies and why there's now a public health threat.

Mr. COMER. Thank you.

Mr. ROUDA. Thank you.

The chair recognizes Representative Speier.

Ms. SPEIER. Thank you, Mr. Chairman.

You know, we have a President of the United States whose had ghosts written many books on his behalf. I don't hear us asking him how much he's getting in royalties from that.

I'm astonished by the questioning that you were just presented with. If I'm not mistaken, we have companies here who deliberately chose not to reveal very—negative information about PFAS that they were selling and chose to hide it from the American people. And they did so and probably were gaining bonuses every year.

Are we asking them did they receive a bonus from hiding this from the American people? That's astonishing questioning that we just heard. And I apologize, Mr. Bilott, for the fact that you had to go through that. But that's the way we are these days.

Let's look at, not the reality, the fact that corporations continue to do this, like the tobacco industry continued to do that, hide it from the American people, and do so with the understanding that this is a cost of doing business. And if somewhere down the road, some 20 years later we get caught, we'll pay out a few hundred million dollars, but that won't affect our stock. It's a cost of doing business. It's shameful.

I understand you investigated a 2001 study sponsored by 3M. In a letter to the U.S. Food and Drug Administration, you characterized the study as confirming elevated levels of PFAS in the U.S. food supply. Is that correct?

Mr. BILOTT. Yes. In fact, 3M had completed a study looking at the presence of PFAS in a variety of different food, milk, vegetables, bread, in different cities across the country and found PFAS in milk, bread, etc., in 2001.

Ms. SPEIER. Mr. Chairman, I'd like to enter Mr. Bilott's letter as well as the 2001 3M study into the record.

Mr. ROUDA. Without objection, so moved.

Ms. SPEIER. So, Mr. Bilott, most people have been focused on the contamination in water. But in your letter, you reference levels of PFAS contamination in apples in Alabama, ground beef in Florida, and milk in Georgia, just to name a few examples. There are about 800 parts per trillion. Based on these numbers, it seems like PFAS contamination extends into our food supply.

15

Is there a red flag that should be going up in every household in America, that we are purchasing food products that contain PFAS that are going to have a deleterious effect on our families?

Mr. BILOTT. I have been trying to get the attention of the Federal agencies for over 18 years to look at this and to look at what's already known about what is out there. Where the PFAS being found. Not only in water but in food as well. And we now know wastewater treatment systems, for example, are taking waste in the water, consolidating this stuff, and they're ending up with very high levels of PFAS in biosludge that's given to farmers across the country, where this sludge is spread on agricultural fields which could be major sources of PFAS for intake by the crops and by the animals.

This is something I've been trying to get our Federal agencies to pay attention to for quite some time now, and that's why I'm very happy to be able to be here. I've had this situation before. I'm familiar with it with if you can't address the facts, try to attack the messenger. So I'm used to that. That's been going on for 20 years.

But that's not going to stop me from trying to at least elevate folks' attention to what we know about this health threat and what we ought to be doing about it, because this information goes back decades.

Ms. SPEIER. Ms. Swanson, you've shown extraordinary leadership, thank you, on behalf of the American people. I know you were representing your state in Minnesota.

Do you think anything would have happened if you hadn't sued 3M?

Ms. SWANSON. No, I don't. I think that our lawsuit brought to the public's attention a number of the documents we're talking about today. But for decades, 3M concealed information about the risks of these chemicals to the environment as well as to public health.

Ultimately, this was a major issue facing Minnesota, as it is a major issue facing the entire country. And it did take our litigation to get a significant recovery for the people of our state, and then through that, information about these documents.

You know, 3M began, after it stopped making some forms of PFAS, a campaign to create what they called defensive barriers to litigation and to command the science. They selectively funded outside research, and they got the right to review and edit scientific papers about a PFOS before they were published. And it even went so far to develop a relationship with the professor and editor of one half of the academic journals in this country about PFAS, where they paid him what we believe is at least $2 million. And in exchange, he was able to send these studies to 3M before they were even published so they could get an advanced peek at them. He made sure in his timesheets that there was no paper trail to 3M. And he even went so far as to advise 3M to keep bad papers of the literature, otherwise in litigation they can become a large obstacle to refute.

And so the company, unfortunately, engaged in a campaign to hide its own studies and to, in fact, shape the science through the funding of these other studies.

Ms. SPEIER. Now, that's shocking. Who is that journal editor?

16

Ms. SWANSON. The professor's name is Dr. John Giesy, and he was a professor out of Michigan.

Ms. SPEIER. My time's expired. But if you could provide the committee, and me in particular, any suggestions that you think we should contemplate in Congress to address that particular issue in general and accountability by corporations as well.

Thank you. I yield back.

Ms. SWANSON. I'd be happy to.

Mr. ROUDA. Okay. The chair now recognizes Representative Gibbs for five minutes of questioning.

Mr. GIBBS. Thank you, Mr. Chairman.

You know, I think if any companies out there hid things and didn't reveal things to the public and stuff, that should be sorted out in the courts, which I think has happened. Let the judicial system do that. We shouldn't relitigate. I don't think that's our role. That should be sorted out in the courts. And what our role should be, determining, moving forward, what research needs to be done to make sure we protect the public and get the facts straight.

And I guess I want to be clear. I see that last month, the Advanced Medical Technology Association wrote a letter to the Senate expressing deep concern about provisions in the NDAA Act that would circumvent the normal regulatory process that would treat all 5,000 PFAS compounds as single class of chemicals. And their concern is not with adequate data to make that such determination.

And I would go on to say I believe some of these PFAS, like fluoropolymers that have been used for like 50 years, that has some good medical benefits and hasn't demonstrated adverse health effects. So I guess my first question to the first two witnesses over here is, I'm trying to understand this a little better. There's 5,000 compounds that make up this category. Is it dangerous to categorize them all as one and go after them or has there been enough research, scientific data, to show what compounds might be hazardous and what might not be, or do you think the whole class of compounds should be?

Mr. BILOTT. Thanks for the question. I think what we do know is that it took this long to find out what the companies already knew about one of these chemicals, PFOA. It took many, many years to dig out what was already known about that chemical. And what we now know about PFOA is enough to know that is something that we really need to take action on.

And the scientific community, looking at what we know about PFOA and looking at the chemical similarity of these other chemicals in the class, that has raised enough red flags to say we need to be looking at this entire class of chemicals. Because we don't know what else—what other information is already out there that we don't know about.

We were told for years that PFOA was perfectly fine. There are no health effects. There's no evidence of harm.

Mr. GIBBS. That was the chemical company telling you? That wasn't FDA or EPA? What scientific research was there?

Mr. BILOTT. That's what I'm—when we first learned that PFOA even existed and that people were being exposed to it, 1999, 2000 timeframe, the companies were telling us, don't worry about it.

17

There's no health effects. There's no evidence that it hurts anybody. It took years of litigation to find out that was not true.

Mr. GIBBS. So what was the role of the regulators during that time?

Mr. BILOTT. I was doing my best, during that period of time, to funnel as much of the internal information, nonconfidential, from within the company files about the health effects of these chemicals to the regulatory agencies so they could take action. That's been going on for 18 years. Those agencies have more than enough information about PFOA, about the related chemistry to act.

Mr. GIBBS. Okay. I want to move on.

Ms. Swanson, you settled a lawsuit with 3M, $850 million. I guess, how much, do you know what the contingency fee was for the attorneys? Do you know?

Ms. SWANSON. Mr. Chairman, Member, I think it came to about 12.9 percent of the total settlement.

Mr. GIBBS. 125 million?

Ms. SWANSON. I think that's right.

Mr. GIBBS. Okay. So that leaves about 720 million left. Ended up with 739 million, because you got interest, because interest rates were higher back then.

Ms. SWANSON. Correct.

Mr. GIBBS. But apparently, the money is still sitting there. Minnesota hasn't used the money to do medical care, water testing, any remediation or anything. Is that true? Is the money still sitting there?

Ms. SWANSON. Mr. Chairman, Representative Gibbs, there was a working group formed under the settlement. And the working group, which concludes 3M and community leaders, local governments, are evaluating the best way to appropriate the moneys.

Essentially, the purpose of the settlement and the limitation——

Mr. GIBBS. This settlement was in 2010, right?

Ms. SWANSON. No. 2018. Just last year.

Mr. GIBBS. Okay. I missed that.

Ms. SWANSON. And, essentially, I didn't have authority to get medical injury damages or injury—recoveries for injured people, so the settlement was for damages to the state's natural resources. Under the settlement, the money is going to go to bring clean drinking water solutions to these hundred-and-some-thousand Minnesotans who have contaminated aquifers and contaminated private wells. And the working group compromised of local units of government and 3M and the state of Minnesota are trying to figure out the best ways to appropriate that money in order to bring these solutions.

If there's money left after the drinking water is dealt with, then it will go to clean up the natural resources and to deal with remediation of, you know, fishing habitats and wildlife and things of that nature.

Mr. GIBBS. Okay. My time is up, Mr. Chairman. I just want to reiterate that we should make sure we're not relitigating these cases, and working for how we should do more research and finding more answers to solutions to protect our drinking water and food supply.

I yield back.

18

Mr. ROUDA. Great. Thank you.

The chair now recognizes Representative Dingell.

Mrs. DINGELL. Thank you, Mr. Chairman. And I really thank you for your leadership on this issue.

This hearing is really important for so many ways, because we're trying to get to the truth. And we've got too many communities that are being impacted by this. We don't know how to clean it up. We don't know what the long-term effects are.

In order to properly address PFAS contamination in America, we've got to understand the full scientific history behind the health risks and its uses. What did corporations know and when did they know it, and where is this contamination and how are we going to clean it up?

Michigan has more sites than any state in the country right now, but that's because we're testing for it. We have more than 70 sites. And if other states begin to test, we're going to see more of these. It is in the water that some people are drinking, though our state is testing water to clean it up. It's in the fish we eat. And communities that rely on it are now being told the fish aren't going to be safe for five, ten, 15 years.

Foam's washing up. And if you're in my district, you're lucky enough now that the fire foam that we're going to—that people are convincing people not to use has to be destroyed or stored someplace. And people in my district may be getting that as well. So it's impacting Republican and Democratic districts. It's not a partisan issue.

I would like do direct my first questions to Attorney General Swanson. When did 3M scientists first learn that PFAS could enter our bodies through food?

Ms. SWANSON. Mr. Chairman, Representative Dingell, I don't have the answer on food, but I can tell you they first learned that it was in human blood in 1975. There were two doctors who came forward, independent scientists, and they were testing blood in blood banks as far away as New York and Texas. And they came forward and they said these chemicals are in the blood and we think it's your chemical in the blood.

3M pled ignorance. Said, you know, we're not going to admit that. And then the scientists said, could you give us a chemical fingerprint of these chemicals so that we can do more testing to show that it's your product chemical in Scotchgard causing this. And 3M said flat out, no, we're not going to cooperate and provide you with that information.

3M confirmed that the very next year that it was in human blood, but it took 20 years for them to tell the EPA and the public. In fact, 3M, in 2006, was fined $1.5 million by the EPA for failing to provide studies that were required to be filed under TSCA, and in many cases, for decades failed to provide studies.

Mrs. DINGELL. So I'm going to ask you some questions quickly, because we're down to two minutes, and they're some important ones.

Is it better for the health of the American people and our environment to address the PFAS crisis through continuing litigation or do we need to get some legislation to address this?

19

Ms. SWANSON. Mr. Chairman, Representative Dingell, I think it's going to be both. But I think it's very, very important that Congress act to help bring global solutions to this problem.

Mrs. DINGELL. How would designating PFAS as a hazardous substance under the Superfund program hold responsible parties accountable for the PFAS contamination that they've caused?

Ms. SWANSON. Mr. Chairman, Representative Dingell, it would be very helpful to call it a hazardous substance under CERCLA, because it will bring to bear known processes for cleaning up these chemicals in communities. It would also help deal with the cleanup around military institutions and bases where the military hasn't really been very quick to clean it up, and soldiers are drinking this water, and their families. So it would be very helpful for Congress to do that.

Mrs. DINGELL. So do you think it's—we currently have an amendment on the DOD bill that would require that, because as you know, EPA has yet to even set a rulemaking to set the standard. It's only a guideline.

So would designation of that increase or speed up the beginning to clean this up and people recognizing how important it is to deal with this pollutant?

Ms. SWANSON. Mr. Chairman, Representative Dingell, yes, it would very much expedite the process for that to happen.

Mrs. DINGELL. What specific actions have you taken as AG to hold PFAS polluters accountable? And how can other states in the federal government follow what you've learned?

Ms. SWANSON. Mr. Chairman, Representative Dingell, it was the companies' products that created this problem. It wasn't communities that created it. It wasn't individual homeowners who created it. It wasn't patients who created it. It was the companies that develop widely popular products and sold them. And then when they learned that the products were dangerous to public health and the environment, didn't disclose it. They didn't come clean. And so I think it's very important for the companies that contributed to the problem to be part of the solution and help fund the cleanups.

What we did in Minnesota was file the lawsuit against 3M that recovered $890 million to help bring clean water to solutions to our state. I think other communities across the country are going to have to look at similar actions because this is a very large and significant problem.

Mrs. DINGELL. Thank you.

And I'd like to ask one yes-or-no. Is that amount of money going to cover cleaning up all the sites that you have there?

Ms. SWANSON. Mr. Chairman, Representative Dingell, yes.

Mrs. DINGELL. Thank you.

Mr. ROUDA. Thank you.

Without objection, the representatives from Michigan, Texas, and Maryland are authorized to participate in today's hearing.

And we have been called to vote. So what we're going to do is I am going to ask Congressman Sarbanes behind me to take over the chair so that he can ask questions while we all go vote. And then he's going to sprint over there and do the same. And after he finishes his questioning, we will move into recess with the next panel.

20

So I thank the three of you, but please stay there.

Mr. SARBANES.

[Presiding.] Thank you.

I'm going to yield myself five minutes to ask questions to the panel. I appreciate you being here.

Mr. Bilott, I wanted to address most of my questions to you. You, at this point, I would say, have made a study of the culture in these corporations in terms of hiding the ball over a period of decades. And I'd like you to speak a little bit to that, because I've seen in the record that you've already created, with the testimony that's been submitted, plenty of instances in which employees inside these companies were trying to raise the alarm, call attention to the risks that were being discovered as a result of testing and other evidence that was coming forward. And essentially, they were run over by supervisors, by executives, by lawyers, whatever, which seem to reflect a culture that had taken hold that was making decisionmakers within these corporations disregard or essentially deaf to these claims and concerns, which would have the effect of being demoralizing on that part of the work force inside these companies.

Can you speak a little bit to what your investigations and the litigation that you engaged in uncovered about a culture and the extent to which you think that culture, in some ways, continues now aided by an army of consultants and lobbyists and others that are acting on behalf of these companies?

Mr. BILOTT. Thank you. You know, it took a while to piece this together through a lot of years of combing through internal DuPont documents. And I'll speak to DuPont at this point. But what we saw in the documents is you've got some of the world's best scientists at DuPont and within the Haskell laboratories. And they were doing world-class science. They were identifying serious health risks from exposure to these chemicals. And you had scientists warning the company that something needed to be done, steps needed to be taken. Let's look for alternatives. Maybe the community should be warned.

You had lawyers within the company. We had the rare circumstance of being able to see some of the internal documents from lawyers warning the company, warning the business that we ought to look into possibly getting people clean water who were drinking this.

So what you see is you had scientists within the company itself who were trying to do the right thing. You had lawyers who were trying to advise the company to do the right thing. Yet, unfortunately, there's a memo from 1984 that I believe is in the record, it's referenced in our attachments, where internally the company looks at all these different factors. And one of the concerns is this could penalize our business going forward. The sales for these materials are increasing. And, you know, one of the problems we're dealing with was it was not regulated at that time.

So the decision was made to keep on using the material. Not only keep on using it but increase the use and increase the emissions out into the environment, despite what the internal scientists and lawyers were warning.

And part of that—you talk about a culture. You're talking about a situation where you've got a company that represented itself as

21

the science company. And, again, this was a huge scientific operation within the company. They had thousands of scientists. They were looked to as experts by the Federal regulatory agencies. People at EPA. People at FDA. People within the Federal regulatory system would look to DuPont to tell them the truth about these chemicals.

You know, so you had a company that was controlling the science, was able to give information to the regulators about these health risks, and repeatedly made the decision not to do so. Business interest won out.

Mr. SARBANES. It makes you wonder why the companies would hire these experts and scientists in the first place if they're not going to give their opinion the weight that it deserved. It's also obviously incredibly nearsighted to judge that, even from the bottom line of a business perspective, it's going to hurt you if you don't address those concerns, because, obviously, these companies now are in a compromised position because of that culture of concealment that took hold.

Whether that has become a reflex that simply cannot be overcome, we'll see as time goes on. We'll have a chance to probe that a little bit with the second panel.

I'm going to adjourn—or—no. Okay.

I'm going to yield to Congresswoman Wasserman Schultz, who's going to come take the chair and ask her questions for five minutes.

Ms. WASSERMAN SCHULTZ. [Presiding.] Okay. Thank you.

Mr. Bilott, I have a question for you. The U.S. Navy, as you mentioned, began to raise serious concerns about the potential toxicity of firefighting foam and its harmful effects on the environment in the 1970's. This was a series of alarming reports. I have the report here, and this report by the Navy noted, quote, the 3M Company has not provided any useful information about the components of FC206, which is one of 3M's firefighting foams.

Would you say that this represents typical behavior for 3M, that the company has a track record of trying to suppress harmful information related to its firefighting foam and PFAS products?

Mr. BILOTT. Thank you for the question. What I can tell you is, in our experience in litigation with 3M, one of the very first things 3M did was go to the court to get what is called a blanket protective order. This is after we had been litigating with DuPont, and we were able to get documents from the litigation and provide them to the regulatory agencies like EPA to warn of the health threat.

When litigation began against 3M, they immediately sought a blanket protective order to prevent any of their internal documents from being shared with the public or the regulatory agencies.

And I believe as Ms. Swanson and others within the state of Minnesota, you know, can testify to, that kind of conduct continued for many years with respect to the perfluorinated business, trying to keep the information about the toxicity, the risks of these chemicals, within the company.

Ms. WASSERMAN SCHULTZ. Thank you. The Navy began working with 3M to develop firefighting foams in the 1960's. It turned into a very lucrative business deal for the company. The military did

22

studies for decades, and DOD only started thinking of the chemicals as hazardous in the late 1990's when it started to seriously explore alternatives to foams with PFOA and PFOS. The Air Force completed a transition to safer foams in 2018, and the Army is scheduled to complete the transition this year. But the Navy is not scheduled to complete its transition until next year.

Mr. Bilott, I know you can't speak on behalf of all of DOD, but in your view, might DOD have made this transition sooner if 3M had not been so reticent about sharing information with the military and the public?

Mr. BILOTT. I believe that probably would be possible. The more information that had been made available about what these chemicals are, what kind of products they are in, how we are all exposed to them, if that information had been made decades earlier, I think a lot of what we are talking about here today could have been avoided. Yes, the U.S. EPA ended up bringing a lawsuit against DuPont for withholding information, and specifically said in that claim, if we had been given information about PFOA, in particular, earlier, we could have begun looking into this decades earlier.

As we already heard, 3M ended up having to pay a fine as well for withholding information from EPA. So——

Ms. WASSERMAN SCHULTZ. Yes, I mean, logic just tells you that obviously the more transparent they were, the sooner that we could have gotten to the bottom of this to address it and avoided exposing literally thousands of people to harm from the impacts.

Last question before we adjourn. In the Fiscal Year military construction and veterans affairs appropriations bill, I made sure—and I chair that appropriations subcommittee—that we put in $60 million in additional funding for PFOA and PFOS cleanup on military installations. Many military bases have unsafe levels of PFAS chemicals in their drinking water. And to either of you, Ms. Swanson or Mr. Bilott, what more should be done by the Federal Government to protect our men and women in uniform? Because they really are impacted severely.

Ms. SWANSON. Madam Chair, I think a number of things can be done. One would be to ban the use of PFAS firefighting foam for training exercises. I mean, it really is a perversity that much of the contamination occurred not by actually fighting fires but by training how to fight fires. I think Congress can limit the ability of these chemicals to be used in training exercises, for example, and then as quickly as possible phaseout the chemicals altogether.

Certainly classifying these substances as a hazardous substance would help because the Department of Defense has been slow to come to the cleanup table, and if it were called a hazardous substance, that would certainly help and eliminate the Department of Defense's ability to say we have no obligation to do that.

I think listing these chemicals under the Toxic Release Inventory is important as well. That helps all communities so that if there is a release of these chemicals, you know, the public knows about it, and I think that would be something that could be helpful.

And then I think as well, just helping with the sampling, I mean, this is an expensive effort. I just saw, I think, in Massachusetts an announcement that the Governor was appropriating some money for testing and it was millions of dollars, and this is something that

23

all communities are grappling with. Some communities are probably better able to pay for that than others, but that goes beyond the military but could certainly help as well if testing were funded. It could be something Congress could do.

Ms. WASSERMAN SCHULTZ. Thank you.

Ms. SWANSON. Thank you.

Ms. WASSERMAN SCHULTZ. Mr. Bilott, anything to add?

Mr. BILOTT. Nothing to add.

Ms. WASSERMAN SCHULTZ. Okay. Thank you. And without objection, the Navy report that I referenced will be entered as a part of the record.And the panel is dismissed with the thanks of the committee, and the committee stands in recess subject to the call of the chair.

[Recess.]

Mr. ROUDA.

[Presiding.] Without objection, the committee will reconvene, and further without objection, the gentleman, Representative Kildee, is authorized to participate in today's hearing. Glad to have you here.

Before we start with the witnesses, I did want to make a few comments. This is a unique hearing, and I want to say a few words before we start with our next panel, which I will introduce shortly. We have with us today representatives from three corporations, the 3M Company, DuPont, and Chemours, and I believe this is the first time these companies have testified before Congress on the issue of PFAS chemicals. I would like to welcome our panel and thank them for being here.

We just heard from Lori Swanson and Rob Bilott and how the cases they litigated against 3M and DuPont, respectively, relied on a long historical record that showed both companies knew PFAS chemicals, specifically PFOA and PFOS, were toxic for decades, and yet continued to manufacture these chemicals and carelessly discharged them into our air, our water, and our soil. As a result, Americans unwittingly drank, ate, and breathed toxic, man-made chemicals for decades, chemicals that can lead to liver disease, thyroid disease, kidney disease, cancer, and more. I am hammering home this point because PFAS contamination is an issue that is just now starting to get the attention it deserves and companies are only recently starting to pay for what they have done.

As I have mentioned, the companies represented before us today are American institutions. They have made products Americans have been eager to buy, and they have helped create many of the conveniences of modern life. But that does not make them exempt from basic ethical standards of conduct. Part of why American capitalism has survived and thrived for as long as is is because companies have historically treated both their workers and the larger American society responsibly and fairly, in addition to turning a profit.

A company is not just a CEO or a head of PR but the hundreds and thousands of people all working to serve a specific purpose. The relationship between companies and the American people is interdependent. Companies make high quality products that Americans decide to purchase and each makes the other better off. And importantly, each trusts the other implicitly to participate in the marketplace in good faith.

24

So when that covenant is broken, when the American people learn that companies have obscured and suppressed evidence and the chemicals they use and manufacture are toxic, it is a seismic event. I mean it, because it shapes the foundation of democratic capitalism. And that is why we are here today, not just to try and help gain some semblance of justice for the affected people who lived in contaminated communities, but also to ensure companies are held accountable for what can only be described as violating the trust of the American people.

I certainly recognize that our panel here today represents companies that have in some cases undergone a lot of changes, including, but not limited to, corporate restructuring and changes in management over the past several decades.

Chemours didn't even exist until 2015 when it was spun off from DuPont. But our subcommittee doesn't accept that these changes in corporate structure let the current incarnation of the company off the hook. A company is tied to its past, morally responsible for its past, and must answer for its past, no matter what changes have occurred from point A to point B, in the same way a Nation must contend with and be responsible for actions taken decades ago, even though there have been changes in government and leadership since then.

This is Congress, the people's body, not a courtroom, and the American people recognize that companies don't just disappear into thin air because a few people in a boardroom somewhere decided that a merger and a few spin-offs might improve the company's bottom line.

So I hope we don't spend this hearing trying to ping-pong responsibility back and forth between two companies or debating whether or not the DuPont that exists today is the same DuPont that dumped PFAS into the water.

It also does not work to simply deny the science linking PFAS to serious health affects in Americans, and try to leave Americans who were poisoned up to their own devices to clean up your mess.

So I hope that we can all start from a common baseline, and that is the scientific consensus that PFAS chemicals and especially the long-chain chemicals like PFOA and PFAS are harmful to human health. Let's not get sucked into the rabbit hole of more research needs to be done, because, you know what, that excuse can be and has been used to justify inaction, and the American people are smart enough to see that excuse for what it is.

It is 2019, and if these chemicals are killing people, let's stop using them and let's get them out of our environment. I call on each company here today to come to the table, work with Congress and the EPA to address this national emergency. The lives of each and every American depend on it.

So with that, I would like to swear the witnesses in. Thank you for rising. Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth so help you God?

Thank you. Please sit down. The record shows that the witnesses answered in the affirmative.

We have three witnesses here. We have Daryl Roberts, chief operating and engineering officer with DuPont; Denise Rutherford,

25

senior vice president of corporate affairs for 3M Company; Paul Kirsch, president of fluoroproducts, The Chemours Company.

And with that, we will move to you, Ms. Rutherford, to start with your oral testimony for five minutes. Please note that the microphones are very sensitive. Make sure you turn it on when you're asked a question or when you're presenting. The floor is yours. Thank you.

### STATEMENT OF DENISE R. RUTHERFORD, SENIOR VICE PRESIDENT OF CORPORATE AFFAIRS, THE 3M COMPANY

Ms. RUTHERFORD. Chairman Rouda, Ranking Member Comer, and distinguished members of the subcommittee, thank you for the opportunity to appear before you today. My name is Denise Rutherford, and I am the senior vice president of corporate affairs at 3M, reporting directly to our chairman and CEO. In this role, my responsibilities include sustainability initiatives, environmental stewardship, and public policy.

I joined 3M as a senior research chemist in 1989 after obtaining my Ph.D. in chemistry at Colorado State University, and I've been a 3Mer for nearly 30 years. We are a company of scientists and engineers who are committed to applying science to help solve some of the world's biggest challenges.

Our core mission is to create products that are essential to improving people's lives, and the innovations produced by 3Mers have benefited millions. These innovative products have—include countless examples that are vital to everyday life, from materials in smartphones, low-emission vehicles, airplanes, and renewable energy, to our products like EKG electrodes, worker safety products, and familiar products like Scotch tape and Post-it notes.

In all our work, we are guided by a deep commitment to people, to science, and to the quality and safety of our products. This commitment extends to the topic that I'm here to testify about today— industry's use of certain per-and polyfluoroalkyl substances, or PFAS, and the state of scientific knowledge about their effects on people and the environment.

While PFAS is a very small fraction of 3M's overall business, we take our stewardship responsibility extremely seriously. At 3M, we have spent decades studying PFAS compounds, and I'm grateful for the opportunity to share what we've learned with the subcommittee and to listen to the subcommittee's concerns on this important topic.

I am proud that 3M has had a—long standing—commitment to environmental stewardship. That commitment extends to our industry-leading, decades-long effort to improve technologies and scientific understanding related to PFAS and includes our decision to voluntarily phaseout production of PFOS and PFOA. We were an industry leader in this respect and since our decision to phaseout these compounds almost 20 years ago, others in the industry eventually followed suit.

As a result, the most recent CDC testing shows that levels of PFOS and PFOA in humans have declined by more than 70 percent. Seventy percent. This shows that progress is possible, and we are headed in the right direction. We are committed to continuing down that path and working with Congress and regulators to de-

26

velop a collaborative, science-based approach to concerns about PFAS. In my written testimony I outlined five key principles of our proposed path forward.

First is our commitment to ongoing remediation at sites where we produced or disposed of PFAS. We believe this is an important responsibility as a manufacturer and as a member of the communities where we live and work.

Second is our commitment to ensure appropriate disposal of fire-fighting foams known as AFFF. 3M's producing and selling AFFF more than a decade ago. We will continue to work with our former customers to ensure that unused 3M firefighting foam is properly handled, and when appropriate we will take that product back from those former customers.

Third is the need for nationwide science-based regulation. We support EPA's PFAS action plan and Congress's efforts to expedite timelines for the EPA to decide whether to set nationwide drinking water standards.

Fourth, we propose establishing a clearing house for sharing best practices on detection, measurement, and remediation.

Finally, we call for a coordinated research into PFAS. We believe that a respected, established, and independent scientific body should be called upon to conduct a comprehensive review of the existing science on PFAS, inform the public of the findings, and set an agenda for continued research.

If we come together, if all relevant stakeholders can come together, we can develop a path forward. We commit to working with Congress and concerned parties. As an active, responsible participant in the dialog and to continuing to drive science-based progress through appropriate actions.

Thank you for the opportunity to present this testimony. We are looking forward to working with the subcommittee.

Mr. ROUDA. Thank you, Ms. Rutherford.

Mr. Kirsch, five minutes for your opening statement.

### STATEMENT OF PAUL KIRSCH, PRESIDENT OF FLUOROPRODUCTS, THE CHEMOURS COMPANY

Mr. KIRSCH. Thank you Chairman Rouda, Ranking Member Comer, and members of the subcommittee for inviting me today to testify on behalf of The Chemours Company.

My name is Paul Kirsch, and I'm the president of the fluoroproducts business at Chemours, my role since I joined the company in June 2016. I also serve as the executive sponsor for the Chemours corporate responsibility commitments.

Like you and others who have come before this subcommittee, I want to leave my children and grandchildren a cleaner, better world. I don't merely empathize with public concerns over the presence of PFAS in drinking water and the broader environment, I share it. The public is rightly concerned over drinking water quality, and Chemours, like all companies, must do its part. Let me assure you, our entire team takes very seriously the obligation to manage PFAS compounds and our manufacturing processes in a responsible way and ensure they are safe for their intended use.

I have been asked to provide some background regarding the formation of Chemours and the details of its spin-off from DuPont.

27

Chemours was established on July 1, 2015, as an independent, publicly traded company. From day one, we faced serious challenges given how DuPont unilaterally designed the spin-off, including a deliberate disproportionate assignment of two-thirds of DuPont's environmental liabilities, 90 percent of its active litigation, as well as an obligation to indemnify DuPont for all assigned environmental liabilities should any regulatory, public, or private plaintiffs seek to hold DuPont accountable.

And if that wasn't enough, DuPont mandated a $4 billion payment from Chemours in the form of a dividend. To our knowledge, there has been no other spin-off like this in terms of debt, as well as the indemnification provisions which have no cap on time or money.

DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities. From my written testimony, you can clearly see that despite the financial condition DuPont left us in at the time of the spin-off, and the legacy issues we inherited, Chemours moved quickly and with a sense of urgency to transform the company and take action against these—to address these historical issues.

At Chemours we live up to our commitments with actions, not just words. The $200 million investment we have made in our Fayetteville, North Carolina facility, is just an example of that. From this investment, we are creating a best-in-class emissions control facility that can serve as a model for other chemical manufacturing facilities around the globe. This facility took tens of thousands of hours to design and will reduce air and wastewater emissions of all PFAS by 99 percent or greater by the end of this year.

The commitment to reduce air and wastewater emissions of all PFAS by 99 percent or greater is not just for our Fayetteville facility but for all of our sites. It's part of our ten ambitious corporate responsibility commitments that we announced a year ago. These commitments are both impactful and measurable.

Besides the PFAS emission goal, a first in the chemical manufacturing industry, these commitments also include environmental goals for greenhouse gases and landfill intensity. While Chemours has only existed as an independent company for four years, we operate with a mature understanding that economic progress and environmental protection are not contradictory. They can and they must go together.

The products we make enable critical components used in the medical, aerospace, automotive, semiconductor, communications, and energy industries. For example, a major product produced at our Fayetteville site not only enables renewable energy storage, but it would be critical in enabling the hydrogen economy with the next generation of fuel cells for the automotive market.

And the types of commitments we have made enable us to manufacture our products in ways that meet the expectation of a world that demands more. We believe collaboration and transparency are critical to better understanding this issue and addressing public concern. We support the Federal legislative efforts currently under way and their goals to develop a safe, regulatory framework for PFAS compounds using a science-based approach.

28

Chemours provided input to the Senate Environment and Public Works Committee on the PFAS provisions in the Senate NDAA bill, and we support the measures that resulted from that process in the Senate bill as passed.

Chemours also supports EPA's process to determine whether legacy, long-chain PFAS chemicals should be designated as hazardous substances under the Superfund law. However, we do understand Congress may move on this issue legislatively and would welcome the opportunity to engage with Members should this be the case.

In closing, we can't change the actions or decisions taken by others in the past which continue to impact us today. We can only control the decisions in front of us. We believe that our record, even in our earliest days as a new company demonstrates our commitment to being a different kind of chemistry company, one dedicated to taking a leadership role in environmental stewardship.

Thank you again for the opportunity to be here today. I look forward to your questions.

Mr. ROUDA. Thank you, Mr. Kirsch.

Mr. Roberts, the floor is yours for five minutes of opening testimony.

### STATEMENT OF DARYL ROBERTS, CHIEF OPERATIONS & ENGINEERING OFFICER, DuPont DE NEMOURS, INC.

Mr. ROBERTS. Thank you, Mr. Chairman, Ranking Member Comer, and members of the subcommittee.

My name is Daryl Roberts, and I am the chief operations and engineering officer for DuPont. I attended Howard University on the ROTC scholarship and earned a degree in chemical engineering. I served as a commissioned Army Reserve officer for eight years, during which time I started my career at Eastman Kodak and earned a master's in occupational health and safety from the University of Rochester, and an MBA from Rochester Institute of Technology. I then worked in health and safety roles in senior leadership for Arkema, a diversified chemicals company.

Just over a year ago I joined DuPont because I was and still am excited about the opportunity to work for a mission-driven company that is focused on making the planet a better place for my daughter's generation and beyond.

The new DuPont appreciates this opportunity to address the subcommittee's questions about PFAS. We're pleased to be here today to endorse specific legislative proposals and congressional efforts to protect public health and the environment.

Let me first explain why I refer to my company as the new DuPont. E.I. du Pont de Nemours and Company, historically known as DuPont, has evolved throughout the course of its history, often adding and removing business lines. For example, in 2004, the fibers business became a separate company called Invista. And in 2013, the coatings business became a separate company called Axalta. In 2015, the performance chemicals business, a long-held business within the DuPont family, became a separate company called Chemours.

Chemours took the fluoroproducts technologies, operations, sites, customers, technical expertise, and executive leadership in the formation of its new company. Their CEO ran the business line. Their

29

executives made decisions about the business line for many, many years, and their plants made the products we are talking about today.

Most recently, historical DuPont merged with the Dow Company and then split into three separate, independent companies—Dow, Corteva, and the new DuPont, which I represent.

With respect to Chemours, which has become a very profitable, free-standing business, I would say no one wants to hear two companies argue about litigation. This is not about money here today. They want to hear about how we are going to work with Congress on legislation, which is what the new DuPont wants to do.

