# EXHIBIT 11

# Exhibit 1



EFiled:  May 13 2019 04:15PM EDT
Transaction ID 63260140
Case No. 2019-0351-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE CHEMOURS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOWDUPONT INC.; | ) | C.A. No. |
| CORTEVA, INC.; AND E. I. DU | ) | **FILED UNDER SEAL** |
| PONT DE NEMOURS AND | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## VERIFIED COMPLAINT

## YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING
## FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**If you are not authorized by Court Order to view or retrieve this document read no further than this page.  You should contact the following person:**

> Joel Friedlander (Bar No. 3163)
> Jeffrey M. Gorris (Bar No. 5012)
> Christopher Foulds (Bar No. 5169)
> Christopher P. Quinn (Bar No. 5823)
> FRIEDLANDER & GORRIS, P.A.
> 1201 N. Market Street, Suite 2200
> Wilmington, DE 19801
> (302) 573-3500

*Counsel for Plaintiff The Chemours Company*

A public version of this document will be filed on or before May 16, 2019.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| THE CHEMOURS COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DOWDUPONT INC.; | ) C.A. No. |
| CORTEVA, INC.; AND E. I. DU | ) **FILED UNDER SEAL** |
| PONT DE NEMOURS AND | ) |
| COMPANY, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## VERIFIED COMPLAINT

Plaintiff The Chemours Company ("Chemours"), by and through its

undersigned counsel, as and for its complaint against the Defendants named herein,

alleges on personal knowledge as to itself and its own conduct, and on information

and belief as to all other matters, as follows:

## INTRODUCTION

1. E. I. du Pont de Nemours and Company ("DuPont") has manufactured

industrial chemicals since 1802. In 2015, DuPont orchestrated a spin-off of its

Performance Chemicals unit into a new company it named Chemours, as part of a

plan to try to off-load its historical environmental liabilities. When DuPont did so,

its board made the determination — required by Delaware statutory and common

law — that the spin-off was appropriate and that Chemours was solvent and viable

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

at the time. DuPont's board made that determination on the basis of "High End (Maximum) Realistic Exposure" numbers DuPont certified for each of the host of contingent liabilities it was dumping on Chemours.

2. It has since become clear that DuPont's supposedly "maximum" numbers were systematically and spectacularly wrong. Yet DuPont and the other Defendants now claim a right to unlimited indemnification from Chemours for DuPont's massive historical liabilities, without regard for the "maximum" numbers DuPont certified for those liabilities and upon which the spin-off was predicated. The Separation Agreement between DuPont and Chemours — the inappropriately named document embodying the one-sided arrangement DuPont forced on Chemours that purports to state Chemours's (limited) rights and (extensive) obligations — cannot be allowed and should not be read to permit that unlawful and inequitable result.

3. DuPont's management had a keen incentive to downplay or close its eyes to the true "maximum" liabilities at the time of the spin-off. The company and management were under activist attack. To save itself, management was looking to shift as much liability onto Chemours as possible — and, at the same time, to extract for DuPont a multi-billion dollar dividend payment from the new company. By lowballing the valuation of the liabilities and not investigating and

-2-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

reflecting the true potential maximums, DuPont's management could heap more liabilities on Chemours and withdraw more cash for DuPont — while still calling the spin-off appropriate and Chemours solvent. That DuPont's certified "maximums" have since been revealed to have been routine and radical understatements speaks volumes about DuPont's true incentives at the time.

4.    At the time of the spin-off, DuPont was defending a multi-district litigation involving 3,500 cancer and other bodily injury claims relating to a compound called PFOA. Even though DuPont certified a "maximum" liability for these cases of $128 million, the actual settlement amount just 19 months later was $671 million — over five times the supposed "maximum." Chemours notified DuPont that the certified "maximum" liability capped Chemours's obligations with respect to those cases. Although DuPont initially insisted that there was no such cap and Chemours needed to pay the entire cost, DuPont ultimately agreed to pay fifty percent of the settlement plus other amounts regarding PFOA liabilities.

5.    But while the parties settled that initial dispute, DuPont has since gone back to its absolutist extreme on other matters where reality has overwhelmed its certified "maximums." As more of the "maximums" have been revealed as anything but, by even larger degrees, DuPont has reverted to the position that Chemours owes the entirety of the liabilities, without regard to the maximum

-3-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

numbers upon which the economics of the spin-off and the DuPont board's approval of it were based.

6.    For example, in February 2019, Chemours entered into a judicially approved consent order with the State of North Carolina to resolve the State's claims arising from DuPont's long-running discharges into the Cape Fear River and contamination of area groundwater.  The consent order requires Chemours to take steps to remediate DuPont's historical contamination and to implement environmental protection measures that DuPont considered implementing years ago but decided not to pursue as too expensive.  At the time of the spin-off, DuPont certified Chemours's "maximum" exposure in North Carolina as a miniscule $2.09 million.  But the cost to Chemours of implementing the consent order will be more than $200 million — that is, more than 100 times DuPont's "maximum" certified number.  Beyond that, many private lawsuits relating to DuPont's activities in the region remain outstanding, including a large class action as to which the North Carolina federal court recently denied DuPont and Chemours's motion to dismiss.  DuPont has demanded indemnification for, and disclaimed any obligation to contribute to, all these liabilities, without regard to the $2.09 million "maximum" it certified.

-4-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7.     Another example:  In March 2019, the State of New Jersey sued and issued directives to Chemours and DuPont to recover the costs of DuPont's discharges all over the State.  According to New Jersey, the remediation costs could be "staggeringly expensive," well into the "hundreds of millions of dollars" — an amount far higher that the "maximums" DuPont certified for the various sites in the State.  Moreover, according to New Jersey, DuPont violated New Jersey law by spinning off Chemours on the basis of underestimated environmental liabilities without providing the State with the "financial assurance necessary to ensure" that the necessary clean-up can be done.  Here again, DuPont has demanded indemnification from Chemours for, and denied any obligation to contribute to, the New Jersey liabilities, again without regard to the "maximums" it certified.

8.     And unfortunately, there are other examples beyond North Carolina and New Jersey.  As detailed below, DuPont imposed on Chemours its historical liabilities from benzene and perfluoroalkyl and polyfluoroalkyl substances ("PFAS").  For benzene, DuPont certified a "maximum" liability of $17 million at the time of the spin-off; yet, in 2018, it provided Chemours with a more comprehensive study valuing the potential maximum costs at over $111 million.  DuPont addressed PFAS litigation, if at all, as part of a catch-all "maximum" of $194 million covering "General Litigation . . . to Perpetuity," which apparently

-5-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

included everything from PFAS liabilities to commercial litigation; yet PFAS litigation is proliferating.  Although Chemours is defending these claims (and New Jersey's), it is evident here as well that the real "maximum" potential liability was not what DuPont certified it was.  But here as well, DuPont has refused to honor the maximums and demanded unlimited indemnification without regard to them.

9.     As detailed below, Chemours seeks declarations that the unlimited indemnification DuPont is now seeking for these matters is contrary to Delaware law and/or the Separation Agreement.  Defendants are not entitled to indemnification for historical DuPont liabilities that exceed the maximums it certified at the time of the spin-off for these matters, and may not preclude Chemours from seeking contribution for historical DuPont liabilities that exceed those maximums.  As described more fully below, Chemours requests that this Court enter declarations to that effect on either of two alternative bases:  (a) that under the circumstances here, the Separation Agreement should be interpreted as incorporating the DuPont-certified "maximums" for these matters as caps, or otherwise (b) that it is unenforceable by Defendants in excess of those "maximums" as a matter of Delaware law, equity and public policy.

10.     Where, as here, a spin-off is predicated on maximum liability amounts that serve as the basis for the board's approval of the transaction, or that are

-6-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

necessary to demonstrate the new company's solvency, those maximums must be given effect. If, as DuPont now maintains, the maximums it certified for its board have zero meaning and Chemours has uncapped liability without regard to them, then DuPont is admitting that the entire spin-off process was a sham. And in the future, other companies could predicate spin-offs on liability "maximums" that are knowingly wrong or certified without reasonable evaluation (as DuPont did here), secure in the knowledge that they could do so with impunity. Worse still, here, if Chemours really had uncapped responsibility for the true potential maximum liabilities, the resulting company would have been insolvent as of the time of the spin, meaning the spin-off would have been effected in violation of Delaware law. DuPont's position is contrary to statute, equity and public policy, and the Separation Agreement cannot be enforceable and should not be interpreted so as to permit it.

## PARTIES

11.    Plaintiff Chemours is a Delaware corporation, with principal executive offices at 1007 Market Street, Wilmington, Delaware. Chemours is a manufacturer of performance chemicals with customers in more than 120 countries and nearly 7,000 employees worldwide, including well over 1,000 in Delaware. Chemours was incorporated as a subsidiary by Defendant DuPont as of April 30,

-7-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

2015. From that time until July 1, 2015, Chemours was a wholly owned subsidiary of DuPont. On July 1, 2015, DuPont spun off Chemours, distributing shares of Chemours stock to DuPont stockholders, and Chemours has since been an independent, publicly traded company.

12. Defendant DuPont is a Delaware corporation, with principal executive offices at 974 Centre Road, Wilmington, Delaware. DuPont is now a wholly owned subsidiary of Defendant DowDuPont. Before its August 31, 2017 merger with The Dow Chemical Company ("Dow"), DuPont was a publicly traded company that operated businesses including agriculture, electronics and communications, industrial biosciences, nutrition and health, performance materials and protection solutions segments.

13. Defendant DowDuPont Inc. ("DowDuPont") is a Delaware corporation, with principal executive offices at 974 Centre Road, Wilmington, Delaware. DowDuPont was formed following DuPont's merger with Dow. DowDuPont has underway a series of separation transactions, following which it will retain certain of DowDuPont's assets and liabilities and be renamed DuPont de Nemours.

14. Defendant Corteva, Inc. ("Corteva") is a wholly owned subsidiary of DowDuPont. Corteva is a Delaware corporation, with principal executive offices

-8-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

at 974 Centre Road, Wilmington, Delaware.  On June 1, 2019, DowDuPont plans

to distribute to DowDuPont stockholders all issued and outstanding shares of

Corteva common stock by way of a pro rata dividend.  As of and following the

distribution, Corteva is expected to be the direct parent of DuPont and to hold

certain of DowDuPont's assets and liabilities.

## FACTUAL ALLEGATIONS

**I.    DuPont decides to off-load most of its liabilities into a "spinco" and to extract a large dividend at the same time.**

15.    In 2013, DuPont's management began to consider restructuring the

company, and in so doing, casting off DuPont's substantial environmental

liabilities, including clean-up and other remediation obligations.  The initiative was

dubbed "Project Beta."

16.    Project Beta focused on DuPont's Performance Chemicals unit.  That

unit historically manufactured and sold a wide catalogue of industrial and specialty

chemicals, including titanium dioxide and a range of fluorochemicals and

fluoroproducts used as and in refrigerants, lubricants, propellants, solvents, fire

extinguishants and electronic gases.  Because these businesses had created

chemical byproducts as part of their chemical manufacturing processes, the unit

had given rise to many of DuPont's environmental liabilities, including costly

-9-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

remediation of prior emissions and the need for substantial investment in pollution abatement technology.

17. DuPont concluded that no rational buyer would accept the associated liabilities without limit, at least absent a price discount so substantial that the sale would not be financially beneficial to DuPont. So DuPont's management instead decided to pursue a divestment in which DuPont could control the transaction structure and economics. So began the spin-off of what would become Chemours.

18. Later in 2013, Project Beta assumed more urgency after the activist hedge fund Trian Fund Management L.P. ("Trian") took a stake in DuPont and began agitating for change. Trian argued that DuPont had failed as a conglomerate and should separate into three independent entities, focused on agriculture, specialty chemicals and performance chemicals. Trian also argued that DuPont's management lacked the skills to execute a reorganization. Among other things, Trian observed that DuPont had recently sold its Performance Coatings business (called Axalta) to private equity firm Carlyle, which promptly discovered an additional $229 million in annual earnings — confirming, Trian argued, DuPont's bloat and incompetence. "[B]y not running [Axalta] efficiently and selling the business for cash rather than doing a tax-free spin," Trian claimed, DuPont had squandered $5 billion in stockholder value.

-10-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

19.    Hoping to ward off Trian, DuPont planned a $5 billion stock buyback. To fund the repurchase, DuPont decided to move forward quickly with the Project Beta/Performance Chemicals spin-off.  DuPont also decided to use the spin-off not just to cast off environmental liabilities, but also as a cash-cow to fund the anti-Trian stock buyback.  So in October 2013, when it announced the planned Performance Chemicals spin-off, DuPont also determined that the unnamed "spinco" would pay DuPont a dividend of at least *$3.3 billion* upon divestment. To fund that massive dividend, the spinco would take on billions in debt.  This huge dividend to DuPont was ordained before full analysis of the spinco's structure and capitalization was conducted.

20.    Unmollified, Trian launched a proxy contest in early 2015.  In response, DuPont went back to the Performance Chemicals well, announcing that the spinco payment back to DuPont would be even higher, about *$4 billion*, pushing spinco into a junk credit rating.  DuPont also announced that substantially all that amount would be paid out to DuPont stockholders through stock repurchases over the succeeding 18 months.

II.    **DuPont designs the Chemours spin-off, unilaterally and on the basis of unreasonable financial data.**

21.    DuPont thus determined to dump the maximum possible environmental liability on spinco while extracting the pre-ordained $4 billion

-11-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Case 1:19-cv-01911-CFC   Document 78-3   Filed 06/03/22   Page 15 of 100 PageID #:
5116
Case 1:19-cv-01911-CFC   Document 42-1   Filed 04/06/21   Page 14 of 68 PageID #: 1541

payment. This would push the spinco, Chemours, to the edge. But that was, indeed, DuPont's goal. DuPont was not only looking to take every last cent of capital to fight off Trian. It also wanted to bury Chemours in liability precisely to prevent a repeat of the Axalta humiliation. Indeed, DuPont's bankers warned it that an underlevered spin may attract criticism from activists.