The new DuPont is a specialty products company dedicated to solving some of the world's most pressing challenges, including those identified in United Nations sustainable development goals. For example, to address the world's food shortages we have developed technologies to increase food shelf life. To address greenhouse gas emissions, we have developed materials to lightweight cars and planes. And we can all agree that our first responders deserve the very best protective equipment, so we continue to make the best-in-class performance fibers for flame-resistant materials and body armor. We do all of this by employing more than 14,000 Americans across 28 states.

The focus of today's hearing is PFAS. The new DuPont does not manufacture PFAS. Like many other companies today, we use some PFAS materials. However, our use is extremely limited. Nevertheless, we recognize these are important issues, and that's why we support legislative proposals addressing PFAS. They are: Requiring EPA to set a national primary drinking water regulation for PFAS within two years; requiring toxic release inventory reporting on certain PFASes including PFOA and PFOS; requiring EPA to set pretreatment and affluent standards for PFAS by 2022; and requiring EPA to list PFOA and PFOS as hazardous substances within one year under CERCLA. We encourage Congress to enact these proposals as part of the National Defense Authorization Act.

While Congress considers this legislation we're moving forward with our own commitments. As this subcommittee recognized in their prior hearing, the vast majority of PFAS contamination is caused by firefighting foams. We do not manufacture or sell firefighting foams and have never done so. However, like countless other companies, we purchase foams for protection of our facilities. We are committed to ending all use of PFAS firefighting foams at our facilities by the end of 2021.

We have also reaffirmed our commitment to not make, buy, or use long-chain PFAS materials. We will eliminate by the end of this year our limited use of long-chain PFAS in a recently integrated operation which is the only instance where we use it today. And we're immediately working to eliminate it.

We will provide free access to our product steward software. We will also grant free licenses to others to what—that want to use our PFAS remediation, using our water-treatment technologies, which we'll make available for free, and we will provide research funding for PFAS remediation. And, of course, we'll continue to fulfill our commitment to remediate our sites.

30

We look forward to today's hearing and how we can work together to further our shared goals of sustainability, innovation, and responsible product stewardship.

Mr. ROUDA. Thank you, Mr. Roberts.

The chair now recognizes Representative Tlaib for five minutes of questions.

Ms. TLAIB. Thank you, Mr. Chairman. As we discussed in the earlier subcommittee previous kind of hearings, we've also discussed DuPont's own scientific research that demonstrated links between exposure of PFAS and a variety of very serious health concerns.

So, Mr. Roberts, I wanted to start by asking about DuPont's current PFAS-related responsibilities. Is it your opinion that since the 2005—is it Chemours spin-off—new DuPont is no longer involved in development and marketing PFAS chemicals?

Mr. ROBERTS. Congresswoman, that is correct.

Ms. TLAIB. So regardless of all the money DuPont made over the decades with PFAS chemicals, is it your opinion that new—I can't stand that you guys call it——

Mr. ROBERTS. New DuPont.

Ms. TLAIB [continuing]. DuPont, which is right now capitalized with those profits, is not liable for the unpaid cost of cleaning up contamination and compensating for the human injuries that DuPont caused?

Mr. ROBERTS. Congresswoman, what we're accountable for is to represent and to ensure that we cleanup sites which we own and operate. So we are——

Ms. TLAIB. So even though you contaminated other sites, you don't want to pay for that?

Mr. ROBERTS. Congresswoman, I would——

Ms. TLAIB. How about injuries, people dying?

Mr. ROBERTS. Congresswoman——

Ms. TLAIB. Medical costs?

Mr. ROBERTS. Yes, if I may? Congresswoman, by all means, the sites that we owned and operate, we're fully committed to continue working to remediate.

Ms. TLAIB. No. It's lawyer talk when you say owned and operate. I'm talking about when you contaminate other properties, you walk away. You're not going to clean those up?

Mr. ROBERTS. Congresswoman, we did not walk away from those sites. I will be very clear in saying that our performance chemicals division of DuPont, which was renamed as Chemours, is still operating those sites.

Ms. TLAIB. Okay.

Mr. ROBERTS. So the same individuals that were operating those sites, that were making decisions on those sites, that were—it was extracting profit from those sites and are still extracting profit from those sites, as I read in the written testimony from Chemours, are fully committed to cleaning them up. So——

Ms. TLAIB. So in spite of growing scientific consensus within the company that PFOA was toxic and was contaminating local environments, DuPont purposely hid the research from affected communities and government regulators. Glen Evers, a former DuPont research scientist testified before this committee, subcommittee,

31

about DuPont's effort to suppress this research on the toxicity of PFAS chemicals and DuPont's effort to limit Mr. Evers' opportunity to discuss his research, as well as retaliation against him for discussing his work with the EPA.

Mr. Roberts, are you aware of these efforts to suppress DuPont's own employee's research concerning the company's development, use, and the health risk of PFAS chemicals?

Mr. ROBERTS. Congresswoman, I can tell you that I'm not aware of that as I was not present at that time. What I can tell you is that the company that I work for is fully committed to working——

Ms. TLAIB. Sure.

Mr. ROBERTS [continuing]. in a way where we're transparent——

Ms. TLAIB. Does DuPont——

Mr. ROBERTS [continuing]. where we work with our communities in a way where they understand what we do. We understand our requirement to ensure——

Ms. TLAIB. So you're not aware of that. But is DuPont, the original manufacturer of Teflon, in any way responsible for shielding critical information from the public?

Mr. ROBERTS. Congressman, no company should shield critical information from the public. The company that I work for is completely focused on making sure that when we have information, that we communicate it, that we work and that our product stewardship efforts are critical in what we do every day, that the communities in which we operate, that we share information, that we work with our regulators to establish the right regulation. That's why we're here today——

Ms. TLAIB. I understand.

Mr. ROBERTS [continuing]. to completely support legislation——

Ms. TLAIB. Well, I'm here because I represent 650,000 people that are being harmed by PFAS exposure, and we're trying to get to the truth here and trying to bring it forward, not talk about who owns what or whatever. We're trying to figure out who is responsible, right?

So more recently, in 2009 DuPont received approval from the Environmental Protection Agency, EPA, to start making GenX commercially as a replacement for PFOA, which persists indefinitely in the environment and is linked to cancer and other serious illnesses.

The agreement passed to Chemours in 2015 when DuPont formed the company from business units. That included the manufacturing of GenX at the—I think it's Fayetteville—works plant in North Carolina. Mr. Roberts, is this a depiction accurate? Is it correct that DuPont's GenX manufacturing passed to Chemours in 2015?

Mr. ROBERTS. Congresswoman, it is correct that the Chemours company owns and operates the facility which is in Fayetteville. That's correct.

Ms. TLAIB. Okay. Mr. Kirsch, so, is it also accurate to stay that it is new DuPont's position, or whatever, that only Chemours is now responsible for what was once DuPont's GenX manufacturing operations?

Mr. KIRSCH. I believe, Congresswoman, that's what's written in the spin-off document, yes.

32

Ms. TLAIB. In our earlier subcommittee hearing, we heard from Emily Donovan, a North Carolina resident, living near Cape Fear River, which is dealing with PFAS contamination, including PFOA, PFOS, and GenX chemicals. Ms. Donovan expressed concerns that have emerged in her local community related to that exposure and these emerging PFAS chemicals in links to cancers, immune disorders, and so forth. Dr. DeWitt even described GenX chemicals as quite toxic and not safe.

So, Mr. Roberts, the people in North Carolina who live this, live by this plant, are very sick, and DuPont played a role in poisoning them. So in my opinion, I think it means that DuPont needs to help Chemours fix that crisis. And so will you commit today to working with Chemours to clean up the water works plant in North Carolina?

Mr. ROBERTS. Congresswoman, we're here today to commit to clean up the sites that we own and operate. Chemours is fully capable of cleaning up the sites that it owns, operates. It continues to drive profits to its shareholders by operating. They're fully—as we've heard from them, from their CEO, from their leadership, they're in great financial position. There's no reason that they would require our help to clean up their sites.

Ms. TLAIB. Thank you, Mr. Chairman.

Mr. ROUDA. Thank you.

The chair now recognizes Representative Gibbs.

Mr. GIBBS. Thank you, Chairman.

Ms. Rutherford, I think I heard you say in your oral testimony that 3M has ceased producing PFOS and PFOA. Is that correct?

Ms. RUTHERFORD. Yes, Congressman, that's correct.

Mr. GIBBS. How long ago was that?

Ms. RUTHERFORD. Congressman, we announced that phase-out in May of the year 2000, and we completed the phase-out within just a couple of years after that, for those two compounds—PFOA and PFOS.

Mr. GIBBS. Did you do that based on your research, or were you forced to do that?

Ms. RUTHERFORD. No, we did this voluntarily, Congressman. Thank you for that question. We discovered in the late 1990's as our testing capabilities improved, we were able to find these materials in the environment in places that we didn't expect to find them and at concentrations, really low concentrations. But as we moved forward, we saw that these did bioaccumulate, meaning that they would buildup over time with continued exposure, for these two particular materials. We voluntarily then took the action to phaseout—we worked closely with the EPA, the Clinton EPA at that time, to develop that exit plan and to communicate our rationale for doing so. We did this without any information, any awareness. There is still no cause-and-effect relationship for any adverse human——

Mr. GIBBS. Okay. Thank you. I guess for all three of you—I mentioned this in the first panel—there's 5,000 known substances that are under this classification of PFAS, and are all these chemicals the same structure? Is there some—my understanding, there's some that testing would be tough, and I'd just like to hear your reaction about, should we handle this as a class, or should we figure

33

out which ones might be harmful to the environment and human health or—you see where I'm going here?

Mr. ROBERTS. Congressman, we don't believe all these chemicals are the same. That's why we support legislation to list PFOA and PFOS, and only those two, as hazardous substances under CERCLA. That's further than the other companies here are willing to go today, but that's what we believe is correct. What we know about those chemicals is that they're biopersistent. That's enough to know that there's a clear concern for those chemicals within society at this point in time. And we feel for that reason that they should be regulated.

On the larger class, we believe it's appropriate to have the EPA continue to gain information for us to drive science-based regulation once we have additional data on the larger class of chemicals.

They can't all be looked at the same, but I think we know enough about those which are called C8s or extremely biopersistent, to say that that's an appropriate action at this point in time.

Mr. GIBBS. Now, with all those 5,000 different compounds, how has the interaction between the companies and the EPA, how has that interaction worked to develop the science-based and get the real facts of what's going on, what compounds might be harmful and what might not be? Anybody can answer, all three of you, whoever wants to.

Ms. RUTHERFORD. Congressman, I'd be happy to address that question. As we worked with the EPA over many, many years and many administrations, we have engaged on a scientist-to-scientist basis, and that work has continued to share the studies we have, the body of evidence in the public domain, as well as the work conducted by our own EPA to do risk assessments as part of the process for setting a nationwide, science-based standard. That work has continued.

We appreciate and support the new action plan to do that in an expedited manner. We believe our country is best served to continue to allow the EPA to exercise that process and not to proceed with a hazardous designation under CERCLA unless it is decided by the EPA through their normal process.

Mr. GIBBS. Okay. Go ahead, Mr. Kirsch.

Mr. KIRSCH. Congressman, we agree that the class of the 5,000 substances that represent PFAS are not all the same. They vary in their uses from the pharmaceutical industry, through aviation, as I mentioned earlier, and automotive. So regulating them as an entire class, we believe, would be a mistake.

To the question about how we work with different regulatory bodies, we've spent time—or we are spending time, even in the present, with different congressional bodies, both in the House and the Senate, as well with the EPA and with the state of North Carolina as a result of the efforts that we put in place there.

Mr. GIBBS. Okay. Well, I think, like I said earlier, we need to make sure that we're protecting the environment and human health, but at the same token, make sure we're not throwing the baby out with the bath water, and I don't think a lot of people realize that there's this many thousands of compounds under this general classification.

34

So we have to be careful how we handle that, Mr. Chairman, and I think that's a prudent point because a lot of those compounds are actually, I think, beneficial, and we need to figure out the ones that aren't. That's where the science comes in. I know somebody made a comment about science is an excuse, and I don't think that's true. I think we need to get the facts and do what's right for everybody. So I yield back. Thank you.

Mr. ROUDA. Thank you. The chair now recognizes Representative Kildee. You're up.

Mr. KILDEE. First of all, thank you, Mr. Chairman, for allowing me to participate in this hearing and thank you especially for your leadership on this question and for holding what has been, I think, a very informative series of hearings. I'm not going to be redundant by asking some of the same questions. I'd like to make a bit of a statement, but I want to clarify something before I go forward.

Mr. Roberts, could you reiterate what you said about what compounds should, in your opinion, the opinion of your company, should be regulated and under CERCLA?

Mr. ROBERTS. Sure. Fluorosity compounds of PFOA and PFOS, which are the two C8 chemistries which are considered long-chain. They are the chemistries which we recognize as being highly biopersistent, meaning they have half lives that can be greater than a year. Because of that connection to biopersistence, that's the reason why we believe that those are the chemicals that should be considered for CERCLA.

Mr. KILDEE. I thought that's what I understood you to say, and I guess I'm a little bit puzzled. I think you mentioned, Mr. Roberts, that Chemours has adequate financial resources to deal with any financial liability for cleanup or for any liability that might emanate out of health concerns as a result of these chemical contaminants. Mr. Kirsch, is it your position that Chemours was provided with adequate financial resources as a part of the spin-off to deal with what obviously would be a pretty significant cost to deal with cleanup and other liability issues?

Mr. KIRSCH. Thank you for the question, Congressman. The answer would be a clear no, and I think the amended complaint that you all received has a couple of interesting examples—and I will mention one, and it gets back to the North Carolina situation. The maximum liability that DuPont estimated for North Carolina in the spin-off was $2.09 million. And as I mentioned in my oral remarks, that cleanup effort and stopping the emissions in that facility will cost us well north of $200 million.

Mr. KILDEE. So this is the concern that many of us have, is that we hear from one witness who has off-loaded their liability, that they think that the chemicals in question should be regulated under CERCLA, but that the company that does have liability has not been given adequate resources to deal with that obligation. And listening to the witness representing 3M, you want to get credit for the decision to no longer produce these dangerous chemicals voluntarily, but in the same breath, want us to believe that there's no science that says that these chemicals are dangerous at all. So if you're responsible for the creation and the promulgation of these chemicals in the environment, you can off-load the obligation to somebody else who doesn't have enough resource, and if you create

35

these chemicals that then contaminate people and affect their lives, you can take credit for the fact that you're taking it out of commerce and no longer putting it into the environment, but on the same token say that there's nothing saying this is dangerous. This is ridiculous. This is ridiculous. We have a huge problem in this country. The people I represent, for example, in the town of Oscoda, Michigan, who hosted an Air Force Base, the Wurtsmith Air Force Base, had their groundwater contaminated, have had their way of life affected. It's a part of Michigan. It's right on the shore of Lake Huron. It's a beautiful part of our state, where the culture is one of hunting and fishing, where now you can't hunt the animals because the groundwater has contaminated them. You can't eat the fish that you catch because they're too dangerous to consume. And we have companies that have benefited and made millions and billions of dollars by selling these products into commerce, who now want to point the finger at somebody else or say, well, we're not going to produce these chemicals anymore, but believe me, there's no science that says they're safe. I take issue with that. There's plenty of science. There's plenty of science out there that demonstrates these are harmful chemicals and dangerous for human consumption. Otherwise, you wouldn't have taken them off the market in the first place.

Mr. Chairman, thank you for holding this hearing. This has been quite elucidating, and I think what we're hearing today, I think, makes the case that we can't sit and wait for voluntary action, even though I think obviously we would appreciate action. Congress has to act. It's the only way we're going to get to this problem and at a scale equal to the problem. Thank you very much.

Mr. ROUDA. Thank you.

The chair now recognizes Representative Gosar for five minutes of questioning.

Mr. GOSAR. Thank you, Mr. Chair.

Ms. Rutherford, what role does science play in EPA's chemical regulatory process, and what type of information does EPA consider as part of this process?

Ms. RUTHERFORD. Yes. Thank you for the question, Congressman. The EPA has a very rigorous, scientific process that is fundamental to its decisions. As I understand it, our scientists work closely with those scientists on a variety of materials. You can appreciate for a company that has 50,000 different products, we are engaged with regulators. We take our responsibility for our products and the safety of those products very, very seriously. And as we have engaged with them, the EPA has been able to develop processes that set appropriate regulations and nationwide science-based standards for us over many years.

Mr. GOSAR. So is there legal or other possible ramifications if the EPA does not base its regulatory actions on sound science?

Ms. RUTHERFORD. Congressman, that's an interesting question. I'm not a legislator or a member of the EPA. Our concern would be that our actions speak for ourselves. We've been engaged with our communities in remediation at our own manufacturing facilities and dealing with these issues over years. It has resulted in remediation, improving water quality in our communities. The blood levels in the Americans has dropped by more than 70 percent. Ac-

36

tions speak louder than words. We're concerned that should legislative action result in a lot more conversation and arguments, it would prevent us from taking action in the communities and improving water quality.

Mr. GOSAR. So I guess my question is, as, you know, it goes about sound science, is, 3M's protocol, were they instrumental in actually constructing some of the protocols that are found at the EPA?

Ms. RUTHERFORD. Congressman, I wouldn't be so bold as to say we're that instrumental, but we have been engaged in testing these materials over many years. It was our scientific—our scientists—excuse me—who were instrumental in developing some of the analytical techniques that allow us now to detect these materials down to the parts-per-trillion level. And so as we are engaged in testing and in active remediation around our own sites, we are able to detect these materials, and that is a technique that was supported by 3M and many others in the industry, quite honestly, to enable the EPA to further its—the interest of the Americans addressing water quality.

Mr. GOSAR. So what you're telling me is, the technology has changed to evaluate the chemistry, the evaluation, to finding bioaccumulation? That's evolved, hasn't it? I mean, once upon a time, science said that the earth was flat. Is it flat?

Ms. RUTHERFORD. Congressman, we all know that's not the case. The world is round. And, you know, our approach in advancing the science has evolved over time. When we first produced these materials, we conducted certain rig tests that were required by the EPA. Additional tests are now required. We are absolutely committed to that degree of compliance, both the standards and our understanding of these materials. Our ability to detect today is far beyond what it was 20 to 30 years ago.

Mr. GOSAR. Well, most of the time, rules and regulatory state actually comes from reaction, not being proactive. So how do you look at this aspect in being proactive? I mean, you know, it's kind of hard to see into the future, but once again, science gives us some predicated outcomes. You know, particularly a scientific method that if I perform certain processes, I get a result, and I turn them back over to you. You do the same processes and get the same result. That's how science has evolved to today. So how have you looked at your process that's been proactive versus reactive?

Ms. RUTHERFORD. Congressman, that's an interesting perspective, and what I can say is that 3M conducts our own research. We also support, by terms of grants to universities, for them to conduct research in an unrestricted way. So that research continues to expand the body of knowledge. Those are peer-reviewed journals. That helps to advance the understanding that we all have of these particular materials in the environment.

We have been studying this for many, many years, our own work force, scientific studies. We see there are associations in these studies. We see a lot of inconsistencies in those data, and the data simply don't show any cause-and-effect relationships at historical levels of these materials in the environment, either the older materials or the newer materials, but yet we continue to advance the science so that we can truly understand the situation.

37

Mr. GOSAR. One indulgence real quick.

Are there other industries that your metrics have been beneficial to, other than the chemistry, like DuPont and 3M?

Ms. RUTHERFORD. Sorry. Could you——

Mr. GOSAR. Are there other industries that have benefited from your quantitative evaluations in a proactive manner?

Ms. RUTHERFORD. Certainly. We're very active in several industries where precise measurements are required. For instance, the advances in electronics have been enabled by some of our materials going into electronic devices—our transportation, low-emission vehicles, aerospace. All of those industries benefit by the dedication of all of our scientific companies here in the U.S.

Mr. GOSAR. Mining as well, right?

Ms. RUTHERFORD. Absolutely.

Mr. GOSAR. Thank you.

Mr. ROUDA. Thank you. The chair now recognizes Representative Ocasio-Cortez.

Ms. OCASIO-CORTEZ. Thank you, Mr. Chair. Thank you for holding this hearing and ensuring that we don't let this go until we get some real answers on this issue. This committee has heard stories of families whose babies have had their brains damaged for their entire lives by PFAS chemicals, women who have been rendered infertile for their entire lives, stage 4 cancer, people whose families have been torn apart by lupus and diabetes, and have lost many family members to this disease. Ms. Rutherford, I want to spend some time here discussing some of 3M's current tactics when it comes to accepting responsibility for PFAS—or not accepting responsibility for PFAS contamination. Are you aware of 3M's membership to an organization entitled Responsible Science Policy Coalition?

Ms. RUTHERFORD. Congresswoman, we are members of many trade associations, and that is one of those.

Ms. OCASIO-CORTEZ. How much money does 3M give to this coalition?

Ms. RUTHERFORD. I'm not aware of that actual number, Congresswoman.

Ms. OCASIO-CORTEZ. Okay. Are you aware of any other chemical companies that are members of the Responsible Science Policy Coalition?

Ms. RUTHERFORD. Again, I will reiterate, we're members of many trade associations. We do that in order to advance our perspective—share our perspective, and to share our science and——

Ms. OCASIO-CORTEZ. Thank you.

Mr. Chairman, I would like to enter into the record a presentation by the Responsible Science Policy Coalition dated July 24th, 2018, which lists 3M as a key member.

Mr. ROUDA. Without objection, so moved.

Ms. OCASIO-CORTEZ. Thank you very much. In the lobbying materials by the coalition, it states, and I quote, the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure. Ms. Rutherford, do you agree with this statement?

Ms. RUTHERFORD. Congresswoman, I absolutely agree with that statement.

38

Ms. OCASIO-CORTEZ. This statement goes against 3M's own scientists who for decades have been studying these chemicals and terming them, quote, toxic. For instance, in 1999, Richard Purdy, one of 3M's own scientists and environmental specialists resigned his position in protest calling PFAS, quote, the most insidious pollutant since PCB. Additionally, this administration's agency for toxic substances and disease registry released a toxicology profile of PFAS chemicals. In the profile the agency states, quote, the available epidemiology study suggests associations between perfluorical exposure and several health outcomes. They then go on to list a myriad of serious health outcomes, including increased risk of thyroid disease, liver damage, increased risk of decreased fertility, and decreased antibody response to vaccines.

Even during the state of Minnesota's lawsuit against 3M, 3M claimed that there were no proven negative health effects of PFAS exposure on human health. Mr. Rutherford—or Ms. Rutherford, are you aware of the efforts made by 3M in the past to conceal the risks of PFAS for more than 60 years?

Ms. RUTHERFORD. Congresswoman, I cannot—I am not familiar with that. That goes against everything I know about my company as a scientist over these past 30 years. We are committed to advancing the science and to sharing information to the public domain.

Ms. OCASIO-CORTEZ. And if that's the case, why is 3M taking a position of denying the scientific findings of its own scientists? A large part of the scientific community and the current administration by joining organizations that are spreading misinformation about PFAS.

Ms. RUTHERFORD. Congresswoman, respectfully, I disagree with that characterization. We have a team of epidemiologists and toxicologists who do report to me. I've spent hours and hours with them, going through these studies. There is—there are a lot of inconsistencies in the data. We accept this that there are associations which are like leads, places that we should continue to look, and we are, in fact, doing that. But when we look at that evidence, there's no cause and effect for adverse human health effects at the levels that we are exposed to as a general population.

Ms. OCASIO-CORTEZ. Right. So it may not be causal, but it's very associative, I see here. Has 3M or any agent of 3M taken meetings in the last year with lawmakers and told them or their staff that there's no negative health effects of PFAS on human health?

Ms. RUTHERFORD. Congresswoman, we have a very active team of representatives here working with policymakers to share information. We are very transparent about that. We do that, we report and register all of our representatives——

Ms. OCASIO-CORTEZ. But is that information—has 3M or an agent of 3M told lawmakers that there is no negative health effects to PFAS?

Ms. RUTHERFORD. We have shared with legislators, policymakers, Congresswoman, the same statement that you have repeated back to me, that the weight of scientific evidence shows no adverse human health effects at current or former levels.

Ms. OCASIO-CORTEZ. So 3M is telling lawmakers to not be concerned about this?

39

Ms. RUTHERFORD. No. We are saying that we should be concerned. We do request additional studies, but what we can say is, we've been studying our own work force for more than 40 years. These are people who had occupational exposure at much higher levels than the general population. We do not see, looking at the scientific evidence of our own work force, adverse human health effects.

Ms. OCASIO-CORTEZ. And has this point ever been communicated to senior officials of the Trump administration?

Ms. RUTHERFORD. I am not aware of that, Congresswoman. We have been working with regulators and policymakers.

Ms. OCASIO-CORTEZ. Thank you very much.

Mr. ROUDA. Thank you.

The chair now recognizes Representative Keller for five minutes of questions.

Mr. KELLER. Thank you, Mr. Chair.

I'm glad to be here today to learn more about the effects of PFAS. And it's all our concern that we have a healthy community, healthy water, and a healthy environment.

Dr. Rutherford, you know, I've been listening to the exchange going back and forth about PFAS and potential harms. And I heard you say, and I want to make sure I understood it correctly, that in your work force, you hadn't seen that the exposure of the employees of 3M had had the negative impact on their health. Is that correct?

Ms. RUTHERFORD. Congressman, that is indeed correct. And thank you for the question. We've been, as all chemical manufacturers will do, monitoring our own work force over many, many years dating back into early operations both in Minnesota and in Alabama and other facilities. We see no adverse human health effects associated with exposures to which they were exposed. And, again, that's many times higher than general population.

Mr. KELLER. Now, this wouldn't be just your view or 3M's view. Do others believe this to be the case as well, such as any government agencies?

Ms. RUTHERFORD. Congressman, many governments have studied this issue. It's a very complex issue, and it's worthy of further study. Other governments, such as Australia Department of Health, Canada's Ministry of Health, have made similar conclusions that the data are inconsistent, yet that the data available today show no conclusive evidence of cause-and-effect relationships creating adverse human health.

Mr. KELLER. And, you know, just some fluoropolymers, you know, compounds of PFAS, they're used in a wide variety of things, even medical devices and those kind of things. Is that correct?

Ms. RUTHERFORD. Congressman, that's correct. These fluoropolymers are used in many very important applications, such as aircraft engines, low emission vehicles, renewable energy, just to name a few, electronics.

Mr. KELLER. But in the case of medical devices, you know, that would be something that would be covered under the Food and Drug Administration if there were some negative impacts. We would certainly think that a branch of the U.S. Government such as the Food and Drug Administration would be concerned if these

40

pose that kind of risk and using them for medical devices. Would that be an accurate assumption to follow?

Ms. RUTHERFORD. Yes, Congressman, that would be an accurate assumption. These are used in medical devices. Some of my fellow witnesses have spoken to that, that these are key components in a variety of devices all around us every day to enable performance.

Mr. KELLER. Okay. Again, I just want to make sure that when we look at anything as Congress, that we follow the science and the actual science. And I'll say this, not the political science of trying to advance an agenda but the actual science of how this impacts the lives of Americans and making sure that—while we want to make sure everybody's safe, we have the tools and we have the ability to have those tools made available, whether it's for low emissions to help our environment, whether it's for medical devices to help us look for ways that we can be healthier or prevent diseases. We need to make sure that we let the science do it and not as Congress tell the scientists how to do their jobs.

So any other government agencies, because it's not just the Food and Drug Administration. We also have a government agency called OSHA, and they deal with safety of Americans and people that work in America.

So, again, I would just encourage the other members of this committee to make sure that we let the actual science dictate what we do and not the political science.

Thank you.

Mr. ROUDA. Thank you.

The chair now recognizes Representative Hill for five minutes of questioning.

Ms. HILL. Thank you.

I appreciate my colleague's commitment to science. And I would urge us to ensure that those who are funding the science are indeed objective, as we know oil companies funded the science that denied climate change for many, many years.

I have to say I'm very glad that these three companies decided to show up here today. The country, our groundwater, and our people have been poisoned by chemicals made, used, and improperly disposed of by the companies in this room. The question is who is going to pay for the injuries and the cleanup. These companies or the taxpayers?

And here's one thing that really bothers me. DuPont is trying to use corporation law to ensure that they are not on the hook for these costs. DuPont spun off its chemical business in 2015 into a new independent company, Chemours. And according to the complaint Chemours recently—and I'm sorry if I'm not pronouncing this right. My French is a little rusty—recently filed against DuPont. DuPont then saddled the new company with liability costs that were dramatically underestimated at the time the spinoff was finalized. Next, DuPont merged with another company, Dow Chemical, and then spun off a company that they refer to as New DuPont.

The sole purpose of these corporate restructuring seems to be the creation of a legal fiction that someone else is responsible for all the documented harms that DuPont perpetrated dumping PFAS chemicals into landfills and waterways, suppressing the science

41

showing these chemicals were toxic, poisoning the drinking water of millions of Americans. This strains credulity, and that is putting it mildly.

DuPont has, in the past, accepted liability for discharging PFAS chemicals into the environment which led to serious problems, including birth defects, liver and thyroid and kidney disease, and cancer. Now, a few years have passed, and there's been a spinoff, a merger, and then other spinoffs.

So, Mr. Roberts, I recognize that you're new with the company, but who is now responsible for this contamination if not DuPont?

Mr. ROBERTS. Congresswoman, to go through your question, the DuPont company has changed forms many times over the last 217 years. The last 10 years is not new and was not constructed in some way to avoid liability around the PFAS issue.

The removal of the fibers business to INVISTA; the spinoff of the Axalta business, which is related to our coatings, the Performance Chemicals business, which is related to the fluorochemicals line of business, which is now called Chemours; the creation of the merger with Dow and then the separation, was about this company now reemerging as a company that's focused on sustainability.

Ms. HILL. I mean, that's fine. I understand restructuring. I mean, I ran an organization. I know how restructures work, and that's fine. But who ultimately is responsible if not DuPont?

Chemours didn't exist when this was happening. I mean, they came into existence in 2015. So who takes accountability? And if corporate law loopholes allow us to put our hands up like this, then the only people who are responsible are the American taxpayers, because the cleanup has to happen. This to me is a nonoption. But who pays for it?

And as far as I'm concerned, the company that was doing this in the first place should be held accountable. But if that company doesn't exist through corporate gymnastics, then who does pay that bill?

Mr. ROBERTS. Okay. Congresswoman, I fully agree with you. And in my opening statement, I stated, first, we're fully committed to remediating the sites that we own. I also heard, as we went through the opening statements, that Chemours has very clearly stated that it's committed to doing remediation on the site that it now owns.

Ms. HILL. Well, let's talk about that.

Mr. ROBERTS. So I don't believe that either company is saying that there's not full commitment to making sure the sites that have been owned and operated either currently by the company that's called DuPont or the division of DuPont, which was Performance Chemicals, which is still operating, which is financially viable in every way, shape, and form——

Ms. HILL. I don't mean to cut you off, but I only have a minute left.

According to the Chemours' complaint against DuPont filed this year, there's issues with the estimates of cost cleanups near Cape Fear, North Carolina, one of DuPont's legacy sites. The estimate was that it would be approximately $2 million in cleanup. Chemours later learned that the actual cost of the cleanup would be somewhere around 200 million, and that's a huge difference in

42

terms of estimates. And then—I'll jump really quickly. I guess what it boils down to is that if Chemours doesn't have the money to pay the victims for all their injuries and to clean up all the contamination, then what happens? Is it DuPont's argument that taxpayers should pay and not DuPont? Who's responsible?

Mr. ROBERTS. Congresswoman, we don't believe the taxpayers should pay. What I would say, when we hear the statement that Chemours then later found out, is that the individuals that were running the sites, the individuals that were developing the products, the individuals that ran this business related to the sites that were fully aware of the financials of the business, fully aware of the liabilities and profits and understood what it was taking with it, are the same individuals that sit and run Chemours today.

Ms. HILL. But there's the $2 million estimate versus the $200 million estimate. That doesn't quite track. And I'm out of time. But I would—maybe you can respond to that in writing after the fact.

Mr. ROBERTS. We would be glad to.

Ms. HILL. Yielding back.

Thank you.

Mr. ROUDA. Thank you.

The chair now recognizes Representative Comer for five minutes of questioning.

Mr. COMER. Thank you.

Dr. Rutherford, I think it would be good for everyone to know how 3M got into the PFAS business to begin with. I know in your testimony you mention relationships with the Navy and with firefighting foam. But can you briefly tell us how that relationship began?

Ms. RUTHERFORD. Yes, Congressman. Thank you for the question. We were involved in the development very early on of fluorochemical surfactants. And that was research that we had engaged in early days. We also had a patent that was purchased from a university that gave us technology in that area as well.

And then after the aircraft carrier fire in—of the Forrestal, where our military personnel lost many, many lives, many of their lives were lost, the Navy put out a request for an improved firefighting system for ships. 3M was one of the companies engaged in that research that resulted in the Navy winning a patent for the—and writing the first specifications for the firefighting foams. And 3M was one of the suppliers in the early development and then through several—many, many years.

Mr. COMER. Okay. I'm going to jump around here.

Mr. Roberts, in your statement, you said that DuPont will no longer use any long-chain PFAS in, quote, recently integrated operations. Can you explain a little bit more what that exactly means?

Mr. ROBERTS. That's correct. Congressman, we recently, as part of the spinoff from the Dow Company, acquired a business that, as part of it, had one product that used a long-chain material. As with the Dow changes—and it will continue to do in the future. Any time that we acquire something, if there's anything that's long-chain, that's included within that portfolio, then we will immediately look to eliminate it, because we're going to stand by our commitment not to use those materials, but—which might be even more important is, not only are we fully committed to not partici-

43

pating in long-chain chemistry, but our biggest footprint around those materials is actually around our firefighting foams.

So our commitment is that we will, by the end of 2021, is to completely stop the use of PFAS-related firefighting foams at our sites. We have already stopped using PFAS firefighting foams for training. Any time that a PFAS-related firefighting foam is used to prevent or in the mitigation of a real event, we collect that material so that it doesn't go to soil—or to a water body. And we believe that the industry is now ready. And we have been working with companies both in the Americas and in Europe on a generation of firefighting foams that we're comfortable for our uses can be used to replace PFAS chemicals, even those that are not long-chain.

So our biggest footprint is around our firefighting foams. We're fully committed to removing that footprint by, not only getting out of long-chain, but also getting out of all PFAS-related firefighting foams across all of our sites worldwide.

Mr. COMER. And I've stated this in a previous hearing that we had on this subject, but the Kentucky firefighters' union came to my office and were very concerned about that. They obviously are concerned about their safety, as I'm sure every Member of Congress is, and that was an important component. So that's good to hear.

They were concerned about their safety, because the PFAS helps put out fires quicker than——

Mr. ROBERTS. Correct.

Mr. COMER [continuing]. than just normal water.

Mr. ROBERTS. But I agree that—normal water. But I think what we see now is a new generation of foams, which though I'm sure will have their own issue, are not biopersistent. So they are made up of alcohols or proteins which don't have that issue. And we now have a generation we think are just as effective as PFAS-related materials. So we are working with those companies. As we are focused on sustainability, we think we can develop a roadmap that other companies can then follow once we work with these companies to develop this line of chemistry. We'll remove this issue that we've heard across the country is really firefighting foams, so we're focused on addressing that issue.

Mr. COMER. Good.

Mr. Kirsch, I'm curious, are the people running Chemours' business today the same people who ran it when it was a part of DuPont?