22.    To achieve its desired result, DuPont (1) completely dominated the planning of the spin-off; (2) forced through an unprecedentedly disproportionate allocation of assets, debts and liabilities; (3) engineered a vastly understated valuation of the liabilities it would impose on Chemours to try to square the spin-off with Delaware law; and (4) sought to shield its conduct from public and judicial scrutiny by purporting to require private arbitration of any dispute raised by Chemours after it became independent.

### A.    DuPont crams down the spin-off.

23.    DuPont made no effort to install procedural protections for Chemours or otherwise replicate an arm's-length bargain. To the contrary, DuPont worked to ensure its complete dominance over every aspect of the transaction.

24.    DuPont refused to allow Chemours (or its prospective management team) to have independent counsel to represent the to-be company's interests in structuring the spin-off. Instead, DuPont and its outside counsel at Skadden, Arps,

-12-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Slate, Meagher & Flom LLP ("Skadden") unilaterally prepared all of the documents underlying and effectuating the spin-off.

25.    DuPont's exercise of unilateral domination started from the outset. Although the spin-off was announced in October 2013, DuPont refused to allow any of the designated management team for Chemours to see drafts of the principal document — the Separation Agreement (attached as Exhibit A) — until late December 2014.  (As background, Chemours was first incorporated in April 2015 in preparation for the spin-off.  Prior to that time, however, DuPont had designated its prospective management team, although these individuals had no power regarding the spin-off terms.  From April 2015 until the July 1, 2015 spin-off, Chemours was a wholly owned subsidiary of DuPont.)

26.    Moreover, when DuPont finally sent the draft Separation Agreement to Chemours's general counsel-designate in late December 2014, DuPont had Skadden send him an extraordinary letter just before doing so.  The letter emphasized that DuPont and Skadden would control the documentation process, that Skadden's "provision of legal services to DuPont . . . has been at the request and on behalf of DuPont alone," that Skadden would not provide Chemours legal advice, and that "Chemours will not be relying on Skadden to advocate for it or to protect its interests in connection therewith."

-13-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

27.    Beyond this, the draft Separation Agreement DuPont finally did provide was woefully incomplete.  In particular, the draft did not include the schedules listing the assets and liabilities to be allocated to Chemours.  As a result, Chemours's designated management team was unable to evaluate central economic terms of the transaction being forced upon their incipient company.  Throughout the winter and spring of 2015, Chemours's designated management team repeatedly requested copies of these schedules; DuPont repeatedly refused to provide them.

28.    Instead, DuPont took the position that Chemours's management had no reason or right to assess the economic terms because "this was not a negotiation."  DuPont thus repeatedly reminded Chemours's management that any discussions between them and DuPont representatives were not considered or to be called "negotiations."  Instead, in an Orwellian flourish, they were to be called "calibration" sessions, in which DuPont would inform Chemours's management what was being done and in which Chemours's personnel were instructed that they were permitted only to ask questions for "clarification."

29.    The culmination of these "calibration" sessions was an April 2015 meeting with DuPont's senior management.  After months of asking, Chemours had just been provided the preceding Friday evening (of Easter weekend, no less)

-14-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

with some of the basic economic terms of the spin-off.  Chemours's designated CEO, CFO and general counsel came to the meeting prepared with facts, figures and eight pages of talking points demonstrating the unfairness of the transaction DuPont was planning.  DuPont largely ignored and then summarily rejected each of Chemours's requests.

30.    Moreover, leading up to a subsequent meeting with DuPont's senior management in June 2015, Chemours's CFO sent an email pleading that he needed an additional $200-300 million in cash reserves to function on day one.  DuPont summarily rejected this plea as well, and castigated him for putting the request in an email.

31.    The summary and arbitrary nature of the rejections is well-illustrated by DuPont's refusal to accede even to Chemours's repeated requests that DuPont remove the patently false clause in the Separation Agreement stating that "[t]he Parties have participated jointly in the negotiation and drafting" of the agreement. Separation Agreement § 10.19.

32.    And finally, when Chemours's CEO was invited to a meeting at which DuPont's board considered the appropriateness of Chemours's strained capital structure, he was told only to answer questions posed by the board and not to volunteer his opinion.

-15-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

33.     As the July 1, 2015 target date for the spin-off drew closer, DuPont

dispensed with even the charade of Chemours's participation.  Thus:

(a)     On May 12, 2015, to facilitate the extraction of capital from

Chemours, DuPont caused Chemours to assume $4 billion in debt and used

the proceeds of that debt to authorize a $3.91 billion dividend back to

DuPont.  On the date this dividend was authorized, Chemours's board

consisted exclusively of three DuPont employees who were not going to be

with Chemours following the spin-off (DuPont's M&A Counsel, Nigel

Pond; DuPont's Treasury Manager, Michael Heffernan; and DuPont's M&A

Manager, Steven Zelac).

(b)     DuPont had also begun executing "completed intercompany

agreements" on Chemours's behalf that Chemours employees had never

seen.

(c)     On June 9, 2015, the Chemours "board" — still consisting

exclusively of the three DuPont employees, Messrs. Pond, Heffernan and

Zelac — held a board "meeting" to "discuss" whether Chemours should

approve the spin-off and the Separation Agreement.  The only other

attendees were other DuPont employees and Skadden.  The entire meeting

lasted 55 minutes, and consisted of "presentations" by Skadden and DuPont.

-16-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

At the end of this perfunctory show exercise, the three DuPont-employee directors (1) took "notice" that "DuPont, as the sole stockholder of the Company [Chemours], has communicated" that the DuPont board had determined that the spin-off and the Separation Agreement "are in DuPont's best interests," and (2) "unanimously" adopted resolutions approving the spin-off and the Separation Agreement on Chemours's supposed behalf. Right after doing so, the three "directors" resigned from the Chemours board.

(d)    On June 26, 2015, DuPont had Pond — whom DuPont now designated a "Vice President" of Chemours (a temporary position he would not hold after the spin took place the next week) — exercise his contrived authority to "execute" the Separation Agreement on Chemours's supposed behalf.

34.    Indeed, DuPont's attempted unilateral dictates persisted even *after* the spin-off took place on July 1.  DuPont had intended to have all the one-sided "intercompany" agreements signed and added to the companies' shared database in advance of the spin-off, while DuPont was fully in control and could direct its employees to sign "for" Chemours.  But after July 1, DuPont realized that one of the agreements (an imbalanced supply agreement) had been added to the database

-17-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

without being signed. So DuPont attempted to supplement this agreement with an undated "side agreement" signed by Pond. Chemours — now independent and beyond DuPont's dictates — protested, and the companies eventually reached an agreement on this one subject with commercially reasonable terms.

35.    In short, no one affiliated with Chemours was given the opportunity to negotiate the terms of the Separation Agreement. No one representing Chemours's interests ever agreed to the Separation Agreement. The use of the word "Agreement" is simply a farce.

**B.    DuPont unilaterally decrees a totally disproportionate allocation of assets, debts and liabilities.**

36.    There is a reason why DuPont refused any concept of negotiation and controlled what its board would hear: the Separation Agreement embodied an abnormally lopsided spin-off.

37.    Chemours received only 19% of DuPont's business lines, but was saddled with approximately two-thirds of DuPont's environmental liabilities and 90% of DuPont's pending litigation by volume of cases. On top of that, it was burdened by all of the debt necessary to fund the nearly $4 billion dividend to DuPont.

38.    The liabilities imposed on Chemours included environmental liabilities arising from a vast array of over 80 DuPont-associated sites. The great

-18-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

majority were not sites that Chemours would operate following the spin-off, including at least 35 that were never owned by DuPont and dozens that were either previously owned by DuPont or were not operating any more.

39.    DuPont even "gave" Chemours liabilities that had nothing to do with its performance chemicals business.  Chemours received all liability related to DuPont's historical explosives operations and asbestos and benzene exposures.  None of these liabilities had anything to do with performance chemicals.  The benzene liability stemmed, in part, from the Performance Coatings business that DuPont sold to Carlyle in the Axalta transaction.  In that sale, DuPont could not get Carlyle to assume the benzene liability, even though Carlyle was purchasing the business that actually generated it.  So since DuPont still had the liability, it decided just to hand it to Chemours.  DuPont even assigned DuPont's Wilmington office building on Rodney Square to Chemours after determining that the landmark headquarters was a liability, thereby allowing DuPont immediately to decamp to headquarters outside of the city.  Chemours had no say in any of the allocation of liabilities and did not even see the final schedule of liabilities until days before the spin-off was consummated.

40.    The result of this process was an extreme transaction with an abnormally skewed distribution of liability.  Chemours's capital structure would

-19-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

brand it as a distant outlier among spin-offs.  It was spun off at inception with a debt-to-EBITDA ratio of 5.5 — meaning that its liabilities exceeded its unadjusted earnings by a multiple of 5.5, a remarkably high ratio.  DuPont's financial advisors had to use leveraged buy-outs, not spins or public company transactions, as comparables for their financial analysis.  This left Chemours, particularly if the DuPont-certified liability maximums were systematically wrong, virtually no cushion for liquidity, necessary capital expenditures or adverse developments — despite warnings from DuPont's advisors that discovery of new environmental liabilities and imposition of new environmental clean-up costs had bankrupted prior spin-offs.

41.    To cement this unilateral allocation of liability, DuPont inserted ten pages of indemnification and related provisions as Article VI of the Separation Agreement (the "Indemnification Provisions").  The Indemnification Provisions include a purported requirement that Chemours defend and indemnify DuPont against any liability "relating to, arising out of, by reason of or otherwise in connection with" the liabilities that DuPont assigned to Chemours.  Separation Agreement § 6.3.  In other words, if any regulator or public or private plaintiff sought to hold DuPont accountable for any of these liabilities, DuPont could claim

-20-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

that Chemours was responsible for defending DuPont, paying the defense costs and ultimately indemnifying DuPont for any liability.

42.    At the same time, the Indemnification Provisions also seek to prohibit Chemours from pursuing any indemnity, contribution or other claim-over seeking reimbursement from DuPont for the liabilities being transferred.  Chemours may not "make any claim for offset, or commence any action, including any claim of contribution or any indemnification" against DuPont with respect to any of those liabilities.  Separation Agreement § 6.1(c).  In other words, if Chemours has to pay any of the liabilities (either because a regulator or plaintiff pursued it directly or because it had to indemnify DuPont), the Indemnification Provisions seek to preclude Chemours from having any recourse against DuPont.

**C.    DuPont's management justifies the spin-off to its board on the basis of certified "maximum" liability numbers that bear no relation to reality.**

43.    Of course, before the spin-off could be consummated, DuPont's board needed to determine that it was "appropriate" (as recited on page one of the Separation Agreement) and consistent with Delaware law.

44.    Among other things, that required a showing that the new company would be solvent and viable.  And indeed, at initial meetings, members of the

-21-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

DuPont board raised questions along these very lines, including about the potential size of the liabilities being transferred.

45.    DuPont's management thus conditioned the spin-off on "the receipt of an opinion from an independent appraisal firm to [DuPont's] Board confirming the solvency of each of DuPont and Chemours after the" spin-off.  Separation Agreement § 4.5(e).  To make the necessary record, DuPont's management commissioned Houlihan Lokey to prepare a financial analysis and opinion concluding that Chemours would be solvent as of the spin-off date.

46.    That analysis required Houlihan Lokey to take account of the huge and volatile liabilities DuPont was piling into Chemours.  But rather than seeking a fair and independent evaluation of the amount of those liabilities, DuPont arranged for Houlihan Lokey to predicate its analysis and opinion on numbers DuPont would give it as the "High End (Maximum) Realistic Exposure" for each of the liabilities.

47.    As DuPont was aware, the accuracy and reliability of these "maximum" liability numbers was critical.  DuPont knew that the Chemours balance sheet was close to the edge.  For example, when Chemours management complained prior to the spin-off about the lack of cash in its reserves, DuPont responded that Chemours could draw on its $1 billion cash revolver, despite

-22-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

knowing that because of the capital structure it had imposed on Chemours, doing so in full would cause Chemours to break its debt covenants. Likewise, when Chemours expressed concerns prior to the spin-off about the cash effect of paying quarterly stockholder dividends of $100 million, DuPont ignored these concerns and declared the Chemours dividend for the last quarter before the spin. DuPont only permitted Chemours to memorialize its concerns by including in its public filings that "any subsequent dividend [would] be subject to the sole discretion of [Chemours's] post-distribution, independent board." In short, it was clear that, if the "maximum" liabilities were understated in any substantial respect, Chemours could not be deemed solvent.

48. In May 2015, DuPont presented Chemours's newly appointed CFO (who had not previously worked for DuPont or in the chemical industry) with financial projections and a list of ostensible "High End (Maximum) Realistic Exposure" numbers for 87 separate categories of transferred liabilities. DuPont demanded that the CFO certify to Houlihan Lokey the accuracy of these "High End (Maximum) Realistic Exposure" figures, together with the DuPont-sponsored financial projections.

49. Chemours's CFO refused to sign the certification — which had been drafted by DuPont — unless, among other things, it were made clear that the

-23-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

==maximum liability numbers came from DuPont and that he was relying on DuPont== ==for their accuracy.== DuPont ultimately agreed to this. DuPont's certification of those numbers was manifested in multiple ways.

50.    First, the Chemours CFO's certification to Houlihan Lokey expressly recites that the maximum liability numbers are based on consultation "with the general counsel and certain other officers of DuPont" and "outside counsel, advisors, and consultants to DuPont" about "pending and threatened litigation, potential environmental liabilities and other contingent liabilities of the Company." In short, the liability numbers relied upon by the Chemours CFO were those vouched for by DuPont itself — nothing more.

51.    Second, DuPont also provided a range of "Backup Certificates" signed by its Accounting Director, Chief Environmental Counsel and Corporate Counsel "on behalf of DuPont" that "certif[ied]" and vouched for the accuracy of the maximum liability numbers. Each of these began by reciting that DuPont "understand[s] that Mark E. Newman [Chemours's CFO] is relying on this Backup Certificate and the statements herein in delivering the CFO Certificate to Houlihan Lokey." Collectively, the Backup Certificates attach all 87 "High End (Maximum) Realistic Exposure" numbers and "certify" that they represent DuPont's "best judgment" of the "maximum realistic exposure range of each such contingent

-24-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

liability." The Backup Certificate from the Accounting Director further "certif[ies]" that there are no "facts known to [DuPont] which could give rise to . . . other contingent liabilities" beyond the 87 categories.