Mr. KIRSCH. No, they're not, Congressman. I think that was a slight misrepresentation. So on my staff, I run the fluoroproducts business, as I mentioned in my opening statement. My staff consists of 12 folks, three of which have any—anything to do with the previous DuPont fluoropolymers business. The rest are either new to the company or had no previous experience in fluoropolymers.

To the best of my understanding, the way that the spin document was created, the current Chemours leadership, anyone that was there at DuPont at the time, was not involved in the creation of that document. So to suggest that there was information and the ability to dictate those terms I think is just false and, hence, the complaint.

Mr. ROBERTS. If I may.

44

Mr. COMER. Yes.

Mr. ROBERTS. The gentleman who was the executive vice president of the fluorochemicals business and had been so since 2008 is now the CEO of Chemours. So I just want to be clear here that so we can truly accept the areas where we're going to focus that we can focus on remediating the sites that we own and that Chemours does the same. But I don't want to really sit here and go back and forth, because it doesn't make sense. But I don't want to be in a shell game.

When the head of the business is now the CEO, it's clear that there's ownership. And an individual who was a part of those discussions who the scientists work for and is currently running Chemours, it makes it very difficult to say we don't know anything about it before 2015.

Mr. KIRSCH. I'm sorry. I need to comment on this.

Yes, Mr. Vergnano is the CEO of Chemours. Mr. Vergnano was part of the DuPont company. I find it interesting that any request I've ever made to address sustainability issues or issues of remediation, which we are taking significant action and we made significant commitments, ambitious commitments one year ago, Mr. Vergnano has approved every single one of those. I'm having trouble bridging this.

Mr. COMER. Thank you. I yield back.

Mr. ROUDA. The chair now recognizes Representative Sarbanes for five minutes of questioning.

Mr. SARBANES. Thank you, Mr. Chairman. Thanks for convening this hearing on an important topic.

So that last exchange was pretty enlightening, I think. The fact that you have two major corporations now pointing fingers at each other, and that's exactly what was just happening, it shows a couple things. There's something wrong with these chemicals. That's an acknowledgment implicitly in that finger-pointing that we just saw. And, second, both companies know that there's a significant amount of legal liability and accompanying financial liability associated with these chemicals and how they were handled. And everybody's trying to get in front of that, I can see.

I want to come back for a moment, Ms. Rutherford, to your testimony previously about the responsible science policy coalition, which I understand 3M is a member of or has helped to fund. And they have concluded, among various studies they've done, quote, the weight of scientific evidence does not show that PFOA or PFOS caused health effects in humans. And you were asked about that, whether you agree with that or you don't agree with that, and I think you said you do agree with it.

Ms. RUTHERFORD. Congressman, that's correct. I do agree with that statement.

Mr. SARBANES. Talk to me about that. How can you agree with this statement after all of the testimony that's come forward and the litigation and otherwise that there are no health effects in humans from PFOA or PFOS? I just want to get into your head for a second, because on its face, it seems to me that goes against the weight of the evidence, testimony, documents that have been presented for years when it comes to the impact of those chemicals.

Ms. RUTHERFORD. Congressman, if I may.

45

Mr. SARBANES. Yes, go ahead.

Ms. RUTHERFORD. Again, it is the complete understanding of how the testing is done, the analytics, the approach to understanding this. I do appreciate that links and associations are indicated in those scientific studies. However, every study I've read, and I've read many, many of these studies, calls for additional work, because there are a lot of inconsistencies in the data. Establishing a human health impact is a very complex thing. And we——

Mr. SARBANES. You know that back in, I guess, 1981 there was a memorandum inside 3M saying that, as a precautionary measure, approximately 25 women of childbearing potential have received job reassignments at the 3M Decatur plant so they will not be exposed to a type of flurorchemical that can cause birth defects in rats.

So I guess are you saying, well, it causes birth defects in rats, but that's not conclusive as to human effects? Nevertheless, there was a reassignment of 25 childbearing women. Are you aware of that testimony and document?

Ms. RUTHERFORD. Congressman, I am indeed aware of that testimony and that study. What I'd like to share with you is I felt that was a measure of very strong responsibility on our part. There was a study conducted in which we observed some of these birth defects. What we found also, though, is that this was an inaccurate study. The way the fetus was dissected was not repeatable. We shared these information with the EPA.

And the way we discovered that, Congressman, is that it showed up in the control group. The same issue that was found in the exposed population of the animals showed up in the control group with no exposure. So we were—that showed——

Mr. SARBANES. So on the one hand—I mean, I get your point here. You're trying to put a context around that particular information. And that's fair, to a point. But there's a lot of other information and evidence that has come forward, which really belies the statement and the conclusion that was reached by this responsible science policy coalition which, as far as I can tell, is just a whitewash operation. I mean, it's sort of, you know, everybody's going to be okay coalition. But I don't think that there's good science behind that, from what we've seen.

The fact of the matter is the chemical industry has a tremendous amount of power, influence, resources. And they have deployed that for decades against the interests of the average person out there. They've done it with lobbyists. They've done it with campaign contributions. They've done it by buying studies that then masquerade as science. And this continues to go on. We have a responsibility here to push back against that, and we're not going to give up until we've done that.

I appreciate your coming here today, but this is the beginning of a continuing inquiry into the harmful effects of these chemicals.

And with that, I yield back.

Mr. ROUDA. Thank you.

The chair now recognizes Representative Wasserman Schultz for five minutes of questioning.

Ms. WASSERMAN SCHULTZ. Thank you, Mr. Chairman.

46

Last year, the Union of Concerned Scientists released a report detailing PFAS contamination at 131 military facilities across the United States. At 90 percent of these sites, PFAS concentration was 10 times higher than CDC's Agency for Toxic Substances and Disease Registry, ATSDR, risk levels, which itself is much lower than the EPA's current health advisory. Two-thirds of these sites were at least 100 times the ATSDR risk level.

I'd like the panel to consider this: At Patrick Air Force Base in Brevard County, Florida, PFAS contamination was found to be 4,338,000 parts per trillion. That's the level that was detected. That is 390,909 times the risk level.

Many servicemembers have developed cases of Hodgkin's lymphoma and other cancers. These chemicals were used at about 400 U.S. military installations, as we have discussed here today.

Ms. Rutherford, what are 3M's plans for compensating servicemembers and veterans that were exposed to these chemicals, chemicals that your company had determined as harmful to human health?

Ms. RUTHERFORD. Thank you for the question, Congresswoman. As we transformed our own product portfolio and phased out of the chemicals that are part of AFFF, we discontinued that product. We have, nevertheless, continued to work with the Department of Defense to understand the safe use of these materials and the remediation. The remediation needs around these bases do need to be addressed.

Ms. WASSERMAN SCHULTZ. Remediation is not what I'm asking you about. What I'm asking you about is what plans do you have to compensate servicemembers and veterans that were exposed to these chemicals that you were aware were harmful to human health?

Ms. RUTHERFORD. Again, Congresswoman, the studies we have do not indicate at the levels of exposure in the environment in the past or today that adverse human health effects exist. We are, however, continuing our studies, and we will work proactively with scientific bodies. It's not only me, Congresswoman. It is every—a lot of other government agencies, our own ATSDR, Australia, Canada, Germany, the weight of scientific evidence is there. We do agree additional study is required.

Ms. WASSERMAN SCHULTZ. I'm sorry, that's just not—that doesn't conform with what information I know that we've been given about 3M's awareness of the harmful effects of these chemicals.

You began working with the Navy on developing your firefighting foam in the sixties. At what point did you convey the research that you had done and the knowledge of the products harmful effects to DOD? My understanding is that you do and were and withheld information about its harmful effects, and I want to know if you ever advised DOD that it should stop the use of the foam based on that awareness.

Ms. RUTHERFORD. Congresswoman, as we became aware of the potential of bioaccumulation of some of the materials of these foams, that communication did indeed happen. So we've been proactive in sharing that information, the risk of bioaccumulation. And that's why we phased out of those two particular materials at the time more than 12 years ago.

47

Ms. WASSERMAN SCHULTZ. Okay. These chemicals have been significantly contaminating our servicemen and servicewomen, yet DuPont worried, in its 2009 SEC annual filings, that approximately—and this is a quote—$1 billion of 2009 revenues could be affected by any such regulation or prohibition of PFOA, while the company stated in the same report, DuPont believes that PFOA exposure does not pose a health risk to the general public.

Did DuPont care more about its bottom line than about our men and women serving in the Armed Forces? And why have your companies, all of your companies been fighting against additional regulation of PFAS chemicals even though our servicemembers who have come into contact with firefighting foam or tainted groundwater are suffering from illness?

Mr. ROBERTS. Congresswoman, first of all, as I stated in my opening, we're not here standing in the way of regulation. We support very clearly the line items that are included as part of the NDAA. So we're here to be cooperative. We're here to support. I think the things that this Congress is talking about in understanding what type of legislation would really help to drive this— the situation in the right direction.

So to start there, clearly requiring the EPA to set a national primary drinking water regulation for PFAS under the Safe Drinking Water Act within two years is something that we're here to support, as well as other line items on the NDAA.

Ms. WASSERMAN SCHULTZ. I'm glad that you have taken this position now. But that was clearly not your position previously. Previously, your company did oppose regulation of these chemicals and maintained that you would lose a billion dollars of revenue in 2009 if there was any such regulation, and kept the information about its harmful effects from the public. Isn't that correct?

Mr. ROBERTS. I don't know that to be the case, Congresswoman.

Ms. WASSERMAN SCHULTZ. Well, I'm reading to you from words that were put out by your own company in a report.

Mr. ROBERTS. Okay. What I can tell you is what we believe today. What I can tell you is that we're here to support, in a proactive way, legislation that we think will drive this situation in the right direction.

Ms. WASSERMAN SCHULTZ. Does DuPont have plans to compensate servicemembers who have been harmed by exposure to these chemicals?

Mr. ROBERTS. Congresswoman, the DuPont company that I represent, and I believe what I also read in the Chemours statement, was that AFFF, or foams related to this issue, were not materials that were made by DuPont. They're not now, and I don't believe that was the case in the past at all. But I would refer that to the gentleman from Chemours to respond to as well.

Ms. WASSERMAN SCHULTZ. Mr. Chairman, I know my time is expired. But if the gentleman from Chemours could respond, that would be helpful.

Mr. KIRSCH. Yes. Thank you, Congresswoman.

Chemours has never manufactured, sold, or formulated firefighting foams. I believe the issue—question is specifically around PFOS and PFOA. Neither one of those Chemours has ever used. So

48

at this point, I'm not sure what else I could possibly add to the conversation.

Ms. WASSERMAN SCHULTZ. Are any of your companies that were responsible for using any of these chemicals that firefighters and military servicemembers were exposed to planning any type of compensation to harmed victims? That's a question for all three of you.

Mr. ROBERTS. At this point, the DuPont company is focused on cleaning up and remediating the sites which we operate, that's our focus, as well as reducing the amount of firefighting foam that we use in our sites. But that's the limit of where we're focused at this time.

Ms. WASSERMAN SCHULTZ. So no?

Mr. ROBERTS. We are focused on what we—what's within our control.

Ms. WASSERMAN SCHULTZ. No. Yes or no? Yes or no?

Mr. ROBERTS. We'll continue to focus on what's within our control.

Ms. WASSERMAN SCHULTZ. That's not a yes-or-no answer. Yes or no, are you planning, at any point, at compensating people who have been harmed by your company's chemicals?

Mr. ROBERTS. Congresswoman, you're speaking specifically to armed forces around the world——

Ms. WASSERMAN SCHULTZ. I'm speaking specifically to any—to this issue specifically.

Mr. ROBERTS. Yes. We are focused on working through——

Ms. WASSERMAN SCHULTZ. Okay. The other two people, if you could answer, please.

Mr. KIRSCH. Yes.

Ms. WASSERMAN SCHULTZ. The answer is no. Let the record reflect that the gentleman essentially said, no, there are no plans.

Mr. KIRSCH. Again, we have not been involved in PFOA or PFOS, which I think are the——

Ms. WASSERMAN SCHULTZ. So your answer is also no?

Mr. KIRSCH. Correct.

Ms. RUTHERFORD. Congresswoman, we have been actively engaged in our communities over many, many years conducting remediation——

Ms. WASSERMAN SCHULTZ. Yes or no? Are there any plans that 3M has to compensate victims who have been damaged by your chemicals?

Ms. RUTHERFORD. I will reiterate my statement, Congresswoman, that our evidence does not indicate that anyone was—adverse human health effects were caused by these foams.

Ms. WASSERMAN SCHULTZ. That's not——

Ms. RUTHERFORD. Nevertheless, we're actively engaged with the DOD.

Ms. WASSERMAN SCHULTZ. That's not actually accurate in terms of the documents and the information that has been provided to the committee and to the military. Thank you. I yield back the balance of my time.

Mr. ROUDA. Thank you. The chair now recognizes myself for a line of questioning.

Let me start with Mr. Roberts. I thought your comment that the spinout of Chemours had nothing to do with reducing the liability

49

of DuPont was patently false. We know that boards and executive management teams often spend time trying to figure out how to reduce liabilities. And I'm quite certain that DuPont, with its in-house attorneys and experts, figured out the best way to reduce the liability here was to spin it out to Chemours.

And that leads me to you, Mr. Kirsch. How much money was given to Chemours when it was started and spun out to address these liabilities?

Mr. KIRSCH. Mr. Chairman, I don't have the exact figure in my head in terms of what the accrual would be. I mentioned the—I mentioned the North Carolina case, the 2 million——

Mr. ROUDA. I'm talking, when you were spun out, were you given a basket of assets to address the studies that DuPont had done to ascertain the potential liability they were going to have? Were you given money to address it?

Mr. KIRSCH. I'm not sure exactly how much money might have been accrued, but there were maximum liabilities that were esti-mated, and I believe an accrual was set forth for that.

Mr. ROUDA. And, of course, the maximum liabilities have shown to be extensively beyond that. I think you said at one point it's a hundred times greater than what was anticipated.

Mr. KIRSCH. That's correct.

Mr. ROUDA. And, Ms. Rutherford, I'm deeply confused. You said, and I want to make sure I understand this, no one has been harmed by any PFAS chemicals that you're aware of?

Ms. RUTHERFORD. Congressman, what I did say——

Mr. ROUDA. That's a yes or no. Come on. I don't need a long speech. Yes or no?

Ms. RUTHERFORD. We have no definitive cause-and-effect rela-tionship for——

Mr. ROUDA. Great. So your point is no one in America right now, no one, has been a victim of any PFAS chemicals, all 5,000, includ-ing PFOA and PFOS. That is your position.

Ms. RUTHERFORD. We state that the majority evidence does not indicate that—that to be true, sir.

Mr. ROUDA. Then why the hell do you care there's been a 70 per-cent reduction in PFAS levels if it doesn't affect anyone?

Ms. RUTHERFORD. Because we know these are concerns of our colleagues, the people in our communities, and all of us. We all want to have confidence in our drinking——

Mr. ROUDA. Damn right, because you guys have internal memos that show that it impacts people, impacts your workers. You've made changes in how you had those workers conduct their activi-ties. You have internal memos showing how devastating these chemicals can be to certain individuals that become exposed to it, yet you also stated earlier that you deny knowing about those in-ternal memos?

Ms. RUTHERFORD. No, I don't believe so.

Mr. ROUDA. I thought Representative Ocasio-Cortez asked you what knowledge you had of coverup of information by 3M, and you stated, I believe, to the effect that you've been completely trans-parent and you're not aware of those situations. Is that incorrect? You are aware of the memos?

Ms. RUTHERFORD. I believe the conversation, Chairman——

50

Mr. ROUDA. Let me ask the question. Are you aware of memos, internal documentation at 3M showing clearly concerns about the hazardous aspects of exposure to these chemicals both by workers of 3M as well as the general public? Are you aware of any documentation within 3M to that effect?

Ms. RUTHERFORD. There are studies, Chairman, that indicate there are effects at extremely high doses as a result of our own scientific inquiry. That is a part of the evidence that we have. At extremely high doses in respect to how we commercialize our new products to ensure the safety——

Mr. ROUDA. How do you define high doses? What would that be? Parts per trillion of what?

Ms. RUTHERFORD. Oh, no. This would be in parts per hundred. So this is a very, very different order of magnitude. Many, many thousands of times higher than what you would be exposed to in the environment.

Mr. ROUDA. I see. So what we've seen when witnesses previously coming in here who have been exposed to those levels who have significant health hazards, health outcomes, you would suggest it has nothing to do with the class of PFAS chemicals. It has something to do with some other item.

Mr. Roberts, I want to ask you. You stated earlier that you would support PFOS and PFOA being covered by the Superfund. Is that correct?

Mr. ROBERTS. That's correct.

Mr. ROUDA. Mr. Kirsch, would you as well?

Mr. KIRSCH. I'm not the expert on the two compounds or the legislation or the—and the process. It sounds like the EPA has enough information to make a decision.

Mr. ROUDA. So your answer is no at this time?

Mr. KIRSCH. I think the EPA has enough information to make the decision, and I think that that's the decision they should make. And I think if they don't, I'm assuming that you'll——

Mr. ROUDA. Okay. Ms. Rutherford?

Ms. RUTHERFORD. Yes, Chairman. We believe the EPA should be allowed to use its process to make that decision.

Mr. ROUDA. Mr. Roberts, if I understand things correctly, there's 5,000 chemicals under the heading of PFAS. The long-chain seem to be the ones that most people would agree are bad for our health.

Besides PFOS and PFOA, of the other 5,000 chemicals under the class of PFAS, how many of them are long-chain, roughly? In other words, it's not just those two, correct?

Mr. ROBERTS. No, it's not just those two. If we think about the chemicals which were identified under TRI, it was PFOA, PFOS, and about 22 other companies that were considered in that group that we talked about reporting under TRI. That's the group that I think that we're talking about. That's why it's——

Mr. ROUDA. Thank you. So you answered my next question.

So based on what we know with long-chain, all long-chain compounds should fall under the Superfund, correct?

Mr. ROBERTS. That group would be acceptable. It's still a very small subgroup. They're all—have that—the issue of being biopersistent. So if it was just those two or slightly larger group, you

51

know, I think that's something that could be determined by Congress.

Mr. ROUDA. I've submitted legislation to support a trust fund to finance an EPA administrative fee on PFAS manufacturers designed to raise at least $2 billion per year sufficient to cover 25 percent of what we know we need in operation and maintenance costs associated with PFAS and predominantly PFOA and PFOS.

Would any of you three support legislation along those lines to hold manufacturers responsible for helping create a trust fund to address these cleanups?

Mr. ROBERTS. Congressman, for today we focused on the sections that were under the NDAA only because we knew that was a current issue on the Hill. But we'd be more than happy to followup with your office to understand more and have a discussion on that. We'd be more than happy to have that discussion.

Mr. ROUDA. Mr. Kirsch?

Mr. KIRSCH. Mr. Chairman, we're spending tremendous amounts of money to virtually eliminate the emissions of PFAS from all of our facilities, tremendous amounts of money. I guess I would also be inclined to work together with your office to understand better what this mechanism looked like.

Mr. ROUDA. I also note that your lobbying efforts have also increased by 123 percent. I assume that's in an effort to address this issue in a way that is most satisfactory to Chemours?

Mr. KIRSCH. I honestly don't know what the lobbying budget is for the company.

Mr. ROUDA. Ms. Rutherford?

Ms. RUTHERFORD. Yes, Chairman. We're very interested in being involved in additional testing and remediation discussions, and we'd be glad to work with your office to understand exactly that intent.

Mr. ROUDA. Well, I'd like to thank all of you for coming in today. I know there's been some tough questions. And I'm a little frustrated, because I do feel like there's a little bit of round robin here and an unwillingness to fully embrace the obligations that companies have to the trust of the American public when it comes to addressing matters of our health and our safety, yet I also see some potential light.

And I appreciate, Mr. Roberts, your commitment on behalf of DuPont to see some of these chemicals under PFAS be brought into the Superfund oversight.

And at this time, the chair would like to recognize Representative Wasserman Schultz for additional questions.

Ms. WASSERMAN SCHULTZ. Thank you, Mr. Chairman. I appreciate it. Referring back to PFAS being one of the biggest sources of contamination in the Department of Defense's use of PFAS containing firefighting foam, the Department has resisted cleaning up the contamination that it caused and argues that PFAS has not yet been designated a hazardous substance under the Superfund law. Making the Superfund designation would also free up EPA funding and other resources to help cleanup civilian sites critical to us addressing this remediation that you're referring to.

Even former EPA Administrator Scott Pruitt said a year and a half ago that EPA would designate some PFAS chemicals to be

52

hazardous substances under the Superfund law. But I know I don't have the confidence that EPA is going to propose a rule that takes that step, let alone finalize one.

So to the panel, and I would like a straight yes or no answer, do you agree that legacy PFAS chemicals like PFOA and PFOS should be designated as hazardous substances under the Superfund law?

Ms. Rutherford?

Ms. RUTHERFORD. Congresswoman, we do not believe that is the case. The EPA should make——

Ms. WASSERMAN SCHULTZ. So no? No?

Ms. RUTHERFORD. At this time, based on the science, we—we're not policymakers, ma'am. We cannot make that assessment for the United States.

Ms. WASSERMAN SCHULTZ. No. Yes or no?

Ms. RUTHERFORD. No.

Ms. WASSERMAN SCHULTZ. Okay. Thank you.

Mr. KIRSCH. I'm not the expert.

Ms. WASSERMAN SCHULTZ. I realize you're not the expert. Yes or no, do you believe that PFAS chemicals like PFOA and PFOS should be designated as hazardous substances under the Superfund law?

Mr. KIRSCH. I think the EPA has all the information they need, based on what I've heard.

Ms. WASSERMAN SCHULTZ. I'm not asking whether—that question. I'm asking you if your company's position is that it should be designated as a hazardous substance under the Superfund law.

Mr. KIRSCH. Congresswoman, I appreciate the line of questioning, but with all due respect, that's as much as I can answer.

Ms. WASSERMAN SCHULTZ. So you won't answer the question? You're refusing to answer what your company's position is——

Mr. KIRSCH. I think the EPA——

Ms. WASSERMAN SCHULTZ.—on whether or not——

Mr. KIRSCH. Sorry.—the EPA has all the information they need.

Ms. WASSERMAN SCHULTZ. You're refusing to answer the question. You will not answer yes or no on whether or not your company believes that these chemicals should be designated as hazardous substances under the Superfund law. You're refusing to answer the question. Is that correct?

Mr. KIRSCH. The answer would be no.

Ms. WASSERMAN SCHULTZ. You don't think so?

Mr. KIRSCH. I think the—again, the EPA has——

Ms. WASSERMAN SCHULTZ. You don't think that designation should be made?

Mr. KIRSCH. The EPA has all the information that they need.

Ms. WASSERMAN SCHULTZ. And so your answer is no. Is that what you're saying? No?

Mr. KIRSCH. I said the EPA has all the information they need to——

Ms. WASSERMAN SCHULTZ. So you're—are you refusing to answer or are you saying no?

Mr. KIRSCH. I think I did answer the question.

Ms. WASSERMAN SCHULTZ. No, you didn't. Yes or no to my question.

53

Mr. KIRSCH. Again, the EPA has——

Ms. WASSERMAN SCHULTZ. That's not yes or no. So essentially you're refusing to answer.

Mr. Roberts?

Mr. ROBERTS. Congresswoman, for PFOA and PFOS, our answer is yes.

Ms. WASSERMAN SCHULTZ. Okay. Thank you very much.

During the subcommittee's July hearing on PFAS and industrial contamination, Emily Donovan, who lives in a community plagued by water laced with several PFAS chemicals called on all PFAS chemicals to be designated as hazardous under the Superfund law. And I agree with Ms. Donovan.

Mr. Chairman, I'd like to enter into the record a letter that was signed by 162 House members asking the NDAA conference to regulate all PFAS chemicals.

And to the panel, if you want this subcommittee, this Congress, and the American public to believe that you are ready to take your obligation to clean up these chemicals seriously, this is your moment.

Do any of you agree—hopefully all of you agree—that all PFAS should be designated as hazardous under the Superfund law?

So far, I've gotten a no and a refusal to answer and a yes, so——

Mr. ROBERTS. Congresswoman, my yes was for PFOA and PFOS. The biopersistent long-chains, I do not agree that that's the right statement for the entire class of 6,000 chemicals.

Ms. WASSERMAN SCHULTZ. Okay.

Mr. ROBERTS. So my answer was very specific to PFOA and PFOS.

Ms. WASSERMAN SCHULTZ. To those two chemicals.

Mr. ROBERTS. Correct.

Ms. WASSERMAN SCHULTZ. Thank you.

To those of you that have disagreed or refused to answer, you are playing a part in this national emergency. You have sickened our first responders and our members of our military, and I don't know how you sleep at night.

Thank you. I yield back the balance of my time.

Mr. ROUDA. Thank you.

Without objection, all members will have five legislative days within which to submit additional written questions for the witnesses to the chair which will be forwarded to the witnesses for their response. I ask our witnesses to please respond as promptly as you are able.

This hearing is adjourned. Thank you.

[Whereupon, at 5:20 p.m., the subcommittee was adjourned.]

○

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE THE CHEMOURS COMPANY SECURITIES LITIGATION | C.A. NO. 1:19-CV-01911-CFC<br>Hon. Colm F. Connolly<br><br>**CLASS ACTION** |
| This Document Related To:<br><br>ALL ACTIONS. | |

## CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY TRIAL DEMAND

**PRICKETT JONES & ELLIOTT, P.A**

Bruce E. Jameson (Bar No. 2931)
Marcus E. Montejo (Bar No. 4890)
Stephen D. Dargitz (Bar No. 3619)
1310 King Street
Wilmington, Delaware 19801
Telephone: (302) 888-6500

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**

Maya S. Saxena
Joseph E. White, III
Lester R. Hooker
Dianne M. Pitre
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Telephone: (561) 394-3399

Steven B. Singer
Kyla Grant
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551

David R. Kaplan
Brandon Marsh
12750 High Bluff Drive, Suite 475
San Diego, California 92130
Telephone: (858) 997-0860

*Counsel for Lead Plaintiff New York State Teachers' Retirement System and Lead Counsel for the Class*

**April 3, 2020**



EXHIBIT

7

Kirsch

PENGAD 800-631-6989

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................1

II.  JURISDICTION AND VENUE .........................................................................8

III. PARTIES AND RELEVANT NON-PARTIES ................................................8

    A.   Lead Plaintiff ...........................................................................................8

    B.   Defendants................................................................................................9

        1.   Chemours .......................................................................................9

        2.   The Individual Defendants.........................................................10

    C.   Relevant Non-Parties.............................................................................13

IV.  OVERVIEW OF THE CHEMOURS FRAUD .............................................14

    A.   DuPont's Performance Chemicals Business, The Predecessor
        To Chemours, Had A Long History Of Discharging PFAS And
        Other Toxic Substances Into The Environment—And Covering
        It Up.......................................................................................................14

    B.   DuPont Spins Off Chemours By Assigning It Two-Thirds Of Its
        Environmental Liabilities—Causing Analysts To Question The
        Company's Solvency And Viability ......................................................18

    C.   In A Desperate Bid To Reassure The Market, Defendants
        Unveil A "Transformation Plan" To Strengthen The Company's
        Balance Sheet, While Insisting Its Inherited Liabilities Are
        Under Control.........................................................................................20

    D.   During The Class Period, Defendants Proclaimed Their
        Transformation Plan Had Worked—While Dramatically
        Downplaying The Company's Inherited Liabilities.............................23

    E.   According To Chemours' Extraordinary Sworn Pleading,
        DuPont Dumped "Massive Historical Liabilities" On Chemours
        Amounting To $2.5 Billion—Rendering It Insolvent.........................26

F. Chemours Admitted That Its Most Senior Executives Were Fully Aware That The Company Was Insolvent "On Day One"—And That Insolvency Persisted Throughout The Class Period ...................................................................................... 32

G. In Its Sworn Pleading, Chemours Admitted That Numerous Categories Of Inherited Liabilities Were Vastly Understated— By Chemours ............................................................................... 36

    1. PFOA Litigation ................................................................ 36

    2. New Jersey ........................................................................ 40

    3. North Carolina .................................................................. 46

    4. Benzene Litigation ............................................................ 54

    5. PFAS and GenX Litigation ............................................... 56

    6. Defendants Admitted To Understating Their Liabilities During The Class Period By Over $2.5 Billion ......................... 57

H. Lead Plaintiff's CWs Confirm That Defendants Massively Understated Chemours' Environmental Liabilities Both Prior To And During The Class Period ..................................................... 59

    1. Lead Plaintiff's CWs Confirmed That The Company Had A Routine Practice Of Deliberately Understating And Underestimating Environmental Liabilities ............................. 60

    2. The Former President Of Fluoroproducts At Chemours Gave A Presentation To The Individual Defendants And The Board Showing Remediation Would Cost $2 Billion ....... 66

V. THE TRUTH BEGINS TO EMERGE ..................................................... 70

A. Details Regarding The True Extent Of Chemours' Environmental Liabilities Come To Light At The Sohn Investment Conference ................................................................. 70

B. Chemours' Verified Complaint Reveals, For The First Time, That The Company Was Insolvent At The Time Of The Spin-Off And Faced $2.5 Billion In Environmental Liabilities ................. 72

C.      Defendants Belatedly Reveal The Full Effects Of Chemours' True Environmental Liabilities .............................................76

D.      Post-Class Period Events Confirm The Continuing Ramifications Of Defendants' Fraud ...................................................77

       1.      Analysts Question The Viability Of Chemours And Anticipate True Liabilities In The Hundreds Of Billions Of Dollars..................................................................78

       2.      Proceedings In Chemours' Litigation Against DuPont Further Evidence Defendants' Fraud.......................................78

       3.      Additional Litigations, Federal Legislation, And A Potential DOJ Criminal Investigation Of Chemours ................81

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................83

A.      False And Misleading Statements And Omissions During The Class Period....................................................................84

       1.      False Statements In 2017 .........................................................84

       2.      False Statements In 2018 .......................................................106

       3.      False Statements In 2019 .......................................................120

B.      Chemours' Financial Statements Violated GAAP ............................131

       1.      Requirements To Disclose Loss Contingencies ......................132

       2.      Requirements To Accrue For Loss Contingencies .................134

       3.      Specific Guidance Governing Litigation, Claims, And Assessments ..........................................................................137

       4.      Fundamental Accounting Concepts ........................................138

       5.      Defendants' GAAP Violations ...............................................139

VII.    LOSS CAUSATION .................................................................................148

VIII.   CLASS ACTION ALLEGATIONS.........................................................151

iv

IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-
      ON-THE-MARKET DOCTRINE ................................................................. 153

X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND THE
      BESPEAKS CAUTION DOCTRINE ........................................................... 155

XI.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ............ 156

XII.  PRAYER FOR RELIEF .............................................................................. 161

XIII. JURY DEMAND ........................................................................................ 162

## **GLOSSARY**

| ABBREVIATION | DEFINITION |
|---|---|
| ASC | FASB Accounting Standards Codification |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Chemours | The Chemours Company |
| Class Period | February 16, 2017 through August 1, 2019, inclusive |
| Company | The Chemours Company |
| COO | Chief Operating Officer |
| Corteva | Corteva, Inc. |
| CW | Confidential Witness |
| Defendants | The Chemours Company, Mark P. Vergnano, and Mark E. Newman |
| Deloitte | Deloitte Transactions and Business Analytics LLP |
| Dow | The Dow Chemical Company |
| DowDuPont | DowDuPont, Inc. |
| DuPont | E.I. du Pont de Nemours and Company |
| EBITDA | Earnings Before Income, Taxes, Depreciation and Amortization |
| EPA | U.S. Environmental Protection Agency |
| Exchange Act | Securities Exchange Act of 1934 |
| FASB | Financial Accounting Standards Board |
| FASCONs | Statements of Financial Accounting Concepts Promulgated by the Financial Accounting Standards Board |
| GAAP | Generally Accepted Accounting Principles |
| Individual Defendants | Mark P. Vergnano and Mark E. Newman |

vi

| ABBREVIATION | DEFINITION |
|---|---|
| ISRA | New Jersey's Industrial Site Recovery Act |
| Lead Plaintiff | New York State Teachers' Retirement System |
| NC DEQ | North Carolina Department of Environmental Quality |
| New York Teachers | New York State Teachers' Retirement System |
| Newman | Mark E. Newman, Chemours' SVP and COO |
| NJDEP | New Jersey Department of Environmental Protection |
| NYSE | New York Stock Exchange |
| Ohio MDL | Multi-District Litigation Filed in the Southern District of Ohio Against DuPont |
| PFAS | Perfluoroalkyl and Polyfluoroalkyl Substances |
| PFOA | Perfluorooctanoic Acid |
| Plaintiff | New York State Teachers' Retirement System |
| SEC | United States Securities and Exchange Commission |
| SOX Certifications | Certifications Pursuant to the Sarbanes-Oxley Act of 2002 |
| SVP | Senior Vice President |
| TSCA | Toxic Substances Control Act |
| Vergnano | Mark. P. Vergnano, Chemours' President and CEO |
| Verified Complaint | Complaint Filed by Chemours Against DuPont in Delaware Chancery Court on May 13, 2019, and amended on August 14, 2019 |

Court-appointed Lead Plaintiff New York State Teachers' Retirement System ("Lead Plaintiff" or "Plaintiff") brings this federal securities fraud class action seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of itself and all other persons and entities who purchased or otherwise acquired the publicly-traded common stock of The Chemours Company ("Chemours" or the "Company") between February 16, 2017 and August 1, 2019, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff alleges the following upon personal knowledge as to allegations specifically pertaining to Lead Plaintiff and, as to all other matters, upon the investigation of Lead Counsel, which included: (a) analysis of public filings with the United States Securities and Exchange Commission ("SEC") made by Chemours and by E.I. du Pont de Nemours and Company ("DuPont"); (b) interviews with former high-level employees of Chemours and DuPont; (c) analysis of conference calls, press releases, and other materials issued and disseminated by Chemours and by DuPont; (d) analyst reports concerning Chemours and DuPont; (e) congressional hearings and testimony from representatives of Chemours and DuPont and other witnesses concerning the facts alleged herein; and (f) other publicly available information regarding Chemours,

I

DuPont and the Individual Defendants, including pleadings and court filings in the following litigations, among others:

(a)   *The Chemours Co. v. DowDuPont Inc.*, No. 2019-0351 (Del. Ch.);

(b)   *In re: E.I. du Pont de Nemours and Co. C-8 Personal Injury Litig.*, No. 2:13-md-2433 (S.D. Ohio) (and related litigation);

(c)   *Carneys Point Tp. v. E.I. DuPont de Nemours and Co., et al.*, No. L-251-16 (N.J. Sup., Law Div.) (and related litigation);

(d)   *Cape Fear Pub. Util. Auth., et al. v. The Chemours Co. FC, et al.*, No. 7:17-cv-00195 (E.D.N.C.);

(e)   *N.J.-Am. Water Company, Inc. v. E.I. DuPont de Nemours & Co., et al.*, No. 1:18-cv-02767 (D.N.J.);

(f)   *N.J. Dep't of Envtl. Prot., et al. v. E.I. DuPont de Nemours and Co., et al.*, No. 1:19-cv-14766 (D.N.J.) (and related litigation);

(g)   *Brent Nix, et al. v. The Chemours Co. FC, LLC, et al.*, No. 7:17-cv-189 (E.D.N.C.) (and related litigation);

(h)   *In re Aqueous Film-Forming Foams Products Liab. Litig.*, No. 2:18-mn-02873 (D.S.C.) (and related litigation);

(i)   *Ohio v. The Chemours Co., et al.*, No. 18OT32 (Ohio Com. Pleas, Wash. Cty.);

(j)   *In re Hoosick Falls PFOA Cases*, No. 1:19-cv-00215 (N.D.N.Y.);

(k)   *New Hampshire v. The Chemours Co. LLC, et al.*, No. 216-2019-cv-445, (N.H. Super., Hillsborough Cty.); and

(l)   *Vermont v. 3M Co., et al.*, No. 546-6-19 Cncv (Vt. Super., Chitt. Cty.)

Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

II

## I.    **<u>INTRODUCTION</u>**[1]

1.      Chemours is a chemical manufacturer that was created in 2015 when DuPont spun off its "Performance Chemicals" division.  This securities fraud class action arises from a series of misrepresentations to investors by Chemours, its CEO Mark Vergnano, and its CFO Mark Newman that dramatically mischaracterized Chemours' true financial condition and vastly understated the Company's liabilities from decades of environmental pollution.  Remarkably, Defendants have now admitted the falsity of their statements in an extraordinary lawsuit filed by Chemours against DuPont, its former parent.  In Chemours' sworn pleading, Defendants admitted that these previously undisclosed liabilities were so massive that <u>they rendered Chemours insolvent as a matter of law</u> for its entire history as a standalone public Company—in Defendants' own words, Chemours was insolvent from "<u>day one</u>" following its spin-off from DuPont.

2.      DuPont's Performance Chemicals division, the predecessor to Chemours, had a long history of discharging perfluoroalkyl and polyfluoroalkyl substances ("PFAS")—durable chemical compounds found in numerous common household products—into groundwater drinking supplies near its chemical plants.  PFAS are highly toxic substances known as "forever chemicals" because they build up (or "bio-accumulate") in the blood of those who ingest contaminated

---

[1] All emphasis herein is added unless otherwise noted.

water or air. Although DuPont (and by extension, Chemours) had directly known about the significant harms of PFAS since at least the 1950s, the general public found out about them only recently, as a result of mounting litigation against DuPont that unearthed DuPont's own internal studies documenting links between PFAS exposure and serious health conditions, including deadly cancers.

3. In the face of these growing environmental liabilities, DuPont devised a plan to rid itself of them altogether: it would spin off the liabilities into a separate company that would become Chemours. Accordingly, following the July 1, 2015 spin-off, Chemours assumed two-thirds of DuPont's environmental liabilities and 90% of DuPont's pending environmental litigation by case volume. Due to the sheer volume of the liabilities it inherited, Chemours quickly began to experience significant headwinds, causing its stock price to collapse from a target price of $21 per share to just over $3 per share mere months after the spinoff—an 85% decline. Given the Company's inherited liabilities and potentially toxic assets, the market speculated after the spinoff that Chemours would soon be "no mores." In an attempt to refute this speculation, Defendants embarked on a campaign to falsely assure the market that these liabilities were limited and fully under control.

4. To that end, Defendants implemented what they termed a "Five-Point Transformation Plan," whose primary objective was to "transform" the Company's balance sheet because, as Defendant Vergnano later admitted, "investors were

worried if we were going to be solvent—were we going to make it through this or not." In addition, Defendants repeatedly misrepresented the risks that Chemours' inherited liabilities posed for the Company. Indeed, on the Company's very first earnings call, Defendant Newman assured investors that Chemours' executive leadership, consisting almost exclusively of long-time DuPont veterans, had been "monitoring these liabilities for many years," and that it was "<u>important</u>" for investors to know that those liabilities were "<u>well understood and well managed</u>." In their public filings, Defendants provided further reassurance by not only quantifying Chemours' environmental liabilities through accruals (a customary accounting practice that quantifies probable and estimable liabilities), but also disclosing that "potential liabilities may range up to" certain specified and regularly updated <u>maximum</u> amounts above the accruals.

5. Significantly, throughout the Class Period, Defendants took these reassurances even further. Beginning with the Company's 2016 Form 10-K filed on February 17, 2017 at the start of the Class Period—and in each of the Company's quarterly and annual reports filed after that—Chemours added language that it had never used before with respect to its disclosed maximum liability ranges, stating that there was only a "<u>remote</u>" chance that the Company's liabilities would exceed its accruals "up to" those specified maximum amounts. Defendants also celebrated the purported success of their "transformation plan,"

3

emphatically proclaiming that Chemours in "no way" had been "set up to fail," and repeatedly touting Chemours' "strong" and "de-risked" balance sheet that sparked a "turnaround" that was "nothing short of remarkable."

6.      Investors and securities analysts heavily relied on and credited Defendants' statements, including Chemours' purported maximum liability caps. Indeed, on the heels of these representations, analysts concluded that Chemours had "healed tremendously from its spin-out of DuPont," noting that the Company had "reduced its risk portfolio" and "reduced litigation risk" because its "balance sheet [and] liabilities [were] cleaned up."  Fueled by Defendants' assurances, the Company's stock price soared, peaking at over $58 per share on October 24, 2017.

7.      However, Defendants have now admitted in their own sworn pleading that all of these statements were patently <u>false</u>.  In a complaint signed and verified by Defendant Newman, and originally filed under seal in Delaware Chancery Court on May 13, 2019 (the "Verified Complaint"),[2] Chemours asserted that prior to the spinoff, DuPont engaged in a "sham" process of deliberately certifying "systematically and spectacularly wrong" maximum estimates for each of Chemours' inherited liabilities in order to claim that it was complying with Delaware law, which required that spun off companies be viable and solvent. However, in reality, and in Chemours' own words, the previously undisclosed

---

[2] Defendants reiterated their admissions in the Amended Verified Complaint (August 14, 2019).

4

liabilities were so "huge," "radical and extraordinary," and "staggering"—and, rather than "remote," virtually inevitable—that Chemours admitted "in no uncertain terms" that, "as of the date of the spin, Chemours was insolvent" in violation of Delaware law.

8.    The contrast between Defendants' Class Period assurances of limited financial exposure, and the Verified Complaint's revelations of liabilities so massive that they rendered Chemours "insolvent," could not be starker.  Indeed, as Chemours' own former parent succinctly stated, "Chemours has been telling a strikingly different story to the SEC and the investing public [in which] Chemours regularly promotes itself as a spin-off success."  Significantly, the Verified Complaint identified approximately $2.5 billion in imminent environmental liabilities—a staggering amount that was nearly eight times Chemours' $313 million in Class Period accruals; dwarfed the maximum liability amounts that Defendants asserted were only "remotely" possible, which averaged less than $500 million; and greatly exceeded its available cash of $700 million, net assets of $816 million, and even its market capitalization of $2.4 billion at the end of the Class Period.  Even worse, Chemours' actual exposure could be multiples greater, as Chemours' own counsel has admitted that the $2.5 billion figure was "nowhere near the maximum," and respected financial analysts have opined that Chemours' ultimate financial exposure could reach as high as $5.5 to $6 billion.

9.      There can be no doubt that Defendants—who, along with other Chemours' senior executives, had over 120 years of combined experience at DuPont, and who were the same individuals who directly operated the sites inherited from DuPont—at all times were fully aware of the Company's overwhelming and undisclosed liabilities.  By Defendants' own admission, they knew from Chemours' inception that DuPont's estimated maximums for the inherited liabilities were "baseless concoction[s]," and that, in truth, these liabilities were so massive that they rendered Chemours legally "insolvent."  These inherited liabilities were so crippling that, immediately prior to the spinoff, Defendant Newman sent an email to DuPont management pleading for an additional $300 million in reserves just "to function on day one."  DuPont not only rejected Newman's plea, but it "castigated him" for making his demand in writing.

10.     In addition, highly placed former employees of DuPont and Chemours—including some of the most senior officers of the Company—further confirmed Defendants' direct knowledge of and participation in the fraud.  Former employees who worked directly with Defendants unequivocally confirmed that "Chemours leadership knew exactly the extent of the liabilities they were taking over" and that Defendants were personally confronted during the Class Period with a detailed account calculating the need for billions in environmental remediation costs.  Despite these facts, from the time of the spinoff and throughout the Class

Period, Defendants did <u>nothing</u> to properly account for Chemours' staggering liabilities.

11. Defendants' fraud was exposed in a series of disclosures that gradually revealed Defendants' fraud and Chemours' true financial condition. In early May 2019, a prominent analyst presented research showing that Chemours' true liabilities were substantially greater than what it had disclosed, triggering a 15% drop in Chemours' stock price. Chemours vehemently denied that was the case and asserted that it was adequately reserved for any potential liabilities.

12. However, contemporaneous with those denials, Chemours filed its lawsuit against DuPont under seal in which it admitted that its liabilities were so large that they rendered the Company insolvent. When the lawsuit was unsealed in late June, Chemours' stock price plunged another 15%, and stunned analysts reported that Chemours had now "quantified potential high-end liabilities of approximately $2.5 billion" that were "<u>materially higher than expected</u>."

13. Finally, on August 1, 2019, Chemours reported a significant and unexpected increase in PFAS litigation coupled with a substantial reduction in free cash flow guidance, and the stock fell another 19% to close at $14.69 per share on August 2, 2019. All told, these disclosures wiped out $2 billion in market capitalization, and have caused massive losses to investors who purchased Chemours common stock at artificially inflated prices during the Class Period.

7

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

16.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and Section 27 of the Exchange Act, 15 U.S.C. §78aa.    Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District, as Chemours is headquartered in this District at 1007 Market Street, Wilmington, Delaware 19899.

17.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES AND RELEVANT NON-PARTIES

### A.    Lead Plaintiff

18.    Lead Plaintiff New York State Teachers' Retirement System ("Lead Plaintiff" or "New York Teachers") is a public retirement system that provides

8

retirement, disability and death benefits to eligible New York State public school teachers and administrators outside New York City. New York Teachers is one of the ten largest public retirement systems in the nation based on portfolio size, serving more than 432,000 active members, retirees and beneficiaries. New York Teachers was established in 1921 by the New York State Legislature and has assets under management of approximately $122.5 billion as of fiscal year ended June 30, 2019. As set forth in its certification, New York Teachers purchased Chemours common stock during the Class Period and suffered damages as a result of the conduct complained of herein. *See* D.I. 15-1. On January 8, 2020, this Court appointed New York Teachers as Lead Plaintiff for this litigation. *See* D.I. 20.

## B.    Defendants

### 1.    Chemours

19.    Defendant Chemours is a Delaware corporation headquartered in Wilmington, Delaware. Chemours produces a wide range of industrial and specialty chemicals products for markets, including plastics and coatings, refrigeration and air conditioning, general industrial, electronics, mining, and oil refining. Chemours operated as the Performance Chemicals business of DuPont until July 2015, when it was spun-out as an independent public company. At all relevant times alleged herein, Chemours traded on the New York Stock Exchange ("NYSE") under the stock symbol "CC."

9

## 2.    The Individual Defendants

20.    Defendant Mark P. Vergnano ("Vergnano") is Chemours' President and CEO. Vergnano has been the Company's President and CEO since Chemours' inception in July 2015. Vergnano began his career at DuPont in 1980 and served in various leadership capacities, culminating in his appointment as DuPont's Executive Vice President of Performance Chemicals in October 2009, a position he held until the spinoff of Chemours in July 2015. Vergnano is a member of the board of directors of Johnson Controls International, a company also embroiled in PFAS contamination issues.

21.    During the Class Period, Defendant Vergnano made materially false and misleading statements and omissions during earnings calls, investor conferences, public speeches, and televised interviews, including on February 16, 2017, March 27, 2017, May 2, 2017, August 3, 2017, November 3, 2017, December 1, 2017, February 15, 2018, May 4, 2018, January 7, 2019, and February 15, 2019. Defendant Vergnano also reviewed, approved, signed and certified Chemours' quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on February 17, 2017, May 3, 2017, August 3, 2017, November 3, 2017, February 16, 2018, May 4, 2018, August 3, 2018, November 2, 2018, February 15, 2019, and May 3, 2019, which contained materially false and misleading statements and omissions.

10

22.     Defendant Mark E. Newman ("Newman") is Chemours' Senior Vice President ("SVP") and Chief Operating Officer as of June 2019, before which Newman served as SVP and Chief Financial Officer starting in 2014 when he joined the Company.

23.     During the Class Period, Defendant Newman made materially false and misleading statements and omissions during earnings calls and investor conferences, including on February 16, 2017, May 2, 2017, August 3, 2017, November 3, 2017, December 1, 2017, February 15, 2018, May 4, 2018, August 3, 2018, November 2, 2018, February 15, 2019, and May 3, 2019.   Defendant Newman also reviewed, approved, signed and certified Chemours' quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on February 17, 2017, May 3, 2017, August 3, 2017, November 3, 2017, February 16, 2018, May 4, 2018, August 3, 2018, November 2, 2018, February 15, 2019, and May 3, 2019, which contained materially false and misleading statements and omissions.

24.     Defendants Vergnano and Newman are collectively referred to as the "Individual Defendants."

25.     Chemours and the Individual Defendants are collectively referred to as the "Defendants."

26.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Chemours, were privy to confidential,

11

proprietary and material adverse non-public information concerning Chemours, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

27. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Chemours' business.

28. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the

Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

29. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Chemours' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Chemours' common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## C.    Relevant Non-Parties

30. DuPont, the former parent company of Chemours, is a Delaware corporation and a wholly owned subsidiary of Corteva, Inc. ("Corteva"). Founded

13

in 1802, DuPont was a publicly traded company that operated businesses including agriculture, industrial biosciences, and performance materials. During the 20th century, DuPont developed numerous polymers, including Teflon. On August 31, 2017, DuPont merged with The Dow Chemical Company ("Dow") to form DowDuPont Inc. ("DowDuPont"), the biggest chemical conglomerate in the world. In April 2019, DowDuPont was broken up into three companies: (1) Dow Inc., which focuses on commodity chemical production; (2) DuPont de Nemours, Inc., which focuses on specialty chemical production; and (3) Corteva, which focuses on agriculture.

## IV.   **OVERVIEW OF THE CHEMOURS FRAUD**

### A.   **DuPont's Performance Chemicals Business, The Predecessor To Chemours, Had A Long History Of Discharging PFAS And Other Toxic Substances Into The Environment—And Covering It Up**

31.   Chemours produces a wide range of industrial and specialty chemicals. The Company is organized into three segments: Fluoroproducts, Chemical Solutions, and Titanium Technologies. Of these three segments, Fluoroproducts, which manufactures PFAS, is by far the most significant, accounting for approximately 50% of the Company's profits and revenues.

32.   By the time of the Company's spin-off from DuPont in 2015, Chemours—through its predecessor business, the former Performance Chemicals division of DuPont—had been manufacturing PFAS for over 80 years. PFAS are

14

man-made compounds that provide extreme chemical durability, causing them to be used in hundreds of common household products, including non-stick cookware such as Teflon, water repellants such as Scotchgard, and coated papers for fast food. However, the same chemical properties that make PFAS so durable also cause them to not break down in the environment—such that they have been deemed "forever chemicals." Moreover, PFAS "bio-accumulate," or build up, in the blood stream of people who ingest contaminated drinking water or breathe contaminated air—leading to a host of serious adverse health consequences, including deadly cancers.

33.     While the harms of PFAS were not known to the general public until recently—indeed, only this past fall did Congress assign a subcommittee to consider legislation to regulate these highly dangerous chemicals—internal DuPont documents show that they were known to DuPont and Chemours for decades. As Robert Bilott—author of the book *Exposure*, which recounts Bilott's role as the lawyer representing numerous individuals in West Virginia and Ohio who were harmed by PFAS discharged by DuPont (recently adapted into the movie *Dark Waters*)—stated during the recent September 10, 2019 Congressional hearing by the House Subcommittee on the Environment on the issue:

> The public may only now be realizing the scope of this problem, but the companies that manufactured these chemicals [*i.e.*, Chemours and DuPont] have been aware of the risks for decades but failed to alert the rest of us. I know because I spent the last 20 years of my career in

15

litigation with these companies, <u>pulling out of their own internal files what was already there and was already known about the risk of these chemicals</u>.

34.    Indeed, the "internal files" Bilott referenced, which were considered by the House Subcommittee, unequivocally showed that DuPont itself had conducted extensive internal research over the course of decades into the harmful health effects of PFAS, and in particular perfluorooctanoic acid ("PFOA"), which is among the most prevalent PFAS.

35.    For example, in the 1950s, DuPont's own scientists began documenting the health effects of PFAS. By the 1960s and 1970s, DuPont had compiled data in its files from animal studies showing toxic effects on multiple species: rats, dogs, rabbits, monkeys, and multiple types of organ systems. By the 1970s, DuPont officials knew that PFAS was building up in the blood of humans and staying there for extended periods of time. By the 1980s, DuPont became concerned about liver damage and birth defects among its own PFAS-exposed workers, causing it to remove all female employees from Teflon-related jobs, and conducted internal studies on animals that caused it to label PFOA as a possible human carcinogen. In the 1990s, DuPont conducted a two-year rat study confirming that PFOA exposure could cause testicular, liver and pancreatic tumors in rats, which a DuPont scientific paper concluded posed the same risk for humans.

16

36.     As the decades passed, DuPont's Performance Chemical division's discharges of PFAS into the environment began to spark PFAS-related litigation that led to comprehensive scientific studies directly linking PFAS exposure to significant and deadly heath issues.  For instance, in 2005, as part of a settlement concerning DuPont's alleged PFOA contamination from its Washington Works site in Parkersburg, West Virginia—one of the litigations spearheaded by Bilott—DuPont agreed to fund a "medical monitoring" health project aimed at determining the medical harms experienced by the exposed local population.  As part of the settlement, a panel of experts selected or approved by DuPont was established to study the effects of PFOA exposure by examining the blood of approximately 70,000 residents.  The "Science Panel" completed its analysis in 2012 and concluded that there were "probable links" between PFOA exposure and six serious diseases:  high cholesterol, ulcerative colitis, pregnancy-induced hypertension, thyroid disease, testicular cancer and kidney cancer.  This led to 3,500 individuals coming forward as having been diagnosed with one of the six diseases due to PFOA exposure from Washington Works, resulting in a multi-district litigation filed in the Southern District of Ohio against DuPont (which was inherited by Chemours upon the spinoff, the "Ohio MDL").

37.     As a result of DuPont's extensive internal knowledge of the adverse health consequences of PFOA exposure, DuPont attempted to shift to a different

17

type of PFAS called "GenX" that was purportedly less toxic. In 2009, DuPont filed the required Toxic Substances Control Act ("TSCA") notices with the U.S. Environmental Protection Agency ("EPA") for two types of GenX compounds. However, when the EPA reviewed the data, it voiced concerns that, just like the previously produced PFAS, GenX would "persist in the environment" and "could bio-accumulate, and be toxic . . . to people, wild animals, and birds." The EPA therefore issued a consent order (the "Consent Order," later inherited by Chemours) requiring DuPont to recover, destroy or recycle GenX at a 99% rate from all effluent process streams and air emissions.

38. Recognizing the magnitude of its costly and mounting exposure to PFAS-related litigation and environmental remediation expenses, DuPont embarked on a plan to restructure the company to rid itself of the Performance Chemicals unit and its associated liabilities altogether—a plan that would result in the formation of Chemours as an independently traded company.

**B. DuPont Spins Off Chemours By Assigning It Two-Thirds Of Its Environmental Liabilities—Causing Analysts To Question The Company's Solvency And Viability**

39. In 2013, DuPont launched "Project Beta," an initiative aimed at off-loading DuPont's Performance Chemicals business and its substantial associated environmental liabilities. However, DuPont quickly realized that the magnitude of these environmental liabilities meant that an outright sale of the Performance

18

Chemicals division was not financially feasible—no rational buyer would assume such bottomless uncapped liabilities without a commensurate discount that would defeat the purpose of the transaction altogether. Accordingly, DuPont devised an alternative transaction: a divestment of its Performance Chemicals division through a spin-off that would become Chemours.

40. On June 5, 2015, DuPont announced that its Board of Directors had approved the spinoff of Chemours, which took effect on July 1, 2015. The Separation Agreement governing the spin-off, which Chemours publicly filed in a Form 8-K the same day, granted Chemours less than 20% of DuPont's business lines while requiring it to assume numerous significant liabilities, including: (i) $4 billion in debt, with Chemours being required to use the proceeds of that debt to authorize a $3.91 billion dividend back to DuPont; (ii) 90% of DuPont's pending litigation by volume of cases, including growing PFOA-related litigation across the country; (iii) 67% of DuPont's environmental liabilities covering over 80 sites; and (iv) liabilities that had nothing to do with Chemours' business, such as benzene liability DuPont had failed to rid itself of in connection with the sale of its Performance Coatings business to Carlyle (because Carlyle would not agree to assume that liability). Moreover, the Separation Agreement required Chemours to defend and indemnify DuPont against any liability "relating to, arising out of, by reason of or otherwise in connection with" the liabilities that DuPont had assigned

19

to Chemours without limitation, and provided that Chemours could not seek any recourse from DuPont with respect to any of those liabilities.

41.    As soon as the spinoff went into effect on July 1, 2015, the Company faced significant headwinds.  Shortly after the transaction closed, Chemours announced that it was cutting its future dividends to almost zero.  Even with this measure implemented, Chemours faced a liquidity crisis that forced the Company to, among other things, lay off 1,000 employees, close plants, sell business lines, and effectuate two corporate restructurings, all of which negatively impacted the Company's stock price.  In fact, while DuPont pegged Chemours' stock price at $21 per share at the time of the spin-off, within a month, the Company's share price collapsed to $11.40 per share, and within seven months, it was down to $3.06 per share—an 85% decline.

**C.    In A Desperate Bid To Reassure The Market, Defendants Unveil A "Transformation Plan" To Strengthen The Company's Balance Sheet, While Insisting Its Inherited Liabilities Are Under Control**

42.    Faced with mounting market concerns about the Company's viability, Defendants recognized that it was absolutely critical to reassure investors that the Company was solvent and could survive the spinoff, and that its inherited liabilities were limited and under control.

43.    Defendants therefore unveiled what they deemed their "Five Point Transformation Plan" for Chemours, which Defendants stated was primarily designed to "transform" the Company's distressed balance sheet.  Defendant

20

Vergnano told investors that the "key financial outcome of our transformation plan" was a strengthened, solid balance sheet, which would be evidenced by a significant reduction in the Company's "net leverage ratio," a critical financial measure of a company's financial health showing how many years it would take for the Company to pay back its debts (calculated by dividing net debt by adjusted EBITDA).    At the time of the spinoff, Chemours' "net leverage ratio" was extremely high, over 6x debt-to-EBITDA—but Defendants promised that, as a result of the "Five Point Transformation Plan," the Company would "<u>reduc[e] []</u> <u>our net leverage to approximately 3x debt-to-EBTIDA</u>," *i.e.*, cut it in half. Vergnano stated that Chemours expected to meet this key target by 2017.

44.    Significantly, however, Defendants could not reduce the Company's net leverage ratio if its environmental liabilities massively outweighed its net assets.  Indeed, the large accruals required for such liabilities would dramatically reduce the Company's earnings and therefore its adjusted EBITDA (the denominator in the net leverage calculation), thereby <u>increasing</u> Chemours' net leverage ratio substantially.  Thus, in truth, and unbeknownst to investors, the only way Defendants could purport to reduce Chemours' net leverage ratio was by deliberately and vastly understating the Company's true liabilities.

45.    On May 18, 2016, Defendant Vergnano emphasized in an interview with *Fortune* magazine that the Company's "Five Point Transformation Plan," and

21

its stated goal of "de-levering" the Company, was a direct response to significant market concerns about Chemours' solvency upon the spinoff:

> You had this high dividend put on us as well as all this debt [at the time of the spinoff] . . . <u>So I think investors were worried if we were going to be solvent—were we going to make it through this or not</u>? We immediately went out to explain our transformation plan to investors . . . So right from the start <u>we put together what we called our 'Five-Point Transformation Plan,' which was all about getting the company de-levered as quickly as possible.</u>

46. In addition to the Five Point Transformation Plan, Defendants took pains to strongly and specifically reassure investors that their inherited environmental liabilities were under control and would not turn out to be larger than expected. For example, on the Company's first earnings call on August 6, 2015, Defendant Newman assured investors that Chemours' liabilities were "well understood" and "well managed"—and that Chemours' own executive team, which consisted of longtime DuPont veterans who formerly ran the Performance Chemicals business (including Defendant Vergnano), had been personally monitoring the Company's inherited environmental liabilities for a "long time":

> <u>Our environmental liabilities are well understood and well managed</u> . . . It is important to understand that these [liabilities] are well understood, and <u>the current team has been monitoring these liabilities for many years.</u>

47. Knowing that the amount of Chemours' environmental liabilities was absolutely critical to investors, following the spinoff, Defendants also took the unusual step of reassuring investors that the Company's inherited liabilities were

22

under control by disclosing precise potential maximum ranges of losses that could occur in excess of the amounts Chemours had accrued. In recognition of how heavily investors would rely on this information, Defendant Vergnano specifically assured investors of the reliability of these maximum ranges—and of the exceedingly low probability they would ever occur—just after the spinoff.

48. For example, in the Company's Form 10-Q for the second quarter ended June 30, 2015, filed on August 6, 2015 (a month after the spinoff), Chemours accrued $302 million for environmental remediation and stated that "the potential liability may range up to approximately $650 [million] above the amount accrued." During the Company's earnings call the same day, analysts directly asked Defendant Vergnano "what's the probability your crude environmental liability increases by your stated [maximum] risk of $650 million?" In response, Vergnano asserted that the probability was very low because the liabilities were "very well characterized, very well documented sites" and "we don't see anything that's going to be a surprise."

**D.    During The Class Period, Defendants Proclaimed Their Transformation Plan Had Worked—While Dramatically Downplaying The Company's Inherited Liabilities**

49. During the Class Period, which began in February 2017, Defendants triumphantly proclaimed that their Five Point Transformation Plan had "worked," such that Chemours' initial struggles as an independent company were completely

23

behind it—and that any possibility of its inherited liabilities being larger than expected was now "deemed remote."

50. First, at the outset of the Class Period, Defendants proclaimed that their "Five Point Transformation Plan" had successfully turned the Company around from the brink of insolvency. Specifically, during the Company's May 2, 2017 first quarter earnings call, Defendant Vergnano announced that "we've achieved our target net leverage [ratio] of at or below 3x, a key commitment we made in announcing the transformation plan in August of 2015." Defendants then repeatedly touted to investors that, as a result of reaching this milestone, the Company had successfully achieved a "strong balance sheet" and an "improvement in our credit profile" that was so significant it was "recognized in [a] ratings upgrade from Moody's."

51. Then, on a December 1, 2017 Investor Day call, Defendant Vergnano proudly proclaimed that the "transformation plan powered tremendous financial improvement in both our earnings and on our balance sheet," and as a result, the Company could "officially declare that our plan is complete and Chemours has been transformed." Defendants steadfastly maintained this successful "transformation" story throughout the Class Period, trumpeting Chemours' "solid," "strong" and "de-risked" balance sheet every quarter. Indeed, as late as January 7, 2019—a mere four months before Chemours would file the Verified Complaint

revealing the true magnitude of its liabilities and its resulting insolvency—Vergnano publicly asserted that in "no way" had Chemours been "set up to fail," and that it had proved the market wrong by successfully completing a "turnaround" that was "nothing short of remarkable."

52.     Second, in line with this narrative, Defendants routinely and dramatically downplayed the significance of the liabilities Chemours had inherited from DuPont during the Class Period, even more so than they had previously.  For example, beginning with the Company's 2016 Form 10-K, filed on February 17, 2017—the start of the Class  Period—Defendants added language, for the first time, that the stated maximum range of liabilities that could occur in excess of the amounts accrued was "deemed remote" by the Company.  Moreover, throughout the Class Period, Defendants disclosed "remote" maximum liabilities that were highly limited in nature, ranging from only $450 million to $535 million.

53.     Analysts responded very favorably to Defendants' assurances of the Company's successful transformation and limited liabilities.  For example, a November 6, 2017 Barclays report commented that "Chemours has healed tremendously from its spin-out of DuPont in 2015 when some questioned it as a going concern."  A December 4, 2017 UBS report similarly stated that Chemours had a "[s]olid victory lap after recovering from initially challenging spin-off from DuPont."  A November 29, 2018 Barclays report commented that Chemours had

25

come out of what "truly was a dark period" with "the balance sheet + liabilities cleaned up," and expressed a positive view of the stock "because the story has seen so much risk mitigated," including a net leverage reduction from "6x leverage [to] [] 1.5x today[]." Finally, an April 15, 2019 SunTrust report noted that the Company had a "favorable cash generation profile and balance sheet."

54. Fueled by Defendants' positive representations of the Company's "remarkable" transformation, its "strong balance sheet," and its limited liabilities, Chemours' stock price soared from $31.94 at the beginning of the Class Period to a Class Period high of over $58 on October 24, 2017—an increase of 82%.

55. However, as Defendants would ultimately be forced to admit, Chemours had not "transformed" itself from being on the brink of its insolvency, nor were its liabilities anywhere near "well managed" at the time of the spinoff or at any point after that. Rather, in reality, and unbeknownst to investors, Chemours had assumed massive liabilities that Defendants knew were vastly understated—to the point that, in truth, they had rendered the Company insolvent from "day one."

**E. According To Chemours' Extraordinary Sworn Pleading, DuPont Dumped "Massive Historical Liabilities" On Chemours Amounting To $2.5 Billion—Rendering It Insolvent**

56. According to Chemours' own sworn pleading against DuPont, filed on May 13, 2019 in the Delaware Court of Chancery, rather than the Company successfully being "transformed" or its inherited environmental liabilities being

26

limited and under control from the time of the spinoff, <u>the exact opposite was true</u>. In reality, DuPont had saddled Chemours with liabilities that were so massive—<u>amounting to at least $2.5 billion in the aggregate, based on Chemours' own conservative estimate</u>—that they rendered Chemours, according to its own pleading, "insolvent" from the time of the spinoff in violation of Delaware law.

57.    Indeed, in order to lawfully complete the spinoff under Delaware law, DuPont had to establish that Chemours would be solvent and viable as an independent company at the time of its inception.  Accordingly, the Separation Agreement between the two companies conditioned the spin-off on "the receipt of an opinion from an independent appraisal firm to [DuPont's] Board confirming the solvency of each of DuPont and Chemours" upon the spin-off.

58.    However, as Chemours' counsel unequivocally confirmed in the recent December 18, 2019 hearing on DuPont's motion to dismiss Chemours' lawsuit, in truth, and "<u>in no uncertain terms</u>," "<u>as of the date of the spin[off], Chemours was insolvent</u>."  Chemours made clear that DuPont had falsely certified that Chemours was solvent by providing "maximum" estimates of the transferred liabilities that were, in Chemours' own words, "undertaken in a way that can <u>only</u> lead to an inference of <u>bad faith</u>" and "<u>systematically and spectacularly</u>" <u>understated by billions of dollars</u>—such that <u>the "entire spinoff process was a sham</u>."  As Chemours' counsel stated at the December 18, 2019 hearing:

27

[W]e have alleged that the liability maximums were undertaken [by DuPont] to satisfy Delaware law; that <u>they were undertaken in a way that can only lead to an inference of bad faith</u>, because they were just <u>manifestly evidently designed to undercount the liability hugely</u>; and that <u>they did, in fact, undercount the liability hugely</u>, as has been demonstrated; and that, <u>in consequence, the Company was not solvent at the time it was spun</u>.

59.     Indeed, Chemours affirmatively represented that because DuPont was highly incentivized "to downplay or close its eyes to the true 'maximum' liabilities at the time of the spinoff," DuPont did not conduct the analysis of the liabilities it was transferring to Chemours in good faith—instead, it deliberately "<u>engineered a vastly understated valuation of the liabilities it would impose on Chemours</u> to try to square the spinoff with Delaware law."

60.     Chemours described in detail how DuPont created a "sham" process for assessing the outsized liabilities. Specifically, while DuPont engaged investment bank Houlihan Lokey to prepare a purportedly independent financial analysis of Chemours' solvency as of the spinoff date, "DuPont arranged for Houlihan Lokey to predicate its analysis" solely on DuPont's own "High End (Maximum) Realistic Exposure" numbers that had been calculated by DuPont itself. Moreover, DuPont's management did not conduct a reasonable inquiry into any of the transferred liabilities to calculate these "maximums." To the contrary, "DuPont engineered the 'High End (Maximum) Realistic Exposure' figures in a way that would <u>massively understate the real potential maximum exposure</u>."

28

61.     For example, with respect to environmental remediation liabilities, Chemours stated that DuPont essentially "cut-and-pasted" the figures it had used to prepare its accounting reserves, even though this approach "<u>obviously and necessarily understated the actual maximum liabilities</u>."  Chemours asserted that this understatement was "obvious" because DuPont's accounting reserves included only liabilities that were viewed as "probable <u>and</u> estimable" as of December 31, 2014, which automatically excluded "two critical components of any realistic assessment of true maximum liabilities":  (i) liabilities deemed *possible*, but not *probable*, "no matter how vast, imminent or possible the potential liability was, and even where DuPont <u>knew</u> that higher clean-up costs were possible"; and (ii) "liabilities that <u>*were*</u> <u>regarded as probable at the time</u>, but for which DuPont had not yet made an estimate."  Accordingly, DuPont's liability "maximums" were "obviously" understated because, "by definition," they "<u>excluded consideration of risks that clearly existed</u>."

62.     Significantly, Chemours was fully apprised and aware of DuPont's scheme.  Indeed, in May 2015, DuPont presented these "maximums" to Chemours' CFO, Defendant Newman, who was required to certify their accuracy before they were passed on to Houlihan Lokey.  However, Chemours stated that Newman was so dubious of DuPont's sham "maximums" that he "refused to sign the certification[s]" unless they "expressly recited . . . [that] the liability numbers

29

relied upon by [Newman] were those vouched for by DuPont itself—nothing more."

63.    Chemours stated that DuPont adopted similar tactics to understate the "maximum" exposure estimates for other categories of liabilities as well.  For example, with respect to multiple categories of litigation that would be transferred to Chemours, DuPont purportedly relied on an analysis conducted by Deloitte Transactions and Business Analytics LLP ("Deloitte").  However, Chemours knew that Deloitte's analysis was deeply flawed for a number of reasons, to the point that any liability "maximums" derived from this analysis were wholly inaccurate.

64.    Indeed, Chemours knew that Deloitte's analysis specifically stated that it did not present worst-case scenarios, and therefore could not be interpreted as actual "maximums."  Furthermore, regarding PFOA litigation, Chemours knew that Deloitte did not actually evaluate, assess or examine DuPont's PFOA cases in any meaningful way.  Instead, Deloitte robotically applied the universal success rate for all tort cases generally, assigning DuPont the same chance of victory as all other defendants in the jurisdictions where the cases were pending.  From these rates, Deloitte mechanically surmised that 20% of the cases would go away for nothing, DuPont would win 68% of the trials, and the remaining cases could be settled inexpensively.  However, as discussed below, in reality, DuPont lost every trial in connection with the Ohio MDL—such that the settlement of just 3,500 out

of 70,000 potential cases cost $671 million. For other liabilities, including PFAS, benzene and general litigation, Deloitte similarly merely assumed historical "run rates" without any analysis of the specific liabilities to determine if the assumptions were valid.