52.     But despite knowing how critical these "maximums" were to its board's consideration of the spin-off and to Chemours's solvency, DuPont's management did not conduct a reasonable inquiry into or a reasonable evaluation of these liabilities. To the contrary, DuPont engineered the "High End (Maximum) Realistic Exposure" figures in a way that would massively understate the real potential maximum exposure.

53.     For example, in itemizing the environmental contingent remediation liabilities at various sites, DuPont simply proceeded from figures used to prepare its accounting reserves. This approach understated the real maximum liabilities. This is because accounting reserves include only liabilities that are both probable and estimable. Excluded from accounting reserves — and therefore excluded from DuPont's "maximum" exposure certifications — were two critical components of any realistic assessment of true maximum liabilities. First, these accounting reserves included only liabilities and amounts that were viewed as "probable" as of December 31, 2014. Where DuPont had deemed liabilities and amounts to be *possible*, though not "probable," the liabilities and amounts were excluded from

-25-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the reserves — and hence from the supposed liability "maximums," no matter how vast, imminent or possible the potential liability was, and even where DuPont knew that higher clean-up costs were possible. Second, the accounting reserves also excluded liabilities that *were* regarded as probable at the time, but for which DuPont had not yet made an estimate (including because DuPont deemed them not to be estimable). To the extent Chemours personnel were consulted in this process, they understood they were simply to use the numbers that had been developed for ordinary accounting purposes — in effect, a cut-and-paste exercise that by definition excluded consideration of risks that clearly existed, but were not yet viewed as meeting the "probable and estimable" limitation of the accounting rule — and were not given the underlying information DuPont had that was necessary to assess the real potential maximums.

54. DuPont's approach to "High End (Maximum) Realistic Exposure" for other categories of liabilities was unreasonable as well. In fact, for multiple categories of litigation (including PFOA, benzene and PFAS), DuPont does not appear to have undertaken *any* analysis. Instead, the DuPont certification invoked a supposed "analysis" of the maximum liabilities done by Deloitte Transactions and Business Analytics LLP ("Deloitte") as the source for the certified "maximums." But Deloitte appears to have done nothing of the sort. For example:

-26-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

(a)    Deloitte apparently expressly advised DuPont that the numbers it provided were *not* "worst case scenarios" — so DuPont's certified "maximums" were numbers that Deloitte said were *not* the actual maximums.

(b)    Deloitte apparently informed DuPont that its numbers were not based on an actual claims analysis or a value assessment of the cases.

(c)    For PFOA, Deloitte thus apparently did not even try to evaluate the PFOA cases themselves or examine the likely or potential damages in them.  Nor did Deloitte take into account that the PFOA cases were governed by a prior settlement agreement under which DuPont was barred from raising a key defense (general causation).  Instead, Deloitte performed arithmetic for success rates in all tort cases *generally*, and assigned DuPont the same chance of victory in PFOA cases as the defendant has in every other tort case in the courts where the PFOA cases were pending.  Based on that completely irrelevant data set, Deloitte apparently simply posited that 20% of the cases would go away for nothing, that DuPont would win 68% of the trials and that the remaining cases could then be settled relatively inexpensively.  (As detailed below, DuPont lost *every* trial and the settlement cost $671 million.)

-27-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

(d)    For other liabilities (including benzene and general litigation, which included PFAS), Deloitte appears just to have done arithmetic assuming a continuation of DuPont's historical "run rates" without any analysis of the liability at issue to see whether the assumption was valid. But DuPont then certified these numbers as high-end maximums anyway, even though Deloitte had not presented them as such and even though DuPont was doing a spin-off precisely because the liabilities were so volatile and potentially huge that it could not profitably sell the Performance Chemicals unit.

55.    In concocting the "High End (Maximum) Realistic Exposure" figures, DuPont thus made no effort to assess or evaluate the *real* maximum potential liabilities. Instead, it employed an unreasonable process that would predictably understate the liability profile it was creating for Chemours. Yet management then certified the numbers to Houlihan Lokey as "maximum" liability figures, so that Houlihan Lokey would incorporate them into its analysis and advice to the DuPont board. This approach suited management's purpose because it provided DuPont's board a basis to approve a spin-off that simultaneously off-loaded these liabilities on Chemours *and* transferred nearly $4 billion to DuPont. Predictably, the

-28-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

<mark>supposed "High End (Maximum) Realistic Exposure(s)" have proven</mark>

<mark>systematically and spectacularly low.</mark>

### D.    DuPont crams down one-sided arbitration provisions.

56.    Finally, DuPont's management decided to insert into the Separation Agreement a requirement that all disputes go to an essentially "confidential" arbitration in New York.  Not only did this purport to shield the propriety and effect of a Delaware spin-off from this Court's review, but as with every aspect of the Separation Agreement, the arbitration provisions themselves tilt radically in DuPont's favor.

57.    For example, the Separation Agreement recites that certain of DuPont's allocations of environmental liabilities are presumptively valid in the event of a subsequent dispute.  Separation Agreement § 1.1(19)(ii).  The Agreement then goes on to require that if Chemours challenges DuPont's allocation in arbitration and loses, Chemours has to pay all DuPont's costs. *Id.*

58.    Similarly, the Separation Agreement purports to strip the arbitrator of power to consider an array of ordinarily available remedies, including that the arbitrator may not rule that any provision of the Separation Agreement is invalid or unenforceable and may not modify, limit, suspend or reform any provision. *Id.* § 8.2(e).  And it purports to bar Chemours from challenging DuPont's unilateral

-29-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Case 1:19-cv-01911-CFC    Document 78-3    Filed 06/03/22    Page 33 of 100 PageID #:
    Case 1:19-cv-01911-CFC    Document 42-5 Filed 04/06/21    Page 32 of 68 PageID #: 1559
5134

allocation of liability by schedule, through arbitration or otherwise. *Id.*

§ 1.1(19)(ii).

59.     Chemours objected to this arbitration scheme, but DuPont, as usual, unilaterally rejected the objection and crammed the provision down anyway. DuPont even rejected Chemours's request that, if DuPont insisted on an arbitration provision, it should allow for arbitration in Delaware. These provisions were not the product of consent, much less negotiation.

60.     Instead, the purpose of these crammed-down provisions was to stack the deck against any post-spin challenge by Chemours to what DuPont was imposing. By DuPont's unilateral dictate, though it was invoking Delaware law as the basis and cover for the spin-off, Chemours would not be able to bring any of the resulting Delaware law issues to this Court. Instead, DuPont decreed that Chemours could go only to a private, virtually secret arbitration in New York, in which the scope of arbitral review would be limited, in which the available remedies would be strictly confined in ways that would not confine this Court, in which DuPont would be deemed presumptively right on key points, and after which Chemours would be on the hook for DuPont's costs if it lost (as DuPont tried to pre-ordain).

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## III.    DuPont consummates the spin-off and seeks to wash its hands of its environmental liabilities.

61.    On June 5, 2015, DuPont's board approved the spin-off, determining on the basis of Houlihan Lokey's opinion "that it [was] appropriate, desirable, and in the best interests of DuPont and its stockholders" to conduct the transaction, including the "assignment of . . . liabilities" to Chemours.

62.    In December 2015, DuPont agreed to merge with Dow and stated that it would proceed with a reorganization of the combined business lines approximately along the lines that DuPont had resisted in the Trian proxy fight.

63.    At the conclusion of this reorganization, which DuPont has targeted for June 1, 2019, the combined DowDuPont entity will have separated into three independent companies:

> ➢ Dow Inc., which was spun off on April 1, 2019, and contains DowDuPont's materials sciences business, along with all financial assets and liabilities of historical Dow not related to its agriculture, specialty products or materials science businesses;

> ➢ Corteva, which will be spun off on June 1, 2019 and will contain DowDuPont's agriculture and nutritional businesses, along with all of the outstanding common stock of the historical entity DuPont exclusive of its subsidiaries and 29% of all financial assets and liabilities of historical DuPont not related to the agriculture, specialty products or materials sciences businesses;

> ➢ DowDuPont, which will be the surviving entity, will be renamed DuPont de Nemours and will contain DowDuPont's specialty products business, along with the balance of the financial assets and liabilities of historical DuPont not assumed by Corteva.

-31-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

64.    Amidst this restructuring, DowDuPont has apparently apportioned the purported indemnification and related obligations DuPont imposed upon Chemours.  In a March 19, 2019 securities filing, DowDuPont disclosed that Corteva anticipated indemnification from Chemours of hundreds of millions of dollars.  Shortly after this disclosure, Chemours requested confirmation that the planned separations would not result in an increase in any obligations that Chemours may have under or in connection with the Separation Agreement or reduce the assets that would be available to satisfy any obligations owed to Chemours.  On May 3, 2019, DowDuPont responded with certain information about the transaction and the identities of the companies that would claim the benefit of DuPont's purported rights under the Indemnification Provisions. DowDuPont's letter did not address many of the confirmations Chemours sought, including about reduction of assets.

## IV.    The Spin-off's Effect on Chemours

### A.    Chemours takes immediate action post-spin to avoid financial disaster.

65.    Things did not go as well for Chemours in the aftermath of the spin-off.  Chemours's stock price — originally pegged by DuPont at $21 per share — collapsed to $11.48 within a month and to $3.16 per share within six months, an

-32-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

85% decline.  Shortly after the spin, Chemours announced it was cutting its future dividends to almost zero.

66.    Chemours's quick suspension of future dividends underscored the dire financial situation DuPont created for it.  Before the spin-off, DuPont promised that Chemours would maintain a substantial dividend such that the pre-spin overall DuPont dividend would be sustained following the spin by combined dividends from the two companies.  In fact, as noted above, before the spin (when Chemours remained a DuPont subsidiary), DuPont actually declared Chemours's initial post-spin quarterly dividend.  But upon becoming independent, Chemours recognized that the dividend was not sustainable, even assuming the maximum liability numbers were respected.

67.    Despite even that step, Chemours was running short of liquidity within months of the spin-off.  Chemours had to take drastic measures, including laying off 1,000 employees (many in Delaware), shuttering plants or production lines in Delaware and Tennessee, selling off business lines and undertaking two corporate restructurings and multiple amendments to its credit agreements.

68.    In November 2015, Chemours announced that it would sell to Dow its aniline facility in Beaumont, Texas for approximately $140 million in cash.  At the time the sale was announced, Dow was just weeks away from entering a merger

-33-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Case 1:19-cv-01911-CFC    Document 78-3    Filed 06/03/22    Page 37 of 100 PageID #:
Case 1:19-cv-01911-CFC    Document 42-1 Filed 04/06/21    Page 36 of 68 PageID #: 1563
5138

agreement with DuPont. The Beaumont sale thus effectively returned to DuPont

an asset that it had just spun off. Three months later, in February 2016, DuPont

advanced Chemours $190 million for goods and services to be provided to DuPont

through mid-2017.

**B.    The "maximum" liability numbers DuPont certified prove to be systematically and spectacularly wrong.**

69.    Chemours thus barely survived its outsized debt burden and lopsided

balance sheet even assuming the maximum liability numbers were correct. But

Chemours also began to face a growing threat from the historical liabilities that

DuPont thrust upon it. In short, the "maximum" liability numbers that DuPont

certified and that formed the basis for the DuPont board's approval of the spin

have proven regularly and radically wrong.

70.    Nonetheless, DuPont now insists that the maximum liability numbers

are of zero force and effect, has demanded 100% indemnification above those

numbers and has taken the position that the Indemnification Provisions apply even

after the maximum at issue has been exceeded.

71.    As detailed below, the first time this dispute arose, DuPont eventually

yielded substantially, agreeing to pay $335 million towards the liability at issue

and to provide up to $125 million further to Chemours to defray follow-on

liability. However, as additional and potentially even larger excesses above other

-34-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"maximums" have more recently emerged, DuPont has re-circled its wagons and reverted to making indemnification claims that Chemours must pay for everything while DuPont escapes scot-free.

### 1.    PFOA

72.    Among the liabilities that DuPont foisted on Chemours was an Ohio multi-district litigation, in which 3,500 plaintiffs were seeking damages for cancer and other diseases allegedly caused by exposure to PFOA.  DuPont historically used PFOA in its manufacture of fluoropolymers and fluoroelastomers.  DuPont purchased PFOA from 3M and later made it for its own use.

73.    The 3,500 cases were governed by a prior DuPont settlement agreement, in which DuPont resolved a class action by, among other things, paying $70 million to fund health studies by an independent science panel to opine as to which diseases (if any) had a "probable link" to PFOA exposure.  Under the settlement, if the science panel found a "probable link" as to a disease, plaintiffs having that disease could then bring personal injury actions against DuPont and DuPont could not defend by contesting general causation.  The 3,500 cases all involved diseases as to which the science panel found a "probable link," including approximately 250 plaintiffs with kidney or testicular cancer.

-35-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Case 1:19-cv-01911-CFC    Document 78-3    Filed 06/03/22    Page 39 of 100 PageID #:
5140
Case 1:19-cv-01911-CFC    Document 42-2    Filed 04/06/21    Page 38 of 68 PageID #: 1565

74.    In connection with the spin-off, DuPont certified to Houlihan Lokey that the "High End (Maximum) Realistic Exposure" for these 3,500 cases was $128 million, *including* defense costs.  This number was a baseless concoction. First, DuPont was paying substantial sums annually on defense costs alone and the cases were going to go on for years.  Moreover, the notion that the 3,500 cases themselves would all be resolved for whatever was left of $128 million after defense costs was baseless.  These were serious cases — hundreds of cancer victims, others with other serious diseases, and DuPont was barred under the settlement agreement from raising a principal defense.  But DuPont did not make a serious attempt to evaluate the potential liability these cases represented when it certified the $128 million maximum.

75.    Following the spin-off, it became clear that the $128 million maximum would be exceeded — indeed, greatly so.  DuPont lost the first three individual bellwether cases to the tune of $19.7 million total.  Other bellwether cases were proceeding, and of course the nearly 3,500 other cases remained.  In February 2017, following protracted discussions, the 3,500 cases ultimately settled for $670.7 million not including defense costs:  well over *five times* the "maximum" that DuPont had certified just 19 months before.