65.     Thus, as Chemours' counsel repeatedly emphasized at the December 18, 2019 hearing, DuPont's "maximum" estimates of Chemours' inherited legacy liabilities were "spectacularly wrong," and "not by a little bit." Rather, by "many hundreds of millions of dollars. And we're just four years out. … This isn't normal course, Your Honor. This is exceptional. It's outrageous. I think it's unprecedented." Chemours' counsel added that "all of this evidence here … all of it is well-pleaded. All of it is based on clear evidence, and all will be proved."

66.     All told, Chemours explicitly admitted that its total understated liabilities amounted to a staggering $2.46 billion—over three times the Company's available cash of $700 million and net assets of $816 million, twice the Company's annual net income during the Class Period of approximately $1 billion, and materially exceeding the Company's market capitalization at the end of the Class Period of approximately $2.4 billion.

31

**F.     Chemours Admitted That Its Most Senior Executives Were Fully Aware That The Company Was Insolvent "On Day One"—And That Insolvency Persisted Throughout The Class Period**

67.     In Chemours' sworn pleading, Defendants admitted that they knew the liabilities Chemours inherited from DuPont were so massive that—in Defendants' own words—they rendered Chemours legally insolvent "<u>on day one</u>."

68.     For instance, Chemours described how the Company's CFO, Defendant Newman, sent an eleventh-hour email to DuPont's senior management that stressed that Chemours was drastically under-reserved and begged for additional funds to keep the Company operational on its first day of existence. Specifically, Chemours stated that, "leading up to a subsequent meeting with DuPont's senior management in June 2015"—only a month before the spinoff would take effect—"Chemours' CFO, [Defendant] Newman, sent an email [to DuPont] <u>pleading that he needed an additional $200-300 million in cash reserves to function on day one</u>."   The $300 million that Newman insisted the Company needed just to function was an extraordinarily material amount, as it constituted almost 100% of the Company's beginning environmental accruals of $316 million. Significantly, however, DuPont refused to increase the Company's reserves at all, and indeed, excoriated Newman for putting his plea in writing.  As the Verified Complaint made clear, DuPont "castigated him [Newman]" for putting the request in an email in an effort to keep Chemours' dire financial status under wraps—an effort Chemours was itself complicit in, and would itself continue, for years.

32

69. The very same liabilities which rendered Chemours insolvent from its inception did not improve prior to or during the Class Period. Indeed, these issues existed throughout Chemours' entire history as a public company. As Chemours' counsel explained during the December 18, 2019 hearing before the Delaware Chancery Court, unbeknownst to investors, Chemours not only privately raised the issue of DuPont's massively understated liabilities and the Company's resulting insolvency to DuPont at the time of the spinoff—it had been doing so for the entirety of the four years since. Specifically, Chemours' counsel stated, in response to the question of why Chemours had not filed suit against DuPont four years ago: "Chemours has been objecting to the interpretation of these estimated liability maximums [by DuPont] for four years."

70. Indeed, a forensic analysis of Chemours' financial statements shows that its massive undisclosed liabilities not only rendered Chemours insolvent at the time of the spinoff, but in each quarter prior to and throughout the Class Period. As shown by the chart below, the Company's undisclosed liabilities of $2.46 billion—which was a highly conservative estimate, as shown by multiple analysts' detailed estimates at the end of the Class Period quantifying the potential liability as high as $6 billion—far outweighed its net assets (reported assets less reported liabilities, or "balance sheet insolvency") by approximately $1.8 to over $2 billion for the period leading up to the Class Period.

| Pre-Class Period | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|---|---|
| Reported Assets | $6,685 | $6,451 | $6,298 | $6,380 | $6,221 | $6,289 |
| Reported Liabilities | $6,280 | $6,361 | $6,168 | $6,188 | $6,052 | $5,908 |
| Net Assets (Assets Less Liabilities) | $405 | $90 | $130 | $192 | $169 | $381 |
| Total Litigation and Remediation Accruals | $316 | $314 | $317 | $313 | $309 | $298 |
| Required Additional Accruals ($2.46 Billion Less Environmental Remediation and Litigation Accruals) | $2,144 | $2,146 | $2,143 | $2,147 | $2,151 | $2,162 |
| Extent of Insolvency (Required Additional Accruals Less Insolvency "Cushion") | ($1,739) | ($2,056) | ($2,013) | ($1,955) | ($1,982) | ($1,781) |

71.     Significantly, Chemours' insolvency continued unabated during the Class Period.  As shown by the chart below, Chemours' conservatively estimated actual liabilities of $2.46 billion at all times greatly exceeded its net assets and accruals by more than $1 billion and ranged between $1 billion to $2 billion throughout the Class Period.[3]

---

[3] The charts herein present amounts in the millions.  Excluded are the Company's immaterial accruals for asbestos liability, which was not specifically addressed as an understated category of liability in the Verified Complaint, and the $335 million the Company accrued at the outset of the Class Period in connection with the settlement payout for the Ohio MDL.

34

| Class Period | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Reported Assets | $6,060 | $6,282 | $7,052 | $7,120 | $7,293 | $7,484 | $7,338 | $7,512 | $7,362 | $7,325 |
| Reported Liabilities | $5,956 | $5,924 | $6,480 | $6,315 | $6,428 | $6,482 | $6,313 | $6,366 | $6,342 | $6,509 |
| Net Assets | $104 | $358 | $572 | $805 | $865 | $1,002 | $1,025 | $1,146 | $1,020 | $816 |
| Total Litigation and Remediation Accruals | $292 | $295 | $293 | $283 | $267 | $270 | $267 | $302 | $313 | $313 |
| Required Additional Accruals | $2,168 | $2,165 | $2,167 | $2,177 | $2,193 | $2,190 | $2,193 | $2,158 | $2,147 | $2,147 |
| Extent of Insolvency | ($2,064) | ($1,807) | ($1,595) | ($1,372) | ($1,328) | ($1,188) | ($1,168) | ($1,012) | ($1,127) | ($1,331) |

72.     Thus, as Chemours' sworn pleading states, "[i]n concocting the 'High End (Maximum) Realistic Exposure' figures, DuPont . . . made no effort to assess or evaluate the *real* maximum potential liabilities" (emphasis in original).  Rather, "it employed an unreasonable process that would predictably understate the liability profile it was creating for Chemours" and as a result, spun off Chemours as an insolvent company.  Yet, remarkably, Chemours did nothing to correct this "understate[d] . . . liability profile" for four years, nor did it reveal these massive liabilities or its resulting insolvency to the market.  To the contrary, as set forth above and as DuPont asserted in its motion to dismiss the Verified Complaint, "Chemours [told] a strikingly different story to the SEC and the investing public [in which] [it] regularly promote[d] itself as a spin-off success."

35

**G.     In Its Sworn Pleading, Chemours Admitted That Numerous Categories Of Inherited Liabilities Were Vastly Understated—By Chemours**

73.     In the Verified Complaint, Chemours listed numerous categories of liabilities for which it asserted DuPont had provided phony "maximums" in violation of Delaware law at the time of the spinoff, resulting in the Company being insolvent as a matter of law from day one.  As set forth further below, however, Chemours itself habitually and vastly understated each of these liabilities throughout the Class Period—including by accruing nothing at all for certain categories of liabilities for which DuPont had provided specific estimates amounting to hundreds of millions of dollars that Chemours actually claimed in its pleading were woefully deficient.

### 1.     PFOA Litigation

74.     The Ohio MDL was brought on behalf of 3,500 individuals with injuries arising from DuPont's discharges of over 1 million pounds of PFOA between 1951 and 2003 from its Washington Works facility in Parkersburg, West Virginia, into the Ohio River.  This contamination caused six significant conditions in these individuals, including two types of deadly cancer, that the 2012 Science Panel concluded had "probable links" to PFOA exposure.

75.     In the Verified Complaint, Chemours stated that, in connection with the spinoff, DuPont certified to Houlihan Lokey that the "High End (Maximum) Realistic Exposure" for these 3,500 cases was $128 million, including defense

36

costs. However, as Chemours stated in its pleading, "[t]his number was a baseless concoction" because "DuPont was paying substantial sums annually on defense costs alone" and "[t]hese were serious cases—hundreds of cancer victims, others with other serious diseases, and DuPont was barred under the settlement agreement from raising a principal defense [causation]."

76.    Chemours stated that it soon "became clear that [DuPont's] $128 million maximum would be exceeded—indeed, greatly so." Specifically, in late 2015 and 2016, DuPont lost the first three individual trials in the Ohio MDL, forcing it to pay out $20 million—indeed, as Chemours stated, contrary to Deloitte's faulty estimate that DuPont would win 68% of the PFOA trials, in reality, "DuPont lost *every* trial." In light of this, in February 2017, DuPont and Chemours settled the 3,500 cases for $671 million—*i.e.*, "well over *five times* the [$128 million] 'maximum' that DuPont had certified just 19 months before." DuPont ultimately agreed to foot the bill for half the settlement despite the blanket indemnification provisions of the Separation Agreement, with DuPont and Chemours paying out $335 million each. While DuPont also agreed to pay up to $125 million for any additional PFOA litigation, DuPont made clear that this was the extent of its willingness to contribute anything toward the liabilities it had fully assigned to Chemours. This settlement occurred only three days prior to the Class Period, further establishing that Chemours knew full well the size of the PFOA

liabilities it was facing and the extent to which DuPont had drastically understated the certified "maximums" of the liabilities Chemours had assumed.

77.    Significantly, on February 16, 2017, the first day of the Class Period, Defendants announced that the Ohio MDL settlement was the full materialization of the Company's PFOA liability exposure, such that it was now a "known" liability.  Defendant Vergnano further emphasized in March 2017 that the "big overhang" from this liability was "really behind us now."  However, as Defendants knew, the PFOA litigation was far from over.  In his book *Exposure*, Robert Bilott, the lawyer who spearheaded the prosecution of the Ohio MDL, estimated that the total number of people exposed to PFOA-contamination from Washington Works numbered "approximately 70,000"—yet the MDL resolved only 3,500 of these cases, which were restricted to individuals who:  (i) were sickened by one of the six conditions identified by the DuPont-created Science Panel, therefore leaving out those who suffered from severe birth defects or other cancers caused by PFOA exposure; and (ii) had been diagnosed with one of the six identified conditions prior to February 11, 2017.

78.    Indeed, during the Class Period, the number of personal injury cases against Chemours arising from PFOA exposure increased tenfold from the third quarter of 2017 to the third quarter of 2018, amounting to approximately 60 cases, and continued to increase throughout the Class Period.  Most, if not all, of the

38

cases were consolidated before the same judge as the Ohio MDL, with some cases seeking up to $120 million in damages—and recently, on March 3, 2020, just one of these cases resulted in a $50 million verdict against DuPont and Chemours.

79.    Remarkably, despite these facts, Defendants accrued <u>virtually nothing</u> for PFOA litigation during the Class Period.  Indeed, aside from accruing $335 million specifically for the settlement of the Ohio MDL in early 2017, <u>the Company never accrued more than $14 to 22 million for all PFOA litigation during the entire Class Period</u>, with portions of even this amount pertaining to the Company's "obligations under agreements with the [EPA]" to test drinking water around Company sites.  This *de minimis* accrual amounted to far less than <u>half</u> of the $50 million verdict that was handed down against Chemours in just <u>one</u> of the 60 cases pending during the Class Period.  Moreover, Chemours essentially maintained no reserve despite the fact that, as it admitted in the Verified Complaint, it <u>knew</u> that DuPont's $128 million liability estimate, which concerned only a <u>fraction</u> of the potential PFOA claims related to the Washington Works site alone, was a "baseless concoction" that was dramatically and "spectacularly" understated <u>by over 500%</u>.

80.    Additionally, despite the fact that the PFOA liability only grew as the Class Period continued, beginning in the third quarter of 2018, Defendants expressly asserted in their public filings that any loss in excess of amounts accrued

39

for PFOA litigation would not "have a material impact" on the Company's financials. However, even assuming the verdicts in the 60 pending PFOA cases amounted to only $25 million (or half the size of the judgment in just one case), and that no future PFOA cases were filed, the Company would be facing no less than $1.5 billion in liability from these cases alone. Moreover, this figure does not even begin to take into account the spiraling costs of governmental litigation related to historical PFOA emissions, or civil litigation from countless individuals harmed by PFOA exposure at sites other than Washington Works. Accordingly, rather than not having any "material impact," in truth, this litigation alone posed an existential threat to the Company.

### 2. New Jersey

81. In its SEC filings, Chemours never accrued more than $101 million for remediation costs across the four highly polluted New Jersey sites it had inherited from DuPont during the Class Period—despite knowing that these accruals were dramatically understated by at least half a billion dollars. Indeed, Chemours admitted for the first time in the Verified Complaint that, from the time of the spinoff through 2018, it had received multiple estimates from DuPont quantifying these liabilities at hundreds of millions of dollars higher than the Company's accruals during the Class Period. Moreover, Chemours further

40

admitted in its sworn pleading that even these much higher estimates from DuPont were "implausib[ly]" low.

82.    The New Jersey sites Chemours inherited from DuPont included Chambers Works and Pompton Lakes Works, two especially toxic sites that had been polluting the environment for decades. Chambers Works, located across the Delaware River from Chemours' headquarters, produces approximately 1,200 toxic chemicals, including PFOA—and according to recent litigation, has released 107 million pounds of hazardous waste into the surrounding soil, air and drinking water wells. Pompton Lakes Works is a former munitions facility where DuPont dumped untreated cleaning solutions for decades into a waterway that became known as "Acid Brook"—causing New Jersey Governor Phil Murphy to compare it in 2018 to Love Canal, the notorious site that forced Congress to set up the "Superfund" (a comprehensive federal program designed to clean up the nation's most contaminated sites).

83.    In the Verified Complaint, Chemours revealed for the first time that, at the time of the spinoff, DuPont provided a "maximum" estimate for the New Jersey environmental liabilities it was transferring to Chemours of $337 million, which Chemours asserted was clearly a substantial understatement. Even when DuPont "revised its liability estimate upward to approximately $620 million" in 2018, Chemours stated that "it [was] evident (again) that the 'maximum' potential

41

liability [was] not what DuPont certified it was." Chemours stated that this was demonstrated by New Jersey's response that it was "<u>implausible</u>" that DuPont's $620 million estimate "could represent 'good-faith estimates of [DuPont's historical New Jersey] environmental obligations and liabilities.'"

84. Despite these facts, as set forth above, Chemours accrued at most a total of only $<u>101 million</u> for remediation across all New Jersey sites during the Class Period—*i.e.*, over $230 million <u>less</u> than the initial $337 million estimate Chemours had received from DuPont that the Company stated was obviously vastly understated, and over <u>half a billion dollars less</u> than the revised $620 million estimate DuPont provided to Chemours in 2018 that the Company called "implausib[ly]" low. These understatements of $230 million and over $500 million were highly material, exceeding the Company's average quarterly net income of $155 million during the Class Period, and amounting to 23% and 50%, respectively, of the Company's annual net income of approximately $1 billion. Additionally, despite DuPont increasing its estimate of the New Jersey liabilities by nearly $300 million in 2018—and despite Chemours finding even that estimate to be woefully understated—the Company actually <u>decreased</u> its combined reserves for its New Jersey liabilities during the Class Period by $38 million, or <u>nearly 40%</u>.

42

85.    Moreover, the $620 million estimate Chemours received from DuPont in 2018—which Chemours asserted was "implausib[ly] low"—<u>alone</u> establishes that the accruals and maximum ranges set forth in the Company's SEC filings were materially false and misleading.   For example, in the Company's 2018 Form 10-K, Defendants accrued a total of $63 million for remediation of Chemours' New Jersey sites, and further stated that there was a "remote" possibility that the Company might incur losses in excess of the amounts accrued of no more than $450 million for <u>all Company sites nationwide</u>.  However, even assuming the $450 million applied only to the Company's New Jersey sites (which it obviously did not), the $620 million estimate far exceeded the Company's accruals for its New Jersey sites <u>and</u> its "remote" maximum liability by <u>$107 million</u>, or more than 20%.

86.    In line with Chemours' assertion that DuPont's much higher $620 million estimate was "implausib[ly]" low, Chemours detailed in its pleading that it had also been sued by a local New Jersey municipality, Carneys Point, for <u>$1.1 billion</u>—a figure that was based on what it would cost to remediate Chambers Works, just <u>one</u> of the four New Jersey sites Chemours had inherited from DuPont. Significantly, Chemours effectively admitted in the Verified Complaint that the Carneys Point lawsuit was so meritorious that the Company was highly likely to actually incur the $1.1 billion cost—indeed, it was among the major liabilities

43

Chemours asserted had rendered the Company insolvent under Delaware law from the time of the spinoff, necessitating the extraordinary lawsuit against DuPont.

87. Chemours also effectively admitted in its pleading that <u>its own senior-level employee was complicit in concealing the $1.1 billion cleanup required for Chambers Works from state regulators</u>. Chemours stated that upon the spinoff of Chemours in 2015, DuPont was required to comply with New Jersey's Industrial Site Recovery Act ("ISRA"), which required owners of industrial sites to either remediate environmental damage prior to a transfer of ownership, or immediately post a bond for the cost of the remediation as computed by a State-approved software program called RACER. Chemours asserted in the Verified Complaint that DuPont had violated ISRA by "knowingly conceal[ing] the true nature of the chemicals it discharged" and spinning off Chemours "on the basis of underestimated liabilities"—however, in reality, <u>this deception was conducted by Chemours' own senior-level employee</u>.

88. Specifically, the Carneys Point lawsuit named as a defendant Sheryl Telford, the former Director of Remediation at DuPont who <u>took the same position at Chemours immediately upon the spin-off</u> (and still holds that position at Chemours today). In its complaint, the township stated that it was Telford who primarily communicated with NJDEP in connection with Chambers Works and its compliance with ISRA, and it was Telford who knowingly withheld information

44

from NJDEP—including "that the cleanup of Chambers Works was over $1 billion." Indeed, it was not until Carneys Point hired an independent environmental consultant to separately assess the cost of remediation of Chambers Works under ISRA (using the state-approved RACER program) that it learned of the true $1.1 billion price tag to clean up the site, prompting its lawsuit against Chemours. Thus, while Chemours asserted in its Verified Complaint that it was DuPont who vastly understated the New Jersey liabilities and concealed the over $1 billion in remediation costs for Chambers Works, in fact, this was done <u>by Chemours' own Director of Remediation who was transferred to Chemours upon the spinoff</u>.

89. There is therefore no question that Chemours unequivocally knew <u>from the time of the spinoff</u> that the remediation liability for Chambers Works alone—<u>just one out of four highly contaminated New Jersey sites</u>—exposed the Company to over $1 billion in remediation costs. Despite this critical knowledge, Defendants <u>never reserved more than $24 million for remediation of Chambers Works specifically</u>, an understatement of over <u>4,000%</u>. Moreover, as set forth above, during the Class Period, <u>Defendants never reported a reserve of more than $101 million</u> for environmental remediation costs across <u>all New Jersey sites</u>—an understatement that, based on Chambers Works alone, amounted to at least $1 billion, or 1,000%.

45

### 3.      North Carolina

90.      In the Verified Complaint, Chemours similarly confirmed that its accruals for the remediation of its inherited Fayetteville Works site in North Carolina were dramatically understated.  Specifically, Defendants admitted that, long before the Class Period in 2010, they were aware that, despite the 2009 EPA Consent Order requiring reduction of GenX emissions at a 99% rate, Fayetteville Works had been dumping GenX into the Cape Fear River for decades.  This contamination led to an internal DuPont-commissioned "Blue Ribbon Panel," which determined that it would cost at least $60 million just to stop future PFAS emissions from Fayetteville Works (an amount that excluded significant additional costs to clean up historical PFAS emissions that had already occurred).  However, Chemours accrued nothing for the remediation of Fayetteville Works during the Class Period until the fourth quarter of 2018—and even then, it accrued only *de minimis* amounts ranging from $10-25 million.  As Chemours would admit in the Verified Complaint filed only days after these miniscule accruals, the actual cost was over eight times this amount, or in excess of $200 million.

91.      Fayetteville Works in North Carolina, which produces GenX—DuPont's PFOA alternative—was transferred to Chemours upon the spinoff.  As part of its required TSCA application to the EPA for the use of GenX, DuPont had submitted several studies that indicated that GenX, like PFAS, did not biodegrade

46

in the environment and was associated with increased risk of serious health effects, including cancer and birth defects. The EPA's 2009 Consent Order accordingly concluded that GenX could be "toxic" to humans and that "uncontrolled . . . disposal of [GenX] may present an unreasonable risk of injury to human health and the environment. The EPA therefore required DuPont to eliminate 99% of GenX emissions into the environment—an obligation that was inherited by Chemours.

92. In its Verified Complaint, Chemours stated that, at the time of the spinoff, DuPont certified a "High End (Maximum) Realistic Exposure" of only $2.09 million for Fayetteville Works. As Chemours stated, this amount was "inexcusably" low because <u>DuPont knew that, despite the 2009 EPA Consent Order, "the Fayetteville plant had been discharging [GenX] for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people</u>."

93. As evidence of this, Chemours cited the 2010 "Blue Ribbon Panel" consisting of DuPont managers and scientists that DuPont had commissioned in response to the "recognized issue" of the contamination of the Cape Fear River. The Blue Ribbon Panel recommended that DuPont invest no less than $60 million in technology to end future PFAS discharges into the Cape Fear River. According to Chemours, this was "too much for DuPont," which instead installed a $2.3 million system that eliminated only one of several waste streams responsible for

the pollution, then terminated the rest of the project in 2013, around the same time it sought to spin off Chemours—because "[w]hy bother spending money to fix the problem . . . when it could be conveniently passed on to Chemours." Chemours stated that what made matters worse was that "DuPont included nothing in Chemours' projections for the technological improvements necessary to abate the problem, and did not even try to take into account the tort liability that could arise from the decades of emissions."

94.    Chemours asserted that as a result, in September 2017 and October 2017, respectively, the State of North Carolina and a consolidated putative class of North Carolina residents filed suit against Chemours. In October 2017, DuPont demanded that, pursuant to the Separation Agreement, Chemours indemnify it for the entirety of this liability. As Chemours stated in its pleading, it is "indisputable that DuPont's $2.09 million maximum will not suffice against this litigation—not even close." Chemours stated that this was confirmed by a consent order the Company entered into with North Carolina in February 2019 to settle the State's claims. The consent order "require[d] Chemours to adopt the very-same abatement technology that DuPont previously declined to install and to undertake extensive remediation regarding the cumulative effects of DuPont's long-running historical emissions," which would cost "in excess of $200 million"—or "approximately *one hundred times* more than DuPont's certified 'maximum' figure for the Fayetteville

48

Works site." Meanwhile, the consolidated class action remains pending against the Company—and Chemours' motion to dismiss that action was recently denied.

95. There is no question that Chemours knew the full extent of the Fayetteville Works liability years before the spinoff. First, at the time of the spinoff, the executives who were directly in charge of DuPont's Performance Chemicals division—which included Fayetteville Works, in addition to the plants discussed above—were the exact same individuals who became the executive leadership of Chemours. Specifically, Defendant Vergnano was the Executive Vice President who directly oversaw the Performance Chemicals division at DuPont for the five years prior to the spinoff, i.e., from October 2009 until July 2015, including Fayetteville Works. Vergnano was therefore fully aware of the PFAS emissions caused by Fayetteville Works, and of the "Blue Ribbon Panel" convened by DuPont in 2010 during his tenure to address that issue—including its recommendations to spend at least $60 million to end the emissions, let alone the substantial costs that would be required to remediate the decades of discharges that had already occurred.

96. Indeed, at the September 10, 2019 congressional hearing on PFAS, in response to questions about Chemours' knowledge of the extent of the liabilities at Fayetteville Works, Daryl Roberts, DuPont's Chief Operating and Engineering Officer, confirmed that "[Chemours'] CEO [Defendant Vergnano] ran the business

line [*i.e.,* Performance Chemicals]" at DuPont, and therefore "made decisions about the business line for many, many years, and their plants made the products we are talking about today." Roberts stated that, as a result, it was "very difficult" for Chemours to say that it had not known about the true size of the Fayetteville Works liability even before 2015:

> What I would say, when we hear the statement that Chemours then later found out [about the size of the Fayetteville Works liability], is that the individuals that were running the sites, the individuals that were developing the products, the individuals that ran this business related to the sites that were fully aware of the financials of the business, fully aware of the liabilities and profits and understood what [Chemours] was taking with it, are <u>the same individuals that sit and run Chemours today</u> . . . <u>When the head of the [Performance Chemicals] business is now the CEO [of Chemours], it's clear that there's ownership</u>. And an individual who was part of those discussions, who the scientists work for and is currently running Chemours, <u>it makes it very difficult to say we don't know anything about it before 2015</u>.

97. <u>Second</u>, DuPont's representative Roberts, in his written response to questions for the record following the September 10, 2019 congressional hearing, stated that rather than DuPont, it was Telford—working as the Director of Remediation on behalf of <u>Chemours</u> at the time—who engineered the "inexcusable" $2.09 million estimate of remediation costs for Fayetteville Works. Specifically, Roberts asserted that "Chemours' own employee"—*i.e.*, Telford, "who was quite familiar with environmental conditions at the locations that were transferred to Chemours"—"estimated a range between $507,000 and $2.09

50

million related to contingent environmental liabilities" at Fayetteville Works "for which reserves were established."

98. <u>Third</u>, during the Class Period, Defendants explicitly confirmed their full knowledge that Fayetteville Works had been dumping GenX into the Cape Fear River for nearly four decades. For example, on June 7, 2017, the Wilmington *StarNews* published an exposé on Fayetteville Works, citing scientific studies that had found significant discharges of GenX into the Cape Fear River. A few days later, on June 15, 2017, and as a result of growing media and regulatory scrutiny, Chemours attended a closed-door meeting about the issue with the North Carolina Department of Environmental Quality ("NC DEQ"), in which only one member of the press was allowed to attend. During the meeting, Chemours <u>admitted</u> that it (and DuPont's Performance Chemicals division before the spin-off) had known that it had been discharging GenX into the Cape Fear River <u>for decades</u>.

99. Specifically, Kathy O'Keefe, Chemours' Product Sustainability Director (who previously worked for DuPont for over 22 years), and Mike Johnson, Chemours' Environmental Manager (who had previously worked for DuPont for over 37 years), expressly admitted—to the incredulity of the NC DEQ—that, despite the EPA Consent Order requiring DuPont and Chemours to recover, destroy or recycle 99% of GenX emissions, Fayetteville Works had been dumping GenX into the Cape Fear River <u>since 1980</u>. Remarkably, O'Keefe and

51

Johnson claimed that these GenX emissions were permissible under the EPA Consent Order because they were not directly due to the production of GenX, but rather were a "byproduct" from a different manufacturing process.  Indeed, they asserted that the EPA was never alerted to these discharges because such "byproducts" were "not regulated by any regulatory agency."

100.    This was followed by Johnson's express admissions that DuPont had nonetheless attempted to "abate" these purportedly insignificant GenX discharges in 2013, referencing the perfunctory $2.3 million system DuPont had installed in response to the much more expensive recommendations from its "Blue Ribbon Panel."  Significantly, contrary to Chemours' Verified Complaint admitting that the $2.3 million investment did virtually nothing to end the GenX discharges in the Cape Fear River because it only eliminated one of several waste streams, Johnson falsely claimed to the NC DEQ that it had resulted in an "80 percent reduction" of the GenX discharges.

101.    Third, Lead Plaintiff's CWs confirmed that Defendants had long been aware of the true sizes of the liability at Fayetteville Works.[4]  CW 1, the former CFO of the Fluoroproducts business at DuPont and then Chemours through 2016, explained that Defendants' knowledge of the Fayetteville site pollution—and that

---

[4] Former Chemours and DuPont employees are referred to herein as Confidential Witness "CW__" and are referenced in the feminine form to protect their confidentiality.

Chemours could have remediated that pollution—dated back to the spinoff.  When asked why Chemours did not implement the $60 million remediation solution it had stated in its sworn pleadings would rectify the PFAS contamination of the Cape Fear River, CW 1 responded that Chemours' view was "[i]f you have to pay $60 million, [then] you have to tell the public.  So [Chemours] just didn't do the work.  It was all about 'cash in my pocket,' not long-term growth."

102.   Notwithstanding these facts, for the vast majority of the Class Period, Defendants maintained no reserve whatsoever for Fayetteville Works. Specifically, Defendants accrued nothing for remediation costs for Fayetteville Works until the fourth quarter of 2018, at which point they accrued a *de minimis* amount of only $10 million.  Even in Defendants' Form 10-Q for the first quarter of 2019, which was filed on May 3, 2019—three months after Defendants entered into the February 2019 consent order with NC DEQ that Defendants knew would require over $200 million in remediation costs, and only ten days before Chemours would file its Verified Complaint lamenting these significant costs—Defendants accrued only $25 million, an understatement of 800%.  Moreover, the remediation cost for Fayetteville Works alone was unquestionably material, as it equaled approximately 80% of Chemours' average remediation accrual of $250 million across all sites during the Class Period, and over 100% of its average quarterly net income of $155 million.

103. <u>Finally</u>, despite referencing in the Verified Complaint that "tort liability" could arise "from the decades of emissions" at Fayetteville Works, and despite explicitly noting that a class action that had proceeded past the motion to dismiss stage was pending against the Company on this very issue, Chemours accrued <u>nothing</u> for private litigation arising from the GenX discharges from Fayetteville Works during the Class Period. Indeed, while Defendants accrued between $43-65 million for litigation costs connected to the site during the Class Period, according to Chemours' public filings, all of these accruals related to the dispute with NC DEQ and negotiations of the consent order, <u>not</u> the private litigation. Yet, significantly, in the Eastern District of North Carolina's April 19, 2019 order denying Chemours' motion to dismiss, the court found that the plaintiffs adequately alleged that Defendants had knowingly "<u>discharge[ed] chemicals into the Cape Fear River even after learning of potential adverse health consequences</u> associated with the chemicals."

### 4.   Benzene Litigation

104. In the Verified Complaint, Chemours also admitted that it dramatically understated its exposure to benzene liability. Throughout the Class Period, Defendants maintained no reserve for Chemours' inherited benzene litigation, and repeatedly told investors that the liability could not be estimated. However, in the Verified Complaint, Chemours admitted that DuPont had given it

a detailed "comprehensive study" specifically quantifying its inherited benzene litigation as amounting to no less than $111 million, a highly material amount representing over 10% of the Company's annual net income of approximately $1 billion.

105.   The toxicity of benzene—which is a chemical compound commonly used in plastics, Styrofoam, adhesives, and pesticides—has been well known for decades.   According to the Occupational Safety and Health Administration ("OSHA"), the "benzene-leukemia link was first identified in 1897," and in 1948, the American Petroleum Institute stated that "it is generally considered that the only absolutely safe concentration for benzene is zero."   Under the Separation Agreement, Chemours inherited 29 benzene-related lawsuits.

106.   In the Verified Complaint, Chemours asserted that DuPont provided a "High End (Maximum) Realistic Exposure" of $17 million for "all its benzene-related liabilities," including defense costs.   Chemours noted, however, that in 2017—when DuPont studied the availability of insurance for benzene liability—it "commissioned a more comprehensive study by a consultant" that "valued the potential maximum costs at _over $111 million_," or "6-7 times higher."   DuPont purportedly shared this study with Chemours in 2018.

107.   Thus, Chemours knew full well, based on this "comprehensive study," that its inherited benzene liability was at least $111 million, or 6-7 times higher

than DuPont's certified "maximum" of $17 million. Indeed, even before DuPont commissioned the "comprehensive study," Chemours knew these liabilities were much more substantial than DuPont's estimated "maximum." As Chemours asserted in the Verified Complaint, when DuPont sold its Performance Coatings business to Carlyle, "DuPont could not get Carlyle to assume the benzene liability, even though Carlyle was purchasing the business that actually generated it."

108. Despite these facts, during the Class Period—including in 2018 after Chemours admitted it was in possession of DuPont's "comprehensive study" quantifying the benzene liability as at least $111 million—Chemours falsely maintained that while it was possible that Chemours could incur a loss related to the benzene litigation, "a range of such loss cannot be reasonably estimated at this time." Moreover, the $111 million liability was clearly material, amounting to over 70% of the Company's average quarterly net income of $155 million during the Class Period and over 10% of its annual net income of $1 billion.

### 5. PFAS and GenX Litigation

109. In the Verified Complaint, Chemours referenced "rapidly unfolding litigation regarding PFAS," stating that "although PFOA is one such substance, PFAS involves other substances"—such as GenX—and thus "goes beyond the parties' prior settlement regarding PFOA." Chemours stated that PFAS litigation targeting Chemours was "proliferating," and many cases "have been consolidated

56

in a multi-district litigation in federal Court in South Carolina," with additional cases pending in New Jersey and North Carolina.  Significantly, Chemours stated that, at the time of the spinoff, DuPont "did not even purport to conduct an evaluation of PFAS liability (apart from PFOA)" but instead "certified a catch-all 'High End (Maximum) Realistic Exposure' of $194 million."

110.  However, Chemours accrued nothing for PFAS liability during the Class Period, not even the $194 million certified by DuPont back in 2015 despite admitting in the Verified Complaint that it was already "sadly clear again that the real 'maximum' potential liabilities" far exceeded that amount.  Moreover, despite knowing that DuPont did not actually conduct any evaluation of PFAS liability, Chemours apparently did not either, instead inexplicably relying on DuPont's 2015 estimate that Chemours itself described as baseless for four years.

### 6.    Defendants Admitted To Understating Their Liabilities During The Class Period By Over $2.5 Billion

111.  All told, in their sworn pleading, Defendants admitted to, and specifically quantified, $2.5 billion in liabilities Chemours was saddled with at the time of the spinoff that persisted during the Class Period, including (i) the Ohio MDL, for which Defendants' share was $335 million; (ii) the "implausib[ly]" low $620 million estimate DuPont provided for liabilities across all four New Jersey sites; (iii) the over $1 billion cost for the remediation of Chambers Works, just one New Jersey site; (iv) the over $200 million for the remediation of Fayetteville

57

Works; (v) the $111 million for inherited benzene liability; and (vi) the $194 million for inherited PFAS liability.

112. Moreover, the over $2.5 billion figure was, in fact, a highly conservative estimate. Indeed, Chemours admitted, for example, that the costs for the New Jersey sites would be "staggeringly expensive," far more than DuPont's $620 million estimate, as evidenced by the $1.1 billion price tag for just one site— in addition to "very substantial additional costs" to cover remediation directives issued by the NJ DEP, as well as hundreds of millions of dollars in overdue fines and penalties. It also admitted that it would likely have to spend in "excess" of $200 million to remediate Fayetteville Works, that the benzene liability would very likely exceed DuPont's $111 million estimate, and that DuPont's $194 million estimate for the PFAS litigation was woefully deficient.