-36-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

76.    As this was unfolding and it became clear that the total liability would far exceed the $128 million maximum, Chemours notified DuPont that any indemnification under the Separation Agreement was capped at $128 million.

77.    In a July 2016 response, DuPont claimed that the $128 million "High End (Maximum) Realistic Exposure" it certified to its board "represented only estimates based on the best judgment of management and its advisors given the available information at the time." According to DuPont, the $128 million maximum had no legal effect and no consequence whatever — although, of course, it (along with the other liability "maximums") had been the basis for the board's approval of the spin-off and the justification for the nearly $4 billion dividend imposed on Chemours. DuPont asserted that, under the Separation Agreement language it had unilaterally drafted, Chemours was "contractually obligated to indemnify DuPont for any and all Indemnifiable Losses . . . including without limitation any and all judgments." And DuPont purported to direct Chemours to "cease and desist from making misleading public statements" to the contrary.

78.    Chemours responded that DuPont had "specifically certified" the $128 million as Chemours's maximum exposure, and that this maximum figure "formed the basis for the solvency analysis that was presented to the DuPont Board and on

-37-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

which the Board relied in assessing and approving Chemours' capital structure and the spin."

79.     The parties ultimately settled the dispute as to PFOA (in a settlement applicable only to PFOA).  Notwithstanding DuPont's insistence that the liability maximums were of no effect and that Chemours owed the entirety of the liability, DuPont agreed to pay $335 million — 50% of the $671 million settlement of the 3,500 cases.  And DuPont also agreed to pay up to an additional $125 million toward the costs (including defense) of additional PFOA-related litigation.

### 2.     North Carolina environmental liabilities

80.     Unfortunately, it has since become clear that PFOA was not the only category of liability where DuPont's certified "maximum" has proven baseless.  To the contrary, the situation is similarly stark with respect to DuPont's Fayetteville Works operation in North Carolina.

81.     When it spun Chemours off in 2015, DuPont knew that the Fayetteville plant had been discharging perfluoroalkyl and polyfluoroalkyl substances ("PFAS") for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people.  In 2010, DuPont commissioned a "Blue Ribbon Panel" of company managers, scientists and engineers to identify solutions for this recognized issue.  This culminated in a

-38-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

range of options, including a $60 million investment in technology that the team believed would end the discharges and a recommended $20 million investment that the team believed would reduce the discharges by 70%. The team also rejected as an option that DuPont do nothing.

82. But the best solution, and even the Blue-Ribbon Panel's more modest recommended solution, was too much for DuPont. Instead, after installing a $2.3 million gas permeator system that effectively eliminated one wastestream responsible for certain fluorinated compounds, DuPont decided to terminate the rest of the project in late 2013. Coincidentally, this decision came right around the time DuPont conceived and announced its plan to spin off Chemours, to give Chemours the Fayetteville Works facility and to assign Chemours the related liabilities. Why bother spending money to fix the problem, DuPont apparently reasoned, when it could be conveniently passed on to Chemours.

83. Despite knowing all this, DuPont inexcusably certified a mere $2.09 million as the "High End (Maximum) Realistic Exposure" liability for Fayetteville Works. Exacerbating matters, DuPont included *nothing* in Chemours's projections for the technological improvements, and apparently did not even try to take into account the tort liability that could arise from the decades of emissions.

-39-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

84.    Beginning in September 2017, the State of North Carolina, public water authorities, well owners and a consolidated putative class of North Carolina residents, among others, filed suit against Chemours and/or DuPont.

85.    In October 2017, DuPont demanded that Chemours agree to indemnify it for all of this, without regard to the $2.09 million maximum. Chemours notified DuPont that the $2.09 million maximum capped its indemnification obligations and reserved all rights on the issue. Chemours also notified DuPont that it reserved the right to seek contribution or reimbursement from DuPont for amounts Chemours paid above that maximum.

86.    It is now indisputable that DuPont's $2.09 million maximum will not suffice against this litigation — not even close. In February 2019, after extensive negotiations with the State, Chemours entered a consent order with North Carolina to settle the State's claims on terms that were subject to public comment and approved as fair and appropriate by the Court. Among other things, the consent order requires Chemours to adopt the very-same abatement technology that DuPont previously declined to install and to undertake extensive remediation regarding the cumulative effects of DuPont's long-running historical emissions. The cost to Chemours will be in excess of $200 million — approximately *one hundred times* more than DuPont's certified "maximum" figure for the Fayetteville

-40-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Works site.  And the remaining lawsuits remain outstanding.  In fact, the putative class actions have been consolidated into one large purported class action, and a North Carolina federal court recently largely denied DuPont and Chemours's motion to dismiss it.

87.    Nevertheless, and despite the parties' prior resolution regarding PFOA, DuPont has hewed to its position that the $2.09 million maximum has no force or effect, that Chemours must pay for everything and that DuPont should pay nothing.

### 3.    New Jersey environmental liabilities

88.    There is, unfortunately, more.  Recently, the State of New Jersey has instituted litigation concerning environmental liabilities arising from DuPont's historical activities there.  In March 2019, New Jersey filed several lawsuits against DuPont and Chemours, warning that the costs of compensating the State for DuPont's legacy environmental liabilities across multiple sites in the State could be "staggeringly expensive," and seeking compensatory and punitive damages.  At the time of the spin-off, DuPont certified that the "maximum" Chemours could have to pay for total New Jersey environmental liabilities was $337 million, divided among different sites in the State.  In 2018, in connection with the DowDuPont spin-off, DuPont revised its liability estimate upward to

-41-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

approximately $620 million.  But New Jersey criticized even DuPont's upward-revised estimates, claiming it "implausible" that these amounts could represent "good-faith estimates of [DuPont's historical New Jersey] environmental obligations and liabilities."  Although Chemours is defending against New Jersey's claims and the matters are in their early stages, it is evident (again) that the "maximum" potential liability is not what DuPont certified it was.

89.    Moreover, and notably for purposes here, New Jersey also alleges that DuPont's efforts to dump its liabilities on Chemours were improper.  Instead of "working in good faith to address the contamination it released into New Jersey's environment," New Jersey states, "DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' businesses . . . and the associated liabilities to Chemours . . . and away from DuPont."

90.    And in so doing, New Jersey claims, DuPont violated not just statutory and common-law requirements regarding environmental discharges and clean-up, but the State's Industrial Site Recovery Act ("ISRA").  ISRA requires owners of specified industrial sites to, among other things, ensure that specified environmental impacts are remediated (or that adequate funding remains for remediation) before doing certain corporate or similar transactions.  The statute's

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

goal, according to New Jersey, "is to ensure that 'funding for the cleanup of industrial establishments is set aside at the time it is available from a transfer or closing' such that 'contaminated property is not abandoned to the State for cleanup'" (quoting N.J.S.A. 13:1K-7).

91.     New Jersey claims that, by spinning off Chemours on the basis of underestimated environmental liabilities without providing notice or meeting the ISRA requirements, DuPont violated ISRA and "thwarted [the State's] right pursuant to ISRA to obtain the financial assurance necessary to ensure that all hazardous substances and pollutants . . . will be remediated in accordance with ISRA and the [New Jersey Department of Environmental Protection's] regulations."

92.     Beyond the lawsuits brought by the State itself, a New Jersey municipality has brought suit against DuPont seeking over $1 billion to address alleged clean-up costs and the State's Department of Environmental Protection has issued directives to DuPont and Chemours (among others) regarding remediation and clean-up that threaten to impose very substantial additional costs.

93.     True to form, DuPont immediately demanded that Chemours agree to indemnify it fully, without regard to the liability maximums it certified for each respective New Jersey site.  Chemours notified DuPont that the applicable liability

-43-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

maximum caps its indemnification obligations and reserved all rights on the issue. Chemours also notified DuPont that it reserved the right to seek contribution or reimbursement from DuPont for amounts Chemours paid above that maximum.

### 4.  Benzene and PFAS

94.  Nor is that all.  As noted, DuPont imposed all its benzene-related liabilities on Chemours.  The "High End (Maximum) Realistic Exposure" DuPont certified for this category was $17 million, including defense costs.  But in 2017, when DuPont studied the availability of insurance for benzene liability, it commissioned a more comprehensive study by a consultant (not shared with Chemours until late 2018).  This time around, DuPont's advisors valued the potential maximum costs at over *$111 million*.  Put otherwise, when DuPont's management had an incentive to minimize the estimated liability so that they could extract as much money from Chemours as possible, the "maximum" was $17 million.  But when DuPont needed a real number for its own purposes, the maximum liability became 6-7 times higher.  Once again, DuPont has refused to agree that its certified $17 million maximum is of any consequence.

95.  Finally, there is the rapidly unfolding litigation regarding PFAS.  For context, "PFAS" refers to the entire suite of perfluoroalkyl and polyfluoroalkyl substances.  Although PFOA is one such substance, PFAS litigation involves other

-44-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

substances (including, in the case of DuPont and Chemours, GenX) and thus goes beyond the parties' prior settlement regarding PFOA.

96.    In certifying numbers to Houlihan Lokey, DuPont did not even purport to conduct an evaluation of PFAS liability (apart from PFOA).  It certified a catch-all "High End (Maximum) Realistic Exposure" of $194 million for all other "General Litigation . . . to Perpetuity," which Houlihan Lokey reflected as including everything not separately valued — from PFAS liability to commercial litigation.

97.    Wrong again.  PFAS litigation filings, including some targeting Chemours and/or DuPont, are proliferating.  Many PFAS claims (some on which DuPont and/or Chemours are defendants) have been consolidated in a multi-district litigation in federal court in South Carolina; others remain in state court elsewhere (including the New Jersey and North Carolina litigation described above in this complaint).

98.    Although Chemours is defending the benzene and PFAS claims and the matters are in their early stages, it is sadly clear again that the real "maximum" potential liabilities are not what DuPont certified they were.  But here as well, DuPont has refused to honor the maximums and demanded indemnification without regard to them.

-45-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

\*        \*        \*        \*

99.    As a result of the foregoing, the parties have a ripe dispute with respect to the North Carolina environmental liabilities, as to which the $2.09 million maximum has now been exceeded.  They also have a dispute about the New Jersey environmental liabilities, benzene and PFAS, as well as potentially other categories of liabilities.

100.    Chemours accordingly seeks relief from this Court declaring that Defendants are bound by the maximums DuPont certified.  Specifically, as detailed more fully below, Chemours seeks declarations that the maximums cap the Indemnification Provisions for these matters, and that Defendants thus are not entitled to indemnification for historical DuPont liabilities that exceed the maximums and may not preclude Chemours from seeking contribution for historical DuPont liabilities that exceed those maximums.  As used below, "liability maximums" refer to the "High End (Maximum) Realistic Exposure" certified by DuPont for the site, facility or compound at issue, along with the certification that there were no "facts known to [DuPont] which could give rise to . . . other contingent liabilities" with respect to that site, facility or compound.

101.    In the alternative, Chemours seeks return of the $3.91 billion dividend DuPont unilaterally extracted from it.  If the liability maximums DuPont certified

-46-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

do not cap the transferred historical liabilities and the Indemnification Provisions, then Chemours was insolvent at the time of the spin-off.  In that event, the dividend paid to DuPont was unlawful and also constituted unjust enrichment of DuPont.  Either way, it must be returned.

## CLAIMS FOR RELIEF

### COUNT ONE

### (Declaratory Judgment – Based on the Spin-off)

102.    Chemours repeats and incorporates by reference the allegations above.

103.    Under the Delaware General Corporation Law, common law and public policy, a parent company may conduct a spin-off transaction creating an independent company only if, among other things, the parent's board of directors both determines that the spin-off is appropriate and complies with all legal requirements and the new company will be solvent as of the time of the spin-off.

104.    DuPont predicated its board's determination that the spin-off of Chemours was appropriate and legal, and that Chemours was solvent as of the time of the spin-off, on the Houlihan Lokey opinion.  The Houlihan Lokey opinion, in turn, was expressly predicated on the liability maximums certified by DuPont.

105.    The liability maximums were not the product of a reasonable inquiry into or a reasonable evaluation by DuPont of the liabilities transferred to

-47-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Chemours. To the contrary, DuPont's management made an unreasonable inquiry, designed to understate or predictably causing understatement of the maximum liabilities. DuPont had knowledge of, or a reasonable inquiry would have turned up, facts indicating that the maximum potential liabilities were significantly higher than the certified maximums.

106. If DuPont had disclosed the true maximum potential liabilities and its current position that Chemours would have unlimited responsibility for them to Houlihan Lokey and/or to the DuPont board, the solvency opinion could not have been given, the DuPont board would have reached (and been required to have reached) a different conclusion about the appropriateness of the spin-off, and/or terms of the spin-off would have been changed in Chemours's favor.

107. If Chemours had unlimited responsibility for the true potential maximum liabilities, it would have been insolvent as of the time of the spin-off.

108. Since DuPont predicated its board's approval of the spin-off as appropriate and legal, and Chemours's solvency, on the liability maximums it certified, those maximums now must be given effect. The Separation Agreement should not be enforceable or interpreted in a way that would have rendered the spin-off contrary to Delaware law or public policy.

-48-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

109.  Chemours seeks a declaration that the Indemnification Provisions are not enforceable by Defendants (and thus should be suspended or modified) or do not apply in excess of the already-exceeded $2.09 million liability maximum for Fayetteville Works, such that Defendants may not obtain indemnification from Chemours as to Fayetteville-related liability and Chemours may seek contribution, indemnification or other reimbursement from Defendants for amounts Chemours has paid or pays above that maximum for Fayetteville-related liability.  Chemours also seeks similar declarations as to the liability maximums for the New Jersey sites, benzene and PFAS to the extent they are exceeded.

110.  The existing controversy regarding the enforceability and interpretation of the Separation Agreement is substantial, justiciable and of sufficient immediacy to warrant the issuance of a declaratory judgment.  The judgment will terminate the controversy and remove an uncertainty regarding the enforceability and interpretation of the Separation Agreement.  Chemours has no adequate remedy at law.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## COUNT TWO

### (Declaratory Judgment – Based on the Dividend)

111.  Chemours repeats and incorporates by reference the allegations above.

112.  In May 2015, Chemours was a wholly owned subsidiary of DuPont. At that time, as part of the spin-off, DuPont caused Chemours to pay a $3.91 billion dividend by Chemours directly to and for the benefit of DuPont.