113. Adding together the Company's accruals for environmental remediation and litigation for the quarter just before the Verified Complaint was unsealed, which totaled $313 million—and even excluding Defendants' $335 million payout for the Ohio MDL—Defendants' reserves were over $1.8 billion below their likely liabilities, an understatement of over 570%. Additionally, even if Defendants' disclosed "remote" maximum ranges were taken into account, which never exceeded $535 million and also decreased during the Class Period to $450 million (a reduction of $85 million), Defendants still vastly understated their

58

liabilities during the Class Period.   Defendants disclosed, on average, $780 million in maximum environmental liability (with over half that amount "deemed remote" by Defendants) during the Class Period—an amount less than one-third of the $2.5 billion in liabilities Defendants would ultimately disclose.   Moreover, Defendants actually decreased this amount during the Class Period by over $60 million.[5]

| Quarter | Total Accruals | "Remote" Potential Maximums | Total |
|---------|----------------|------------------------------|-------|
| Q4 2016 | $292 | $535 | $827 |
| Q1 2017 | $295 | $480 | $775 |
| Q2 2017 | $293 | $480 | $773 |
| Q3 2017 | $283 | $510 | $793 |
| Q4 2017 | $267 | $510 | $777 |
| Q1 2018 | $270 | $510 | $780 |
| Q2 2018 | $267 | $500 | $767 |
| Q3 2018 | $302 | $470 | $772 |
| Q4 2018 | $313 | $450 | $763 |
| Q1 2019 | $313 | $450 | $763 |

**H.    Lead Plaintiff's CWs Confirm That Defendants Massively Understated Chemours' Environmental Liabilities Both Prior To And During The Class Period**

114.   Lead Plaintiff's CWs—all former high-level employees of DuPont and Chemours—unequivocally confirmed that Chemours and the Individual Defendants had extensive knowledge of the true size of the massive environmental liabilities inherited from DuPont upon the spinoff, and that Defendants

---

[5] All litigation accrual tables provided herein present amounts in the millions, exclude the $335 million that Chemours was forced to accrue early in the Class Period for the Ohio MDL settlement that was reached shortly before the Class Period, and exclude accruals for asbestos liability.

59

intentionally and routinely understated those liabilities both prior to and during the Class Period. Significantly, these CWs described, among other things, direct meetings with senior leadership in which Defendants discussed strategies for understating or otherwise hiding the Company's environmental liabilities; a routine Company practice of using the "low end" of the liability range that categorically excluded PFAS and other liabilities for purposes of disclosure of environmental remediation costs; and a presentation given by one of Lead Plaintiff's high-level CWs in early 2018 directly to the Individual Defendants and the Company's board that expressly stated that the total cost of remediation alone (not taking into account any related litigation) for Chemours' inherited sites would top $2 billion.

1. **Lead Plaintiff's CWs Confirmed That The Company Had A Routine Practice Of Deliberately Understating And Underestimating Environmental Liabilities**

115. <u>First</u>, Lead Plaintiff's CWs confirmed that, despite knowing the full extent of the Company's massive environmental liabilities, Defendants' disclosure strategy was to consciously understate them to bolster the Company's stock price.

116. For example, CW 1, the former Global CFO of the Fluoroproducts business at DuPont and then Chemours from May 2000 to September 2016—during which time she reported directly to Thierry Vanlancker, President of the Fluoroproducts business at DuPont and then Chemours who in turn reported

60

directly to Defendant Vergnano—stated unequivocally that Chemours knew the full extent of the liabilities it was facing but consciously downplayed them.

117.   Specifically, CW 1 stated that "Chemours leadership knew exactly the extent of the liabilities they were taking over.  Vergnano was a senior player at DuPont for a long time."  CW 1 stated that the Company's executive leadership—including Defendants Vergnano and Newman, her boss Vanlancker, Dave Shelton (the Company's General Counsel), and E. Bryan Snell (President of the Titanium Dioxide business at Chemours)—had "a meeting every week" that made it "impossible" for any of them to say "that they didn't know what was going on" with respect to the true extent of the environmental liabilities.  "Mark [Vergnano] and Mark [Newman] were both there.  It was their meeting."

118.   CW 1 stated these meetings were held weekly because "[t]here was a lot of turmoil at that time."  Chemours was "firing people left and right, like, three months after the spinoff," as the executives were increasingly concerned that Chemours was not making "the numbers they were promising [Wall] Street."  CW 1 stated that she "kn[ew] for a fact that Vergnano discussed [the extent of the environmental liabilities] with his executive team—that was part of the conversation at the time.  I heard it from my President, Thierry Vanlancker, who was in those meetings."  CW 1 stated that Vanlancker had expressed concerns

61

about the environmental liabilities, "[i]t was concern leading to clear disagreement," and that was "why he left" in 2016.

119. CW 1 stated that Defendants Vergnano and Newman also directly received periodic reports on Chemours' environmental liabilities and risk exposures in real time. CW 1 stated that Chemours' "plant managers knew those plants inside and out," and sent monthly safety reports to senior executives— including "the amount of releases each month, the amount of releases that shouldn't happen." CW 1 further stated: "I know [Vergnano and Newman] did travel regularly to the plants . . . they would have had the information [about releases of PFAS]."

120. Significantly, CW 1 stated that despite the fact that Defendants were fully aware of the extent of the massive environmental liabilities inherited from DuPont, rather than disclose those liabilities, Defendants made concerted efforts to hide them in order to keep the Company's stock price inflated. CW 1 was a member of the Company's "Disclosure Committee," which consisted of "finance people," Defendant Newman, and General Counsel Shelton. The committee met quarterly to determine what language to use in the Company's public filings to describe its environmental liabilities. Defendant Newman attended every meeting because he had to "sign off" on the Disclosure Committee's decisions.

62

121.   CW 1 stated that, in general, it was obvious inside Chemours that the Company was understating its liabilities.   For example, it was part of the Disclosure Committee's process to routinely categorize environmental remediation costs as something other than accruals or liabilities because the Company viewed it as "difficult to disclose that you are spending money to address [environmental liabilities]."   As a result, "[w]e had a group of people that were crafting those answers to show them as additional investments to improve productivity at the plants" instead of environmental liabilities or accruals.   CW 1 stated that, specifically, the Disclosure Committee would use such statements as: "[W]e have to start reducing potential risks for the future" to obscure remediation costs.

122.   CW 1 stated that, as a result of these practices, from the time of the spinoff until she left the Company in September 2016, "there was no honest statement" regarding the Company's environmental liabilities in its public filings. CW 1 further stated that the reason why the Company sought to actively report low liability accruals was to try and maintain the Company's stock price.  "Admitting that PFOA can be harmful is not helpful for a company that says they are doing everything they can to make your life better.  They don't want to hurt their stock price.  If you have a big liability on your balance sheet, or accruals for liabilities, people say, 'what are you afraid of,' and then you have to disclose it.  When I was

63

there, they didn't want to make it a big deal. <u>They wanted to make [Chemours] successful on the stock exchange</u>."

123. <u>Second</u>, Plaintiff's CWs confirmed that the practices described by CW 1 continued throughout the Class Period. Specifically, these CWs confirmed that, with respect to calculating the underlying liabilities that were later relied upon for financial reporting, the Company expressly instructed its employees to always use the "low end" of the estimates they calculated—which explicitly excluded potential damages to natural resources and cleanup costs pertaining to PFAS—and to use "certainty" as the bar for determining which costs to include in the estimate.

124. For example, CW 2, a former Project Director of Environmental Remediation at DuPont and then Chemours from 1993 to 2017 who reported directly to Sheryl Telford (the Director of Remediation at both companies), described a routine Company practice of deliberately underestimating environmental liabilities. CW 2's job was to calculate remediation estimates for various sites, which was important because they "affected [Chemours'] cash flow." CW 2 stated that the remediation group would conduct weekly meetings, which Telford and Steve Shoemaker (another Director of Remediation at Chemours) would attend. While Defendants Vergnano and Newman did not attend these meetings, "Sheryl [Telford] would interact with those guys [Defendants Vergnano and Newman] on the various estimates we were making."

64

125. CW 2 stated that the Company had a practice of calculating remediation estimates by using the "low end"—which categorically excluded certain liabilities. As CW 2 explained: "We had an electronic system to roll up each site, estimating remediation needs for what we called the 'low end,'" which CW 2 explained was the estimate of the least amount of money it would cost to remediate a site. CW 2 stated that there was also the "high-end" estimate, which would be the highest dollar amount CW 2 expected the remediation project to cost.

126. CW 2 clarified that certain categories of environmental remediation liability were completely excluded from the "low end" estimate. For example, the probability of "Natural Resource Damages" (NRDs)—which account for costs necessary to restore injured natural resources and compensate the public for loss of their use—was not included in the "low-end" remediation estimates. CW 2 stated that, put simply, the "'low end was based on certainty." "We were told not to include anything like that [NRDs] in the low end." CW 2 further stated that the remediation group's estimates did not include the cost of cleaning up PFAS because it was an unregulated compound whose damaging effects were purportedly unknown. "For a long time, there was nothing in the 'low end' that accounted for [PFAS] being spread far and wide." CW 2 was not sure "when any of that [PFAS liability] ended up in a 'low end' estimate."

65

## 2. The Former President Of Fluoroproducts At Chemours Gave A Presentation To The Individual Defendants And The Board Showing Remediation Would Cost $2 Billion

127. Further confirming that Chemours' environmental liabilities were grossly understated during the Class Period, CW 3—the former President of the Fluoroproducts business at Chemours from 2016 to October 2019 who reported directly to Defendant Vergnano—stated that she gave an exhaustive presentation in the spring of 2018 to the Individual Defendants (and then the Company's board) showing that remediation across all of Chemours' problematic sites would cost $2 billion.

128. In describing how the $2 billion report came about, CW 3 first explained that Chemours' environmental remediation policy in general was to do only the bare minimum. The Company would observe mandatory limits set by state and federal governments, but whenever there were gaps in regulation, Chemours would not voluntarily spend money on remediation—the policy was "don't ask, don't tell." CW 3 stated that her predecessor, Vanlancker, was not in favor of taking preemptive action to protect the environment; Vanlancker used to shrug and tell colleagues: "Why be more Catholic than the Pope?"

129. However, CW 3 stated that when the $671 million settlement of the Ohio MDL occurred in February 2017, the Company had a "moment of enlightenment," i.e., it realized that by doing the bare minimum it had exposed

66

itself to significant liabilities. As a result, CW 3 conducted an exhaustive evaluation of total environmental remediation costs (not taking into account potential related litigation) that would be required to clean up problematic sites Company-wide. This culminated in CW 3 presenting a detailed report directly to the Individual Defendants (and then Chemours' board) stating that the Company's current environmental remediation costs would be $2 billion.

130. Specifically, in early 2018, CW 3 began an exercise of looking into how much it would cost to "plug all the holes" at each Chemours worksite and remediate the damage already done to the environment. CW 3 prepared a detailed report tallying the remediation liabilities—which she calculated would cost approximately $2 billion—over the course of three months in the spring of 2018, which CW 3 planned to present at the upcoming board meeting in August 2018.

131. CW 3 stated that, by this time—the spring of 2018—the Individual Defendants were fully aware of the very high $2 billion expenditure she planned to recommend to the board. Specifically, CW 3 stated that she had direct conversations with Defendants Vergnano and Newman, as well as Chemours General Counsel Dave Shelton, about the $2 billion figure while she was preparing the report—as they would have to review the report before it was presented to the Company's board—which occurred during monthly executive staff meetings that Vergnano, Newman and Shelton attended, in addition to "Vergnano's staff," which

included E. Bryan Snell (President of Titanium Technologies), Erich Parker (SVP of Corporate Communications), Susan Kelliher (SVP of HR), and Ed Sparks (the individual who took over CW 3's job when she left the Company). CW 3 stated that these conversations would be reflected in the meeting minutes.

132. CW 3 further stated that Defendant Vergnano was not surprised by the $2 billion figure—by now, Vergnano was resigned to the fact that Chemours was going to have to spend millions of dollars on remediation every year for at least the next ten years. Similar to CW 1, CW 3 further stated that Vergnano categorized these costs as coming from the "capital budget," and not environmental remediation accruals—meaning they would not have to be disclosed as an environmental liability in the Company's public filings.

133. Notwithstanding CW 3's report, Chemours actually reduced both its reserves and its maximum liability range in 2018. Indeed, although internally aware that remediation costs would approach at least $2 billion, Defendants hid these numbers by publicly disclosing a second set of numbers which vastly understated the Company's expected environmental remediation costs. Specifically, Defendants accrued an average of $240 million for environmental remediation in 2018—which, in light of CW 3's report stating that remediation Company-wide would cost at least $2 billion, was a massive understatement of approximately $1.8 billion. Moreover, Defendants actually decreased their

68

environmental remediation accruals as 2018 progressed. Indeed, in the first quarter of 2018, Defendants accrued $254 million for environmental remediation, while they accrued only $226 million in the fourth quarter—a reduction of more than 10%. Similarly, Chemours reduced its "remote" maximum exposure from $510 million to $450 million—a reduction of almost 12%.

134. At the same time Defendants were dramatically downplaying the Company's exposure to environmental liabilities, Defendants Vergnano and Newman capitalized on their knowledge of the Company's true liabilities by effectuating insider sales of Chemours stock that were highly suspicious in both timing and magnitude. Indeed, shortly after CW 3 provided her comprehensive analysis that estimated approximately $2 billion in remediation liabilities, Defendants Vergnano and Newman sold $10.1 million and $2.2 million worth of Chemours stock, respectively, over the course of just two days on May 8 and 9, 2018—after having sold zero shares prior to the Class Period. Moreover, these sales were effectuated at prices of up to $50.86 per share—representing near-term highs for Chemours' stock price—and before Defendants' fraud was revealed through several disastrous corrective disclosures, which caused Chemours' stock price to plummet as low as $14.96 at the end of the Class Period.

135. CW 3 further expressed that Chemours' decision to file the Delaware Chancery Complaint against DuPont was very much the "nuclear option" for

69

Defendant Vergnano and the Company—indicating Chemours' view of the huge magnitude of environmental liabilities the Company faced.

## V.     THE TRUTH BEGINS TO EMERGE

### A.     Details Regarding The True Extent Of Chemours' Environmental Liabilities Come To Light At The Sohn Investment Conference

136.    On May 6, 2019, the truth began to emerge.  That day, the Sohn Investment Conference was held in New York City—an annual meeting of investors and hedge fund managers that the *Wall Street Journal* has referred to as "the Super Bowl of investing conferences."  During the conference, Larry Robbins, the Chief Executive Officer and Portfolio Manager of Glenview Capital Management—a prominent hedge fund founded in 2000 with approximately $7.7 billion in assets under management—gave a detailed presentation during which he revealed previously undisclosed information about the true liabilities that Chemours and other chemical manufacturers were facing as a result of increasing PFAS litigation exposure.

137.    In his presentation, Robbins revealed that Chemours had massively understated the environmental liabilities it was facing, highlighting that Chemours, DuPont and other manufacturers of PFAS had known about the contamination of drinking water supplies—and the deadly human health effects that such contamination caused—for decades, but intentionally suppressed that information from the public.  Robbins further underscored the fact that Chemours was forced to

70

indemnify DuPont for these liabilities, stating: "the liabilities are now Chemours'. Every time you see DuPont losing a suit, you should assume that that liability will stay with Chemours." As a result of his analyses, Robbins revealed that, in reality, Chemours faced "$4 to 6 billion" in environmental liabilities—dwarfing the Company's Class Period reserves—a massive amount that represented "60 to 100% of its market [capitalization]."

138. On this news, Chemours' stock price plummeted over two trading days from $34.18 per share on Friday, May 3, 2019 to $29.09 per share on Tuesday, May 7, 2019—a decline of nearly 15% that wiped out over $830 million in the Company's market capitalization.

139. In the days that followed, Defendants strongly disputed Robbins' conclusions and sought to reassure the market regarding Chemours' environmental litigation liabilities. For instance, a May 15, 2019 SunTrust Robinson Humphrey report on Chemours provided "takeaways" from a meeting SunTrust had with Chemours' management "to discuss the company's exposure to PFAS." Those takeaways included that (i) PFOA was previously used by Chemours' former parent company, DuPont, but that "[u]sage was discontinued 3 years before the spin of CC"; (ii) Chemours' replacement for PFOA, GenX, "is manufactured and recycled at the Fayetteville site in accordance with an EPA consent order"; (iii) the Company saw "limited litigation risk related to GenX, and believes it is adequately

71

reserved for any potential liabilities"; and (iv) Chemours was pursuing litigation regarding the Company's separation agreement with DuPont, but that "lawsuit is unrelated to PFAS." In light of Defendants' reassurances, SunTrust concluded: "Given the lack of specific legal claims against CC regarding PFAS and the company's proactive stance toward . . . eliminating GenX emissions from its facilities, we believe the concerns about PFAS-related liabilities are premature."

### B. Chemours' Verified Complaint Reveals, For The First Time, That The Company Was Insolvent At The Time Of The Spin-Off And Faced $2.5 Billion In Environmental Liabilities

140. At the same time Defendants were emphatically denying the Glenview Capital Management report, they filed the Verified Complaint on May 13, 2019. Recognizing that the information contained therein would directly contradict Defendants' emphatic denials, they filed the complaint under seal. However, on June 28, 2019, the Delaware Court of Chancery ordered the unsealing of the Verified Complaint against DuPont.

141. The Verified Complaint contained a series of stunning admissions by Chemours, including that—contrary to its public pronouncements that the Company was adequately reserved and that there was only a "remote" chance of incurring liability above its accruals—the Company actually faced nearly inevitable environmental liabilities of approximately $2.5 billion, and this figure was <u>conservative</u>. Significantly, Chemours had initially sought to keep the

Verified Complaint out of the public eye, as it originally filed the complaint under seal on May 13, 2019—just one week after the Robbins presentation at the Sohn Investor Conference initially exposed Chemours' vastly understated environmental liabilities, and two days before Defendants denied Robbins' findings to analysts and reassured the market concerning Chemours' exposure to such liabilities.

142. The Verified Complaint included remarkable admissions that Chemours was insolvent from its inception, with liabilities far outstripping its assets—a condition that only grew worse as the Class Period progressed and liability exposures crystallized and expanded. For instance, the Verified Complaint admitted that the environmental liabilities that Chemours assumed through the spin-off were so profound that it had in fact been set up to fail from the beginning and was legally insolvent as a matter of "Delaware General Corporation Law, common law and public policy." Indeed, the Verified Complaint detailed how the "maximum" liability estimates that were used by DuPont to support the spin-off under Delaware law were "routine and radical understatements" and "systematically and spectacularly wrong," to the point that the "entire spin-off process was a sham."

143. Significantly, the Verified Complaint individually addressed four specific categories of liabilities that established Chemours' insolvency at all relevant times during the Class Period: (1) PFOA-related litigation; (2) North

73

Carolina environmental liabilities; (3) New Jersey environmental liabilities; and (4) Benzene and PFAS litigation liabilities.  The Verified Complaint described the "staggering" liabilities facing the Company for each category of liability, detailed how DuPont's initial estimates for each category were "baseless" and "miniscule," and how even the upwardly-revised estimates were "implausible" and "not good-faith estimates."  For example, the Verified Complaint specifically identified "over $1 billion" in remediation and litigation liabilities for just one New Jersey site, "more than $200 million" of remediation costs in North Carolina, "over $111 million" in benzene litigation liabilities, and in excess of "$194 million" in PFAS litigation liabilities.

144.  All told, Chemours' remarkable filing admitted the Company was insolvent—with "virtually no cushion for liquidity, necessary capital expenditures or adverse developments"—from the moment the spin-off was consummated, and that it had only kept its head above water during the Class Period by materially misleading investors about the true size of its liabilities.

145.  In response to these disclosures, Chemours' stock price fell nearly 15%, from $24.90 per share on June 27, 2019 to $21.17 per share on July 2, 2019, wiping out over $610 million in market capitalization.

146.  In a statement released to reporters following the unsealing of the Verified Complaint, Chemours stated: "Chemours believes the legal action we

have taken in Delaware Chancery Court is in the best interest of all Chemours stakeholders. From its inception, Chemours moved quickly and with urgency to transform the company and take action to address historic issues. The language in the lawsuits speaks for itself and we will not comment further on pending litigation."

147. Despite Chemours' assurance that the legal action was "in the best interest of all Chemours stakeholders," analysts were stunned by Defendants' admission that the Company had vastly understated the magnitude of its liabilities by no less than $2.5 billion. A July 8, 2019 SunTrust report stated "[w]e are lowering our price target on CC from $52 to $36 to account for an upwardly revised estimate of potential legacy environmental liabilities stemming from [PFAS]." The report continued by stating that, "[i]n a recent court filing, CC quantified potential high-end liabilities of approximately $2.5B"—meaning that the Company's exposure was "<u>materially higher than expected</u>"—with many more liabilities remaining that had not yet been quantified. Moreover, the report opined that the $2.5 billion estimate was likely highly conservative, representing only liabilities that the Company had chosen to specifically quantify—indeed, the report estimated that the Company's "current valuation of 4.1 X 2020 EBITDA assumes <u>exposure of ~$5.5 billion, or more than 2x the upper end of what CC has been able to estimate</u>."

75

## C.   Defendants Belatedly Reveal The Full Effects Of Chemours' True Environmental Liabilities

148.   Finally, after the close of the market on August 1, 2019, Chemours reported its second quarter results and suddenly lowered its full-year guidance, dramatically reducing its full-year free cash flow outlook from prior guidance of over $550 million to only $100 million—indicating that, rather than a "strong," "solid, or "flexible" balance sheet with ample room to deal with future liabilities, in reality, the Company had virtually no liquidity cushion to speak of.  When the Company filed its Form 10-Q the same day, Chemours further disclosed significant increases in its estimated environmental liabilities, including over a dozen new legal and regulatory actions related to PFAS.

149.   On this news, Chemours shares plummeted from $18.16 per share on August 1, 2019 to $14.69 on August 2, 2019 on unusually high trading volume—a 19% decline that wiped out another $560 million in market capitalization.

150.   Analysts reacted negatively again, and specifically tied the Company's poor financial results and diminishing value to its environmental liabilities.  For instance, on August 1, 2019, Barclays issued a report stating that Chemours' financial results had been heavily impacted by its rising liabilities, commenting that PFAS liability was the "more significant issue in our mind" and "the only credible risk to [Chemours'] intrinsic value."  Similarly, an August 5, 2019 SunTrust report downgraded Chemours' stock from "buy" to "hold," cutting

76

its target price my more than half from $36 to $16 per share, due to "worst case environmental liability scenarios as accruals for remediation and litigation continue to rise." SunTrust noted again that the Verified Complaint had "detail[ed] materially higher potential exposures under multiple lawsuits since the spin," amounting to "~2.5B of maximum liability" even after the Ohio MDL settlement was paid out with "several active legal cases" still pending. The report further stated that "investors are likely to presume that max environmental liabilities are roughly equivalent to the $4B dividend paid to DuPont, which CC seeks to recoup in its lawsuit." Also on August 5, 2019, Barclays issued a report stating that "PFAS liability" represented a "significant liability" for Chemours, adding that "we believe the market will continue to discount ~2.5bn [for environmental liabilities] for the foreseeable future." Lastly, an August 9, 2019, RBC Capital Markets report downgraded Chemours' stock from "Outperform" to "Sector Perform," noting that PFAS liability could be "worse than expected."

**D. Post-Class Period Events Confirm The Continuing Ramifications Of Defendants' Fraud**

151. A series of post-Class Period events provide additional evidence of Defendants' fraud and further confirm that Defendants' scheme continues to have a devastating impact on the Company to this day—to the point that Chemours' solvency and viability remains in question.

### 1. Analysts Question The Viability Of Chemours And Anticipate True Liabilities In The Hundreds Of Billions Of Dollars

152. For example, in the months following the end of the Class Period, analysts continued to question the true extent of Chemours' environmental liabilities, with some analysts anticipating liabilities of <u>hundreds</u> of billions of dollars. For instance, on November 5, 2019, SunTrust Robinson Humphrey noted "continued uncertainty around [Chemours'] environmental liabilities."

153. Significantly, a November 4, 2019 *Bloomberg* article called "'Forever Chemicals' Legacy Weighs on Chemours' Future" cites John Inch, an analyst with the market research firm Gordon Haskett Research Advisors LLC, who has calculated that Chemours "<u>may have to pay more than $160 billion over the next two to three decades, with roughly half of that coming from environmental remediation</u>," over 67 times its current market capitalization.

### 2. Proceedings In Chemours' Litigation Against DuPont Further Evidence Defendants' Fraud

154. As noted above, in an effort to keep the Verified Complaint confidential, Chemours filed the complaint against DuPont under seal on May 13, 2019. While Court of Chancery rules require that a redacted, public version of the complaint be filed within three days, Chemours belatedly filed a redacted version on May 17, 2019 that was <u>almost entirely blacked out</u>. On May 23, 2019, Vice Chancellor Glasscock held a telephonic conference in which he noted that this

78

treatment "can't be a good-faith compliance with the rule," and issued a Bench Ruling finding that Chemours had "failed to comply with Court of Chancery Rule 5.1 in the redaction of confidential information in the Complaint," but "[d]eferred unsealing of the complaint first giving counsel an opportunity to file either an Interlocutory Appeal or a Motion for Reargument."  On June 6, 2019, Chemours filed a Motion for Confidential Treatment seeking to file the complaint under seal, which Vice Chancellor Glasscock denied the following day.  On June 26, 2019, the Supreme Court of Delaware refused DuPont's application for interlocutory appeal. As a result, the Verified Complaint was unsealed on June 28, 2019.

155. Subsequent proceedings in the litigation further underscored Defendants' violations of the federal securities laws.  For instance, in DuPont's motion to dismiss the Verified Complaint in favor of arbitration mandated by the Separation Agreement, filed on September 13, 2019, DuPont made crystal clear that Chemours' admissions in the Verified Complaint directly contradicted its assurances to investors throughout the Class Period, emphasizing that "Chemours has been telling a strikingly different story to the SEC and the investing public [in which] Chemours regularly promotes itself as a spin-off success."  In a later reply brief, DuPont again highlighted this contradiction, noting that "in none of its SEC filings has Chemours ever mentioned any supposed insolvency," and "contrary to what Chemours now alleges, [the Company] reassured investors about its

79

environmental liabilities: Our environmental liabilities are well understood and well managed."

156. In its October 18, 2019 opposition to DuPont's motion, Chemours reiterated the allegations that it made in the Verified Complaint, including that DuPont's "maximum" liability estimates were "systematically and spectacularly wrong" from the get-go, asserting that "[n]o reasonable person could have believed in good faith that these reserves actually reflected Chemours' likely maximum exposure." As a result, Chemours acknowledged again that these liabilities rendered the Company "insolvent at the time of the spin-off."

157. Thereafter, during a December 18, 2019 hearing, counsel for Chemours reiterated that DuPont's "maximum" liability estimates "necessarily and radically undercounted the liability being assigned to [Chemours]," and that it was "astonishing, breathtaking, the extent to which these certified maximum liability estimates have proved wrong . . . not by a little bit," but by "many hundreds of millions of dollars." Chemours' counsel concluded that these facts "can only lead to an inference of bad faith, because [the liability maximums] were just manifestly evidently designed to undercount the liability hugely; and that they did, in fact, undercount the liability hugely . . . and that, [as a] consequence, [Chemours] was not solvent at the time it was spun."

80

158. Significantly, Chemours' counsel openly admitted that the true exposure the Company was facing was substantially larger than even the $2.5 billion figure referenced in the Verified Complaint, noting: "And we're just four years out. <u>We're nowhere near the maximum here</u>." Remarkably, counsel also confirmed in no uncertain terms that Chemours had "<u>been objecting to the interpretation of these estimated liability maximums for four years</u>," thereby establishing (i) that Defendants were fully aware of these facts throughout the Class Period; (ii) that the liabilities had <u>not</u> improved but in fact had only worsened in the four years since the spin-off; and (iii) that the same exact issues that rendered Chemours insolvent at the time of the spin-off still exist today. Accordingly, at the same time that Defendants were publicly touting Chemours' limited liabilities, Defendants were privately acknowledging the true extent of those same liabilities to DuPont, and the litigation against DuPont represented an open acknowledgment that the Company could no longer handle the financial implications of these massive liabilities.

### 3. Additional Litigations, Federal Legislation, And A Potential DOJ Criminal Investigation Of Chemours

159. On January 10, 2020, the House of Representatives passed H.R. 535, the PFAS Action Act, which required the EPA to designate PFOA and PFOS chemicals as hazardous substances under the Superfund law, and directed the EPA to create limits for PFOA and PFOS in drinking water within two years. In a press

release issued the same day, the House highlighted that the act "stem[s] the tide of further contamination with tough new testing, reporting and monitoring requirements; strict[ly] limits [] the introduction of new PFAS chemicals; [puts] limits on air emission and ban[s] unsafe incineration; [and implements] strong measures to hold contaminating companies accountable."  A September 30, 2019 *Bloomberg* article noted that "if the bill … were signed into law, it would trigger mandatory cleanups and, in some cases, force manufacturers to foot the bill."

160.  PFAS-related federal investigations and the potential for future such investigations have continued.  On February 14, 2020, the Company filed its annual report on Form 10-K with the SEC.  The 2019 10-K disclosed that, in January 2020, the Department of Justice and United States Attorney's Office for the Eastern District of Pennsylvania had informed the Company that they were considering initiating a criminal investigation of Chemours under the Federal Food, Drug and Cosmetic Act concerning PFAS exposure.  The 2019 10-K declined to estimate a range of possible losses stemming therefrom.

161.  The 2019 10-K also disclosed that, on January 14, 2020, the Michigan Attorney General had joined other states in filing PFAS-related litigation against Chemours.  The complaint alleges that Chemours and other defendant companies, including DuPont, "manufactured and used PFAS with full knowledge of PFAS health and environmental risks, which they intentionally hid from the public and

the State." Michigan is seeking "[c]ompensatory damages arising from PFAS contamination and injury of State natural resources and property," including the costs related to: investigating, monitoring, "installing and maintaining an early warning system to detect PFAS," "remediating PFAS from natural resources," and "remediating PFAS contamination at release sites."

162. On February 20, 2020, the EPA announced that, pursuant to its PFAS Action Plan of February 2019, it would set legal limits for PFAS in drinking water nationwide. The EPA also updated the Action Plan to state that it "has multiple criminal investigations underway concerning PFAS-related pollution."

163. Accordingly, the fallout from Defendants' fraud has been devastating for the Company and its investors, and will continue to be for years to come. Chemours' financial results have suffered tremendously, and investors have suffered substantial damages as a result.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

164. Defendants made materially false and misleading statements and omitted material facts when speaking to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## A. False And Misleading Statements And Omissions During The Class Period

### 1. False Statements In 2017

165. The Class Period begins on February 16, 2017, when Chemours held its year-end and fourth quarter 2016 investor conference call. During the call, Defendants announced annual adjusted EBITDA of $822 million and net income of $7 million, which Defendant Vergnano attributed to "truly a year of transformation guided by our Five-Point Transformation Plan," and commented that "Chemours exited 2016 in a very strong position" with the "effects of our transformation plan [] evident in our earnings results."

166. Defendants also addressed the $671 million settlement of the Ohio MDL related to PFOA emissions, which Chemours announced three days beforehand and was a topic of great concern to investors. Vergnano described the Ohio MDL settlement as largely resolving the Company's PFOA-related liabilities, stating: "I would say ... after this period as we get through the finality of the settlement we should have our [PFOA] costs come down." Defendant Vergnano further announced that the Company had made "great progress on reducing our net leverage" to 3.3x, "a tremendous reduction since spin," and as a result, "[w]e have sufficient balance sheet capacity to fund both our portion of [the Ohio MDL settlement] and to support the planned expansions in 2017 and beyond."

84

167.  Defendant Newman further stated that "[w]e've always said we expect our environmental to be a <u>fairly steady, mature liability</u>.  Now that we have clarity around PFOA, I think from a credit perspective our view is we are in a better position today with that as a <u>known, certainly for the next five years</u>."

168.  The quoted statements above in ¶¶165-167 were materially false and misleading.  Rather than PFOA-related litigation and remediation being a "fairly steady, mature liability," such that it was now a "known," in reality, and as Chemours admitted in the Verified Complaint, this category of inherited liability—which was uncapped with no end in sight—had only deepened the Company's "insolvency" that began from the time of the spinoff.  Thus, the Company had not exited 2016 in a "very strong position," nor did it have "sufficient balance sheet capacity" to fund the $335 million settlement in addition to other expenditures—to the contrary, and as Defendants admitted in the Verified Complaint, this settlement amount was much larger than what the Company had planned for.  Indeed, the only way Defendants had made "great progress on reducing [Chemours'] net leverage" was not through its "Five-Year Transformation Plan," but by concealing and massively understating the Company's over $2.5 billion in liabilities revealed in the Verified Complaint.  Moreover, far from PFOA costs "com[ing] down" in the future, the exact opposite was true.  The Ohio MDL settled only narrow categories of PFOA litigation,

85

resolving just 3,500 out of 70,000 potential claims arising from the Washington Works facility. Indeed, PFOA litigation left unresolved by the Ohio MDL increased tenfold during the Class Period, with just <u>one</u> out of over 60 pending cases resulting in a $<u>50 million</u> verdict against DuPont and Chemours.

169. On February 17, 2017, Defendants filed Chemours' 2016 Annual Report on Form 10-K (the "2016 Form 10-K"). In it, Defendants reported a total environmental remediation accrual of just $278 million, which they asserted was "<u>appropriate based on existing facts and circumstances</u>," and further stated that "under adverse changes in circumstances, <u>although deemed remote</u>, the potential liability may range up to approximately $535 million above the [$278 million] amount accrued at December 31, 2016." The 2016 Form 10-K also stated that "[m]anagement <u>does not believe that any loss, in excess of amounts accrued</u>, related to remediation activities at any individual site <u>will have a material impact on the Company's financial position</u>, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."

170. The statements referenced above in ¶169 were materially false and misleading. As Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were massive, amounting to <u>over $2.46 billion</u>, such that they rendered the Company <u>insolvent</u> as a matter of law from the time of the spin-off and throughout the Class Period.

Defendants' assertion that their reserve of only $278 million was "appropriate based on existing facts and circumstances" was therefore false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $813 million) bore no relation to reality.

171.   Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false.  In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation costs for Chemours' <u>New Jersey sites alone</u> would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.  Moreover, Chemours itself asserted that DuPont's $620 million estimate was "<u>implausi[bly]</u>" <u>low</u>, and that the true remediation liability for just <u>one</u> of the inherited New Jersey sites, Chambers Works, would be as much as $<u>1.1 billion</u>—an amount that was required to be posted immediately under ISRA.  Additionally, Defendants knew from the time of the spinoff that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which Defendants knew was the <u>minimum</u> cost to stop <u>future</u> PFAS discharges at Fayetteville Works, in addition to substantial clean-up costs for the decades of emissions that Defendants knew had already occurred.

172.   Defendants also misrepresented Chemours' substantial liability for

87

benzene-related litigation. The Form 10-K did not accrue <u>any</u> amounts for benzene-related litigation liability, and stated that while a loss was possible "a range of such losses cannot be reasonably estimated at this time."

173. The statements referenced above in ¶172 that Chemours' benzene liabilities "cannot be reasonably estimated" were materially false and misleading. Chemours' Verified Complaint admitted that a 2017 "comprehensive study" of its inherited benzene liability specifically quantified it as amounting to no less than $111 million—an estimate that Chemours labeled as a reliable, "real number." Moreover, Chemours has admitted that at the time of filing its 2016 Form 10-K, Defendants were in possession of another much lower $17 million estimate of the benzene liabilities from DuPont that Defendants knew was "spectacularly" understated and showed DuPont's "bad faith" in conducting the spin-off. Indeed, Defendants stated in their Verified Complaint that it was clear that the benzene liability was far more significant, as shown by the fact that DuPont was unable to unload it on Carlyle, which purchased the related Performance Coatings business.