113.  The legality of this dividend to DuPont was conditioned on the Houlihan Lokey solvency opinion.  The Houlihan Lokey opinion, in turn, was expressly predicated on the liability maximums certified by DuPont.

114.  The liability maximums were not the product of a reasonable inquiry into or a reasonable evaluation by DuPont of the liabilities transferred to Chemours.  To the contrary, DuPont's management made an unreasonable inquiry, designed to understate or predictably causing understatement of the maximum liabilities.  DuPont had knowledge of, or a reasonable inquiry would have turned up, facts indicating that the maximum potential liabilities were significantly higher than the certified maximums.

115.  If DuPont had disclosed the true maximum potential liabilities and its current position that Chemours would have unlimited responsibility for them, it and Houlihan Lokey would have arrived at a valuation of Chemours's total

-50-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Case 1:19-cv-01911-CFC    Document 78-3    Filed 06/03/22    Page 54 of 100 PageID #:
5155
Case 1:19-cv-01911-CFC    Document 42-1  Filed 04/06/21    Page 53 of 68 PageID #: 1580

liabilities that rendered the $3.91 billion dividend unlawful under 8 *Del. C.* §§ 170, 173, 174.  The Indemnification Provisions should be deemed unenforceable or interpreted so as to avoid this result.

116.   Accordingly, Chemours seeks a declaration that the Indemnification Provisions are not enforceable by Defendants (and thus should be suspended or modified) or do not apply in excess of the already-exceeded $2.09 million liability maximum for Fayetteville Works, such that Defendants may not obtain indemnification from Chemours as to Fayetteville-related liability and Chemours may seek contribution, indemnification or other reimbursement from Defendants for amounts Chemours has paid or pays above that maximum for Fayetteville-related liability.  Chemours also seeks similar declarations as to the liability maximums for the New Jersey sites, benzene and PFAS to the extent they are exceeded.

117.   The existing controversy regarding the enforceability and interpretation of the Separation Agreement is substantial, justiciable and of sufficient immediacy to warrant the issuance of a declaratory judgment.  The judgment will terminate the controversy and remove an uncertainty regarding the enforceability and interpretation of the Separation Agreement.  Chemours has no adequate remedy at law.

-51-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## COUNT THREE

### (Declaratory Judgment — Based on Public Policy)

118.    Chemours repeats and incorporates by reference the allegations above.

119.    Under Delaware law and public policy, indemnification provisions are not enforceable or interpreted in a way that would produce inequity.

120.    The terms of DuPont's spin-off of Chemours, including the $3.91 billion dividend payment to DuPont, were predicated on the Houlihan Lokey opinion.  The Houlihan Lokey opinion, in turn, was expressly predicated on the liability maximums certified by DuPont.

121.    The liability maximums were not the product of a reasonable inquiry into or a reasonable evaluation by DuPont of the liabilities transferred to Chemours.  To the contrary, DuPont's management made an unreasonable inquiry, designed to understate or predictably causing understatement of the maximum liabilities.  DuPont had knowledge of, or a reasonable inquiry would have turned up, facts indicating that the maximum potential liabilities were significantly higher than the certified maximums.

122.    If DuPont had disclosed the true maximum potential liabilities and its current position that Chemours would have unlimited responsibility for them to

-52-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Houlihan Lokey and/or to the DuPont board, the terms of the spin-off would have been changed (and been legally required to have changed) in Chemours's favor.

123.   If Chemours had unlimited responsibility for the true potential maximum liabilities, it would have been insolvent as of the time of the spin-off.

124.   Accordingly, as a matter of Delaware law and public policy, the liability maximums DuPont certified must be given effect and the Indemnification Provisions should be deemed unenforceable or interpreted so as to avoid inequity. Chemours seeks a declaration that the Indemnification Provisions are not enforceable by Defendants (and thus should be suspended or modified) or do not apply in excess of the already-exceeded $2.09 million liability maximum for Fayetteville Works, such that Defendants may not obtain indemnification from Chemours as to Fayetteville-related liability and Chemours may seek contribution, indemnification or other reimbursement from Defendants for amounts Chemours has paid or pays above that maximum for Fayetteville-related liability.  Chemours also seeks similar declarations as to the liability maximums for the New Jersey sites, benzene and PFAS to the extent they are exceeded.

125.   The existing controversy regarding the enforceability and interpretation of the Separation Agreement is substantial, justiciable and of sufficient immediacy to warrant the issuance of a declaratory judgment.  The

-53-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

judgment will terminate the controversy and remove an uncertainty regarding the enforceability and interpretation of the Separation Agreement. Chemours has no adequate remedy at law.

## COUNT FOUR

### (Declaratory Judgment — Based on Unconscionability)

126.   Chemours repeats and incorporates by reference the allegations above.

127.   As alleged above, the Separation Agreement was the product of a one-sided process that lacked any of the hallmarks of arm's-length bargaining. DuPont unilaterally dictated the terms of the Separation Agreement and imposed them on Chemours. For these reasons, the process by which the Separation Agreement was prepared and executed was procedurally unconscionable.

128.   The procedural unconscionability of the Separation Agreement gave rise to substantive unconscionability. If Chemours has unlimited responsibility for the true potential maximum liabilities, the spin-off and Separation Agreement will have caused Chemours to pay amounts, take on debt, assume liabilities and be subject to Indemnification Provisions that shock the conscience due to their extreme imbalance towards DuPont's interests.

129.   Accordingly, and to remedy the unconscionability, Chemours seeks a declaration that the Indemnification Provisions are not enforceable by Defendants

-54-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

(and thus should be suspended or modified) or do not apply in excess of the already-exceeded $2.09 million liability maximum for Fayetteville Works, such that Defendants may not obtain indemnification from Chemours as to Fayetteville-related liability and Chemours may seek contribution, indemnification or other reimbursement from Defendants for amounts Chemours has paid or pays above that maximum for Fayetteville-related liability.  Chemours also seeks similar declarations as to the liability maximums for the New Jersey sites, benzene and PFAS to the extent they are exceeded.

130.   The existing controversy regarding the enforceability and interpretation of the Separation Agreement is substantial, justiciable and of sufficient immediacy to warrant the issuance of a declaratory judgment.  The judgment will terminate the controversy and remove an uncertainty regarding the enforceability and interpretation of the Separation Agreement.  Chemours has no adequate remedy at law.

## COUNT FIVE

### (Declaratory Judgment — Based on Section 10.20)

131.   Chemours repeats and incorporates by reference the allegations above.

132.   Section 10.20 of the Separation Agreement provides:  "Nothing in this Agreement is intended to confer to or impose upon any Party a duplicative right,

-55-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

entitlement, obligation or recovery with respect to any matter arising out of the same facts and circumstances (including with respect to the rights, entitlements, obligations and recoveries that may arise out of one or more of the following Sections: Section 6.2; Section 6.3; and Section 6.4)."

133.  The Separation Agreement conferred upon DuPont an entitlement to a $3.91 billion dividend from Chemours (consisting of a Debt-for-Debt Exchange and a Chemours Financing Cash Distribution, as defined in the Separation Agreement).  Separation Agreement § 2.2(d).

134.  The $3.91 billion dividend paid by Chemours was premised on and incorporated the liability maximums certified by DuPont.  That dividend was increased to the extent DuPont's certifications understated the maximum liability from those sources.

135.  If DuPont were to receive the benefit of the Indemnification Provisions above the liability maximums, it would receive a duplicative recovery arising out of the same facts and circumstances.

136.  Accordingly, Chemours seeks a declaration that, pursuant to Separation Agreement § 10.20, the Indemnification Provisions are not enforceable by Defendants (and thus should be suspended or modified) or do not apply in excess of the already-exceeded $2.09 million liability maximum for Fayetteville

-56-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Works, such that Defendants may not obtain indemnification from Chemours as to Fayetteville-related liability and Chemours may seek contribution, indemnification or other reimbursement from Defendants for amounts Chemours has paid or pays above that maximum for Fayetteville-related liability. Chemours also seeks similar declarations as to the liability maximums for the New Jersey sites, benzene and PFAS to the extent they are exceeded.

137. The existing controversy regarding the enforceability and interpretation of the Separation Agreement is substantial, justiciable and of sufficient immediacy to warrant the issuance of a declaratory judgment. The judgment will terminate the controversy and remove an uncertainty regarding the enforceability and interpretation of the Separation Agreement. Chemours has no adequate remedy at law.

## COUNT SIX

**(Declaratory Judgment — Based on Interpretation of Unilateral Contract)**

138. Chemours repeats and incorporates by reference the allegations above.

139. The Separation Agreement was predicated by DuPont and approved as "appropriate" by DuPont's board on the basis of the liability maximums that DuPont certified.

-57-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

140. As a matter of interpretation under Delaware law of an "agreement" that was unilaterally drafted by one "party" and crammed down on the other, the agreement should be read as incorporating those maximums as limits on DuPont's rights under the Indemnification Provisions.

141. This is particularly the case where DuPont elided a main legal constraint on its unilateral action — the Delaware law requirement that its board approve the Agreement as appropriate and legal, and that the Agreement not create an insolvent entity — on the basis of the certified liability maximums.

142. Accordingly, Chemours seeks a declaration that Defendants' rights under the Indemnification Provisions do not apply in excess of the already-exceeded $2.09 million liability maximum for Fayetteville Works, such that Defendants may not obtain indemnification from Chemours as to Fayetteville-related liability and Chemours may seek contribution, indemnification or other reimbursement from Defendants for amounts Chemours has paid or pays above that maximum for Fayetteville-related liability. Chemours also seeks similar declarations as to the liability maximums for the New Jersey sites, benzene and PFAS to the extent they are exceeded.

143. The existing controversy regarding the interpretation of the Separation Agreement is substantial, justiciable and of sufficient immediacy to warrant the

-58-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

issuance of a declaratory judgment.  The judgment will terminate the controversy and remove an uncertainty regarding the interpretation of the Separation Agreement.  Chemours has no adequate remedy at law.

## COUNT SEVEN

### (Unlawful Dividend (8 *Del. C.* §§ 170, 173 & 174))

144.   Chemours repeats and incorporates by reference the allegations above.

145.   In May 2015, Chemours was a wholly owned subsidiary of DuPont. At that time, Chemours's board consisted of DuPont employees Michael Heffernan, Nigel Pond and Steven Zelac.

146.   On or about May 12, 2015, as part of the spin-off, DuPont caused the Chemours board to approve and Chemours to pay a $3.91 billion dividend directly to and for the benefit of DuPont.

147.   The legality of this dividend to DuPont was conditioned on the Houlihan Lokey solvency opinion.  The Houlihan Lokey opinion, in turn, was expressly predicated on the liability maximums certified by DuPont.

148.   The liability maximums were not the product of a reasonable inquiry into or a reasonable evaluation by DuPont of the liabilities transferred to Chemours.  To the contrary, DuPont's management made an unreasonable inquiry, designed to understate or predictably causing understatement of the maximum

-59-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

liabilities. DuPont had knowledge of, or a reasonable inquiry would have turned up, facts indicating that the maximum potential liabilities were significantly higher than the certified maximums. For that reason, the Houlihan Lokey opinion was not reliable.

149. If DuPont had disclosed the true maximum potential liabilities and its current position that Chemours would have unlimited responsibility for them, it, Houlihan Lokey and/or the DuPont employees who comprised the Chemours board would have arrived at a valuation of Chemours's total liabilities that rendered the $3.91 billion dividend unlawful under 8 *Del. C.* §§ 170, 173, 174. In fact, if Chemours had unlimited responsibility for the true potential maximum liabilities, it would have been insolvent as of the time.

150. Accordingly, if this Court determines Defendants' current position that Chemours has unlimited responsibility for the true maximum potential liabilities is correct, then as an alternative to the declarations described above Chemours is entitled to the return of the $3.91 billion dividend.

-60-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Case 1:19-cv-01911-CFC    Document 78-3    Filed 06/03/22    Page 64 of 100 PageID #:
5165
Case 1:19-cv-01911-CFC    Document 42-1    Filed 04/06/21    Page 63 of 68 PageID #: 1590

## COUNT EIGHT

### (Unjust Enrichment)

151.    Chemours repeats and incorporates by reference the allegations above.

152.    In May 2015, Chemours was a wholly owned subsidiary of DuPont. At that time, Chemours's board consisted of DuPont employees Michael Heffernan, Nigel Pond and Steven Zelac.

153.    On or about May 12, 2015, as part of the spin-off, DuPont caused the Chemours board to approve and Chemours to pay a $3.91 billion dividend directly to and for the benefit of DuPont.

154.    The legality of this dividend to DuPont was conditioned on the Houlihan Lokey solvency opinion.  The Houlihan Lokey opinion, in turn, was expressly predicated on the liability maximums certified by DuPont.

155.    The liability maximums were not the product of a reasonable inquiry into or a reasonable evaluation of the liabilities transferred to Chemours.  To the contrary, DuPont's management made an unreasonable inquiry, designed to understate or predictably causing understatement of the maximum liabilities. DuPont had knowledge of, or a reasonable inquiry would have turned up, facts indicating that the maximum potential liabilities were significantly higher than the certified maximums.  For that reason, the Houlihan Lokey opinion was not reliable.

-61-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

156. If DuPont had disclosed the true maximum potential liabilities and its current position that Chemours would have unlimited responsibility for them, it, Houlihan Lokey and/or the DuPont employees who comprised the Chemours board would have arrived at a valuation of Chemours's total liabilities that would have required the reduction of the $3.91 billion dividend. In fact, if Chemours had unlimited responsibility for the true potential maximum liabilities, it would have been insolvent as of the time. Under such circumstances, the $3.91 billion dividend would not have been justified, would not have been approved by a board acting consistently with its duties, would have been unfair and inconsistent with ordinary practice and would have unjustly enriched DuPont and the other Defendants.