174. On March 27, 2017, Defendant Vergnano was interviewed by financial reporters during a live television broadcast of Bloomberg Television's *Wall Street Week*, during which he repeatedly assured investors that the Company's inherited environmental liabilities were "behind us." The first question noted that following Chemours' post spin-off stock price decline,

88

"[t]here is quite a bit of bearishness … on the company" and asked Vergnano "[w]hat did investors and analysts get wrong?" Vergnano replied that as a spin-off of DuPont, Chemours inherited a number of great products and businesses "but we also had some liabilities we had to deal with. <u>Heavy level of debt, we had some legal liabilities, and that now has gone behind us. We've de-levered the company, those legal liabilities are behind us</u>, and now people are starting to see the businesses we have turned out." Later in the interview, Vergnano was asked about whether the settlement of the Ohio PFOA MDL addressing 3,500 lawsuits removed the "overhang" of PFOA-related lawsuits "or are we going to see more cases come forward?" Vergnano replied, "I think that was the big issue that a lot of investors had, that one set of cases. . . . So I think that <u>those 3,500 cases were the big cloud, the big overhang that are really behind us now</u>."

175. Also, on March 27, 2017, Vergnano was interviewed by financial reporters during a live broadcast of CNBC's *Power Lunch*. During the interview, Vergnano asserted that <u>the Company had "executed every element of [its transformation] plan</u>," and as a result, <u>"we're just about three times levered and we're where we want to be</u>." Vergnano was also asked whether, given the Company's "global joint settlement with DuPont in terms of the PFOA issue," "are all the legal liabilities behind you at this point in terms of the money that you need to set aside or potential future litigation?" In response, Vergnano again

confirmed that "I think that our transformation plan and <u>the settlement that we worked out with DuPont really put those behind us</u>."

176. The statements quoted above in ¶174-175 were materially false and misleading. Defendants have now confirmed, in direct contrast to Vergnano's repeated statements, that the Company's environmental liabilities were not "behind us," and moreover, that the Company's transformation plan had not put the Company "where we want to be" at "three times levered." To the contrary, Defendants admitted in the Verified Complaint that the Company's environmental remediation and litigation liabilities amount to over <u>$2.46 billion</u>, a staggering amount that rendered the Company insolvent as a matter of law from the time of the spin-off through the Class Period. Thus, Defendants had achieved their goal of being "three times levered" not by "execut[ing] every element of [its transformation] plan," but by concealing and vastly understating these massive liabilities. Defendants' assertions that the Company's "legal liabilities are behind us," and the "big [PFOA] overhang" was "behind us now," were false for the additional reason that, as Defendants well knew, the Ohio MDL settlement resolved only a fraction of the Company's massive environmental liabilities. Moreover, the Company's "settlement" with DuPont only covered 3,500 out of a potential 70,000 PFOA cases arising from the Ohio MDL. Indeed, additional PFOA litigation ballooned during the Class Period.

177.    On May 2, 2017, Defendants announced the Company's first quarter earnings for 2017, including adjusted EBITDA of $285 million and net income of $150 million.    Defendant Vergnano announced that <u>the Company's</u> <u>"transformation plan has made a huge impact on our business,</u>" as Chemours had "<u>achieved our target net leverage of at or below 3x,</u> a key commitment we made in announcing the transformation plan in August of 2015."

178.    Defendant Newman also emphasized that the Company had "<u>reached</u> <u>our goal of reducing our net leverage ratio to be at or below 3x on a trailing 12-</u> <u>month basis</u>" to 2.7x, and "<u>[w]e are proud of the progress we've made to reduce</u> <u>our net leverage</u>, which you may recall was north of 6x at spin."    Defendant Newman further asserted that, as a result of reaching this milestone, the Company had achieved "<u>balance sheet flexibility</u>."

179.    On May 3, 2017, Defendants filed with the SEC Chemours' Form 10-Q for Q1 2017.    In it, Defendants reported a total environmental remediation accrual of just $279 million that they asserted was "<u>appropriate under existing</u> <u>facts and circumstances</u>," and stated that "under adverse changes in circumstances, <u>although deemed remote</u>, the potential liability may range up to approximately $480 [million] above the [$279 million] amount accrued."    The Form 10-Q also stated that "<u>[m]anagement does not believe that any loss, in</u> <u>excess of amounts accrued</u>, related to remediation activities at any individual site

91

will have a material impact on our financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."

180. The statements quoted above in ¶¶177-179 were materially false and misleading. In truth, the Company had not "reached our goal" of reducing its net leverage ratio to below 3x because of its "transformation plan," nor had it achieved "balance sheet flexibility." Rather, as Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law from the time of the spin-off and throughout the Class Period. Thus, in reality, Defendants' net leverage ratio only increased during the Class Period—indeed, the only way Defendants were able to purportedly claim they had reduced it was by concealing and vastly understating these massive liabilities. In light of these facts, Defendants' assertion that their reserve of only $279 million was "appropriate based on existing facts and circumstances" was also false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $759 million) bore no relation to reality.

181. Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site"

92

was also demonstrably false.  In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.  Moreover, Chemours itself asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA.  Additionally, Defendants knew from the time of the spinoff that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which Defendants knew was the minimum cost to stop future PFAS discharges at Fayetteville Works, in addition to substantial clean-up costs for the decades of emissions that Defendants knew had already occurred.

182.  The Form 10-Q also repeated the statements in ¶172 above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities.  This statement and omission were false and misleading for the reasons explained in ¶173.

183.  Defendants also made a series of false and misleading statements designed to convince investors that certain of their more significant

93

environmental liabilities were supposedly inconsequential. For example, on June 15, 2017, the Wilmington *StarNews*, a North Carolina newspaper, reported on a study finding that Chemours' Fayetteville Works plant had been releasing PFAS into the Cape Fear River for many years, and that the chemicals had contaminated the region's drinking water. The article detailed a meeting that Chemours held with local and state officials on June 15, 2017, in which Chemours staff stated that the process that was causing the contamination had been part of Fayetteville Works' operations since 1980.[6] However, Kathy O'Keefe, Chemours' Product Sustainability Director (who previously worked for DuPont for over 22 years), made a series of statements emphasizing that the contamination posed absolutely no harm to human health:

> Our belief is that the GenX level in the drinking water coming from the Cape Fear River <u>is safe and it does not pose any harm to human health</u>. We have that belief; <u>we're confident in that belief</u>:

184. To emphasize the point, O'Keefe compared the purported trace amounts of GenX emitted by Fayetteville Works to the benign amounts of "formaldehyde" released "[w]hen you cook Brussel sprouts." At the same meeting, Michael Johnson, Chemours' Environmental Manager, who had previously worked at DuPont for over 37 years, stated that the amount of GenX in the Cape Fear River "is <u>very, very small. When you look at parts per trillion,</u>

---

[6] A transcript of the meeting was published online by *encore magazine*, a North Carolina weekly print and online newspaper, on June 16, 2017.

94

you're looking at very, very small concentrations," also stating that "it's not like there's a cup or a swimming pool." Johnson further claimed that abatement technology DuPont had installed in 2013 had resulted in an "80 percent reduction" of any trace amounts of GenX that were present in the river.

185. On June 20, 2017, Chemours issued a press release announcing that it would be undertaking remediation activities at the Fayetteville Works site to address alleged contamination in the Cape Fear River caused by years of GenX emissions. However, the Company assured investors that Fayetteville Works emissions had not impacted the safety of drinking water:

> Wilmington, Del., June 20, 2017 – The Chemours Company (Chemours) (NYSE: CC) today announced that it will capture, remove, and safely dispose of wastewater that contains the byproduct GenX generated from fluoromonomers production at its manufacturing plant in Fayetteville, North Carolina. Trace GenX amounts in the Cape Fear River to date have been well below the health screening level announced by the North Carolina Department of Health and Human Services on June 12, 2017, and the company continues to believe that emissions from its Fayetteville facility have not impacted the safety of drinking water. However, Chemours will take these additional steps, embracing its role as a significant employer and member of the community. The capture and removal of this wastewater will commence on June 21, 2017. This action complements the abatement technology already put in place at the Fayetteville site in 2013.

186. The statements above in ¶¶183-185 were materially false and misleading. Contrary to Defendants' claim that GenX "is safe and does not pose any harm to human health," the Company was in possession of numerous studies

showing that GenX was "toxic" and presented serious danger to human health—including a risk of cancer and birth defects—and had significantly contaminated drinking water sourced from the Cape Fear River. *See* ¶¶90-99. Indeed, Defendants admitted in the Verified Complaint that because of the significant harms caused by Fayetteville Works' decades of PFAS emissions into the Cape Fear River, the Company faced significant liability—including "tort liability"—that rendered it insolvent from the time of the spinoff through the Class Period. Defendants further admitted in the Verified Complaint that the abatement technology DuPont installed in 2013—which Johnson claimed had resulted in an "80 percent reduction"—had in fact done virtually nothing to stop GenX emissions, as it had eliminated only one of numerous waste streams going into the river.

187. On August 3, 2017, Defendants held their earnings call announcing their results for the second quarter of 2017, including $361 million in adjusted EBITDA and $161 million in net income. Defendant Newman stated that there were "year-over-year increases across all key financial metrics" and "significant improvement in profitability," which Defendant Vergnano attributed to "the success of our transformation plan."

188. Defendant Newman also stated that the Company had further reduced its net leverage ratio to 2.2x on a trailing 12-month basis, "well below our net

leverage target of 3x, including our new debt issuance, [which] demonstrates our significantly improved credit profile."

189.  The same day, Defendants filed with the SEC Chemours' Form 10-Q for Q2 2017.  In it, Defendants reported a total environmental remediation accrual of just $278 million that Defendants state was "appropriate based on existing facts and circumstances" and further stated that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $480 [million] above the [$278 million] amount accrued."  The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."

190.  The statements quoted above in ¶¶187-189 were materially false and misleading.  In truth, the Company had not achieved a "significant improvement in profitability" as a result of the "success" of its transformation plan, nor had it "significantly improved [Chemours'] credit profile" through a reduction in net leverage.  Rather, as Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets

97

and rendered it <u>insolvent</u> as a matter of law at the time of the spin-off and throughout the Class Period. Thus, the Company's "profitability" and "significantly improved credit profile" were in fact attributable to Defendants' deliberate concealment and vast understatement of these massive liabilities. In light of these facts, Defendants' assertion that their reserve of only $278 million was "appropriate based on existing facts and circumstances" was also false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $758 million) bore no relation to reality.

191. Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation costs for Chemours' <u>New Jersey sites alone</u> would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "<u>implausi[bly]</u>" low, and that the true remediation liability for just <u>one</u> of the inherited New Jersey sites, Chambers Works, would be as much as $<u>1.1 billion</u>—an amount that was required to be posted immediately under ISRA. Additionally, Defendants knew from the time of the spinoff that remediation costs for Fayetteville Works alone would

98

greatly exceed \$60 million, which Defendants knew was the <u>minimum</u> cost to stop <u>future</u> PFAS discharges at Fayetteville Works, in addition to substantial clean-up costs for the decades of emissions that Defendants knew had already occurred.

192.  The Form 10-Q also repeated the statements in ¶172 above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities.  This statement and omission were false and misleading for the reasons explained in ¶173.

193.  On November 3, 2017, Chemours held its earnings call for the third quarter of 2017, announcing adjusted EBIDTA of \$381 million and net income of \$207 million.  Defendant Vergnano announced that the Company "had another great quarter" and that "[t]he significant progress we've made over the last couple of years to improve our cash generation and strengthen our balance sheet now affords us greater financial and strategic flexibility."

194.  Defendant Newman  stated that the Company had further reduced its net leverage ratio to 2x on a trailing 12-month basis, and that "[w]e're very pleased with the continued improvement in our credit profile as recently recognized in the ratings upgrade from Moody's."  During the question and answer session, Newman again touted the Company's reduction in net leverage, stating "[w]e had committed to be at 3x in '17" and "[t]oday, we're at 2x . . .

obviously, [we] continue to have as a key focus a strong balance sheet. It was recently recognized with the Moody's upgrade."

195. The same day, Chemours filed its Form 10-Q with the SEC for the third quarter of 2017. In it, Defendants reported a total environmental remediation accrual of just $268 million and stated that "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $510 [million] above the [$268 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows in any given year, as such obligation can be satisfied or settled over many years."

196. The statements quoted above in ¶¶193-195 were materially false and misleading for the reasons explained in ¶190. In truth, the Company had not achieved "improved profitability," nor did it have "continued improvement in our credit profile" or a "strong balance sheet" as evidenced by the Moody's upgrade. The exact opposite was true. As Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of

100

the spin-off and throughout the Class Period.  Indeed, Defendants' purportedly "strong balance sheet" had only resulted from their concealment and vast understatement of these massive liabilities—as evidenced by the fact that, when the truth of the Company's financial condition was revealed, Moody's immediately <u>downgraded</u> the Company from "stable" to "negative," specifically stating that "<u>[t]he negative outlook reflects the growing litigation risk and possible future costs associated with PFAS water contamination</u>."   In light of these facts, Defendants' assertion that their reserve of only $268 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $778 million) bore no relation to reality.

197.   Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false.  In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation costs for Chemours' <u>New Jersey sites alone</u> would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.   Moreover, Chemours itself asserted that DuPont's $620 million estimate was "<u>implausi[bly]</u> <u>low</u>, and that the true remediation liability for just <u>one</u> of the inherited New Jersey

101

sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Additionally, according to CW 3, beginning in June 2017, Chemours' senior management, including Defendant Newman, attended weekly "crisis" meetings regarding the escalating situation at Fayetteville Works, and in September 2017, the State of North Carolina filed a lawsuit against Chemours to enjoin the Company from discharging "all GenX compounds into the Cape Fear River" and "[r]emove, treat or control" all such discharges in order to continue operations at Fayetteville Works—remediation Defendants admitted in the Verified Complaint would cost in excess of $200 million. *See* ¶90.

198. The Form 10-Q also repeated the statements in ¶172 above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained in ¶173.

199. Also during the earnings call, Patrick Duffy Fischer, a securities analyst at Barclays, asked about "[t]he situation down in North Carolina, the GenX . . . What's the status? [F]rom a headline perspective, what should investors expect?", to which Vergnano answered:

> I would say that this is a very normal chemical operation. And we've been working very closely with the regulators both in the state and at

the federal level, and <u>we continue to be very transparent and open in working with them through this issue. . . We do not believe that there [are] health effects of this in the drinking water</u>, and we've stated that. But nonetheless, we stopped the effluent going forward, and we've thought that was a good-faith effort for folks in the community as well as good-faith effort with the regulators that we're dealing with.

200.   The statements above in ¶199 were materially false and misleading. Contrary to Defendant Vergnano's claim that Fayetteville Works was a "very normal chemical operation," the Company was "very transparent and open" with regulators, and there were no "health effects of this in the drinking water," in truth, the Company was in possession of numerous studies showing that GenX was "toxic" and presented serious danger to human health—including a risk of cancer and birth defects—and had significantly contaminated drinking water sourced from the Cape Fear River. *See* ¶¶90-99.  Defendants also knew that, despite the 2009 EPA Consent Order requiring Defendants to reduce any GenX emissions by 99%, they had been discharging GenX into the Cape Fear River since 1980 through a manufacturing process the EPA had not reviewed. Moreover, Defendants admitted in the Verified Complaint that because of the significant harms caused by Fayetteville Works' decades of PFAS emissions into the Cape Fear River, a major drinking water supply, the Company faced significant liability—including substantial "tort liability"—that rendered it insolvent from the time of the spinoff through the Class Period.

201.   On December 1, 2017, Chemours held an "Investor Day" conference

103

to discuss the Company's financial performance. Defendants Newman, Vergnano, and certain other Company representatives participated in the conference on behalf of Chemours. During the call, Newman touted that "[i]n less than 2.5 years, we have been able to de-lever our balance sheet, reducing our net leverage ratio from north of 6x to approximately 2x today, well below what we contemplated at spin and much faster too." Newman further stated that "[t]his improvement has been recognized by our rating agencies with the recent Moody's and S&P upgrades," resulting in a "strong BB credit profile." Vergnano stated that, accordingly, the Company's transformation plan was "complete and Chemours has been transformed":

> Our transformation plan powered tremendous financial improvement in both our earnings and on our balance sheet. We made some bold commitments, and we delivered on those. Today, we can officially declare that our plan is complete and Chemours has been transformed. In fact, this afternoon, we'll ring the New York Stock Exchange Closing Bell to symbolically mark this achievement for ourselves, our investors and our customers.

202. Additionally, in response to a question from Christopher Perrella, a securities analyst at Bloomberg, asking "[h]ow … should I think about the cash spend for environmental issues over the next couple of years," Defendant Newman stated, among other things, that "[w]e had quite a bit of spend this year related to the Pompton Lake. And we expect that spend to gradually decline over time, while of course, the reserve will continue to come down as it has since

104

been.  So I wouldn't expect any significant change in cash spending."

203.  The statements quoted above in ¶¶201-202 were materially false and misleading.  In truth, Defendants had not successfully "transformed" Chemours such that they had "de-lever[ed]" or "powered tremendous financial improvement" in its balance sheet, nor had Chemours achieved a "strong credit profile" as evidenced by the Moody's upgrade.  Rather, as Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to <u>over $2.46 billion</u>, that they far outweighed Chemours' net assets and rendered it legally <u>insolvent</u> at the time of the spin-off and during the Class Period.  Indeed, the Company's purportedly "strong credit profile" had only resulted from Defendants' concealment and vast understatement of these massive liabilities—as evidenced by the fact that, when the truth of the Company's financial condition was revealed, Moody's immediately <u>downgraded</u> the Company from "stable" to "negative," specifically stating that "[t]<u>he negative outlook reflects the growing litigation risk and possible future costs associated with PFAS water contamination</u>."  Furthermore, as Defendants admitted in the Verified Complaint, their environmental liabilities were not expected to "come down" or "gradually decline over time"—indeed, the opposite was true.  Defendants expected their expenditures on environmental liabilities to only increase, threatening the Company's viability.

### 2.    False Statements In 2018

204.    On February 15, 2018, the Company held its fourth quarter and full year earnings call, announcing annual adjusted EBIDTA of $1.4 billion and net income of $746 million.  Defendant Vergnano stated that "2017 proved to be the year that we solidified our foundation, as we successfully completed our Five-Point Transformation Plan" which "helped us to achieve the impressive financial results that we just reviewed."

205.    Defendant Newman stated that "2017 proved to be a great finale to our transformation plan," as the Company had "maturely improved our profitability."  Defendant Newman also stated that the Company had further reduced its net leverage ratio to 1.8x, "over a full turn less than our original leverage target of 3x," resulting in "strong balance sheet flexibility" that "really supports the objectives that we've laid out for shareholders."

206.    On February 16, 2018, the Company filed its 2017 Form 10-K with the SEC.  In it, Defendants reported a total environmental remediation accrual of just $253 million, which was actually a significant reduction of close to 10% from the $278 million accrual the Company reported just one year earlier, in its 2016 Form 10-K.  With respect to that reduced accrual, Defendants stated that it was "appropriate based on existing facts and circumstances," and further stated that, "under adverse changes in circumstances, although deemed remote, the potential

106

liability may range up to approximately $510 million above the [$253 million] amount accrued." The Form 10-K also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows at any given year, as such obligation can be satisfied or settled over many years."

207. The statements quoted above in ¶¶204-206 were materially false and misleading for the reasons explained in ¶¶196 and 203. In truth, Defendants had not "successfully" transformed the Company or "maturely improved [its] profitability" through the "successful[] completion" of its transformation plan, nor had Chemours achieved "strong balance sheet flexibility." Rather, as Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law from the time of the spin-off and throughout the Class Period. In light of these facts, Defendants' assertion that their reserve of only $253 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $763 million) bore no relation to reality.

208. Defendants' statement rejecting the notion of any "material impact"

107

on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation costs for Chemours' <u>New Jersey sites alone</u> would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "<u>implausi[bly]</u>" <u>low</u>, and that the true remediation liability for just <u>one</u> of the inherited New Jersey sites, Chambers Works, would be as much as $<u>1.1 billion</u>—an amount that was required to be posted immediately under ISRA. Additionally, and as Defendants admitted in the Verified Complaint, regulatory scrutiny of the Fayetteville Works site increased significantly throughout 2017, including of the effects of the PFAS emissions on public health, indicating that substantial remediation costs—which Defendants would admit in the Verified Complaint exceeded $200 million—were imminent. *See* ¶90.

209. The Form 10-K repeated the statements in ¶172 above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained in ¶173. In addition, Chemours admitted in its Verified Complaint that by no later

108

than 2018, DuPont had provided Chemours with the "comprehensive study" precisely estimating the benzene liabilities "at over $111 million."

210. On May 4, 2018, Defendants held their earnings call for the first quarter of 2018, announcing $468 million in adjusted EBITDA and $297 million in net income. Defendant Vergnano stated that the Company had achieved "meaningful improvements across all key financial metrics," and that its "net income and EPS doubled . . . driven by the strength of our business."

211. Defendant Newman touted that the Company now had a "solid balance sheet position," stating that "the strength of our balance sheet" had provided the Company "ample flexibility, which we put to good use during the quarter."

212. On the same day, the Company filed with the SEC Chemours' Form 10-Q for Q1 2018. In it, Defendants reported a total environmental remediation accrual of just $254 million that Defendants stated was "appropriate based on existing facts and circumstances," and further stated that "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $510 million above the [$254 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash

109

flows in any given year, as such obligation can be satisfied or settled over many years."

213. The statements quoted above in ¶¶210-213 were materially false and misleading. In truth, the Company had not achieved a "solid," "strong" or "flexible" balance sheet that was "driven by the strength of our business." The exact opposite was true. As Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and throughout the Class Period. Indeed, the Company's purportedly "solid" and "strong" balance sheet had only resulted from Defendants' concealment and vast understatement of these massive liabilities. In light of these facts, Defendants' assertion that their reserve of only $254 million was "appropriate based on existing facts and circumstances" was clearly false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $764 million) bore no relation to reality.

214. Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation

110

costs for Chemours' New Jersey sites alone would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Defendants further admitted in the Verified Complaint that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which was the minimum required amount to end future PFAS emissions (in addition to the substantial costs required to clean up the decades of emissions that had already occurred). In addition, in early 2018, CW 3, the former President of the Fluoroproducts business at Chemours who reported to Defendant Vergnano, stated that she directly provided the Individual Defendants with a comprehensive environmental remediation liability analysis by no later than the spring of 2018 that calculated the Company faced no less than $2 billion in existing remediation costs across all Company sites (excluding any related litigation).

215. The Form 10-Q also repeated the statements in ¶172 above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This

111

statement and omission were false and misleading for the reasons explained in ¶173. In addition, Chemours admitted in its Verified Complaint that by no later than 2018, DuPont had provided Chemours with the "comprehensive study" estimating the benzene liabilities "at over $111 million."

216. Defendants, well aware of the true exposure Chemours was facing, engaged in suspiciously timed insider trading only days after filing the 10-Q. Defendants Vergnano and Newman each sold unusually large amounts of Chemours stock during the Class Period, precisely at a time when they could maximize their insider profits. Indeed, Defendants Vergnano and Newman sold over $10.1 million and $6.8 million in Chemours stock, respectively, during the Class Period, after having sold *zero* shares before the Class Period.

217. These sales were coordinated, as the overwhelming majority of the sales occurred between May 8 and 9, 2018.[7] On these two days, Defendant Vergnano sold over $10.1 million worth of Chemours stock, while Defendant Newman sold $2.2 million worth. These May 2018 sales were timed to maximize insider profits, as they were made shortly after Defendants had received CW 3's internal estimate of approximately $2 billion in Chemours liabilities for

---

[7] Defendants entered into 10b5-1 trading plans one after the other, on March 2 and March 15, 2018, which provided or allowed for the highly suspicious—and for Defendant Vergnano, truly anomalous—stock sales just weeks later, on May 8-9, 2018. Notably, after the trading plans served their purpose of "allowing" Defendants' massive stock dumping in May 2018, Defendants abandoned the trading plans. Moreover, Newman's other Class Period stock sales were not pursuant to any trading plan.

112

remediation. Indeed, the sales were strategically timed at prices of up to $50.86 per share, at near-term highs for Chemours' stock price, and before several disastrous corrective disclosures sank Chemours' stock price as low as $14.96 at the end of the Class Period.

218. On August 3, 2018, Defendants held their second quarter earnings call for 2018, reporting $497 million in adjusted EBIDTA and $281 million in net income. During the call, Defendant Newman stated that "we continue to enhance our liquidity while adding flexibility to [Chemours'] balance sheet," and that the Company "continued to benefit from the flexibility that our balance sheet provides."

219. On the same day, Defendants filed with the SEC Chemours' Form 10-Q for Q2 2018. In it, Defendants reported a total environmental remediation accrual of just $247 million, which Defendants stated was "appropriate based on existing facts and circumstances," and further stated that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $500 [million] above the [$247 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations, or cash flows in any given year, as such obligation can be satisfied or

settled over many years."

220. The statements quoted above in ¶¶218-219 were materially false and misleading. In truth, Defendants had not "add[ed] flexibility" to the Company's balance sheet. Rather, as Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to <u>over $2.46 billion</u>, that they far outweighed the Company's net assets and rendered it <u>insolvent</u> as a matter of law at the time of the spin-off and throughout the Class Period. In light of these facts, Defendants' assertion that their reserve of only $247 million was "appropriate based on existing facts and circumstances" was clearly false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $747 million) bore no relation to reality.

221. Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation costs for Chemours' <u>New Jersey sites alone</u> would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "<u>implausi[bly]</u>"

114

low, and that the true remediation liability for just <u>one</u> of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Additionally, by this time, Defendants had directly received an upward estimate of "maximum" liability from DuPont of remediation across all New Jersey sites of $620 million, which Defendants asserted in the Verified Complaint was "implausib[ly]" low. Defendants further admitted in the Verified Complaint that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which was the minimum required amount to end future PFAS emissions (in addition to the substantial costs required to clean up the decades of emissions that had already occurred). In addition, in early 2018, CW 3, the former President of the Fluoroproducts business at Chemours who reported to Defendant Vergnano, stated that she directly provided the Individual Defendants with a comprehensive environmental remediation liability analysis by no later than the spring of 2018 that calculated the Company faced no less than $2 billion in existing remediation costs across all Company sites (excluding any related litigation).

222. The Form 10-Q also repeated the statements in ¶172 above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained in

115

¶173.

223.    On November 2, 2018, Defendants held their earnings call for the third quarter of 2018, reporting adjusted EBITDA of $435 million and net income of $275 million.  Defendant Newman touted the "profitability of our business," and stated that the Company had reduced its net leverage ratio again, to 1.5x. Defendant Newman further stated that "[w]e continue to believe that our balance sheet affords us ample strategic flexibility in each of our 3 businesses and the ability to manage through any broader economic cycle."

224.    The same day, Defendants filed with the SEC Chemours' Form 10-Q for Q3 2018.  In it, Defendants reported a total environmental remediation accrual of just $239 million, which Defendants stated was "appropriate based on existing facts and circumstances," and further stated that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $470 million above the [$239 million] amount accrued."  The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows in any given year, as such obligation can be satisfied or settled over many years."

225.    The statements quoted above in ¶¶223-224 were materially false and

116

misleading for the reasons explained in ¶¶196, 203 and 207.  In truth, the Company had not achieved "profitability," nor did it have "ample strategic flexibility" on its balance sheet.  The exact opposite was true.  As Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to <u>over $2.46 billion</u>, that they far outweighed the Company's net assets and rendered it <u>insolvent</u> as a matter of law at the time of the spin-off and throughout the Class Period.  In light of these facts, Defendants' assertion that their reserve of only $239 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $709 million) bore no relation to reality.

226.  Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false.  In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation costs for Chemours' <u>New Jersey sites alone</u> would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.  Moreover, Chemours itself asserted that DuPont's $620 million estimate was "<u>implausi[bly]</u> <u>low</u>, and that the true remediation liability for just <u>one</u> of the inherited New Jersey

117

sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Defendants further admitted in the Verified Complaint that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which was the minimum required amount to end future PFAS emissions (in addition to the substantial costs required to clean up the decades of emissions that had already occurred). In addition, in early 2018, CW 3, the former President of the Fluoroproducts business at Chemours who reported to Defendant Vergnano, stated that she directly provided the Individual Defendants with a comprehensive environmental remediation liability analysis by no later than the spring of 2018 that calculated the Company faced no less than $2 billion in existing remediation costs across all Company sites (excluding any related litigation).

227. The Form 10-Q also reported a total litigation accrual for PFOA of only $20 million, with no accrual at all for PFAS litigation, and stated that, "while management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the [proceedings regarding which Chemours was obligated to indemnify DuPont], it does not believe any such loss would have a material impact on the Company's consolidated financial position, results of operations, or cash flows."

228. The statements quoted above in ¶227 were materially false and

118

misleading. Indeed, this was the first time during the Class Period that Defendants had expressly claimed in their public filings that PFOA and PFAS litigation would have no "material impact" on the Company's financials— however, the exact opposite was true. Indeed, PFOA litigation had only increased during the Class Period, amounting to 60 cases that were filed by the end of 2018 claiming up to $120 million in personal injury damages. Considering that just one of these actions resulted in a $50 million verdict against Chemours, this litigation clearly posed a material threat to the Company. Moreover, as Defendants admitted in the Verified Complaint, PFAS litigation was also quickly "proliferating" across the country during this time, including by civil litigants and governmental authorities. Indeed, DuPont had given Chemours a precise estimate for this liability of $194 million at the time of the spinoff, which was itself highly material (equaling the Company's average net quarterly income during the Class Period), that Chemours admitted in the Verified Complaint vastly understated the PFAS liability risk it actually faced.

229. The Form 10-Q also repeated the statements in ¶172 above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained in ¶173.

119

### 3.     False Statements In 2019

230.   On January 7, 2019, Defendant Vergnano gave the keynote address at the Delaware State Chamber of Commerce Annual Dinner, a video of which both the Chamber of Commerce and Chemours posted online.  Against the backdrop of a slide titled, "Early on, more than a few chattering pundits and prognosticators left Chemours for dead," Vergnano specifically rebutted concerns about Chemours' financial condition and emphatically denied that it had been set up to fail:

> Not too long into our life as a publicly traded company, a number of business journalists and financial writers left us for dead.  Some proclaim that we were absolutely set up to fail.  Chemours was born in the summer of 2015, a spin-off of DuPont's performance chemicals business, as many of you here tonight know.  Did we have a tough slog ahead?  You bet.  <u>Were we set up to fail?  No way</u>.

231.   Vergnano then touted the Company's remarkable "transformation" and "turnaround."  Vergnano stressed that Chemours successfully executed a "5-point <u>transformation plan</u>" resulting in a turnaround that was "<u>nothing short of remarkable</u>," including "tripled" adjusted earnings, reduced leverage from "8 times levered to below 2 times levered from a debt perspective," and a shareholder return "of over 127% in the last fiscal year."

232.   The statements quoted above in ¶¶230-231 were materially false and misleading.  Defendant Vergnano's staunch denial that "no way" had Chemours been "set up to fail" is directly contradicted by Chemours' admission in the

120

Verified Complaint that Chemours was indeed set up to fail. In Chemours' own words, "DuPont orchestrated a spin-off … as part of a plan to try to off-load its historical environmental liabilities" by "dump[ing]" the "maximum possible environmental liability" into Chemours—such that DuPont had rendered Chemours insolvent in violation of Delaware law. Moreover, rather than "transforming" Chemours' financial condition and executing a financial "turnaround" that was "nothing short of remarkable," the Company was in fact readying its confidential lawsuit against DuPont that was premised on Chemours' continued and deepening insolvency—which was filed (under seal) less than six months after Vergnano's speech. Indeed, as DuPont asserted in its motion to dismiss the Verified Complaint, despite revealing that it was insolvent from the time of the spinoff in its sworn pleading, "<u>Chemours [told] a strikingly different story to the SEC and the investing public [in which] [it] regularly promote[d] itself as a spin-off success.</u>"

233. On February 15, 2019, Defendants held their earnings call for the fourth quarter and full year 2018, reporting annual adjusted EBIDTA of $1.7 billion and net income of $995 million. During the call, Defendant Vergnano touted "<u>[t]he strength of our balance sheet</u>," which "affords us the ability to invest in our company while continuing to return significant cash to shareholders through our share repurchase authorization and dividends."

121

234.    Defendant Newman stated that the Company's net leverage ratio continued to be low at approximately 1.6x, and asserted that "[w]e believe that our de-risked balance sheet gives us the ability to execute our strategy through any potential economic cycle, while returning the majority of our free cash flow to shareholders."

235.    The same day, Defendants filed with the SEC Chemours' Form 10-K for 2018.  Notwithstanding the fact that Chemours was just three short months from filing its lawsuit against DuPont in which it disclosed for the first time that it faced billions of dollars in environmental liabilities that rendered it insolvent, in its 2018 Form 10-K, Chemours reported both dramatically reduced accruals and purported "maximum liability" figures.  Indeed, in that filing Chemours reported accruals for environmental remediation of only $226 million, a reduction of more than 10% from the $253 million it had accrued in its 2017 Form 10-K, and a reduction of almost 20% from the accrual set forth in its 2016 Form 10-K.  Similarly, the Company stated that its "remote" maximum liability above that accrual would only be $450 million—a reduction of almost 12% from the $510 million the Company reported in the 2017 Form 10-K.  The Form 10-Q also again stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows at

122

any given year, as such obligation can be satisfied or settled over many years."

236. The statements quoted above in ¶¶233-235 were materially false and misleading. In truth, the Company's balance sheet was not "strong" or "de-risked." To the contrary, as Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and throughout the Class Period. In light of these facts, Defendants' assertion that their reserve of only $226 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $676 million) bore no relation to reality.

237. Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "implausi[bly]"

123

low, and that the true remediation liability for just <u>one</u> of the inherited New Jersey sites, Chambers Works, would be as much as $\underline{1.1 \text{ billion}}$—an amount that was required to be posted immediately under ISRA.  Moreover, by this time, and as Defendants admitted in the Verified Complaint, Defendants had entered or were about to enter into the consent order with NC DEQ requiring them to spend in excess of $200 million to remediate Fayetteville Works.  In addition, in early 2018, CW 3, the former President of the Fluoroproducts business at Chemours who reported directly to Defendant Vergnano, had directly provided a comprehensive environmental remediation liability analysis that calculated that the Company faced no less than $\underline{2 \text{ billion}}$ in existing remediation costs across all Company sites (excluding any related litigation).

238.  The Form 10-K also reported a litigation accrual for PFOA of just $22 million, with no litigation accrual at all for other types of PFAS, and stated that, "while management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the [proceedings regarding which Chemours was obligated to indemnify DuPont], <u>it does not believe any such loss would have a material impact on Chemours' consolidated financial position</u>, results of operations, or cash flows."