157. Accordingly, if this Court determines Defendants' current position that Chemours has unlimited responsibility for the true maximum potential liabilities is correct, then as an alternative to the declarations described above Chemours is entitled to the return of the $3.91 billion dividend to cure the unjust enrichment. Chemours has no adequate remedy at law.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## PRAYER FOR RELIEF

**WHEREFORE**, Chemours requests that this Court enter a judgment:

A.     declaring that the Indemnification Provisions are not enforceable by Defendants (and thus should be suspended or modified) and do not apply in excess of the $2.09 million liability maximum for Fayetteville Works;

B.     declaring that, because Chemours has already paid over $2.09 million in connection with Fayetteville Works-related liability, Defendants may not obtain indemnification from Chemours as to Fayetteville Works-related liability;

C.     declaring that, notwithstanding the Indemnification Provisions, Chemours may seek contribution, indemnification or other reimbursement from Defendants for amounts Chemours has paid or pays above that maximum for Fayetteville Works-related liability;

D.     declaring that, if the liability maximums for the New Jersey sites and benzene (and any other liability category) are exceeded, the applicable liability maximum will limit Chemours's indemnification obligations to Defendants and Chemours may seek contribution, indemnification

-63-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

or other reimbursement from Defendants for amounts Chemours pays above that maximum;

E.      in the alternative, ordering the return of all or a portion of Chemours's $3.91 billion dividend to DuPont, in an amount to be determined at trial; and

F.      for such other, further and different relief as the Court may deem just and proper.

FRIEDLANDER & GORRIS P.A.

/s/ Joel Friedlander
Joel Friedlander (Bar No. 3163)
Jeffrey Gorris (Bar No. 5012)
Christopher Foulds (Bar No. 5169)
Christopher P. Quinn (Bar No. 5823)
1201 N. Market Street, Suite 2200
Wilmington, DE  19801
(302) 573-3500

OF COUNSEL:

WACHTELL, LIPTON, ROSEN
    & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

Counsel for Plaintiff The Chemours
Company

DATED:  May 13, 2019

-64-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| THE CHEMOURS COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DOWDUPONT INC.; | ) C.A. No. |
| CORTEVA, INC.; AND E. I. DU | ) |
| PONT DE NEMOURS AND | ) |
| COMPANY, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## VERIFICATION

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) ss. |
| COUNTY OF NEW CASTLE | ) |

I, Mark Newman, being duly sworn, depose and say as follows:

1.      I have reviewed the foregoing Verified Complaint (the "Complaint").

2.      I am Senior Vice President and Chief Financial Officer of The Chemours Company, the plaintiff in the above-captioned action, and am authorized to make this verification on its behalf.

3.      The factual statements in the Complaint insofar as they relate to my acts and deeds are true and correct to the best of my knowledge, information, and

Case 1:19-cv-01911-CFC    Document 78-3    Filed 06/03/22    Page 69 of 100 PageID #:
5170
Case 1:19-cv-01911-CFC    Document 42-1    Filed 04/06/21    Page 68 of 68 PageID #: 1595

belief, and insofar as they relate to the acts and deeds of any other person are

believed by me to be true and correct.

_____
Mark Newman


SWORN AND SUBSCRIBED before me

this __13__ day of May, 2019.



Notary Public

My Commission Expires: __Feb. 28, 2021__

# EXHIBIT 12

**Testimony of Paul Kirsch**
The Chemours Company
President, Fluoroproducts
Before the U.S. House of Representatives
Committee on Oversight and Reform
Subcommittee on Environment

September 10, 2019

### *Introduction and Opening Remarks*

Thank you, Chairman Rouda, Ranking Member Comer, and members of the Subcommittee, for inviting me to testify today on behalf of The Chemours Company on issues related to perfluoroalkyl and polyfluoroalkyl substances (PFAS). My name is Paul Kirsch, and I am the president of the fluoroproducts business at Chemours. I have served in this role since I joined Chemours in June 2016. I am a member of the Chemours Executive Leadership Team and the executive sponsor of Chemours' Corporate Responsibility Commitments.

I am also a father of four children who are the light of my life. Like you, and others who have come before this Subcommittee in the past, I have a great desire and passion to leave my children and grandchildren with a cleaner and better world. Our entire Chemours team takes very seriously our obligation to manage the PFAS compounds in our manufacturing process in a responsible manner and ensure they are safe for their intended use. We don't merely sympathize with public concern over the presence of PFAS compounds in drinking water and the broader environment; we share it. People have an understandable concern over drinking water quality, and Chemours, like all companies, must do its part. Chemours has outlined its environmental commitments – commitments that are concrete and actionable – and backed those commitments up with definitive actions that address the pathways through which PFAS from our sites reach

1


PENGAD 800-631-6989

EXHIBIT

12

Kirsch

the environment and drinking water. We owe that to our communities, to our neighbors, to our children, and future generations.

In this testimony, I will attempt to provide some insight about Chemours and information on:

- The fluorinated applications we manufacture;

- Our environmental commitments;

- Actions we have taken to address PFAS emissions at our sites and remediate historic environmental liabilities inherited from DuPont; and

- The non-polymer PFAS used during production at our sites.

### *About Chemours*

First, briefly, some background on Chemours, where we came from, and where we are going. Chemours became an independent company just four years ago, through the spin-off of the performance chemicals segment of DuPont. Since July 1, 2015, Chemours has been an independent, publicly-traded company; we are not a subsidiary of DuPont, as some have mistakenly thought. Since that time, our company faced some very serious challenges given how DuPont unilaterally designed the transaction, including a deliberate, disproportionate assignment of two-thirds of DuPont's environmental liability and 90 percent of DuPont's active litigation to Chemours - liability and litigation resulting from DuPont's operating practices at dozens of manufacturing sites throughout DuPont's very long history. DuPont executives structured the spin-off agreement so that Chemours was obligated to indemnify DuPont for all assigned environmental liabilities should any regulatory, public or private plaintiff seek to hold DuPont accountable.  Off-loading and abandoning its historic liability was not enough for DuPont, the

2

company also significantly disadvantaged Chemours financially through the strategic assignment of extensive debt to Chemours.  Among the debt thrust on Chemours was a $4 billion dividend that DuPont made Chemours pay to DuPont. These actions made the first 18 months an exceptionally harrowing time for the newly independent Chemours.

Even facing extensive challenges, from day one as an independent company, we committed ourselves to be a very different kind of chemistry company—one dedicated to taking a leadership role in environmental stewardship. We believe collaboration and transparency are critical to achieving this, and the remediation work that we have done, and continue to do, at the sites we inherited is done in partnership with local, state, and federal authorities and the communities in which we operate. That collaborative approach is emblematic of Chemours' bedrock commitment to environmental stewardship.

Chemours has taken a leadership role in supporting rigorous environmental safety standards, guidelines, and science-based regulatory oversight of both our processes and our products. In 2018, we announced ten ambitious Corporate Responsibility Commitment goals, including a 99% or greater reduction of air and water emissions of all persistent organic fluorinated compounds at all our sites globally.  We know of no other company that has made such a commitment.

While our company name may not be very well known, Chemours enables products that are critical to modern life. Our products address the challenges we all face today and provide solutions for the future. Our materials make aerospace and automobile travel safer and more environmentally friendly. Our applications are used in aerospace computers and processors, hydraulics, and fuel systems. We provide various components of renewable energy installations and materials that help lower energy consumption and foster environmental safety in the

3

chemical and power sectors. Our innovative automotive applications improve fuel efficiency and reduce emissions in automobiles. In the technology space, our ingredients are used in the cellphones and smart tablets we use every day, and in the newest advances in communication technologies like 5G. And in medical applications, our products reduce the risk of equipment failures, infections, and unnecessary medical procedures.  Catheters, saline bags, breathing tubes, some pharmaceuticals, and other critical medical necessities require PFAS for their creation.  For many of the applications, there are no readily available replacements.

Collectively, these PFAS-enabled technological and medical advancements have been helping to drive the U.S. economy for this last generation.  While Chemours has only existed as an independent company for four years, we operate with the mature understanding that economic progress and environmental protection are not contradictory; they must go together. Chemours is committed to working collaboratively and transparently with this Subcommittee, with federal and state regulators, and with the communities to understand the nature of the PFAS compounds we use, the environmental footprint of our manufacturing sites, and the actions we have taken since our creation to abate and remediate current and historic PFAS emissions from our manufacturing sites. There should be no mystery about what happens behind the fences of any manufacturing facility. We pledge to do our part to remove any perceived mystery about the current operations at our sites, and to provide you and the community with confidence that your voices are heard and questions addressed.

We at Chemours support the federal legislative efforts currently underway and their goals to develop a safe regulatory framework for PFAS compounds using a science-based approach.  Chemours provided input to the Senate Environment and Public Works Committee on the PFAS provisions in the Senate NDAA bill and we support the measures that resulted from

4

that process in the Senate bill as passed.  Chemours also supports EPA's process to determine whether legacy long-chain PFAS chemicals should be designated as hazardous substances under the Superfund law.  However, we understand Congress may move on this issue legislatively and we would welcome the opportunity to engage with Members should that be the case.

Circumventing the existing regulatory process for determining hazardous substances and wastes, for example, could threaten the ability of companies across multiple industries to continue to provide patients with life-saving medical necessities and industries with applications that are essential for safety. PFAS are a broad and diverse range of compounds that have a variety of physical and chemical properties, health and environmental profiles, uses, and benefits, for which a "one-size fits all" approach would not be appropriate.  Accordingly, Chemours supports focusing first on the highest priority substances, and then on other appropriate PFAS compounds on an expedited basis.  We are committed to being a transparent and collaborative partner through the remainder of the legislative process.

### *Chemours' Proactive Corporate Responsibility Commitments*

From its inception in 2015, Chemours has committed itself to be a chemistry company with a positive and responsible corporate culture.  Central to this commitment is a strong focus on the well-being of our employees, our communities, and the environment.  In the actions we have taken to reduce PFAS emissions into air and water and to fulfill remediation obligations for legacy areas that DuPont imposed upon Chemours, we have sought to demonstrate that we are prepared to meet the heightened demands placed on corporations in the 21st Century.

In the summer of 2016, during my first few months at Chemours, I spent time learning more about Chemours' fluoroproducts business, including its strengths and challenges, and

opportunities for further growth.  Through this process, I considered the strategic priorities for the fluoroproducts business, including that sustainability would be one of those priorities.  That decision was enthusiastically supported by our entire Chemours Executive Team and our Board of Directors who believe firmly in responsible growth – in doing well, by doing good.  That began the process of identifying the Corporate Responsibility Commitments that we believe distinguish Chemours from other companies.

In 2018, Chemours publicly announced ten ambitious Corporate Responsibility Commitment Goals, including actionable environmental goals that address PFAS emissions, global warming, and landfill intensity.  Those goals include:

- Chemours will reduce air and water process emissions of fluorinated organic chemicals by 99% or greater on a site-by-site basis.  While other companies practice very similar chemistry, Chemours remains the only company in the chemical manufacturing industry that has made this public commitment.

- Chemours will reduce our greenhouse gas emissions intensity by 60% on a journey toward eventually becoming carbon-positive by 2050.

- Chemours will reduce our landfill volume intensity by 70%.

As an important part of our effort, Chemours continues to pursue research into new, sustainable products with the hope of bringing more sustainable products as soon as they are available.  To date, we have added two innovative new products to our portfolio, a plant-based, renewably sourced, non-fluorinated durable water repellent, and our non-ozone depleting, low global warming potential refrigerant.

### *Action Chemours Has Taken to Address PFAS Emissions*

Chemours' fluoropolymer sites use a small subset of PFAS compounds in the production process for manufacturing fluoropolymer-based materials.  There are three primary U.S. based fluoropolymer sites, all three with a long manufacturing history predating the creation of Chemours. Chemours has already made a significant investment in emissions controls at these sites and continues to pursue additional opportunities to reduce our environmental footprint.  The investment in state-of-the-art emissions control technologies at our fluoropolymer site in Fayetteville, North Carolina, and related remediation activity will cost the company at least $200 million to implement.  Further, as part of our Corporate Responsibility Commitments, we are conducting comprehensive Operations Sustainability Reviews at every one of our manufacturing facilities worldwide to further understand site emissions and the potential for community impact and to devise any needed action plans to reduce environmental impact further.

Efforts at Chemours' three major U.S. fluoropolymer facilities further underscore our commitment to environmental stewardship and cooperation.  All three facilities have robust on-site and off-site remediation programs and are actively working to abate air and water process emissions.[1]  Some highlights include:

- At the Washington Works site located in Washington, West Virginia, Chemours utilizes an extensive system of groundwater pumping wells that prevent off-site groundwater migration.  Chemours uses a combination of air and water abatement technologies and recycling, to capture 99% of all GenX emissions at the site. Chemours is investing in reducing the remaining GenX emissions by another 50%.  By the end of 2020, Chemours plans to install a carbon treatment system to remove historical groundwater PFAS

---

[1] As requested by the Subcommittee, we have provided PFAS sampling data from Washington Works, Chambers Works, and Fayetteville Works, as well as from other Chemours sites.

7

contamination from one of its groundwater production wells.  With respect to the surrounding community, a robust public and private drinking water program has helped to assess contamination and provide treatment for years.  The site has installed and maintains water filtration on 11 public water systems and 120 private water wells.  It has also connected 70 residents to a filtered public water source.

- At Chambers Works, located in Deepwater, New Jersey, Chemours prevents migration of groundwater offsite through a pumping well system and sheet pile barrier.  In cooperation with the U.S. Environmental Protection Agency (EPA) Region II and the New Jersey Department of Environmental Protection, Chemours has conducted extensive off-site water testing for PFAS-related contamination. Since our creation in 2015, Chemours has sampled 440 private drinking water wells within a 7-mile radius of the site and provided water treatment to 150 properties.  The facility has also recently installed additional water and air abatement measures to its fluoropolymer processing facilities to reduce GenX emissions.

- At Fayetteville Works, Chemours is implementing a comprehensive abatement and remediation program.  This program was initially launched by Chemours in 2016 and is now further reflected in a Consent Order agreed to by Chemours, the North Carolina Department of Environmental Quality and Cape Fear River Watch, approved and entered by North Carolina Superior Court in Bladen County on February 25, 2019.  Among other things, the Consent Order sets rigorous standards for on-site groundwater remediation and requires the replacement of impacted off-site private drinking water supplies.  To substantially reduce the potential for deposition from air emissions to impact groundwater, Chemours has already installed a suite of air emissions control equipment,

8

and by the end of this year will install a state-of-the-art thermal oxidizer that will control 99.99% of PFAS emissions vented to it.