239.  The statements quoted above in ¶238 that the Company's PFOA and PFAS litigation would have no "material impact" on the Company's financials

124

were materially false and misleading, as the exact opposite was true. Indeed, PFOA litigation had only increased during the Class Period, amounting to 60 cases that were filed by the end of 2018 claiming up to $120 million in personal injury damages. Considering that just one of these actions resulted in a $50 million verdict against Chemours, this litigation clearly posed a material threat to the Company. Moreover, as Defendants admitted in the Verified Complaint, PFAS litigation was also quickly "proliferating" across the country during this time. Indeed, DuPont had given Chemours a precise estimate for this liability of $194 million at the time of the spinoff, which was itself highly material (equaling the Company's average net quarterly income during the Class Period), that Chemours admitted in the Verified Complaint vastly understated the PFAS liability risk it actually faced.

240. The Form 10-K repeated the statements in ¶172 above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained in ¶173.

241. The Form 10-K further stated, with respect to GenX, that "[t]he Company believes that discharges to the Cape Fear River, site surface water, groundwater, and air emissions have not impacted the safety of drinking water in

125

North Carolina." This statement was false and misleading for the reasons explained in ¶¶186 and 200.

242. On May 3, 2019—<u>only ten days before Defendants would file the Verified Complaint in the Delaware Chancery Court</u>—Defendants held their first quarter earnings call for 2019, reporting adjusted EBITDA of $262 million and net income of $94 million. Defendant Newman stated that, "[w]ith a strong balance sheet heading into 2019, we were able to opportunistically execute on our share repurchase program, fund the working capital needs of the business and execute strategic investments."

243. The same day, Defendants filed with the SEC Chemours' Form 10-Q for Q1 2019. In it, Defendants reported a total environmental remediation accrual of just $233 million, which Defendants stated was "<u>appropriate based on existing facts and circumstances</u>," and further stated that, "under adverse changes in circumstances, <u>although deemed remote</u>, the potential liability may range up to approximately $450 million above the [$233 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows for any given year, as such obligation can be satisfied or settled over many years."

244. The statements quoted above in ¶¶242-243 were materially false and misleading. In truth, the Company did not have a "strong balance sheet heading into 2019." Rather, as Defendants would admit in the Verified Complaint only ten days later, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and throughout the Class Period. In light of these facts, Defendants' assertion that their reserve of only $233 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $683 million) bore no relation to reality.

245. Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Class Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Class Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey

127

sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Moreover, by this time, and as Defendants admitted in the Verified Complaint, Defendants had entered or were about to enter into the consent order with NC DEQ requiring them to spend in excess of $200 million to remediate Fayetteville Works. In addition, in early 2018, CW 3, the former President of the Fluoroproducts business at Chemours who reported directly to Defendant Vergnano, had directly provided a comprehensive environmental remediation liability analysis that calculated that the Company faced no less than $2 billion in existing remediation costs across all Company sites (excluding any related litigation).

246. The Form 10-Q also reported a litigation accrual for PFOA of just $22 million, with no litigation accrual at all for PFAS, and stated that, "while management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the [proceedings regarding which Chemours was obligated to indemnify DuPont], it does not believe any such loss would have a material impact on the Company's consolidated financial position, results of operations, or cash flows."

247. The statements quoted above in ¶246 that the Company's PFOA and PFAS litigation would have no "material impact" on the Company's financials were materially false and misleading, as the exact opposite was true. Indeed,

128

PFOA litigation had only <u>increased</u> during the Class Period, amounting to 60 cases that were filed by the end of 2018 claiming up to $120 million in personal injury damages.  Considering that just <u>one</u> of these actions resulted in a $50 million verdict against Chemours, this litigation clearly posed a material threat to the Company.  Moreover, as Defendants admitted in the Verified Complaint, PFAS litigation was also quickly "proliferating" across the country during this time.  Indeed, DuPont had given Chemours a precise estimate for this liability of $194 million at the time of the spinoff, which was itself highly material (equaling the Company's average net quarterly income during the Class Period), that Chemours admitted in the Verified Complaint vastly understated the PFAS liability risk it actually faced.

248.    The Form 10-Q also repeated the statements in ¶172 above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities.  This statement and omission were false and misleading for the reasons explained in ¶173.

249.    The Form 10-Q repeated the statement in ¶241 above stating, with respect to GenX, that "[t]he Company believes that discharges to the Cape Fear River, site surface water, groundwater, and air emissions have not impacted the safety of drinking water in North Carolina."  This statement was false and

129

misleading for the reasons explained in ¶¶186 and 200.

250. Defendants also misrepresented Chemours' liability for several lawsuits filed by the NJ DEP in March 2019. The Form 10-Q did not report <u>any</u> accruals for liabilities relating to these actions, and stated that while a loss was possible, it was "<u>not estimable</u>." This statement was false and misleading. Rather than losses from these actions being "not estimable," as Defendants admitted in the Verified Complaint, Chemours was aware of estimates by DuPont that its environmental liabilities in New Jersey would be approximately $620 million, a figure Defendants admitted was, as New Jersey had stated, "implausib[ly]" low. *See* ¶¶83-85. Furthermore, Chemours admitted in its Verified Complaint that New Jersey's lawsuits threatened the Company with "staggeringly expensive" costs well into the "hundreds of millions of dollars."

251. Strikingly, less than two months before the 10-Q was filed, Defendant Newman engaged in further suspicious sales on March 11, 2019. On that date—at near-term price peaks and shortly before Chemours would file its Verified Complaint against DuPont on May 13, 2019, Newman sold more shares, for more proceeds, than at any other time up until that point.

252. Finally, each of Chemours' Forms 10-K and 10-Q filed during the Class Period represented that the Company's financial statements were "prepared in accordance" with GAAP, and contained certifications pursuant to the Sarbanes-

130

Oxley Act of 2002 ("SOX Certifications") signed by Defendants Vergnano and Newman. The SOX Certifications assured investors that the subject Form 10-K or 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." The SOX Certifications also stated that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows," of Chemours. Furthermore, the SOX Certifications stated that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

253. Each of the SOX Certifications quoted above in ¶252 were materially false and misleading for the reasons explained in ¶¶165-251 above and ¶¶254-284, *infra*.

### B.    Chemours' Financial Statements Violated GAAP

254. Compliance with Generally Accepted Accounting Principles ("GAAP") is a fundamental obligation of publicly traded companies. GAAP are the principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices at a particular time. The SEC requires the financial

131

statements of public companies, such as Chemours, to adhere to GAAP.[8]   SEC

Regulation S-X, to which Chemours is also subject, provides that annual and

interim financial statements, including all notes to the statements, "filed with the

[SEC] which are not prepared in accordance with [GAAP] will be presumed to be

misleading or inaccurate."   See 17 C.F.R. § 210.4-01(a)(1) and § 210.10-01(a)

(regarding annual and interim financial statements, respectively).

### 1.      Requirements To Disclose Loss Contingencies

255.   Because the nature and size of a company's liabilities are core

information on which investors rely, GAAP requires that companies publicly

disclose the nature of loss contingencies (*i.e.*, liabilities) that are reasonably

possible and an estimate or range of estimate of potential losses for such liabilities.

The bar for this disclosure obligation is low: disclosure is required whenever the

probability of a loss is merely more than slight.

256.   In particular, FASB Accounting Standards Codification ("ASC") 450-

20 codifies GAAP regarding "loss contingencies."   A loss contingency is an

existing condition, situation, or set of circumstances involving uncertainty as to a

possible loss that will ultimately be resolved when one or more future events occur

or fail to occur.  ASC 450-20-20.  Loss contingencies include (i) actual or possible

---

[8] The SEC recognizes the financial reporting and accounting standards of the Financial Accounting Standards Board ("FASB") as "generally accepted" for purposes of federal securities laws.  *See* SEC Release Nos. 33-8221, 34-47743, and FR-70.

claims and assessments; and (ii) pending or threatened litigation.  ASC 450-20-05-10.

257.  ASC 450-20 requires that an issuer disclose a material loss contingency—such as a liability resulting from environmental remediation and related litigation costs arising from the discharge of toxic chemicals—if a loss is at least "reasonably possible."  ASC 450-20-50-3.  A loss is considered reasonably possible when the chance of the loss occurring is more than remote (*i.e.*, more than slight) but less than likely.  ASC 450-20-20.  If a loss contingency is reasonably possible and the amount of loss or range of loss is estimable, then a company must disclose the nature of the contingency and also provide its estimate of the loss or range of loss.  ASC 450-20-50-4.

258.  In addition to requiring full disclosure of material loss contingencies in companies' annual reports filed with the SEC on Form 10-K, the SEC also requires such disclosure in quarterly reports filed with the SEC on Form 10-Q.  *See* 17 C.F.R. §210.10-01.  The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it requires disclosure of material loss contingencies in quarterly reports "even though a significant change since year end may not have occurred." *Id.*

133

## 2.      Requirements To Accrue For Loss Contingencies

259.  GAAP also requires that if it is "probable" – *i.e.*, more likely than not – that a company has an estimable material loss contingency, then the company must do more than disclose an estimate of the value of the loss contingency: indeed, in that scenario the company must record an accrual for the loss contingency as a charge against income in its financial statements.  ASC 450-20-25-2.

260.  GAAP makes it clear that the threshold for determining that it is "probable" that a loss contingency exists is not high.  According to GAAP, "probable" requires only that a future event or events are likely to occur; GAAP is not so rigid as to demand "virtual certainty" that the events triggering the loss will occur.  ASC 450-20-25-3; ASC 450-20-20.

261.  If a range of potential liability values exists, the loss is "reasonably estimable" under ASC 450-20 and the company must accrue for the loss.  For example, the FASB has provided that once it is probable that a liability had been incurred and "information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated." ASC 450-20-25-5.  Accordingly, accrual of a loss is not to be delayed until only a single amount can be reasonably estimated.  ASC 450-20-50-5.

134

262.   When accruing for a loss contingency, a company is required to charge such accrual against income either (a) its estimate of the loss, or (b) if the loss is a range, then either (i) the amount within the range that appears to be the better estimate than any other amount in the range or (ii) the minimum amount in the range, if there is no amount in the range that is a better estimate than any other amount. ASC 450-20-30-1.

263.   Determining an estimate of the range of an environmental remediation liability typically is derived by combining estimates of various components of the liability which are themselves likely to be ranges.  For some of the component ranges there may be amounts that appear to be better estimates than any other amount within the range; for other component ranges, there may be no best estimate.  Accordingly, the overall liability that is recorded may be based on amounts representing the lower end of a range of costs for some components of the liability and best estimates within ranges of costs for other components of the liability.  ASC 410-30-25-9.[9]  At the early stage of the remediation process, particular components of the overall liability that are not reasonably estimable should not preclude the recognition of a liability.  ASC 410-30-25-10.  The components of the liability that can be reasonably estimated should be viewed as a surrogate for the minimum in the range of the overall liability.  *Id.*

---

[9] ACS 410, *Asset Retirement and Environmental Obligations*.

135

264.  Additionally, "[u]ncertainties relating to an entity's share of an environmental remediation liability should not preclude an entity from recognizing its best estimate of its share of the liability or, if no best estimate can be made, the minimum estimate of its share of the liability, if the liability is probable and the total remediation liability…is reasonably estimable within a range."  ASC 410-30-25-12.  Entities are required to refine their estimate of their share of the liability as events in the remediation process occur.  ASC 410-30-25-13.

265.  If a loss contingency is probable and there is exposure to the loss in excess of the amount accrued, a company must disclose the nature of the contingency exposing the company to additional liability, and provide an estimate of the possible loss or range of loss in excess of the accrued amount.  ASC 450-20-50-3, ASC 450-20-50-4.

266.  Significantly, the SEC has instructed that a company should update its disclosures about a loss contingency as additional information becomes available, and that "[w]ith the passage of time, there is a greater presumption that it will be possible for a company to provide quantitative information."[10]

---

[10] Center for Audit Quality, SEC Regulations Committee, *June 24, 2010 – Joint Meeting with SEC Staff SEC Offices – Washington D.C.*, at 3.

136

### 3.    Specific Guidance Governing Litigation, Claims, And Assessments

267.    Because pending or threatened lawsuits, and actual or possible claims and assessments, are a common type of contingent liability, the FASB has issued specific guidance governing the accrual and disclosure obligations for this type of liability.  In determining whether accrual and/or disclosure is required with respect to pending or threatened litigation and actual or possible claims and assessments, a company cannot wait until the matter is resolved, e.g., by settlement, judgment, or decree.  Instead, the FASB requires a company to consider the following factors during the pendency of the matter:  (a) the period in which the underlying cause of action occurred; (b) the degree of probability of an unfavorable outcome; and (c) the ability to make a reasonable estimate of the amount of loss.  ASC 450-20-55-10.  In determining the probability of an unfavorable outcome to the company, the company must consider, *inter alia*, (i) the nature of the litigation, claim, or assessment; (ii) the progress of the case; (iii) the experience of the company in similar cases; and (iv) the experience of other companies. ASC 450-20-55-12.

### 4.    Fundamental Accounting Concepts

268.    Fundamental concepts underlying financial accounting and reporting (i.e., GAAP)[11] also required that Chemours' financial statements be accurate and complete, including:

i.    The concept that financial reporting should provide information about the prospects for future net cash inflows, because investors' and creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of (the prospects for) future net cash inflows to the entity. FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON 8") ¶OB3;

ii.    The concept that financial reporting should provide information about the resources of the entity and claims against the entity, because investors and other creditors need such information in order to assess the entity's prospects for future net cash inflows and cannot require the entity to provide it directly to them. FASCON 8 ¶¶OB4, 5; and

iii.    The concept that to be useful, financial information should be relevant, timely, and provide faithful representation of what it purports to represent. *Id.* ¶QC4. "Relevant financial information is capable of making a difference in the decisions made by users," which may occur "even if some users choose not to take advantage" of the information "or already are aware of it from other sources." *Id.* ¶QC6. "Timeliness means having information available to decision makers in time to be capable of influencing their decisions." FACSON 8 ¶QC29. Providing a perfectly faithful representation of the underlying facts means that the depiction meets three necessary characteristics: "It would be <u>complete</u>, <u>neutral</u>, and <u>free from error</u>." *Id.* ¶QC12.

---

[11]    The conceptual framework underlying financial accounting and reporting, especially the rules that comprise the accrual-based accounting required by GAAP, are set forth, among other places, in Statements of Financial Accounting Concepts ("FASCONs") promulgated by the Financial Accounting Standards Board.

138

## 5.    Defendants' GAAP Violations

269.    Each of the Company's Forms 10-K and 10-Q filed during the Class Period violated GAAP and fundamental accounting concepts.

270.    <u>First</u>, each of the Company's Forms 10-K and 10-Q filed during the Class Period reported total accruals for environmental remediation and litigation, as well as exposure to loss in excess of the amounts accrued, as provided below in millions.

|  | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Accrual for Environmental Remediation** | $278 | $279 | $278 | $268 | $253 | $254 | $247 | $239 | $226 | $233 |
| **Reported Additional Potential Exposure** | $535 | $480 | $480 | $510 | $510 | $510 | $500 | $470 | $450 | $450 |
| **Accrual for Litigation** | $14 | $16 | $15 | $15 | $14 | $16 | $20 | $63 | $87 | $80 |
| **Reported Additional Litigation Exposure** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

271.    Each of these accrual statements violated ASC 450-20-25-2 and FASCON 8 (i.e., ¶QC4 and ¶QC12).  Each accrual materially understated the Company's probable and estimable loss in violation of ASC 450-20-25-2, and Chemours failed to take a corresponding charge against income in its financial statements filed during the Class Period, also in violation of ASC 450-20-25-2. Indeed, the Verified Complaint specifically identifies approximately $2.5 billion in probable liabilities that the Company admits rendered it <u>insolvent</u> even before the Class

139

Period.

272.    Additionally, each of the statements identifying "remote" exposure to loss in excess of the amounts accrued violated ASC 450-20-50-3, ASC 450-20-50-4, and FASCON 8 (i.e., ¶QC4 and ¶QC12), as each of these statements was nowhere close to truthfully representing the Company's probability of loss or its actual additional exposure for environmental remediation.    Moreover, the Company's failure to report any loss exposure in excess of the amounts accrued for litigation matters was a *per se* violation of ASC 450-20-50-3, ASC 450-20-50-4, and FASCON 8 (i.e., ¶QC4 and ¶QC12) made intentionally to conceal from investors Chemours' massive known and quantifiable loss exposure for pending legal proceedings.

273.    Each of the Company's Class Period Forms 10-K and 10-Q also broke-out accrual subtotals for environment remediation and related litigation at the "most significant remediation" sites, including the Company's sites in Fayetteville Works and Chambers Works, as provided below for each reporting period, in millions.

| | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Fayetteville Works | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10 | $25 |
| Chambers Works | $24 | $24 | $24 | $21 | $19 | $18 | $18 | $18 | $18 | $18 |

140

274. Each of these statements violated ASC 450-20-25-2 and FASCON 8 (i.e., ¶QC4 and ¶QC12). Each of these accrual amounts materially understated the Company's probable and estimable loss in violation of ASC 450-20-25-2, and Chemours failed to take a corresponding charge against income in its financial statements, also in violation of ASC 450-20-25-2.

275. Further, with respect to the Fayetteville Works site specifically—for which Chemours did not disclose any specific accrual until the Q3 2018 Form 10-Q, and then reported an average accrual of just $22 million through the end of the Class Period—Defendants knew from the start of the Class Period that Chemours' probable and estimable remediation expenses would be far more substantial than the Company represented. As the Verified Complaint alleges, DuPont spent just $2.3 million remediating at the Fayetteville Works site prior to the spin-off, despite a Blue Ribbon Panel concluding that $60 million in required costs were required to end the subject discharges. *See* ¶¶90-92. Even after Chemours signed a consent order with the State of North Carolina in February 2019, pursuant to which Chemours was admittedly required to spend "at least $200 million" in remediation costs, Defendants failed to report this cost in the Company's financial statements. It was not until Chemours' Q4 2019 Form 10-Q, filed after the Class Period, that Chemours belatedly recognized a Fayetteville Works remediation accrual of

141

$201 million—approximately <u>7 to 20 times</u> more than the levels the Company previously reported.

276. Defendants also knew from the start of the Class Period that Chemours' probable and estimable remediation expenses for its Chambers Works site would be materially higher than the accrued amounts, which ranged from only $18 million to $24 million during the Class Period. As Chemours acknowledged in its Verified Complaint, Chemours' insolvency at the time of the spin-off was in part based on a lawsuit filed by the Township of Carneys Point before the Class Period which sought, as Chemours put it, "<u>over $1 billion</u> to address alleged clean-up costs" resulting from 125 years of discharges at the massively polluted Chambers Works site. *See* ¶¶86-89. Indeed, Chemours was well aware even before the Class Period that its liability to remediate Chambers Works—which was DuPont's largest manufacturing complex and had released upwards of 107 million pounds of hazardous waste during its 125 years of operations—could be in the billions of dollars. Indeed, in 2016, the Township of Carneys Point submitted to Chemours calculations by a Licensed Sited Remediation Professional showing that only 8% of the contamination at Chambers Works had been completed as of

December 2016, and that there were $1.1 billion in total remediation costs for Carneys Works under a best-case scenario lasting up to 30 years.[12]

277. Further, between January 2017 and March 2019, the Company participated in private negotiations with New Jersey regulators regarding remediation at Chambers Works. On December 11, 2017, Chemours sent a letter to the NJDEP acknowledging the Company's need to conduct extensive remediation at Chambers Works, which proposed a plan that would require Chemours to spend $54 million to clean-up the site. *Id.* Even though the $54 million proposal constituted less than 5% of the $1.1 billion at issue in Carneys' Point lawsuit, the Company's proposal was still more than double its accrual at the time. *Id.*

278. Moreover, over the course of the Class Period, additional lawsuits were filed against Chemours demanding remediation at Chambers Works, which further made clear to Defendants that the Company's accrual was severely understated. For example, on February 27, 2018, the New Jersey-American Water Company filed suits against DuPont and Chemours in New Jersey federal court for discharges from Chambers Works, seeking an additional $4 million in installation and $240,000 in annual operating costs for filters and other remediation equipment.

---

[12] This $1.1 billion estimate was based on a review over 30 years of reports submitted by DuPont and Chemours to state and federal regulators, and the use of specialized software approved by state regulators to calculate remediation costs. ¶¶86-89.

143

In March 2019, the New Jersey Attorney General filed a lawsuit on behalf of the NJDEP against Chemours and DuPont seeking compensatory and punitive damages relating to environmental contamination and clean-up at Chambers Works. *Id.* As Chemours admitted in its Verified Complaint, the costs of compensating the State could be "staggeringly expensive." *Id.*

279. <u>Second</u>, each of the Company's Forms 10-K and 10-Q reported an accrual for PFOA-related litigation matters (excluding the Ohio MDL settlement), as provided in the chart below, in millions.

| Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 |
|---|---|---|---|---|---|---|---|---|---|
| $14 | $16 | $15 | $15 | $14 | $16 | $20 | $20 | $22 | $22 |

280. The accrual amounts identified in ¶279 above violated ASC 450-20-25-2 as well as fundamental accounting concepts, including FASCON 8 (*i.e.*, ¶QC4 and ¶QC12), by materially understating the Company's probable and estimable losses for PFOA-related litigation, and by failing to take a corresponding charge against income in the Company's financial statements. As explained in ¶¶276-278 above, Defendants were well aware that each of the accruals that Defendants reported for PFOA matters vastly understated the Company's true probable and estimable liabilities.

281. Indeed, Chemours' Verified Complaint specifically identified over <u>$1.62 billion</u> in PFOA-related liabilities (excluding the $335 million Ohio MDL settlement)

144

that the Company admitted were largely responsible for the Company's undisclosed insolvency even before the Class Period began. Multiple PFOA-related matters that were not resolved by the Ohio MDL settlement included, for example, the Township of Carneys Point's $1.1 billion lawsuit against Chemours and DuPont for environmental contamination at the Chambers Works facility in New Jersey.

282. Chemours also faced substantial liabilities for numerous personal injury cases arising from PFOA exposure at Washington Works that were not resolved by the Ohio MDL settlement. Indeed, personal injury cases arising from PFOA exposure at Washington Works increased tenfold from the third quarter of 2017 to the third quarter of 2018, and continued rising through the end of the Class Period. Most if not all of these cases (i) sought substantial damages, with some seeking damages as high as $120 million; (ii) involved the same type of PFOA exposure as in the Ohio MDL litigation; (iii) were consolidated in the same court, and before the same judge, as the Ohio MDL; (iv) had progressed deep into discovery; and (v) were similar to other PFOA cases that resulted in substantial costs to the defendant chemical companies. However, in blatant violation of GAAP which expressly contemplates accruals during the pendency of litigation, Chemours refused to accrue any amounts for these and other PFOA litigation matters until the cases resolved. *See* ASC 450-20-55-10, ASC 450-20-55-12 (providing specific guidance

for when determining accruals for pending and threatened litigation, claims, and assessments).

283.   Indeed, Chemours had a systemic practice of <u>not</u> accruing for PFOA litigation—as well as PFAS and other types of litigation—until the cases were resolved.   For example, despite over fifteen years of PFOA litigation relating to Washington Works, Chemours did not reserve any amounts for the Ohio MDL until the case settled in 2017 for $671 million.   Chemours' failure to accrue for PFOA litigation until the proceedings resolved is particularly egregious given that Chemours has itself acknowledged in its Verified Complaint that its litigation costs <u>were</u> reasonably estimable, and when quantifying litigation liabilities, the Company must take account of facts such as the amount of damages claimed by plaintiffs, the procedural posture of any pending litigation, defense costs, and experience of the Company and other chemical companies in similar cases. *See*, *e.g.*, ¶64 (criticizing Deloitte's estimates for PFOA-related litigation exposure as robotically applying the universal success rate for all tort cases generally, rather than the defendant company's experience in PFOA litigation specifically). Moreover, Chemours criticized DuPont's assessment of liabilities relating to PFOA litigation because DuPont and its advisors did not perform "an actual claims analysis," "a value assessment of the cases," or "examine the likely or potential

146

damages in [the litigations]." Yet, Chemours evidently made the exact same omissions when reserving against its own PFOA docket.[13]

284. Furthermore, Chemours has acknowledged that even liabilities for lawsuits in their "early stages," including the State of New Jersey, Benzene, and PFAS litigations, can be estimated, claiming it was "evident" and "sadly clear" that the maximum liability figures certified by DuPont for those litigations were incorrect. Chemours also recognized that litigation liabilities should be taken into account even before a formal suit is filed, stating that the maximum liability figures certified by DuPont related to the Fayetteville Works plant were "inexcusabl[e]," in part because "DuPont … did not even try to take into account the tort liability that could arise from the decades of emissions." Chemours claimed it was "indisputable," that DuPont's certified maximum "comes nowhere near covering the Fayetteville exposure," in part because a "North Carolina federal court recently largely denied DuPont and Chemours' motion to dismiss" the private tort litigation related to Fayetteville. Finally, Chemours recognized that it was possible to engage experts to quantify litigation liabilities, citing DuPont's

---

[13] DuPont's estimate for PFOA liabilities relied on an analysis from Deloitte. Rather than compare the PFOA cases to similar litigations, Deloitte's analysis compared the PFOA cases to "all tort cases generally," which Chemours recognized was a "completely irrelevant data set." Chemours further stated that DuPont's PFOA estimate was "recklessly low" in part because "DuPont was paying substantial sums annually on defense costs alone and the cases were going to go on for years." Notwithstanding, Chemours failed to undertake any accrual for its own PFOA docket during the entire class period, other than certain "commitments" and "obligations" to the EPA and NJ DEP.

147

"comprehensive study by a consultant" that provided an estimate of $111 million for Benzene litigation.

## VII.   LOSS CAUSATION

285. During the Class Period, shares of Chemours' publicly traded common stock traded on the NYSE. The market for shares of Chemours' common stock was open, well-developed and efficient at all relevant times.

286.   During the Class Period, Defendants' materially false and misleading statements and omissions artificially inflated the price of Chemours common stock and maintained inflation in the stock price.  A series of partial disclosures revealed the relevant truth and removed the artificial inflation from the stock price.  As a result of their purchases of Chemours stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss.  Chemours' common stock reached a price of $58.08 on October 24, 2017, then lost approximately 75% of its value to close at $14.69 per share at the end of the Class Period.

287. On May 6, 2019, a securities analyst from Glenview Capital Management gave a presentation at the Sohn Investment Conference that disclosed significant new facts about Chemours' environmental liabilities, including a detailed analysis estimating the Company's true PFAS exposure between $4 to 6 billion. *See* ¶137.  The disclosures caused the Company's stock price to decline. The stock price plummeted nearly 15% in two trading days, falling from a closing

148

price of $34.18 per share on May 3, 2019 to close at $29.09 on May 7, 2019, on unusually heavy volume averaging 4.8 million shares over the two-day period, an increase of nearly three times the annual average daily volume. The substantial decline eliminated over $834 million in market capitalization.

288. On June 28, 2019, the Delaware Chancery Court unsealed Chemours' Verified Complaint against DuPont. *See* ¶¶140 and 154. The Verified Complaint made a series of disclosures regarding the previously undisclosed enormity of Chemours' liabilities, including that Chemours was insolvent at the time of the spin-off; Chemours still faced well over $2 billion in environmental liabilities; and the liability estimates underlying the spin-off were "baseless concoctions" and "routine and radical understatements." *Id.* The Verified Complaint further disclosed Defendants' knowledge of the liability understatements as Company insiders at the time of the spin-off, as well as a years-long series of communications between Chemours and DuPont regarding the enormous undisclosed obligations. *Id.* The disclosures caused the Company's stock price to decline. The stock price plummeted nearly 15% over three trading days, from a closing price of $24.90 per share on June 27, 2019 to close at $21.17 on July 2, 2019, on unusually heavy volume that averaged 6 million shares over the three-day period, an increase of over three times the annual average daily volume. The decline eliminated over $611 million in market capitalization.

149

289. Finally, on August 1, 2019, after market close, Chemours issued a press release disclosing disappointing financial results and increased liabilities. In the morning of August 2, 2019, Defendants made further disclosures during an investor conference call. *See* ¶148. The disclosures caused the Company's stock price to decline. The stock price plummeted over 19% in one day, falling from a closing price of $18.16 per share on August 1, 2019 to close at $14.69 on August 2, 2019, on exceptionally heavy volume of 14.1 million shares, and an increase of 6.7 times the annual average daily volume. The decline eliminated over $568 million in market capitalization.

290. The declines in the price of Chemours common stock after the truth came to light was a direct result of the nature and extent of the disclosures identified above. The timing and magnitude of the decline in the Company's stock price negates any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The following graphic shows the performance of a $100 investment in Chemours common stock from February 16, 2017 through the end of the Class Period as compared to a market index and a peer group index.



**The Chemours Company**
Share Price Performance During Corrective Disclosure Period

## VIII. CLASS ACTION ALLEGATIONS

291. Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the common stock of Chemours between February 16, 2017 and August 1, 2019, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Chemours at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof,

151

and any entity in which Defendants or their immediate families have or had a controlling interest.

292. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Chemours shares were actively traded on the New York Stock Exchange. As of July 29, 2019, there were over 163 million shares of Chemours common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least tens-of-thousands of members of the proposed Class. Class members who purchased shares of Chemours common stock may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

293. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

294. Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

295. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    i.    whether the federal securities laws were violated by Defendants' acts, as alleged herein;

    ii.    whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

    iii.    whether Defendants acted with scienter; and

    iv.    the proper way to measure damages.

296. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

297. At all relevant times, the market for Chemours' common stock was an open, efficient and well-developed market for the following reasons, among others:

    i.    Chemours stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

153

ii.     As a regulated issuer, Chemours filed periodic reports with the SEC and the New York Stock Exchange;

iii.    Chemours regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

iv.     Chemours was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

298.    As a result of the foregoing, the market for Chemours' common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Chemours' common stock. All purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of Chemours stock at artificially inflated prices, and a presumption of reliance applies.

299.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Chemours' business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be

154

material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.   INAPPLICABILITY OF STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

300. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Chemours' present business and operations, its present financial condition, and its internal controls, among others.

301. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Chemours' liabilities for environmental remediation, litigation relating to chemicals manufacturing, and its environmental practices, among others. Given

155

the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Chemours were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

302. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Chemours who knew that the statement was false when made.

## XI.   <u>CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT</u>

### <u>FIRST CLAIM FOR RELIEF</u>
**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5**
**(Against Defendants)**

303. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

304. This Count is asserted on behalf of all members of the Class against Chemours and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

305. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately

156

disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

306. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and other investors similarly situated in connection with their purchases of Chemours common stock during the Class Period.

307. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of

Chemours common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, Chemours' business and operations; (b) artificially inflate and maintain the market price of Chemours common stock; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

308. Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

309. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Chemours common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

310. Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Chemours common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiff and the other members of the Class would not have purchased Chemours common stock at

158

the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

311. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Chemours common stock during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violations Of Section 20(a) Of The Exchange Act
### (Against The Individual Defendants)

312. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

313. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

314. During their tenures as officers and/or directors of Chemours, each of these Individual Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. *See* ¶¶27-29. By reason of their positions of control and authority as officers and/or directors of Chemours, these Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage

159

in the wrongful conduct complained of herein. These Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by Chemours during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

315. In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. The Individual Defendants signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Chemours during the Class Period. The Individual Defendants were also directly involved in providing false information, and they certified and approved the false statements disseminated by Chemours during the Class Period. As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of Chemours within the meaning of Section 20(a) of the Exchange Act.

316. As set forth above, Chemours violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

160

317.    By virtue of their positions as controlling persons of Chemours, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class, who purchased or otherwise acquired shares of Chemours common stock.    As detailed above in ¶¶314-315, during the respective times these Individual Defendants served as officers and/or directors of Chemours, each of these Individual Defendants was culpable for the material misstatements and omissions made by the Company.

318.    As a direct and proximate result of these Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or other acquisition of Chemours common stock.

## XII.    **PRAYER FOR RELIEF**

319.    WHEREFORE, Lead Plaintiff prays for judgment individually and on behalf of the Class, as follows:

> i.    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;
>
> ii.    Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

161

iii.    Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

iv.    Awarding such other and further relief as the Court may deem just and proper.

## XIII.  <u>JURY DEMAND</u>

320.  Lead Plaintiff demands a trial by jury for all issues so triable.

Dated:  April 3, 2020

Respectfully Submitted,

/s/    *Bruce E. Jameson*

Bruce E. Jameson (Bar No. 2931)
Marcus E. Montejo (Bar No. 4890)
Stephen D. Dargitz (Bar No. 3619)
**PRICKETT JONES & ELLIOTT, P.A**
1310 King Street
Wilmington, Delaware 19801
Telephone: (302) 888-6500
Facsimile: (302) 658-8111
bejameson@prickett.com
memontejo@prickett.com
sddargitz@prickett.com

*Liaison Counsel for the Class*

Maya Saxena
Joseph E. White III
Lester R. Hooker
Dianne M. Pitre
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com

162

lhooker@saxenawhite.com
dpitre@saxenawhite.com

Steven B. Singer
Kyla Grant
**SAXENA WHITE P.A.**
10 Bank Street
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 216-2220
ssinger@saxenawhite.com
kgrant@saxenawhite.com

David R. Kaplan
Brandon Marsh
**SAXENA WHITE P.A.**
12750 High Bluff Drive, Suite 475
San Diego, California 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
bmarsh@saxenawhite.com

*Counsel for Lead Plaintiff New York*
*State Teachers' Retirement System*
*and Lead Counsel for the Class*

163

# EXHIBIT 8

Case 1:19-cv-01911-CFC    Document 78-2    Filed 06/03/22    Page 233 of 235 PageID #:
5099
Case 1:19-cv-01911-CFC   Document 42-10   Filed 04/06/21   Page 1 of 3 PageID #: 1986

# Exhibit 7



EXHIBIT

8

Kirsch

PENGAD 800-631-6989

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE THE CHEMOURS COMPANY
SECURITIES LITIGATION

This document relates to all actions.

C.A. NO. 1:19-CV-01911-CFC

Hon. Colm F. Connolly

CLASS ACTION

## DECLARATION OF PAUL KIRSCH

I, PAUL KIRSCH, declare under the penalty of perjury and state as follows:

1.      I was President of the Fluoroproducts business at Chemours from June 2016 to October 2019. I submit this declaration as I understand that the Complaint filed in this action describes the person who occupied that position during that time as Confidential Witness 3 ("CW 3").

2.      Having reviewed the section of the Complaint discussing CW 3, I believe it is misleading. Paragraphs 127-132 describe a project to review environmental matters at Chemours's various facilities and presentations made in connection with that review to executive management and the Board. Those paragraphs suggest that this review identified approximately $2 billion in remediation obligations and that Chemours improperly failed to accrue for those obligations.

3.      I participated in the 2018 review of environmental matters undertaken by Chemours and am familiar with these presentations. I, in fact, made the presentation to the Chemours Board. The presentations did not concern environmental remediation obligations; rather they were part of a publicly disclosed Corporate Responsibility Commitment program

==through which Chemours hoped by 2030 to significantly reduce its environmental footprint and==

==demonstrate its leadership on environmental issues within the chemical industry.==  Among the

ambitious goals we set were a 60 percent reduction in greenhouse gas emissions, a 99 percent

reduction in air and water process PFAS emissions, and a 20 percent reduction in waste intensity.

We estimated that achieving these goals could cost from $1.7 billion to $2.3 billion over that 12-

year period if we were able to implement all of them.  We also expected this project would

generate significant benefits for Chemours.  The analysis I provided was in no way an estimate

of Chemours's current remediation obligations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.  Executed on this 24th day of August, 2020 in WAYNE, PA        .

Paul Kirsch