As of August 30, 2019, Chemours has tested 1101 private drinking water wells, and North Carolina has tested 69 additional wells. We have identified 205 residential wells that have tested above the North Carolina provisional health goal of 140 parts-per-trillion (ppt) for GenX.  In cooperation with North Carolina DEQ, Chemours has offered or will offer to connect these properties to public water, where that is feasible, or to provide granulated activated carbon (GAC) filtration systems.  To date, GAC systems have been installed at 51 of those properties, and Chemours continues to provide residents with bottled water for drinking and cooking until installation of the remaining systems occurs.

I want to emphasize that Chemours' management has taken a far more robust and comprehensive approach to environmental issues at Fayetteville Works than had historically been taken.  Before 2016, the site had taken steps, in compliance with TSCA, to abate 99% of GenX emissions from its Polymer Processing Aid manufacturing plant. However, in August 2016, shortly after I came to Chemours, I approved the formation of a project team to examine emissions at our fluoroproducts sites and identify opportunities for further abatement. The team brought forward two recommendations in early 2017. I launched a technical team to evaluate available technological options well before this matter garnered increased public visibility in the summer of 2017.  By March 2017, the Chemours team had identified two potential abatement options to pursue: a filtration process combined with granular activated carbon, or a thermal oxidizer. I, along with others within Chemours senior management, fully supported the investment to install

9

either of those technologies, and we were planning to include the necessary funding in our company's capital budget process.

When GenX became a public issue in June 2017, we were already taking steps to proactively address site emissions and moved quickly to try to address community concerns. Chemours immediately acknowledged that the Fayetteville facility was the source of the GenX found in the Cape Fear River.[2] Without waiting for a request, Chemours immediately began capturing part of Fayetteville Works' wastewater containing the discharges for off-site disposal. By November 2017, in response to State regulators' requests, Chemours began capturing all process wastewater from its Fayetteville operations for off-site disposal. Because of these actions, GenX levels in the Cape Fear River dropped significantly, and GenX levels at drinking water inlets along the river began testing well below North Carolina's provisional health goal of 140 ppt. To date, Chemours has already reduced GenX levels in the Cape Fear River by more than 95% and reduced air emissions of GenX by 92% from 2017 levels. We are on track to complete the installation of our $100 million emissions control technologies, which includes carbon filtration as well as a thermal oxidizer that uses high temperatures to break down fluorocarbon bonds and achieve our goal of a 99% reduction in PFAS emissions by the end of 2019.

In addition to proactively adopting a broad range of abatement and control measures at our facilities, Chemours has recently submitted proposals to NC DEQ for continuing to reduce PFAS loading to the river. While groundwater is a less substantial contributor to river loading,

---

[2] To be clear, the source of the material found in the River was not the GenX manufactured at Fayetteville Works, but rather materials produced as an unintended byproduct from other parts of the Fayetteville operations.

our proposals are representative of our comprehensive approach to addressing our environmental footprint.

Chemours has also sought to advance PFAS science and technology more generally beyond our labs and our manufacturing sites. We have invested millions of dollars in advancing analytical chemistry, including by developing new test methods and lab standards that allow, for the first time, the study and analysis of many PFAS compounds that were previously undetectable. In the spirit of collaboration and to advance science, we have independently shared these methods and standards with researchers from federal and state government agencies, academic institutions, and private laboratories to enhance their knowledge and detection capabilities. We likewise are working to develop new abatement and remediation technologies for PFAS.

### *Distinguishing between Current and Historic PFAS*

We understand that the Subcommittee is focused primarily on the PFAS compounds PFOS, PFOA and GenX, and their persistence in ground and drinking water.

Of these compounds, Chemours does not use PFOS or PFOA in any of its manufacturing processes. No Chemours plant site had ever used PFOS in its manufacturing processes, even when they belonged to DuPont, and all our sites had ceased using PFOA prior to being transferred to Chemours. The information we can provide to the Committee related to PFOA use before July 1, 2015, is predominantly information provided by DuPont or 3M. The information was supplied to Chemours by those parties for pending PFOA-related litigation.

Before Chemours' formation in 2015, several companies did use PFOA, including DuPont which used PFOA as a polymer processing aid and for a period manufactured PFOA.

11

Under the U.S. EPA's PFOA Stewardship Program[3], DuPont phased out its PFOA manufacturing operations well before its spin-off of Chemours in 2015.

As part of the shift away from PFOA under EPA's Stewardship Program, DuPont developed substances -- that came to be known as "GenX" -- as a commercial substitute for PFOA. Other fluoropolymer manufacturers that participated in the EPA Stewardship Program include Daikin, Asahi Glass (AGC), Arkema, 3M/Dyneon and Solvay Solexis. Given the broad range of product types that used PFOA, there are several technology alternatives that the industry is using, but in general, they are all utilizing similar short-chain chemical technology. GenX is one example of that. Another is ADONA, a polymerization processing aid that was commercialized by 3M, which is based on chemistry that is similar to GenX. Because the U.S. EPA's 2010/2015 PFOA Stewardship Program was only voluntary, PFOA is still being produced today in some parts of the world, including China, where PFOA production has increased significantly since the early 2000s and the use of PFOA in the production of fluoropolymers appears to continue for most Chinese fluoropolymer manufacturers.

GenX was designed by DuPont as a shorter-chain molecule that was expected to be rapidly eliminated from peoples' bodies and not degrade into the longer-chain PFOA if released into the environment. DuPont sought EPA approval for the manufacture and use of GenX under the Toxic Substances Control Act (TSCA). EPA and DuPont entered a Consent Order in 2009 permitting DuPont to manufacture and use GenX under conditions specified by EPA. Pursuant to this Consent Order, DuPont conducted extensive health and safety testing which indicated that GenX had a more favorable toxicological profile than PFOA, including rapid elimination from mammalian systems. We have shared these health and safety studies with the Subcommittee.

---

[3] https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program

12

Following the 2015 spin-off, Chemours has continued to manufacture GenX at the Fayetteville Works facility pursuant to and in compliance with the 2009 TSCA Consent Order. GenX is primarily used for its intended purpose as a polymerization processing aid to enable the reactants in a polymerization process to come together and build polymer chains or molecules. It is used in this capacity at Washington Works and also used at Chambers Works. GenX is neither sold or made available to any other entity in the U.S., nor the main ingredient in the final fluoropolymer product. After GenX is used as a polymerization processing aid, it is recycled and reused, or captured and disposed of responsibly, with only minute and declining levels of emissions. One of the GenX substances is also formed as an unintended byproduct or impurity from other processes at the Fayetteville Works facility in North Carolina and, to a lesser degree, the Chambers Works and Parlin facilities in New Jersey.[4] GenX is regulated in numerous ways beyond the 2009 TSCA Consent Order. Chemours' uses and discharges of GenX - at its Fayetteville Works, Washington Works, and Chambers Works facilities - are regulated by state environmental agencies through permits, as well as the Consent Order in North Carolina.

Additionally, in 2017, the State of North Carolina set non-binding health goals for GenX in drinking water. North Carolina initially set the goal at 71,000 parts per trillion, but soon after that revised the goal to only 140 ppt. EPA has also published a proposed Draft Toxicity Assessment for GenX, which is currently awaiting final publication in the Federal Register.[5]

In response to both North Carolina's and EPA's evaluations of the potential health impacts of GenX, Chemours provided extensive scientific information to North Carolina and EPA to enable both to conduct independent evaluations. Additionally, scientific research

---

[4] Although the TSCA Consent Order contained an exemption for such byproducts, Chemours has taken measures to address discharges of that substance, however it may have been created.

[5] EPA did not include a suggested drinking water goal, although it did calculate a key input in developing such a goal at a level four times higher than the equivalent level for PFOS and PFOA combined.

commissioned by Chemours has resulted in a recent peer-reviewed paper published in the Journal of Applied Toxicology which calculated a safe level for GenX in drinking water at 70,000 parts per trillion.[6]

While continuing to evaluate the scientific data on GenX, we at Chemours are taking significant actions to reduce human exposure to GenX, as outlined previously in this testimony, to levels well below those identified as a concern by regulators.

### *DuPont Unilaterally Crafted the Spin-off of Chemours*

We are confident that the concrete actions we have taken and continue to take are addressing the current emissions at our operational sites and position today's Chemours as an industry leader in emissions control. There is a significant and undeniable improvement from the Chemours that existed when it was spun-off from DuPont in 2015. As noted earlier, while it was assigned only 20% of the income-generating businesses, the spin-off company was forced to absorb two-thirds of DuPont's environmental liabilities, over 90% of DuPont's active litigation and it was required to indemnify DuPont for actions and decisions DuPont took long before Chemours came into existence. Chemours leadership had no say or decision-making authority in the spin-off arrangements.

Moreover, DuPont stripped Chemours of financial resources to address the true scale of these liabilities: one of DuPont's last acts as a corporate parent was to extract a $4 billion "midnight" dividend from Chemours. DuPont justified this by certifying "maximum" numbers for each of the liabilities it had assigned Chemours. Those "maximums" have turned out to be wrong—and wrong by hundreds of millions of dollars—but DuPont has claimed since the

---

[6] Thompson CM, Fitch SE, Ring C, Rish W, Cullen JM, Haws LC. Development of an oral reference dose for the perfluorinated compound GenX. *J Appl Toxicol*. 2019;1–16. https://doi.org/10.1002/jat.3812.

14

transaction that Chemours has no recourse.  These are all components of a separation agreement drafted unilaterally by DuPont and their legal counsel – an agreement into which the Chemours leadership had no voice, no input, and no independent legal representation – to which Chemours has been bound since our separation from DuPont on July 1, 2015.

Since those early days after the transaction, Chemours leadership has worked hard to put the company on solid financial footing.  Thanks to the tremendous efforts of our employees, and difficult choices we were forced to make because of the financial condition DuPont left us in at the time of the spin-off, our company is on more solid financial footing today. While we continue to face environmental liabilities that DuPont created before 2015, throughout its long history that predated the formation of Chemours, our people remained steadfastly committed to doing the right thing. They remain committed to addressing the environmental shortcomings Chemours inherited and committed to being a different kind of chemistry company regarding how we operate.

In May 2019, Chemours filed a lawsuit against DuPont in the Delaware Court of Chancery challenging this attempt by DuPont to offload its legacy liabilities to Chemours. We have provided a copy of Chemours's Amended Complaint in this lawsuit to the Subcommittee, and the litigation currently remains pending.

The Amended Complaint sets out in detail how it took over 18 months following the July 2015 transaction for Chemours to achieve the financial stability necessary to begin substantially addressing the environmental issues we inherited.  This enormous effort required Chemours to close multiple facilities, sell several lines of business, lay off 1,000 employees, restructure our debt, and negotiate a financial resolution with DuPont through which it contributed hundreds of

15

millions of dollars to settle then-pending PFOA claims. DuPont initially refused to provide any contribution to Chemours to settle the PFOA claims.

The Amended Complaint also explains that DuPont purported to justify the unfair and lop-sided terms of the spin-off transaction it engineered by certifying "high end (maximum) realistic exposures" for the accumulated environmental liabilities that it transferred to Chemours and forced Chemours to accept. Recent events have demonstrated that DuPont's certified "maximum" exposures are systematically and spectacularly wrong. One example of many is the environmental issues faced at the Fayetteville Works site in North Carolina, an issue DuPont certified as a $2.09 million liability but for which Chemours is incurring more than $200 million in actual costs.

### *Conclusion and Closing Remarks*

In our short four-year life, we at Chemours have faced head-on the fundamental challenge presented by our desire to supply the valuable fluoropolymers required by our customers while necessarily using chemistries that have become the source of public concern. Chemours made an unwavering commitment to manufacturing these valuable fluoropolymer materials in a manner that is protective of public health and the environment, even as we address the many legacy remediation issues imposed on us by DuPont. We have done this, and are committed to continuing to do this, through the development of cutting-edge science and technology, and by going beyond what the law requires.

As I stated at the start of this testimony, our entire Chemours team takes very seriously our obligation to manage the PFAS compounds in our manufacturing process in a responsible manner and ensure they are safe for their intended use. As I stated above, we don't merely

16

sympathize with public concern over the presence of PFAS compounds in drinking water and the broader environment; we share it.  Thank you for the opportunity to be here today, and for the consideration of our views.

We look forward to working with you and others transparently and collaboratively to develop a safe, science-based regulatory framework for PFAS compounds.  I welcome the opportunity to discuss these issues with you and look forward to your questions.

# EXHIBIT 13

# FORM 4

[X] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

OMB APPROVAL

OMB Number:   3235- 0287
Expires:  February 28, 2011
Estimated average burden
hours per response...  0.5

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person *<br><br>**Kirsch Paul**<br><br>(Last)   (First)   (Middle)<br><br>**C/O THE CHEMOURS COMPANY, 1007 MARKET STREET**<br>(Street)<br><br>**WILMINGTON, DE 19899**<br><br>(City)   (State)   (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br><br>**Chemours Co [CC]**<br><br>3. Date of Earliest Transaction (MM/DD/YYYY)<br><br>**02/25/2019**<br><br>4. If Amendment, Date Original Filed (MM/DD/YYYY) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)<br><br>___ Director        ___ 10% Owner<br>_X_ Officer (give title below)    ___ Other (specify below)<br>**President - Fluoroproducts**<br><br>6. Individual or Joint/Group Filing  (Check Applicable Line)<br><br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

## Table I - Non- Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction (s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/25/2019 | | S | | 10,000 | D | $ 38.66 (1) | 73,562 (2) | D | |

## Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security | | 8. Price of Derivative Security | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) | 11. Nature of Indirect Beneficial Ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount / Number Shares | | | | |

**Explanation of Responses:**

(1)     Price reported is a weighted average. Shares were sold in multiple transactions at prices ranging from $38.65 to $38.69.

(2)     Includes unvested restricted stock units and dividend equivalent units.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **Kirsch Paul**<br>**C/O THE CHEMOURS COMPANY**<br>**1007 MARKET STREET**<br>**WILMINGTON, DE 19899** | | | **President - Fluoroproducts** | |

**Signatures**

/s/ Brian Morrissey, attorney- in- fact for Paul Kirsch          02/27/2019

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:      File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.



EXHIBIT
13
Kirsch

PENGAD 800-631-6989

# FORM 4

[X] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL
OMB Number: 3235- 0287
Expires: February 28, 2011
Estimated average burden hours per response... 0.5

| 1. Name and Address of Reporting Person *<br><br>**Kirsch Paul**<br>(Last)  (First)  (Middle)<br><br>**C/O THE CHEMOURS COMPANY, 1007 MARKET STREET**<br>(Street)<br><br>**WILMINGTON, DE 19899**<br>(City)  (State)  (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br><br>**Chemours Co [CC]**<br><br>3. Date of Earliest Transaction (MM/DD/YYYY)<br><br>**02/20/2018**<br><br>4. If Amendment, Date Original Filed (MM/DD/YYYY) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)<br><br>____ Director  ____ 10% Owner<br>_X__ Officer (give title below)  ____ Other (specify below)<br>**President, Fluoroproducts**<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br><br>_X_ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

**Table I - Non- Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction (s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 02/20/2018 | | M | | 13,770 (1) | A | $ 8.8 | 63,093 | D | |
| Common Stock | 02/20/2018 | | S | | 13,770 | D | $ 50.01 (2) | 49,323 (1) | D | |

**Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security | | 8. Price of Derivative Security | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) | 11. Nature of Indirect Beneficial Ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount / Number Shares | | | | |
| Common Stock | $ 8.8 | 02/20/2018 | | M | | | 13,770 | (3) | 05/31/2026 | Common Stock | 13,770 | $ 0 | 27,538 | D | |

**Explanation of Responses:**

(1)  Includes unvested restricted stock units and dividend equivalent units.

(2)  Price reported is a weighted average. Shares were sold in multiple transactions at prices ranging from $50.00 to $50.09.

(3)  The options vest ratably in three equal installments, one- third on each of the first three anniversaries of the date of grant.

| Reporting Owners | | | | |
|---|---|---|---|---|
| Reporting Owner Name / Address | Relationships | | | |
| | Director | 10% Owner | Officer | Other |
| Kirsch Paul<br>C/O THE CHEMOURS COMPANY<br>1007 MARKET STREET<br>WILMINGTON, DE 19899 | | | President, Fluoroproducts | |

**Signatures**

| /s/ Brian Morrissey, attorney- in- fact for Paul Kirsch | 02/22/2018 |
|---|---|

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*  If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*  Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:  File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# FORM 4

[X] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

OMB APPROVAL
OMB Number:  3235- 0287
Expires:  February 28, 2011
Estimated average burden hours per response...  0.5

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **Kirsch Paul** | **Chemours Co [CC]** | ____ Director _____ 10% Owner<br>_X__ Officer (give title below) ____ Other (specify below)<br>**President - Fluoroproducts** |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction  (MM/DD/YYYY) | |
| **C/O THE CHEMOURS COMPANY, 1007 MARKET STREET** | **06/01/2017** | |
| (Street) | 4. If Amendment, Date Original Filed  (MM/DD/YYYY) | 6. Individual or Joint/Group Filing  (Check Applicable Line) |
| **WILMINGTON, DE 19899** | | _X__ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

### Table I - Non- Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction (s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 06/01/2017 | | F | | 13,806 (1) | D | $ 41.51 | 68,359 (2) | D | |
| Common Stock | 06/05/2017 | | S | | 19,036 | D | $ 41.42 (3) | 49,323 (2) | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security | | 8. Price of Derivative Security | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) | 11. Nature of Indirect Beneficial Ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount / Number Shares | | | | |

**Explanation of Responses:**

(1)    Shares withheld for tax obligations on vested restricted stock units (RSUs) and dividend equivalent units (DEUs). No shares were sold.

(2)    Includes unvested RSUs and DEUs.

(3)    Price reported is a weighted average. Shares were sold in multiple transactions at prices ranging from $41.40 to $41.51.

| Reporting Owners | | | | | |
|---|---|---|---|---|---|
| Reporting Owner Name / Address | Relationships | | | | |
| | Director | 10% Owner | Officer | | Other |
| Kirsch Paul<br>C/O THE CHEMOURS COMPANY<br>1007 MARKET STREET<br>WILMINGTON, DE 19899 | | | **President - Fluoroproducts** | | |

**Signatures**

| /s/ Brian Morrissey, attorney- in- fact for Paul Kirsch | 06/05/2017 |
|---|---|

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:        File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# EXHIBIT 14



# Capstone™ Fluorosurfactant Additives for Fire Suppressant Products



## Capstone™ Products for Suppression of Class B Fires

The Chemours Company produces fluorosurfactants that are used as additives in fire suppressant products to reduce surface tension and improve the effectiveness in suppressing Class B fires.

These partially fluorinated, water soluble surfactants come in a variety of products to best suit individual applications.

- Capstone™ fluorosurfactant 1157
- Capstone™ fluorosurfactant 1157D
- Capstone™ fluorosurfactant 1183
- Capstone™ fluorosurfactant 1430

EXHIBIT
14
Kirsch
PENGAD 800-631-6989

- Capstone™ fluorosurfactant 1440
- Capstone™ fluorosurfactant 1460
- Capstone™ fluorosurfactant 1470
- Capstone™ fluorosurfactant 1475

+

## Contact Us With Your Questions

Connect with experts to learn more about Capstone™ products and to find the right solution for your needs.

CONTACT US   >(/EN/BRANDS-AND-PRODUCTS/CAPSTONE/SUPPORT/CONTACT)

## Safety Data Sheets

For specific SDS, please contact us.

REQUEST SDS   >(/EN/BRANDS-AND-PRODUCTS/CAPSTONE/SUPPORT/CONTACT)

## Related Items

### Capstone™ Fire Suppressant Applications

Capstone™ fluorosurfactants are effective at enhancing fire suppressants.

→ (/en/brands-and-products/capstone/applications/fire-suppression-applications)

### Capstone™ Fluorosurfactants Applications

Capstone™ fluorosurfactants are used in paints, waxes, inks, and more.

→ (/en/brands-and-products/capstone/applications/fluorosurfactant-applications)

### Ca Co

Cap and

→ pro

# EXHIBIT 15

EXHIBIT

15

Kirsch

PENGAD 800-631-6989

View all Press Releases >

# The Chemours Company Takes Significant Action to Address Emissions in North Carolina

May 09, 2018

*Chemours Creating a Model for the Future*

WILMINGTON, DE, May 9, 2018 – The Chemours Company (Chemours) (NYSE: CC), a global chemistry company with leading market positions in titanium technologies, fluoroproducts and chemical solutions, announced today a commitment to spend over $100 million at its Fayetteville Works plant site in Fayetteville, North Carolina to make it a best-in-class facility with respect to air and wastewater emission control and a model for other chemical manufacturing facilities around the globe.

The commitment includes investing in an array of state-of-the-art emission control technology, including a thermal oxidizer and a thermolysis reactor as well as other technology that in combination is expected to result in an overall 99% reduction of air and water emissions of C3 dimer acid (also referred to as GenX) and other PFAS compounds.

The development of this plan and these long-term solutions is the result of active consultation with external experts. We also have presented the elements of our plan to the North Carolina Department of Environmental Quality in presentations made over the past few months, including a detailed submission we made to DEQ on Friday, April 27, 2018. We look forward to getting further input from DEQ and to answering any questions they may have.

"We are committed to taking a leadership role with respect to environmental stewardship at our facilities and being a good neighbor," said Paul Kirsch, president of Chemours' fluoroproducts business unit. "This means going beyond our legal and regulatory requirements to meet local community expectations now and in the future."

This technology includes custom-designed, specialized equipment (such as the thermal oxidizer) that will take approximately 18-24 months to manufacture and install. The design-and-manufacturing process is currently underway. In the interim, Chemours is taking additional steps that will control and substantially reduce air emissions of C3 dimer acid almost immediately, with the majority being eliminated by year's end. These measures include the installation of carbon adsorption beds in May; upgrades to a waste gas scrubber from May through October; and the continuation of the enhanced Leak Detection and Repair (LDAR) program that began in January of this year.

These solutions are being undertaken on the heels of two programs Chemours has already implemented: the capture of all process wastewater generated by its Fayetteville Works operations for off-site disposal and a groundwater remediation program, which will include, upon approval by DEQ, free granular-activated-carbon treatment units to area residents whose wells have tested over 140 ppt for C3 dimer acid.

Dr. Damian Shea, Professor of Environmental Chemistry and Toxicology at North Carolina State University, recently completed a detailed analysis of the currently available data regarding GenX. Dr. Shea said, "Over a decade of scientific data has been collected regarding the safety profile of C3 dimer acid. These data, including numerous toxicology studies, provide compelling scientific evidence that the low levels of C3 dimer acid detected in the environment do not pose a risk to human health." A copy of Dr. Shea's paper can be found on our website below.

Fayetteville Works Plant Manager Brian Long said: "Chemours is committed to enhancing our operations in North Carolina and being a valued member of the local community. Since we first became aware of the community's concerns, we have focused our attention not on public debate, but on finding ways to virtually eliminate air and water emissions from our operations. We believe we now have the right answer for the long-term, which is why we have started outreach efforts with the surrounding community."

For more information about the actions Chemours is taking Fayetteville, we invite you to visit https://www.chemours.com/Fayetteville/ or contact https://www.chemours.com/contact-us/.

### #

## About The Chemours Company

The Chemours Company (NYSE: CC) helps create a colorful, capable and cleaner world through the power of chemistry. Chemours is a global leader in titanium technologies, fluoroproducts and chemical solutions, providing its customers with solutions in a wide range of

industries with market-defining products, application expertise and chemistry-based innovations. Chemours ingredients are found in plastics and coatings, refrigeration and air conditioning, mining and general industrial manufacturing. Our flagship products include prominent brands such as Teflon™, Ti-Pure™, Krytox™, Viton™, Opteon™, Freon™ and Nafion™. Chemours has approximately 7,000 employees and 26 manufacturing sites serving approximately 4,000 customers in North America, Latin America, Asia-Pacific and Europe.

Chemours is headquartered in Wilmington, Delaware and is listed on the NYSE under the symbol CC. For more information please visit chemours.com.

**CONTACT:**

**MEDIA**
*Alvenia Scarborough*
*Sr. Director, Brand Marketing and Corporate Communications*
*+1.302.773.4507*
*media@chemours.com*

**INVESTORS**
*Jonathan Lock*
*VP, Corporate Development & Investor Relations*
*+1.302.773.2263*
*investor@chemours.com*

View all Press Releases >

## EMAIL ALERTS

Receive the latest news and information via email.

**YOUR EMAIL ADDRESS**

Select Mailing Lists

☐ Press Releases ☐ Events

☐ SEC Filings ☐ End-of-Day Stock Quote

☐ Presentations ☐ Financials

SUBMIT

**CONTACT US**



**Jonathan Lock**
SVP & Chief Development Officer



**Kurt Bonner**
Manager, Investor Relations



**Lori Ursomarso**
Investor Relations Specialist

+1.302.773.2263

investor@chemours.com

**Unsubscribe & RSS**

# EXHIBIT 16



EXHIBIT
16
Kirsch
PENGAD 800-631-6989



ENVIRONMENT

# Chemours responds to DEQ air permit notice

**Adam Wagner GateHouse Media**

Published 7:32 p.m. ET May 8, 2018 | Updated 7:33 p.m. ET May 8, 2018

RALEIGH -- Chemours expects to spend more than $100 million to decrease GenX emissions at its Fayetteville Works plant by 99.99 percent, an assertion made in the company's response to the N.C. Department of Environmental Quality's (DEQ) April 6 notice of intent to modify the facility's air permit.

Centered around a $40 million thermal oxidizer that will be installed by April 30, 2020, at the latest, Chemours detailed a process that, it said, has been crafted during more than 35,000 man hours since last fall. The company also stated that by the end of the month it will have installed carbon adsorption systems at two facilities, with upgrades to a gas scrubber addressing process emissions at its Vinyl Ethers North facility.

"With respect to air emissions, (Chemours) is willing to commit to DEQ in a binding agreement that, once installed, this technology will ensure that overall air emissions of GenX compounds are reduced from current levels by 99 percent," Joel M. Gross, an attorney representing Chemours, wrote in the letter.

The company's letter is a response to DEQ's April 6 notice, which stated Chemours had to either prove it could keep air emissions from adding more than 10 parts per trillion to groundwater annually or face a prohibition of all GenX releases at the plant.

In a memo sent Tuesday, Megan Thorpe, DEQ's communications director, said staff is reviewing Chemours' letter and its attachments.

On April 6, DEQ Secretary Michael Regan stated, "Chemours must show to DEQ's satisfaction that they can operate without further contamination of groundwater or we will prohibit all GenX air emissions."

DEQ's Division of Air Quality (DAQ), Chemours contends, does not have the authority to modify the permit.

Gross wrote, "To the extent DAQ is suggesting that it will impose a zero-emission standard, DAQ knows such a standard would be impossible for Chemours to meet and DAQ has never imposed such a standard on anyone else or as to any other compound."

Chemours estimates 2,300 pounds of GenX emissions annually, dropping to about 1,390 by the end of May, dipping to about 640 by October and then reaching 27 pounds by the end of 2019 or early 2020, once the thermal oxidizer is installed.

"The investment will include installation of a thermal oxidizer (which is on order), as well as a theormolysis reactor and other technology that we understand no other chemical facility in the world has in combination," Gross wrote.

The company is also, Gross wrote, willing to agree to modification of the permit to include operations of the carbon adsorption systems beginning May 25, tests of those systems by July 31,  installation of the thermal oxidizer by April 30, 2020, and quarterly reports quantifying GenX emissions beginning in the third quarter of 2017, among other conditions.

"Chemours has already taken extensive and proactive measures, and has committed to take many more, to continue operating at Fayetteville Works," Gross wrote, "while substantially reducing emissions of GenX compounds and ensuring the protection of the public."

*Reporter Adam Wagner can be reached at 910-343-2389 or Adam.Wagner@GateHouseMedia.com.*